KATERI LYNNE DAHL, )
 )
 Plaintiff, )
 )
v. ) No.
 )
CHIEF KARL TURNER, ) **PLAINTIFF DEMANDS**
 *in his individual capacity only,* ) **JURY TRIAL**
 )
Serve: Johnson City Police Department )
 601 E. Main St. )
 Johnson City, Tennessee 37601 )
 )
 )
OFFICER JOHN DOES 1 THROUGH 3, )
 *in their individual capacities only,* )
 )
 and )
 )
CITY OF JOHNSON CITY, TENNESSEE, )
 )
Serve: 601 E. Main St. )
 Johnson City, Tennessee 37601 )
 )
 Defendants. )

## Complaint for Damages

## Civil Rights, 42 U.S.C. § 1983 & Supplemental State Law TPPA Claim

Plaintiff Kateri Lynn Dahl, by counsel Hugh A. Eastwood and Alexis I. Tahinci,

states as follows for her civil rights Complaint for damages under 42 U.S.C. § 1983, and

supplemental state law Tennessee Public Protection Act (TPPA) statutory claim:

## Introduction

1.        Dahl was a Special Assistant United States Attorney ("SAUSA") detailed to

coordinate between the U.S. Attorney for the Eastern District of Tennessee and the City of

Johnson City, Tennessee, to investigate and federally prosecute violent, firearm and/or drug-trafficking crimes pursuant to a multi-agency Memorandum of Understanding ("MOU"). Dahl gathered substantial evidence that a well-known individual (real name "████████" redacted with a contemporaneously-filed motion for leave to file under seal an unredacted copy of this Complaint pursuant to Fed. R. Civ. P. 5.2 and L.R. 26.2, and otherwise identified in this Complaint by the pseudonym "Robert Voe") had not just been dealing drugs, but was credibly accused of raping multiple women, and had possibly caused the death of one of his alleged victims. Dahl urged Johnson City and its Police Chief Karl Turner to investigate "Voe" further. But Chief Karl Turner intentionally or recklessly failed to investigate "Voe" despite Dahl's repeated urging, and despite his knowledge of Dahl's statements to third parties about her concerns about Johnson City's failures with respect to "Voe". After Dahl obtained a sealed federal indictment and arrest warrant for "Voe" from an U.S. Magistrate Judge on a relatively minor federal ammunition charge, Johnson City police officers unreasonably delayed execution of the warrant, and ultimately botched "Voe's" arrest by improperly notifying "Voe" of the existence of the sealed indictment, effectively letting him flee. (Today, more than a year later, "Voe" is still wanted on a felony and at-large, and the indictment remains under seal.)

2.      Dahl had always received excellent performance reviews, had her annual employment MOU previously renewed, and had been told recently by Chief Turner to expect another renewal. Despite this, after Dahl urged Johnson City to investigate "Voe" further, Chief Turner attempted to manufacture false complaints about Dahl's job performance. He used this as a pretext to terminate Dahl on short notice by refusing to extend the MOU on behalf of Johnson City. Moreover, he did so unilaterally without

consulting other agencies or offices with an interest in Dahl's continued employment. Chief Turner was effectively protecting "Voe" from federal prosecution because either (a) his department was corruptly connected to "Voe", or (b) out of fear of exposing his department's plain incompetence as to investigating and seizing "Voe". Accordingly, Dahl claims damages under § 1983 and the TPPA.

## Parties

3.    Plaintiff Kateri Lynne Dahl is a resident of Washington County, Tennessee. She is a former Special Assistant United States Attorney who practiced before this Court, who worked with the Johnson City Police Department to bring federal charges in violent, firearm, and drug trafficking cases pursuant to a Memorandum of Understanding, first executed as to Dahl holding that position in September 2019, for 12 months, and renewed in June 2020 for 12 months.

4.    Defendant Karl Turner currently and at all relevant times has been the Chief of Police for the City of Johnson City Police Department. At all relevant times, Chief Turner was a final policymaker for Johnson City as to the MOU, and was responsible for supervising Dahl. Dahl brings claims against Turner in his individual capacity only.

5.    Defendant Officers John Does 1 through 3 are Johnson City Police Officers. Dahl names them as "Doe" Defendants with the expectation that their identities will be ascertained after reasonable discovery.[1]

---

[1] Dahl concedes that the one-year Statute of Limitations set by Tennessee law may bar her from later amending her complaint to properly identify Officers John Doe 1 through 3 by name. *See, e.g.,* T.C.A. § 28-3-104; *Braswell v. Carothers,* 863 S.W.2d 722, 725 (Tenn. Ct. App. 1993). Identifying a Doe defendant by name does not toll the statute. *Grady v. Madison Cnty.,* No. 1:19-cv-01153-STA-tmp (W.D. Tenn. June 5, 2020), citing *Smith v. City of Akron,* 476 F. App'x 67, 69-70 (6th Cir. 2012) (discussing Fed. R. Civ. P. 15(c) and the Statute of Limitations in the context of amending a pleading to identify Doe defendants). Nevertheless, Officers John Doe 1 through 3 are necessary and sufficient parties to perfect her civil conspiracy count in this Complaint.

3

6.     Defendant City of Johnson City is a municipality that straddles the Tennessee counties of Washington, Sullivan, and Carter.  Johnson City operates as a home rule municipality and is governed by the City Manager-Commission form of government.

### Jurisdiction and Venue

7.     Dahl brings this civil rights action pursuant to 42 U.S.C. § 1983 and § 1988; and the First and Fourteenth Amendments to the United States Constitution.

8.     This Court has jurisdiction over Dahl's federal civil rights claims pursuant to 28 U.S.C. §§ 1331 and 1343.

9.     This Court has supplemental jurisdiction over Dahl's Tennessee state law TPPA statutory claim that forms part of the same case or controversy under 28 U.S.C. § 1367.

10.     Venue is proper in this Court under 28 U.S.C. § 1391 because all parties reside within the Northeastern Division of the Eastern District of Tennessee, and the relevant events occurred within Washington County, Tennessee.

### Color of State Law

11.     At all relevant times, all defendants acted under color of state law. Particularly, at all relevant times, all defendants acted under color of the laws, statutes, ordinances, regulations, policies, customs and usages of the State of Tennessee.

### Jury Demand

12.     Dahl demands a jury trial on her claims for damages.

### Facts

### Dahl's employment under the MOU

13.     Dahl is a graduate of the University of Memphis and the University of

Tennessee Law School. She is a member in good standing of the District of Columbia Bar. From September 9, 2019 to July 31, 2021, Dahl served as a Special Assistant United States Attorney ("SAUSA") in the U.S. Attorney's Office for the Eastern District of Tennessee and an Assistant District Attorney in Washington County pursuant to a multi-agency Memorandum of Understanding.

14.     The MOU contemplates that the SAUSA would assist Johnson City to identify investigations best prosecuted in federal district court with the goals of reducing firearms, drug trafficking, and violent crime. The MOU notes that sentences in federal court are non-parolable, and include more serious sanctions and minimum mandatory sentences than in state court. The MOU further notes that individuals who "are a danger to the community or ***are at a risk to flee the jurisdiction*** are routinely not granted bond in federal court, and therefore, will reduce the recidivism of those on bond committing additional crime." (*Ex.* 1 - 2019 MOU extension) (emphasis added).

15.     On May 20, 2019, Dahl had an interview for the existing SAUSA position under the MOU with Wayne Taylor, the Supervisory Assistant U.S. Attorney in the Eastern District of Tennessee; defendant Chief Turner; and Ken Baldwin, the District Attorney for the First Judicial District of Tennessee. Dahl was hired pursuant to an MOU dated to start July 1, 2019, and began working as a SAUSA on September 9, 2019 after completing her background check.

16.     Dahl's employment structure under the MOU was somewhat unusual. Johnson City funded her job by giving the funds to Washington County, who paid Dahl on behalf of the District Attorney's Office with the City's funds using IRS Form 1099. Under the MOU, Dahl was to work closely with the Police Chief of Johnson City and his officers,

but was also under the supervision of the Supervisory AUSA.  The MOU provided that Dahl's standard of conduct was governed by the U.S. Attorney's Office and applicable federal law "including the Standards of Ethical Conduct for **_Employees_** of the Executive Branch, 5 C.F.R. § 2635 et seq.," and provided for "**_Employee_** Evaluation."  (*Ex.* 1 - 2019 MOU extension) (emphasis added).  Although the MOU also used the term "independent contractor" to describe Dahl's position, her position met all criteria for "employee" status, with the MOU serving as a multi-party contract of employment.

17.  The MOU described Dahl as both "Assistant District Attorney" (a state government title) and "Special Assistant U.S. Attorney" (a federal government title). The "Duties" section of the MOU stated that her first duty was "(1) She will work with the Johnson City Police Department to identify cases which are appropriate for federal prosecution."  The MOU also stated that "Dahl will be actively involved in furthering the training of the Johnson City Police Department."

18.  In practice, Dahl was told by Wayne Taylor, the Supervisory AUSA, that she answered both to Taylor and to Chief Turner, and to split her time between the U.S. Attorney's Office in Greeneville and the Johnson City Police Department.  She was further directed by Supervisory AUSA Taylor to make an effort to assist the Johnson City Police Department however she could with identifying investigations for federal prosecution.

19.  By contrast, in practice, she had little contact with the District Attorney's Office.  Although both the Mayor and City Manager of Johnson City signed the MOU requiring her to work with the Police Department, she never interacted with either as part of her job. In practice Chief Turner had final decision-making authority with respect to most of Dahl's job.

6

20.     The MOU was a 12-month agreement subject to annual extension by various agency signatories, including the U.S. Attorney, the District Attorney, each of the Mayor and City Manager of Johnson City, the Mayor of Washington County, as well as Dahl herself.

21.     The first MOU extension in June 2020 was characterized by Chief Turner as a "formality" that occurred without any objective process for evaluation of either Dahl or the MOU's goals.

22.     Dahl had generally excellent job performance reviews by the U.S. Attorney's Office, and the MOU was extended in June 2020. (*Ex.* 2 – 2020 MOU extension)

### The "Robert Voe" Investigation

23.     On November 13, 2020, Dahl was approached by Toma Sparks, a Johnson City Police Department detective within its Criminal Investigation Division, to review a potential case for a felon in possession of ammunition.  The request was unusual in that it was known to be an informal policy within the Greeneville U.S. Attorney's Office that ammunition possession charges are usually declined absent a compelling reason.  That is because an "Ammunition—Felon In Possession" ("ammo FIP") conviction or plea brings minimal prison time under the federal sentencing guidelines as compared to a "firearms FIP."

24.     In this case, the compelling reason for the charge was the suspect, "Robert Voe", was under investigation by Johnson City for attempted homicide after a woman, Jane Doe 1[2], had fallen from the window of "Voe's" fifth-floor condominium apartment on

---

[2] Although Dahl knows the names of the sexual assault victims identified in this pleading, she refers to them as Jane Does by number in order to protect their privacy as innocent

September 19, 2020. "Voe" was already a convicted felon who had previously been named as a suspect in two Johnson City police reports for sexual assault. Detective Sparks told Dahl about unproven, but pervasive, rumors within the local community that "Voe" engaged in cocaine trafficking.

25.     As part of the attempted homicide investigation, the Johnson City Police Department had previously executed a search warrant on "Voe's" condo. From "Voe's" safe, officers recovered not just ammunition but also a handwritten note from "Voe's" nightstand with the word "Raped" written atop a list of 23 women's first names in black ink.

26.     Based on the facts provided by Detective Sparks, Dahl agreed to pursue the case, and alerted both the Supervisory AUSA Taylor, her direct supervisor, and her informal office mentor AUSA Tom McCauley, who had previously held the same SAUSA position that she was now occupying.

27.     Dahl was concerned, however, that Johnson City officers had made errors in their investigation of "Voe" to date, particularly by failing to obtain a search warrant for "Voe's" garage nearby where he was known to socialize, show off his sports cars, and keep some of his belongings. She shared these concerns with Taylor, who suggested that he could set up a meeting with the Tennessee Bureau of Investigation to provide additional help.

28.     Dahl stated to Detective Sparks that she would indict "Voe" on the ammunition charge, but that she wanted to build a broader case against "Voe" with more serious charges (a) given the minimal prison time for an "ammo FIP" conviction or plea,

---

third parties. This is a compelling reason for non-disclosure in a judicial record. *See Shane Grp., Inc. v. Blue Cross Blue Shield of Mich.,* 825 F.3d 299, 305, 308 (6th Cir. 2016).

and (b) given the substantial evidence of sexual assault and attempted homicide warranting further investigation. She also notified Chief Turner and CID Captain Kevin Peters as to her goals for building a case against "Voe".

29. Rape, sexual assault and homicide prosecutions were outside the scope and goals of Dahl's employment under the MOU, in that her duties were described as covering to violent firearms and drug trafficking crimes pursuant to a Project Safe Neighborhoods program and the Targeted Community Crime Reduction Project (TCCRP) funded by the U.S. Department of Justice.

30. Further, sexual assaults and rape are normally prosecuted by State and local officials as state crimes. While there is a federal date rape statute, 21 U.S.C. § 841(b)(7)(A), it is rarely used as the elements are difficult to prove. The Mann Act, 18 U.S.C. § 2421 et seq., requires proving a perpetrator transported victim(s) across state lines.

31. Dahl requested a copy of the relevant files that Johnson City Police Department had on "Voe", but it took two weeks for Detective Sparks to send them to Dahl. During that two-week period, on November 24, 2020, another sexual assault victim, Jane Doe 2, came forward and filed a report with Johnson City Police Department alleging "Voe" had raped her.

32. At the beginning of December 2020, Taylor connected Dahl with a TBI agent, and a meeting was scheduled for December 8 to review the "Voe" case. The day before, however, it was canceled after the TBI agent contracted Covid-19.

33. That same day, Taylor called Dahl to state that Chief Turner had called him, angry that Dahl had arranged a TBI meeting without his knowledge or permission. Taylor had explained to Chief Turner, however, that it was Taylor and not Dahl who had arranged

9

the TBI meeting. Shortly afterward, Chief Turner called Dahl and asked her to come in and review the "Voe" case.

34.     Later the same day, December 8, 2020, Dahl met with Chief Turner and Captain Peters. Dahl expressed her alarm about the new evidence as to "Voe", and stated that an "ammo FIP" charge was not serious enough given the evidence. Dahl also expressed her concern that there were additional rape and sexual assault victims who might come forward.

35.     Chief Turner cast doubt on the handwritten "Raped" list recovered from "Voe's" condo, stating that the victims "are not for sure in that regard, regardless of what he wrote in the notebook." He further stated "Even the list, I don't know if that's girls he's raped or girls he's had consensual sex with and calls it whatever he calls it. All I know is there's a piece of paper with some first names on it." Chief Turner also cast doubts about Jane Doe 1, who had "fallen" from "Voe's" fifth-floor window. Captain Peters then cast doubts on the credibility of Jane Doe 2, who had recently come forward with her own allegations.

36.     Shortly after the December 8 meeting, Dahl contacted a victim, Jane Doe 3, from one of the existing Johnson City police reports on suspect "Voe". Detective Sparks had earlier characterized Jane Doe 3 to Dahl as uncooperative. Nevertheless, when Dahl called Jane Doe 3, she readily agreed to come into the Johnson City Police Department to give a more thorough statement.

37.     Taylor told Dahl that federal prosecutors normally are not supposed to contact sexual assault victims without a detective's involvement. Dahl believed Taylor had made this statement because investigation of sex crimes were outside the terms of

10

Dahl's responsibilities under the MOU, namely to focus on violent firearms and drug trafficking crimes. Dahl responded to Taylor that she had made contact because Detective Sparks had dismissed the victim as uncooperative, but that she doubted this characterization.

38.    On December 15, 2020, Jane Doe 3 came into the Johnson City Police Department, and was cooperative. She gave a very credible statement to Dahl and to AUSA McCauley alleging she had been raped by "Voe"; her statement closely mirrored that of other Jane Doe victims.

39.    Jane Doe 3 stated that on June 2, 2020, after waking up in "Voe's" condo and finding that she had been sexually assaulted, Jane Doe 3 fled the condo and encountered Johnson City police officers in the lobby downstairs. She was in extreme distress, screaming, and shoeless as she had left her shoes upstairs in the condo. She recounted what had occurred upstairs in "Voe's" condo. The officers drove Jane Doe 3 home to her parents' house, but declined to help her seek medical attention or a rape kit for her, make a full report, or follow up with Jane Doe 3. The officers also declined to get a statement from suspect "Voe".

40.    Dahl's professional judgment was that there was no legitimate law enforcement purpose or explanation for officers to fail to investigate a distressed victim of a sexual assault, and to fail to investigate the alleged perpetrator, unless the officers were ordered by a superior to do nothing.

41.    Before the meeting, while waiting for Jane Doe 3 to arrive, Captain Peters went to Jane Doe 3's Facebook profile, and made jokes about her appearance and clothing.

42.    Later on December 15, several hours after the meeting with Jane Doe 3,

11

Taylor called Dahl.  He stated that he had just received complaints from Chief Turner about Dahl's job performance.  This was the first time that Dahl heard of any issues as to her job performance from anyone.  Taylor told Dahl that Chief Turner had alleged that Dahl was not "communicating enough" with Johnson City CID officers.

43.     In response, Dahl approached three Johnson City CID officers with whom she frequently worked, and asked if they had a problem with how she communicated. Investigator Kirt Still Wagon, Investigator Will Saulsbury, and Sergeant Jeff Legault all contradicted Chief Turner's allegation, stated that they did not have any issues with how Dahl communicated with them, and further stated they did not know why Turner had made the allegation.

44.     The conversations with three CID officers led Dahl to reasonably suspect that Chief Turner's complaint was pretextual and in fact an act of retaliation for her investigation of "Voe".

45.     Soon thereafter, Dahl identified yet another sexual assault victim of "Voe", and began to establish a modus operandi for how "Voe" conducted his sexual assaults:[3] Dahl obtained credible statements that "Voe" would meet young women and invite them to come to his condo, often after he bought them alcoholic drinks and/or gave them cocaine. A young male associate of "Voe's" would sometimes help "Voe" in meeting these young women.  The women would then pass out at "Voe's" condo, and later awaken to find that "Voe" had sexually assaulted them.

46.     From December 2020 through March 2021, Dahl repeatedly asked Chief

_____

[3] For a prosecutor, similarity is an important concept as it permits prior sexual assaults to be admissible evidence in a criminal prosecution under Fed. R. Evid. 413(a).  *See generally United States v. Mandoka,* 869 F.3d 448, 453-54 (6th Cir. 2017); *United States v. Morris,* 494 Fed.Appx. 574, 584 (6th Cir. 2012)*, cert. denied,* 568 U.S. 1107 (2013); *United States v. Miller,* 3:20-CR-58-KAC-HBG (E.D. Tenn. Aug. 27, 2021).

Turner, Captain Peters, and CID investigators to further investigate "Voe". Nevertheless, after Turner's baseless complaint, Johnson City Police Department failed to further investigate "Voe."

47.     Instead, when Dahl pressed the need to build a case, Chief Turner, Captain Peters and other Johnson City officers made repeated comments dismissing the credibility of the Jane Doe victims. For example, one Johnson City investigator stated to Dahl, "In my 20 years on the force, I've only encountered one real rape." Another stated about Jane Doe 1, "You can see her on the security footage, and she's dressed like a real… well I won't say it."

48.     Dahl reasonably became concerned and confused by Johnson City's failure to investigate "Voe." One male investigator stated to Dahl: "Well Kat, if you're so invested in developing this case, go have a drink at Label[4] and let ["Voe"] pick you up and take you back to his place. We'll come get you in an hour." Instead of refuting the allegations, the investigator's words suggested Dahl would have better luck assembling evidence if she voluntarily made *herself* a victim of sexual assault.

49.     Johnson City investigators also unreasonably delayed producing requested documents to Dahl. For example, in early November 2020, Dahl began seeking a federal search warrant for "Voe's" computer and phone SIM card, but Johnson City officers did not provide needed documentation until mid-January 2021. By that point, the evidence for the probable cause affidavit was too old and stale to meet federal requirements for obtaining a search warrant.

50.     Dahl had also requested that Johnson City CID investigators obtain a certified copy of "Voe's" earlier felony conviction, which she needed to prosecute "Voe".

---

[4] Label is the name of a bar near "Voe's" condo.

Unreasonably, CID investigators never produced a copy, and eventually Dahl obtained a certified copy through other means.

51.     In January 2021, a fourth sexual assault victim, Jane Doe 4, came forward to Johnson City anonymously; investigators unreasonably failed to notify Dahl.

52.     In January 2021, an unknown person prominently scrawled the word "Rapist" as graffiti on "Voe's" garage.  Johnson City officers joked that Dahl herself had made the graffiti. (She did not.)  *Ex.* 3 - Graffiti photograph)

53.     In early 2021, Dahl continued to hear additional allegations against ███████ from members of the downtown Johnson City community, including a woman in her yoga class, a friend with whom she had a drink at a local bar, and a colleague in the Federal Defender's office.

54.     Finally, in April 2021, Dahl decided to prosecute "Voe" just for the "ammo FIP" charge, hoping that the publicity would encourage other sexual assault victims to come forward.  On April 13, 2021, Dahl indicted "Voe" under seal, and obtained a federal arrest warrant that same day.

55.     Dahl told Chief Turner and Captain Peters that "ammo FIP" charges only brought sentences of two to three years, and reiterated the need to develop a broader case against a dangerous perpetrator. They laughed and said they would be "retired at the lake" by then.

56.     The policy of the Greeneville U.S. Attorney's Office states that responsibility for arresting a criminal defendant falls to the investigating agency, unless the defendant is a fugitive, in which case the arrest falls to the U.S. Marshals. In the "Voe" case, Johnson City Police Department was the investigating agency, and "Voe" was not

(yet) a fugitive; therefore responsibility for "Voe's" arrest lay with the police. Detective Sparks told Dahl that the Johnson City Special Investigative Squad ("SIS") would be responsible for executing the federal arrest warrant.

57.     Dahl spent the next several weeks after April 13, 2021 asking SIS and Detective Sparks to arrest "Voe" approximately 30 times, but was either ignored entirely, or met with excuses as to why the arrest could not be carried out. The excuses were nonsensical: the SIS officers were too busy, or were in training, or could not find "Voe" (despite knowing where he lived and worked). One officer stated that they could not execute the federal arrest warrant because the police lacked the door code to the lobby of his condo building.

58.     On May 4, 2021, Plaintiff had a conversation with Detective Sparks and Sergeant Legault about her concerns that "Voe" had not been arrested, and demanded that someone within the Police Department carry out the arrest immediately.

59.     On May 6, 2021, Dahl received a voicemail from Lieutenant Don Shepherd with the Johnson City Police Department CID. Lt. Shepherd relayed that defendant Officers John Doe 1 through 3 from Johnson City SIS had gone to "Voe's" condo the night before, and asked "Voe" to come outside the closed front door to his condo unit, stating to "Voe" and others inside the condo unit that they had a warrant for "Voe's" arrest. This was improper because the target of an arrest warrant should not be notified when his or her indictment is still under seal. When "Voe" declined to leave his condo and submit to arrest, Officers John Doe 1 through 3 left.

60.     The decisions by Johnson City officers to notify "Voe" of the warrant for his arrest, and then, after "Voe" declined to leave his condo to submit to arrest, simply to leave

15

without attempting an arrest, violated their duties under clear policy and almost universal historical practice. Indeed, no reasonable officer would fail under such circumstances to execute an arrest warrant on a felon solely because the felon declined to leave his home and submit to arrest. In Dahl's experience, Johnson City officers generally treated executing felony arrest warrants as a serious part of their job duties, which they routinely performed even in cases involving risks to officer safety.

61. The day after police officers tipped off "Voe" about the federal arrest warrant, and thus his indictment, "Voe" fled his apartment and became a fugitive from justice. Despite social media postings by "Voe" and others indicating "Voe's" whereabouts, "Voe" has been a fugitive ever since.

62. "Voe's" unlawful flight was possible only because of intentional or reckless misconduct by officers John Doe 1 through 3.

63. These events were extremely concerning to Dahl. Obviously, the fact that a suspected serial rapist and attempted murderer was now at-large meant that it would be nearly impossible to prevent new serious crimes, or even reliably identify new victims. But beyond that, the botched arrest made Dahl reasonably wonder whether the Johnson City Police Department's misconduct went beyond plain incompetence and into deliberate conspiracy to protect "Voe."

64. Dahl called Sgt. Legault and Sgt. Matt Gryder to express her extreme displeasure with the mishandled arrest attempt, noting that she had made approximately 30 phone calls to Johnson City officers to arrest "Voe" after he had been indicted, all to no avail. Dahl also stated to Sgt. Legault that she had previously communicated her fears that "Voe" presented a substantial flight risk, but her valid concerns had been dismissed.

16

65.     Under the goals of the MOU, a properly executed arrest of "Voe" would have prevented him from fleeing.  The MOU notes that "individuals whom the court determines are a danger to the community or ***are at a risk to flee the jurisdiction*** are routinely not granted bond in federal court, and therefore, will reduce the recidivism of those on bond committing additional crime." Therefore, the failure to arrest "Voe" contradicted one of the explicit purposes of the MOU governing Dahl's employment.

66.     On May 11, 2021, on her own initiative and outside her chains of command at the U.S. Attorney's Office and Johnson City Police Department, Dahl made a report to an agent with the local Federal Bureau of Investigation office expressing her concerns about how Johnson City Police Department had handled the "Voe" case.

67.     On May 19, 2021, Dahl met with Chief Turner and Captain Peters to review the status of various ongoing cases.  Dahl raised her particular concerns as to the "Voe" case.  Chief Turner and Captain Peters were dismissive, joking that if "Voe" served any additional time, they would be retired by the time he was released.

68.     Chief Turner then brought up Dahl's forthcoming MOU extension.  He stated that he was communicating with the Johnson City Board of Commissioners for an extension of the MOU for her employment contract, and told Dahl to expect a smooth renewal and the process for extension was a "formality." The implication was that Turner could unilaterally renew Dahl's contract.

69.     During the month of May, Dahl became increasingly worried about the "Voe" case, and perceived increasing indications of deliberate misconduct by the Johnson City Police Department.  Consistent with all laws and policies, but beyond the facial terms of the MOU, Dahl began quietly investigating "Voe" herself, including through no less than

eight interviews with individuals who lived and worked in downtown Johnson City near "Voe's" condo. Unanimously, they told her that they had personal information and belief that "Voe" serially intoxicated and/or drugged, then raped or otherwise sexual assaulted, young female victims.  Unanimously, they stated that "Voe" had a well-known reputation in the downton Johnson City community for this criminal misconduct.

70.     Another victim, Jane Doe 5, contacted Dahl on June 14, 2021.  Jane Doe 5's account of her sexual assault by "Voe" mirrored that of the other Jane Does.

71.     Dahl became concerned that the Johnson City was intentionally refusing or recklessly failing to investigate or seize "Voe", either (a) because "Voe" was corruptly paying off Johnson City officers, and/or (b) to cover up its plain incompetence.

72.     Dahl's investigation, while consistent with all laws and policies, went beyond the facial terms of her MOU in multiple respects.

73.     First, While Dahl was tasked under the MOU to investigate and prosecute suspects such as "Voe" for the "ammo FIP" charge, she was not tasked under the MOU with prosecuting either sexual assault or public corruption cases.

74.     Second, the MOU contemplated Dahl would investigate and prosecute private citizens, not the Johnson City Police Department, which was the primary law enforcement agency of two of the signatories to her MOU (the Mayor and City Manager of Johnson City). Nor did the terms of Dahl's MOU contemplate  investigating or prosecuting one of her supervisors, namely Chief Turner, nor the Johnson City police officers with whom she worked hand-in-glove.

75.     Third, outside her chains of command, Dahl repeatedly spoke out to third parties, describing her concerns about the police department's failure to investigate "Voe"

for the many rape cases, and also her concerns about Johnson City Police Department's motive for its inaction and conduct as to "Voe".

76. For example, starting in November 2020, Dahl shared her concerns with her mentor AUSA McCauley and other federal prosecutorial colleagues outside her chain of command, and continued to voice concerns in December 2020 after another Jane Doe victim came forward on November 24, 2020.

77. For example, starting in December 2020, Dahl shared her concerns with a friend at the Federal Defender's Office, and with two other female friends, warning them to be cautious in going out to downtown bars in Johnson City because of "Voe's" history of predations.

78. For example, in May 2021 without notifying her chains of command, and beyond the scope of her job responsibilities, Dahl reported her concerns to an FBI agent, describing not just the situation concerning wanted suspect "Voe", but also concerns about the Johnson City Police Department.

79. Johnson City Police Department had a liaison assigned to detail in the local FBI office who regularly communicated with Chief Turner.

**Chief Turner fires Dahl**

80. On reasonable inference, Chief Turner came to learn of Dahl's communications about Johnson City's failure to investigate or seize "Voe" to other agencies and to other individuals in the Johnson City community, and particularly her report to the local FBI office. On reasonable inference, Chief Turner also came to learn of Dahl's own continued investigation of "Voe" beyond the scope of her responsibilities as described in the MOU.

81.     On June 25, 2021, one week before her MOU was to be extended, Chief Turner called Dahl and informed her that Johnson City would not be renewing her contract, and that her job would be terminated at the end of the month, less than a week later.

82.     Dahl was shocked.  Chief Turner had given no previous indication that Johnson City was considering not extending the MOU.  Dahl had a full caseload and a trial set for September 2021, and only a few weeks before, Chief Turner had personally assured her she could expect a smooth renewal.

83.     Dahl immediately contacted her Supervisory AUSA Taylor, who was also shocked and exclaimed "What are you talking about?"  Turner said that Chief Turner had never expressed any intent to terminate Dahl's job, and that Taylor was displeased Chief Turner acted this way.  Notwithstanding the MOU's status as a multi-agency agreement between the U.S. Attorney and various local government officials, Chief Turner acted unilaterally to have Johnson City terminate the MOU.  No one within the U.S. Attorney's Office was informed of Chief Turner's intention before his announcement to Dahl, nor did anyone inside the U.S. Attorney's Office have control over Dahl's dismissal, because Turner had effective control over the funding of Dahl's salary.

84.     On information and belief, no other agency or signatory to the MOU was involved with, previously informed about, or had control over Chief Turner's decision to terminate Dahl.

85.     Supervisory AUSA Taylor immediately contacted Chief Turner, and managed to convince him to extend the MOU for a month so that Dahl would have more time to transfer her pending cases to other federal prosecutors.

86.     A few days after June 25, 2021, Dahl received a letter signed by Chief

20

Turner personally stating that Johnson City did not wish to extend her employment under the MOU. It did not give a reason. It was dated June 24, the day before Chief Turner called Dahl to notify her of her termination, and did not mention the extension that Taylor had negotiated. Dahl reasonably infers that the letter was written before Chief Turner called Dahl, and before Taylor had spoken with Chief Turner. (*Ex.* 4 – Turner letter dated June 24, 2021).

87. On June 28, 2021, Dahl called Chief Turner and asked for an explanation as to why the MOU was not extended. Chief Turner asked Dahl to meet with him in person the next day.

88. At the meeting, Chief Turner stated that Dahl had not been unresponsive in communicating with his Johnson City officers. Dahl disputed this assertion by telling Chief Turner that she had raised this issue with his CID officers as early as December 2020, and they unanimously told her that they did not have any problems with her communication.

89. Immediately after her meeting Chief Turner, Dahl next met separately with Sgt. Legault, with whom she had always had a trusting and collegial professional relationship, to discuss her termination. Sgt. Legault admitted that Chief Turner had called him that morning, and apparently out of the blue, asked him (Legault) about whether or not Dahl had ever been unresponsive. Sgt. Legault told Dahl words to the effect that he had first expressed confusion to Chief Turner as to what constituted a "timely response." He then told Chief Turner that he (Sgt. Legault) had no problems with Dahl's responsiveness, and that there were "maybe six times where she went a day or two when I haven't heard from her" over the course of nearly two years. Both the timing of Chief Turner's call to

Legault, and Legault's answer to Chief Turner, strongly suggest that Chief Turner's purported reasons for terminating Dahl's employment were entirely false and pretextual.

90.     On July 23, 2021, Dahl met with Sergeant Matt Gryder, with whom she had always had a trusting and collegial professional relationship, about her termination. Sgt. Gryder told Dahl that Captain Peters had alleged to him that Dahl had "lied" to Chief Turner on May 19, 2020 about which cases she planned to indict for a June Grand Jury.

91.     Sgt. Gryder knew that the allegation was false, and told Dahl that he had directly challenged Captain Peters' statement, but that Captain Peters refused to listen. Sgt. Gryder well knew the June Grand Jury case schedule because he himself was a key witness for a case that Dahl had set for trial in June, and as such he had first-hand knowledge about Dahl's trial preparation and schedule during those weeks for planning purposes.

92.     Dahl asked Supervisory AUSA Taylor if she could make a report to the U.S. Department of Justice Office of Inspector General about her concerns as to Johnson City Police Department's failure to investigate or seize "Voe", and concerns about either incompetence or corruption at Johnson City Police Department. Taylor told Dahl that she could not make such a report, citing a supposed lack of OIG jurisdiction.

**Dahl finds more Victims**

93.     On July 1, 2021, another victim, Jane Doe 6, contacted Dahl to state that "Voe" had raped her. Jane Doe 6's account was extremely similar to the statements made by the other Jane Does. Jane Doe 6 stated that she had been assaulted in January 2021, months after the "Voe" investigation began.

94.     In July 2021, Dahl's review of newspaper articles led her to identify a Jane Doe 7. Understanding her story requires rewinding the chronology about eight months, to

22

November 10, 2020. That night, Jane Doe 7 died after crashing her car. She had last been seen alive with "Voe."

95.     Months later, after Dahl found newspaper reporting on the case, Dahl proactively contacted Jane Doe 7's family, and spoke to one of her sisters. Dahl was shocked by what the sister said:

a.     The night of the crash, Jane Doe 7 had called one of their other sisters that evening in extreme emotional distress. Jane Doe 7 attempted to tell her sister why she was distraught, but was incoherent. Against her sister's advice, Jane Doe 7 attempted to drive home, and died in a car crash in neighboring Elizabethton.

b.     Two days after Jane Doe 7's death, on or about November 12, 2020, one of Jane Doe 7's sisters had contacted the Johnson City Police Department regarding "Voe's" connection to her sister Jane Doe 7's death, concerned that Jane Doe 7 may have been sexually assaulted and/or drugged by "Voe". The sister was falsely told by a Johnson City officer that Johnson City lacked jurisdiction because the death did not occur in Johnson City. This was obviously incorrect as a matter of law because relevant allegations as to "Voe" and Jane Doe 7 occurred within Johnson City limits. This raised further reasonable suspicions that the John City Police Department was engaged in misconduct with respect to "Voe".

c.     After the car crash, the sister speaking to Dahl tracked down "Voe" and confronted him. "Voe" admitted taking Jane Doe 7 back to his condo, after Jane Doe 7 had been drinking at a nearby brewery with her sisters, boyfriend and

friends, and had become disoriented. (A portion of the November call between "Voe" and Jane Doe 7's sister is recorded and, on information and belief, in possession of the sister.)

d. The sister told Dahl that a particular investigator from Tennessee Alcohol Bureau of Control told Dahl that she (the TABC investigator) had contacted the Johnson City Police Department concerning the Jane Doe 7 case in connection with her death, but received no cooperation or follow up. Dahl called the particular TABC agent, who confirmed the sister's account. This raised further reasonable suspicions that the Johnson City Police Department was engaged in misconduct with respect to "Voe."

96. Dahl's conversation with Jane Doe 7's sister occurred in July 2021. But as Dahl put the pieces together, the situation appeared even more anomalous. Recall that Dahl had been asked to investigate the "ammo FIP" case against "Voe" on or about November 13, 2020, just one day after Jane Doe 7's sister had contacted the Johnson City Police Department. But shockingly, in the 8 months that had since elapsed, throughout all of the efforts to investigate and arrest "Voe," no police officer had ever told Dahl about Jane Doe 7 death in November 2020, or the "Voe" connection.

97. Dahl inferred, reasonably, that the only plausible reason the police had not notified her (Dahl) of Jane Doe 7's sister's complaint was because Chief Turner did not want her to know, and ordered his officers not to inform Dahl.

98. Several witnesses and Jane Doe 8 expressed their concern to Dahl that "Voe" was able to get away with his behavior by paying Johnson City Police officers off. "Voe" was known to have significant financial assets, and was often witnessed around

24

downtown Johnson City with thousands of dollars in cash at the local bars. Jane Doe 8 stated that she had witnessed Johnson City officers at "Voe's" condo for unexplained reasons unrelated to criminal investigations or community caretaking, that she had witnessed exchanges of unknown things between "Voe" and Johnson City at "Voe's" condo that seemed inappropriate, and that she was fearful that "Voe" was bribing law enforcement at Johnson City. Jane Doe 8 gave detailed descriptions to Dahl of some officers' appearances and voices that corroborate Dahl's knowledge of those officer's identities.

99.     Dahl's last day at the Greeneville U.S. Attorney's Office was July 31, 2021. She left the U.S. Attorney's Office with wide support and in good standing. When she left, she was presented with a framed print signed by most or all of her federal colleagues, a card signed by the same with well wishes, and a $150 gift card. One of the federal district judges before whom she appeared offered to serve as a reference for future employment.

100.    In January of 2022, now a private citizen, Dahl became aware of three more victims, Jane Does 8, 9, and 10, who claimed that "Voe" had raped them. Dahl spoke to Jane Does 8 and 9 about their sexual assaults, and their accounts were highly similar to those of previous Jane Doe victims.

101.    Dahl is a lawful whistleblower who suffered unlawfully termination as retaliation for engaging in repeated protected communications and activities in her role as SAUSA, and as a private citizen.

102.    Further, before filing this complaint in U.S. District Court, Dahl filed another protected, lawful whistleblower disclosure with two offices at the U.S. Department of Justice (specifically the Office of Inspector General, and the Criminal Division, Public Integrity Section) describing these facts, and urging the Department to initiate

25

investigations into the Johnson City Police Department and the circumstances of her termination.

103.    Dahl has lawful whistleblower status under both Tennessee and United States law.

**Causation of Damages**

104.    Dahl engaged in protected First Amendment activities well beyond the limited scope of her employment duties as defined by the MOU (namely to prosecute violent, firearms and drug trafficking crimes) by:

a.   Urging Chief Turner and Johnson City to investigate "Voe" for rape and sexual assault (neither of which were mentioned in the MOU);

b.   Investigating "Voe" herself by talking to Jane Doe victims and to witnesses in the downtown Johnson City bar and restaurant scene;

c.   Speaking out about each of "Voe's" predatory conduct, and Johnson City's failure to investigate or seize "Voe", to friends, U.S. Attorney's office colleagues, and Federal Defender's office colleagues;

d.   Warning female friends and colleagues to be cautious about going out to downtown Johnson City bars and restaurants because of "Voe's" modus operandi in finding his sexual assault vitims;

e.   Making a report to an FBI agent at an office where a posted Johnson City liaison would ultimately, on information and belief, notify Chief Turner of the report; and

f.   Voicing concerns that Johnson City Police Department's inaction and reckless conduct as to "Voe", particularly as to the failure to execute the "ammo FIP"

26

arrest warrant, was evidence of either corruption or plain incompetence at

Johnson City Police Department.

105.    Defendant Chief Turner took adverse action against Dahl by unilaterally

terminating her employment under the MOU, which would chill a person of ordinary

firmness from continuing to speak out about her allegations.

106.    Defendant Chief Turner's adverse action was motivated at least in part by

Dahl's previous protected statements and activity tending to implicate the Johnson City

Police Department for corruption or plain incompetence.

### No Qualified Immunity

107.    Defendant Chief Turner has no qualified immunity from claims under 42

U.S.C. § 1983 because he had actual notice and personal knowledge of Dahl's allegations.

He then retaliated against Dahl by having her terminated in violation of her

clearly-established First Amendment right to speech on a matter of public concern[5], her

clearly-established Fourteenth Amendment rights to procedural and substantive due process

under the United States Constitution, and her clearly-established right under the First and

Fourteenth Amendment to be free from a civil conspiracy unrelated to the course and scope

of Chief Turner's official and corporate duties.[6]

### No Official Immunity

108.    Defendant Chief Turner has no official immunity from claims at Tennessee

law because he had actual notice and personal knowledge of Dahl's allegations, and his

conduct was malicious, intentional or reckless, and contrary to the public policy purpose of

---

[5] *See, e.g., Fritz v. Charter Tp. of Comstock,* 592 F.3d 718 (6th Cir. 2010); *Bell v. Johnson,*
308 F.3d 594 (6th Cir. 2002); *McLaughlin v. Sullivan Cnty. Bd. of Educ.,*
2:20-CV-00243-DCLC-CRW (E.D. Tenn. Aug. 24, 2021).
[6] *Brown v. Beaudry,* No. 2:19-cv-140 at *7 (W.D. Mich. Aug. 20, 2019).

27

the Tennessee Public Protection Act ("TPPA"), T.C.A. § 50-1-304.

## No Sovereign Immunity

109.    Defendant Johnson City has no sovereign immunity from Dahl's federal civil rights claims under § 1983, and no sovereign immunity from a TPPA statutory claim for refusal to participate in or remain silent about illegal activities.

## Damages

110.    Dahl lost meaningful paid employment.

111.    Dahl is an attorney in good standing with the D.C. Bar. Her sudden termination under the MOU has tarnished her reputation within the Eastern District of Tennessee, and created an adverse inference to future legal employers about her performance as an attorney, and particularly as a SAUSA, which is a prestigious job within the U.S. Attorney's Office.

112.    Dahl has suffered "garden variety" emotional distress.[7]

## Punitive Damages

113.    The conduct of defendant Chief Turner in terminating Dahl's employment under the MOU was maliciously or recklessly indifferent to Dahl's First Amendment right to speak up about Johnson City's intentional or reckless failures to investigate and seize "Voe".

## Attorney's Fees and Costs

114.    In pursuit of her § 1983 federal civil rights claims, Dahl is incurring reasonable attorney's fees, taxable costs, and non-taxable costs. 42 U.S.C. § 1988.

115.    In pursuit of her TPAA statutory state law claim, Dahl is incurring

---

[7] *McTaggart v. Catholic Health Initiatives*, 1:19-CV-00088-DCLC, at *6 (E.D. Tenn. Aug. 2, 2021) (quoting *Thorsen v. County of Nassau*, 722 F.Supp.2d 277, 292 (2d Cir. 2010)).

28

reasonable attorney's fees and costs.  T.C.A. § 50-1-304(d)(2).

**Count I – First Amendment Retaliation against Chief Turner individually**

116.    Plaintiff Kateri Lynne Dahl incorporates all prior paragraphs.

117.    Defendant Chief Turner terminated Dahl's employment by advising Johnson City's Mayor and City Manager not to renew the MOU.

118.    Dahl engaged in protected First Amendment activities outside of her chain of command by making allegations to multiple third parties, including the FBI, about Johnson City Police Department's failures to investigate and seize "Voe", and the substantial likelihood that Johnson City Police Department was either corrupt or plainly incompetent.

119.    Dahl's communications about sex crimes and public corruption were not expressions made pursuant to her duties as a SAUSA under the MOU (which limited the scope of her employment as prosecuting violent, firearms and drug trafficking crimes).

120.    The MOU did not contemplate that Dahl would investigate and make protected communications to one of her supervisors, Chief Turner, and/or a partner agency under the MOU, Johnson City. Those actions and communications were therefore not made pursuant to her employment duties as a SAUSA under the MOU.

121.    Dahl's protected activities and communications played at least a part in defendant Chief Turner's decision to tell the Mayor and City Manager of Johnson City not to extend the MOU for Dahl's employment.

122.    Defendant Chief Turner's termination of Dahl's employment was an adverse action against her that would chill a person of ordinary firmness from continuing in Dahl's communication.

29

123. The adverse action was motivated at least in part as a response to Dahl's exercise of her protected activities and communications.

124. As a direct result, Dahl was injured.

## Punitive Damages

125. Defendant Chief Turner was maliciously, intentionally, or recklessly indifferent to Dahl's First Amendment protected right to speak up and make protected allegations about Chief Turner and Johnson City Police Department.

## Prayer

WHEREFORE Plaintiff Kateri Lynne Dahl prays the Court enter a judgment for First Amendment retaliation against Defendant Chief Karl Turner in his individual capacity; award Plaintiff actual and punitive damages; award Plaintiff her taxable costs, non-taxable costs, and reasonable statutory attorney's fees under 42 U.S.C. § 1988; and grant such other relief as may be just, meet and reasonable.

## Count II – Procedural Due Process Violation
## by Chief Turner in his individual capacity

126. Plaintiff Kateri Lynne Dahl incorporates all prior paragraphs.

127. Tennessee is an "at-will" employment jurisdiction, meaning that employees can generally be terminated for any reason, or no reason at all.

128. But even in most "at-will" jurisdictions, employees have a limited property interest in employment free from violations of public policy and/or statute, including retaliation for engaging in protected activities including but not limited to whistleblowing.[89] The Tennessee Public Protection Act, T.C.A. § 50-1-304, provides Dahl with a limited but

---

[8] *Armstrong v. Reynolds,* 22 F.4th 1058, 1068 (9th Cir. 2022).
[9] *Young v. Township of Green Oak,* 471 F.3d 674, 683 (6th Cir. 2006).

cognizable Constitutional property interest in continued employment free from retaliation for whistleblowing.

129.     A plaintiff with a Constitutionally-cognizable property interest cannot, consistent with the 14th Amendment, be deprived of that property interest by a state or local official acting under color of law "without due process of law."

130.     The "due process" that Chief Turner owed to Dahl was modest, and afforded him wide latitude. In fact, the multi-agency MOU for Dahl's employment itself had no written or other objective standard or review process for annual extension. Defendant Chief Turner himself stated there was no objective standard or review process as to the extension of the MOU for Dahl's employment, and that the annual extension was a "formality."

131.     But Chief Turner did owe Dahl at least some meaningful "due process": As a local government official, acting under color of state law, he could not deprive her of her limited property interest in continued employment as retaliation for whistleblowing.

132.     Chief Turner manufactured pretextual allegations that Dahl failed to communicate with his officers, and falsely alleged she had lied to him about a June Grand Jury schedule, to cover up his unlawful and retaliatory purpose.

133.     Chief Turner unreasonably, arbitrarily and capriciously told the Mayor and City Manager of Johnson City not to extend the MOU one week before its extension to retaliate against Dahl for her whistleblowing allegations and activities concerning Johnson City Police Department's failures to investigate and seize "Voe", and Johnson City Police Department being either corrupt or plainly incompetent.

134.     Chief Turner had unilateral authority to terminate Dahl, and no other party to the MOU was aware of defendant Chief Turner's decision to terminate Dahl until after

the fact. Chief Turner terminated Dahl in whole or substantial part in retaliation for engaging in protected activities including whistleblowing.

135.    Dahl had no procedural ability or right to contest her termination, or to request a "name-clearing" hearing.[10]

136.    Dahl was thereby deprived of her limited property interest in her employment without due process of law in violation of the procedural element of the Due Process Clause of the Fourteenth Amendment.[11]

137.    As a direct result, Dahl was injured.

**Punitive Damages**

138.    Defendant Chief Turner's termination of Dahl by causing the MOU not to be extended was maliciously, intentionally, or recklessly indifferent to the procedural due process rights of Dahl under the Fourteenth Amendment as to her public employment.

**Prayer**

WHEREFORE Plaintiff Kateri Lynne Dahl prays the Court enter a judgment against defendant Chief Turner for violating the Procedural element of the Fourteenth Amendment's Due Process Clause; award Plaintiff actual and punitive damages; award Plaintiff her taxable costs, non-taxable costs, and reasonable statutory attorney's fees under 42 U.S.C. § 1988; and grant such other relief as may be just, meet and reasonable.

**Count III – Civil Conspiracy to violate Constitutional Rights**

**by Chief Turner and Officer John Does 1 through 3 in their individual capacities**

139.    Plaintiff Kateri Lynne Dahl incorporates all prior paragraphs.

140.    Defendant Chief Turner had an agreement, common design and a single plan

---

[10] *Cf. Daily Servs., LLC v. Valentino*, 756 F.3d 893, 907 (6th Cir. 2013).
[11] *Young v. Township of Green Oak,* 471 F.3d 674, 683 (6th Cir. 2006).

with defendant Officers John Does 1 through 3 to fire Dahl in retaliation for her First Amendment activities either (a) to protect "Voe", a wanted felon, from investigation and seizure, and/or (b) to cover up police corruption as to "Voe", and/or (c) to cover up their plain incompetence in investigating and seizing "Voe".

141.    The first two such purposes are unlawful, while the third is a lawful purpose accomplished by unlawful means.[12]

142.    Multiple overt acts and/or omissions occured in furtherance of the conspiracy agreement, including but not limited to:

a.    Chief Turner failed to direct an investigation of sexual assault victim Jane Doe 3 or "Voe" after his officers found Jane Doe 3 shoeless and in extreme emotional distress in the lobby of "Voe's" condo;

b.    Chief Turner failing to notify Dahl about Jane Doe 7's death when she first started with investigating the "ammo FIP" charge in November 2020;

c.    Officers John Doe 1 through 3 improperly notified rape suspect "Voe" of the federak warrant for his arrest, and thereby the existence of a sealed federal indictment against him;

d.    Officers John Doe 1 through 3 improperly refused to execute said warrant against a dangerous rape suspect, and effectively permitted him to flee;

e.    Chief Turner called at least one officer seeking false, pretextual rationales purporting to justify Dahl's termination; and

f.    Chief Turner personally calling Dahl on June 25, 2021, and signing and delivering a letter to Dahl dated June 24, 2021, to tell her that he was

---

[12] *First Cmty. Bank N.A. v. First Tenn. Bank N.A.*, 489 S.W.3d 369, 395 (Tenn. 2015); *Morgan v. Brush Wellman, Inc.,* 165 F.Supp.2d 704, 720 (E.D. Tenn. 2001).

declining to renew the MOU for another year, thereby terminating her

employment, and hindering her ability to continue the "Voe" investigation.[13]

143.    Defendant Chief Turner and defendant Officers John Does 1 through 3 were

acting outside the scope of their employment and not in furtherance of their corporate

duties, in that the agreement was unconscionable, against the public welfare, and for no

legitimate police purpose.  Thus the intracorporate conspiracy doctrine does not apply

here.[14]

144.    In the alternative, even if Officers John 1 through 3 were acting within the

scope of their agency,  or at the direction of Chief Turner,  that is not a bar to liability for

their agreement.[15]

145.    Dahl made  allegations to multiple third parties including the FBI about

Johnson City Police Department's failures to investigate and seize "Voe", and Johnson City

Police Department being either corrupt or plainly incompetent.

146.    As a direct result, Dahl suffered injuries including but not limited to loss of

her employment salary.

**Punitive Damages**

147.    Defendant Chief Turner's termination of Dahl, by causing the MOU not to

be extended, as an overt act and substantial step toward in furtherance of his conspiracy

agreement with defendants Officer John Does 1 through 3, was maliciously, intentionally,

or recklessly indifferent to Dahl's rights under the First and Fourteenth Amendments as to

her employment under the MOU.

---

[13] *Revis v. Meldrum,* 489 F.3d 273, 290 (6th Cir. 2007).
[14] *Brown v. Beaudry,* No. 2:19-cv-140 at *7 (W.D. Mich. Aug. 20, 2019).
[15] *Brungard v. Caprice Records, Inc.*, 608 S.W.2d 585, 590 (Tenn. Ct. App. 1980) (citing *Howard v. Haven*, 198 Tenn. 572, 281 S.W.2d 480 (1955); *Scott v. Burton*, 173 Tenn. 147, 114 S.W.2d 956 (1938)).

34

WHEREFORE Plaintiff Kateri Lynne Dahl prays the Court enter a judgment for civil conspiracy to violate Constitutional rights under the First and Fourteenth Amendments against defendant Chief Turner and defendant Officer John Does 1 through 3 in their individual capacities; award Plaintiff actual and punitive damages; award Plaintiff her taxable costs, non-taxable costs, and reasonable statutory attorney's fees under 42 U.S.C. § 1988; and grant such other relief as may be just, meet and reasonable.

## Count IV – Substantive Due Process Violation against Chief Turner individually

148.    Plaintiff incorporates all prior paragraphs.

149.    The substantive element of the due process clause of the Fourteenth Amendment prohibits government action that shocks the conscience.[16]

150.    Defendant Chief Turner terminated Dahl's employment by causing the MOU not to be extended as part of a Johnson City Police Department civil conspiracy to protect a felon from investigation and seizure.

151.    Dahl concedes that generally employment claims cannot be raised under the substantive element of the due process clause as there is no fundamental right to employment.[17]

152.    Terminating a whistleblowing employee such as Dahl, however, as part of a conspiracy to protect a felon credibly accused of dozens of rapes from investigation and seizure, and to protect a police department that is either corrupt or incompetent, shocks the

---

[16] Substantive due process "prevents the government from engaging in conduct that 'shocks the conscience,' *Rochin v. California*, 342 U.S. 165, 172 . . . (1952), or interferes with rights 'implicit in the concept of ordered liberty,' *Palko v. Connecticut*, 302 U.S. 319, 325-26 . . . (1937)."

[17] *Young v. Township of Green Oak,* 471 F.3d at 684.

35

conscience.

153.    Dahl was thereby deprived of her employment without substantive due process of law in violation of the Fourteenth Amendment.

154.    As a direct result, Dahl was injured.

**Punitive Damages**

155.    Defendant Chief Turner's termination of Dahl, by causing her employment MOU not to be extended as part of an unlawful conspiracy to protect a felon from investigation and seizure, and to protect a police department that is either corrupt or incompetent, shocks the conscience, and was maliciously, intentionally, or recklessly indifferent to Dahl's rights under the substantive element of the Due Process Clause to the Fourteenth Amendment.

**Prayer**

WHEREFORE Plaintiff Kateri Lynne Dahl prays the Court enter a judgment for Fourteenth Amendment substantive due process violation against defendant Chief Turner in his individual capacity; award Plaintiff actual and punitive damages; award Plaintiff her taxable costs, non-taxable costs, and reasonable statutory attorney's fees under 42 U.S.C. § 1988; and grant such other relief as may be just, meet and reasonable.

**Count V – TPPA Retaliatory Discharge against Johnson City**

156.    Plaintiff Kateri Lynn Dahl incorporates all prior paragraphs.

157.    The Tennessee Public Protection Act requires that "[n]o employee shall be discharged or terminated solely for refusing to participate in, or for refusing to remain silent about, illegal activities." T.C.A. § 50-1-304(b).

158.    Dahl is an employee under the Tennessee Public Protection Act, T.C.A. §

50-1-304(a)(1)(A) and (C) because she was employed pursuant to a multi-agency MOU between Johnson City, Washington County, the First Judicial District Attorney's Office, and the U.S. Attorney.

159.     Johnson City paid Dahl's compensation under the MOU.

160.     Johnson City is an employer under the TPPA, T.C.A. § 50-1-304(a)(2)(A).

161.     Johnson City terminated Dahl for refusing to participate in, or for refusing to remain silent about, illegal activities, namely Dahl's allegations about Johnson City Police Department's failures to investigate and seize "Voe", and about Johnson City Police Department being either corrupt or plainly incompetent.

162.     Johnson City thereby retaliatorily discharged Dahl in violation of the TPPA.

163.     As a direct result, Dahl was injured.

**Prayer**

WHEREFORE Plaintiff Kateri Lynne Dahl prays the Court enter a judgment for retaliatory discharge against defendant Johnson City under the Tennessee Public Protection Act, T.C.A. § 50-1-304; award Plaintiff damages; award Plaintiff her costs and reasonable statutory attorney's fees under T.C.A. § 50-1-304(d)(2); and grant such other relief as may be just, meet and reasonable.

Dated: June 23, 2022                    Respectfully submitted,

Lead Counsel for Plaintiff Kateri Lynne Dahl

/s/ Hugh A. Eastwood
Hugh A. Eastwood, Missouri Bar No. 62058,
E.D. Mo. Bar No. 62058MO,
*admitted in Missouri, Missouri federal district courts, the 8th Circuit, and the Supreme Court,*
*pro hac vice motion forthcoming*
*pursuant to L.R. 83.5(b)(1)*

37

7911 Forsyth Blvd., Ste. 300
St. Louis, Missouri 63105-3825
hugh@eastwoodlawstl.com
(314) 809 2343
(314) 228 0107 eFax

Co-Counsel for Plaintiff Kateri Lynne Dahl

/s/ Alexis I. Tahinci
Alexis I. Tahinci, TN BPR No. 031808
Tahinci Law Firm PLLC
1227 Volunteer Pkwy, Suite 528
Bristol, TN, 37620
(423) 557-8086
alexis@tahincilaw.com