UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
NORTHEASTERN DIVISION
GREENEVILLE

| | | |
|---|---|---|
| KATERI LYNNE DAHL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 2:22-cv-00072-KAC-JEM |
| | ) | |
| CHIEF KARL TURNER, | ) | **PLAINTIFF DEMANDS** |
| *in his individual capacity only, et al.,* | ) | **JURY TRIAL** _____ |
| | ) | |
| ~~Serve:~~ ~~Johnson City Police Department~~ | ) | |
| ~~601 E. Main St.~~ | ) | |
| ~~Johnson City, Tennessee 37601~~ | ) | |
| | ) | |
| ~~OFFICER JOHN DOES 1 THROUGH 3,~~ | ) | |
| ~~*in their individual capacities only,*~~ | ) | |
| | ) | |
| ~~and~~ | ) | |
| | ) | |
| ~~CITY OF JOHNSON CITY, TENNESSEE,~~ | ) | |
| | ) | |
| ~~Serve:~~ ~~601 E. Main St.~~ | ) | |
| ~~Johnson City, Tennessee 37601~~ | ) | |
| | ) | |
| Defendants. | ) | |

**First Amended Complaint for Damages**

**Civil Rights, 42 U.S.C. § 1983, NDAA & Supplemental State Law TPPA Claim**

Plaintiff Kateri ~~Lynn~~Lynne Dahl, by counsel Hugh A. Eastwood and Alexis I.

Tahinci, states as follows for her ~~civil rights~~ first amended Complaint for damages to her

civil rights under 42 U.S.C. § 1983, National Defense Authorization Act, 10 U.S.C. § 2409

and 41 U.S.C. § 4712, and her supplemental state law Tennessee Public Protection Act

(TPPA) statutory claim:

**Introduction**

1.      Dahl was a Special Assistant United States Attorney ("SAUSA") detailed to coordinate between the U.S. Attorney for the Eastern District of Tennessee and the City of Johnson City, Tennessee, to investigate and federally prosecute violent, firearm and/or drug-trafficking crimes pursuant to a multi-agency Memorandum of Understanding ("MOU"). Dahl gathered substantial evidence that a well-known individual ~~(real name~~ "named Sean Williams~~" redacted with a contemporaneously-filed motion for leave to file under seal an unredacted copy of this Complaint pursuant to Fed. R. Civ. P. 5.2 and L.R. 26.2, and otherwise identified in this Complaint by the pseudonym "Robert Voe")~~ had not just been dealing drugs, but was credibly accused of sexually assaulting and/or raping multiple women, and had possibly caused the death of one of his alleged victims~~,~~ and attempted to murder another. Dahl urged Johnson City and its Police Chief Karl Turner to investigate ~~"Voe"~~Williams further. But Chief Karl Turner intentionally or recklessly failed to investigate ~~"Voe"~~Williams despite Dahl's repeated urging, and despite his knowledge of Dahl's statements to third parties about her concerns about Johnson City's failures with respect to ~~"Voe".~~Williams. After Dahl obtained a sealed federal indictment and arrest warrant for ~~"Voe"~~Williams from ~~an~~a U.S. Magistrate Judge on a relatively minor federal ammunition charge, Johnson City police officers unreasonably delayed execution of the warrant, and ultimately botched ~~"Voe's"~~an attempt to arrest ~~by improperly notifying "Voe" of the existence of the sealed indictment~~Williams' arrest, effectively letting him flee. ~~(Today, more than a year later, "Voe" is still wanted on a felony and at-large, and the indictment remains under seal.)~~

2.      ~~Dahl had always received excellent performance reviews,~~Dahl had her

2

annual employment MOU previously renewed, and had been told recently by Chief Turner
to expect another renewal. Despite this, after Dahl urged Johnson City to investigate
~~"Voe" further, Chief Turner attempted to manufacture false complaints about Dahl's job~~
~~performance. He used this as a pretext to terminate Dahl on short notice by refusing to~~
~~extend the MOU on behalf of Johnson City.~~ Williams further, Chief Turner directed his
subordinates to gather complaints about Dahl's job performance. He pressured Dahl to
indict five gun and drug cases at the June 2021 Covid-era Federal Grand Jury where there
were limited slots, even though prosecutors—not police—decide which cases to present for
indictment. Immediately afterward, Dahl was assigned to try another case that was
scheduled during the June Grand Jury, and engaged in time-consuming trial prep at the
expense of other matters including those five cases. Dahl did not indict those five cases at
the June Grand Jury, although she did indict one other case that Johnson City police
deemed a priority. Ultimately three out of the five cases identified by Chief Turner were
never indicted federally (either for lack of probable cause or because the U.S. Attorney's
Office otherwise exercised its discretion not to prosecute them), while two others were not
indicted until October 2021, including one of a non-violent woman already in custody.
Nevertheless, Chief Turner explicitly used Dahl's failure to indict those five cases in June
2021 as his sole pretext to terminate Dahl on short notice by refusing to extend the MOU
on behalf of Johnson City. Moreover, he did so unilaterally without consulting other
agencies or offices with an interest in Dahl's continued employment. Chief Turner was
effectively protecting ~~"Voe"~~Williams from federal prosecution because either (a) ~~his~~
~~department~~Johnson City was corruptly connected to ~~"Voe",~~Williams, or (b) out of fear of
exposing his department's plain incompetence as to investigating and seizing ~~"Voe".~~

3

~~Accordingly, Dahl claims damages under § 1983 and the TPPA.~~Williams.

3.      Since Dahl filed her original Complaint, Johnson City hired independent expert and former Connecticut highway patrolman Eric P. Daigle to review its handling of over 300 sexual assault cases. Daigle delivered a blistering report finding that Johnson City failed to meet minimum legal or industry standards, held illegitimate and discriminatory stereotypes about women and sexual assault victims, and discouraged female sexual assault victims from collaborating with law enforcement. The "Daigle Report" confirms Dahl's allegations as to Johnson City's mishandling of sex crimes generally, even as it noted that Johnson City had improperly failed to conduct an internal affairs investigation as to the Sean Williams's sexual assault victims particularly.

4.      Williams has since been arrested in North Carolina and charged with additional sex crimes by the United States and by the State of Tennessee, and it has emerged from First Judicial District Attorney investigator affidavits that credible video evidence of Williams's sex crimes may have been in the possession of Johnson City since September 2020.  Specifically, video evidence shows Williams sexually assaulting 52 incapacitated adult women as well as two minor children aged 8 and 1 years respectively.

5.      Since Dahl filed her Complaint, Jane Doe victims of Williams have sued Johnson City alleging its officers engaged in a conspiracy to sex traffic Williams' victims. The City has blamed these women by stating in court filings and press conferences that they bore comparative fault for being drunk or high around Williams—even though some of the women now state they never took any alcohol or drugs, and/or that Williams surreptitiously drugged them before sexually assaulting them.  If borne out, then the Jane Does allegations further confirm Dahl's allegations.

4

1.6. Since Dahl filed her Complaint, discovery has showed that Johnson City received federal funds from the United States Department of Justice, and particularly that Johnson City used federal funds to install a useless exterior pole camera as part of its inadequate attempt to investigate Sean Williams. Accordingly, Dahl brings a damages claim for retaliatory discharge under the National Defense Authorization Act's protections for whistleblowers, in addition to her damages claims under § 1983 and the TPPA.

7. Since Dahl filed her Complaint, discovery has revealed that Captain Kevin Peters, Lieutenant Jeff Legault, Investigator Will Saulsbury, and possibly others within the police department conspired with Chief Turner to document claims that Dahl failed to reasonably communicate with them as to certain drug and gun cases. Sgt. Legault, working with Investigator Saulsbury and possibly others[1], created a list of Dahl's cases shortly after she began investigating Williams, five of which Captain Peters reviewed and Chief Turner ultimately used as a pretext to fire Dahl.

2.8. Since Dahl filed her original Complaint, the federal ammunition charge for which Dahl indicted Williams has been dismissed by the United States, on inference because proving that charge at trial would rely on the testimony and evidence from a Johnson City officer named Toma Sparks.

3.9. Williams fled custody on October 18, 2023, and reports from the local U.S. Marshal appear to suggest that he is investigating if Williams had insider assistance in escaping.

10. Since Dahl filed her Complaint, Johnson City leadership and Dahl's DOJ supervisor Wayne Taylor have "circled the wagons" given their failures as to Williams, and

---

[1] Discovery is still ongoing.

have suggested that Dahl was uncommunicative and tardy as to her work during her time as a SAUSA during Covid.  This petty criticism ignores, however, the fact that Dahl—like other DOJ personnel—was working remotely under federal Covid restrictions, yet brought sufficient numbers of Johnson City cases to the Federal Grand Jury under the circumstances.  It also ignores that both Johnson City and Taylor are heavily invested in defending the Johnson City SAUSA program, and defending their mishandling of the Williams case specifically and sexual assault cases generally, despite the horrific results that occurred under their watch.

**Parties**

3.11.    Plaintiff Kateri Lynne Dahl is now a resident of Madison County, Alabama, but was formerly a resident of Washington County, Tennessee. She is during her service as a former Special Assistant United States Attorney who practiced, practicing before this Court, who worked with. She was assigned to the Johnson City Police Department to bring federal charges in violent, firearm, gang, and drugdrug trafficking cases pursuant to a Memorandum of Understanding, first executed as to Dahl holding that position in September 2019, for 12nine months, and renewed in June 2020 for 12 months.

4.12.    Defendant Karl Turner currently and at all relevant times has beenwas the Chief of Police for the City of Johnson City Police Department.  At all relevant times, Chief Turner was a the final policymaker for Johnson City as to the renewing Dahl's MOU, and was responsible for supervising Dahl.  Along with other police department leadership, Chief Turner took a retirement incentive package several months after Dahl filed her original Complaint.  Dahl brings claims against Turner in his individual capacity only.

5.        Defendant Officers John Does 1 through 3 are Johnson City Police Officers.

6

~~Dahl names them as "Doe" Defendants with the expectation that their identities will be ascertained after reasonable discovery.²~~

~~6.~~13.　　Defendant City of Johnson City is a municipality that straddles the Tennessee counties of Washington, Sullivan, and Carter.  Johnson City operates as a home rule municipality and is governed by the City Manager-Commission form of government.

### Jurisdiction and Venue

~~7.~~14.　Dahl brings this civil rights action pursuant to 42 U.S.C. § 1983 and § 1988; and the First and Fourteenth Amendments to the United States Constitution.  She also brings this action pursuant to the National Defense Authorization Act, 10 U.S.C. § 2409 and 41 U.S.C. § 4712.

~~8.~~15.　This Court has jurisdiction over Dahl's federal ~~civil rights~~ claims pursuant to 28 U.S.C. §§ 1331 and 1343.

~~9.~~16.　This Court has supplemental jurisdiction over Dahl's Tennessee state law TPPA statutory claim that forms part of the same case or controversy under 28 U.S.C. § 1367.

~~10.~~17.　Venue is proper in this Court under 28 U.S.C. § 1391 because all ~~parties~~defendants reside within the Northeastern Division of the Eastern District of Tennessee, and the relevant events occurred within Washington County, Tennessee.

---

~~² Dahl concedes that the one-year Statute of Limitations set by Tennessee law may bar her from later amending her complaint to properly identify Officers John Doe 1 through 3 by name.  See, e.g., T.C.A. § 28-3-104; Braswell v. Carothers, 863 S.W.2d 722, 725 (Tenn. Ct. App. 1993).  Identifying a Doe defendant by name does not toll the statute.  Grady v. Madison Cnty., No. 1:19-cv-01153-STA-tmp (W.D. Tenn. June 5, 2020), citing Smith v. City of Akron, 476 F. App'x 67, 69-70 (6th Cir. 2012) (discussing Fed. R. Civ. P. 15(c) and the Statute of Limitations in the context of amending a pleading to identify Doe defendants).  Nevertheless, Officers John Doe 1 through 3 are necessary and sufficient parties to perfect her civil conspiracy count in this Complaint.~~

## Color of State Law

~~11.~~18.  At all relevant times, all defendants acted under color of state law. Particularly, at all relevant times, all defendants acted under color of the laws, statutes, ordinances, regulations, policies, customs and usages of the State of Tennessee.

## Jury Demand

~~12.~~19.  Dahl demands a jury trial on her claims for damages.

## Facts

### Dahl's employment under the MOU

~~13.~~20.  Dahl is a graduate of the University of Memphis and the University of Tennessee Law School.  She is a member in good standing of the District of Columbia Bar. From September 9, 2019 to July 31, 2021, Dahl served as a Special Assistant United States Attorney ("SAUSA") in the U.S. Attorney's Office for the Eastern District of Tennessee and an Assistant District Attorney in Washington County pursuant to a multi-agency Memorandum of Understanding.

~~14.~~21.  The MOU contemplates that the SAUSA would assist Johnson City to identify investigations best prosecuted in federal district court with the goals of reducing firearms, drug trafficking, and violent crime.  The MOU notes that sentences in federal court are non-parolable, and include more serious sanctions and minimum mandatory sentences than in state court.  The MOU further notes that individuals who "***are a danger to the community*** or ***are at a risk to flee the jurisdiction*** are routinely not granted bond in federal court, and therefore, will reduce the recidivism of those on bond committing additional crime." (*Ex.* 1 - 2019 MOU extension) (emphasis added).

~~15.~~22.  On May 20, 2019, Dahl had an interview for the existing SAUSA position

8

under the MOU with Wayne Taylor, the Supervisory Assistant U.S. Attorney in the Eastern District of Tennessee; defendant Chief Turner; and Ken Baldwin, the District Attorney for the First Judicial District of Tennessee. Dahl was hired pursuant to an MOU dated to start July 1, 2019, and began working as a SAUSA on September 9, 2019 after completing her background check.

~~16.~~23. Dahl's employment structure under the MOU was somewhat unusual. Johnson City funded her job by giving the funds to Washington County, who paid Dahl on behalf of the District Attorney's Office with the City's funds using IRS Form 1099. Under the MOU, Dahl was to work closely with the Police Chief of Johnson City and his officers, but was also under the supervision of the Supervisory AUSA. The MOU provided that Dahl's standard of conduct was governed by the U.S. Attorney's Office and applicable federal law "including the Standards of Ethical Conduct for ***Employees*** of the Executive Branch, 5 C.F.R. § 2635 et seq.," and provided for "***Employee*** Evaluation." (*Ex.* 1 - 2019 MOU extension) (emphasis added). Although the MOU also used the term "independent contractor" to describe Dahl's position, her position met all criteria for "employee" status, with the MOU serving as a multi-party contract of employment.[3]

~~17.~~24. The MOU described Dahl as both "Assistant District Attorney" (a state government title) and "Special Assistant U.S. Attorney" (a federal government title). The "Duties" section of the MOU stated that her first duty was "(1) She will work with the Johnson City Police Department to identify cases which are appropriate for federal

---

[3] Dahl qualifies as an employee who made a report to an authorized official of the Department of Justice or other law enforcement agency for purposes of the National Defense Authorization Act.

Case 2:22-cv-00072-KAC-JEM   Document 40-9   Filed 10/23/23   Page 9 of 61   PageID #: 441

prosecution." The MOU also stated that "Dahl will be actively involved in furthering the training of the Johnson City Police Department."

18.25. In practice, Dahl was told by Wayne Taylor, the Supervisory AUSA, that she answered both to Taylor and to Chief Turner, and to split her time between the U.S. Attorney's Office in Greeneville and the Johnson City Police Department. She was further directed by Supervisory AUSA Taylor to make an effort to assist the Johnson City Police Department however she could with identifying investigations for federal prosecution.

19.26. By contrast, in practice, she had little contact with the District Attorney's Office. Although both the Mayor and City Manager of Johnson City signed the MOU requiring her to work with the Police Department, she never interacted with either as part of her job. In practice, Chief Turner had final decision-making authority for Johnson City with respect to most of Dahl's job.

20.27. The MOU was a 12-month agreement subject to annual extension by various agency signatories, including the U.S. Attorney, the District Attorney, each of the Mayor and City Manager of Johnson City, the Mayor of Washington County, as well as Dahl herself.

21.28. The first MOU extension in June 2020 was characterized by Chief Turner as a "formality" that occurred without any objective process for evaluation of either Dahl or the MOU's goals.

22.29. Dahl had generally excellent job performance reviews by the U.S. Attorney's Office, and the Dahl's MOU was extended in June 2020. 2020 based on her performance (*Ex.* 2 – 2020 MOU extension)).

**The "Robert Voe"Sean Williams Investigation**

10

23.30.  On November 13, 2020, Dahl was approached by Toma Sparks, a Johnson City Police Department detective within its Criminal Investigation Division, to review a potential case for a felon in possession of ammunition.  The request was unusual in that it was known to be an informal policy within the Greeneville U.S. Attorney's Office that ammunition possession charges are usually declined absent a compelling reason.  That is because an "Ammunition—Felon In Possession" ("ammo FIP") conviction or plea brings minimal prison time under the federal sentencing guidelines as compared to a "firearms FIP."

24.31.  In this case, the compelling reason for the charge was the suspect, "Robert Voe",Sean Williams was under investigation by Johnson City for attempted homicide after a woman, Jane Doe 1[4], had fallen from the window of "Voe's"Williams's fifth-floor condominium apartment on September 19, 2020.  "Voe"Williams was already a convicted felon who had previously been named as a suspect in at least two Johnson City police reports for sexual assault.  Detective Sparks told Dahl about unproven, but pervasive, rumors within the local community that "Voe"Williams engaged in cocaine trafficking.

25.32.  As part of the an attempted homicide investigation, the Johnson City Police Department had previously executed a search warrant on "Voe's" condo.Williams's apartment. From "Voe's"Williams's safe and bedroom, officers recovered not just ammunition but also a handwritten note from "Voe's"Williams's nightstand with the word

---

[4] Although Dahl knows the names of the sexual assault victims identified in this pleading, she refers to them as numbered Jane Does by number in order to protect their privacy as innocent third parties.  This is a compelling reason for non-disclosure in a judicial record. *See Shane Grp., Inc. v. Blue Cross Blue Shield of Mich.,* 825 F.3d 299, 305, 308 (6th Cir. 2016).  Counsel for the parties herein has a Sealed Key identifying the Jane Does pursuant to the Court's Protective Order.

"Raped" written atop a list of 23 women's first names in black ink.

26.33.   Based on the facts provided by Detective Sparks, Dahl agreed to pursue the case, and alerted both ~~the Supervisory AUSA Taylor,~~ her direct supervisor AUSA Taylor, and her informal office mentor AUSA Tom McCauley, who had previously held the same SAUSA position that she was now occupying.

27.34.   Dahl was concerned, however, that Johnson City officers had made errors in their investigation of ~~"Voe"~~Williams to date, particularly by failing to obtain a search warrant for ~~"Voe's"~~Williams's garage nearby where he was known to socialize, show off his sports cars, and keep some of his belongings. ~~She shared these concerns with~~, including firearms–and where the victim had been just before visiting Williams' apartment and falling from his window.  Moreover, officers had waited to obtain a search warrant after the victim's fall from the window, rather than relying on the warrant exception that would allow them to search the apartment immediately to prevent destruction of evidence of a crime.  Dahl further did not understand why Detective Sparks had waited nearly two months after execution of the search warrant on Williams' apartment to approach her about the case.  Dahl shared these concerns with her Supervisory AUSA Taylor, who suggested that he could set up a meeting with the Tennessee Bureau of Investigation to provide additional help.

28.35.   Dahl stated to Detective Sparks that she would indict ~~"Voe"~~Williams on the ammunition charge, but that she wanted to build a broader case against ~~"Voe"~~Williams with more serious charges (a) given the minimal prison time for an "ammo FIP" conviction or plea, and (b) given the substantial evidence of sexual assault and attempted homicide warranting further investigation.  She also notified Chief Turner and ~~CID~~ Captain Kevin

12

Peters as to her goals for building a case against ~~"Voe".~~Williams.  In particular, she explained that she was concerned that if Williams was indicted on an ammo FIP charge alone, he would likely be released on bond and may try to flee[5] or destroy evidence.

~~29.~~36.  Rape, sexual assault and homicide prosecutions were outside the scope and goals of Dahl's employment under the MOU, in that her duties were described as covering ~~to~~ violent firearms, gang, and drug trafficking crimes pursuant to a Project Safe Neighborhoods program and the Targeted Community Crime Reduction Project (TCCRP) funded by the U.S. Department of Justice.

~~30.~~37.  Further, sexual assaults and rape are normally prosecuted by State and local officials as state crimes.  While there is a federal date rape statute, 21 U.S.C. § 841(b)(7)(A), it is rarely used as the elements are difficult to prove.  The Mann Act, 18 U.S.C. § 2421 et seq., requires proving a perpetrator transported victim(s) across state lines.

38.    Dahl was the only woman and, on information and belief, the only sexual assault survivor ever to hold the Johnson City SAUSA position.  Dahl's assault had been mishandled by police investigating that crime.  Accordingly, Dahl was particularly careful and mindful of the need to build an effective case against Williams.

~~31.~~39.  Dahl requested a copy of the relevant files that Johnson City Police Department had on ~~"Voe",~~Williams, but it took two weeks for Detective Sparks to send them to Dahl.  During that two-week period, on November 24, 2020, another sexual assault victim, Jane Doe 2, came forward and filed a report with Johnson City Police Department

---

[5] Dahl's concerns were validated by later events.  Since Williams was arrested in April 2023, he has once attempted to flee unsuccessfully (for which he was subsequently charged), and has since successfully escaped custody on October 18, 2023.  On inference from statements by the local U.S. Marshal, Williams may have had insider assistance in escaping.  Williams is now back on the lam.

13

alleging "Voe"Williams had raped her.

32.40. At the beginning of December 2020, Taylor connected Dahl with a TBI agent, and a meeting was scheduled for December 8 to review the "Voe" case. The day before, however, it was canceled after the TBI agent contracted Covid-19. Tuesday, December 8 to review the Williams case. On Friday, December 4, 2020, six minutes after receiving a group email from Investigator Will Saulsbury about the meeting, Captain Kevin Peters responded to Saulsbury, "This meeting will be cancelled as of right now." Captain Peters indicated that he would meet with the TBI representative agent by himself (without Dahl, Saulsbury, Lieutenant Jeff Legault (then a Sergeant), or Sparks) on Monday, December 7, 2020. He further wrote, "Myself and Chief Turner had a conversation with Wayne Taylor expressing our concerns yesterday."

33.41. That same day, Shortly thereafter, AUSA Taylor called Dahl to state that Chief Turner had called him, angry that Dahl had arranged a TBI meeting without his knowledge or permission. Taylor had explained to Chief Turner, however, that it was Taylor and not Dahl who had arranged the TBI meeting. Shortly afterward, Chief Turner called Dahl and asked her to come in and review the "Voe"Williams case.

34.42. Later the same day, December 8, 2020Shortly thereafter, Dahl met with Chief Turner and Captain Peters. Dahl expressed her alarm about the new evidence as to "Voe",Williams, and stated that an "ammo FIP" charge was not serious enough given the evidence. In addition to the now three formal police reports of sexual assault by Williams, witnesses had stated that Williams had a pattern of filming himself engaging in sexual misconduct, and during the search warrant execution, a defiled baby doll had been found in his safe next to a number of sex toys, raising particular concerns about the danger Williams

14

posed to children. Dahl also expressed her concern that there were additional rape and sexual assault victims who might come forward.

35. Chief Turner cast doubt on the handwritten "Raped" list recovered from "Voe's" condo,Williams's apartment, stating that the victims "are not for sure in that regard, regardless of what he wrote in the notebook." He further stated "Even the list, I don't know if that's girls he's raped or girls he's had consensual sex with and calls it whatever he calls it. All I know is there's a piece of paper with some first names on it." Chief Turner also cast doubts about Jane Doe 1, who had "fallen" from "Voe's"Williams's fifth-floor window. Captain Peters then cast doubts on the credibility of Jane Doe 2, who had recently come forward with her own allegations.

36.43. Shortly after the December 8 meeting, Dahl contacted a victim, Jane Doe 3, from one of the existing Johnson City police reports on suspect "Voe".Williams. Detective Sparks had earlier characterized Jane Doe 3 to Dahl as uncooperative. Nevertheless, when Dahl called Jane Doe 3, she readily agreed to come into the Johnson City Police Department to give a more thorough statement.

37.44. Taylor told Dahl that federal prosecutors normally are not supposed to contact sexual assault victims without a detective's involvement. Dahl believed Taylor had made this statement because investigation of sex crimes werewas outside the terms of Dahl's responsibilities under the MOU, namely to focus on violent firearms, gang, and drug trafficking crimes. Dahl responded to Taylor that she had made contact because Detective Sparks had dismissed the victim as uncooperative, but that she doubted this characterization.

38.45. On December 15, 2020, Jane Doe 3 came into the Johnson City Police

15

Department, and was cooperative.  She gave a very credible statement to Dahl and to

AUSA McCauley alleging she had been raped by ~~"Voe";~~Williams; her statement closely

mirrored that of other Jane Doe victims.

~~39.~~46.   Jane Doe 3 stated that on June 2, 2020, after waking up in ~~"Voe's"~~

~~condo~~Williams's apartment and finding that she had been sexually assaulted, Jane Doe 3

fled the ~~condo~~apartment and encountered Johnson City police officers in the lobby

downstairs.  She was in extreme distress, screaming, and shoeless as she had left her shoes

upstairs in the ~~condo~~apartment.  She recounted what had occurred upstairs in ~~"Voe's"~~

~~condo.~~Williams's apartment.  The officers ~~drove~~contacted Jane Doe 3's mother, ~~3 home to~~

~~her parents' house,~~ but ~~declined to~~did not help her seek medical attention or obtain a ~~rape~~

sexual assault kit ~~for her,~~ (which would be critical evidence), did not make a full report,

~~or~~and did not follow up with Jane Doe 3.  ~~The~~Shockingly, and against practice, the officers

made no attempt~~also declined~~ to get a statement from suspect Williams despite

encountering the distressed victim in the lobby of Williams's apartment building.    ~~"Voe".~~

~~40.~~47.   Dahl's professional judgment was that there was no legitimate law

enforcement purpose or explanation for officers to fail to investigate a distressed victim of

a sexual assault, fail to collect evidence, and to fail to investigate the alleged perpetrator,

unless the officers were ordered by a superior to do nothing~~.~~.

~~41.~~48.   Before the meeting, while waiting for Jane Doe 3 to arrive, Captain Peters

went to Jane Doe 3's Facebook profile, and made jokes about her appearance and clothing.

~~42.~~49.   Later on December 15, several hours after the meeting with Jane Doe 3,

Taylor called Dahl.  He stated that he had just received complaints from Chief Turner about

Dahl's job performance.  This was the first time that Dahl heard of any issues as to her job

16

performance from anyone.  Taylor also told Dahl that Chief Turner had alleged that Dahl was not "communicating enough" with certain Johnson City CID officers. ___

50.     Chief Turner presented Taylor with a list of Dahl's cases as to which he wanted indictments from the Federal Grand Jury.  This list was unusual in several respects. First, no such list had ever before been prepared by Johnson City as to potential cases for its SAUSA to prosecute.  Second, functionally police investigate crimes but prosecutors file charges or seek indictments based on probable cause; it would be inappropriate for municipal police officers to determine which cases should be prosecuted, particularly by a federal prosecutor.  Third, the DOJ Justice Manual and American Bar Association criminal justice standards also counsel that the decision to prosecute is to be made on a case-by-case discretionary basis, and that the client of the prosecutor is the public—not a particular law enforcement agency or law enforcement officer.  Fourth, Chief Turner had no idea as to changes with the Federal Grand Jury during the Covid-19 pandemic in 2020.  Indeed, the Federal Grand Jury in the Greeneville division (where Dahl was based) had shut down in late March 2020 and did not restart until November 2020, on a reduced schedule.   Further, Dahl—with the permission of her DOJ supervisor—was out of state the week before the October 2020 Federal Grand Jury in the Knoxville division, and therefore could not effectively bring indictments then.  Dahl did proceed to present indictments to the Federal Grand Jury thereafter at a rate commensurate with her Greeneville peers given the limited slots available under pandemic operating conditions—a circumstance that her mentor AUSA McCauley jokingly described to the office as the "Hunger Games" in terms of competition for Federal Grand Jury slots.

43. 51.  In response to Chief Turner's comments, Dahl approached three Johnson

17

City CID officers with whom she frequently worked, and asked if they had a problem with how she communicated. Investigator Kirt ~~Still Wagon~~Stillwagon, Investigator ~~Will~~ Saulsbury, and ~~Sergeant Jeff~~Lt. Legault all contradicted Chief Turner's allegation, stated that they did not have any issues with how Dahl communicated with them, and further stated they did not know why Turner had made the allegation. On information, Investigator Saulsbury and Lt. Legault were not being truthful and candid with Dahl about what they had earlier stated to their superior officers.

44.52. The conversations with three CID officers led Dahl to reasonably suspect that Chief Turner's job performance complaint was pretextual and in fact an act of retaliation for her investigation of ~~"Voe".~~Williams.

45.53. Soon thereafter, Dahl identified yet another sexual assault victim of ~~"Voe",~~Williams, and began to establish a modus operandi for how ~~"Voe"~~Williams conducted his sexual assaults:[6] Dahl obtained credible statements that ~~"Voe"~~Williams would meet young women and invite them to come to his ~~condo,~~apartment, often after he bought them alcoholic drinks and/or gave them cocaine. A young male associate of ~~"Voe's"~~Williams would sometimes help ~~"Voe"~~Williams in meeting these young women. The women would then pass out at ~~"Voe's" condo,~~Williams's apartment, and later awaken to find that ~~"Voe"~~Williams had sexually assaulted them.

46.54. From December 2020 through March 2021, Dahl repeatedly asked Chief Turner, ~~Captain Peters,~~ and Johnson City CID investigators to further investigate

_____

[6] For a prosecutor, similarity is an important concept as it permits prior sexual assaults to be admissible evidence in a criminal prosecution under Fed. R. Evid. 413(a). *See generally United States v. Mandoka,* 869 F.3d 448, 453-54 (6th Cir. 2017); *United States v. Morris,* 494 Fed.Appx. 574, 584 (6th Cir. 2012)*, cert. denied,* 568 U.S. 1107 (2013); *United States v. Miller,* 3:20-CR-58-KAC-HBG (E.D. Tenn. Aug. 27, 2021).

18

"Voe".Williams.  Nevertheless, after Chief Turner's baseless complaint, presentment of the list of Dahl cases, the Johnson City Police Department failed to further investigate "Voe."Williams.

47.55.  Instead, when Dahl pressed the need to build a case, Chief Turner, Captain Peters and other Johnson City officers made repeated comments dismissing the credibility of the Jane Doe victims. For example, one Johnson City investigatorDetective Toma Sparks stated to Dahl, "In my 20 years on the force, I've only encountered one real rape." [7] Another stated about Jane Doe 1, "You can see her on the security footage, and she's dressed like a real… well I won't say it."

48.56.  Dahl reasonably became concerned and confused by Johnson City's failure to investigate "Voe."Williams.  One male investigator stated to Dahl: "Well Kat, if you're so invested in developing this case, go have a drink at Label[8] and let ["Voe"][Williams] pick you up and take you back to his place. We'll come get you in an hour." Instead of refuting the allegations, the investigator's words suggested Dahl would have better luck assembling evidence if she voluntarily made *herself* a victim of sexual assault.

49.57.  Johnson City investigators also unreasonably delayed producing requested documents to Dahl.  For example, in early November 2020, Dahl began seeking a federal search warrant for "Voe's"Williams's computer and phone SIM card, but Johnson City officers did not provide needed documentation until mid-January 2021.  By that point, after four months, the evidence for the probable cause affidavit was too old and stale to meet

---

[7] This was a bizarre comment given the fact that Detective Sparks appears on all or nearly all of the police reports for Williams's sexual assault victims, despite the fact that he is not a sex crimes investigator and lacks specialized training other than a relatively brief annual state-mandated course on child sex crimes that all Tennessee officers must take.

[8] "Label" is the name of a bar near "Voe's" condoWilliams's apartment.

19

federal requirements for obtaining a search warrant. Moreover, the probable cause affidavit prepared by Detective Sparks was so bare-bones as to be unusable. Dahl mentioned to her Supervisory AUSA Taylor her concerns about the deficiencies in the affidavit, and worries that a case against Williams could be suppressed because of a defective affidavit.

58. In February 2021, Chief Turner again called AUSA Taylor to complain about Dahl. In response, Dahl sent a copy of Sparks's affidavit to her mentor AUSA McCauley to show him the poor quality of Sparks's work product and to share her frustration about Johnson City's mishandling of the Williams investigation.

50.59. Dahl had also requested that Johnson City CID investigators obtain a certified copy of "Voe's"Williams's earlier felony judgment conviction, which she needed to prosecute "Voe".Williams. Unreasonably, CID investigators never produced a copy, and eventually Dahl obtained a certified copy through other means. The delay by JCPD in providing this essential documentation ultimately delayed Dahl's ability to indict Williams on the ammo FIP charge.

51.60. In January 2021, a fourth sexual assault victim of Williams, Jane Doe 4, came forward to Johnson City anonymously; investigators unreasonably failed to notify Dahl.

52.61. In January 2021, an unknown person prominently scrawled the word "Rapist" as graffiti on "Voe's"Williams's garage. Johnson City officers joked that Dahl herself had made the graffiti. (She did not.) (*Ex.* 3 - Graffiti photograph)).

53.62. In early 2021, Dahl continued to hear additional allegations against Williams from members of the downtown Johnson City community, including a woman in her yoga class, a friend with whom she had a drink at a local bar, and a colleague in the

Federal Defender's office.

63.  At the same time, two Johnson City police officers opined that Dahl was "obsessed" with pursuing a broad case against Williams, and stated to Chief Turner that their preference was for Dahl to focus on federal charges involving relatively more minor state cases involving possession of meth, and felons possessing firearms.  Those officers updated the unusual list of cases they wanted Dahl to prosecute and delivered it to Chief Turner.

54.64.  Finally, in April 2021, Dahl decided to prosecute "Voe"Williams just for the "ammo FIP" charge, hopingrealizing that the publicityJohnson City would not bring her additional evidence to present additional charges against Williams.encourage other sexual assault victims to come forward.  On April 13, 2021, Dahl indicted "Voe"Williams under seal for the "ammo FIP", and obtained a federal arrest warrant that same day.

55.65.  Dahl told Chief Turner and Captain Peters that "ammo FIP" charges only brought sentences of two to three years, and reiterated the need to develop a broader case against a dangerous perpetrator. They laughed and said they would be "retired at the lake" by then.

56.66.  The policy of the Greeneville U.S. Attorney's Office states that responsibility for arresting a criminal defendant falls to the investigating agency, unless the defendant is a fugitive, in which case the arrest falls to the U.S. Marshals. In the "Voe"Williams case, Johnson City Police Department was the investigating agency, and "Voe"Williams was not (yet) a fugitive; therefore responsibility for "Voe's"Williams's arrest lay with the Johnson City police.  Detective Sparks told Dahl that the Johnson City Special Investigative Squad ("SIS") would be responsible for executing the federal

21

arrest warrant.

57.68. Dahl spent the next several weeks after April 13, 2021 asking SIS and Detective Sparks to arrest "Voe"Williams approximately 30 times, but was either ignored entirely, or met with excuses as to why the arrest could not be carried out. The excuses were nonsensical: the SIS officers were too busy, or were in training, or could not find "Voe"Williams (despite knowing where he lived and worked). One officer stated that they could not execute the federal arrest warrant because the police lacked the door code to the lobby of his condoapartment building.

58.68. On May 4, 2021, Plaintiff Dahl had a conversation with Detective Sparks and Sergeant Lt. Legault about her concerns that "Voe"Williams had not been arrested, and demanded that someone within the Johnson City Police Department carry out the arrest immediately.

69. On May 6, 2021, Dahl received a voicemail from Johnson City Lieutenant Don Shepherd with the Johnson City Police Department CID. Lt. . Lt. Shepherd relayed that defendant Officers John Doe 1 through 3 fromthree Johnson City officersSIS had gone to "Voe's" condoWilliams's apartment the night before, and asked "Voe"Williams to come outside the closed front door to his condo unit, stating to "Voe" and others inside the condo unit that unit. This was after Detective Sparks had finally issued a "be-on-the-lookout" email ("BOLO") for Williams's arrest, which had contained no details of his crimes or dangerousness.

70. Although Johnson City did not issue a written Threat Assessment for Williams in connection with the execution of the arrest warrant, Johnson City officers were required to follow General Order 200.04A and CALEA accreditation standards.

22

71.     911 tapes obtained since the original Complaint was filed and now in the public domain show that a Johnson City officer (Officer Jason Lewis) knocked on William's door around 9:50 p.m.  Thus, this was an attempted "knock" execution of the arrest warrant by a single officer without back-up present at the scene.

72.     After Officer Lewis knocked on the door to Williams's apartment, Williams called 911, variously first admitting to the dispatcher that he was in his apartment, then later denying that he was and stated that it was his "roommate or whoever is there." Williams stated that he did not know why a JCPD officer was there, and asked the 911 dispatcher what the issue was, at one point saying words to the effect of the officer "can call me and tell me what this is about or wait for my lawyer to get here."  The 911 dispatcher stated to Williams that another officer was on the way.  Williams then went silent and eventually hung up.

73.     Williams called 911 back six minutes later, after another officer (Officer Vanessa McKinney) had arrived on the scene, and the two officers again tried to get Williams to answer the door.   Williams confirmed that he was in his apartment.  The 911 dispatcher stated that a sergeant was on the way as well.   The 911 dispatcher stated that she did not know what this was about.  The officers tried to call Williams, but the calls went to voicemail because Williams was already on the line with the 911 dispatcher.

74.     Williams called a third time to say that the officers should call Williams's lawyer instead of contacting Williams.

75.     At some point a third officer (a supervisor named Sergeant Jim Tallmadge) arrived outside the door.  The supervisor stated to 911 that he believed Williams was either in the apartment or at his garage close nearby.  The 911 operator stated that Williams's cell

23

phone was "mapping" in the vicinity of Williams's apartment, and "I guarantee you he's home." Within 22 minutes of their arrival, the officers left Williams's building on direction of Tallmadge, who also stated that "he'd have to be an idiot not to know that something's up … that we have some sort of warrant or something or other."  The supervisor also stated that "they ~~had a warrant for "Voe's" arrest.  This was~~ put it out there with very little detail" (a reference to the BOLO) and that he would "talk it over with the Captain."

76.     The supervisor stated that Williams's apartment had steel plates on all the interior walls and the interior of two doors leading into Williams's apartment (a detail that had not been included in the BOLO email).  The supervisor also stated that "we've already tipped our hand as it were."

~~59.~~77.     This was improper because the target of an arrest warrant should not be ~~notified when his or her~~tipped off by word, deed or omission that there may be an arrest warrant, as that effectively provides notices to him of his indictment while it is still under seal.  ~~When "Voe" declined to leave his condo and submit to arrest, Officers John Doe 1 through 3 left~~By knocking on his door, not stating their purpose, and then leaving, the officers essentially tipped Williams off as to his arrest warrant.

~~60.~~78.   ~~The decisions by Johnson City officers to notify "Voe" of the warrant for his arrest, and then, after "Voe" declined to leave his condo to submit to arrest,~~By simply ~~to leave~~leaving without attempting an arrest, without exigent circumstances such as an objective threat to officer safety, the officers violated their duties under clear policy and almost universal historical practice. Indeed, no reasonable officer would fail under such circumstances to execute an arrest warrant on a felon solely because the felon declined to leave his home and submit to arrest.  In Dahl's experience, Johnson City officers generally

24

treated executing felony arrest warrants as a serious part of their job duties, which they routinely performed even in cases involving risks to officer safety. In that regard, the attempt to execute the arrest warrant by a "knock and talk" on Williams's door pursuant to a BOLO, and without a written Threat Assessment Plan, was baffling. Given that Williams lived in a high-rise apartment building with only two exterior doors, even after tipping off Williams to the warrant, officers could have prevented him from fleeing by simply surveilling the building exits until he left the premises.

61.79.  The day after Johnson City police officers tipped off "Voe"effectively notified Williams about the federal arrest warrant, and thus his indictment, "Voe"Williams fled his apartment and became a fugitive from justice. Despite social media postings by "Voe"Williams and others indicating "Voe's"Williams's whereabouts, "Voe" has been Williams was a fugitive ever sinceuntil he was arrested on April 29, 2023 in North Carolina, when a campus security officer happened to come across him nearly asleep in his car with evidence of crimes in plain view.

62.80.  "Voe's"Williams's unlawful flight was possible only because of intentional or reckless misconduct byJohnson City effectively "tipped off" Williams as to the arrest warrant, in the words of the supervisor on scene, and Johnson City officers then failed to monitor his subsequent movementsJohn Doe 1 through 3.

63.81.  These events were extremely concerning to Dahl. Obviously, the fact that a suspected serial rapist, sexual assailant, and attempted murderer was now at-large meant that it would be nearly impossible to prevent new serious crimes, or even reliably identify new victims. But beyond that, the botched arrest made Dahl reasonably wonder whether the Johnson City Police Department's misconduct went beyond plain incompetence and into

25

deliberate conspiracy to protect ~~"Voe."~~Williams.

64.82.  Dahl called ~~Sgt~~Lt. Legault and Sgt. Matt Gryder to express her extreme displeasure with the mishandled arrest attempt, noting that she had made approximately 30 phone calls to Johnson City officers to arrest ~~"Voe"~~Williams after he had been indicted, all to no avail.  Dahl also stated to ~~Sgt~~Lt. Legault that she had previously communicated her fears that ~~"Voe"~~Williams presented a substantial flight risk, but her valid concerns had been dismissed.

65.83.  Under the goals of the MOU, a properly executed arrest of ~~"Voe"~~Williams would have prevented him from fleeing.  The MOU notes that "individuals whom the court determines are a danger to the community or ***are at a risk to flee the jurisdiction*** are routinely not granted bond in federal court, and therefore, will reduce the recidivism of those on bond committing additional crime." Therefore, the failure to arrest ~~"Voe"~~Williams contradicted one of the explicit purposes of the MOU governing Dahl's employment.

66.84.  On May 11, 2021, on her own initiative and outside her chains of command at the U.S. Attorney's Office and Johnson City Police Department, Dahl made a report to an agent with the local Federal Bureau of Investigation office expressing her concerns about how Johnson City Police Department had handled the ~~"Voe"~~Williams case.

67.85.  On May 19, 2021, Dahl met with Chief Turner and Captain Peters to review the status of various ongoing cases.  Dahl raised her particular concerns as to the ~~"Voe"~~Williams case.  Chief Turner and Captain Peters were dismissive, joking that if ~~"Voe"~~Williams served any additional time, they would be retired by the time he was released.  Chief Turner and Captain Peters further jokingly accused Dahl of having thrown a rock through the window of Williams' garage, suggesting that only Dahl would have

26

been so upset about Williams' conduct to have done so. Chief Turner and Captain Peters seemed to be more interested in getting Williams out of Johnson City so that they would no longer be responsible for him, than in removing him from the public so that he could not commit future crimes.

4.    Chief Turner then brought up Dahl's forthcoming MOU extension.  He stated that he was communicating with the Johnson City Board of Commissioners for an extension of the MOU for her employment contract, and ~~told Dahl~~ discussed providing an update to ~~expect a smooth renewal and~~ the Commissioners about her accomplishments sometime that summer. ~~process for extension was a "formality."~~ The implication was that Turner could unilaterally renew Dahl's contract, or at least be the decisionmaker as to renewing Dahl's contract on whose judgment and recommendation the City Manager and Commissioners relied.

~~68.~~86.  ~~.~~

~~5.~~87.   Finally, Chief Turner and Captain Peters pressured Dahl to indict five particular drug and gun cases at the June 2021 Federal Grand Jury.[9]  Dahl stated that she would try to do so.

88.    Two days after the May 19 meeting, Dahl was assigned by DOJ to try a criminal case involving thorny witness testimony on June 8 and 9.[10]  This was to be Dahl's

---

[9] Of those five cases, three were never federally indicted, presumably for lack of probable cause or other defects preventing prosecution.  A fourth was eventually indicted by the U.S. Attorney's Office in October 2021 with drug charges against a non-violent woman already in state custody who posed no threat to public safety.  The fifth—a related case—was also indicted in October 2021 against a man who possessed a sufficient quantity of meth to show intent to distribute.
[10] That case settled with a plea agreement less than a week before the scheduled trial. *United States v. Chism*, No. 2:19-CR-115 (E.D. Tenn.).

first trial as a licensed attorney, and her second at DOJ given that she had helped with one previous trial as a law student. It also occurred at a time when her paralegal had left the office, which was generally short-staffed under Covid-19 restrictions. That the trial was proceeding at all was a "little bit shock[ing]" to DOJ personnel, as it was the first trial to occur involving the Greeneville office since Covid-19 had first occurred. The trial required AUSA Taylor to reschedule the June Federal Grand Jury to June 9 when Dahl was otherwise to be in trial. Taylor also noted to Greeneville office personnel in a June 2 email that DOJ had approved a new "cap" allowing 17 instead of 12 persons to be in the office on any given day.

69.89. During the month of May, before she was assigned to the June trial, Dahl became increasingly worried about the "Voe"Williams case, and perceived increasing indications of deliberate misconduct by the Johnson City Police Department. Consistent with all laws and policies, but beyond the facial terms of the MOU, Dahl began quietly investigating "Voe"Williams herself, including through no less than eight interviews with individuals who lived and worked in downtown Johnson City near "Voe's" condo.Williams's apartment. Unanimously, they told her that they had personal information and belief that "Voe"Williams serially intoxicated and/or drugged, then raped or otherwise sexual assaulted, young female victims. Unanimously, they stated that "Voe"Williams had a well-known reputation in the downtondowntown Johnson City community for this criminal misconduct.

70.90. Another victim, Jane Doe 5, contacted Dahl on June 14, 2021. Jane Doe 5's account of her sexual assault by "Voe"Williams mirrored that of the other Jane Does.

71.91. Dahl became concerned that the Johnson City was intentionally refusing or

28

recklessly failing to investigate or seize ~~"Voe".~~Williams, either (a) because ~~"Voe"~~Williams was corruptly paying off Johnson City officers, and/or (b) to cover up its plain incompetence.

~~72.~~92.  Dahl's investigation, while consistent with all laws and policies, went beyond the facial terms of her MOU in multiple respects.

~~73.~~93.  First, ~~While~~while Dahl was tasked under the MOU to investigate and prosecute suspects such as ~~"Voe"~~Williams for the "ammo FIP" charge, she was not tasked under the MOU with prosecuting either sexual assault or public corruption cases.

~~74.~~94.  Second, the MOU contemplated Dahl would investigate and prosecute private citizens, not the Johnson City Police Department, which was the primary law enforcement agency of two of the signatories to her MOU (the Mayor and City Manager of Johnson City). Nor did the terms of Dahl's MOU contemplate investigating or prosecuting one of her supervisors, namely Chief Turner, nor the Johnson City police officers with whom she worked hand-in-glove.

~~75.~~95.  Third, outside her chains of command, Dahl repeatedly spoke out to third parties, describing her concerns about the police department's failure to investigate ~~"Voe"~~Williams for the many ~~rape~~sexual assault cases, and also her concerns about Johnson City Police Department's motive for its inaction and baffling conduct as to ~~"Voe".~~Williams.

~~76.~~96.  For example, starting in November 2020, Dahl shared her concerns with her mentor AUSA McCauley and other federal prosecutorial colleagues outside her chain of command, and continued to voice concerns in December 2020 after another Jane Doe victim came forward on November 24, 2020.

77.97.  For example, starting in December 2020, Dahl shared her concerns with a friend at the Federal Defender's Office, and with two other female friends, warning them to be cautious in going out to downtown bars in Johnson City because of "Voe's"Williams's history of predations.

78.98.  For example, in May 2021 without notifying her chains of command, and beyond the scope of her job responsibilities, Dahl reported her concerns to an FBI agent, describing not just the situation concerning wanted suspect "Voe",Williams, but also concerns about the Johnson City Police Department.  This was particularly because her complaints about Johnson City's handling of Williams had fallen on deaf ears not just with Johnson Cty, but also with her Supervisory AUSA Taylor.

79.99.  Johnson City Police Department had a liaison assigned to detail in the local FBI office who regularly communicated with Chief Turner.

### Chief Turner fires Dahl

6.    On reasonable inference, Chief Turner came to learn of Dahl's communications about Johnson City's failure to investigate or seize Williams"Voe" to other agencies and to other individuals in the Johnson City community, and particularly her report to the local FBI office.  On reasonable inference, Chief Turner also came to learn of Dahl's own continued investigation of Williams"Voe" beyond the scope of her responsibilities as described in the MOU.

80.100.           -

81.101.           On June 25, 2021, one week before her MOU was to be extended, Chief Turner called Dahl and informed her that Johnson City would not be renewing her contract, and that her job would be terminated at the end of the month, less than a week

30

later.

82.102.      Dahl was shocked.  Chief Turner had given no previous indication that Johnson City was considering not extending the MOU.  Dahl had a full caseload and a trial set for September 2021, and only a few weeks before, Chief Turner had personally assured her she could expect a smooth renewal.

83.103.      Dahl immediately contacted her Supervisory AUSA Taylor, who was also shocked and exclaimed "What are you talking about?"  Turner said that Chief Turner had never expressed any intent to terminate Dahl's job, and that Taylor was displeased Chief Turner acted this way.  Notwithstanding the MOU's status as a multi-agency agreement between the U.S. Attorney and various local government officials, Chief Turner acted unilaterally to have Johnson City terminate the MOU.  No one within the U.S. Attorney's Office was informed of Chief Turner's intention before his announcement to Dahl, nor did anyone inside the U.S. Attorney's Office have control over Dahl's dismissal, because Turner had effective control over the funding of Dahl's salary.

84.104.      On information and belief, no other agency or signatory to the MOU was involved with, previously informed about, or had control over Chief Turner's decision to terminate Dahl.

85.105.      Supervisory AUSA Taylor immediately contacted Chief Turner, and managed to convince him to extend the MOU for a month so that Dahl would have more time to transfer her pending cases to other federal prosecutors.  AUSA Taylor later characterized Chief Turner's actions and lack of communication as "discourteous."

86.106.      A few days after June 25, 2021, Dahl received a letter signed by Chief Turner personally stating that Johnson City did not wish to extend her employment

31

under the MOU.  It did not give a reason.  It was dated June 24, the day before Chief

Turner called Dahl to notify her of her termination, and did not mention the extension that

Taylor had negotiated. Dahl reasonably infers that the letter was written before Chief

Turner called Dahl, ~~and~~ with the assistance of City Attorney Sunny Sandos, before Taylor

had spoken with Chief Turner.  (*Ex.* 4 – Turner letter dated June 24, 2021).

~~87.~~107.          On June 28, 2021, Dahl called Chief Turner and asked for an

explanation as to why the MOU was not ~~extended~~renewed.  Chief Turner asked Dahl to

meet with him in person the next day.

~~88.~~108.          At the meeting, Chief Turner stated that Dahl had not been

~~unresponsive~~ responsive in communicating with his Johnson City officers.  Dahl disputed

this assertion by telling Chief Turner that she had raised this issue with his ~~CID~~ officers as

early as December 2020, and they unanimously told her that they did not have any

problems with her communication.  This was also ironic given Chief Turner's

"discourteous" lack of communication with any agency partners about his decision not to

renew Dahl's MOU.

~~89.~~109.          Immediately after her meeting with Chief Turner, Dahl next met

separately with ~~Sgt~~Lt. Legault, with whom she then believed that she had ~~always~~had a

trusting and collegial professional relationship, to discuss her termination.  ~~Sgt~~Lt. Legault

admitted that Chief Turner had called him that morning, and apparently out of the blue,

asked him (Legault) about whether or not Dahl had ever been unresponsive.  ~~Sgt~~Lt. Legault

told Dahl words to the effect that he had first expressed confusion to Chief Turner as to

what constituted a "timely response."  He then told Chief Turner that he (~~Sgt~~Lt. Legault)

had no problems with Dahl's responsiveness, and that there were "maybe six times where

she went a day or two when I haven't heard from her" over the course of nearly two years. Both the timing of Chief Turner's call to Lt. Legault, and Lt. Legault's answer to ~~Chief Turner~~Dahl, strongly suggest that Chief Turner's purported reasons for terminating Dahl's employment were ~~entirely false and~~ pretextual.

~~90.~~110.　　　On July 23, 2021, Dahl met with Sergeant Matt Gryder, with whom she had always had a trusting and collegial professional relationship, about her termination. Sgt. Gryder told Dahl that Captain Peters had alleged to him that Dahl had "lied" to Chief Turner and Captain Peters on May 19, ~~2020~~2021 about which cases she planned to indict for a June Grand Jury.

~~91.~~111.　　　Sgt. Gryder knew that the allegation was false, and told Dahl that he had directly challenged Captain Peters' statement, but that Captain Peters refused to listen. Sgt. Gryder well knew the June Grand Jury case schedule because he himself was a key witness for ~~a~~the case that ~~Dahl~~had been set for trial ~~in~~on June 8th and 9th, and as such he had first-hand knowledge about Dahl's trial preparation and schedule during those weeks for planning purposes.

~~92.~~112.　　　Dahl asked Supervisory AUSA Taylor if she could make a report to the U.S. Department of Justice Office of Inspector General about her concerns as to Johnson City Police Department's failure to investigate or seize ~~"Voe",~~Williams, and concerns about either incompetence or corruption at Johnson City Police Department. Taylor told Dahl that she could not make such a report, citing a supposed lack of OIG jurisdiction.

**Dahl finds more Victims**

~~93.~~113.　　　On July 1, 2021, another victim, Jane Doe 6, contacted Dahl to state

33

that ~~"Voe"~~Williams had raped her. Jane Doe 6's account was extremely similar to the statements made by the other Jane Does. Jane Doe 6 stated that she had been assaulted in January 2021, months after the ~~"Voe"~~Williams investigation began.

~~94.~~114.        In July 2021, Dahl's review of newspaper articles led her to identify a Jane Doe 7. Understanding her story requires rewinding the chronology about eight months, to November 10, 2020. That night, Jane Doe 7 died after crashing her car. She had last been seen alive with ~~"Voe."~~Williams

~~95.~~115.        Months later, after Dahl found newspaper reporting on the case, Dahl proactively contacted Jane Doe 7's family, and spoke to one of her sisters. Dahl was shocked by what the sister said:

a.    The night of the crash, Jane Doe 7 had called one of their other sisters that evening in extreme emotional distress. Jane Doe 7 attempted to tell her sister why she was distraught, but was incoherent. Against her sister's advice, Jane Doe 7 attempted to drive home, and died in a car crash in neighboring Elizabethton.

b.    Two days after Jane Doe 7's death, on or about November 12, 2020, one of Jane Doe 7's sisters had contacted the Johnson City Police Department regarding ~~"Voe's"~~Williams's connection to her sister Jane Doe 7's death, concerned that Jane Doe 7 may have been sexually assaulted and/or drugged by ~~"Voe".~~Williams.  The sister was falsely told by a Johnson City officer that Johnson City lacked jurisdiction because the death did not occur in Johnson City. This was obviously incorrect as a matter of law because relevant allegations as to ~~"Voe"~~Williams and Jane Doe 7 occurred within Johnson City

limits. This raised further reasonable suspicions that the John City Police

Department was engaged in misconduct with respect to ~~"Voe".~~Williams.

c.  After the car crash, the sister speaking to Dahl tracked down ~~"Voe"~~Williams

and confronted him. ~~"Voe"~~Williams admitted taking Jane Doe 7 back to his

~~condo,~~apartment, after Jane Doe 7 had been drinking at a nearby brewery with

her sisters, boyfriend and friends, and had become disoriented.   (A portion of

the November call between ~~"Voe"~~Williams and Jane Doe 7's sister is recorded

and, on information and belief, in possession of the sister.)

d.  The sister told Dahl that a particular investigator from Tennessee Alcohol

Bureau of Control ("TABC") told Dahl that she (the TABC investigator) had

contacted the Johnson City Police Department concerning the Jane Doe 7 case

in connection with her death, but received no cooperation or follow up. Dahl

called the particular TABC agent, who confirmed the sister's account. This

raised further reasonable suspicions that the Johnson City Police Department

was engaged in misconduct with respect to ~~"Voe."~~Williams.

~~96.~~116.        Dahl's conversation with Jane Doe 7's sister occurred in July 2021.

But as Dahl put the pieces together, the situation appeared even more anomalous. Recall

that Dahl had been asked to investigate the "ammo FIP" case against ~~"Voe"~~Williams on or

about November 13, 2020, just one day after Jane Doe 7's sister had contacted the Johnson

City Police Department.  But shockingly, in the ~~8~~eight months that had since elapsed,

throughout all of the efforts to investigate and arrest ~~"Voe,"~~Williams, no police officer had

ever told Dahl about Jane Doe ~~7~~7's death in November 2020, or the ~~"Voe"~~Williams

connection.

35

97.117.      Dahl inferred, reasonably, that the only plausible reason the police had not notified her (Dahl) of Jane Doe 7's sister's complaint was because Chief Turner did not want her to know, and ordered his officers not to inform Dahl.

98.118.      Several witnesses and Jane Doe 8 expressed their concern to Dahl that "Voe"Williams was able to get away with his behavior by paying Johnson City Police officers off.  "Voe"Williams was known to have significant financial assets, and was often witnessed around downtown Johnson City with thousands of dollars in cash at the local bars.  Jane Doe 8 stated that she had witnessed Johnson City officers at "Voe's" condoWilliams's apartment for unexplained reasons unrelated to criminal investigations or community caretaking, that she had witnessed exchanges of unknown things between "Voe"Williams and Johnson City at "Voe's" condoWilliams's apartment that seemed inappropriate, and that she was fearful that "Voe"Williams was bribing law enforcement at Johnson City.  Jane Doe 8 gave detailed descriptions to Dahl of some officers' appearances and voices that corroborate Dahl's knowledge of those officer's identities.

99.119.Dahl's last day at the Greeneville U.S. Attorney's Office was July 31, 2021.  She left the U.S. Attorney's Office with wide support and in good standing. When she left, she was presented with a framed print signed by most or all of her federal colleagues, a card signed by the same with well wishes, and a $150 gift card.  One of the federal district judges before whom she appeared offered to serve as a reference for future employment.

100.120.      In January of 2022, now a private citizen, Dahl became aware of three more victims, Jane Does 8, 9, and 10, who claimed that "Voe"Williams had raped them.  Dahl spoke to Jane Does 8 and 9 about their sexual assaults, and their accounts were highly similar to those of previous Jane Doe victims.

36

101.121.　　Dahl is a lawful whistleblower who suffered unlawfullyunlawful termination as retaliation for engaging in repeated protected communications and activities in her role as SAUSA, and as a private citizen.

102.122.　　Further, before filing this complaint in U.S. District Court, Dahl filed another protected, lawful whistleblower disclosure with two offices at the U.S. Department of Justice (specifically the Office of Inspector General, and the Criminal Division, Public Integrity Section) describing these facts, and urging the Department to initiate investigations into the Johnson City Police Department and the circumstances of her termination.

103.123.　　Dahl has lawful whistleblower status under both Tennessee and United States law.

**Events after Dahl filed her Complaint**

124.　　After Dahl's filing of her original Complaint in June 2022, a flurry of activities occurred outside of the four corners of this case.

125.　　Local community activists pushed Johnson City to fire Chief Turner, who along with other senior police department leadership took retirement incentive packages several months later.

126.　　Details emerged that Williams, after fleeing, was able to sell his apartment as well as two other units in the same building in May 2021 after he had fled and was at large. Williams posted about the sale on Facebook and even communicated about the sale in public Facebook posts with a local official appointed to the Johnson City Development Authority by Johnson City commissioners. As recently as April 2022, Williams had felt safe and comfortable visiting the Washington County Register of Deeds office, where he

37

caused a ruckus over the filing of a deed related to the apartment, and caused office staff there to file a report with the Jonesborough Police Department.

127.    On August 24, 2022, Johnson City's City Manager Cathy Ball sent a letter to the local District Attorney in the First Judicial District asking him to open a "preliminary investigation" into police corruption identified by a Jane Doe in the initial Complaint in this suit.  A couple weeks later, the newly-elected District Attorney explained in a letter back to Johnson City that there is no such thing as a "preliminary investigation" and that he had not referred the Williams matter to TBI.  Johnson City at no point contacted the U.S. Department of Justice to conduct an investigation, which is odd because normally investigation and prosecution of local corruption is conducted by federal law enforcement and federal prosecutors, particularly given the "hand-in-glove" close working nature of local police and prosecutors, the lack of a corruption unit at the District Attorney's Office, and the fact that the local D.A.'s Office had no history of prosecuting corruption in local police departments.[11]

128.    On August 26, 2022, Johnson City issued a press release blaming Dahl for taking five months to indict Williams, and stating that Dahl had caused "unjustifiable damage" to the City, Chief Turner and the Johnson City Police Department.[12]

---

[11] As an example, it was the U.S. Attorney who federally prosecuted a local First District prosecutor for soliciting commercial sex acts in exchange for dropping and expunging drug charges.  *United States v. William E. McManus, Jr.,* No. 2:21-cr-36 (E.D. Tenn.). Similarly, it was the U.S. Attorney who indicted—but later dropped charges as to—another First District prosecutor on extortion charges.  *United States v. Erin McArdle,* No. 2:20-cr-00056 (E.D. Tenn.).
[12] The press release is available at https://www.johnsoncitytn.org/news_detail_T11_R1375.php (last accessed Oct. 4, 2023).

38

129.     Local community activists also pushed to investigate the City's handling of sexual assaults.   On the recommendation of Chief Turner, Johnson City retained Eric P. Daigle of the Daigle Law Group, an outside expert and former highway patrolman in Connecticut, to perform a review.  In a press release, the City characterized the Daigle Law Group as "a leading law firm specializing in management consulting services in support and development of effective and constitutional policing practices."[13]  Johnson City went on to say "Daigle will have access to all sexual assault reports from the past 4 and half years to determine how they were handled as compared to national standards set by the Commission on Accreditation for Law Enforcement Agencies (CALEA) as well as the District Attorney's Office and the JCPD's general orders.  Daigle will interview Police personnel, victims and others as needed before developing a complete report of findings."[14]

130.     Daigle's 45-page audit, known as the "Daigle Report," looked at over 300 sexual assault cases handled by the Johnson City Police Department from 2018 through 2022 and found several key issues including poor record keeping; inconsistent, ineffective and incomplete investigations; flaws with the closing of investigations insufficient training; and insufficient department policies and procedures.  It is a widely-publicized government report admissible in the case under Fed. R. Evid. 803(8)(A)(iii).  (*Ex.* 5 – Daigle Report).

131.     The Daigle Report at 32 found that "[f]ollowing the denial of a criminal investigation, JCPD should have moved forward with an internal investigation to address the misconduct allegations" that Dahl had made in this lawsuit.  Chief Turner also confirmed to Daigle in December 2022 that no investigation was initiated.  The Daigle

---

[13] The press release is available at
https://www.johnsoncitytn.org/news_detail_T11_R1357.php (last accessed Oct. 4, 2023)
[14] *Id.*

Report at 32 bemoaned the lack of investigation, stating that it "may have assisted us [Daigle] in locating or identifying documents specific to the JCPD's investigation of sexual-related cases that were not discovered during the DLG audit."  Nor did Daigle apparently interview any of the sexual assault victims of Sean Williams.  On inference, then, the Daigle Report was essentially incomplete as to the Sean Williams victims.

132.    Johnson City's failure to conduct an Internal Affairs investigation into the Sean Williams cases appears also to have violated its own General Order 300.08-13 (4.1.7) as well as CALEA accreditation standards.

133.    The Daigle Report—again, the City's own retained expert—also found that between January 2018 and December 2022:

a.      The City maintained poor record keeping as to over 325 reports of sexual assault made to the City.

b.      The City conducted inconsistent, ineffective and incomplete investigations into over 325 reports of sexual assault made to the City.

c.      The City had flaws with the closing of investigations into over 325 reports of sexual assault made to the City.

d.      The City had insufficient training procedures as to sexual assault investigations that did not meet industry standards and legal requirements.

e.      The City had insufficient department policies and procedures as to sexual assault investigations that did not meet industry standards and legal requirements.

f.    There was an existing bias and belief of stereotypes about women within the Johnson City Police Department that hurt the quality of sexual assault investigations.

134.   The City appears now to dispute some of the Daigle Report's findings and conclusions in this litigation, even as it publicly appeared to endorse the Daigle Report in a press release. *Compare* City's Response to Plaintiff's Requests for Admission Nos. 8 through 14 denying Paragraph 133(a) through (f) *supra* (*Ex.* 6 – City Admissions), with City Press Release dated July 19, 2023:

The audit, which was specific to the processes and procedures used in investigations of this nature, included file review, interviews of personnel, and input from the community.

"We first want to acknowledge that victims of sexual assault have not always received the best possible treatment and care from our police department," said City Manager Cathy Ball. "The department's new leadership team is dedicated to continued changes toward compassionate and effective service so that all citizens know they are safe and protected."

The eight findings from the report are as follows:

Finding No. 1: The Records Management System and records process at JCPD is inadequate to support the effective operation of the Department.

Finding No. 2: The sexual assault investigations conducted by JCPD have material deficiencies that can hinder the ability to collect necessary evidence for a complete and accurate investigation.

Finding No. 3: JCPD's investigations were found to be inconsistent, ineffective, and incomplete.

Finding No. 4: JCPD process of closing investigations is flawed and inaccurate.

Finding No. 5: JCPD needs to ensure that all complaints of misconduct against the Department, including anonymous complaints, are timely investigated.

Finding No. 6: Supervision was insufficient to ensure full, fair and complete investigations.

41

Finding No. 7: Department policies and procedures do not meet industry standards and legal requirements to investigate sexual assault investigations.

Finding No. 8: Department training is insufficient to effectively conduct unbiased sexual assault and related investigations.

*See* Johnson City Press Release, *Audit report of sexual assault investigations details 8 key findings* (Jul. 18, 2023), available online at https://www.johnsoncitytn.org/news_detail_T11_R1585.php (last accessed Oct. 22, 2023).

135.    By sheer coincidence and luck, Williams was eventually seized by a campus police officer in North Carolina on April 29, 2023, and finally charged with extreme and heinous sex crimes in this Court and in state court.  Video evidence has come to light in search warrant affidavits filed in Washington County Circuit Court showing Williams sexually assaulting 52 incapacitated female adults as well as two children aged eight and one years.  It appears from another affidavit filed by a District Attorney Investigator named Mike Little that Johnson City may have had some of that evidence all along in its possession from the 2021 search warrant.  (*Ex.* 7 – Little affidavit.)  But because Sparks had waited four months after the apartment search to produce a draft search warrant affidavit for Williams' digital devices, and because what he produced to Dahl was legally insufficient, JCPD presumably never viewed the files on Williams' digital devices.[15]

136.    Since then, nine Jane Doe sexual assault victims of Williams have sued the City in this Court alleging that multiple Johnson City police officers were part of a sex trafficking conspiracy.  *See generally Jane Does v. Johnson City,* 2:23-cv-00071-TRM-CRW.

---

[15] The contrast between the Little affidavit and the draft Sparks affidavit shows the difference between a well-drafted search warrant affidavit and a defective one, confirming Dahl's fears that a poorly drafted affidavit could lead to suppression of seized evidence of Williams's heinous crimes.

137.    According to the U.S. Department of Justice, at least one of the sex crimes that Williams has since been charged with—against a child—occurred *after* Dahl pushed for JCPD to further investigate Williams, and *after* she was first retaliated against by Chief Turner and JCPD officers for pursuing a TBI investigation into Williams. *United States v. Williams,* 2:23-cr-00111-JRG-CRW-1 (E.D. Tenn). In other words, Johnson City's failures to adequately investigate Williams's sex crimes permitted him to continue to offend.

138.    Johnson City has tried to pin the blame on Dahl for the delay in seizing Williams, arguing that Dahl should have just indicted Williams on the Ammo FIP charge.[16] This argument misses the mark for several reasons, however.

139.    First, in the words of the television series Law & Order, "In the criminal justice system, the people are represented by two separate yet equally important groups: the police, who investigate crime, and the district attorneys, who prosecute the offenders."[17] There are important functional distinctions between investigating and prosecuting which have been recognized by the Sixth Circuit.[18] Dahl was not an investigator; she was a federal prosecutor. She was stymied repeatedly by Johnson City's failure to investigate Williams, and particularly by Detective Sparks failing to provide timely and adequate probable cause affidavits to search items he had seized from Williams's apartment, including his computer and SIM card. And, as noted above, Dahl's client was the public; it

---

[16] *See, e.g.,* Answer [Doc. 18] at 55, 56; Johnson City press release, *City files response to lawsuit* (Aug. 26, 2022), available at https://www.johnsoncitytn.org/news_detail_T11_R1375.php (last accessed Oct. 5, 2023);
[17] *See* Law & Order (NBC 1990-present). Wikiquote page at https://en.wikiquote.org/wiki/Law_%26_Order#:~:text=4%20External%20links-,Opening,These%20are%20their%20stories. (last accessed Oct. 4, 2023).
[18] *See, e.g., Rieves v. Town of Smyrna,* 959 F.3d 678, 691 (6th Cir. 2020) (differentiating investigative and prosecutorial functions).

43

was not Johnson City.  Neither the DOJ Justice Manual nor American Bar Association criminal justice standards permit local police departments or individual officers to determine which cases will ultimately be prosecuted by the U.S. Attorney's Office.

140.    Second, if Williams had been indicted and arrested on the Ammo FIP charge alone, there was a substantial risk that he would have been able to post bail and be released on bond given the relatively low-level nature of the felony, and his significant financial resources.  This was not the type of charge contemplated by Dahl's MOU when it cites to the more stringent bail and bond requirements of federal court as compared to Tennessee state court, and the comparatively longer sentences, typically upwards of five years imprisonment.   On reasonable inference, then, Williams could have kept offending as to his sex crimes against women and children *even if* indicted for the Ammo FIP charge alone.

141.    Third, Johnson City appears to claim that Chief Turner fired Dahl not because of any alleged delay in indicting Williams, but rather because Chief Turner tried to force Dahl to agree to indict five particular cases involving drug offenses at the May 19, 2021 meeting.  But that rationale is questionable because, as noted above, police play no functional role in determining whether or not to indict a case, nor should they.  A prosecutor has to determine if there is sufficient evidence to form probable cause, and then has the burden of persuasion to a grand jury.

142.    Fourth, Chief Turner's rationale is further questionable because Chief Turner did not understand the discretionary bases on which the U.S. Department of Justice indicts cases and lacked understanding of what criteria prosecutors use in bringing charges—despite nearly three decades of service, albeit with no investigative experience of

44

sexual assault crimes, and an apparent mistaken belief that domestic violence crimes can only be prosecuted if the female victim cooperates with the police.

143.  Fifth, Chief Turner's rationale is further questionable since three of the five cases in question were never indicted—that is, either because there was a lack of probable cause, or because the U.S. Attorney's Office (after Dahl's departure) within its discretion declined to prosecute those cases.  The other two cases cited by Chief Turner involved a man and woman who possessed enough meth to have intent to distribute.[19]  Those cases were not indicted until mid-October 2021, and the woman was not a violent offender and was otherwise in custody. The woman pled to 78 months; the man's case is pending as of this filing.  While not insignificant, this drug case paled in comparison to the scope and depravity of the sex crimes of a prominent citizen such as Williams.

144.  Johnson City has since announced that it will play no further role in any case involving sexual assault victims of Sean Williams, after initially having Detective Sparks participate in state sex crime charges filed based on the video evidence discovered in Williams's possession in April 2023.

7.145.  Since then, the Ammo FIP case indicted by Dahl has been dismissed by the U.S. Department of Justice, on inference because it would rely on the search warrant affidavit and testimony of Detective Sparks, and the prosecution would not want to rely on Detective Sparks as the evidentiary basis for a sound conviction beyond a reasonable doubt.

---

[19] *United States v. Nathan Tucker,* No. 2:21-cr-00107-DCLC-CRW-1; *United States v. Kacei Pierce,* No. 2:21-cr-00107-DCLC-CRW-2.

146.    Williams fled custody on October 18, 2023 while being transported to the Greeneville division of this Court.  A press conference by the local U.S. Marshal has suggested that Dahl's concerns as to Williams being a flight risk and extreme danger to the community were valid.  Since Williams was arrested in April 2023, he has once attempted to flee unsuccessfully (for which he was subsequently charged), and has since fled on October 18, 2023.  On inference from the U.S. Marshall's press conference, Williams may have had assistance in fleeing from persons unknown, perhaps insiders.[20]  Williams is now back on the lam.

**Causation of Damages**

~~104.~~147.        Dahl engaged in protected First Amendment activities well beyond the limited scope of her employment duties as defined by ~~the~~ MOU (namely to prosecute violent, firearms and drug trafficking crimes) by:

a.  Urging Chief Turner and Johnson City to investigate ~~"Voe"~~Williams for rape and sexual assault (neither of which were mentioned in the MOU);

b.  Investigating ~~"Voe"~~Williams herself by talking to Jane Doe victims and to witnesses in the downtown Johnson City bar and restaurant scene;

c.  Speaking out about each of ~~"Voe's"~~Williams's predatory conduct, and Johnson City's failure to investigate or seize ~~"Voe",~~Williams, to friends, U.S. Attorney's office colleagues, and Federal Defender's office colleagues;

d.  Warning female friends and colleagues to be cautious about going out to

---

[20] Jeff Keeling, U.S. Marshal: *'A lot of questions' about Sean Williams escape,* WJLH (Sept. 18, 2023), available online at https://www.wjhl.com/news/local/sean-williams-case/u-s-marshal-a-lot-of-questions-about-sean-williams-escape/?ipid=promo-link-block-ml1 (last accessed Oct. 22, 2023).

46

downtown Johnson City bars and restaurants because of ~~"Voe's"~~Williams's

modus operandi in finding his sexual assault ~~vitims~~victims;

e.   Making a report to an FBI agent at an office where a posted Johnson City

liaison would ultimately, on information and belief, notify Chief Turner of the

report; and

f.   Voicing concerns that Johnson City Police Department's inaction and reckless

conduct as to ~~"Voe",~~Williams, particularly as to the failure to execute the

"ammo FIP" arrest warrant, was evidence of either corruption or plain

incompetence at Johnson City Police Department.

~~105.~~148.     Defendant Chief Turner took adverse action against Dahl by

unilaterally terminating her employment under the MOU, which would chill a person of

ordinary firmness from continuing to speak out about her allegations.

~~106.~~149.     Defendant Chief Turner's adverse action was motivated at least in

part by Dahl's previous protected statements and activity tending to implicate the Johnson

City Police Department for corruption or plain incompetence.

**<u>No Qualified Immunity</u>**

~~107.~~150.     Defendant Chief Turner has no qualified immunity from claims

under 42 U.S.C. § 1983 because he had actual notice and personal knowledge of Dahl's

allegations.  He then retaliated against Dahl by having her terminated in violation of her

clearly-established First Amendment right to speech on a matter of public concern[21], and

her clearly-established Fourteenth Amendment rights to procedural and substantive due

---

[21] *See, e.g., Fritz v. Charter Tp. of Comstock,* 592 F.3d 718 (6th Cir. 2010); *Bell v. Johnson,* 308 F.3d 594 (6th Cir. 2002); *McLaughlin v. Sullivan Cnty. Bd. of Educ.,* 2:20-CV-00243-DCLC-CRW (E.D. Tenn. Aug. 24, 2021).

47

process under the United States Constitution.  Further, Defendant Chief Turner has no qualified immunity from whistleblowing claims under the NDAA.    , and her clearly established right under the First and Fourteenth Amendment to be free from a civil conspiracy unrelated to the course and scope of Chief Turner's official and corporate duties.[22]

### No Official Immunity

108.151.    Defendant Chief Turner has no official immunity from claims at Tennessee law because he had actual notice and personal knowledge of Dahl's allegations, and his conduct was malicious, intentional or reckless, and contrary to the public policy purpose of the Tennessee Public Protection Act ("TPPA"), T.C.A. § 50-1-304.

### No Sovereign Immunity

109.152.    Defendant Johnson City has no sovereign immunity from Dahl's federal civil rights claims under § 1983, or from Dahl's federal claim under the NDAA, and no sovereign immunity from a TPPA statutory claim for refusal to participate in or remain silent about illegal activities.

### Damages

110.153.    Dahl lost meaningful paid employment.

111.154.    Dahl is an attorney in good standing with the D.C. Bar.  Her sudden termination under the MOU has tarnished her reputation within the Eastern District of Tennessee, and created an adverse inference to future legal employers about her performance as an attorney, and particularly as a SAUSA, which is a prestigious job within the U.S. Attorney's Office.

---

[22] *Brown v. Beaudry,* No. 2:19-cv-140 at *7 (W.D. Mich. Aug. 20, 2019).

48

112.155.        Dahl has suffered "garden variety" emotional distress.[23]

**Punitive Damages**

113.156.        The conduct of defendant Chief Turner in terminating Dahl's employment under the MOU was maliciously or recklessly indifferent to Dahl's First Amendment right to speak up out about Johnson City's intentional or reckless failures to investigate and seize "Voe". Williams.

**Attorney's Fees and Costs**

114.157.        In pursuit of her § 1983 federal civil rights claims, Dahl is incurring reasonable attorney's fees, taxable costs, and non-taxable costs.  42 U.S.C. § 1988.

115.158.        In pursuit of her TPAA statutory state law claim, Dahl is incurring reasonable attorney's fees and costs.  T.C.A. § 50-1-304(d)(2).

159.    In pursuit of her NDAA federal claim, Dahl is incurring costs and expenses (including her reasonable statutory attorney's fees and expert witness fees).  10 U.S.C. § 2409(c)(1) and 41 U.S.C. § 4712(c)(1).

**Count I – First Amendment Retaliation against Chief Turner individually**

116.160.        Plaintiff Kateri Lynne Dahl incorporates all prior paragraphs.

117.161.        Defendant Chief Turner terminated Dahl's employment by advising Johnson City's Mayor and City Manager not to renew the MOU.

118.162.        Dahl engaged in protected First Amendment activities outside of her chain of command by making allegations to multiple third parties, including the FBI, about Johnson City Police Department's failures to investigate and seize "Voe", Williams, and the

---

[23] *McTaggart v. Catholic Health Initiatives*, 1:19-CV-00088-DCLC, at *6 (E.D. Tenn. Aug. 2, 2021) (quoting *Thorsen v. County of Nassau*, 722 F.Supp.2d 277, 292 (2d Cir. 2010)).

49

substantial likelihood that Johnson City Police Department was either corrupt or plainly incompetent.

119.163.    Dahl's communications about sex crimes and public corruption were not expressions made pursuant to her duties as a SAUSA under the MOU (which limited the scope of her employment as prosecuting violent, firearms and drug trafficking crimes).

120.164.    The MOU did not contemplate that Dahl would investigate and make protected communications to one of her supervisors, Chief Turner, and/or a partner agency under the MOU, Johnson City. Those actions and communications were therefore not made pursuant to her employment duties as a SAUSA under the MOU.

121.165.    Dahl's protected activities and communications played at least a part in defendant Chief Turner's decision to tell the Mayor and City Manager of Johnson City not to extend the MOU for Dahl's employment.

122.166.    Defendant Chief Turner's termination of Dahl's employment was an adverse action against her that would chill a person of ordinary firmness from continuing in Dahl's communication.

123.167.    The adverse action was motivated at least in part as a response to Dahl's exercise of her protected activities and communications.

124.168.    As a direct result, Dahl was injured.

**Punitive Damages**

125.169.    Defendant Chief Turner was maliciously, intentionally, or recklessly indifferent to Dahl's First Amendment protected right to speak up and make protected allegations about Chief Turner and Johnson City Police Department.

**Prayer**

50

WHEREFORE Plaintiff Kateri Lynne Dahl prays the Court enter a judgment for First Amendment retaliation against Defendant Chief Karl Turner in his individual capacity; award Plaintiff actual and punitive damages; award Plaintiff her taxable costs, non-taxable costs, and reasonable statutory attorney's fees under 42 U.S.C. § 1988; and grant such other relief as may be just, meet and reasonable.

**Count II – Procedural Due Process Violation**

**by Chief Turner in his individual capacity**

~~126.~~170.    Plaintiff Kateri Lynne Dahl incorporates all prior paragraphs.

~~127.~~171.    Tennessee is an "at-will" employment jurisdiction, meaning that employees can generally be terminated for any reason, or no reason at all.

~~128.~~172.    But even in most "at-will" jurisdictions, employees have a limited property interest in employment free from violations of public policy and/or statute, including retaliation for engaging in protected activities including but not limited to whistleblowing.[24][25]  The Tennessee Public Protection Act, T.C.A. § 50-1-304, provides Dahl with a limited but cognizable Constitutional property interest in continued employment free from retaliation for whistleblowing.

~~129.~~173.    A plaintiff with a Constitutionally-cognizable property interest cannot, consistent with the 14th Amendment, be deprived of that property interest by a state or local official acting under color of law "without due process of law."

~~130.~~174.    The "due process" that Chief Turner owed to Dahl was modest, and afforded him wide latitude. In fact, the multi-agency MOU for Dahl's employment itself

---

[24] *Armstrong v. Reynolds,* 22 F.4th 1058, 1068 (9th Cir. 2022).
[25] *Young v. Township of Green Oak,* 471 F.3d 674, 683 (6th Cir. 2006).

had no written or other objective standard or review process for annual extension. Defendant Chief Turner himself stated there was no objective standard or review process as to the extension of the MOU for Dahl's employment, and had previously stated in 2020 that the annual extension was a "formality."

131.175.    But Chief Turner did owe Dahl at least some meaningful "due process": As a local government official, acting under color of state law, he could not deprive her of her limited property interest in continued employment as retaliation for whistleblowing.

132.176.    Chief Turner manufactured used pretextual allegations that Dahl failed to communicate with his officers that are not supported by text and phone records, and falsely alleged she had lied to him about a her June schedule as to trial and the Grand Jury schedule, to cover up his unlawful and retaliatory purpose.

133.177.    Chief Turner unreasonably, arbitrarily and capriciously told the Mayor, City Manager and City Attorney Manager of Johnson City not to extend the MOU one week before its extension to retaliate against Dahl for her whistleblowing allegations and activities concerning Johnson City Police Department's failures to investigate and seize "Voe", Williams, and Johnson City Police Department being either corrupt or plainly incompetent.

134.178.    Chief Turner had unilateral authority to terminate Dahl, and no other party to the MOU was aware of defendant Chief Turner's decision to terminate Dahl until after the fact. Chief Turner terminated Dahl in whole or substantial part in retaliation for engaging in protected activities including whistleblowing.

135.179.    Dahl had no procedural ability or right to contest her termination, or

52

to request a "name-clearing" hearing.[26]

136.180.      Dahl was thereby deprived of her limited property interest in her employment without due process of law in violation of the procedural element of the Due Process Clause of the Fourteenth Amendment.[27]

137.181.      As a direct result, Dahl was injured.

**Punitive Damages**

138.182.      Defendant Chief Turner's termination of Dahl by causing the MOU not to be extended was maliciously, intentionally, or recklessly indifferent to the procedural due process rights of Dahl under the Fourteenth Amendment as to her public employment.

**Prayer**

WHEREFORE Plaintiff Kateri Lynne Dahl prays the Court enter a judgment against defendant Chief Turner for violating the Procedural element of the Fourteenth Amendment's Due Process Clause; award Plaintiff actual and punitive damages; award Plaintiff her taxable costs, non-taxable costs, and reasonable statutory attorney's fees under 42 U.S.C. § 1988; and grant such other relief as may be just, meet and reasonable.

**Count III - Civil Conspiracy to violate Constitutional Rights by Chief Turner and Officer John Does 1 through 3 in their individual capacities**

139.1.  III

Plaintiff Kateri Lynne Dahl incorporates all prior paragraphs.

140.   Defendant Chief Turner had an agreement, common design and a single plan with defendant Officers John Does 1 through 3 to fire Dahl in retaliation for her First

---

[26] *Cf. Daily Servs.*, *LLC v. Valentino*, 756 F.3d 893, 907 (6th6th Cir. 2013).
[27] *Young v. Township of Green Oak*, 471 F.3d 674, 683 (6th Cir. 2006).

Amendment activities either (a) to protect "Voe", a wanted felon, from investigation and seizure, and/or (b) to cover up police corruption as to "Voe", and/or (c) to cover up their plain incompetence in investigating and seizing "Voe".

141. The first two such purposes are unlawful, while the third is a lawful purpose accomplished by unlawful means.[28]

142. Multiple overt acts and/or omissions occured in furtherance of the conspiracy agreement, including but not limited to:

a. Chief Turner failed to direct an investigation of sexual assault victim Jane Doe 3 or "Voe" after his officers found Jane Doe 3 shoeless and in extreme emotional distress in the lobby of "Voe's" condo;

b. Chief Turner failing to notify Dahl about Jane Doe 7's death when she first started with investigating the "ammo FIP" charge in November 2020;

c. Officers John Doe 1 through 3 improperly notified rape suspect "Voe" of the federak warrant for his arrest, and thereby the existence of a sealed federal indictment against him;

d. Officers John Doe 1 through 3 improperly refused to execute said warrant against a dangerous rape suspect, and effectively permitted him to flee;

e. Chief Turner called at least one officer seeking false, pretextual rationales purporting to justify Dahl's termination; and

f. Chief Turner personally calling Dahl on June 25, 2021, and signing and delivering a letter to Dahl dated June 24, 2021, to tell her that he was

---

[28] *First Cmty. Bank N.A. v. First Tenn. Bank N.A.*, 489 S.W.3d 369, 395 (Tenn. 2015); *Morgan v. Brush Wellman, Inc.*, 165 F.Supp.2d 704, 720 (E.D. Tenn. 2001).

54

declining to renew the MOU for another year, thereby terminating her

employment, and hindering her ability to continue the "Voe" investigation.[29]

143.    Defendant Chief Turner and defendant Officers John Does 1 through 3 were

acting outside the scope of their employment and not in furtherance of their corporate

duties, in that the agreement was unconscionable, against the public welfare, and for no

legitimate police purpose.  Thus the intracorporate conspiracy doctrine does not apply

here.[30]

144.    In the alternative, even if Officers John 1 through 3 were acting within the

scope of their agency,  or at the direction of Chief Turner,  that is not a bar to liability for

their agreement.[31]

145.    Dahl made  allegations to multiple third parties including the FBI about

Johnson City Police Department's failures to investigate and seize "Voe", and Johnson City

Police Department being either corrupt or plainly incompetent.

146.    As a direct result, Dahl suffered injuries including but not limited to loss of

her employment salary.

### Punitive Damages

147.    Defendant Chief Turner's termination of Dahl, by causing the MOU not to

be extended, as an overt act and substantial step toward in furtherance of his conspiracy

agreement with defendants Officer John Does 1 through 3, was maliciously, intentionally,

or recklessly indifferent to Dahl's rights under the First and Fourteenth Amendments as to

---

[29] *Revis v. Meldrum,* 489 F.3d 273, 290 (6th Cir. 2007).

[30] *Brown v. Beaudry,* No. 2:19-cv-140 at *7 (W.D. Mich. Aug. 20, 2019).

[31] *Brungard v. Caprice Records, Inc.*, 608 S.W.2d 585, 590 (Tenn. Ct. App. 1980) (citing *Howard v. Haven*, 198 Tenn. 572, 281 S.W.2d 480 (1955); *Scott v. Burton*, 173 Tenn. 147, 114 S.W.2d 956 (1938)).

~~her employment under the MOU.~~

~~**Prayer**~~

~~WHEREFORE Plaintiff Kateri Lynne Dahl prays the Court enter a judgment for civil conspiracy to violate Constitutional rights under the First and Fourteenth Amendments against defendant Chief Turner and defendant Officer John Does 1 through 3 in their individual capacities; award Plaintiff actual and punitive damages; award Plaintiff her taxable costs, non-taxable costs, and reasonable statutory attorney's fees under 42 U.S.C. § 1988; and grant such other relief as may be just, meet and reasonable.~~

**~~Count IV~~ Substantive Due Process Violation ~~-~~ against Chief Turner individually**

~~148.~~183.        Plaintiff incorporates all prior paragraphs.

~~149.~~184.        The substantive element of the due process clause of the Fourteenth Amendment prohibits government action that shocks the conscience.[32]

~~150.~~185.        Defendant Chief Turner terminated Dahl's employment by causing the MOU not to be extended ~~as part of a Johnson City Police Department civil conspiracy to protect a felon from investigation and seizure.~~in retaliation for Dahl seeking to investigate and seize Williams.

~~151.~~186.        Dahl concedes that generally employment claims cannot be raised under the substantive element of the due process clause as there is no fundamental right to employment.[33]

~~152.~~187.        Terminating a whistleblowing employee such as Dahl, however, ~~as~~

---

[32] Substantive due process "prevents the government from engaging in conduct that 'shocks the conscience,' *Rochin v. California*, 342 U.S. 165, 172 . . . (1952), or interferes with rights 'implicit in the concept of ordered liberty,' *Palko v. Connecticut*, 302 U.S. 319, 325-26 . . . (1937)."

[33] *Young v. Township of Green Oak,* 471 F.3d at 684.

part of a conspiracy in order to protect a felon credibly accused of dozens of rapes sexual assaults from investigation and seizure, and to protect a police department that is either corrupt or incompetent, shocks the conscience.

153.188.    Dahl was thereby deprived of her employment without substantive due process of law in violation of the Fourteenth Amendment.

154.189.    As a direct result, Dahl was injured.

**Punitive Damages**

155.190.    Defendant Chief Turner's termination of Dahl, by causing her employment under the MOU not to be extended as part of an unlawful conspiracy in order to protect a felon from investigation and seizure, and to protect a police department that is either corrupt or incompetent, shocks the conscience, and was maliciously, intentionally, or recklessly indifferent to Dahl's rights under the substantive element of the Due Process Clause to the Fourteenth Amendment.

**Prayer**

WHEREFORE Plaintiff Kateri Lynne Dahl prays the Court enter a judgment for Fourteenth Amendment substantive due process violation against defendant Chief Turner in his individual capacity; award Plaintiff actual and punitive damages; award Plaintiff her taxable costs, non-taxable costs, and reasonable statutory attorney's fees under 42 U.S.C. § 1988; and grant such other relief as may be just, meet and reasonable.

**<u>Count IV – TPPA Retaliatory Discharge against Johnson City</u>**

156.191.    Plaintiff Kateri Lynn Lynne Dahl incorporates all prior paragraphs.

157.192.    The Tennessee Public Protection Act requires that "[n]o employee shall be discharged or terminated solely for refusing to participate in, or for refusing to

remain silent about, illegal activities." T.C.A. § 50-1-304(b).

158.193. Dahl is an employee under the Tennessee Public Protection Act, T.C.A. § 50-1-304(a)(1)(A) and (C) because she was employed pursuant to a multi-agency MOU between Johnson City, Washington County, the First Judicial District Attorney's Office, and the U.S. Attorney.

159.194. Johnson City paid Dahl's compensation under the MOU.

160.195. Johnson City is an employer under the TPPA, T.C.A. § 50-1-304(a)(2)(A).

161.196. Johnson City terminated Dahl for refusing to participate in, or for refusing to remain silent about, illegal activities, namely Dahl's allegations about Johnson City Police Department's failures to investigate and seize "Voe", Williams, and about Johnson City Police Department being either corrupt or plainly incompetent.

162.197. Johnson City thereby retaliatorily discharged Dahl in violation of the TPPA.

163.198. As a direct result, Dahl was injured.

**Prayer**

WHEREFORE Plaintiff Kateri Lynne Dahl prays the Court enter a judgment for retaliatory discharge against defendant Johnson City under the Tennessee Public Protection Act, T.C.A. § 50-1-304; award Plaintiff damages; award Plaintiff her costs and reasonable statutory attorney's fees under T.C.A. § 50-1-304(d)(2); and grant such other relief as may be just, meet and reasonable.

**Count V**

**National Defense Authorization Act claim against Johnson City, 41 U.S.C. § 4712**

199.  Plaintiff Kateri Lynne Dahl incorporates all prior paragraphs.

200.  Pursuant to her MOU, Dahl was an employee of Johnson City, which is a federal government contractor and/or grantee under the meaning of 41 U.S.C. § 4712.

201.  Dahl's SAUSA position was funded at least in part by a federal grant from the U.S. Department of Justice.

202.  Johnson City used a pole camera to surveil Sean Williams that was directly funded by a federal grant from the U.S. Department of Justice.

203.  Dahl had information that she reasonably believed was evidence of "gross mismanagement of a Federal contract or grant, a gross waste of Federal funds, an abuse of authority relating to a Federal contract or grant, a substantial and specific danger to public health or safety, a violation of law, rule, or regulation related to a Federal contract . . . or grant."[34]  Particularly, Dahl had information that Johnson City allowed evidence seized from Williams's apartment not to be properly searched for evidence of Williams's sex crimes, had information that Johnson City refused to adequately investigate Williams for his sex crimes, and had information that Johnson City bungled its attempted arrest of Williams on the Ammo FIP charge.  Further, the use of the federally-funded pole camera to surveil Williams was useless, of no investigatory benefit, and yielded no evidence against Williams.

204.  Dahl complained to people outside her chain of command, including to the FBI and to DOJ colleagues..

---

[34] *See* 10 U.S.C. § 2409(a)(1) and 41 U.S.C. § 4712(a)(1).

59

205.    Dahl's complaints were a protected action that was a contributing factor in Chief Turner's decision to take an adverse employment action against Dahl on behalf of Johnson City.[35]

206.    Dahl complained as a lawful whistleblower to the U.S. Department of Justice Office of Inspector General in June 2022.

207.    DOJ OIG has not yet issued an Order in response to Dahl's complaint.

208.    As a direct result, Dahl was thereby damaged.

**Prayer**

WHEREFORE Plaintiff Kateri Lynne Dahl prays the Court enter a judgment for retaliatory discharge against defendant Johnson City under the National Defense Authorization Act claim against Johnson City, 41 U.S.C. § 4712; award Plaintiff compensatory damages (including back pay), employment benefits, and other terms and conditions of employment that would apply to a person in Dahl's position if Chief Turner's reprisal had not been taken on behalf of Johnson City; award Plaintiff her costs and expenses (including her reasonable statutory attorney's fees and expert witness fees), 10 U.S.C. § 2409(c)(1) and 41 U.S.C. § 4712(c)(1); and grant such other relief as may be just, meet and reasonable.

Dated: ~~June~~October 23, ~~2022~~                        2023                        Respectfully submitted,

Lead Counsel for Plaintiff Kateri Lynne Dahl

/s/ Hugh A. Eastwood
Hugh A. Eastwood, ~~Missouri Bar No. 62058,~~*admitted pro hac vice pursuant to L.R. 83.5(b)(1)*

---

[35] *See Miller v. Abbott Labs.,* No. 3:14-cv-00363-JHM at *12-13 (W.D. Ky. June 17, 2015), citing *Whistleblower Litigation,* American Law Institute American Bar Association Continuing Legal Education, SV037 ALI-ABA 1407, *1478 (2014).

E.D. Mo. Bar No. 62058MO~~, admitted in Missouri, Missouri federal district courts, the 8th Circuit, and the Supreme Court, pro hac vice motion forthcoming pursuant to L.R. 83.5(b)(1)~~
7911 Forsyth Blvd., Ste. 300
St. Louis, Missouri 63105-3825
hugh@eastwoodlawstl.com
(314) 809 2343
(314) 228 0107 eFax

Co-Counsel for Plaintiff Kateri Lynne Dahl

/s/ Alexis I. Tahinci
Alexis I. Tahinci, TN BPR No. 031808
Tahinci Law Firm PLLC
~~1227 Volunteer Pkwy,~~
105 Ford Ave., Suite 3
~~528~~
~~Bristol~~
Kingsport, TN 37663
~~, 37620~~
Ph: (423) 406-1151
~~557-8086~~
F: (423) 815-1728
alexis@tahincilaw.com

**Certificate of Service**

The undersigned certifies that on October 23, 2023 that (s)he filed this document with the District Clerk to be served by operation of the Court's CM/ECF system upon all counsel of record.

*/s/ Hugh A. Eastwood*

61