IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE
AT GREENEVILLE

| | | |
|---|---|---|
| KATERI LYNNE DAHL, Plaintiff, | * | |
| | * | |
| VS. | * | CASE NO. |
| | * | 2:22-CV-00072-KAC-CRW |
| CHIEF KARL TURNER, in his individual capacity only; OFFICER JOHN DOES 1-3, in their individual capacities only; and CITY OF JOHNSON CITY, Defendants. | * | |

DEPOSITION OF

# TOMA SPARKS

(Taken December 19, 2023)

APPEARANCES:

COUNSEL FOR THE PLAINTIFF:

HUGH A. EASTWOOD
Attorney at Law
7911 Forsyth Blvd., Ste. 300
St. Louis, MO 63105-3825

ALEXIS I. TAHINCI
TAHINCI LAW FIRM
105 Ford Avenue, Ste. 3
Kingsport, TN 37663

***THIS STYLE PAGE CONTINUES***

| | |
|---|---|
| COUNSEL FOR THE DEFENDANTS: | K. ERICKSON HERRIN<br>HERRIN, MCPEAK & ASSOCIATES<br>515 E. Unaka Avenue<br>Johnson City, TN 37601 |
| | THOMAS J. GARLAND, JR.<br>MILLIGAN COLEMAN<br>230 W. Depot Street<br>Greeneville, TN 37743 |
| | EMILY C. TAYLOR<br>WATSON, ROACH, BATSON<br>& LAUDERBACK<br>900 South Gay Street<br>Knoxville, TN 37902 |
| ALSO APPEARING: | KRISTIN E. BEREXA<br>FARRAR BATES BEREXA<br>12 Cadillac Drive, Suite 480<br>Brentwood, TN 37027 |
| | DANNY RADER<br>AIDAN MOORE<br>MOORE, RADER, FITZPATRICK<br>& YORK<br>46 N. Jefferson Avenue<br>Cookeville, TN 38501 |
| ALSO PRESENT: | JOY BAKER<br>INTERIM ASSISTANT CITY MANAGER<br>CITY OF JOHNSON CITY |

Q. What would be typical practice, in your experience, for witness interviews following an incident like that, time frame for interviews?
A. As soon as possible.
Q. Okay. At some point, Sean Williams came down to the police station, right?
A. Yes, sir.
Q. Okay. Tell me about that.
MR. HERRIN: Object to the form of the question.
A. I asked him to come to headquarters with me, and I drove him to headquarters.
Q. Did he go willingly?
A. Yes, sir.
Q. Okay. What was your purpose in having him come down to the station?
A. He had videos on his phone and we were going to try to get him -- talk to him and see if he'll talk to us, and tell us what happened, and send us the videos that he had.
Q. Okay. And did he make statements to you at the scene about the videos?
A. He showed me the video of what he had on his phone.
Q. Tell me more about that.
A. He just showed me the ones of them entering the apartment and Sean and Albert exiting the apartment.
Q. You say he showed them on his phone. Was he actually

holding his phone and showing it to you?
A. Yes, sir. Yes, sir.
Q. Okay. When you -- and you went into the apartment?
A. Yes, sir.
Q. Okay. Did you see cameras inside the apartment?
A. I did.
Q. Okay. Did you investigate how those cameras were recording the footage?
A. Not at that time.
Q. Okay. Did you have knowledge at that time about servers or computers that were keeping these recordings?
A. Did I have knowledge of it?
Q. At the time.
A. No, sir.
Q. Okay. Did you make an inquiry with Sean Williams about where these cameras were recording?
A. I did not.
Q. Did you ask Williams for consent to search his apartment at the time?
A. I did not.
Q. Okay. Why not?
A. I just wanted to follow up and try to get him to cooperate with his phone, and send me the videos and stuff, and I didn't ask him at that time.
Q. When you arrived at the scene that evening and went into

Williams' apartment, did you think you needed a warrant?
A. Not at that time, no.
Q. And why was that?
A. Because it was an active crime scene.
Q. Okay. Did anyone object to you entering into the apartment?
A. Not that I recall.
Q. Did Williams?
A. Not that I recall.
Q. Were you investigating crimes other than attempted homicide that evening?
A. No, sir.
Q. Were you concerned about Williams not cooperating with you at that time at the scene?
A. No, sir.
Q. How did you get into the apartment?
A. Officer Stork was inside the apartment at that time and let us in.
Q. Was anything seized at the time?
A. No, sir.
Q. Was anything searched at the time that was not in plain view?
A. No, sir.
Q. Have you had training on search and seizure?
A. I have.

Q. Before the incident?
A. After the incident.
Q. After the incident.
A. Yes.
Q. Tell me about when you had that training after the incident.
A. I did -- I've been down to Georgia for four weeks for crime scene, and they went over some of that at that time.
Q. Had you -- had you ever had a search -- strike that. Had you ever had evidence seized during a search thrown out by a judge?
A. No, sir.
Q. Did you give Williams a Miranda warning at any point that evening?
A. I did not.
Q. Okay. Did you give any other witnesses a Miranda warning that evening?
A. I did not.
Q. Do you know if JCPD other officers gave any Miranda warnings to anyone that evening?
A. Investigator Jenkins gave one to Sean Williams.
Q. Okay. Any other witnesses receive a Miranda?
A. Not that I recall.
Q. Okay. Why -- do you know why Williams received a Miranda?
A. As far as -- no, I don't recall why Jenkins did that.

showing you on his phone?
A. There was two other -- the angles he showed -- there was two other cameras in there that would have shown the window where this happened at, and he told me it wasn't working at the time. The only two -- the only two that he would show me was the ones that I explained earlier.
Q. So when you say it wasn't working at the time, you mean the camera wasn't working?
A. Correct.
Q. Okay. So it wasn't with the playback on his phone.
A. Right. He said the cameras weren't working.
Q. I've got it. Okay, thanks. And did you ask Sean Williams any questions that evening down at the station?
A. I did not.
Q. Okay. And how long was Williams interviewed by Jenkins? Do you recall?
A. I think by the time he got there and left, approximately 30 minutes.
Q. Okay. When you say he left, where did Williams go?
A. He wanted to leave, and we didn't have nothing to hold him on, so we was going to take him back to his condo, and he decided to walk.
Q. Okay. You mean you offered to drive him?
A. Yes, sir.
Q. Did he say why he didn't accept your offer?

Department.

Q. Did Jenkins relay any information about his interview of Williams that evening?

A. No, sir.

Q. Was Williams allowed to possess his cell phone during the interview?

A. He was.

Q. Okay. Do you know why?

A. We was trying to get him to send us the video, and then he wanted a lawyer -- to call his lawyer, so he tried to call his lawyer, also.

Q. Okay. Do you know if Williams possessed the ability to delete videos using his phone?

A. I would assume so, yes.

Q. Okay. Why do you have that assumption?

A. I mean, you can delete stuff off your phone.

Q. Fair enough. Did you have a concern that Williams would try to delete footage from using his phone?

A. Not at that time, no.

Q. Why not?

A. Because he was -- like I said, Jenkins was in there trying to get him to -- and he said he was going to send them to us, and then he said something happened that he couldn't send it to us, and then at that point before he left is when I took his phone.

Q. Okay. Did you have a warrant to seize his phone?
A. Huh?
Q. Did you have a warrant to seize his phone?
A. I did not.
Q. Okay. On what basis did you seize his phone?
A. He had video and potential other videos on his phone that could be evidence of what happened, so I took his phone.
Q. Okay. Did you have a concern that he might try to delete evidence using the phone?
A. At that point when he was ready to go, yes, sir.
Q. Okay. Then that was an additional reason to seize the phone?
A Correct.
Q. Did he protest?
A. He did.
Q. Okay. Did he do anything to follow up on that protest at the time?
A. Who, Sean Williams?
Q. Yeah.
A. No.
Q. Okay. Do you know if he spoke to an attorney that night?
A. Not while he was with us, he didn't.
Q. Okay. Did you know who his attorney was at the time?
A. No, sir.
Q. Did he say anything about attorneys to you generally?

A. No, sir.
Q. I know earlier you testified that you were not in the room, so how did you come to interact with Williams at the end of the evening when he left?
A. He said he wanted to leave, so I went out there -- I went to the room, and got him, and walked him out.
Q. Jenkins told you he wanted to leave?
A. No, we heard him. I heard Sean say he wanted to leave.
Q. How did you hear him?
A. Through the door.
Q. Were you listening to the interview at the time?
A. I was not.
Q. Okay. How did you happen to be outside the door?
A. Huh?
Q. How did you happen to be outside the door?
A. If I recall correctly, he knocked on the door. And I went up there, and he said he wanted to leave, so that's when I went and got him.
Q. Was he locked inside?
A. It was not locked, no. The door was shut, but it wasn't locked.
Q. What did you do next after he left?
A. After he left, I tried to put his phone in airplane mode, but it was -- it was dead. It didn't have any power, so we plugged it up to let it charge. And then I contacted

Q. Okay. It says when the phone was powered on, it had a message displaying that it was lost. Do you see that? The last sentence of that relevant facts section.
MS. BEREXA: Down here.
A. Yes, sir, I see it.
Q. Okay. Did you see that message?
A. Yes, sir.
Q. Which would suggest that Sean Williams has access to other devices in the residence that could be connected to the camera system.
A. Yes, sir, I see that.
Q. Okay. You wrote it would suggest, so it was suggested to you that Sean Williams had access to other cameras?
A. It would suggest it, yes.
Q. Did you have a concern that Williams may try to delete or alter footage?
A. At that point, yes.
Q. Okay. Did you go back to Williams' apartment?
A. Not at that time, no, sir.
Q. And Williams had just -- had just left for his apartment?
A. Yes, sir.
Q. Okay. Did you have concern that Williams back at his apartment would destroy video footage?
A. At that time, yes.
Q. Okay. So what steps did you do to try to stop him from

destroying video footage?
A. I was working on obtaining a search warrant to go search his apartment.
Q. Now, you said you've since had training on search warrants.
A. Uh-huh (Affirmative).
Q. Are you familiar with exigent circumstances?
A. Yes, sir.
Q. Okay. And is the immediate destruction of evidence an exigent circumstance?
A. Yes. Yes, sir.
Q. So, for example, if I've got meth on me and I'm going to flush it down the toilet, that could be an exigent circumstance?
A. Yes. Yes, sir.
Q. Okay. Did you consider Williams returning to his apartment that evening to be an exigent circumstance?
A. Yes.
Q. Okay. Did you or anyone else from JCPD go to the apartment to try to stop Williams from altering...
A. At that -- no, sir, not at that time.
Q. Then it says items to be seized, and it has four items. The first two are video cameras and video storage devices. That was to look for footage?
A. Yes, sir.

Q. Searched it for what?
A. I explained to you earlier, video, recording devices, any devices that would store video, and the camera system, the cameras that were up, and any -- that's what we were searching for, and laptops, computers, so on and so forth.
Q. Okay. And did you open drawers, and cupboards, and things of that nature?
A. Yes, sir. Yes, sir.
Q. Because some of these devices can be pretty small, right?
A. Correct.
Q. Okay. Do you believe sitting here today that you located all such devices that were in the apartment?
A. As far as I recall, yes.
Q. Did you seize, like, the cameras themselves, too?
A. We did.
Q. Okay. And did you seize anything else from the apartment?
A. Other than what we were there for, no.
Q. Okay. Did you have a K-9 go through the apartment?
A. No, sir.
Q. Did you find any drugs at the time?
A. Yes, we did.
Q. Okay. Tell me more about that.
A. I didn't find it, another officer found it and told me about it
Q. What did he find?

A. A small baggie of what appeared to be cocaine.
Q. Okay. Based on your training and experience, do you know what the weight of that might have been?
A. No, sir.
Q. Did you inventory all of that?
A. Yes, sir.
Q. Okay. Did you seek to bring additional charges against Williams at the time based on these other things you found?
A. Are you talking about the drugs?
Q. Well, let's go through them, the drugs first.
A. I think we relayed that on to SIS to see if they were doing anything with it.
Q. Do you know...
A. But me personally, no.
Q. Okay. Do you know who relayed it to SIS?
A. No, sir.
Q. Did you know who in SIS this was relayed to?
A. No, sir.
Q. Do you know where the coke was found?
A. It was in the hallway. Well, it was in the bedroom up against the wall where, like, a bookshelf, and there was some statue, and it was behind that.
Q. Was this Sean Williams' bedroom?
A. Yes, sir.

A. We called -- Sergeant Hilton called our evidence guys and they brought a dolly out to us.
Q. Had you seized a safe before in your experience?
A. No, sir.
Q. Okay. You had seen safes before though.
A. Yes, sir.
Q. Okay. And had you searched for video equipment before in your experience?
A. I don't recall any situation that I have. I could have, but I don't recall when that was.
Q. Well, and I say because you drafted the search warrant affidavit here.
A. Correct.
Q. Had you ever done one before for video equipment?
A. I don't recall if I ever did one before.
Q. Okay. What was the basis of your particularized suspicion that there could have been video equipment in the safe?
A. Just from the cameras, and all the computers and laptops he had, and SD cards that we found in the bedroom.
Q. Okay. But what made you think there was more in the safe?
A. Because first -- when we first went back in the condo for the search warrant, the cameras had been taken down in the living room.
Q. Before you got there.
A. Yes, sir. And we located them, and that's what gave a

Q. Yeah.
A. Yes, sir.
Q. And that's how this information turned up?
A. Correct.
Q. Okay. Had anyone at JCPD ever reviewed these cameras to your knowledge?
A. Reviewed what cameras?
Q. The -- good point. Let me clarify my question. Has anyone, to your knowledge, ever reviewed the devices you seized that evening?
A. At JCPD?
Q. Yeah.
A. No, sir.
Q. [redacted]. When did you first come to know of [redacted]s accusations against Sean Williams?
A. I don't recall exactly when that was.
Q. Was it after [redacted] fell out the window?
A. Yes, sir.
Q. Okay. She reported in -- I'll represent to you in November of 2019. Do you know who took her initial report at JCPD?
A. Who took the report?
Q. Yes.
A. No, sir.
Q. Do you know what was done with her report initially?

A. I don't -- I don't recall.
Q. Okay. And did she meet with you when she was first assigned to the case?
MR. HERRIN: Object to the form of the question.
A. Not that I recall.
Q. Did you -- did you request to meet with her?
A. I don't recall if we did or not.
Q. Okay. When did you first start communicating with Kat Dahl about Sean Williams?
A. When we were going to try to get an indictment on him for the weapons, ammunition.
Q. Okay.
A. Convicted felon.
Q. Okay.
A. That I can recall.
Q. Okay. When was that? Do you recall?
A. I do not.
Q. Okay. And why did you want to seek an indictment on ammunition?
A. Because that's all that we had that we could charge him with at that point.
Q. Okay.
A. So that's why we went forward with it.
Q. Where did you find the ammunition?
A. In the safe.

his penis?
A. I don't recall if it was or not.
Q. Did you know whether or not a SAK or sexual assault kit had been obtained for her?
A. No, sir.
Q. Did you ever talk to Chris Carney about Nick Austin's report in this case?
A. I did not.
Q. Okay. Do you know why?
A. No, sir.
Q. Okay. Did you ever talk to John Hames?
A. No, sir.
Q. There's a note in the case file on September 21st, 2020 by John Hames saying that additional investigation revealed there was no actual rape, the case is changed in RMS to an attempt. Do you know why Officer Hames made that entry?
A. No, sir.
Q. Do you know why that occurred on or around the time of [redacted]' fall?
A. Repeat that.
Q. Do you know why Officer Hames made this entry about Sean Williams around the time of [redacted]' fall?
A. No, sir.
Q. Was Officer Hames aware of [redacted]' fall?
A. Not that I recall. I don't know.

North Carolina?
A. Not that -- I've looked at some of it, but I don't -- I don't recall seeing her on there, but that was me. I don't recall seeing her. I didn't see everything.
Q. Did you look at this with Mike Little?
A. Do what?
Q. Did you look at it with Mike Little?
A. I was -- I was looking at some, and then he would be looking at some, and if we had somebody identified or something like that, we would say, yes, but I didn't watch it with him, no.
Q. And how come you were -- of all JCPD investigators were asked to look at this footage?
A. Why was I?
Q. Yes.
A. I guess because of the [redacted] case. I was already dealing with that part of it. I don't know why they said here, Toma, you do it. I don't know.
Q. Okay. [redacted]. Have you ever worked on her case?
A. Yes.
Q. Okay. When did that start?
A. I don't recall the date.
Q. Before or after [redacted]'s fall?
A. After.

case?
A. We was interviewing her, [redacted].
Q. Okay. Who else was present for the interview?
A. Ms. Dahl.
Q. And what did you do next?
A. I don't recall what -- what occurred next. I don't recall.
Q. Were you aware at the time of previous reports of rape against Sean Williams?
A. I believe -- I don't recall if I was or not.
Q. Did you interview Sean Williams?
A. No, sir.
Q. Why not?
A. I don't know.
Q. Had you had -- would it be normal practice to interview the suspect in a rape case?
A. I normally -- I don't know how many sexual assault cases that I had. I would assume, yeah, to interview the suspect. Then I knew he wasn't going to answer the door if we went up there, so I didn't go up there.
Q. Why did you know he wouldn't answer the door?
A. Just from when we went up there to do the search warrant, he wouldn't open up for us then, and that was the reason I didn't go up there and talk to him or try to talk to him.
Q. Did you try to seize any evidence from Williams'

apartment?
A. In reference to this case?
Q. Yes.
A. No, sir.
Q. Why not?
A. I didn't. I don't know why.
Q. I mean...
A. I couldn't tell you why.
Q. ...it's often the case in a sex case that there could be DNA on sheets, towels, things of that nature.
A. Yes, sir. Yes, sir.
Q. You knew that at the time.
A. I didn't -- I can't say I knew that at the time, but...
Q. Did [redacted] mention to you at the time that there were a lot of guns in the apartment?
A. No.
Q. Do you know why that appears in the case notes from the 24th?
MS. BEREXA: Can you let him see those?
Q. I'm asking from his memory.
MS. BEREXA: Sorry.
Q. So let me take my depo, ma'am.
A. No, I don't recall her saying that. I believe she said something about the garage, but not his condo.
Q. You knew then that he was a felon.

Q. Tell me about that, please.
A. It was a case that a girl was sexually -- raped -- sexually assaulted and after I was done interviewing and everything, I had to go back and interview -- get some statements from a witness. At the time, the business was closed and we couldn't get in contact with them at that point. So after I reviewed it with the DA, I went and got the statements from them.
Q. When was that?
A. I don't recall when that was.
Q. Shortly before [redacted], a long time before?
A. I don't recall.
Q. Do you recall who your supervisor was at the time?
A. Sergeant Hilton, I think.
Q. Did you talk to Saulsbury about this case?
A. Which case are you talking about?
Q. [redacted].
A. I don't recall if I did or didn't.
Q. Did you have knowledge that Saulsbury was texting with [redacted]?
A. No.
Q. I think I know the answer to this one, but did Saulsbury ever share text messages between himself and [redacted] with you at any point?
A. No.

found on Williams earlier this year?
A. Not that I'm aware of.
Q. Is that -- when you say not that I'm aware of, is that because you just don't know?
A. Correct, correct.
Q. Have you seen any footage of those videos?
A. Of...
Q. What was seized on Williams earlier this year?
A. Yes, I've seen some.
Q. Okay.
A. Yes, sir.
Q. Did you recognize any of the women on them?
MR. HERRIN: I'm going to enter an objection. You're looking at an open investigative file at the DA's office.
Q. You can answer.
A. I don't -- I don't recall.
Q. Were any of those videos shot in Sean Williams' condo?
A. Yes.
Q. Do you recall issuing a BOLO in October of '20 about Sean Williams reinforcing the doors of his apartment?
A. I don't recall if I sent that or not.
Q. Okay. What is a BOLO?
A. Be on the lookout for or be aware of, yeah.
Q. And did you routinely issue BOLOs during the time period that Kat Dahl was a SAUSA?

we've just gone through some reports, and it looks like [redacted] and [redacted] were before October of 2020, right?

A. Yes.

Q. Let me ask you about the record keeping system. In the course of your investigation, initial investigation of Sean Williams, would those reports have been apparent to you?

A. On which case?

Q. [redacted]'s.

A. I mean, I can look them up. [redacted]'s case?

Q. Well, you're investigating Sean Williams, right?

A. With [redacted], yes, sir.

Q. Okay. For attempted homicide, right?

A. Correct.

Q. Okay. Would these prior reports to JCPD have been known to you in the course of your investigation?

A. Not necessarily.

Q. Why not.

A. They may have came up. I don't know when they came up.

Q. Was that because of defects in the City's record keeping system?

A. No, sir.

Q. Was that because you didn't look for them?

A. I may not have looked for them at the first of it.

Q. Normally, when you had an accusation of a serious felony like a homicide, would you look for prior complaints?
A. Yes.
Q. I don't think we've entered this, the BOLO. Do we want to do that?
COURT REPORTER: Sure. Number 175.
Q. Thank you, ma'am.
EXHIBIT #175: BOLO E-mail from Toma Sparks, dated 10/13/20, Sparks 000239.
Q. Around October -- strike that. Around December 3rd, 2020, you sent a memo to Kevin Peters. Do you recall doing that?
A. Yes.
Q. And what was the purpose of the memo?
A. I don't -- just to give him a simple update.
Q. He wasn't your direct supervisor.
A. Correct.
Q. So why would you be giving him an update on Sean Williams?
A. I don't recall who asked me to send that to him. I really -- off the top of my head, I really can't recall who said send that to me.
Q. Did you ever -- outside of this memo, have you ever gone outside of your chain of command and sent a memo to Captain Peters?
A. No, sir.

A. I don't know.
Q. Were you telling Captain Peters this for some purpose?
A. No in particular purpose. I just sent him that memo.
Q. That he didn't ask for.
A. I don't know who asked for it or who said what. I don't recall how that came about.
Q. Okay. Were you expecting a response to this memo from Captain Peters?
A. I don't recall.
Q. Were you expecting direction from somebody higher up in your chain of command in response to this memo?
A. I don't recall what all this was about or how it came about.
Q. Why would Peters have an interest in the Sean Williams case?
A. He was the CID commander at that time.
Q. But captains don't normally take an interest in the day-to-day details on an investigation, do they?
MR. HERRIN: Object to the form of the question.
A. He keeps up on his cases, yes. He looks at cases and case notes, so he knows kind of what's going on.
Q. Just not like this. Just not like memos, right?
A. Correct.
Q. You sent Kat Dahl a copy of a search warrant. We'll admit that, thank you.

COURT REPORTER: 176.
EXHIBIT #176: Memo E-mail from Toma Sparks to Kevin Peters, dated 12/3/20, Sparks 000220-000221.
Q. This is an E-mail with a draft of a search warrant you sent to Kat Dahl on January 12th of '21. Do you recall that?
A. Yes.
Q. Okay. And you wrote to her at the bottom of the thread, I've started on the search warrant. We talked about this a little bit earlier. You didn't think you could search those without -- based on the warrant you had obtained back in September?
A. Correct.
Q. Okay. And why is that?
A. Because there wasn't enough probable cause to get into them.
Q. Okay. And had you obtained additional evidence to make the probable cause hurdle?
A. Possible of any weapons or anything like that to be able to get into them.
Q. Okay. And you said, I'm having problems with some of the language for the probable cause. What did you mean by that?
A. Articulating the...
Q. How many affidavits had you done before in your

EXHIBIT #178: E-mail from Toma Sparks to himself, dated 1/4/21, with attached search warrant, Sparks 000214-000219.

Q. And then on January 26, you send a copy of a search warrant to Captain Peters. Do you see that?
A. Yes.
Q. Do you know if it was a draft of this search warrant? I'm not asking which draft, just do you know if it was a draft of this particular search warrant?
A. I'm sure it was a draft, yes, but I don't know which one.
Q. Okay. And then the subject line is Kat Dahl E-mail. Do you know why you wrote Kat Dahl?
A. I don't recall why that says that.
Q. Do you know why it doesn't say Sean Williams?
A. No, I don't know.
Q. Did you ever refer to your cases by the prosecutor working on them?
A. No, sir.
Q. How many fed cases did you work on?
A. I only had one.
Q. Because I think you testified earlier you never worked with a SAUSA before.
A. Correct.
Q. We'll mark that.
COURT REPORTER: 179.

A. It could have.
Q. Did you follow up on the raped list?
A. I looked -- I looked up the repots that we had in our system and none of the names were -- we had none of the names in our system...
Q. When did you...
A. ...as being reported.
Q. Sorry.
A. That's okay.
Q. When did you look that up?
A. I don't recall. It was not long after. I don't recall the exact date.
Q. Did you make any further investigation into the raped list?
A. I did not.
Q. Did you make an attempt to search the devices based on the raped list?
A. No, sir.
Q. Why not?
A. I was talking with a supervisor and we didn't have enough to move forward with it.
Q. And which supervisor was that?
A. Sergeant Hilton.
Q. Okay. And then you said -- we're on Page 82 still, paragraph number five it says, between June 2020 and

Q. No speaking objections. Okay. Let me ask you this. Did probable cause exist to apply for a search warrant of these devices before Williams was arrested earlier this year?
MR. HERRIN: Object to the form of the question.
A. No.
Q. Why not?
A. I don't -- we didn't have enough information on it at the time to get into the computers.
Q. Why not?
A. We didn't have probable cause. We didn't have enough information on these incidents to be able to articulate to get a search warrant for the computers.
Q. What is the bar for probable cause in your view?
A. Eyewitness information and testimony or evidence that this occurred in their apartment -- his apartment to show that this happened in his apartment to be able to get the search warrant for them.
Q. But you had multiple complaints, right?
A. Yes, sir.
Q. Multiple women, the same perp, Sean Williams?
A. Listed as a perp, yes, sir.
Q. The same location, his condo, right?
A. Yes, sir.
Q. In some cases, you had DNA, right?

A. At least one of them, I did.
Q. And a report from TBI as much?
A. On that one case, yes, sir.
Q. And that's not enough to apply for a search warrant for videos?
A. I guess.
Q. But in January of '21, [redacted]s statement about seeing guns is enough to apply for a search warrant for the same videos, the same devices, for carrying or possessing a firearm?
MR. HERRIN: Object to the form of the question.
A. That was with me and Ms. Dahl. We was going to the last extreme to try to get it, and that was going to be pushing it. There was a 50/50 shot that you even got a search warrant on that it was so little.
Q. You're the -- you're the affiant, right?
A. Correct.
Q. Your name is signature, right?
A. Correct.
Q. Okay. This same document, Mike Little's affidavit, let's turn to page Sparks 83. This is the North Carolina seizure earlier this year. Do you see that, sir?
A. Yes, sir.
Q. Okay. I'm going to draw your attention to the second paragraph of section seven. It says -- it begins, due to

schizophrenic?
A. I don't recall that.
Q. That's all I have.
MR. EASTWOOD: Just very brief redirect.

******

REDIRECT EXAMINATION BY MR. EASTWOOD:

Q. Do you testify regularly in court as part of your job as a police officer?
A. I do.
Q. And memory is an important part of a police officer's job?
A. Correct.
Q. And in the cases you're testifying about, they often occur months, if not years, in the past?
A. Yes.
Q. And your testimony is an important part of obtaining a conviction?
A. Yes.
Q. And do you have particular memory issues?
A. No.
Q. Nothing further.

******

RECROSS EXAMINATION BY MR. HERRIN:

Q. Is this a Sparks document number?
MS. BEREXA: Uh-huh (Affirmative), the case notes.
Q. Do we know the number? I can't see it. Okay, Sparks 393.