IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE
AT GREENEVILLE

| | | |
|---|---|---|
| KATERI LYNNE DAHL, Plaintiff, | * * * | |
| VS. | * * | CASE NO. 2:22-CV-00072-KAC-CRW |
| CHIEF KARL TURNER, in his individual capacity only; OFFICER JOHN DOES 1-3, in their individual capacities only; and CITY OF JOHNSON CITY, Defendants. | * * * * * | |

DEPOSITION OF

# MATTHEW GRYDER

(Taken October 18, 2023)

APPEARANCES:

COUNSEL FOR THE PLAINTIFF:

HUGH A. EASTWOOD
Attorney at Law
7911 Forsyth Blvd., Ste. 300
St. Louis, MO 63105-3825

ALEXIS I. TAHINCI
TAHINCI LAW FIRM
105 Ford Avenue, Ste. 3
Kingsport, TN 37663

***THIS STYLE PAGE CONTINUES***

| | |
|---|---|
| COUNSEL FOR THE DEFENDANTS: | K. ERICKSON HERRIN<br>HERRIN, MCPEAK & ASSOCIATES<br>515 E. Unaka Avenue<br>Johnson City, TN 37601 |
| | THOMAS J. GARLAND, JR.<br>MILLIGAN COLEMAN<br>230 W. Depot Street<br>Greeneville, TN 37743 |
| | EMILY C. TAYLOR<br>WATSON, ROACH, BATSON<br>& LAUDERBACK<br>900 South Gay Street<br>Knoxville, TN 37902 |
| ALSO PRESENT: | JOY BAKER<br>INTERIM ASSISTANT CITY MANAGER<br>CITY OF JOHNSON CITY |

assisted her and Emily Swecker with discovery and with trial prep.
Q. Did you work pretty closely with Kat Dahl in that trial prep process?
A. Yes.
Q. And is it accurate to state that Mr. Chism eventually pled guilty?
A. Yes.
Q. Did that happen pretty close to the scheduled trial date?
A. That's my recollection.
Q. What did you know about Kat Dahl's trial preparation and how she was spending her time in the weeks leading up to that scheduled trial?
A. I know that we spent a few days tracking down witnesses, interviewing witnesses that were going to be witnesses in the trial. What she did the other days, I don't have any clue.
Q. Did you have the impression that that would have kept her fairly busy?
A. I know from being involved in several trials, trial prep is time consuming.
Q. Okay, thank you. In general in your interactions with Kat Dahl -- first of all, how often would you say that you interacted with her?
A. I couldn't begin to give you a number on that.

notes on that date?
A. As a CID supervisor, we were supposed to review our subordinates' cases at least once per week.
Q. Every case?
A. Every case.
Q. All right. And if we go to the second page, there's another entry of 11/21/19 that says, reviewed case MSG. Is that you again?
A. It is.
Q. And was it your practice to note in the case notes that you had reviewed the notes whenever you did that?
A. Yes.
Q. Okay. And it doesn't look like -- there's no indication here that you reviewed these notes again after 11/21/19. Is that accurate?
A. If you will look two paragraphs under 11/21/19, it says writer requests that the case be closed unfounded.
Q. Uh-huh (Affirmative).
A. No evidence a forcible rape ever occurred, and the victim and witness have both not shown up for two scheduled appointments to come in and provide witness statements.
Q. Are those your notes?
A. They are not, but that would explain why I did not review the case after that is because the case was no longer an active case.

Q. So when the writer there says writer requests that the case be closed by unfounded, who is he making that request to?
A. It would have been to all the CID supervisors.
Q. And someone would have to approve that?
A. Yes.
Q. Do you know if you would have been the one to approve that?
A. It's likely. I don't know for sure.
Q. And you'll see that there are other entries after that date, correct?
A. Yes.
Q. There's no indication that anyone else has reviewed this case, any other supervisor has reviewed this case, after that 11/21/19 entry, correct?
A. Yes.
Q. Were you still in that same position in CID in 2021?
A. I was.
Q. Do you know why you would not have reviewed the case again in March or April of 2021?
A. Because it looks like just from reading the notes, without seeing anything but this, that the case was not an active case after this note was put in sometime after November 27th, 2019 and before March 24th, 2021.
Q. So despite the fact that there are additional notes here,

are you saying that the case was given an inactive flag or otherwise inactivated in your system such that it would not have appeared in searching for active cases? Is that an accurate description?
A. From just looking at these notes, that's what it appears to me, yes.
Q. Okay. So when you were doing your periodic review, your weekly review of cases, would you go into the system and only look for cases that were flagged active?
A. Yes.
Q. So when we see these additional notes on this report from March and April of 2021, I don't know that this is clear from the document, but based on your testimony are we to assume that the case status was never changed back to active in the system?
A. From just looking at the notes and nothing else, that would be my assumption.
Q. Okay, thank you. After this November 7th, 2019 reported rape by Sean Williams, when was the next time that you remember hearing about Sean Williams?
A. I'm not sure. Of course, I remember hearing about him when the girl fell out of the window at his apartment.
Q. Okay. Do you remember approximately when that was?
A. I think it was in maybe September of 2020.
Q. Okay. And what did you hear about that incident?

complaints by Sean Williams?
A. Not that I'm aware of.
Q. At any point, whether in preparing for today's deposition or several years ago at the time these events were happening, did you ever look in JCPD's computer systems and find out if there were other complaints involving Sean Williams?
A. I don't remember.
Q. Okay. So how far would you say your curiosity extended into this case? Were you only present for the safe opening and had no further involvement?
A. Yes.
Q. Okay. So tell me about the safe opening. What do you remember?
A. It happened in the basement of the police department.
Q. Okay.
A. The investigators had the combination to the safe.
Q. How do you think they got that?
A. I don't remember. I think that Mr. Williams' attorney provided it.
Q. Why would he do that?
A. I guess to prevent the safe from being destroyed.
Q. Would that be a common practice for a suspect's attorney to provide a safe combination?
A. I can't really say what's common practice.

A. Just venting, I assume, because there was -- we were the same rank. There was nothing I could do to Kat Dahl that he couldn't do, which was -- I mean, neither one of us could do anything because Kat didn't work for us.
Q. What was the substance of what he said to you?
A. I have no idea. I can't...
Q. Would it surprise you to learn that he testified that he -- that she was responsive to him?
MR. HERRIN: I'm sorry?
Q. Would it surprise you to learn that Sergeant Legault testified that Kat Dahl was responsive to him?
A. I think being responsive and getting the job done are two separate things.
Q. Sergeant Legault would not have directly -- Sergeant Legault was not himself an investigator, correct?
A. He was a supervisor of investigators.
Q. So would he personally have given cases to the SAUSA to prosecute?
A. Yes. It wouldn't be uncommon for a sergeant to work a case.
Q. So in your recollection, was he complaining about a case that he had given her or complaints that he had heard from people about her?
A. I don't remember.
Q. Did you ever talk to Captain Peters about Kat Dahl?

A. Captain Peters talked to me about Kat Dahl.
Q. Tell me about that.
A. The one that stands out in my head is part of the recordings that exists between Kat Dahl and I...
Q. Okay.
A. ...where Kevin Peters was in the office and he said -- he came into my office and he said something to the effect Kat's done, or Kat's finished, or something like that. And I said, well, what do you mean, what happened? And he said, Kat lied to the chief and I right to our face. And I said, what do you mean she lied in your face? And he said, she told us that she was going to indict "X" amount of people at this grand jury and she only indicted one. And I said, Kevin, I said, you're probably lucky that she indicted one person because she had a trial scheduled for when grand jury was and we have been working on trial prep for this trial. And he said, no, she lied, she lied, and just walked off to his office.
Q. Do you know whether Kat Dahl was assigned to that Chism trial before or after she would have had that conversation that Captain Peters referenced?
A. I don't know.
Q. Did you think Captain Peters was being unreasonable?
A. Yes.
Q. Has Captain Peters ever taken a case to trial with a SAUSA

Q. Were you surprised to hear these things about her?
A. I'm not really surprised by a lot.
Q. Okay. What do you mean by that?
A. I wasn't surprised.
Q. Had you heard complaints about other SAUSAs in the past?
A. Yes.
Q. Who?
A. Corey Shipley.
Q. What were the complaints about Corey Shipley?
A. The same kind of things.
Q. Was Corey Shipley's contract nonrenewed?
A. I think he resigned. I don't know. I'm not involved in personnel decisions like that, but I knew he left the position and went back into private practice.
Q. Were you aware of whether that was his voluntary choice?
A. I don't know.
Q. Were you aware of anyone within the department maintaining a list of cases of his?
A. I don't know.
Q. What else did you hear about Corey Shipley?
A. He's a nice guy.
Q. Who made those complaints about Corey Shipley?
A. I don't remember. That's been five years ago or more.
Q. Did you ever hear any complaints about any other SAUSAs or AUSAs?

sexual assault case, and you reviewed those notes as a supervisor, correct?
A. Yes.
Q. What would you have been looking for in your review of those notes?
A. To see if the investigator was, number one, actually working the case, not just letting it sit. And number two, looking to see if they were doing what the supervisors thought they should be doing.
Q. And so in a sexual assault case, what are some of the things that you as a supervisor would have expected to be done?
A. I would have expected if it was a sexual assault that was immediately reported, that an investigator responded, spoke with the victim, attempted to get the victim to cooperate and have a sexual assault kit done, interview the victim, make sure the victim has a safe place to go, make sure that the victim is treated for any injuries, and then I would expect the investigator to follow up and attempt to identify and locate a suspect.
Q. Would you expect someone to secure the scene of the assault?
A. Yes.
Q. Would you expect someone to collect evidence from the scene of the assault?

A. Yes.
Q. Would you expect someone to interview a known suspect?
A. Yes.
Q. To the best of your recollection, does the annual sexual assault training address victim-centered and trauma-informed approaches?
A. I'm not sure that the annual training does. I think that it does, but I can't sit here and say with 100 percent certainty that it does.
Q. Do you have other training in victim-centered and trauma-informed approaches to sexual assault investigations?
A. Yes. I just attended one this year.
Q. Tell me about that.
A. It was a day long training taught by a former sexual assault investigator. It was at ETSU.
Q. And you said this year. When this year?
A. I think June of this year.
Q. Were you ordered to attend that?
A. Yes.
Q. By whom?
A. Captain Mike Adams.
Q. What is his role?
A. He's the CID commander.
Q. Had you ever been ordered to attend something like that in the past?

going to a suspect's house to serve an arrest warrant by themselves, I don't see a supervisor at the Johnson City Police Department being okay with that.

Q. Specifically with respect to the incident on May 5th, 2021 when officers went to the home of Sean Williams, have you heard anything about what led Officer Jason Lewis to do that?

A. No.

Q. You have no insight into that at all?

A. I have not talked to anyone that was there.

Q. Okay.

A. I have no firsthand knowledge of what happened there.

Q. Do you know Jason Lewis?

A. I do.

Q. Based on your knowledge of him and your professional experiences with him, is it likely that he would have done that completely of his own accord?

A. By himself?

Q. Yes.

A. That would surprise me.

Q. Thank you. What are other best practices for serving arrest warrants? Aside from coming up with a plan and not going on your own, what are other best practices?

A. Knowing who you're dealing with, what the arrest warrant is for. Based upon who the person is, what their criminal

history looks like, what the charges are on the warrant, that would kind of decide the manpower for you.
Q. In your experience, who would be responsible for creating that plan?
A. It could be anybody.
Q. Can you give some examples?
A. It could be the officer who took out the arrest warrant. If they're the ones that are going to serve it, they can be responsible for coming up with the plan. It could be the officer that plans to serve the warrant's supervisor coming up with the plan. It could be a SWAT team commander coming up with the plan.
Q. Would it typically be someone with no involvement in the case?
A. Not typically.
Q. What is the purpose of a BOLO?
A. For officers to be on the lookout for someone or something.
Q. And let's get a little more specific if we could. Why -- and I realize this may change from case to case, but generally speaking, why are BOLOs issued?
A. They are generally issued -- so I'm trying to think of a way to explain it, because what first comes to mind, they're issued for officers to find someone who is wanted or find something that's wanted.

Q. Is it typical for a BOLO to be issued anytime there's a warrant for someone?
A. It's pretty typical.
Q. So every time a warrant is issued for someone...
A. If it were something that was of a sensitive nature, something that was a sealed indictment, a sealed warrant, no. If an officer goes and takes out a warrant, yes.
Q. So if there is a sealed federal indictment for a suspect, it is not typical for a BOLO to be issued based on a sealed federal indictment?
A. That's not typical, yes.
Q. Would you expect typically a BOLO to indicate details about whether the subject is dangerous, what their criminal history may be, what they've been charged with, any of that information?
A. If they were armed, or dangerous, or both, yes. Not necessarily details of criminal history, things like that.
Q. Would you expect the BOLO to indicate what the charges are that they're wanted on?
A. Yes.
Q. When are threat assessments typically done with respect to warrants, arrest warrants?
A. Normally they're done if it's something that's high risk, something that's going to be a SWAT team operation, search warrants, things like that.

times they're still not going to answer the door, and then you've lost the element of surprise.
Q. And if they didn't know they were wanted up until the point of the knock and talk, would that give them a reason to suspect that they are wanted and then flee?
A. Yes.
Q. Might that create a flight risk?
A. It might.
Q. Thank you. What are some other ways to effectuate an arrest warrant other than a knock and talk?
A. Traffic stops, doing surveillance on the residence, waiting until they come out, arresting them then. Probation and parole visits, if the person is on probation or parole. Going to their workplace, I mean, there's lot of other ways.
Q. In your experience as a law enforcement officer, is it accurate to state that nobody stays in one apartment forever?
A. I would say that is accurate.
Q. Eventually they're going to come out.
A. Yes.
Q. Any other best practices that we haven't addressed surrounding the execution of arrest warrants?
A. I'm sure that there are.
Q. Nothing that comes to mind right now?

Q. What is the city manager's involvement?
A. They're the ultimate -- they have the ultimate say in terminations and things of that sort.
Q. Where do you get that knowledge?
A. From the department's general orders.
Q. Does the city manager, in your knowledge and experience, generally take the recommendation of the chief of police in making those decisions?
MR. HERRIN: Object to the form of the question.
A. I have no firsthand knowledge of that.
Q. Do you participate in hiring and firing within the department?
A. I do not.
Q. Are you aware of any instances of retaliation by JCPD leadership?
A. I don't have any firsthand knowledge of it.
Q. What have you heard?
A. I don't know of any instances of retaliation.
Q. Have you heard people complain about retaliation within the department?
A. No, I haven't.
Q. You paused quite a bit there.
A. I was trying to rack my brain.
Q. Okay. Did you ever have concerns that anyone might retaliate against you within the department?

A. I did.
Q. Tell me about that.
A. After this lawsuit came out because I know the kind of person that Kevin Peters was.
Q. Tell me what you mean by that.
A. If you crossed him, he would nitpick until he found something that he didn't like. It might be something that was nothing, but it would be the biggest thing in the world to him.
Q. Are you aware of other JCPD personnel who have been terminated or disciplined based on complaints by Kevin Peters?
A. I'm sure that there have been people disciplined because of complaints from Kevin Peters. I don't know of anyone that's been terminated because of that.
Q. Do you recall any specific people?
A. I can't think of any official discipline other than people that, you know, received verbal counseling or something of that nature because of something that Kevin decided to nitpick about.
Q. Are you aware of -- you mentioned a few moments ago that Kevin Peters did not like to be crossed by someone. I think those were the words that you used. Are you aware of Kat Dahl doing anything to cross Kevin Peters?

A. I'm not aware of any of that.
Q. Aside from, I suppose, the allegation that he made that she had lied to him. Is that accurate?
A. Yeah.
Q. Would you say that former Chief Turner had Kevin Peters' ear?
A. It was, I think, the other way around.
Q. Okay. Tell me about that.
A. That Kevin Peters had Chief Turner's ear.
Q. Were they friends?
A. Yes.
Q. Were they close colleagues?
A. Yes.
Q. Did they have a long history with each other?
A. Yes.
Q. When you say that Kevin Peters had Chief Turner's ear, what more specifically do you mean by that?
A. I know that I had complaints about Kevin Peters, and I went to Deputy Chief Botelho about them a couple of times and voiced my complaints. And she said, I'm sorry, there's nothing I can do because when I go to the chief, he tells me he doesn't want to hear it.
Q. Did you have concerns about anyone within department leadership being vindictive?
A. Kevin Peters.