IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE
AT GREENEVILLE

| | | |
|---|---|---|
| KATERI LYNNE DAHL, Plaintiff, | * | |
| VS. | * | CASE NO. 2:22-CV-00072-KAC-CRW |
| CHIEF KARL TURNER, in his individual capacity only; OFFICER JOHN DOES 1-3, in their individual capacities only; and CITY OF JOHNSON CITY, Defendants. | * | |

DEPOSITION OF

# WILL SAULSBURY

(Taken October 17, 2023)

**APPEARANCES**:

COUNSEL FOR THE PLAINTIFF:

HUGH A. EASTWOOD
Attorney at Law
7911 Forsyth Blvd., Ste. 300
St. Louis, MO 63105-3825

ALEXIS I. TAHINCI
TAHINCI LAW FIRM
105 Ford Avenue, Ste. 3
Kingsport, TN 37663

****THIS STYLE PAGE CONTINUES****

COUNSEL FOR THE DEFENDANTS: K. ERICKSON HERRIN
HERRIN, MCPEAK & ASSOCIATES
515 E. Unaka Avenue
Johnson City, TN 37601

THOMAS J. GARLAND, JR.
MILLIGAN COLEMAN
230 W. Depot Street
Greeneville, TN 37743

EMILY C. TAYLOR
WATSON, ROACH, BATSON & LAUDERBACK
900 South Gay Street
Knoxville, TN 37902

ALSO PRESENT: JOY BAKER
INTERIM ASSISTANT CITY MANAGER
CITY OF JOHNSON CITY

with Sergeant Legault about cases that you had sent to Kat Dahl that she had not yet indicted or not yet presented to the grand jury for indictment?

MR. HERRIN: Counsel, could we clarify for the witness that you've shown him two different lists so that he's not confused?

Q. Yes.

MR. HERRIN: The one with the names on it is the December list.

Q. Sure. I will represent to you that Exhibit 8 that we were just looking at that has the handwritten names on it is a slightly different list than the Exhibit 1 list without the names on it. I believe that the Exhibit 8 list with the names has several more cases on it than the first list. Did you -- were you aware that Sergeant Legault was preparing a list of cases that had been given to Kat Dahl that she had not yet indicted?

A. I was asked to get my federal cases. I can't remember if I -- or compile a list of my federal cases that needed to be prosecuted. I can't remember if I knew the purpose of that list at that time or not.

Q. Did Sergeant Legault make that request?

A. I can't remember.

Q. So when you say you were asked, you don't recall who asked you?

A. No, I believe it was Legault, but I can't remember.
Q Do you remember when he asked you?
A. No, ma'am.
Q. Do you remember how many times he asked you?
A. No, ma'am.
Q. Do you remember how he asked you in terms of the means of communication?
A. No, ma'am, I don't.
Q. Do you remember anything else about your communications with Sergeant Legault about cases that you have sent to Kat Dahl that she had not yet prosecuted?
A. How broad of an answer are you wanting?
Q. Well, so far you've given me responses that you don't remember many details. Is that accurate?
A. Right.
Q. Are there any details that you do remember about any of those communications?
A. There were talks between myself, and other officers, and Sergeant Legault about how we were unhappy with Kat's performance as far as not taking our cases through, or not taking our cases through in an expedited manner, or not being responsive to us, if that's the answer you're looking for. But as far as specifics, like we compiled a list on this date, I don't know.
Q. What do you recall about those conversations that you just

referenced?

A. There was frustration in the unit. And by the unit, I mean special investigation squad. There was frustration in the unit that Kat was too distracted with other things, that she wasn't being responsive to us as far as giving us updates on how our cases were doing in federal court, giving us updates on when we could expect grand jury presentments for indictments. We weren't getting answers from her on several of our cases, like I referenced earlier with Johnthan Johnson and Cheyenne Lowery, and she seemed to have time to do other things except take our cases or take our cases seriously, so that caused frustration within the unit.

Q. When is the first time that you recall having a conversation with any of your colleagues about that subject?

A. It would have been in 2020. Probably in the summer to fall range of 2020, I would think.

Q. Who first brought up Ms. Dahl's perceived deficiencies?

A. I can't remember who first brought it up.

Q. Who all did you discuss her perceived deficiencies with?

A. Sergeant Legault, Investigator Stillwagon, Investigator Barron. You'll have to forgive me because these guys aren't -- a lot of these guys aren't in the unit anymore, so I'm trying to remember who was working down there then.

Q. Do the best you can. Sitting here right now, do you remember any specific comments by any specific individuals?
A. I just remember the content or just the general -- general theme of the conversations, I guess, for lack of a better term. I don't remember specifics, or who said what, or something like that.
Q. You testified earlier that you communicated with Kat Dahl at least once or twice a week, correct?
A. Yes.
Q. In any of those communications with Kat Dahl did you express these displeasures to her?
A. I don't think so.
Q. Why not?
A. Because it's -- well, several reasons. First of all, it's not my job. She had superiors. I'm not a sergeant. I'm not a chief, or a captain, or anything, so it's not my job to worry about how she works or what she does. She's almost in a position of authority over us because she's the gatekeeper to the federal court system, so we had to stay on her good side if we wanted cases prosecuted. You know, we don't want to make the person that's taking our federal cases through the court system upset to the point where we get absolutely zero cases through. So a combination of those two things, just I wasn't her boss, I

a copy of this list herself.

Q. You don't have any independent knowledge of whether she was presented with that list?

A. Not other than my cases that I know she was presented with.

Q. And when you say that you know she was presented with your cases, what cases would that include?

A. Cheyenne Lowery and Johnthan Johnson.

Q. Which she indicted, accurate?

A. Yes, ma'am.

Q. Were there other cases that you transmitted to Kat Dahl for the purpose of prosecuting that she did prosecute, that she did present to the grand jury or present a complaint on?

A. I'd have to look back. I don't think so, but if you have a case that I can review, then I'll be happy to review it. To my knowledge, no.

Q. To the best of your recollection, Johnthan Johnson and Cheyenne Lowery were the only cases where you presented to a federal grand jury with Kat Dahl.

A. Yes, ma'am.

Q. When you said that Ms. Dahl was too distracted with other things, what other things are you talking about?

A. Primarily Sean Williams.

Q. And what makes you say that she was too distracted with

understanding of him came through reports. I wasn't hip on the downtown scene. I didn't go downtown, so I don't know. Any understanding I had of him would have been through official Johnson City police reports.

Q. What about discussion within the department about Sean Williams reputation?

A. I don't know if there was any at that time. It wasn't a big enough, like, perpetrator to be discussed. Our office is away from CID too, so we're not necessarily always in tune with what CID is talking about or what CID is doing.

Q. Okay. You mentioned the girl falling out of the window. Is it accurate to state that you are referring to [redacted]?

A. I think that's her name. If that's the girl that fell out the window, then yes. The one that was on the ledge or whatever happened and fell out.

Q. When did you first hear about that incident?

A. It was the morning after it occurred. I got a call from Sergeant David Hilton who was wanting to know if we had anything on Sean Williams because he had heard we were investigating him for cocaine.

Q. And what did you tell Mr. Hilton?

A. I told him we had nothing concrete. And he relayed to me that they would be doing a search warrant on the residence. I offered my assistance and I told him to keep

me posted if he found anything. At that point, I was excited because I felt like we had a real development in finally catching Sean. It seemed like his luck had run out, so to speak. You know, we can't -- the people we talked to won't go up and buy off of him or anything. I can't get a reliable informant that knows anything about him. So suddenly we had a stroke of good luck, it would seem, so I was pretty -- I figured something would come of that.

Q. Now, what you just said, you were excited that you finally had something on him.

A. Right.

Q. It seems a little bit inconsistent to me with your prior testimony.

A. Yeah, I can see that. It was more like we didn't have any solid information. We had this guy that was this supposed cocaine guy downtown, throwing these big parties, had a big nice garage with all of these cars, and yet, you know, we didn't have anything concrete on him.

Q. You had [redacted], correct?

A. I think [redacted] came after the girl fell out the window. I'll have to look on the dates of that, but I think that was after the girl fell out the window.

Q. So what did you have aside from this anonymous tip that he was on cocaine?

A. At the same time I was investigating -- well, at the same time the Sean Williams stuff was going on, I was investigating a cocaine and marijuana case in Johnson City. I suspected that one of the guys involved in that one of the big guys involved in that, may have some connections to Sean, or at least may have some connections to the downtown cocaine scene. I was interested in getting in further with him, and in turn I thought it might lead me to Sean, it might not. I didn't really know the connection yet. That whole crowd, it's hard to describe if you haven't worked in narcotics. When you get into certain groups of individuals, like cocaine traffickers or people like that, sometimes it can be really hard to get an informant in with them because their groups or the groups of people they associate with are so tight. It's not that way necessarily for people that sell meth, for instance. Usually they're easier to flip. Their loyalty is less tight. When you've got people that hang out consistently or are friends outside of whatever they do, then it's harder to get an informant to flip or try to develop an informant. So in the case of my state marijuana and cocaine case, I was looking for ways to branch that out and I thought that Sean may be a branch of that. I didn't think that he was the source of cocaine, but I thought that he might potentially be a

co-conspirator.
Q. Did you have any idea who the source of cocaine was?
A. The source of cocaine locally for Sean or my other case?
Q. Would it have been the same person?
A. No, not necessarily.
Q. Okay.
A. I didn't know that. I didn't know if it was or not. That's something I still don't know.
Q. So at the time that [redacted] fell from the window, I understand your testimony to be that all you knew about Sean Williams at that point came from what you described as an anonymous tip that he was selling cocaine. Is that accurate?
A. Whatever research I would have done as far as Johnson City Police reports are concerned. I don't remember -- you're asking if I knew about a rape case in 2019. I don't remember. I don't know if that was one of the cases I looked at or not. I don't remember.
Q. How many -- well, you stated that when you got this anonymous tip, this person gave you a laundry list of names, correct?
A. Yes, ma'am.
Q. What about Sean Williams as part of that name drop would have made you so excited when [redacted] fell out the window to finally catch him when you knew nothing about

him except that one report?

MR. HERRIN: Object to the form of the question.

Q. You can answer.

A. I'm sorry, that throws me off. I guess that's how my marijuana and cocaine case developed. Specifically the head guy in that case, and I don't want to get too far into the weeds with this, but the head guy in that case fancied himself as an amateur rapper in Johnson City. He's a local guy. There was some videos where he was rapping at Sean's garage. There wasn't, like, any illegal activity going on. He was flashing money, I believe, in one video, and then he was in one of Sean's cars rapping. Sean isn't seen in any of the videos that I recall. It was this guy and some other people. So to me, that was intriguing that this big cocaine trafficker would be at Sean Williams' garage making a rap video. That interested me, and it's part of what made me wonder how Sean Williams was connected to that. And you have to understand at the time, this case still wasn't solved, so I didn't know how people were connected to who. I didn't know what Sean Williams' role in the case was. So to hear a potential break like this as far as a search warrant may be done on an apartment, it could lead to the entire group, it could lead to nothing. It could lead to that Sean was some kind of kingpin. You just don't know.

made by [redacted]?

A. I don't think so. I'm not familiar with that report.

Q. Who is [redacted]?

A. I believe that she is [redacted]'s girlfriend, that guy that I referenced earlier.

Q. Are you aware of a complaint of sexual assault made by [redacted]?

A. I am, yes.

Q. Were you aware of that prior to the filing of this lawsuit?

A. No. Well, I'm sorry, [redacted] had mentioned it in his interview with me. When we were talking about Sean Williams, [redacted] mentioned that fact, but I didn't remember it until I was reviewing for this deposition and watched the video of the interview.

Q. What did [redacted] tell you about Sean Williams with respect to sexual assaults in your interview of him?

A. He said he -- that Sean either sexually assaulted or raped his girlfriend.

Q. Did he say whether Sean Williams had done that to other women?

A. I don't remember.

Q. Do you remember anything else about what [redacted] told you about Sean Williams?

A. I don't think so, no.

Q. Did you ever meet with the girlfriend?
A. [redacted]?
Q. Right.
A. No.
Q. With whom did you communicate about [redacted]? With whom within the department did you communicate about [redacted]?
A. I don't know. I haven't communicated about [redacted] in a couple of years. There might have been some communication immediately after the fall, but since then, none that I -- probably since the opening of the safe, I haven't communicated with anybody about the case.
Q. So at any point -- well, let me ask it this way. Prior to the filing of this lawsuit, when was -- what was the last activity in your investigation of Sean Williams?
A. I sat outside of his apartment one night after the warrant was filed on him by the marshals. I sat outside of his apartment one night to try to catch him leaving, or coming, or see him in the garage or something. And it wasn't his apartment, I'm sorry, it was his garage. I sat outside of his garage. I sat in the Tipton Street lot and looked across the street at his garage, and I never saw him.
Q. How long did you sit there?
A. Probably at least a couple of hours. It was a while.

A. Right.
Q. Which to me suggests that he knew at that point that he was wanted. Is that accurate?
A. No, it could have been before. Anytime the warrant is active would have been when I was looking for him.
Q. So when you said he was a fugitive, that could -- in your mind, that could have been anytime after the warrant was issued.
A. I'm sorry. Fugitive to me means wanted person.
Q. Okay.
A. So as soon as the ink on that warrant is dry, he's a fugitive in my mind.
Q. Okay. You stated that you were not present during the search of Sean Williams' apartment, correct?
A. That's correct.
Q. Did you discuss that search with anyone who was present?
A. I'm sure I did. I don't remember the substance of the conversation.
Q. Do you remember who you would have discussed it with?
A. No.
Q. Do you remember when?
A. No.
Q. Do you remember anything about those conversations?
A. I remember there were conversations about how detectives had theorized that he may have hidden his guns in an

elevator shaft or something because they didn't find any guns. That was -- that was all I remember. I don't know how I came to that information. I just know that was something that was theorized. I don't know.
Q. Had they previously seen guns in the apartment?
A. No, I don't -- who? I'm sorry.
Q. The people who theorized that his guns were in an elevator shaft.
A. [redacted] said that she had seen guns in the garage, but that may have been after that girl fell out the window.
Q. So if people within the department theorize that he had hidden his guns because they didn't find any guns...
A. It was more than a theory. There was some sort of a basis. I'm sorry for interrupting you. There was some sort of a basis of knowledge for that, I just don't remember what it was and how I came to that information.
Q. Well, it sounds to me that in setting forth such a theory, they must have believed that he possessed guns. Is that accurate?
A. I would guess so, yes.
Q. Do you know the basis for their belief that he possessed guns?
A. No, ma'am, I don't.
Q. Did you talk to anybody who had seen firearms in his

A. Okay.
Q. You may not.
A. For those cases, there were months when I would seek a response from her and would get none. Like I had testified previously, even up to the night before grand jury, she was asking me questions about the case. That would suggest to me she was putting together the grand jury file because she was looking for specific documents. I understand the COVID protocol. My work as an investigator, if I had a limited factor on me, like I can only take a case this far, like up to the point of the grand jury, and then I have to schedule it, and I have to wait through the backlog of cases, I would at least have every single case file done, and ready to go, and marked and ready. She didn't do that. Instead, she was out looking for Sean Williams, suggesting ways that we can investigate him that weren't in line with what we believed were legal practices or even commonly used practices, and that's my basis for why I think she's incompetent.
Q. I want to focus on the time line here a little bit because you keep referring to the Johnson and Lowery cases.
A. Right.
Q. Would it be accurate to state that you did not mention those defendants to Ms. Dahl for the first time until January of 2021?

A. That would be accurate. My basis of knowledge for some of that came from just working with the other guys, too. During this time, that state case that I referenced previously, the big cocaine and marijuana case, that was a 26 defendant case, so that was taking up a lot of my time. That was a state case. So I didn't have my normal federal cases that I would be prosecuting now outside of a regular year or in a regular year because I had that state case going on that took up a lot of my time.
Q. So again, you stated that you began having conversations with others within SIS in the summer of 2020 about Kat Dahl.
A. Right.
Q. Would it surprise you to learn that Kat Dahl was not given the Sean Williams case until November of 2020?
A. What do you mean by -- well, I can't ask you a question. What do you mean by given the case? I don't understand. Can I ask you to clarify that? I don't understand.
Q. Well, I mean, would it surprise you to learn that she didn't even learn about the Sean Williams case until November of 2020?
A. When was the fall incident out of the window?
Q. I can represent to you that it was in September of 2020.
A. And she didn't learn about it until November of 2020?
Q. Correct.

meeting for a day and you've got a number of prosecutors who want to present cases, do you have any idea how many cases a grand jury can review in that time?

A. No. I'm sorry, I kind of misunderstood your question, but no.

Q. So, you know, if you had an expectation -- and this is just a hypothetical, but if you had an expectation that Kat Dahl was going to present 15 cases to the grand jury on December 1st, hypothetically, you have no way of knowing whether or not that would be a reasonable number, correct?

A. No, she would have to tell me.

Q. Circling back to the search of Sean Williams' safe. What did you observe in that safe?

A. There was a box of money. There were some sex toys. There was a baby doll with its crotch drilled out. There were some IDs belonging to his roommate. He went by Alvie. I don't remember his last name. I think his real name is Alvarado or something. There was some legal paperwork, some car titles. I think there a deed to some land. A lot of legal paperwork.

Q. You mentioned a box of money. Is that correct?

A. Yes, ma'am.

Q. What happened to that box of money?

A. It went back into the safe.

Q. Do you know whether it was returned to Sean Williams?
A. I assume it was.
Q. What is the basis of that assumption?
A. That -- well, there's no basis of assumption. The last I saw it, it went into the safe and the safe was closed.
Q. When you learned of [redacted]' incident, did anything suggest to you that she may not have fallen out of the window and there may have actually been a crime committed?
A. No.
Q. When [redacted] told you that Sean Williams had sexually assaulted his girlfriend, did you take any action based on that accusation?
A. I asked him if he had made a report on it.
Q. What did he tell you?
A. He said he had, or they had, or she had. There was a police report done on it.
Q. Did you follow up on that?
A. No, ma'am.
Q. Why not?
A. I assumed that an investigator was following up on it. I just worked the SIS cases. I didn't work sex crimes.
Q. What is our next exhibit number?
COURT REPORTER: 90.
Q. All right. I'm handing you what has been marked as Exhibit 90.

A. Yeah, a camera in the safe and then he had those wild -- I mean, it was no secret he had wild parties up in his -- up in his apartment. We'd heard that he had parties up there. We hadn't heard about the rapes or anything like that, but we heard that there were cocaine parties like I discussed earlier.
Q. If you'll go back to 1513, a text message from you on that page says, we've done some rape and assault reports on him, correct?
A. Yes.
Q. So when you say we didn't know about the rapes, that's obviously not accurate, correct?
A. Well, right, based on Johnson City Police reports. I'm sorry.
Q. Let's look at 1517. Is this still part of the November 14th conversation?
A. It looks like it.
Q. There are no other dates that appear on these text message photographs after the November 14th date up through 1517. Is that correct?
A. I'm sorry.
Q. Go ahead.
A. 1520 is the first date I saw, but you may be right. 1520 is November 16, so I guess we can say between November 14th and November 16th these messages were sent.

Q. Do you know why Kat Dahl is talking to you about Sean Williams at this point?
A. I assume it's because I would listen. I mean, I wanted to catch the guy. If I could find him doing something wrong, I would love to catch him.
Q. Well, how did she know that you would listen?
A. I assume prior conversations.
Q. Did she know that you had an interest in Sean Williams as well? Did she know that you were investigating him for drug charges?
A. I don't know what her knowledge was in regards to that.
Q. Let's go to 1518. These are a little hard to read because there's a glare on the screen, but I'm going to do the best that I can here. It looks to me -- in the second text from you on this page it looks like you said, we know he has guns and coke based on him reinforcing the apartment door himself, would almost be he has child porn somewhere too. Is that accurate?
A. Yes, ma'am.
Q. Why did you say that?
A. The baby doll with the crotch drilled out in the safe.
Q. Pretty disturbing, right?
A. Yes, very disturbing.
Q. And yet, you testified earlier that Kat Dahl was obsessed with the Sean Williams case. Is that accurate?

A. Yes.

Q. Did you think that was unwarranted?

A. I felt like it needed -- I felt like the way she was going about investigating the case was incorrect. She was too personally invested in it.

Q. What do you mean by that?

A. You have to be careful not to take a huge personal interest. It's hard to do, but when you're working a case, you have to be careful not to become too personally invested in a case because it creates a liability for you, it creates the possibility of mistakes, it creates a liability for your department. It also creates an opening for a defense attorney to look at your work later and see that you're too personally invested. It also can lead to mistakes. You get tunnel vision or you don't -- you get tunnel vision. You focus on the wrong thing or you focus too much on one thing and you might miss something over here, you might miss the big picture. So there's a lot of reasons you want to try to remain as objective as possible. It's hard because you get -- you know, you get invested in cases, you put a lot of work into them. But my opinion is that Kat was too personally invested in this case. And the other thing is, as bad as it is, and as bad of a person that I think Sean Williams is, Sean Williams still has Fourth Amendment Constitutional rights. We just

can't search his stuff. We just can't search his phones. We just can't hold a press conference and solicit tips on him or stuff like that. So as bad as it is, there are certain investigative steps that we have to take that preserve his rights, and keep liability off of us, and put together a good case that when he is taken to court, he can be prosecuted and he doesn't get off on a technicality during a suppression hearing or something like that.

Q. Is it possible that Johnson City did not take this case seriously enough?

A. No, ma'am.

Q. Why do you say that?

A. I did everything in my power to bring Sean Williams to justice legally.

Q. You weren't the investigator on the sexual assault reports, were you?

A. I can't speak to sexual assaults. I'm telling you as far as the drug work goes that I did everything I could.

Q. Well, he's never been prosecuted for drugs, has he?

A. No, ma'am. It's -- the legal system is set up to favor the offender. I mean, people have Fourth Amendment rights -- mainly Fourth Amendment rights, but the legal system is set up with the presumption of innocense. We have to prove people's guilt. So just because I didn't prove Sean Williams' guilt, that doesn't mean he wasn't doing

A. Yes, ma'am.
Q. And then you respond, I will. Do you see that?
A. Yes, ma'am.
Q. Did you?
A. No, ma'am.
Q. And then further down you write, no luck on Williams today. Do you see that?
A. Yes, ma'am.
Q. What did you do that day with respect to Sean Williams?
A. I'm not sure if I did anything. That could be the day that I went out and sat on his garage. The only recollection I have of trying to get Sean was sitting on his garage.
Q. So you have complained about Kat Dahl not following through on things and her job performance, correct?
A. Yes, ma'am.
Q. And yet you told her affirmatively that you would arrest Sean Williams, correct?
A. Yes, ma'am, I did.
Q. And you did not.
A. That's right, I did not.
Q. And you never did, correct?
A. No, ma'am.
Q. And no one from Johnson City ever did, correct?
A. No, ma'am.

trained to do, correct?

A. Yes, ma'am.

Q. And you have no opinion on how he did that?

A. No. I don't know what was -- I don't know what facts were known to him when he did that.

Q. Do you have any opinions at all on how JCPD handled the Sean Williams investigation?

A. There's nothing more we could have done to have arrested Sean Williams or prosecuted Sean Williams.

Q. Nothing more?

A. Yes, ma'am.

Q. It would not have been possible, for instance, for JCPD to surveil his apartment or garage?

A. We did surveil his apartment and garage.

Q. Give me the details about that.

A. I already did. That's what I was referring to when I watched his garage.

Q. Okay. And you said that you did that for a period of several hours?

A. Yes, ma'am.

Q. What other attempts were there to surveil Sean Williams' apartment or garage?

A. As far as my attempts, driving around downtown. If I was out of the office, I might drive by and see if he was out there or something like that. That's all my attempts. I

hear back in a day or two?

A. I would like to hear something sooner, like, hey, I'll take a look at this search warrant, or, hey, I'll take a look at your indictment and get back to you, something that lets me know they got it and they're looking at it, that they -- you know, just that they got whatever I sent.

Q. How many other SAUSAs have you worked with aside from Kat Dahl?

A. Two.

Q. The first one being Tom McCauley. Is that accurate?

A. Right. Yes, ma'am.

Q. And I think you testified you worked with him on one case. Is that right?

A. Yes.

Q. So do you have much information to go on in terms of assessing his responsiveness?

A. Tom's?

A. Right.

Q. Since then, I have worked with him and he's generally good about getting back to you or letting you know that he's busy and he'll do something about it later, look at something later, something like that.

Q. Did you ever complain to any of your colleagues about Tom McCauley?

A. I'm sure I have.

Q. In what way?
A. I'm trying to think of the specifics. Tom was slow to get back to me on the conspiracy case I was working. I think it was the winter of 2021 or the spring of 2022, I think. I know I complained about that.
Q. To whom?
A. Just colleagues.
Q. Did you complain to leadership?
A. Maybe the sergeant heard the complaint, whoever the sergeant was at the time.
Q. Did you complain to anybody in the U.S. Attorney's office?
A. No.
Q. When you say he was slow to respond, what do you mean by that?
A. I think it was a 12 person conspiracy case that we had or I had. I had sent it to him to review and just didn't hear anything back for a while. We had met about it once, and then I didn't really hear a follow-up as far as when the indictment would be done or what else he needed from me on the case.
Q. Kat Dahl's successor, have you worked with him?
A. I have.
Q. What is his name?
A. Blake Watson. I think his actual name is Mitchell Watson, I think is his real name, but Blake.

cell phone?
A. I don't think so. I would imagine this would be the only one.
Q. Okay.
A. Usually prosecutors and law enforcement officers just have my personal number.
Q. Why is that?
A. Because it's the one I have with me.
Q. You testified previously that you typically communicated with Kat Dahl at least once to twice a week, correct?
A. Yes.
Q. Between December 16th, 2020 and February 10th, 2021, would you have communicated with her via other means?
A. Yeah, I'm sure she was in and out of the office and stuff like that.
Q. So you think you would have communicated with her verbally?
A. Oh, yeah. Yeah, there would have been no way I would have gone for two months without talking to her.
Q. When she writes on February 10th, 2021, looking over those reports, will get back to you later today, do you know what reports she's referring to?
A. Johnthan Johnson and the Cheyenne Lowery case files, I think.
Q. What makes you think that?

then I'm sure, like I said, she was in the office and we maybe even talked on the phone. I can't remember.

Q. Would you have discussed the Johnson and Lowery cases with her verbally between February 10th and April 29th?

A. I'm not sure.

Q. And then on 1533, May 10th, 2021, Kat Dahl sends you a text message that states, can you send me Lowery and Johnthan's judgments. Is that accurate?

A. Yes, ma'am.

Q. Would you not have already sent her Lowery and Johnthan's judgments before this date?

A. No. Usually for federal cases, I wait until the U.S. Attorney asks for them.

Q. Why?

A. Because you've got to get -- well, if they're in state or if they're in, like, Washington County, for example, you have to ask the clerk in Washington County for them, which requires them to print them out. It's some work on their end for something that may never be needed. If it's out of state, you have to figure out whatever court the person was convicted in, you have to contact that court. If there's any fees associated, you have to try to get those fees waived, which usually they'll do that for law enforcement. And then you have to get them mailed -- mailed to the police department. So it's a lot of work

June 1st, 2021?
A. Text messages, no. Probably some in person or maybe phone calls, something like that.
Q. When did you learn that Ms. Dahl's contract was not being renewed?
A. It would have been a few days prior to it not being renewed.
Q. How did you learn that?
A. Jeff Legault told us.
Q. What did he say?
A. Basically that Kat's contract wasn't being renewed. He had been told by the chief or by superior officers that her contract wasn't being renewed.
Q. Did you think it was proper for you to learn about that before she did?
A. I didn't have an opinion on it.
Q. What was your response when you learned that information?
A. Relief.
Q. Did you text with anyone else about Kat Dahl?
A. No, I wouldn't have had a reason to. All -- most of our conversations, we have a small office, so when I mentioned -- referenced those conversations earlier about Kat, it was just from desk to desk.
Q. Did you text with anyone about Sean Williams?
A. I may have texted David Hilton some the day that that girl

Q. Were you aware of any concerns that Ms. Dahl in particular had about COVID-19?
A. No.
Q. Were you aware of how her behavior may have changed after becoming vaccinated against COVID-19?
MR. GARLAND: I'm sorry, I couldn't hear you.
Q. After becoming vaccinated against COVID-19.
A. I didn't even know she was vaccinated. I don't know.
Q. Were you aware that she had asthma?
A. No.
Q. Did you have any issue with her availability to you and other SIS personnel in person?
A. As far as...
MR. HERRIN: What was the question? I'm sorry.
Q. Let me rephrase that. Did you voice any concerns about Kat not being physically present in the office enough?
A. No. She could have been there every day or she could have been there once a month, just as long as our cases get done, we don't care, you know.
Q. So your primary complaint about Kat Dahl, as I understand it, was that she was not prosecuting enough cases. Is that accurate?
A. Yeah, pros' -- yeah, not prosecuting enough cases, yeah.
Q. Did you have any other complaints about Kat Dahl?
A. Other than her just repeatedly trying to get us to do

stuff on the Sean Williams stuff that we didn't feel comfortable with doing, no. We couldn't get it through to her head that you can't just write a search warrant for anything. You have to have a nexus, you have to have a legal basis, and it just never seemed to get through to her. So that was just a nuisance because we would be doing everything we can to catch Sean Williams, but we have to do it legally.

Q. You testified that when you learned that Kat Dahl's contract was not being renewed, you were relieved, correct?

A. Yes.

Q. You wanted her to lose her position as SAUSA, correct?

A. Yes.

Q. When did you develop that desire?

A. Probably the fall of 2020.

Q. From the fall of 2020 until July 2021, how many times did you speak with your superiors about your perceived -- Kat Dahl's perceived deficiencies in her performance?

A. I would think five or less, but that's a guess. I don't know.

Q. And your goal in having those conversations with your superiors was to get her contract nonrenewed, correct?

A. No, our goal was to get our cases prosecuted and have a smooth transition of cases from the police department to

A. I do, yes, ma'am.
Q. Is this a document that you reviewed in preparation for this deposition?
A. I don't remember if we reviewed it or not. I don't remember.
Q. In the first E-mail at the bottom half of this page, it appears to be an E-mail from you to Kevin Peters, Jeff Legault, and Toma Sparks dated December 4th, 2020. Is that accurate?
A. Yes, ma'am.
Q. And the subject is TBI meeting. Is that accurate?
A. Yes, ma'am.
Q. What prompted you to send this E-mail?
A. Let me read it for a minute.
Q. Sure.
MR. HERRIN: Have you got another copy of that?
Q. You can look at mine if you want.
MR. HERRIN: That's all right.
A. I don't remember what prompted me to send it.
Q. When did you first learn about a TBI meeting about Sean Williams?
A. I would imagine it's around this time frame.
Q. Why would you have been the person to follow up on this meeting?
A. Maybe because I was the only one that had information that

she had gone to the TBI requesting that they investigate Sean Williams because she didn't feel like we were doing a good job.

Q. How did you get that information?

A. It would have had to have come from a TBI agent, but I don't know which one. I'm friends with all of them and I don't -- the information -- this is vague as far as, like, exact dates, and times, and stuff like that, or people. It would have had to have come from the TBI, but I don't know which agent.

Q. The way this E-mail is written, to my reading, it sounds like you're discussing something that these other folks receiving this E-mail already are aware of. Is that accurate?

A. You're correct about that. I remember that I was made aware that she had gone to the TBI and had asked for an investigation, and then I had relayed that to one of my superiors. I don't know which one. And then I think there was some sort of a talk about a meeting or something and this came to be. I don't remember the stuff in between.

Q. And you said that it was your understanding that Kat Dahl asked for this meeting because she thought you weren't doing a good job with respect to Sean Williams. Is that accurate?