RE: DAHL v. CHIEF KARL TURNER
and CITY OF JOHNSON CITY

# DAHL RECORDINGS

***CONFIDENTIAL***


*COURT REPORTING AND VIDEO SERVICES*

P. O. Box 7481
Kingsport, TN 37664

TELEPHONE: (423) 230-8000
REBECCA@COURTREP.NET

## TABLE OF CONTENTS

**DAHL RECORDINGS**


**PAGE**

**RECORDING 1105 - DAHL/TURNER/PETERS ...................... 3**

**RECORDING 1106 - DAHL/LEGAULT ........................... 64**

**RECORDING 1108 - DAHL/TURNER/PETERS ..................... 98**

**RECORDING 1109 - DAHL/TURNER ............................ 131**

**RECORDING 1110 - DAHL/LEGAULT ........................... 145**

**RECORDING 1111 - DAHL/GRYDER ............................ 168**

**RECORDING 1113 - DAHL/GRYDER ............................ 176**

**CERTIFICATE .............................................. 178**


***CONFIDENTIAL***

***RECORDING 1105 - DAHL/CHIEF KARL TURNER/KEVIN PETERS***

MS. DAHL: Hi, I'm here to see Chief Turner.

UNKNOWN FEMALE: Well, he is not here yet. You can come in and wait on him or...

MS. DAHL: Sure, that's fine.

UNKNOWN FEMALE: All right. [INAUDIBLE] Let me -- let me think that one over.

MS. DAHL: Okay.

UNKNOWN FEMALE: You can sit here or I can put you in his office, whichever you prefer.

MS. DAHL: Sure, I'll hang out back there.

UNKNOWN FEMALE: Okay. [INAUDIBLE] Come on in, that way if you've got something you need to take of, you can.

MS. DAHL: I've got you. Thank you.

UNKNOWN FEMALE: You're welcome. He says that he's still in the meeting [INAUDIBLE] will be here ASAP.

MS. DAHL: Okay, that's fine.

UNKNOWN FEMALE: So I don't know how long he'll be.

MS. DAHL: Okay.

UNKNOWN FEMALE: Do you want something to drink? Do you want a water?

MS. DAHL: No, I'm good, but thank you.

UNKNOWN FEMALE: Okay.

***LONG PAUSE***

MR. TURNER: Kat, how are you?

MS. DAHL: I'm good. How are you?
MR. TURNER: I'm fine. I'm sorry.
MS. DAHL: That's all right.
MR. TURNER: They swore we'd be out by 4:00. They lied.
MS. DAHL: Yeah, well, that's how it usually goes.
MR. TURNER: [INAUDIBLE] we just stay until it's over. We don't have a choice.
MS. DAHL: I completely understand.
MR. TURNER: Kat, do you mind if I..
MS. DAHL: Oh, no, you're good.
MR. TURNER: Do I need a mask?
MS. DAHL: I'm going to keep my on just because I've been trying to be...
MR. TURNER: You sound like you've got a cold.
MS. DAHL: ...really cautious with my asthma, so...
MR. TURNER: Do you have asthma?
MS. DAHL: I do. I do, which makes this whole situation a pain, that's for sure. Every time I think, oh, you know, my chest is little bit tight, is it COVID or is it something I've lived with my whole life.
MR. TURNER: Do you have to carry an inhaler and that kind of thing?
MS. DAHL: Yeah.
MR. TURNER: Do you?
MS. DAHL: Yeah. Oh, yeah. I've had it since, I think, like,

***CONFIDENTIAL***

the first or second grade, so it's a pain, but yeah.
MR. TURNER: I thought you grow out of that sometimes.
MS. DAHL: You do. I apparently was not one of the lucky ones.
MR. TURNER: Maybe you're not done growing yet. Look at it that way.
MS. DAHL: There you go.
MR. TURNER: Maybe there's still hope. Let's talk about the Williams case for a minute.
MS. DAHL: Yeah, yeah.
MR. TURNER: I know apparently, I guess, you have some concerns about it or...
MS. DAHL: Yeah. So when I was first approached about it back in I guess it would be, like, three or four weeks ago now, they approached me about felon in possession case with the ammunition. And upon being told the details of the case, I kind of became concerned that simply prosecuting for, you know, felon in possession, you know, I'm happy to do it if no other avenue -- if there's no other avenue available, but it appears to me that this is something that should be explored more fully with, you know, as far as the rape charges themselves and whether or not this individual has anything on his computer. The whole baby doll in the safe makes me think that, you know, this very well could be an individual who has child porn on his

***CONFIDENTIAL***

computer or something of that nature. I wouldn't be surprised if there were many more victims other than the 20 on the list, you know, because the two that came forward were not on the list. So, you know, God knows how many people there actually are. And, you know, I did the math on sentencing. He would only get about four or five years with his history for a felon in possession case.

MR. TURNER: Uh-huh (Affirmative).

MS. DAHL: I mean, if he really does have that number of victims, it's my opinion that he should be doing 20 or 30.

MR. TURNER: Yeah. And I'm not familiar with everything on the rape side of it. I know -- I think there's a journal with people's names on it that...

MS. DAHL: Yeah.

MR. TURNER: ...we suspect may be rape victims, but I don't know for sure in that regard.

MS. DAHL: Right.

MR. TURNER: Regardless of what he wrote on the note or whatever it was on. I'm not sure. I think that came about when they were doing the search with the girl that fell out of the window.

MS. DAHL: Right.

MR. TURNER: And we didn't have anything to charge him with there as well.

MS. DAHL: Right.

MR. TURNER: But I think we seized his safe and some -- maybe the ammunition came as a part of that search.
MS. DAHL: Yes, yes.
MR. TURNER: And so I guess that was -- even though there was no charges and we don't suspect he did anything with the girl that fell out of the window...
MS. DAHL: Right.
MR. TURNER: ...I don't think we'll ever know for sure. I mean, even she didn't remember a lot of it, I think, after the fact.
MS. DAHL: Right.
MR. TURNER: Just due to her injuries and her treatment, I guess. She remembers falling, I think, but she didn't implicate him in any way.
MS. DAHL: Right, right.
MR. TURNER: But I think some of the other things -- and, you know, he's popped up before on us as far as traffic things and just some minor stuff like that. Now, I think there's also some discussion of drug sales, but...
MS. DAHL: Right.
MR. TURNER: ...from what I understand, it's not anybody in the area. It would have to be somebody he knows that he could sell to. I don't think...
MS. DAHL: Right.
MR. TURNER: You know, an informant that he doesn't know, I

don't think he's going to sell to them. I just think that he's -- you know, his family must have some money. I think he's more of a social drug user. He probably sells maybe to people that he's friends with...

MS. DAHL: Right.

MR. TURNER: ...more than making money.

MS. DAHL: Right.

MR. TURNER: The rape thing is, you know, the bigger concern.

MS. DAHL: Right, right.

MR. TURNER: And again, I think some of the victims that came and made statements initially weren't cooperative after that.

MS. DAHL: Right.

MR. TURNER: And again, I may be corrected on some of this because I'm not -- I don't get a chance to keep up with cases like Kevin does.

MS. DAHL: Right, right.

MR. TURNER: But I think there's drug use involved before the rape.

MS. DAHL: Yeah.

MR. TURNER: You know, if he does have sex with somebody who is unwilling or he's coerced them in some way, I think there's drug use. You know, there's some talk about maybe having someone in law enforcement try to go undercover, but I don't think he's going to do anything unless they

use drugs with him. That's our concern there.

MS. DAHL: Yeah, right.

MR. TURNER: We could be wrong there, but I don't know.

MS. DAHL: Right, right. Well, you know, I was kind of trying, you know, to push for them to get a search warrant on the computer because if he does have, you know, something, you know, of the nature of, like, child porn or whatever, you know, that would be a kind of ace in the hole type of situation, you know. At that point, I think, you know, we could go after him for a significant amount of time depending on what's on there. The other thing that I had explored...

MR. TURNER: The probable cause on the search warrant, just I think where we ran into some issues...

MS. DAHL: Right.

MR. TURNER: ...someone had made a statement about they heard from somebody else something was there. That was my understanding about the search warrant here just recently.

MS. DAHL: With...

MR. TURNER: Toma.

MS. DAHL: As far as with the drugs or with...

MR. TURNER: I think it was the drugs.

MS. DAHL: Yeah. So this last...

MR. TURNER: That he had drugs maybe in his garage or somewhere, or a gun in his garage...

MS. DAHL: Yes.
MR. TURNER: ...but that was somebody that they were saying that they heard it from a third party.
MS. DAHL: So there was this latest victim where she -- she saw cocaine and used cocaine in his garage and I believe in his apartment as well, so she had firsthand knowledge of the drugs. While she was hanging out in his garage, someone came by and she said that this person wasn't really well known to him, that it sounded like he was just someone that was out drinking in the area, and he walked by and saw them hanging out, started chitchatting and whatnot. And so they start talking and she said that the conversation turned to firearms. And his friend that -- I don't know if he -- he's, like, the close friend that I think is a roommate. I'm not sure if he's, like, an official roommate or if he just stays over a lot. But his friend that was there said, you know, something to the effect of, well guns, you know, we've got lots of guns. Do you want to see an AR-15? And she said she saw him lead this -- you know, this guy over to the back of the garage to look at the guns. And so one of the avenues that I was trying to explore is there actually is a Federal date rape statute. And I don't know, I think as far as charges go, it's not the best, but I was trying to explore it from the standpoint of a search warrant because

there's been -- this last victim did mention that she did a line of cocaine with him, and then she got sleepy, and that's when she went up to, you know, go to sleep in his apartment. The victim's advocate that was with her mentioned that she had another person come to her and talk, you know, or come forward about this guy and said that she was attacked, and she mentioned something similar as well that she did a line of cocaine in the garage and she blacked out. Now, the last victim speculated, well, you know, he puts GHB in his cocaine. I looked it up. I've never heard of this method. Usually GHB is used with alcohol. But theoretically, I think it's possible because GHB can come in a powder form and, you know, the fact that two different sources kind of repeated this very weird detail of, well, I did a line of cocaine and then I blacked out, when cocaine is an upper, you know, and usually doesn't cause you to black out. It makes me think that, you know, if we were able to get the right, you know, circumstances lined up or the right testimony, maybe we could get a search warrant, you know, under this Federal date rape statute. So that's kind of one of the angles that I was trying to explore.

MR. TURNER: Did you and Wayne discuss the search warrant?

MS. DAHL: We did, we did. He's kind of where I'm at at the moment in that it's kind of 50/50 at this point, you know.

We've got the latest victim and her statement. We've got the victim's advocate who mentioned she heard another...

MR. TURNER: I think this latest victim is -- there's some issues with her.

MS. DAHL: There are.

MR. TURNER: And we'll discuss those.

MS. DAHL: Yeah, yeah. I think there are issues with her. I think she -- you know, granted, I'm not a psychiatrist, so I can't make an official diagnosis or anything, but she struck me as someone that is very possibly mentally ill. If I had to hazard a guess, you know, paranoid schizophrenic, someone of that nature. Someone that has, you know, paranoid delusions that are kind -- that are based in reality, because that's what I got from listening to her talk is that she was very lucid when she was describing the attack. And all of the Facebook messages support her narrative. It's just that when she gets off topic, you know, she started -- she starts to go off the rails. And so, you know, just from kind of the stuff that I've done with, like, homeless work and stuff like that, she very much struck me as someone that is probably mentally ill, and that's probably why he chose her as a victim.

MR. TURNER: I don't know if the girl that fell out the window if she used cocaine with him or not. She was intoxicated,

I know, but I don't know if...
MS. DAHL: Yeah.
MR. TURNER: I don't know if that might be part of the memory issues with her as well. I don't know that for a fact.
MS. DAHL: Right.
MR. TURNER: I'm just speculating. It may have been she was just very intoxicated.
MS. DAHL: Right.
MR. TURNER: And the fact that she fell five stories might tend to affect your memory when you hit the concrete.
MS. DAHL: Right, right. Well, they told me that they were waiting on her toxicology report.
MR. TURNER: The girl that fell out the window?
MS. DAHL: Yes. And that they drew blood from this latest victim and that they were going to test it as well. And so I think depending on what comes back in those reports, that might, you know, be something that maybe pushes this from it's a 50/50 shot over towards...
MR. TURNER: Yeah. Well, I think, first, TBI got involved somehow or there was a request for TBI to get involved somehow.
MS. DAHL: Yeah, because I had asked -- so I called Wayne when this first happened, and I kind of explained the whole crazy situation. And he said, you know, well, let me make a few calls, because he had never heard of this with the

amount of victims. And so he, you know, then got back to me because TBI has this other case that has a lot of very weird similarities to this case. They're working some sort of rape slash human trafficking case that had just kind of a couple of weird details that were similar with someone that, you know, mentioned a cult-like atmosphere in TBI's case. And then you have this girl mentioning this -- you know, this cult and that Sean Williams is involved in satanism. It's very bizarre. And, you know, I was -- I was more or less inclined to think that, like I said, her ranting about satanism and cults was, you know, something -- is a cause or a symptom of her being unwell. But it is odd in the fact that she -- in connection with all of this, she kept bringing up this [redacted] individual. And the victim's advocate took me aside and said this isn't the first time [redacted] name came up. Well, [redacted] is friends with the guy at the center of this TBI probe. So there's just -- there's just weird details like that where it's probably nothing. It's probably, you know, an Occam's razor situation where, you know, the simplest, you know, explanation is probably the correct one. She's probably just unwell and it's probably just a coincidence, but it was still enough to make me go, huh.

MR. TURNER: Or they may run in similar circles. I don't

know.

MS. DAHL: Right, right.

MR. TURNER: She might run in similar circles with a group here and a group there. I don't know.

MS. DAHL: Right.

MR. TURNER: We met with the TBI and, of course, they offered to assist us in any way. I'll get Kevin to come up in a minute. He can fill in some blanks for you and stuff.

MS. DAHL: Okay.

MR. TURNER: But I think it's a decision on how they want to try to work the case with him. There's a couple of different ways that Kevin has talked about. One is to charge him with the -- what we've got on him now.

MS. DAHL: Right.

MR. TURNER: And try to work back from that to see if that influences him to cooperate in any way. That's our big gamble there.

MS. DAHL: Right.

MR. TURNER: The other is we talked about we've got -- I think we just purchased it. We've got two pole cams that we were talking about maybe putting one up downtown and doing some traffic stops and seeing if we can get anything or anybody that's close to him...

MS. DAHL: Right.

MR. TURNER: ...where they're going to work for us.

***CONFIDENTIAL***

MS. DAHL: Right.
MR. TURNER: Again, a big gamble, but...
MS. DAHL: Right, right.
MR. TURNER: ...you know, those are the -- you know, we don't have anybody I think that -- there's no other way to get in unless it's somebody he knows, I don't think.
MS. DAHL: Right.
MR. TURNER: Or, you know, I mean, he may be picking up acquaintances or people that he meets out at, you know, night clubs or whatever...
MS. DAHL: Right.
MR. TURNER: ...obviously, but those are kind of the two avenues we're looking at. I think they've got a subpoena on some of his phone records, which we'll be looking at.
MS. DAHL: Okay.
MR. TURNER: I don't know what that's for. I think they did that last week, so I don't think they've got the phone records back. They've been trying to get some records to see -- again, Kevin will have to fill in those blanks for us. But that's kind of where we're at.
MS. DAHL: Okay.
MR. TURNER: You know, even the -- even the list, I don't know if that's girls he's raped or girls he's had consensual sex with and he calls it whatever he calls it.
MS. DAHL: Right.

MR. TURNER: I mean, all we know is there's a piece of paper with some first names on it.
MS. DAHL: Right. Now, I'm pretty sure...
MR. TURNER: Now, it's a big red flag, believe me. If it's his rape list...
MS. DAHL: Right.
MR. TURNER: ...that might be a red flag, but that...
MS. DAHL: Right.
MR. TURNER: Again, there's no 100 percent certainty in that.
MS. DAHL: Right.
MR. TURNER: But I think that with some statements made by victims really gives you cause for concern.
MS. DAHL: Right, right. Well, and I've already got -- I was doing a little bit of digging on Facebook. I've already got an idea, at least to a high, you know, degree of certainty who two of the people on that list are. One is by the name of [redacted], which I thought that's a pretty uncommon name. It turns out it's his ex-girlfriend. Curt said that she used to work at the deli downtown and that she used to bad mouth him and say that, well, he was abusive. So with her being the ex-girlfriend and there's pictures of them all online and everything like that, and she's on the list, I'm pretty sure it's the same [redacted] I've never heard that first name before.
MR. TURNER: [redacted]

***CONFIDENTIAL***

MS. DAHL: [redacted]

MR. TURNER: [redacted]

MS. DAHL: Yeah. And the second one is there's a [redacted] on the list, and so I was looking at some of the addresses that he has, and he has an address that comes back to Cullowhee, North Carolina.

MR. TURNER: Yeah, I think his family is from North Carolina.

MS. DAHL: Yeah.

MR. TURNER: They're in the concrete business.

MS. DAHL: Yeah. And so he -- from what I can tell, it was his mother's house that was in Cullowhee, but his mother and his step-dad were living in Florida. So I think that what happened was they were renting this house out to college kids because through kind of, like, my Google search was able to kind of piece together that this house was being rented as, like, an unofficial frat house for one of the Western Carolina, you know, frats that got kicked off campus. And it initially kind of piqued my interest when I saw this address because it's ten minutes away from the campus and, you know, he likes to prey on young women.

MR. TURNER: What campus?

MS. DAHL: Western Carolina University. And so I kind of started digging into this, and when I was running this North Carolina address, you know, and kind of looking into

it, there popped up a Vertex Building Services that was connected to this address. And so I ran the D-U-N-S number on Vertex Building Services and it came back -- the agent listed came back as a [redacted]. Well, [redacted] has a daughter named [redacted] who is in North Carolina and is friends with him on Facebook. So I think that's probably -- there's a -- you know, it's an uncommon name as well, then there's the connection to this, you know, business in North Carolina that her mom would have been involved with, you know, at an address that is connected back to him. So it's stuff like that. There's a -- and there's several more that kind of made me pause as far as, like, names that matched the list that correspond to people that he's friends with on Facebook. One of them posted kind of a very concerning thing. It was, like, back in 2018, something to the effect of, you know, it was essentially a "me too" post where she was saying, you know, my abuser is still out there, yada, yada, yada. So that kind of made me raise an eyebrow, too. But I think that this [redacted] is probably definitely the one that's on the list. I'm fairly certain this [redacted] could be this, you know, [redacted] that I found in North Carolina. So there are people out there that could potentially correspond to people on this list, you know, that if, you know, they decide to reach out to.

MR. TURNER: Yeah. And, you know, like the [redacted], I mean, if something happened, it may not have even been in Johnson City. It could have been in North Carolina.
MS. DAHL: Right.
MR. TURNER: And so, you know, that may be -- I mean, I don't know if she's made a complaint to a department over there or not.
MS. DAHL: Right.
MR. TURNER: I don't know where it could be.
MS. DAHL: Right.
MR. TURNER: It could have been in Unicoi County, or Elizabethton, or I don't know where, so...
MS. DAHL: Right, right.
MR. TURNER: She may have reported something that we're unaware of.
MS. DAHL: Right.
MR. TURNER: But I think a Federal statute might help as far as prosecution of that case because -- you know, again, we're assuming a lot. There's a list.
MS. DAHL: Right.
MR. TURNER: You're assuming this has happened or there's a lot of red flags that maybe point in that direction, but it doesn't mean they're all in Johnson City...
MS. DAHL: Right.
MR. TURNER: ...despite the fact he lives here, I guess.

MS. DAHL: Right, right. Well, and, you know, if we could get, you know, as far as like a search warrant -- for purposes of a search warrant, if we could try to verify whether or not people on this list are victims, that would certainly bolster, you know, the case for a search warrant as well.
MR. TURNER: Uh-huh (Affirmative).
MS. DAHL: Even if it's just -- even if we're able to just track down, you know, one or two of them. One or two of them saying, yeah, he did, and, you know, getting them to make a statement, that could very well weigh heavily in our favor.
MR. TURNER: Uh-huh (Affirmative), yeah. As long as we get one or two that give a statement and we don't get one or two that goes back and tells him that, hey, the police are looking at you, you know.
MS. DAHL: Right, right, right. That's the whole where you would want to...
MR. TURNER: Everything is a roll of the dice, I think, at times.
MS. DAHL: Right. Tread lightly for sure.
MR. TURNER: I think that's why we're kind of waiting on the phone records to see. And again, I'll let Kevin talk about what they were subpoenaing and what they were kind of looking for from that first.

MS. DAHL: Yeah.
MR. TURNER: But you know if you have any concerns about a case or something, you can come to me.
MS. DAHL: Okay. I appreciate that, yeah.
MR. TURNER: You do realize that.
MS. DAHL: Yeah. You know, this wasn't out of concern, this was more of I was alarmed at, I guess, the potential sheer number of victims, you know, in this case. Because, I mean, if that really is the case that he has upwards of 20 plus victims, then I would be extremely concerned as to whether or not this individual would ever escalate or whether or not he would, you know, accidentally kill someone if he's drugging them. So -- and the baby doll thing really...
MR. TURNER: What was that, now? I've not heard of that.
MS. DAHL: So they found in his safe, in addition to kind of, you know, the ammunition and odds and ends, papers and whatnot, they found an assortment of sex toys, and they found a baby doll that had a hole in it at the bottom. And that kind of really made me pause because that's actually a theme in pretty disturbing cases, you know, BTK, several serial rapists, several serial killers have been found with baby dolls which they have -- or dolls of some sort which they've kind of acted out their, you know, sick fantasies on.

MR. TURNER: I was going to say, there's a lot of sick people in the world.
MS. DAHL: Yeah. So it's not unheard of for something like that in cases that involve serial offenders, and that -- that detail really concerned me as a major red flag, and made me wonder about, like, the whole, you know, possibility of, you know, interest in kids, or child porn, or something of that nature.
MR. TURNER: You know when I talked about a couple of different ways to try to make some end roads in this case, you know, if we do start stopping cars and things like that, he's going to know. I mean, they're going to go back and tell him, you know.
MS. DAHL: Right.
MR. TURNER: So once that starts, I mean...
MS. DAHL: Right.
MR. TURNER: ...either we get somebody that's going to do something for us...
MS. DAHL: Right.
MR. TURNER: ...good for us and help us in that regard or he's going to know.
MS. DAHL: Right.
MR. TURNER: You know, even when the girl fell out the window, he had Jim Bowman representing him.
MS. DAHL: Right.

MR. TURNER: Most victims don't go to that length, you know.
MS. DAHL: Yeah.
MR. TURNER: I mean, if something -- if somebody got accidentally injured on my property, I'm not going to go hire a criminal defense attorney. I might go hire a civil attorney to help me, but, you know.
MS. DAHL: Yeah, yeah. Well, or put a steel plate over their door.
MR. TURNER: Yeah, or, you know, not release my video footage or things like that.
MS. DAHL: Yeah.
MR. TURNER: I mean, like I said, there's lots of red flags with this guy.
MS. DAHL: Yeah.
MR. TURNER: And, you know, we're not out to get anybody, but we're out to arrest people who commit crimes.
MS. DAHL: Yeah.
MR. TURNER: And so...
MS. DAHL: Well...
MR. TURNER: ...there's a lot of concern we have with him.
MS. DAHL: Yeah.
MR. TURNER: Again, I'm not out to target anybody unless you're committing a bunch of crimes then, yeah, you ought to be targeted.
MS. DAHL: Well, I think this guy is a clear and present

danger to the -- like, honestly, I think he's an ongoing danger to the community.

MR. TURNER: If -- if, in fact, he has drugged women and taken advantage of them, that's probably going to be what he does in the future.

MS. DAHL: Right.

MR. TURNER: I mean, if it's worked in the past...

MS. DAHL: Right.

MR. TURNER: ...don't change a winning game plan, you know...

MS. DAHL: Right.

MR. TURNER: ... is probably going to be his thought process, which is...

MS. DAHL: Right. Well, and what else was I -- there was something else that I was reading about. The doll thing really kind of concerned me, and the list concerned me, you know. I guess theoretically it could be just him listing partners and he has a sick label put on it.

MR. TURNER: Right. And that's what I told Kevin. I said, this may be people he had consensual sex with, but he calls it whatever he calls it.

MS. DAHL: Right.

MR. TURNER: I don't know.

MS. DAHL: And that's the only plausible explanation that I could possibly think of, but that combined with, you know, the victims that have already come forward, eh...

MR. TURNER: Some people may like to enhance their thug status with their friends or something. I don't know.
MS. DAHL: That's true.
MR. TURNER: There's no telling. What do I know, you know.
MS. DAHL: What I'm curious too as to where they found this list because it -- it weirded me out that someone would even, you know, make that, you know. Because if you were just going to brag to your friends, you would...
MR. TURNER: I wouldn't call it the rape list.
MS. DAHL: Right. You would just -- or you would just brag to your friends, you wouldn't write it down.
MR. TURNER: Or if I had a black book, as they used to call them, you know...
MS. DAHL: Yeah.
MR. TURNER: ...it wouldn't -- I don't think I would call it the rape list, but that's just me.
MS. DAHL: Right, right. Well, to me, that is a little bit odd or concerning just because -- and, you know, granted maybe I have read too much, you know, true crime and all of that, but it seems like someone that's pretty arrogant, you know.
MR. TURNER: Well, he's pretty arrogant. He's -- he's pretty narcissistic, I would say. I can get my wife to evaluate him...
MS. DAHL: Yeah.

MR. TURNER: ...but I think he would be high on the narcissistic scale.

MS. DAHL: Right, right. Well, and, you know, someone like that -- you know, because I ran -- there was a psychiatrist friend of mine and I asked him about like, you know the baby doll and the steel plate. And he was -- even he was disturbed by, you know, this. And he said, the only time I have ever heard of, like, a steel plate in front of a door thing was I once had a client whose uncle was involved with the mob, but that's the only time I've ever heard of a steel -- someone installing a steel plate over the door. Which, you know, I guess, yeah, if you were in the mob, that would be common practice, but someone like this...

MR. TURNER: He may have concerns about the police entering his residence, or other people entering his residence, or both.

MS. DAHL: Yeah, yeah. Well, and when I was going back through -- because Will sent me a couple of reports too, you know, from all of his encounters with law enforcement. There was one report that kind of made me scratch my head too because he reported a burglary and it sounded like whoever burgled him, he knew them. And they -- I think they -- it said he -- they busted into his safe and they stole, like, his passport and some papers, but they also

stole two cameras and, like, the SIM cards. And it made me just raise an eyebrow because if you're going to burgle someone's house, why do you just steal two cameras and not anything -- any other electronics, or cash, or whatever. You go for, like, two cameras? And the reason I just kind of -- and maybe I'm reading too much into this, but, you know, the one victim mentioned that he likes to photograph women. And I don't know if he's photographing them willingly or if he's photographing victims, but the camera connection there kind of made me pause as well. And this was, I think, a couple of years ago, but, you know, I thought that's weird. Your house is burgled and all they steal is two cameras, you know. So that, I thought, was pretty bizarre. There's all sorts of weird, you know, details in this that I sit here and think, all right, well, is this a red herring or is this, you know, something legitimate, but...

MR. TURNER: Well, I don't think we're going to know until we get a little bit farther along in the ordeal.

MS. DAHL: Yeah.

MR. TURNER: It's going to be -- it's going to take some time.

MS. DAHL: Yeah.

MR. TURNER: Let me get Kevin to come up here if you have a second.

MS. DAHL: Yeah, yeah.

MR. TURNER: [PHONE CALL - VOICE MAIL PICKS UP] He's not here. Did you have a good Thanksgiving?
MS. DAHL: I did. I just stuck around here, to be honest, you know. We had just finished up or wrapped up Grand Jury, our only Grand Jury this year.
MR. TURNER: Well, it's better than nothing, I guess.
MS. DAHL: I guess. But because I had been around so many people, I decided to stick around here.
MR. TURNER: [PHONE CALL] Hey, Petey, can you come on up to the office? All right.
MS. DAHL: You know, because my parents are older and my dad has diabetes.
MR. TURNER: You have to be careful around them, yeah.
MS. DAHL: Yeah.
MR. TURNER: We didn't -- we didn't have -- [redacted], he goes to Florida during the winter, but [redacted], so there's two stops on Christmas and that kind of thing.
MS. DAHL: Yeah.
MR. TURNER: But we didn't get together on Thanksgiving just because they're trying to be careful.
MS. DAHL: Yeah, it's crazy. Well, and I've had a heck of a time trying to get my parents to, you know, exercise caution because my dad is firmly in the mind set of, oh, it's just the flu. I'm sitting here like, dad, you're

[redacted], you check, like, five different boxes on people that should not get this. So trying to get them to, you know, exercise caution with this has been, like, herding cats.

MR. TURNER: Yeah. I'm not sure how serious my dad takes it. I guess he does, but at the same time, maybe when you get to be 83 or something you're, like, I'm not doing all of this stuff, you know.

MS. DAHL: That's how one of our judges is. Judge Jordan up until recently was holding, you know, in-person hearings. And Judge Jordan was born -- I'm pretty sure born at the turn of the century, so...

MR. TURNER: I don't know how much of that is I'm too old to do all of this stuff, if it happens, you know, I'll deal with it.

MS. DAHL: You know, I would probably have the same outlook at that -- if I live to be, like, 95 and a pandemic comes along, I would probably be of the mind set if it takes me, it takes me.

MR. TURNER: Yeah.

MS. DAHL: Hey.

MR. PETERS: Hey, how are you?

MS. DAHL: I'm good. How are you?

MR. PETERS: All right.

MR. TURNER: Kevin, we were talking about the case and, of

course, I let Kat know that, you know, she can come to me or you if there's any concerns.

MR. PETERS: Okay.

MR. TURNER: She said that the TBI was kind of working a case similar. I think there were some circumstances similar, but anyway, we'll get to that. The victim that came and gave us a statement, what was her name?

MR. PETERS: [redacted]

MR. TURNER: That's the one that there's some problems with her.

MR. PETERS: Yeah.

MS. DAHL: Yeah.

MR. PETERS: It starts with an [redacted] I forget what her -- [redacted] [redacted] or something like that.

MS. DAHL: Yeah, yeah.

MR. TURNER: We talked about it, Petey, but maybe you can share with Kat some of the issues with her as far as credibility.

MR. PETERS: Yeah. Did Toma tell you everything we found off her phone dump?

MS. DAHL: No.

MR. PETERS: Okay. There's text messages back and forth between her and Sean, her wanting to buy drugs off of him.

MS. DAHL: Right.

MR. PETERS: [redacted]

[redacted]

MR. TURNER: Man, she is narcissistic, isn't she?

MR. PETERS: Yeah.

MS. DAHL: Yeah.

MR. PETERS: Yeah, very much so. Of course, then the whole -- [redacted]

MS. DAHL: Yeah.

MR. PETERS: ...up there when we can -- when she said she got kidnapped, she was -- [redacted]

MR. TURNER: Yeah, we've got FIs that officers give that she was here and not where she said she was.

MR. PETERS: Yeah.

MS. DAHL: Oh, interesting.

MR. TURNER: There's problems.

MR. PETERS: Yeah, we had business owners call on her because she was down there in her panties where she had gotten naked on the sidewalk, so...

MS. DAHL: Oh, gosh. Well, she definitely struck me as

***CONFIDENTIAL***

someone that's not well.

MR. PETERS: No, she's not well at all.

MS. DAHL: So, well...

MR. TURNER: And, you know, I told you what you told me, Kevin, we can do -- you know, we can look at him two ways, charge him and try to work back from the -- from the ammunition charge, or cameras, surveillance, traffic stops, whatever, try to get somebody that knows him...

MR. PETERS: Yeah.

MR. TURNER: ...to see if anything comes from that.

MR. PETERS: Well, I mean, either way, if we go ahead and do the charges on him for the ammo, we're still going to do the cameras. We're still going to put up the pole cams down there to see what we can get. We'll still stop people leaving from down there to see if we can...

MS. DAHL: Right.

MR. PETERS: ...find anything like that.

MS. DAHL: Right.

MR. TURNER: We had a subpoena last week on his phone records?

MR. PETERS: Well, the subpoena was to make sure that the text messages she said on her phone was between them two was actually his number, and it did come back to him. Now, we have done a preservation letter or, yeah, a preservation letter. Toma is doing that for his phone records, and text messages, and stuff like that.

MS. DAHL: Yeah.
MR. PETERS: So we are doing that. And, you know, I personally -- and I don't know everything, that's for darn sure, but the only thing -- the only way I can see us working this case from this point on is probably the drug angle.
MS. DAHL: Right.
MR. PETERS: And hopefully if we do get him on something like that, then it will free up some girls coming forward.
MS. DAHL: Right.
MR. PETERS: But unfortunately, I just don't see this girl...
MR. TURNER: I don't -- I don't think he sells to anybody unless it's somebody he knows.
MR. PETERS: Yeah.
MR. TURNER: I think that he's a drug user and he probably gives drugs to people who are partying with him...
MS. DAHL: Right.
MR. TURNER: ...and he uses, you know, more than he does anything to sell. And he may -- if you -- Kevin and I have been friends for 30 years. So, Kevin, hey, I need some mar' -- you know, some coke or something. Yeah, I'll sell it to you, you know.
MS. DAHL: Right.
MR. PETERS: Yeah.
MR. TURNER: I'll give you a good deal on it because you're my

friend. I think that may be it, but I don't think he's out selling drugs to make money, do you?

MR. PETERS: No. Well, no. I don't think that's his main source of income. Now, it may be. I don't know what all he's involved in.

MR. TURNER: Yeah, who knows.

MR. PETERS: The problem we're going to have with him is he's a little bit tech savvy.

MS. DAHL: Yeah.

MR. PETERS: Because when we had the girl fall out and we served the search warrant on him, before we got him back here, he had already wiped his phone remotely.

MS. DAHL: Right.

MR. PETERS: And so I'm sure he's done it with that computer, too. And that computer is a whole 'nother issue that we really don't have any reason to get a subpoena or anything for it because it's don't pertain to the case and it was in our custody when this incident happened.

MS. DAHL: Right.

MR. PETERS: I don't think we could get -- be able to even get a search warrant on it at this point.

MS. DAHL: I mean, the likelihood of anything being on the hard drive? Because if anything is on the hard drive, he wouldn't be able to wipe that remotely.

MR. PETERS: I don't know if he would be able to or not.

Again, I'm not that tech savvy. Evidently he's a lot more tech savvy than I am, so...
MS. DAHL: Right. Because if it's -- if it's stored on the cloud, he would be able to wipe it remotely.
MR. PETERS: Yeah.
MS. DAHL: But if it's saved to the hard drive of the computer, then there would be, you know, photos or something, you know, of that nature on there.
MR. TURNER: If he's as narcissistic as he seems to be, he probably thinks nothing is going to happen to him now or it already would have with this girl. I don't think he's going to...
MR. PETERS: Yeah. I mean, I can't believe he's not even come down here and asked for that computer yet because we've had it for a while now evidently, so...
MS. DAHL: Well, and I just, you know, wonder about -- you know, because I kind of told Chief Turner about my concerns about whether or not this would be the type of individual to have, like, child porn on his computer just based on like...
MR. PETERS: I don't know.
MS. DAHL: ...the baby doll and stuff like that.
MR. PETERS: Yeah.
MS. DAHL: Or even just photos of firearms. He seems like the type of peacock that would take pictures of firearms, or

drugs, or cash, and all of the things that, you know, go along with being a, you know...

MR. TURNER: Scumbag.

MS. DAHL: Yeah.

MR. PETERS: He may very well have that. I mean, yeah, that would be great if we could get it. If somebody can find the nexus for us to get the search warrant for the computer, hey, I'm more than willing to do it.

MS. DAHL: Yeah, yeah. Well, I mean, we have the ammunition. You know, I guess, yes, it would be a little bit stale with a couple of months having gone by, but you could make the argument that, well, if the photos are there, they're still going to be there.

MR. PETERS: Uh-huh (Affirmative).

MS. DAHL: You know, the issue with something being stale is what is the likelihood that it's going to be there when we've got the computer. And if it's on the hard drive, then it's there. You've got the ammunition that was in his safe, and you've got -- you know he had cameras and, you know, SIM cards, and things like that. You know, making the argument that you're looking for photos of firearms might be one to make. And then whatever else you find on there is fair game.

MR. PETERS: Well, we can -- I mean, you tell us how to write it up, we'll write it up.

MS. DAHL: Okay.
MR. PETERS: I have no problems going after him.
MS. DAHL: Okay. Yeah, you know, I would really like to -- and who knows, maybe it's one of these that you strike out on and there's nothing on his computer, but to me that seems like one of the most, you know, low risk possibilities. Because if you gamble on a search warrant for his house and there's nothing there, then you've kind of missed your shot.
MR. PETERS: Uh-huh (Affirmative).
MS. DAHL: But if nothing is on the computer, well, then no harm, no foul. But if something is on the computer, then that could then kick the door open for an in-person search warrant.
MR. TURNER: You know, the problem with him, he's got that garage, then he's got his house over here.
MR. PETERS: Yeah.
MR. TURNER: Drugs could be in either one, guns could be in either one.
MR. PETERS: Well, we think the guns are probably -- well, the guns are probably both places, but we think the majority of them are in the garage because that's what she said.
MS. DAHL: Right.
MR. PETERS: The guy came in and they took him back there and showed him, you know. I don't know. I can't see them

laying out. They would have to be in a safe or something because they could get broke in -- a garage can get broke into real easy. And I find it hard to believe he's just -- because evidently what she said, this guy just walked in off the street and they're showing these guys the guns. Would you go grab somebody walking down the middle of the street and say come on in my house, I'm going to show you my guns?

MR. TURNER: And the thing about it is, you don't know who was with him. It could be me, Kevin, two or three other people and they would say, well hell, those are my guns, those aren't his guns.

MR. PETERS: Yeah.

MS. DAHL: Right.

MR. TURNER: You know, that kind of thing. So I doubt if he's by himself a lot. He's probably got friends he hangs out with.

MR. PETERS: Yeah, yeah, there's definitely friends.

MR. TURNER: There's two or three.

MR. PETERS: I mean, that [redacted] is always around him or seems to be.

MS. DAHL: Right, right. Well, one of the things that I was telling Chief Turner about is this idea of trying to get in through this Federal date rape statute in that if he is drugging people, you know, that's -- I don't think it's

the strongest statute as far as prosecuting or charging him with it, but using it as an avenue to get a search warrant might be something to explore. But I think it depends on, you know, they did the toxicology of the girl that fell out the window. They said that they drew the blood of this latest girl. Depending on how that comes back, there might be enough for a search warrant in that way, too.

MR. PETERS: Okay.

MS. DAHL: But I would have to see, you know, what comes back on the search warrants.

MR. PETERS: But if we did a search warrant on that -- and this is just me asking. I'm not arguing.

MS. DAHL: Yeah.

MR. PETERS: If we -- the guns wouldn't fall in the scope of the search warrant as far as getting into the safe and stuff, right?

MS. DAHL: Well, unless you did a search warrant for any safes looking for date rape drugs, depending on where he keeps them. It's -- this thing is hardly ever used, this statute.

MR. PETERS: Yeah.

MS. DAHL: So trying to figure -- like, trying to do any research on this has been short of -- has been extremely difficult because it is -- when I say it's hardly used, I

***CONFIDENTIAL***

really mean it's hardly used. Like, there were a total of four cases that pop up nationwide that have used this. And I don't think I would be comfortable, unless the evidence became, you know, overwhelmingly clear cut, actually charging him with this statute, but using it as an avenue to get in might be something. But as far as, you know, precedent for something like that, there is not a lot of precedent. This would be kind of some what we used to term back in one of our -- one of the immigration clinics, creative lawyering. So...

MR. TURNER: You know, Kat, it's our job to walk up to the line. I mean, honestly, it's our job to push the envelope as far as we can.

MS. DAHL: Yeah.

MR. TURNER: Because the defense does the same, don't they, and that's kind of -- doesn't that equal the balance?

MS. DAHL: Yeah.

MR. TURNER: I mean, if we don't push the line, then sometimes the courts can't tell us...

MS. DAHL: Right.

MR. TURNER: ...you stepped over the line.

MS. DAHL: Well, and, you know, maybe you break new ground and pave the way...

MR. TURNER: There you go.

MS. DAHL: ...for this to be used more often.

MR. TURNER: So who knows. It's -- everything is on the table right now.
MS. DAHL: Right.
MR. TURNER: Petey, what do you want to -- do you want to look at getting some cameras up and see if that pans out here in the next week or two?
MR. PETERS: Yeah. John, he looked at the cameras today to get the SIM card for them. That's the only thing holding us up on them. We've got the cameras in, we've just got to get the SIM cards so we'll have the internet to run them off of. And he said that once he knows which SIM cards to order, he said they'll send them overnight. So the next issue is just going to be finding a place to put them down there. The housing that we have in these pole cams are different than the housing we had in the other ones. These don't look like something that goes up on a transformer as much as maybe on the side of a building. So we're just going to have to scout a good location, and I'll get SI -- SIS started on scouting locations and maybe putting cameras up down there. Because I figure we just -- if we've got them both, we might as well just put one on his place and put the rest of them -- put the other one down there somewhere that we can see Capone's and Numan's where we're having these issues.
MR. TURNER: His residence is on the fifth floor, so we're not

going to get anything on that building.
MR. PETERS: Yeah, we won't -- no.
MR. TURNER: So it's basically on the garage.
MR. PETERS: The garage. And like I said, that's where the girl said the guns were, and that's where they're spending a lot of time on Friday and Saturday nights in that garage.
MS. DAHL: Yeah.
MR. PETERS: So if there's going to be any drugs or anything like that, I'm sure that's where it's going to take place is in that garage because he flings open those glass doors and people just kind of seem to mill or come over from Tipton Street and everything. So -- and I think that's where he's luring some of these girls in and everything.
MS. DAHL: Yeah. Well, and, I mean, this was several weeks ago, but I was coming back from The Label and I noticed -- I think it was [redacted] if he's...
MR. TURNER: We needed to know that, Kat was at The Label. What day was that?
MS. DAHL: There was this guy, like, he was sketchy looking. I mean, that's the best way to describe him. He was kind of dark complexion, dark hair, and, you know, he made me sit up and take notice because he just looked like he was trying to be incognito, but doing a really poor job at it. And he went into that place. And I think when I described

***CONFIDENTIAL***

him to I think it was Will, he said, yeah, that's Albie. And, you know, he was going in and out of the garage, so...

MR. PETERS: [redacted] seems to have free range over there, so...

MS. DAHL: Yeah, yeah, yeah. It's -- it's a weird crew over there.

MR. PETERS: Yeah, it definitely is, but I think, you know, right now, I mean, I just -- the only way I can see working this case is working backwards to forwards or work the drug angle, I mean.

MS. DAHL: Yeah. My only concern is, well, if I charge him with the ammo, he's going to get out.

MR. PETERS: Yeah.

MS. DAHL: You know, even in Federal court, he's going to get out on bond. He doesn't have enough of a significant criminal history for...

MR. TURNER: And he's got the money to make bond.

MR. PETERS: Oh, yeah.

MS. DAHL: Yeah, right. And he's going to get some fancy lawyer. He's not going to get, you know, FDS. And especially with COVID going on, it would be a real tough uphill battle keeping him in custody with what we have. And so I would be concerned that if I charge him now, he's going to get spooked and you're not going to get anything.

MR. TURNER: Let's see what we get from the cameras then.

MR. PETERS: Yeah. I mean, I'm fine with that.
MS. DAHL: Okay. And can you see what you can get on the toxicology, and the computer, and the cameras and see if we can start the process for a search warrant on the computer and the cameras that they've got?
MR. PETERS: Well, now, I will tell you with toxicology, we're going to probably be a while on that...
MS. DAHL: Really?
MR. PETERS: ...with TBI turnaround, yeah.
MS. DAHL: Okay.
MR. PETERS: Yeah. We're probably looking at months.
MR. TURNER: Weeks, yeah.
MS. DAHL: Oh, wow.
MR. PETERS: Yeah. That's not going to be -- I mean, because we would have to -- I mean, I can see if somebody from the DA's office will do a letter for us to expedite it, but...
MR. TURNER: Even then you're weeks probably.
MR. PETERS: Yeah.
MS. DAHL: Wow.
MR. TURNER: By weeks, I mean 10 to 12.
MR. PETERS: Yeah.
MS. DAHL: Oh, Lord. Well, what about the cameras and the computer, starting the process on a search warrant for those?
MR. PETERS: The computer, I understand. The cameras?

MS. DAHL: Toma told me he had -- like they had confiscated, like, the SIM cards for...
MR. PETERS: Okay. Okay, yeah, we have SIM cards.
MS. DAHL: Yeah.
MR. PETERS: Yeah. We don't have no cameras, but we've got SIM cards.
MS. DAHL: Yeah. So the computer and the SIM cards, trying to get a search warrant for anything off of there, that might be...
MR. PETERS: Well, why don't we do this then. Why don't we get you and Toma together...
MS. DAHL: Okay.
MR. PETERS: ...and you can help him with wording that.
MS. DAHL: Okay, yeah.
MR. PETERS: Because whichever way is best to word it and everything.
MS. DAHL: Yeah.
MR. PETERS: And then we'll go from there.
MS. DAHL: Okay, yeah, absolutely.
MR. PETERS: And we'll see.
MS. DAHL: You know, if we strike out on the computer, then we strike out on the computer, but there's no -- you know, we don't spook him or...
MR. PETERS: Uh-huh (Affirmative).
MS. DAHL: ...blow anything up to where he would, you know,

stop doing -- we wouldn't get anything off of it, so...

MR. PETERS: Now, the SIM cards will be pretty easy, but now, the computer itself, we'll have to send it off to see if we can get [redacted] to -- he's not doing any of that anymore, but he can get it maybe hurried for us.

MS. DAHL: Okay.

MR. TURNER: Somebody with the FBI?

MR. PETERS: Yeah.

MS. DAHL: Well, and I was telling -- because I was doing a little bit of research on it, I was telling Chief Turner how the reason the baby doll thing concerns me is that it's actually kind of a theme in serial offenders. It has popped up in several serial killers, several serial rapists that have been found with dolls in their possession as, you know, I guess a way for them to kind of act out their issues, to put it mildly. But it's actually something that's a pretty established theme...

MR. PETERS: Uh-huh (Affirmative).

MS. DAHL: ...in some of these cases. Like even BTK had -- was found with a doll in his possession. So that just makes me wonder, well, and the testimony that -- that was the other thing. And who knows if this -- there are definitely credibility issues with this latest girl, but one of the things that she mentioned was -- and I think someone else mentioned this as well, is that I guess he

struggles to have sex, and that's also a pretty common theme with serial offenders is that, you know, they -- they struggle to perform in some way, so that kind of made me pause as well.

MR. PETERS: Now, this girl is the first one we've had -- of course, we've only had two reports filed, but this one -- well, three reports filed. But this girl, she's the only one that has said anything about that. She just said he had done so much drugs. Now, the other ones reported that he raped them, so...

MS. DAHL: Yeah.

MR. TURNER: But didn't we have a cooperation problem with some of the other ones?

MR. PETERS: Oh, yeah. They -- they wouldn't return our phone calls, yeah. That's why I'm saying if we work it backwards and we get him to where we can get him on drugs, or the guns, or something like that, then these girls may come back knowing he's going to go away for that for a while and be willing to cooperate to where we can do something.

MS. DAHL: Yeah, yeah.

MR. TURNER: Yeah, they may be scared to cooperate while he's out.

MR. PETERS: Yeah.

MS. DAHL: Right, right. Well, he does have guns so, you

know.

MR. PETERS: And in that sense, you know, we can work it backwards and maybe get all the rapes on him, just depending.

MS. DAHL: Okay, yeah. Sounds good. Well, yeah, I will -- I will get in touch with Toma this week and help him with the wording on it.

MR. PETERS: Okay.

MS. DAHL: I'm sure there's some -- I'll ask Tom, too, if he has any experience with specifically searching a computer for photos of firearms and if there's any, you know, language that could be tailored to that specific situation that we could use.

MR. TURNER: And Kat, while you're here, I want to give you your Christmas present.

MS. DAHL: Thank you.

MR. TURNER: You're welcome. If you'll -- you can go ahead and open it, if you like.

MS. DAHL: Okay.

MR. TURNER: If you'll ignore the Morris Baker Funeral Home and Cremation on the side of it.

MS. DAHL: Oh.

MR. TURNER: That really shows, you know, that we care here at the department. And here, let me...

MS. DAHL: Oh.

MR. TURNER: You know, you may want to leave it in your car because it does have the handy dandy flashlight thing on there in case you need it.
MS. DAHL: Oh, okay. Wonderful. Well, you know, that will be helpful, too, for...
MR. TURNER: That's the gift that keeps on giving.
MR. PETERS: We look forward to those every year.
MS. DAHL: Yeah.
MR. TURNER: Yeah.
MS. DAHL: Well, that will be helpful too if...
MR. TURNER: We meant to have Johnson City Police Department on those, but instead it came out Morris Baker Funeral Home.
MS. DAHL: Well, you know, if we go back to teaching classes over at Walters State in the new year, I can use this to shine in the eyes of anybody that falls asleep.
MR. TURNER: It's a handy stylus, pen, and flashlight.
MS. DAHL: Yeah. I love it. I'll use it to -- you know.
MR. TURNER: I know you'll cherish it forever.
MS. DAHL: Yeah. I'll use it to harass the guys that are falling asleep on me in constitutional law.
MR. TURNER: There you go.
MS. DAHL: Yeah, I love it. Well, great, it sounds like you've got a plan going. I'll -- I'll get with him on getting a search warrant together for the computer and the

SIM cards.

MR. PETERS: Okay.

MS. DAHL: That would be the -- that would be the ace in the hole if he has something on there, you know. That would be my dream come true.

MR. TURNER: So we're going to write the search warrant looking for evidence of firearms to go with the ammunition we already have. Is that...

MS. DAHL: Yes. Yeah. And anything else is just...

MR. PETERS: Gravy.

MS. DAHL: Yeah, yeah. And, I mean, he's a weirdo. God knows what's on there, so...

MR. PETERS: Yeah, he's a weirdo. There ain't no doubt about that.

MR. TURNER: Nothing on social media of him with firearms or anything like that?

MS. DAHL: No. I did manage to find his Snapchat, and that was one thing that this girl mentioned is that he communicates a lot via -- to these girls via Snapchat because it disappears.

MR. PETERS: Yeah.

MS. DAHL: You know, that makes sense. So I don't know how much use that would be trying to either set up a dummy Snapchat account or, you know, trying to do a search warrant on his Snapchat, but...

MR. PETERS: Well, we've tried Snapchat before. Without a preservation letter as far as them capturing from that moment on, you can't get it.

MS. DAHL: Yeah, yeah.

MR. PETERS: Because, like you said, it just disappears, it's gone.

MS. DAHL: Yeah.

MR. PETERS: And that's -- that's another thing, that's why everybody was using it because there's no trace.

MS. DAHL: He has sig' -- well, and the other thing that I thought was interesting too because -- and this is just me playing around on my phone. If you put in someone as a contact, it will automatically pop up on different apps, like so and so is also on Snapchat, so and so is also on this. And it popped up, you know, because I put his number, or what I thought was his number, into my phone and it popped up that he uses Signal, too, so -- which is frustrating because even if you did have his phone, it's likely that he uses Signal or Snapchat for any -- what he would, like, deem incriminating, you know, conversations. Signal is encrypted end to end, and you can set text messages to be -- you know, to erase themselves after a mere matter of minutes, so Signal is a pain in the ass.

MR. PETERS: Yeah. I don't even know what you're talking about, to be honest.

***CONFIDENTIAL***

MR. TURNER: I've never heard of Signal.
MS. DAHL: So the only reason I know about Signal...
MR. PETERS: I told you, we're not tech savvy.
MS. DAHL: So the only reason I know Signal is because it is the app of choice for people -- you know, Hill staffers or, you know, government staffers in Washington to leak stuff to the press.
MR. PETERS: Oh, okay.
MS. DAHL: That is the thing.
MR. TURNER: I don't even have a Facebook account, so you're talking to the wrong person here. Petey is more advanced than I am.
MR. PETERS: I'm not very advanced.
MS. DAHL: Well, Signal, in terms of discovery, is a giant pain because it's basically a text messaging app, but it's encrypted end to end, which means that getting anything from Signal itself would probably be just as difficult as getting something from Apple, if not more. And the other thing is that there are settings on Signal where you can set the text messages to disappear after a minute, after five minutes, after a day, after, you know, a week. And depending on the setting that you have, it just self destructs after, you know, the set amount of time. So if he's got a Signal app where he's texting about drugs or whatever that's set to destruct after every five minutes,

even if you get a search warrant and they preserve everything, there's likely not to even be anything there. So and all of that to say, if he's got Signal, he's definitely into some, you know, shady stuff. And getting any text messages off of his phone would probably be an exercise in futility anyway, so...
MR. TURNER: You don't remember Mission Impossible. You're too young for Mission Impossible.
MS. DAHL: I do. Well, I have seen it. It's been a while.
MR. PETERS: Self destruct.
MR. TURNER: You know, the tape recorder thing that starts going up in smoke.
MS. DAHL: Yeah, yeah. Basically that, but text messaging, so...
MR. PETERS: It sounds like we may have to work this the old fashioned way.
MR. TURNER: Yeah.
MS. DAHL: Yeah, yeah, exactly. But who knows, maybe he has something on the hard drive of his computer or his SIM cards.
MR. PETERS: Let's hope.
MS. DAHL: That would be ideal.
MR. PETERS: Lord, I hope he does.
MR. TURNER: You know, why do you need a social media account that erases itself? It's either you're going to use it

for criminal activity or you're going to cheat on your spouse or something.

MR. PETERS: Yeah.

MR. TURNER: It's one of the two, otherwise who needs it?

MS. DAHL: Or kids misbehaving, you know, teenagers that don't want mom and dad to see, that's the other, I think.

MR. TURNER: Yeah, I guess. But none of those are good reasons to have it, so...

MS. DAHL: Yeah, yeah.

MR. PETERS: No.

MS. DAHL: Exactly.

MR. TURNER: All right, Kat...

MR. PETERS: That's the first time I had heard of Signal, so...

MS. DAHL: Yeah.

MR. TURNER: What day was it you were at The Label? What time did you leave?

MS. DAHL: Let's see, this is...

MR. TURNER: Kevin, have you got any questions you want to ask?

MR. PETERS: And who was you there with, and did you go over to the garage on Buffalo Street?

MS. DAHL: Yeah. This was a couple of weeks ago.

MR. TURNER: Did you send any Snapchats, or posts, or messages, or...

MS. DAHL: I'm too old for Snapchat.
MR. TURNER: I guess I'm too old for a lot of things, Facebook included.
MS. DAHL: I hardly ever use Facebook anymore, but -- I'm just kind of over it. I'm over all of the social media, to be honest.
MR. TURNER: Well, we can see what comes up from the garage then if we get those cameras up.
MS. DAHL: Yeah.
MR. TURNER: Or we can just do good old fashioned surveillance on it and stop a few.
MR. PETERS: I think we'll have the cameras up by next week, no problem. I mean, that's definitely no problem. Hopefully they can maybe even get them up this week, but by next week for sure we'll have them up.
MS. DAHL: Okay, cool. I was looking...
MR. PETERS: Unless we run into a problem with the SIM cards.
MS. DAHL: I was looking at the -- you know, because they've got those lofts downtown. I thought, well, you could just do an old fashioned window style, find someone with a loft.
MR. PETERS: Does [INAUDIBLE] live down there?
MR. TURNER: I don't know. He wouldn't let us in. He probably goes over there.
MR. PETERS: Yeah, he probably does.

MS. DAHL: Find someone that's willing to let you sit in their living room with a pair of binoculars.
MR. PETERS: Yeah.
MR. TURNER: I do know [redacted] who has got one up there on Tipton Street. Do you remember seeing that article in the paper about the speakeasy? Well, it's...
MR. PETERS: Yeah.
MR. TURNER: It's on Tipton Street, isn't it?
MR. PETERS: The speakeasy?
MR. TURNER: No, his -- his apartment there.
MR. PETERS: Oh, I don't know.
MS. DAHL: Oh, is this the guy with, like, the really fancy -- that had the article about he did his apartment up like a speakeasy or something?
MR. TURNER: Uh-huh (Affirmative).
MS. DAHL: I remember that article.
MR. PETERS: No, that -- he's in the same building, right, as Williams?
MR. TURNER: Is that the building he's in?
MR. PETERS: Yeah, because didn't he have the safe from the bank in his apartment and stuff?
MS. DAHL: Yes.
MR. TURNER: Yes.
MR. PETERS: So I think he's in the same bank building as Williams is.

MS. DAHL: I saw that article.
MR. PETERS: Yeah, so he would be in that same building.
MS. DAHL: Oh, man.
MR. TURNER: I wonder if he knows Williams.
MR. PETERS: I don't know. I don't know.
MS. DAHL: Yeah. I remember thinking -- because doesn't he own the speakeasy that's downtown, too?
MR. PETERS: I don't know.
MS. DAHL: I thought that was the connection. I might be wrong.
MR. TURNER: No, he owns a business like [redacted] did, they clean industrial smokestack kind of...
MS. DAHL: Oh. Well, there is a speakeasy downtown, and I remember being disappointed because his apartment looks cooler than the actual speakeasy downtown, and I got them confused when we went.
MR. TURNER: Kat...
MR. PETERS: Are you seeing -- are you seeing a pattern here?
MR. TURNER: ...when were you at the speakeasy downtown?
MS. DAHL: Okay. Well, this was with Casey. She's, you know, a defense attorney, and we were talking work.
MR. PETERS: I am seeing a pattern.
MR. TURNER: Are there any...
MR. PETERS: What about that new rooftop bar down there? Have you been to it?

MS. DAHL: I have not, but one of my coworkers has.
MR. TURNER: Are there any -- are any of the bars...
MR. PETERS: I was just wondering what it was like. I have heard some rumors.
MR. TURNER: Are any of the bars you're frequenting down there, Kat, have any windows?
MS. DAHL: Oh, no. That's -- that's what's coming.
MR. TURNER: Okay. Well, let's go at him that way and let's see what happens.
MS. DAHL: Okay. Good deal.
MR. TURNER: Like you said, we've always got the ammunition to fall back on if you can't get him with nothing else.
MS. DAHL: Yeah.
MR. PETERS: Yeah.
MR. TURNER: If that's all we've got, that's all we've got.
MS. DAHL: Right. I would like to see him go away for 20 or 30 though. That would be nice.
MR. PETERS: Well, I would, too. And I guess if we got him on the ammo and even just got him on Federal probation, if he's using drugs he can piss hot at some point in time, so...
MS. DAHL: That's true. That is very true.
MR. TURNER: It would be nice. What does putting a gun on him do?
MS. DAHL: Probably with his, it would depend on what kind of

gun, how many guns, whether the guns were found with any drugs.

MR. TURNER: Let's just say it's guns. What's that going to do for us?

MS. DAHL: Possibly push it to seven or eight, just off the top of my head.

MR. PETERS: We'll never have to worry with him.

MR. TURNER: I won't.

MR. PETERS: I won't either. That's what I'm saying.

MR. TURNER: Unless he runs over me downtown while I'm walking or something.

MS. DAHL: Yeah, I thought his car was, like, a Lamborghini, or a Ferrari, or something.

MR. TURNER: It's not.

MR. PETERS: It's a kit car.

MR. TURNER: It's a kit car.

MS. DAHL: Yeah.

MR. PETERS: Yeah, he thinks it's a Lotus, but it's a kit car.

MR. TURNER: It's not even a real Lotus. He's just saying that.

MS. DAHL: That's really funny to me.

MR. PETERS: He paid 45,000 for it. They've got the bill of sale or seen a picture of the bill of sale anyway.

MS. DAHL: More than mine is worth. Yeah, he had me fooled. I'm apparently not a car person because I thought it was

something fancy.
MR. TURNER: Well, I'm sure it's lots of fun, but it's not a real Lotus. He's an idiot.
MS. DAHL: Yeah.
MR. PETERS: Yeah, he is. I'll give you that. He needs to go back to North Carolina or somewhere.
MS. DAHL: Yeah.
MR. PETERS: He can be their problem.
MR. TURNER: He's been here too long. So when the garage door is open...
MR. PETERS: He's invested in downtown.
MR. TURNER: Yeah. When the garage door is open, the traffic starts, huh?
MS. DAHL: He's got that, like, swing of his in there. That was something that they mentioned, one of the girls.
MR. PETERS: Yeah, and that's -- she mentioned that and said -- in the text messages where she sent the other girl down there. She said get her on that swing, she'll like that.
MS. DAHL: Yeah. Talk about a cast of weirdos, that's all I can say.
MR. TURNER: All right, Petey. I'm going to go ride a bicycle like I said I was going to.
MR. PETERS: I find that hard to believe.
MR. TURNER: What?

MR. PETERS: I thought Matt was going to stay and ride with you. You do know where they went, right?
MR. TURNER: They went to get ice cream.
MR. PETERS: Yeah.
MR. TURNER: Frozen yogurt.
MR. PETERS: I tried to bribe him this afternoon with powdered doughnuts. He said, I'm on a diet. I said, bull crap, you went and got ice cream last week. He said, well, we actually went and got it again today, too.
MR. TURNER: Debbie fell right in there with him.
MR. PETERS: He's so full of shit.
MS. DAHL: Goodness. Well...
MR. TURNER: When does Toma -- is he off Friday or...
MR. PETERS: Yeah, he's off Friday. He'll be here tomorrow and Thursday.
MS. DAHL: Okay, great.
MR. TURNER: And he'll come in next week.
MR. PETERS: Monday through Thursday next week.
MS. DAHL: Great. I will get with him and then we'll figure out how best to do the search warrant.
MR. PETERS: Sounds good to me.
MS. DAHL: Cool. Good deal. I appreciate it.
MR. TURNER: Enjoy that pen.
MR. PETERS: You might want to go out this door because she locks this one up, I think.

***CONFIDENTIAL***

MR. TURNER: Enjoy that pen, Kat. I hope you get a lot of good use out of it.
MS. DAHL: Oh, yes. I will cherish it. Thanks, guys.

THIS CONCLUDES THE TRANSCRIPT OF
RECORDING 1105 - DAHL/TURNER/PETERS

******

***RECORDING 1106 - DAHL/JEFF LEGAULT***

MS. DAHL: Hey.
MR. LEGAULT: Hey.
MS. DAHL: What's up?
MR. LEGAULT: [INAUDIBLE]
MS. DAHL: So, can we talk?
MR. LEGAULT: Yeah.
MS. DAHL: So I just wanted to kind of touch base with you about this whole, you know, Williams thing because I know it's not a priority for you guys, but it is a priority for me.
MR. LEGAULT: Okay.
MS. DAHL: And I really -- it's not just about, you know, the priority, but it's also about the timing as well, you know. We've got Grand Jury next week, and May is shaping up to be a little bit nuts. And so, you know, it's -- it's -- I mean, it's been three weeks since he was indicted.
MR. LEGAULT: I understand that. But you understand, that's not our case. We're not a warrant serving crew down here.
MS. DAHL: No, I know. But so then how do I get -- because Toma told me that you guys would handle it, and I don't -- so I don't know what to do if Toma is not -- do you see where I'm coming from?
MR. LEGAULT: I do.

MS. DAHL: Like, I'm being told one thing and then, like, you know, when I talked to, you know, him after Grand Jury, he was, like, well, SIS will handle it.
MR. LEGAULT: It's as simple as him calling him to come in. That's all he needs to do is call him and he'll come in, then he can put him under arrest.
MS. DAHL: Okay.
MR. LEGAULT: I mean, it's that simple.
MS. DAHL: Yeah. Like...
MR. LEGAULT: Why he's not doing it, I don't know.
MS. DAHL: Okay.
MR. LEGAULT: But, I mean, he's up there. I imagine you can probably ask him.
MS. DAHL: Okay, okay. You know, I didn't mean to get after you guys, it's just, like, I was told by him, you know, and I don't know how you guys divvy that stuff up, you know. And then when I -- when I asked Wayne about the marshals, he was, like -- you know, he told me, like, well, you know, it's really only if they're fugitives. And so I felt like I was being -- you know, that wasn't an option for me to really go after either. But so, you know, I didn't mean to get -- keep harping on that, but I was just told by, you know, Toma and, you know, them that you guys would be ones to take care of it, so...
MR. LEGAULT: Well, I'm sorry if he said that, but that's -- I

mean, we usually take care of our cases, and if we need to help them, we can. But if he's not going to make an attempt, I'm not going to make an attempt.

MS. DAHL: Right.

MR. LEGAULT: I mean, it's his case. If he's fine with just letting him run around, then why am I worried about him?

MS. DAHL: Right. No, I get it.

MR. LEGAULT: You know?

MS. DAHL: You know, and so that's -- but that's the reason why I kept calling you is because, you know, he told me, hey, well, talk to -- talk to Jeff.

MR. LEGAULT: I've actually went up there and said why don't you just call him, he'll turn himself in. Just call and say, hey, I've got your computer, you can come get it.

MS. DAHL: Yeah.

MR. LEGAULT: And then get him. I mean, it's -- the guy doesn't know that he's got an indictment against him.

MS. DAHL: Right.

MR. LEGAULT: He's going to come in.

MS. DAHL: Right.

MR. LEGAULT: There's no reason to try to do any tricks with him or anything. So I don't know why -- I don't know -- I don't understand. I don't know. I don't have his number. I can't call him.

MS. DAHL: Right.

MR. LEGAULT: Toma's got all of his information.
MS. DAHL: Right. I'm sorry, you know. I didn't mean to -- do you know what I mean? I was, like -- well, I guess I'll go talk to him then just because, like I said, you know, the sooner I can get him in schedule wise...
MR. LEGAULT: I understand.
MS. DAHL: ...the better, so -- and like I said, sorry to, you know, get after you all, just that's what I was told, so...
MR. LEGAULT: I get it. I mean, I don't -- we'd like to -- I mean, we'll take care of our stuff.
MS. DAHL: Right.
MR. LEGAULT: And if they need help, they'll ask, but that's not something that needs help. He's not making an attempt, so I'm not going to make an attempt.
MS. DAHL: That's fair. Well...
MR. LEGAULT: So...
MS. DAHL: Yeah. It's interesting. Do you have any idea why?
MR. LEGAULT: Do what?
MS. DAHL: Any idea why? Just not a priority?
MR. LEGAULT: I guess. I don't -- I don't know what they have going on up there. I stay out of their stuff. I mean, they have -- we're all in CID, but -- oh, I thought we had a meeting at 4:30. I was about to go, oh shit. We're all in CID, but we kind of keep our stuff separate.

MS. DAHL: Right.
MR. LEGAULT: Like I don't know what they're doing.
MS. DAHL: Right.
MR. LEGAULT: And they don't know what we do.
MS. DAHL: Right.
MR. LEGAULT: So I don't know what he's got going on related to it.
MS. DAHL: Right, right. Well, okay. I'm trying to figure -- well, it's just -- it's interesting too because I think this was back in January where Turner called Wayne and basically was, like, complaining about how, like, I hadn't indicted him for the ammunition yet. And, you know, at that point I was still kind of hoping some of the other stuff would come through. It never did, so -- and then there was the thing about trying to get his warrant from North Carolina, which ended up being a big deal because it's so old, it was on microfilm.
MR. LEGAULT: I don't know anything about that.
MS. DAHL: Right. No, I'm just explaining.
MR. LEGAULT: Yeah.
MS. DAHL: Like, it's interesting that, like, I mean, you know, Turner was so hot on this that he was calling Wayne, you know. I indicted him and then poof. Okay. Well, back to square one, I guess.
MR. LEGAULT: I figured since, I mean, John called me, I

figured they done had him. I figured they would have been up here. I mean, for him to call me and ask where he was at and everything, usually that means they're going to come and get him.

MS. DAHL: Yeah.

MR. LEGAULT: I don't know if somebody told him to stand down or what. I don't know.

MS. DAHL: I don't know. I tried giving Toma a call earlier to see where they're at on that because he said he was going to try and find out, but, yeah.

MR. LEGAULT: The main problem with him trying to find him at his house is you have to have a code to get in the damn building.

MS. DAHL: Right, right.

MR. LEGAULT: If you don't have the code, you're kind of spinning your wheels until you see somebody go in.

MS. DAHL: Right, yeah. Well...

MR. LEGAULT: To me, I think that's the easiest way to get him is to just tell him to come in.

MS. DAHL: Yeah, yeah.

MR. LEGAULT: That's me. I don't know. I don't think he's expecting anything other than...

MS. DAHL: Right.

MR. LEGAULT: ...to get his stuff back or to talk. I don't think he's expecting that to happen to him.

MS. DAHL: Right.
MR. LEGAULT: So I don't -- I don't know why he wouldn't come in.
MS. DAHL: Right, right. Well, you know, the other thing that kind of, I guess, concerned me and, you know, lit a fire in my butt this past week was I had gone out for drinks with someone and we were downtown by the building. He was, like, isn't that the building where the girl fell out the window -- the window? And I was like, yeah. And he was like, wasn't that the girl that was over there and, like, that creepy guy, like, assaults all the girls? And I was like, holy shit, this is just like, well, there goes the secret.
MR. LEGAULT: It's not a secret. I mean, everybody knows who he is.
MS. DAHL: Yeah. Well, I mean -- well, I appreciate you clearing that up for me. That makes it a little bit -- that gives me a little bit more context for, like, why things have kind of...
MR. LEGAULT: We're putting it off. You know, I mean, we have driven by. If I see him out, I'm going to stop and get him.
MS. DAHL: Right.
MR. LEGAULT: We've driven by his garage. I mean, it's always shut, you know, and we can't get in. Obviously, we can't

***CONFIDENTIAL***

get in his apartment without the code.

MS. DAHL: Right.

MR. LEGAULT: But it's just I don't -- I don't know what goes on up there, but I don't know why he's not been called in.

MS. DAHL: Okay. All right. I'm sorry for, you know, I guess getting after you because they were just like, okay, well, Jeff is handling it. I was like, all right.

MR. LEGAULT: We get thrown a lot of the gun charges cases...

MS. DAHL: Right.

MR. LEGAULT: ...but that's what -- we take those. We ask patrol to give those to us. I'm fine with those.

MS. DAHL: Right.

MR. LEGAULT: That's not my case. I didn't start it. I don't have anything to do with it.

MS. DAHL: Right, right. I get it. Cool. Well, maybe, hopefully Toma is up there. I'm going to go talk to him.

MR. LEGAULT: I think he was up there, unless he's out and about now. He was up there earlier.

MS. DAHL: Okay. I might -- I'll have to look. I think this was a Joe Jaynes case, but you don't know off the -- well, you wouldn't off the top of your head. I'm sure you've got, like, a dozen cases. But [redacted], do you remember who has that?

MR. LEGAULT: I think Curt may have sent you the stuff on it.

MS. DAHL: Right.

MR. LEGAULT: But I don't know who the actual case was.
MS. DAHL: Okay.
MR. LEGAULT: I think it may actually have started as a patrol case.
MS. DAHL: Yeah, I think it did.
MR. LEGAULT: I think Curt sent you that stuff.
MS. DAHL: Yeah, yeah. Is he in or...
MR. LEGAULT: He's running a deal.
MS. DAHL: Oh, okay.
MR. LEGAULT: He'll be back here shortly.
MS. DAHL: Okay, cool, because I have to get some of the other stuff from his files.
MR. LEGAULT: I can try to pull up his file.
MS. DAHL: Okay.
MR. LEGAULT: If I can find where it's at. You can take it back, but...
MS. DAHL: Great.
MR. LEGAULT: But yeah, I don't -- I would like to -- I mean, I don't know. I can't help you.
MS. DAHL: Sorry. Well, you know, I felt like, you know, a fucking bitch. It's just...
MR. LEGAULT: We haven't -- you know, we haven't went above and beyond trying to locate him...
MS. DAHL: Right.
MR. LEGAULT: ...because it's not one of our guys. But I will

say we have went several times to try to find him.
MS. DAHL: Right. And Will texted me about that, yeah.
MR. LEGAULT: Yeah. We have went several times to try and find him, you know. The only places we really know is the garage and his house.
MS. DAHL: Right.
MR. LEGAULT: I mean, I'm sure he probably goes to some bars or something, but...
MS. DAHL: Yeah.
MR. LEGAULT: So we have tried.
MS. DAHL: Right. No, I don't doubt that you've tried, I just...
MR. LEGAULT: I think the easier way is calling him.
MS. DAHL: Yeah.
MR. LEGAULT: Hey, you know, I've got your computer. We're going to give it to you. Because I think we've still got one of his computers here.
MS. DAHL: Yeah, I think so.
MR. LEGAULT: Say we're done with your computer if you want to come get it.
MS. DAHL: Yeah, yeah.
MR. LEGAULT: He'll come in, pick him up.
MS. DAHL: Yeah, yeah, for sure. Like I said, you know, I hate to be, like, a bitch, you know. I wasn't trying to be a bitch on purpose. I was just, like, going off of...

MR. LEGAULT: Yeah, if you're told one thing, I get it, but that was the first I was told that we were supposed to be responsible for him. It's not me.
MS. DAHL: Yeah.
MR. LEGAULT: If Kevin were to come and say, yes it is your responsibility, you're going to go find him, that's different. We'll go find him.
MS. DAHL: Right.
MR. LEGAULT: I haven't been told that, and that's not usually how it works. It's usually they take the warrant...
MS. DAHL: Right.
MR. LEGAULT: ...it's their responsibility to go find him.
MS. DAHL: Right, right, right. Okay, cool. Oh, another thing. On [redacted], so I talked to [redacted] attorney today because I was interested in finding out whether he -- [redacted] knows anything about [redacted]. And so they were going to try and set up a debriefing Friday morning. Is that something you would be able to do time wise or...
MR. LEGAULT: Yeah. It just depends on what time, yeah.
MS. DAHL: Okay.
MR. LEGAULT: I don't think I have -- I've got something, which I doubt it would be at 7:30 in the morning. I've got something at 7:30 until about 9:00.
MS. DAHL: 7:30.

MR. LEGAULT: Yeah, it's early. They invited me to be part of something called drug court in Washington County.

MS. DAHL: Is that like -- what is that, like, just special, like, diversion?

MR. LEGAULT: Kind of.

MS. DAHL: Yeah.

MR. LEGAULT: Kind of, like, little rehab stuff.

MS. DAHL: Okay. Like an alternative for some of the petty ones?

MR. LEGAULT: Some of -- yes.

MS. DAHL: I've got you.

MR. LEGAULT: So it's, like, that might be a decent idea. We'll see.

MS. DAHL: Well, cool. Okay, cool.

MR. LEGAULT: But anytime after about 9:30, I should be good.

MS. DAHL: Okay, cool. I'll text her and we'll get something set up.

MR. LEGAULT: Yeah, if you could. I mean, I don't -- I don't know what his -- what would be looking for for a debrief out of him on [redacted], just that he's seen him with guns before?

MS. DAHL: Yeah.

MR. LEGAULT: Stuff like that?

MS. DAHL: I'm curious, you know, if -- he was all about these rap videos, especially with just how distinctive the gun

was, like, whether he's ever seen him with a gold gun. I feel like that's something that would stand out.
MR. LEGAULT: Yeah.
MS. DAHL: So if it was just like -- I wouldn't be quite as keen if it was just, like, oh, have you seen Jackson with a gun, but...
MR. LEGAULT: My thing that I would think is, I mean, it's a possibility, but I don't think this is -- I think he just gets guns somehow, you know. [redacted] was in jail for probably close to a year before he was picked up, wasn't he?
MS. DAHL: Yeah.
MR. LEGAULT: So, I mean, maybe he has seen him with one, maybe not.
MS. DAHL: Yeah. He was picked up -- [redacted] was one of my first cases.
MR. LEGAULT: Yeah.
MS. DAHL: It was like -- so that's -- it would have been fall of 2019, and he made these videos in January of 2020, so like, I guess...
MR. LEGAULT: So not too far.
MS. DAHL: Yeah. Well, and like, I thought with him filming so many of these, like, videos in pretty much public places...
MR. LEGAULT: Yeah.

MS. DAHL: ...like the trap house and stuff, and these apartments, like maybe he's been around and like, oh yeah, I remember he was flashing that thing and making his YouTube videos.

MR. LEGAULT: Yeah. Yeah, we can see. I mean, it's worth a shot.

MS. DAHL: Yeah, yeah. And, well, I was thinking about approaching [redacted] too, because [redacted] said she would be willing to cooperate.

MR. LEGAULT: Yeah. Now, she -- because remember the day we did the search warrant, he came be bopping up to the front door...

MS. DAHL: Right.

MR. LEGAULT: ...after we already had him in custody.

MS. DAHL: Right.

MR. LEGAULT: He took off running. Now, her and [redacted] or [redacted] [redacted] or whatever...

MS. DAHL: Now, he didn't want to cooperate, but [redacted] did.

MR. LEGAULT: That's shocking. I thought he was the one that did want to and she didn't.

MS. DAHL: Right, and they flipped.

MR. LEGAULT: Really?

MS. DAHL: Yeah. They switched, like, all -- because I sent them both, you know, the cooperation and non-cooperation supplements, and [redacted] is the one that signed the

cooperation one and [redacted] didn't. So I was like, okay, cool. Well, I bet you she knows more than him too, so I think as far as potential value for...

MR. LEGAULT: Yeah, I think so. I think she kind of ran the show, if I had to guess.

MS. DAHL: Yeah. She comes -- he comes across as -- he comes across as the dumb one.

MR. LEGAULT: I think -- my guess is he probably just didn't -- I think he's in the Vice Lords pretty deep, so if they ever found out that he ratted, he would probably get himself killed in prison, so that may be why he didn't want to, you know.

MS. DAHL: Yeah. Maybe it's just their personas, but she -- she came across as, like, wilier to me than he did.

MR. LEGAULT: Yeah.

MS. DAHL: He just kind of came across as, like, a dumb gang banger.

MR. LEGAULT: Yeah, for sure.

MS. DAHL: Okay. Well, I'm going to try and go find Toma. I'm sorry to be, like, such a nag.

MR. LEGAULT: Well, I mean, he needs to be caught. There's no doubt if there's an indictment out, I mean, he needs to be caught.

MS. DAHL: Yeah. Well, you know, I'm -- the other reason I'm a little bit just eager to get going is just, you know,

not that I don't put, you know, work into, like, every indictment and all that jazz, but his took a lot of work and research.

MR. LEGAULT: Yeah.

MS. DAHL: So I spent, like, nine hours trying to figure out whether we could even do it, so...

MR. LEGAULT: Right. I've got you.

MS. DAHL: Which is -- God, I hate North Carolina law. It's the dumbest shit. Okay, cool. Well, yeah, I'll leave you with -- I don't know if you have [redacted].

MR. LEGAULT: Let me see if I can find it. I'll have to try and find what year it is first.

MS. DAHL: So I've got your dude with -- you said you were out looking for him. I've got him on my list to -- on my Grand Jury list for next week.

MR. LEGAULT: Yeah. He went and assaulted his wife and kids. He's got, like, three aggravated assault warrants against him right now.

MS. DAHL: Lovely.

MR. LEGAULT: Yeah.

MS. DAHL: Sounds like a...

UNKNOWN MALE: I didn't think it was going to go.

MR. LEGAULT: I didn't either. She called him, like, 12 times.

UNKNOWN MALE: Yeah. We talked to him back at the meet spot.

She called him at the meet spot and I couldn't get the shit turned on quick enough. And I was like, well, okay. So we go over there and she calls him, like, five or six times. And I'm, like, what the fuck, we just talked to you two minutes ago.

MR. LEGAULT: Yeah.

UNKNOWN MALE: But he came down and did it.

MR. LEGAULT: [redacted], did you send her the stuff on him?

UNKNOWN MALE: Uh-huh (Affirmative).

MR. LEGAULT: Do you -- is it a file? Do we have a file?

UNKNOWN MALE: No. I think I just scanned an E-mail. This was patrol shit.

MR. LEGAULT: Okay. I thought you might know.

MS. DAHL: I've got, like, the case file, but, like, as far as everything else, like potential videos and all that stuff...

UNKNOWN MALE: I'd talk to patrol.

MS. DAHL: Okay, okay.

MR. LEGAULT: If you want the case number, I can probably look it up if I look up some stuff.

MS. DAHL: Cool. I think I might have...

UNKNOWN MALE: [INAUDIBLE] said he's got a shit load of powder up there, so we're going to try to buy some powder off of him tomorrow.

***CONFIDENTIAL***

MR. LEGAULT: Is he staying here?
UNKNOWN MALE: He's got a fucking 423 area number, so -- and it's a Verizon number. It's 202.
MR. LEGAULT: Did they go up in the room today or did he come down?
UNKNOWN MALE: No, he came down and got in the car. We drove around the back of the parking lot, did the deal, and dropped him back off.
MR. LEGAULT: We need to try to get somebody in there and try to follow him up or is that too hard? Are you going to try to see if they can get into his room?
UNKNOWN MALE: I want to see if anybody can get to the room. I want to find who the fuck he is first.
MR. LEGAULT: Yeah.
UNKNOWN MALE: That's the biggest thing is to figure out who [redacted] is. I've never heard of anybody named [redacted].
MR. LEGAULT: [redacted]?
UNKNOWN MALE: [redacted]. See you all later.
MS. DAHL: I can't pull up the reports on my phone.
MR. LEGAULT: I can probably pull it up.
MS. DAHL: Yeah. He's -- if you find him before -- yeah, I would say if you find him, like, tomorrow or Thursday, we can just try and complaint him just to get him stashed away.
MR. LEGAULT: Barron -- yeah, Barron has it at the top.

MS. DAHL: Right. But either way, he's on the...
MR. LEGAULT: Okay.
MS. DAHL: ...list for Grand Jury next Tuesday, so...
MR. LEGAULT: He needs to go, like, yesteryear.
MS. DAHL: He's on there. Cheyenne Lowry is on there.
MR. LEGAULT: Yeah. That will be a good one.
MS. DAHL: The other Will case is John Johnson.
MR. LEGAULT: Oh, Jonathan Johnson?
MS. DAHL: Yeah. Which I've never heard a John Johnson.
MR. LEGAULT: He's bad, too.
MS. DAHL: Yeah, I read the thing.
MR. LEGAULT: He's a Vice Lord or one of the gangs. Cheyenne is not a bad dude, but he's just out of control.
MS. DAHL: Yeah.
MR. LEGAULT: Constantly, he's just a dumb ass, constantly getting caught with guns, so we're tired of dealing with him.
MS. DAHL: Yeah.
MR. LEGAULT: And, of course, that guy that I just told you about, he's not a good guy either.
MS. DAHL: Yeah. Also, I'm slated, if I can get some of this shit from North Carolina is Demetrius Bolden, but...
MR. LEGAULT: Who is he? I know -- I remember the name, but I don't remember...
MS. DAHL: He was the dude that, like, got caught with a bunch

of, like, drugs and a gun, and then fled to North Carolina and was involved in, like, the homicide down in North Carolina.
MR. LEGAULT: Oh, yeah, yeah, yeah, yeah.
MS. DAHL: And they, like, have a shitty case, and so they were, like, you should make this your...
MR. LEGAULT: Yes.
MS. DAHL: We can't get him for murder, so you guys should...
MR. LEGAULT: That's the one that Curt stopped at the...
MS. DAHL: Yeah.
MR. LEGAULT: He had a bunch of drugs, and guns, and stuff. Yeah, that was a murder. So then he never got charged with murder?
MS. DAHL: No, he did, like, but -- and I would have to call the...
MR. LEGAULT: I remember that one
MS. DAHL: ...the DA down there to find out, like, where it's at, but they basically have been, like, harassing me because they're, like, we have a shitty case, we're not sure if we can convict. And I'm just, like, whose fault is that, like, you know, I'm kind of -- just from a policy standpoint. Like, don't get me wrong. He probably very much deserves to go away, but it does make me uncomfortable that, like, you feel like you can't make your murder case on him, so you're going to...

MR. LEGAULT: Yeah.
MS. DAHL: ...try and get the feds to do your work for you.
MR. LEGAULT: Right.
MS. DAHL: Like, that bothers me.
MR. LEGAULT: Yeah, it should.
MS. DAHL: Just, ugh. Plus, I mean, there is a legitimate question whether it was murder or whether it was self defense.
MR. LEGAULT: Yeah, I remember the case now.
MS. DAHL: Which that makes me real uncomfortable, too.
MR. LEGAULT: Yes, for that part. The part of Johnson City though...
MS. DAHL: Well, yeah.
MR. LEGAULT: You know, they could still charge, I guess, with the gun and the drugs and stuff.
MS. DAHL: Right.
MR. LEGAULT: Yeah, I see what you're saying though.
MS. DAHL: Right.
MR. LEGAULT: It's like just because you've got a shitty case, then all of a sudden you want us to drop -- drop your shitty case so that Johnson City can prosecute him federally.
MS. DAHL: Right, right, exactly. Like, also, Savyon Prather...
MR. LEGAULT: Yes.

MS. DAHL:  ...apparently was -- like, I've been helping out some AUSA from Roanoke because homeboy was apparently pretty busy...
MR. LEGAULT:  Yes.
MS. DAHL:  ...and was robbing banks...
MR. LEGAULT:  Yes.
MS. DAHL:  ...over in Roanoke.
MR. LEGAULT:  So I'm guessing that was a good one that we complainted on him...
MS. DAHL:  Yeah.
MR. LEGAULT:  ...because he was causing some issues.  I didn't -- I found that out later, too.
MS. DAHL:  Yeah.
MR. LEGAULT:  And it may have been you.  I can't remember if it was you or Gryder told me about him robbing banks.  I was, like, oh shit.
MS. DAHL:  Yeah.  It was, like, the day before he came to Johnson City.  I was just like...
MR. LEGAULT:  I thought it was you.
MS. DAHL:  Yeah.  Yeah, that was...
MR. LEGAULT:  He'll go away for a long time.
MS. DAHL:  Yeah, because they're working on their case over there, so like...
MR. LEGAULT:  On a bank robbery case, shit.
MS. DAHL:  Yeah.  He fucked up.

MR. LEGAULT: He robbed them and had a gun to the...
MS. DAHL: He's got not one, but two, like, federal offices after him.
MR. LEGAULT: Bad ones.
MS. DAHL: That's pretty impressive.
MR. LEGAULT: Yeah. And he's a young kid. He might as well just worry about sitting there for a while.
MS. DAHL: Yeah.
MR. LEGAULT: [INAUDIBLE]
UNKNOWN MALE: Hello.
MS. DAHL: Hey.
MR. LEGAULT: He's been limping today.
MS. DAHL: Aw.
MR. LEGAULT: I don't know what he's done. He just barely could walk over the weekend, then he started to walk. I thought he was doing good. I went and played ball with him this morning and he started limping again.
MS. DAHL: Aw, poor baby.
UNKNOWN MALE: I thought you threw him out of a helicopter on a rope or something.
MR. LEGAULT: I did not.
UNKNOWN MALE: Okay.
MR. LEGAULT: I was the one that chose I don't think I want to do that.
MS. DAHL: Tom was telling me about there's this cat that

hangs out outside his apartment and he said, like, he'll feed it from time to time. He said it came up to him, like, limping heavily and he was, like, oh no, you know, I hope, like, a coyote didn't get him or whatever.

MR. LEGAULT: Yeah.

MS. DAHL: So he lets him into the apartment so he can take a look at him in the light, and he said as soon as got in the apartment, he's walking normally, like perfectly fine.

MR. LEGAULT: That's great.

MS. DAHL: So he got -- he got taken for a ride by a cat.

MR. LEGAULT: He did. Was it just the -- was Porter's case just the...

MS. DAHL: So it was two.

MR. LEGAULT: Was it two?

MS. DAHL: Yeah. He had that one case where it was, like, weird where...

MR. LEGAULT: The girl in the car?

MS. DAHL: Yeah, with the girl in the car and all that shit, and then the case where they found him at the hotel.

MR. LEGAULT: Was it drugs? I assume there's drugs in that one, so I'll see what I can find.

MS. DAHL: Cool. Well, you'll love this. So have you been following, like, the news out of, like, India? Like the -- so they're -- they're doing real bad with, like, COVID over there. Like, their health care system is, like, on

the verge of actually collapsing.
MR. LEGAULT: Really?
MS. DAHL: Yeah. It's bad. Like, I have a friend who she has family over there, and she's had four relatives die already. And so, like, but what was concerning me is she was telling me about it, two of the relatives that died, her aunt and uncle, one was fully vaccinated and the other one was partially vaccinated. I was like...
MR. LEGAULT: That's weird.
MS. DAHL: ...that's not good. So apparently it's a mutation. It's like...
MR. LEGAULT: Yeah.
MS. DAHL: ...one of these variant mutations. So, like, I don't know.
MR. LEGAULT: I hate to tell them, but just leave that shit over there.
MS. DAHL: Yeah. Well, too late because they already found it in Michigan.
MR. LEGAULT: Well, is that one of them that came over here a while back a few months ago that they were talking about or is this something else?
MS. DAHL: No, this is new. This one, like, they just found it in Michigan two days ago.
MR. LEGAULT: Oh, I've got you.
MS. DAHL: Yeah. I was, like, fucking hell.

MR. LEGAULT: You've got to stop watching that shit.
MS. DAHL: I know.
MR. LEGAULT: Don't worry too much about that. What will be will be. Is it the one with Kacei Pierce? Yes.
MS. DAHL: Yes.
MR. LEGAULT: Because that's the one she was going to get indicted as part of Curt's case, right?
MS. DAHL: Yeah, yeah.
MR. LEGAULT: That one was just a bunch of drugs, wasn't it?
MS. DAHL: I think so.
MR. LEGAULT: Okay. Yeah, I think I should...
MS. DAHL: There might be one gun in there, if there is any, because there was two guns on two separate occasions. Maybe that one is an even different report. He's been a busy boy.
MR. LEGAULT: Yeah. Kacei is the only one that got arrested on this one.
MS. DAHL: Yeah, then that's not it.
MR. LEGAULT: He was with her, apparently, but she's the one that got arrested.
MS. DAHL: Yeah, that's not the one then. This one was, like, he got arrested for this assault, had a gun, I guess bonded out. This was -- then, like, fast-forward two or three months, and they find him at the hotel again, and he's got a gun.

MR. LEGAULT: There's another page, that's why.
MS. DAHL: Is [redacted], like, a local, like, name or family group?
MR. LEGAULT: It must be because, I mean, you've got the [redacted] dealership.
MS. DAHL: Yeah.
MR. LEGAULT: So it must be. There's a lot of [redacted] here. And I don't know if he's related or not.
MS. DAHL: Right. I'd just never heard that last name outside of this area, so I was like, huh. So Skip Arnett is dying?
MR. LEGAULT: Yeah. That's the rumor anyway.
MS. DAHL: Good for him. Mazel tov.
MR. LEGAULT: [INAUDIBLE] At a hotel?
MS. DAHL: Yes.
UNKNOWN MALE: The Braves did good yesterday.
MR. LEGAULT: Did they win yesterday? Because I seen they got beat by the -- they didn't play yesterday.
UNKNOWN MALE: I know it. They did good.
MR. LEGAULT: That's right, they didn't play yesterday. They got beat. They can't get it together, man.
UNKNOWN MALE: They lost all three.
MR. LEGAULT: Against Toronto.
UNKNOWN MALE: And then d'Arnaud...
MR. LEGAULT: d'Arnaud or d'Arnaud.

UNKNOWN MALE: Yeah, that one. I make fun of my wife trying to say it and I can't say it. But anyway, he's hurt.
MR. LEGAULT: Did he get hurt?
UNKNOWN MALE: Yeah.
MR. LEGAULT: That's the catcher, right?
UNKNOWN MALE: Yeah. And then the other catcher got hurt, so they had to bring up Contreras and sign a catcher somewhere else.
MR. LEGAULT: That's not good.
UNKNOWN MALE: We don't have any pitching because...
MR. LEGAULT: They're all hurt.
UNKNOWN MALE: ...they're all hurt.
MR. LEGAULT: But they're still only two games out or three.
UNKNOWN MALE: Yeah, the National League East sucks.
MR. LEGAULT: Thank goodness everybody sucks.
UNKNOWN MALE: Maybe they'll get on track. I don't know.
MR. LEGAULT: Oh, the gun was lying on the bed with him, so...
MS. DAHL: Yeah.
MR. LEGAULT: Yeah. I will see -- this one in the hotel room, my guess is there's not going to be video...
MS. DAHL: Okay.
MR. LEGAULT: ...because they were -- we don't have body cameras. We do, but patrol doesn't have body cameras.
MS. DAHL: I've got you.
MR. LEGAULT: My guess is there's not going to be. Maybe from

the transport there might be, but that's all you'll get.
MS. DAHL: Right.
MR. LEGAULT: There might be some from the others.
MS. DAHL: Of all the sports to watch, baseball is, like, my least favorite.
MR. LEGAULT: Well, I played baseball, so...
MS. DAHL: Oh, well, that's different then.
MR. LEGAULT: ...I kind of have a love for it. It is boring to watch if you...
MS. DAHL: I'm a hockey person.
MR. LEGAULT: See, I don't understand hockey, but I'd love to go to a hockey game. They say once you go, then you can really appreciate it.
MS. DAHL: Yeah. It's just like -- it's the energy for me, like, the energy is just -- it's so -- like, I like it because it's so fast-paced. Yeah.
MR. LEGAULT: Yeah. I just don't understand it. It's like soccer on ice. I don't get it.
MS. DAHL: Well, yeah, it's soccer on ice, but, like, much faster.
MR. LEGAULT: And you can fight.
MS. DAHL: Like people -- yeah, and like -- and people fight.
MR. LEGAULT: And they don't -- and they don't flop like hockey puck soccer players, they actually get the shit knocked out of them.

MS. DAHL: Yeah. No, they actually like -- yeah. Kind of like NASCAR, like everybody goes, you know, to NASCAR to see them wreck.
MR. LEGAULT: Yeah. You go to see them fight.
MS. DAHL: People watch hockey for the fights.
MR. LEGAULT: I don't know that I'll have this ready for you today, but I'll see if I have anything for you.
MS. DAHL: Okay. I appreciate it.
MR. LEGAULT: I will take me a while to remember to -- it will take me a little bit to remember how to even do it. I know there's a cheat sheet somewhere around here in this mess if I look.
MS. DAHL: Yeah. I need to clean my desk. If anyone walks by, I'm like, I know it looks disorganized, but, like, I know where everything is.
MR. LEGAULT: Yeah, it's organized chaos.
MS. DAHL: Yeah. I'll leave you with one of my hard drives. I leave you with mine because the one that I have from you all has some of my other files on it that I need.
MR. LEGAULT: Okay. Yeah, I'll look. Once I find them, I'll download if there are any. If there's not, I'll just let you know.
MS. DAHL: Cool.
MR. LEGAULT: Do you want transport video too if that was something they had?

MS. DAHL: Yeah.
MR. LEGAULT: Anything if he's in it?
MS. DAHL: Yeah, if he's in it. So I'll leave that with you. I'll text McAfee and find out when we can meet with [redacted]. On [redacted], do you have any interest in debriefing with him again? She wanted to know.
MR. LEGAULT: Is that mine?
MS. DAHL: No, it's Curt's.
MR. LEGAULT: That's Curt's.
MS. DAHL: The crack dude over in the trailers on North Roan.
MR. LEGAULT: Oh, that would be Curt's. He may. I mean, he's got some new people that started. He may want to to see if he might know -- the others might know who some of these people are.
MS. DAHL: Okay, cool.
MR. LEGAULT: You might just ask him.
MS. DAHL: There was one other thing that -- who was telling me this? Oh, it was -- shoot. I think it was McAfee with [redacted] where somehow she said that, like -- I'm pretty sure. I should have written it down. But I'm pretty sure it was McAfee when she was talking about [redacted] that, like, he apparently knows -- so has, like, a lot of information because, like, he knew all about, like, the prosecutor that got picked up and, like, all this stuff.
MR. LEGAULT: Yeah. I think he was in the ring with that

girl, like kind of knew that girl.
MS. DAHL: Okay.
MR. LEGAULT: So, yeah, I would say he probably does.
MS. DAHL: I've got you.
MR. LEGAULT: That was [redacted]
MS. DAHL: Yeah.
MR. LEGAULT: Okay.
MS. DAHL: Because she was saying he might have information, like, beyond what you're looking for with [redacted].
MR. LEGAULT: Yeah. So, I mean, we'll feel him out and if he wants to talk, then...
MS. DAHL: From what Casey said...
MR. LEGAULT: ...we'll let him talk. I mean...
MS. DAHL: Yeah. From what Casey said before she had to get off the case for a conflict, he, like, apparently was super gung-ho about helping however he can.
MR. LEGAULT: Yeah. Well, I mean, you can't really -- the other -- that murder trial is over, so I mean, there's nothing...
MS. DAHL: Right, right.
MR. LEGAULT: He can't really help say or do for that. But if he's got information...
MS. DAHL: Right.
MR. LEGAULT: ...on something that's still going on and can meet us somewhere, that's -- we'll take it.

MS. DAHL: Cool. I think -- no, [redacted] -- [redacted] was the one.
MR. LEGAULT: [redacted]
MS. DAHL: Yeah, that apparently Russ was telling me she knows, like, a bunch of shit.
MR. LEGAULT: Oh, she always has, and she always sings like a bird here, but we just could never get her to do anything.
MS. DAHL: Yeah.
MR. LEGAULT: Of course, we can't get her to do anything now.
MS. DAHL: Right.
MR. LEGAULT: But if she still wants to talk, there's no doubt she knows stuff.
MS. DAHL: Yeah. So Russ is wanting to set up a debriefing with her, too.
MR. LEGAULT: Yeah, I'd love to debrief her.
MS. DAHL: Okay, cool.
MR. LEGAULT: Yeah, because I know she knows a lot of stuff that's going on around here.
MS. DAHL: Yeah, yeah.
MR. LEGAULT: Even today. Yeah, there's no doubt. So, yeah, I would love to debrief her.
MS. DAHL: Okay, cool. Then I'll set that up, and then I think that's all. Like, I need to start, like, writing down the things that I have to, like, tell you. I, like, build this mental list and then inevitably a few things get left off.

MR. LEGAULT: Well, I'll take care of this.
MS. DAHL: Cool
MR. LEGAULT: I'll keep you in the loop about it. If that Dalvin Stephens slash Robinson gets picked up, that's the one that we were going to complaint.
MS. DAHL: Yeah. He's on my list. Well, regardless, he's on...
MR. LEGAULT: He's on your list, so unless he gets picked up, we'll just indict him.
MS. DAHL: Yeah.
MR. LEGAULT: Okay.
MS. DAHL: Okay, cool. I'm going to go try and look for Toma.
MR. LEGAULT: He should be up there.
MS. DAHL: Okay. I'm just going to leave this here. [INAUDIBLE] Thanks.

THIS CONCLUDES THE TRANSCRIPT OF

RECORDING 1106 - DAHL/LEGAULT

******

***RECORDING 1108 - DAHL/CHIEF KARL TURNER/KEVIN PETERS***

MS. DAHL: Hi, I'm here to see Chief Turner. I'm the SAUSA.

UNKNOWN FEMALE: Okay. Just give me your temperature and you can come in.

MS. DAHL: Okay.

UNKNOWN FEMALE: Thank you, darling.

MS. DAHL: Thank you. Hey.

UNKNOWN FEMALE: Hello.

MS. DAHL: I'm here to see Chief Turner.

UNKNOWN FEMALE: Oh, yeah. Come on in.

MS. DAHL: Thanks. Hi, there.

MR. TURNER: Hi, Kat, how are you?

MS. DAHL: I'm good. How are you?

MR. TURNER: I'm fine.

MS. DAHL: Goodness.

MR. TURNER: Vegas, work, vacation. It's not bad, is it?

MR. PETERS: No, not bad at all.

MR. TURNER: And I needed a vacation. How about you?

MS. DAHL: Yes, I would. That's probably at the top of my list of things that I would like right now, especially with some of these upcoming trials. So, you wanted to talk about some of the case statuses, correct?

MR. TURNER: Yeah. Kevin, do you have your list or...

MR. PETERS: Yeah, I've got it.

MS. DAHL: Okay.



Case 2:22-cv-00072-KAC-JEM Document 82-11 Filed 02/06/24 Page 98 of 178 PageID #: 2344

MR. TURNER: We can try to figure out where we're at.
MR. PETERS: Do you have it?
MS. DAHL: Yeah.
MR. TURNER: [INAUDIBLE]
MS. DAHL: I had -- when I was looking at some of these, on some of them, because I just had the case number, it was hard for me to track them down just because it's not how I store things on my laptop, and so I was having to go back through, like, files and match up the cases numbers about what you were asking about, so there's several that I'm missing.
MR. TURNER: Okay. We can fill in the blanks, I think.
MS. DAHL: Great.
MR. TURNER: How's everything in Greeneville?
MS. DAHL: It's doing great, you know. We're picking back up finally, so it's starting to...
MR. TURNER: They've had a couple of Federal Grand Juries haven't they?
MS. DAHL: Yeah. We've had -- we had one in March and one in April, and then another one -- we've had one since March, so three now. I've got...
MR. TURNER: And Kat, we can -- did you send this to -- does Kat have a copy with the names?
MS. DAHL: I have -- yeah, that's the one I brought with me.
MR. PETERS: Not with the names on them, I don't think.

MS. DAHL: Oh.
MR. TURNER: Yeah. We can get the names for you.
MR. PETERS: I just put the names on them because I just went through them one day and put the names on them to see who it was.
MS. DAHL: That would -- well, that would be very much appreciated because...
MR. PETERS: Let me go make you a copy then.
MS. DAHL: Great.
MR. TURNER: Two copies.
MS. DAHL: Good, good, good.
MR. TURNER: That will help us streamline things.
MS. DAHL: Yeah.
MR. TURNER: How's Wayne? I've just talked to him on the phone a couple of times.
MS. DAHL: He's good. He's doing real well. I think everybody is kind of relieved to be slowly getting back to normal.
MR. TURNER: And we've got a new U.S. Attorney down there, don't we?
MS. DAHL: No. We've still got an acting U.S.
MR. TURNER: Do you?
MS. DAHL: Uh-huh (Affirmative). It's my understanding that historically we haven't had that position filled until about the end of the year.

***CONFIDENTIAL***

MR. TURNER: It must take a while.
MS. DAHL: It does. You know, when I was up in D.C., we were -- they were filling -- you know, granted we work for the State department and whatnot, but -- we work for the State department, but we were filling the empty ambassador positions -- they were probably filling them right up until -- we were trying to fill them up until the last year of the last administration.
MR. TURNER: We hate to see Mr. Overbey go.
MS. DAHL: Right.
MR. TURNER: But I guess that happens.
MS. DAHL: Yep. Such is the circle of life up there. Okay. So on the last three down there, Sean Williams, Xavius Williams, and Dakota Shasteen, those have all been indicted. Cheyenne Lowry on the next page has been indicted.
MR. TURNER: Hang on just a second. Petey, you've got those grouped together some way there.
MR. PETERS: I don't have that. I don't know who wrote -- who did that.
MR. TURNER: 4774. Okay. So the last three are indicted.
MS. DAHL: Uh-huh (Affirmative).
MR. PETERS: Yeah. I don't know who did that. I don't know if I did that. That don't look like mine.
MS. DAHL: Correct.

***CONFIDENTIAL***

MR. TURNER: And who did you say on the next page? Cheyenne Lowry?

MS. DAHL: Cheyenne Lowry and Jonathan Johnson. Those have both been indicted as well.

MR. TURNER: Okay.

MS. DAHL: And then of the remaining ones, Nathan Tucker -- Nathan Tucker, Kacei Pierce, [redacted] and I think [redacted] were kind of, like, on my list of clearing, you know, a backlog. So, like, as far as, you know, prioritizing, those have been kind of, like, on my next round.

MR. PETERS: Okay. Say that again. Who?

MS. DAHL: So -- well, [redacted] Nathan Tucker, Kacei Pierce, [redacted] and [redacted] were all on my list of to go, like, for the next round or next couple of rounds. And as for the rest of them, so they're all on my, like, waiting in the wings list more or less, just because when we were not having Grand Jury, I was really having to fight for slots. And so any time we had a complaint or anytime SIS would call me and say, hey, this guy has got to go now, all of these that we just had kind of E-mailed to me or just, like, casually handed, like hey, can you take a look at this, got pushed further down the priority list.

MR. TURNER: So is [redacted] -- this is for the next

Grand Jury.
MS. DAHL: Uh-huh (Affirmative).
MR. TURNER: We're looking at [redacted]
MS. DAHL: Yes, [redacted] Nathan Tucker.
MR. TURNER: Nathan Tucker. Okay.
MS. DAHL: Kacei Pierce.
MR. TURNER: Kacei Pierce. I see that, yeah.
MS. DAHL: [redacted]
MR. PETERS: She's the second list.
MS. DAHL: And then [redacted]
MR. PETERS: That's on the second page.
MR. TURNER: [redacted]
MR. PETERS: Now, is there another case on [redacted] also?
MS. DAHL: I don't know.
MR. PETERS: Because didn't -- we got him -- this is a 2000 case or a '20 case, 2020. We just got him not too long again -- ago again.
MS. DAHL: I only have the 2020 case.
MR. PETERS: Okay.
MS. DAHL: Or the report, at least.
MR. PETERS: I need to check on that because we got him not long ago again.
MS. DAHL: Oh, well, happy days. And I kind of did an informal poll of the office as well just to kind of get some idea of where everybody's case stats were at. And I

talked to -- I talked to Andrew. I talked to Greg, and Tom, and Megan. So, granted, this is just kind of -- this is just kind of in passing. I want you to kind of have context for all of this as well. And they all told me -- and Christian Lampe as well. They all told me that since we entered lock down, so I guess March of 2020, their case -- total number of indictments has generally numbered under 20, some of them hovering around 10 -- as few as 10. And I counted up the number of cases I have indicted since lock down, which was at 17, so...

MR. PETERS: Let me ask you something, Kat. This is just for my own -- I ask this because of my own ignorance, let me put it that way.

MS. DAHL: Uh-huh (Affirmative).

MR. PETERS: I see where Stillwagon contacted you. Legault sent me an E-mail on Christopher Johnson and Chad Whitson.

MS. DAHL: Uh-huh (Affirmative).

MR. PETERS: Now, we're in the process of getting Barron a TFO position with the ATF.

MS. DAHL: Okay.

MR. PETERS: So if those -- let's say if Barron picked up that case -- and I'm not saying that's going to happen because he's not gone through everything.

MS. DAHL: Uh-huh (Affirmative).

MR. PETERS: But if he picked up that case as a TFO through

the ATF...

MS. DAHL: Uh-huh (Affirmative).

MR. PETERS: ...would that go to anybody or is that still going to go to you?

MS. DAHL: It still goes to me.

MR. PETERS: Okay. So, for example, the subpoena I was working on was born out of -- it was one of these revocation hearings for a guy that had violated his parole, but they had discovered that the IP address, you know, at his house was -- someone at that IP address was downloading child porn.

MR. TURNER: Not him. Not me. I hadn't had a party that night.

MS. DAHL: And so what started out as a revocation case became an FBI investigation into this guy, [redacted] And because I was handling the revocation, I'm now helping FBI out on this. So it's technically not something that came from you guys, it was born out of this other thing, but that's kind of how that landed in my lap. So yes, long story short, does not matter, you can still give me cases.

MR. TURNER: Petey, wasn't one of these a guy did a robbery afterwards or...

MR. PETERS: I think that's [redacted]

MR. TURNER: [redacted]

MR. PETERS: [redacted] done a robbery, then we -- like I

***CONFIDENTIAL***

said, I've got to look at that one because we've arrested him again since 2020. It was just a month or a couple of months ago where he got -- with another gun and I think he done a robbery. I think that's [redacted]

MR. TURNER: Okay.

MR. PETERS: I'm pretty sure.

MR. TURNER: So he's on deck.

MS. DAHL: Uh-huh (Affirmative). He's on deck. And then it's just a matter of working through the list kind of backwards, you know, as we're now kind of chugging along. And then of course, you know, the list kind of changes because SIS calls me up and they're like, hey, you know, we need so and so to go now. Like Curt just gave me one that he wants to complaint later this week, and so that might bump someone else off the list depending on, you know, the amount of time I can get at Grand Jury, the amount of cases that I, you know, can feasibly amount in June, et cetera.

MR. PETERS: And June is the next one?

MS. DAHL: Uh-huh (Affirmative).

MR. PETERS: So let's say there is another case on [redacted]

MS. DAHL: Uh-huh (Affirmative).

MR. PETERS: Will you do those separate or can you do them together?

MS. DAHL: I can do it together.
MR. PETERS: Okay.
MS. DAHL: Yeah. Same indict' -- same defendant.
MR. PETERS: So we just need to -- I need to find out the day and get you that stuff.
MS. DAHL: Yeah, that makes it easy because it's the same person.
MR. TURNER: I guess our -- I'll support it, Kat, and maybe CID needs to look at the cases. We need to look at who might be our most violent offenders or who we think is -- and I know that's a guess sometimes when you're dealing with people that are using drugs and selling drugs.
MS. DAHL: Uh-huh (Affirmative).
MR. TURNER: But I know we've got two robberies on there that I guess they've already committed robbery or it was a robbery -- a gun case where they committed robbery. Is that right, Kevin?
MR. PETERS: Uh-huh (Affirmative).
MR. TURNER: So those two have already shown a propensity for violence, I guess.
MS. DAHL: Yeah.
MR. TURNER: You know, if you want to prioritize them, that might be something to take into consideration, I would guess.
MS. DAHL: Okay. Yeah, it would be...

MR. TURNER: And it's a guess at best, you know. I mean, I don't know what somebody is going to do no more than anybody else.

MS. DAHL: Right. You can only make your best judgment based on the facts you've got.

MR. TURNER: Yeah.

MS. DAHL: But yes, it would be really helpful for me if they kind of look over their cases and start kind of ranking them by which ones are a priority and which ones, you know, when we get to it, we get to it, more or less. So, you know, category of like, you know, just first tier, this one has got to go now.

MR. TURNER: Okay.

MS. DAHL: Second tier, I want you to, you know, look at this when you get a chance, but, like, not a priority. And then third tier, like, eh, look at this when you -- you know.

MR. TURNER: I've never been to Federal Grand Jury, thankfully. Are you allotted so much time or is that...

MS. DAHL: So it depends on, like, what everybody else has got in the office. Sometimes we've got other attorneys either -- on the rare occasion, like, let's say maybe 30 -- 20 or 30 percent of the time we'll have some random, like, people from D.C. that sometimes need, like, Grand Jury time. That doesn't seem to happen very often. And then

every once in a while depending on, like, if someone has got a case that needs to go immediately from one of the other offices, they'll sometimes have time as well. So really it just kind of -- it varies, you know, from Grand Jury to Grand Jury. So last month, we had some people down from D.C. that were taking up some time.

MR. TURNER: Okay.

MS. DAHL: And, you know, depending on if someone is indicting, like, a 30 person conspiracy where, you know, they might have one case, but it takes an hour, versus, you know, I might have five or six cases and it takes, like, 30 minutes. So it just -- it's really hard to predict. I can generally say that conservatively speaking, it's a good bet that I can get in at least 30 minutes, if not an hour, you know, for most Grand Juries. Now, depending on if it's, like, a multi -- I would say an hour -- I would budget probably an hour for, like, three cases that have multiple defendants. And then I could probably do three single count defendants in 30 minutes. And so I could do five or six of those in an hour. It just kind of widely varies.

MR. PETERS: What about Dalvin Robinson? We've got him this week.

MS. DAHL: He's indicted.

MR. PETERS: He's already indicted.

MS. DAHL: Yes.
MR. PETERS: So we don't have to worry about him.
MS. DAHL: Yes. He's got his initial appearance set for later this month.
MR. PETERS: Well, let me ask you this then because you said something there that kind of raised something up to me that if somebody calls, somebody might have to be bumped off the list or something like that.
MS. DAHL: Uh-huh (Affirmative).
MR. PETERS: And I know how some of those guys are down there, Stillwagon and a couple of them. Their cases are the most important thing going on.
MS. DAHL: Yeah.
MR. PETERS: So would it be easier if all of this went through Jeff rather than them individually calling you?
MS. DAHL: That -- that could work. That could potentially kind of help even things out because, I'll be honest, you know, like Jeff, and Will, and, you know, Curt probably most of all, you know, they've all got my cell phone number and they text or call me anytime they want to. And so it is sometimes a case of, you know, the squeaky wheel gets the grease, and...
MR. PETERS: Because I know Stillwagon wants all of his cases done right now, right this second.
MS. DAHL: Yes.

MR. PETERS: So I know that surprises you.
MS. DAHL: Uh-huh (Affirmative).
MR. TURNER: He's usually not like that.
MR. PETERS: No. Well, I'll do that then. I'll talk to Jeff and just have them start -- and Jeff can go through you on which cases are the most important...
MS. DAHL: Okay.
MR. PETERS: ...and which ones we need done right then.
MS. DAHL: Yeah, yeah. If he would provide me some context of like, this one, you know, needs to go now, and this one you know, take it or leave it, more or less, and anything in between, so...
MR. TURNER: Okay.
MR. PETERS: Are you good with that?
MR. TURNER: Yeah, I'm fine with it. You know, I mean, we've got '19 cases and '20 -- we've got 2019 and 2020 cases, but I know they've not had a Grand Jury, but they need to go sometime.
MS. DAHL: Well, I'll...
MR. TURNER: And again, you know, I would rather have somebody who, you know, has got an aggravated assault or a robbery go before somebody that's just, you know, a drug case.
MS. DAHL: Right, right. Yeah, I would generally agree with that as well, you know, the violent offenders are probably -- probably number one on the list.

***CONFIDENTIAL***



Case 2:22-cv-00072-KAC-JEM Document 82-11 Filed 02/06/24 Page 111 of 178 PageID #: 2357

MR. TURNER: Did you say Robinson, Petey? Is he the one here?
MR. PETERS: Dalvin. No, no.
MR. TURNER: Okay.
MR. PETERS: He's the one that hit Daughterty down there at the county and then we've been chasing him.
MR. TURNER: Yeah.
MR. PETERS: [INAUDIBLE] got him up here on felon in possession Monday -- Monday or Tuesday -- Monday.
MR. TURNER: That's the one we were looking for, wasn't it, for a while?
MR. PETERS: Uh-huh (Affirmative), yeah, yeah. They got him up there Monday. Jeff on his daily had said something about he worked on some stuff on it, so I just didn't know if he had already been indicted or..
MS. DAHL: He has, and he's awaiting his initial appearance on the 27th.
MR. PETERS: We don't have to worry about indicting him then. He's good.
MS. DAHL: He's ready to go.
MR. TURNER: Kat, did you play softball or anything in high school?
MS. DAHL: So I was on the swim team briefly.
MR. TURNER: Swim team?
MS. DAHL: But unfortunately was mostly a performing arts nerd.

MR. TURNER: You didn't play softball or anything?
MS. DAHL: I didn't. I did not. The closest I came to a team sport was volleyball.
MR. TURNER: Did you play softball when you were a child in your neighborhood?
MS. DAHL: Yeah.
MR. TURNER: You did?
MS. DAHL: Yeah.
MR. TURNER: Did you have a good arm?
MS. DAHL: No. Hence why I turned to swimming.
MR. TUNER: Well, we noticed a broken window down there at Sean Williams' garage. I just wanted to know if I needed to read you your rights before we continue on.
MS. DAHL: No.
MR. PETERS: I was wondering where you were going with that.
MS. DAHL: No.
MR. PETERS: I was wondering.
MS. DAHL: No.
MR. TURNER: We were just down there the other day.
MR. PETERS: I know. I've got a lot of things on my -- going on.
MS. DAHL: I'm pretty sure...
MR. TURNER: Kevin said, Kat might have thrown that rock through there.
MS. DAHL: I'm pretty sure if it was me, I would be down there

with pom-poms and strobe lights.
MR. TURNER: You know, we have a camera, so...
MS. DAHL: Right, right, exactly.
MR. TURNER: I was just wondering if you were out there.
MS. DAHL: Yeah. You know, I think if I decided to throw something at his garage, it would probably be bigger than a rock. And he is kind of -- he's gone, as far as the marshals are aware at this point. He was supposed to turn himself in and then freaked out.
MR. PETERS: He's fighting that.
MS. DAHL: Freaked out and is God knows where.
MR. TURNER: Well, he'll turn up. Don't worry.
MS. DAHL: Yeah.
MR. TURNER: He'll turn up.
MS. DAHL: Yeah.
MR. PETERS: I think what we're having is a lot of communication problems.
MS. DAHL: Uh-huh (Affirmative).
MR. PETERS: Things are not getting back to us.
MS. DAHL: Okay.
MR. PETERS: So I'm not trying to cause you any more work or anything like that, but let's say this June indictment goes in.
MS. DAHL: Uh-huh (Affirmative).
MR. PETERS: Can you just send me an E-mail on who got

indicted and then that way I can get in with the Chief and we know where we stand on these cases and everything?

MS. DAHL: Sure, sure.

MR. PETERS: Because evidently the information is not flowing to us.

MS. DAHL: Okay, yeah. I'm fine with that. Well, and, you know, I presume you guys have my cell phone number as well, you know. Feel free to call or text anytime. I know Curt and company take a little advantage of that offer, so...

MR. PETERS: Yeah.

MR. TURNER: And sometime along the line, Kat, we'll -- we will update the commission on your position. It usually helps if we can, you know, not go into specifics or names, but we can say I have indicted for, you know, a gun charge or robbery, you know.

MS. DAHL: Yeah.

MR. TURNER: But we can just kind of give them a little synopsis of, you know, what you're doing and how it is benefitting Johnson City. It's always good for the commission to hear that...

MS. DAHL: Yeah.

MR. TURNER: ...because part of, you know the grant money, they approved it to pay your salary and that type of thing, so it's just -- you know.

MS. DAHL: Right.
MR. TURNER: There's no real formal evaluation that I do, so it's just an update for the city manager to do that.
MS. DAHL: I've got you,
MR. TURNER: So we'll do that maybe in the summer sometime.
MS. DAHL: Okay. Sounds good. Yeah, just let me know when and I can kind of put together something on, you know, a summary of "X" amount of cases and all of that.
MR. TURNER: Yeah, that's fine. They don't want to hear too much. They don't -- they want to get it over with, so, you know...
MS. DAHL: That's fair. That's fair.
MR. TURNER: Mr. Overbey came -- he came down, I think maybe when Tom McCauley was -- that might have been the last time.
MR. PETERS: Yeah.
MR. TURNER: Because we got into COVID after that, but...
MS. DAHL: Right, right.
MR. TURNER: ...he had a chance to speak to the commission about, you know, our Special U.S. Attorney, and what it means for his office and for Johnson City. That's always good for them to hear that.
MS. DAHL: Oh, yeah, absolutely.
MR. TURNER: All right, Petey. Have we got any other...
MR. PETERS: No, no.

MR. TURNER: ...concerns about who is on the list? Like I said, I remember that one I think who committed a robbery or something after we had a case on him.
MR. PETERS: Yeah. I'm pretty sure that was [redacted] I know we've got more cases on him, but I'll -- I'll get that today and I'll give it to you.
MS. DAHL: Okay.
MR. PETERS: Since you're already going to indict him. He's been a thorn for a while. We just need to take care of him once and for all.
MS. DAHL: Right, right, right.
MR. TURNER: I was surprised Sean Williams didn't take the Pantera with him -- I mean the kit car with him.
MR. PETERS: It's still sitting down there.
MS. DAHL: The blue car is gone, which I thought was interesting, that belongs to his friend, like the Ford LTD.
MR. PETERS: Yeah, [redacted]?
MS. DAHL: No, I think it -- so it belongs to this other guy named [redacted]
MR. PETERS: Oh, I don't know. I haven't heard of him.
MS. DAHL: I have no idea.
MR. TURNER: He probably didn't want them running the tag on something and find out it's him.
MR. PETERS: Yeah.

MR. TURNER: As far as...
MS. DAHL: Yeah.
MR. TURNER: ...I can lay low if I'm in somebody else's car.
MS. DAHL: Yeah, yeah.
MR. TURNER: He'll probably lie about who he is if he gets stopped or something.
MS. DAHL: I'm sure. I'm sure the marshals will eventually pick him up.
MR. TURNER: He'll turn up.
MS. DAHL: I got a call from Spurrell. Apparently he was suicidal when he went on the run and was saying or, like, telling Don that, well, he's going to get some -- you know, he said he's just going to kill himself.
MR. TURNER: I'm going to call Don and say, Don, you know Williams is going to get a huge sentence, don't you?
MR. PETERS: I thought Spurrell -- Bowman was his attorney.
MS. DAHL: Apparently he's been talking to both and, like, didn't formally retain either, so...
MR. PETERS: The last time we got with him it was Bowman.
MS. DAHL: Yeah. Apparently he was making multiple calls to multiple attorneys.
MR. PETERS: Apparently we've got him on the run and a little uneasy.
MR. TURNER: Yeah. I was about to play tennis with Spurrell the other night. I could have mentioned something.

MR. PETERS: Maybe you could have hit him in the chest.
MR. TURNER: Spurrell is a pretty good player.
MR. PETERS: Is he?
MR. TURNER: Yeah, he is. That doesn't mean I couldn't hit him in the chest. I could try. I'm not that good. My aim is not that good. I could ask him about that. Do you know that Sean Williams guy? Have you ever heard of him? He's looking down the barrel.
MS. DAHL: Yeah.
MR. TURNER: He ain't going to kill himself. He likes his damn self too much.
MR. PETERS: Yeah.
MR. TURNER: Hell far. He ain't going to kill himself.
MS. DAHL: Yeah, yeah.
MR. TURNER: There's too many college girls out there in the world.
MS. DAHL: Yep, absolutely. I think he has too high of an opinion of himself.
MR. TURNER: Oh, yeah. He's skated by in life on probably lots of things.
MS. DAHL: I know.
MR. TURNER: He just needs to calm down. He'll get over it.
MR. PETERS: Oh, I think I see it now. Bristol -- Bristol -- Diante Bristol is the one that's got the robbery. It's got robbery beside his name. I didn't see that a minute

ago.

MR. TURNER: Yeah, he and [redacted] and [redacted]...

MS. PETERS: Yeah. I'll have to -- I don't remember them by name. I'll have to look those up.

MS. DAHL: I'll put a star by him.

MR. PETERS: I'll have to see what those are.

MR. TURNER: I don't know if it was a robbery case or he's done a robbery after.

MR. PETERS: I would have put that out there because it was involving a robbery. But, now, [redacted] has got a robbery too since -- since that case.

MR. TURNER: [redacted], I don't know him, do you?

MR. PETERS: I don't either.

MR. TURNER: I don't know who a lot of these are. What's the range for Mr. Williams?

MS. DAHL: Well, probably not great with it just being an ammunition case and with him having very minimal criminal history. He's probably looking at -- I think when I ran the guidelines, like, two to three years, maybe four. Now, of course, there's always the possibility for an upward departure, you know, depending on the facts with, you know, the assault cases in his past. That's something that I could potentially look into pursuing as well. But just from the ammunition, he's only looking at two or three years, I would say.

***CONFIDENTIAL***

MR. TURNER: Two or three years?
MR. PETERS: We're living rent free in his mind right now. That's worth it.
MR. TURNER: I wouldn't have to worry about him.
MR. PETERS: No, I wouldn't either. Just the aggravation we're causing him right now is worth it, and we got him out of Johnson City.
MR. TURNER: Two or three years, Kat, I'll be at the lake every day hopefully, so...
MS. DAHL: Yeah, yeah.
MR. TURNER: That would be good. Yeah, whatever we can get with him, that would be great.
MS. DAHL: Yeah, yeah.
MR. PETERS: I think we've achieved our desired outcome already.
MR. TURNER: If he stays gone a year and then they get him, I really won't have to worry about him.
MR. PETERS: That's even better.
MR. TURNER: Then he maybe gets a couple of years and I'm done with him.
MS. DAHL: Yeah, yeah.
MR. PETERS: Then we'll go down and throw rocks at the windows.
MR. TURNER: Yeah. I can put him on my protest list.
MR. PETERS: Yeah.

MR. TURNER: People I'm going to protest when I retire. I've got a pretty good list.
MS. DAHL: Oh, I'm sure.
MR. TURNER: I can exercise my first amendment rights after I retire.
MS. DAHL: Yeah, there's a few that would probably be on my list as well.
MR. TURNER: All right. So Petey, we're going to kind of prioritize?
MR. PETERS: Yeah, and I think that's going to be a better way of doing it is just one person communicating with her on cases that we need done. Get Jeff -- get Sergeant Legault to do it. I think that's going to -- that way people aren't being bumped up more important just because Stillwagon wants them bumped.
MR. TURNER: Yeah. Kat, I don't want to put you in the position to have to ignore Stillwagon all the time.
MR. PETERS: I ain't saying nothing bad about Stillwagon, just Stillwagon thinks his cases are the most important thing going on and he's eager.
MR. TURNER: You know, I'd rather have somebody that's passionate than somebody than somebody that...
MR. PETERS: Oh, he's passionate, yeah.
MR. TURNER: ...you've got to kick in the butt to do something.

MR. PETERS: I mean, I'm glad to have him.
MS. DAHL: That's very true, very true
MR. TURNER: Legault can ignore him instead.
MS. DAHL: That's fair. Yeah, he's -- he's the one that's definitely blowing up my phone probably the most, weekends, holidays.
MR. PETERS: Yeah, I think that will work.
MR. TURNER: Legault -- Legault will take care of that, too.
MR. PETERS: Yeah.
MR. TURNER: You know, I don't mind him calling you if he needs advice or things like that, but otherwise...
MS. DAHL: Oh, I don't care. I told all of them that, you know, that's what the cell phone is there for, you know, so -- and the more that they -- you know, the more that they text me or call me, that's, you know, easier for me too to kind of keep tabs, just especially when we're still in this kind of weird hybrid bouncing between, you know, tele-work and office work, you know. We're, I think, I would say, I'm 50 to 60 -- 60 to 70 percent in the office, back to, but still tele-working, like, maybe two days a week. So when they text me, you know, that helps me as well.
MR. PETERS: All right.
MR. TURNER: Anything else going on with SIS that you can share with Kat? I don't know of anything pending.

MR. PETERS: No, I mean, there's always cases going on, but I don't know if they've got anything big right now.

MR. TURNER: All that marijuana was in State court, wasn't it?

MR. PETERS: Uh-huh (Affirmative).

MS. DAHL: It was.

MR. PETERS: Yeah.

MS. DAHL: [redacted] is probably going to go to trial next month -- well, possibly next month. His attorney just filed another continuance, but he's -- I'm 99 percent sure he's going to go to trial.

MR. TURNER: [redacted], is that the one...

MS. DAHL: [redacted].

MR. PETERS: [redacted]. That's the one we took to Chattanooga -- gave a free ride to Chattanooga and then he come back up here.

MR. TURNER: Isn't he the one -- didn't they get him down around the river or something or was that another guy I'm thinking of?

MR. PETERS: No, you're thinking of [redacted] that got out on the river and then was going to drown and we had to go get him. Yeah, that was [redacted]. No, [redacted] is from Chattanooga. He's a thorn in our side. He was the one that had information on the...

MR. TURNER: Yeah, the murder.

MR. PETERS: The murder. And we got out of jail, and took him

to Chattanooga, and left him down there, and then he come right back up here.

MS. DAHL: Well, he's looking at at least 15 because he's a career criminal.

MR. PETERS: That's good. He needs to go.

MS. DAHL: And with his guideline range, if he goes to trial, he could be looking at, like, 25, so...

MR. TURNER: He's not going to take a deal though, huh?

MS. DAHL: No, no. I offered -- I offered him 16, and I think he's going to go to trial. Which if he goes to trial, then he's going to get probably around 25, and I'm probably going to ask for a upward departure to make it around -- you know, tack on as much time as I can get, so -- and I wouldn't be surprised if he got a serious upward departure granted with everything that's in his background. We've got, you know, suspected homicide, we've got suspected rape, we've got the dog killing, you know.

MR. TURNER: He's done all kinds of crap, hasn't he?

MS. DAHL: Uh-huh (Affirmative).

MR. PETERS: He's the one that complained on SIS that we had to get Keller to -- you know.

MR. TURNER: Yeah, yeah.

MS. DAHL: He was going to contact...

MR. PETERS: After he had already sent a letter saying if you

don't do this, I'm going to complain on you.

MS. DAHL: Yeah, that's him.

MR. TURNER: Yeah. He's the one that said they planted drugs on him or something, wasn't it?

MR. PETERS: Yeah, they were going around planting guns and drugs on people.

MS. DAHL: Yeah, that's him. He's a lovely, lovely person. So, I think after -- because, you know, with sentencing you can bring in just about anything and I was going to drag out probably everything that's in his background, and even bonus points for, you know, at that point I'll be able to put on the CI who can tell the judge all about how he murdered her dog. She's very upset about it. I'm sure that will not play well either.

MR. TURNER: That was like a Godfather moment, wasn't it? He was sending a message or something?

MR. PETERS: I guess.

MS. DAHL: Yeah. He's a real piece of work. Well, if you have anything else for me, you know, please let me know.

MR. TURNER: Well, we're just trying to figure out where we're at and make sure that the Grand Jury is going to go again. The CDC is allowing all kinds of good stuff to happen.

MS. DAHL: Yes, finally. We're allowed in the office without masks. Now, we're still having to wear them in court, but in our office, we're allowed to not wear masks anymore if

you're fully vaccinated, a caveat.
MR. TURNER: Well, Kat, do you need anything from us?
MS. DAHL: No, I think that's about it.
MR. TURNER: Well, thank you. We're glad we got those indicted and some coming up.
MS. DAHL: Yeah, yeah. I'm relieved that we're finally kind of clawing our way back to some semblance of normalcy.
MR. PETERS: Sounds good to me. It looks like we're on the right track here.
MR. TURNER: You know, I talked to Ashley Ellenburg -- remember that group we took a picture of down in the breezeway?
MR. PETERS: Yeah.
MR. TURNER: She said a lot of them got released from Red Onion Prison, ended up on a bus to Kingsport, and Kingsport said they've got free shit in Johnson City, and here they are.
MR. PETERS: Imagine that. That's all we needed.
MR. TURNER: So they made a bus trip from Virginia, I guess, to Kingsport and here.
MS. DAHL: Oh, goodness.
MR. TURNER: I don't know how they got let out, but anyway...
MS. DAHL: Huh.
MR. PETERS: Well, that girl that Shane polygraphed yesterday for the jail used to work at Red Onion. I wouldn't hire

***CONFIDENTIAL***

her.

MR. TURNER: That bad?

MR. PETERS: Well, she quit up there because evidently there was an internal going on, so she just quit going to work. They kept trying to bring her in for the internal. But when Shane pressed her on what the internal was, she goes, well, it was either for my friend that works there who was sleeping with one of the inmates, or my husband who was selling drugs

MS. DAHL: Oh, boy.

MR. PETERS: It's her ex-husband now, but it was her husband at the time.

MR. TURNER: So it was either for her sleeping with an inmate or her ex-husband selling drugs.

MR. PETERS: For her friend she said was sleeping with an inmate.

MR. TURNER: But it was actually for her.

MR. PETERS: Yeah, there you go.

MR. TURNER: Yeah.

MR. PETERS: I believe I would stay away from her if I was you.

MS. DAHL: Lord, have mercy.

MR. TURNER: Kat, thank you.

MS. DAHL: Yeah, absolutely. Well, let me know if you...

MR. TURNER: We'll try to put a filter up a little bit.

MR. PETERS: Yeah, maybe we can start prioritizing.
MS. DAHL: A Stillwagon spam filter.
MR. TURNER: Yeah. I mean, I don't care if they text you on the case or something, but you can only prosecute so many at a time, I guess, if it's Grand Jury, right?
MS. DAHL: Correct, correct. Unless you guys want to tack on a travel budget for me to go up to Knoxville and Chattanooga on a regular basis.
MR. TURNER: Tell McCauley to give up his time. We know he's not doing anything.
MS. DAHL: Will do. I'll just start giving my...
MR. TURNER: We'll blame it on Tom. Let's blame something on Tom.
MR. PETERS: He needs it.
MR. TURNER: Tom, quit taking up all the time of the Grand Jury so we can get some cases closed.
MS. DAHL: All his.
MR. PETERS: You know he's just in there telling stories anyway.
MS. DAHL: Yeah. All his multi -- fancy multi count conspiracies. All right. Well, let me know if you guys need anything or, you know, whatnot. If you have any pressing issues or...
MR. TURNER: We'll check on those robbery cases.
MS. DAHL: Great. Yeah, just let me know.

MR. PETERS: Yeah. I'm going to check on this one for sure because I know he's got more stuff since then.
MS. DAHL: Yeah, yeah. Well, he's next to go, so good deal.
MR. TURNER: All right. Thank you, Kat.
MS. DAHL: All right. Thank you.
MR. TURNER: Goodbye.
MS. DAHL: Do you want this open or closed?
MR. TURNER: If you'll just close it, please. Thank you.
MS. DAHL: Excuse me, sorry.
UNKNOWN FEMALE: Would you like a bottle of water or anything?
MS. DAHL: A bottle of water would actually be wonderful.
UNKNOWN FEMALE: Or we've got green tea, too.
MS. DAHL: Oh, thank you.
UNKNOWN FEMALE: It's kind of warm out there today.
MS. DAHL: I know. I said that. I was, like, well, we've had such a cool spring that this is a shock to the system.
UNKNOWN FEMALE: I know. I know, it is. Yeah, it is.
MS. DAHL: You have a good one.

THIS CONCLUDES THE TRANSCRIPT OF
RECORDING 1108 - DAHL/TURNER/PETERS

******

***RECORDING 1109 - DAHL/CHIEF KARL TURNER***

MS. DAHL: Hi. I'm here to see Chief Turner.

UNKNOWN FEMALE: Kat, right?

MS. DAHL: Yes.

UNKNOWN FEMALE: Ms. Kat is here. Do you want me to send her in? Okay. We have some water or tea in the fridge if you want.

MS. DAHL: I'm good, but thank you.

UNKNOWN FEMALE: Okay. Just come on in.

MS. DAHL: All right. Hi.

MR. TURNER: Hi, Kat, how are you?

MS. DAHL: I'm good. How are you?

MR. TURNER: I'm all right. Do you want something to drink, water or something?

MS. DAHL: No, but thank you.

MR. TURNER: Green tea?

MS. DAHL: I'm not much of tea drinker so...

MR. TURNER: I don't know what else we've got out there. Coffee?

MS. DAHL: Yeah. No, I'm good, but thank you. So yeah, I had just -- let me grab my notebook real quick. I just wanted to touch base with you about the -- as I mentioned on the phone, I want to get, you know, an explanation kind of for the decision not to renew, just so I could get some insight. So I was wondering...

MR. TURNER: Okay. I guess there's a couple of things. Basically, one of them is I think there were some communication issues that -- and that's officers communicating with you and getting a timely response.
MS. DAHL: Okay. Now, when I communicated mostly with SIS, you know, they -- they had my number and they would text or call me all the time. When I asked them about communication issues, they said they didn't have any.
MR. TURNER: Well, they're telling me a different story. I'll put it that way.
MS. DAHL: Okay.
MR. TURNER: That was part of the concerns was, you know, we had talked about a search warrant, for example, with Williams. I think Toma had reached out to you about that search warrant, and there was some breakdown there.
MS. DAHL: So, right, correct. I do think there was some breakdown there, you know, especially given the fact that I spent a significant amount of my time asking Toma -- and I did not bring this up at the time because I didn't want to be the one to throw him under the bus, but, you know, communication goes both ways. You know, I tried to get that search warrant turned around in a timely manner, but the fact remains is that I was given that case in November and he didn't give me the stuff that I needed until I think it was, like, January, so there was that.

***CONFIDENTIAL***

MR. TURNER: Uh-huh (Affirmative).
MS. DAHL: And I didn't want to be the one to, you know, be that person, but I definitely spent a significant amount of my time trying to get him -- and, you know, at the end of the day, too, it wouldn't have mattered because even if I had gotten everything that day back in November and turned around, you know, the research the following day, it would have been too stale.
MR. TURNER: Yeah. And I think that was in an E-mail that he sent. That was my question was -- because I looked at the dates on it and I said, I don't know if this thing would have worked out anyway.
MS. DAHL: Right.
MR. TURNER: But I think Heather tried to contact you about some information for the grant, and she talked to you on the phone, I think, about the number of prosecutors. Do you recall that conversation?
MS. DAHL: I do. The last that I recall that I talked to her was -- and this was last year. I mean, this was, like, last summer was the last time.
MR. TURNER: Yeah. She had E-mailed you for some information that we have to use for a grant report about the number of cases.
MS. DAHL: Right. And at that point, I told her, because she was looking for -- I believe this conversation was, like,

***CONFIDENTIAL***

in June of last year, if I recall correctly.
MR. TURNER: Uh-huh (Affirmative).
MS. DAHL: And at that point she was asking me for indictment numbers, I think it was from January through June, and I recall giving them verbally to her. I was, like, I have only indicted "X" number of cases, but that was right when COVID had hit and everything was completely...
MR. TURNER: She had E-mailed you some -- there's some questions that we have to answer on the grant.
MS. DAHL: Okay.
MR. TURNER: We needed your response on them.
MS. DAHL: Okay.
MR. TURNER: The -- you know, we talked the other day about the Federal Grand Jury and about the indictments.
MS. DAHL: Right, right.
MR. TURNER: And, you know, we had agreed on the cases that were going to be indicted.
MS. DAHL: Right, and I spoke to Legault about that. So Tommy Nelson had already been indicted. I went ahead and indicted Demetrius Bolden because he's been at the top of the list for quite some time. And I spoke to Legault about the fact that, you know, the reason I had wanted to -- I had wanted to get originally, like, four or five cases through. I ended up...
MR. TURNER: And that was our conversation with Kevin and I.

***CONFIDENTIAL***

MS. DAHL: Right, right. And the reason I was only able to get one through is because I thought I was going to be in trial. You know, up until I think it was three days before Grand Jury, I was supposed to be in trial that -- that day.
MR. TURNER: Uh-huh (Affirmative).
MS. DAHL: And that was supposed to be my -- it was the Melvin Chism one. And, you know, that was going to be -- that was supposed to be my first trial. I had spent a significant amount of time preparing for it because I was supposed to, you know, second chair. I was going to give opening and all of that jazz. So I had spent a lot of time -- you know, a lot of my time had been devoted to that, so...
MR. TURNER: Okay.
MS. DAHL: I'm just -- I guess I'm just curious because when we had talked on May 19th...
MR. TURNER: And -- I'm sorry. Let me -- I'm sorry.
MS. DAHL: Oh, yeah, yeah. Go ahead. Go ahead.
MR. TURNER: And I talked to Wayne a couple of times. And I don't know if Wayne talked to you or not, but I called Wayne about some of the issues that we were having at the time. I asked Wayne if he could speak to you. Did he speak...
MS. DAHL: Right, but that was back in January or December, I

think, and we did talk about it. And I never got the impression that, you know, the issue hadn't, you know, been resolved. I, you know, communicated to Legault, you know, why I wasn't able to get people through for this last Grand Jury. I guess I'm just a little bit curious because we'd had conversations about these types of things and I've -- you know, I've tried to explain why some of the things are the way that they are. And I apologize on, like, the -- you're going to -- forgive me, you're going to have to remind me of her name. I'm so bad with names. The -- she reached out to me about the stats.

MR. TURNER: Heather.

MS. DAHL: Heather, yes. So, you know, with things like, you know, Heather, I certainly apologize. But I am a little bit curious because, you know, when we talked on May 19th, there really wasn't any indication on your part that you had intended not to renew or that you were significantly unhappy with my performance. So I guess I'm just a little bit confused, especially given the fact that I had a trial set for September.

MR. TURNER: Well, I guess the thing that really concerned me the most is when we met about the Grand Jury, and those were cases that you told us you were going to present.

MS. DAHL: Right.

MR. TURNER: Those were the ones that you picked out.

MS. DAHL: Right. And then I told, you know, Jeff -- I was, like, look, I've got this first trial coming up.
MR. TURNER: And Kevin -- Kevin Peters had E-mailed you about that several days ago.
MS. DAHL: Right, and I got his E-mail.
MR. TURNER: And we never got a response back. It always seems like there's not a timely response.
MS. DAHL: Right. Well, and like I said, I did communicate to Legault about that and to, you know, Curt when he was up there for Grand Jury. And I apologize for not, you know, reaching directly back out to Kevin. I figured since Legault -- since you all had told me that this was all going to go through Legault, I thought it was sufficient enough, you know, to...
MR. TURNER: Well, I think he had some case files that he needed to get to you or ask you questions about. There was some communication between Kevin that had to do with some case files and that's why he E-mailed you. As far as I know, I mean, he still hasn't got a response.
MS. DAHL: So the only thing Kevin had E-mailed me about was on Tommy Nelson, and I had been mistaken when I had told you he hadn't been indicted. You know, I guess that was just my -- you know, all of these -- I guess all of these, they all start to blend together at some point, you know, felon in possession and felon in possession.

MR. TURNER: I understand.
MS. DAHL: All of that. And so I had already indicted Tommy Nelson, and so I made a mental note of it, but I was, like, okay, well, that was, you know, kind of taken care of anyways because he had been indicted, I think, in May.
MR. TURNER: And I don't know if that's who the case file was.
MS. DAHL: It was.
MR. TURNER: He just said that he had E-mailed you and he had some information, or was going to ask you for information about case files, or that he needed to get those to you...
MS. DAHL: Yeah.
MR. TURNER: ...or whatever the case may be.
MS. DAHL: I've got you.
MR. TURNER: And, I mean, sometimes I guess we communicate by phone and sometimes we communicate by E-mail.
MS. DAHL: Right, right.
MR. TURNER: And it just didn't seem like there was, you know, a back and forth...
MS. DAHL: Right.
MR. TURNER: ...in a timely manner as far as being efficient.
MS. DAHL: Right. Well, and I -- again, I apologize, because you had conveyed to me that you wanted this communication to go through -- through Jeff, and so I thought my response to him had been sufficient, so that was a misunderstanding, I guess, on my part.

***CONFIDENTIAL***

MR. TURNER: Well, I think that Kevin talked about if you would get with Jeff to prioritize what cases needed to be presented...
MS. DAHL: Right.
MR. TURNER: ...as far as any Grand Jury.
MS. DAHL: Right, right.
MR. TURNER: What we would need to prioritize from our side.
MS. DAHL: Right,
MR. TURNER: And that doesn't mean that that's the way it should be. I mean, again, you may have information that we don't know about that would make us reprioritize things, but -- and I think Kevin wanted to communicate with you just to make sure that those things were happening and that you had sent him the cases that had been presented for the Grand Jury.
MS. DAHL: Right.
MR. TURNER: And the one you presented, I think Tom -- that was a case that Tom McCauley had worked. Is that right?
MS. DAHL: Yeah, it was very old.
MR. TURNER: I mean, I understand COVID, and I understand the fact that you weren't in the office, but I guess you were working from home. In my mind, I mean, that would have been the time to look at cases to prepare for the Grand Jury when it did reopen.
MS. DAHL: Right. Well, we did, and I had been. You know, it

was also -- there were also a lot of other different things that were coming around as well, you know, responding to cases that were already in, you know, court, you know, revocations, things -- things of that nature. So, you know, I...

MR. TURNER: And I know it's difficult to work from home, because it would be for me as well...

MS. DAHL: Right.

MR. TURNER: ...to not have access to certain things. But, I mean, you know, there was -- I guess there were opportunities too for you to be here.

MS. DAHL: Okay. Well, I wish I had known that because that was -- you know, and I'll be honest too, I was trying to be very careful with COVID because of my asthma.

MR. TURNER: Uh-huh (Affirmative).

MS. DAHL: And so that was a deep concern of mine just because I have been hospitalized for pneumonia in the past and it's not fun. So, you know, I wish -- but I wish someone had, you know, communicated to me that they would have liked me in a little bit more because that was never -- it was never really conveyed. So, yeah.

MR. TURNER: I think it was conveyed when we hired you. We talked about -- we set up a desk for you, you know, outside of our SIS.

MS. DAHL: Right. No, I meant, like, under, like, COVID, you

know. I'm not talking about, like, you know -- I mean, like, kind of under COVID when everything was very weird. So, you know, at least for me that had changed the game a little bit, so...

MR. TURNER: Sure, and I understand that. And I know that they're -- I guess they didn't have some Federal Grand Juries during that time as well.

MS. DAHL: Correct. Well, I mean, we had -- we didn't have Grand Juries, and then when we did, we only had one for the whole district. And so it was always a fight to get any sort of time in. So, you know, I remember there was one time where they sent out a notice that there was going to be a Grand Jury in Knoxville, and like 15 minutes later they sent out an E-mail saying, oh okay, it's full. So it was a very -- I think at the time I compared it to The Hunger Games, if you've ever seen that movie, or Gladiator.

MR. TURNER: Yeah.

MS. DAHL: Try to get a spot in. So, you know, it did prove to be kind of difficult in that manner. But yeah, I just wanted to get, you know, some insight just because I was a little bit, you know, taken aback between -- between our conversation on May 19th and...

MR. TURNER: And part of that is my fault because when the check request came and we started looking at the MOU --

and I should have looked at it earlier, and I take responsibility for that.

MS. DAHL: Uh-huh (Affirmative).

MR. TURNER: And I apologize for that. But the MOU, it doesn't expire when, I think, you were hired. I think it's -- it's our fiscal year.

MS. DAHL: Yeah.

MR. TURNER: And if you look at the document, that's what it says.

MS. DAHL: Right.

MR. TURNER: I just think that -- I just think we have to go a different direction.

MS. DAHL: I've got you, okay. Well, I appreciate, you know, you giving me a little bit of insight to that. As far as what I should sign for the extension, is there...

MR. TURNER: I've got a document if you want to look at it.

MS. DAHL: Sure, sure.

MR. TURNER: It will run through the 30th of July.

MS. DAHL: Okay.

MR. TURNER: And Sunny drafted that, so if you have any questions...

MS. DAHL: Okay, okay.

MR. TURNER: That's the only copy that I have.

MS. DAHL: Great.

MR. TURNER: This is the copy I have.

MS. DAHL: Great. Okay, great. Do you mind if I make a copy of this once I sign it?

MR. TURNER: No. No, not at all.

MS. DAHL: Okay.

MR. TURNER: And if you -- Kat, if you need some time to look over it just to see if you're satisfied with it.

MS. DAHL: Oh, okay. You have -- do you have a blue pen, by chance? I have a green pen with me, but I always prefer to sign in blue or black ink.

MR. TURNER: I've got black.

MS. DAHL: That works. I just didn't want to sign in green necessarily. There you go.

MR. TURNER: Do you want a copy of it now?

MS. DAHL: Yeah, that would be great. There's your notebook and your pen.

MR. TURNER: I'll have her make a copy [INAUDIBLE]

MS. DAHL: Okay.

MR. TURNER: I'll give it to you. Do you want a copy after we both signed this?

MS. DAHL: Yeah, that would be great.

MR. TURNER: Okay.

MS. DAHL: Okay, okay.

MR. TURNER: I'll just get you a copy of this.

MS. DAHL: Okay, okay. Well, I certainly appreciate, you know, you taking the time to just, you know, sit down and

talk.

MR. TURNER: Well, thank you for everything you've done for us.

MS. DAHL: Yeah, yeah, absolutely. Thanks.

THIS CONCLUDES THE TRANSCRIPT OF

RECORDING 1109 - DAHL/TURNER

******

***RECORDING 1110 - DAHL/JEFF LEGAULT***

MS. DAHL: Hey.

MR. LEGAULT: Let me get my dog some water.

MS. DAHL: Cool. Sweet baby. Hey.

UNKNOWN MALE: What's up?

MS. DAHL: Not much.

UNKNOWN MALE: People are saying you did a good job out there.

MS. DAHL: Aw.

**RADIO CALL***

MR. LEGAULT: Yes. Hey. Yeah, call -- call 911 because I'm on -- I'm in the middle of a search warrant. All you can do is -- all you can do is try. Yeah, just let -- does he know -- I assume he knows you're following him. I've got you. Yeah, just call 911. I can't help right now because I'm in the middle of a search warrant. See if they'll send somebody out there. We don't have any charges on him. He may -- he may have something, like a violation or something that I might be able to have our PIN center run and check and see if he's got that. Oh, well that's enough that we'll come out there. Just call and tell them that he's got a parole violation, they'll send somebody out there. Yeah, they'll send somebody for that. All right. Thank you. Bye.

***RADIO CALL ENDS***

MS. DAHL: Sorry.

***CONFIDENTIAL***

MR. LEGAULT: I've got one more thing.

MS. DAHL: You're good.

***CHIEF KARL TURNER ENTERS***

MR. TURNER: Kat...

MS. DAHL: Oh, thank you.

MR. TURNER: There's your copy. It doesn't have the date on it. I'll put the date on it when Mr. Peterson signs it.

MS. DAHL: Okay.

MR. TURNER: And that's also a copy of the letter that I had mailed to your house, okay?

MS. DAHL: I've got you. Okay. Great.

MR. TURNER: So there's those two things for you.

MS. DAHL: Thank you.

MR. TURNER: Okay. Thank you.

MS. DAHL: I appreciate it.

***CHIEF TURNER EXITS***

MR. LEGAULT: I've got to make one phone call.

MS. DAHL: Sure, go ahead. I kind of barged in on you just because I was talking to Turner.

MR. LEGAULT: Do what?

MS. DAHL: I said I barged in on you because I was talking to Turner, so...

MR. LEGAULT: I've got you.

***PHONE CALL***

MR. LEGAULT: Hey, is this Mr. Sanford? Hey, this is Sergeant

Legault. I'm giving you a call back. I guess they wanted you -- one of us to give you a call. Okay. I was out there when -- when you all pulled back in. Did you -- did you need me to call you? Oh, okay. You're her brother, I guess. Okay. Well, basically there's -- I mean, without going into a lot of details, there's an investigation that was going on through the post office that turned out to be a methamphetamine case that was getting delivered there, and so basically right now, I guess -- is that your mom and dad or just -- yeah. They're being both arrested for felony possession of methamphetamine, and because there's children in the house, there will be a charge of child neglect. Oh, way over a Federal amount, yeah. It was a Federal amount, yeah. So right now what it is is we're going to hold it as a State case until the DEA and Homeland Security pops up the indictment to take it to a Grand Jury to Federal Court. That's correct, that's correct. And apparently this isn't their first package. This isn't their first package they've gotten there, so. It's in a different name. I can't tell you the name, but it was a different name, yeah. So they'll have a bond here shortly. They're at our police department where the investigator is typing up the warrant for them right now, and then they'll be going to Washington County. They'll have a bond. I can't tell you what it is right now

because we don't sign -- we don't assign the bonds. The magistrate or the judge will assign the bonds. So you should know something here within the next hour or two what their bond is. As soon as we get them down there, they'll be allowed to call and they can contact you then, I guess. It shouldn't be -- I think he's about to wrap up, so it shouldn't be another hour or so, I wouldn't think. I mean, you can. I mean, you would probably have to wait for them to get booked in and everything before they'll have visitations. But yeah, that's Washington County down right off -- right in Jonesborough, yes, Washington County in Jonesborough. Like I told -- like I told your sister, the best thing to do so you'll save yourself some time is just to call down there in, like, an hour and see if they have been down there and what their bond is. If they're still not there, maybe call back in another hour and see what their bond is. But they should be down there within an hour or an hour and a half, I would think, and you should know what their bond and stuff is. I'm not sure how long DEA and them has been watching it. We just kind of help with them. We're just charging them on a State level right now, just so that they -- until they can get their charges together for Federal court. So basically the State charges will eventually be dismissed. Correct. You're welcome. Goodbye.

***PHONE CALL ENDS***

MS. DAHL: Hey.

MR. LEGAULT: Hey. Do you want to shut that?

MS. DAHL: Sure. So I assume you have heard.

MR. LEGAULT: I have. I have. I didn't intentionally blow your phone calls off the other day. I was actually off -- off work.

MS. DAHL: That's okay. I knew you wouldn't intentionally.

MR. LEGAULT: Stillwagon told me what was going on. You know, I was told not to say anything or do anything until Chief spoke with you, so that's why I was, like, I kind of knew what you were calling for and I was, like, I need to stay out of this for right now.

MS. DAHL: Yeah, I've got you. Yeah, so I kind of got the feeling that you guys didn't know this was coming down the pipeline.

MR. LEGAULT: Not all the way.

MS. DAHL: I've got you. So I'm just curious because -- so one of the reasons I was talking to Turner was I was, like, can I get an explanation, you know, on this.

MR. LEGAULT: Sure.

MS. DAHL: And he was like, well, you know -- the one thing that kind of -- that bothered me -- well, there were other things, but the thing that really bothered me was he was like, well, the detectives were telling me, like, you

weren't communicating with them and blah, blah, blah. And, you know, we'd had the conversation back I think it was like December or January where he had -- Chief had brought up communication. And I reached out to you and said, do you have a problem with how I communicate? And I asked Curt, and I asked Will, and all of you said no. You know, so I'm a little bit -- and so when I -- and I brought that up to Chief. I said, well, I talked to them back when we had that initial conversation and they said they didn't have issues with me. And he was like, well, that's not what I was hearing. And I was like, okay, well someone is not being straight with me then.

MR. LEGAULT: So he kind of put me on the spot and called me today when I was in the middle of a search warrant. And I'm just going to be honest with you.

MS. DAHL: Yeah. No.

MR. LEGAULT: He said, how many times have you spoken with Kat and there's not been a timely response? And I was like, timely, I mean, that can be many things. That can be an hour...

MS. DAHL: Yeah.

MR. LEGAULT: ...a day, two days, three days, you know. I don't know what you're asking in particular. So I said probably since you've worked here, I said, maybe six times where you may have went a day or two and I hadn't heard

***CONFIDENTIAL***

from you.

MS. DAHL: Okay. Six times total over the past two years.

MR. LEGAULT: So that's -- and I just sent him a text and said, probably six times for me. I don't know. I said, Stillwagon may be the same. I don't know. But...

MS. DAHL: Okay. Well, look, I kind of figured that already that, you know, this wasn't you bitching. I just wanted to make sure. Just because, like, you know, you -- I feel like you -- look, I think I've been on good terms with all y'all down here, or at least I felt that way.

MR. LEGAULT: Kat, I mean, here's the thing. I think we -- COVID...

MS. DAHL: Yeah.

MR. LEGAULT: ...was a nightmare for you and probably...

MS. DAHL: Yeah.

***PHONE CALL***

MR. LEGAULT: I cannot talk to her right now.

MS. DAHL: No.

MR. LEGAULT: That's the lady that's -- it's a bail bondsman following somebody around everywhere.

MS. DAHL: Oh, God.

MR. LEGAULT: I don't know. I can -- I have to take this.

MS. DAHL: No, you're good, you're good.

MR. LEGAULT: Sergeant Legault. Yes, sir. Yes, sir. Yes, sir. Good question. I think it went with your sister,

maybe, because your children were holding it. If not, it's still in the house, so you might want to call your sister to see if they have it. If not, it's back in the house. That's a good question. There was a black cat out on the porch, but that's a good question about the dog because it came out. I know that your mom was holding it, and then I think I turned around and the next thing I know your sister was there picking up the children. I don't know where the dog went from there, so I think your sister may have it. You're welcome.

***PHONE CALL ENDS***

MR. LEGAULT: Along with everybody else down there, unfortunately, COVID probably cost you a lot of cases. I'm not going to say it cost you your job, but cost you a lot of cases because stuff -- a lot of our cases needed to get prosecuted.

MS. DAHL: Yeah.

MR. LEGAULT: And, of course, COVID put you behind.

MS. DAHL: Yeah.

MR. LEGAULT: And it is what it is. I mean, when it came time for Grand Juries, we didn't have any cases going through.

MS. DAHL: Yeah.

MR. LEGAULT: And that was frustrating to all of us.

MS. DAHL: Right. Well, and, you know, as far as, like, the last Grand Jury goes, you know, I think I talked to you

about that about how, you know, I was only supposed to get -- or I was only able to get one through, but that was, you know, because I thought I was going to be in the Chism trial.

MR. LEGAULT: You didn't -- you -- if I remember right, you said you were going to take a couple through.

MS. DAHL: Right.

MR. LEGAULT: But apparently you told them something else, so that's why...

MS. DAHL: Well, because I -- honestly, because I got overly ambitious with them and I didn't realize how much time because it was my first trial.

MR. LEGAULT: Sure.

MS. DAHL: And I was freaking out and spending all my time -- like, I was supposed to give the opening statement and, like, I'll be real with you, I was putting in a lot of hours on that and freaking out because, like, this is the first time I'm going to be up, you know, in front of, like, Wayne and all of them, you know, and there was a lot riding on it.

MR. LEGAULT: Right.

MS. DAHL: And so I will admit, I got overly ambitious with them and didn't realize how much time I was going to sink into that trial prep, so I was freaked. I mean, because I hadn't done, you know, a trial, you know, in a couple of

years, so it was like -- and especially after COVID and everything. And, you know, I really wanted to -- well, I mean, obviously, it was -- the Chism trial was a little bit of a shit show, you know.

MR. LEGAULT: Apparently.

MS. DAHL: So between that and the fact that it was, like, the first time, I was, like, really worried that, you know, this is going to be my first trial and we're going to lose. So, yeah, you know, I got overly ambitious. Because I met with them on May 19th and then, like, two weeks or so later, you know, when I was in the thick of it, I just didn't realize how much time I was sinking into it.

MR. LEGAULT: Did they tell you how many -- I mean, did they tell you that they talked to Wayne, like, two or three different times?

MS. DAHL: They've talked to Wayne, like, once.

MR. LEGAULT: They talked to Wayne three times. That's what they told me.

MS. DAHL: I don't think they have. Okay. So Wayne has mentioned one time to me, and it was back in, like, December or January -- that December/January conversation, like, when I -- the one -- yeah, that was the one.

MR. LEGAULT: Okay. Well, they've told me, like, three times. I don't know.

***CONFIDENTIAL***

MS. DAHL: Well, I'll go to Wayne, but Wayne has talked to me exactly once.
MR. LEGAULT: Okay. There's definitely some stuff that's not getting through. I don't know if they're not telling me or Wayne is not telling you.
MS. DAHL: I don't know. It's weird.
MR. LEGAULT: Yeah.
MS. DAHL: It's very weird. Well...
MR. LEGAULT: But they gave me a heads up that the letter was being drafted, like, a day before you were to get it. I was like, huh, okay.
MS. DAHL: Yeah. They didn't tell Wayne at all.
MR. LEGAULT: That's what Curt said that they didn't -- that Wayne didn't know.
MS. DAHL: No. No one in my office knew, so awkward.
MR. LEGAULT: Yeah, for sure, for sure. Like I said, I don't -- I don't know. I think COVID probably was your worst enemy in all of this.
MS. DAHL: Yeah.
MR. LEGAULT: And probably everybody down there, but unfortunately they're getting employed by the government.
MS. DAHL: Yeah, yeah, yeah. Oh, yeah. Well, and I guess my -- one of my biggest things too was, like, most places that I worked, you know, either -- well, I've never encountered this type of situation, but like based on what

the protocol in the office is or the places that I worked was, you know, if your boss or your supervisor felt like, you know, you were slipping or, like, hey, you know, we need to fix this or else we're going to let you go, there was usually a very direct conversation.

MR. LEGAULT: I think that's why I asked how many times about Wayne because they told me three times that they've talked to Wayne.

MS. DAHL: No.

MR. LEGAULT: So I don't know if Wayne is just not relaying it to you when they talk to him or...

MS. DAHL: No, that's not how we -- I mean, I'll ask him, but that's not, like, how Wayne operates.

MR. LEGAULT: Because I don't know why -- and I know of one for sure, and that's probably the one you're saying, because they both told me that.

MS. DAHL: Right, once.

MR. LEGAULT: But they told me three different times they've talked to Wayne.

MS. DAHL: Yeah. No, I remember exactly once.

MR. LEGAULT: Okay.

MS. DAHL: So, like, I mean, I would have to go back through my notes. Maybe there was, like, one time that I don't remember, but the other thing was too, like okay, even if you've talked to Wayne, why not talk to me and be, like,

hey, we need you to do "X" else we are going to do this.

MR. LEGAULT: Yeah.

MS. DAHL: Like, you -- I mean, I guess it's just I'm a little bit baffled because it's, like, if you felt like -- if you felt or, you know, they had felt that things were slipping so badly that I needed to, like, do something drastic or I needed to do something, you know, "X Y Z" or else they weren't going to renew, they need to say that, you know. That's a crazy thought. Like, because I had no idea that they were anywhere close to this, you know. The biggest I figured was, like, okay, you know, they're getting impatient over, you know, things ramping up after COVID. But I was, like, that's going to subside in, like, a couple of months, you know, once we get rocking and rolling. And especially once I get that trial, you know, in September going, like, that was -- that was always the vibe I got, you know, what scene was being conveyed to me was just, you know, hey, we would like you to do this, but nowhere near the level of, like, oh, well, you know, bye, you know. So it just felt like a huge jump to me.

MR. LEGAULT: I don't know. They always ask me what cases, and I have sent them cases. Because, I mean, I don't want to hide anything from you.

MS. DAHL: Right, right.

MR. LEGAULT: They're always asking me what cases have we sent

you and what cases have went through, and I just send them.

MS. DAHL: Right.

MR. LEGAULT: So I don't know if that's something that they look at, like, why haven't these cases went through.

MS. DAHL: Right, interesting. Well...

MR. LEGAULT: Because, I mean, I do, I send you a lot of cases that I had.

MS. DAHL: Right.

MR. LEGAULT: And then I stopped because I know that you've got -- you had a lot of your plate and there's still a lot that we could have sent you.

MS. DAHL: Right.

MR. LEGAULT: A lot of gun -- definitely gun ones anyway.

MS. DAHL: Right. Well, and...

MR. LEGAULT: And I just stopped.

MS. DAHL: ...I was working on trying to get a huge load through this July. Now...

MR. LEGAULT: That's what they said to me and was, like, so what's going to happen with these cases, and I was, like, I guess they'll get dispersed. I don't know what happens with them.

MS. DAHL: Yeah. I mean, that's -- that's the weird thing too is, like, you guys realize that, you know, all of my cases are going to go to everybody else in the office and you're

not going to have someone to specifically -- for, like, six months or something.

MR. LEGAULT: I don't know. At least.

MS. DAHL: It makes no sense. Like, if your whole thing is you want to get these things, you know, assembly line, you know, off your desk, especially with things opening back up, why -- why create this gap. Or at least, you know, if you -- okay. I guess, like, if you were really unhappy and, like, okay, like, Kat, you know, we think we should move in another direction, like, it would make sense to be, like, we're going to give you, like, to the end of the year and then have someone lined up to immediately jump in. But you know how slow this is, like, you guys are going to be out...

MR. LEGAULT: It's a process, yeah. We'll be out for a while.

MS. DAHL: Yeah. So Megan is going to be lead on the Jackson case, so...

MR. LEGAULT: That's what I figured that she would probably be lead now. I bet she's tickled to death on that.

MS. DAHL: Yeah. I did -- so I sat down with Kathy, who is my -- the paralegal that's assigned to me, and she -- I made some comment, like, I am kind of sad that I won't get to do the Jackson trial, which I am, you know, because it wasn't for freaking COVID, I wanted to get at least a

couple of trials under my belt, like -- but Kathy looked at me and she was like, no, you're not.

MR. LEGAULT: You can just show up for it.

MS. DAHL: Yeah.

MR. LEGAULT: Keep putting it off and my CI is going to end up going off the rails.

MS. DAHL: Oh, yeah, yeah. The longer we put this off, the more of a ticking time bomb she is.

MR. LEGAULT: [INAUDIBLE]

MS. DAHL: Oh, no. Mustang Sally. Well, cool, cool, cool. I appreciate you being candid with me.

MR. LEGAULT: Yeah. I mean...

MS. DAHL: Listen, you know, I'm not trying to -- I just feel like, you know...

MR. LEGAULT: I have to report to them.

MS. DAHL: Right.

MR. LEGAULT: That's where I go to. So when they ask what cases I have, what I give you, what goes up there, I have to tell them.

MS. DAHL: Dude, I get it, you know. And like I said, you know, the only thing I was trying to find out is, like, this weird comment Turner had made about, like, well, that's not what I was hearing, and I was like...

MR. LEGAULT: Yeah, he called me in the middle of a search warrant and, of course, I was, like, that's weird. So I

got to where I could call him and he wanted to know that. And I was, like, Chief, six maybe where it's been a day or so before I heard from her. I don't know.
MS. DAHL: Yeah.
MR. LEGAULT: I don't keep track of that. I don't know.
MS. DAHL: Well, and I always thought I like...
MR. LEGAULT: An I was like, and that's a random number I'm throwing out. I don't -- I don't know.
MS. DAHL: ...called -- called you back, like, relatively...
MR. LEGAULT: Usually, the majority of the time, yes, because I call you a lot.
MS. DAHL: Yeah.
MR. LEGAULT: And Stillwagon does too, so I know he calls you a lot, and that's very obvious.
MS. DAHL: Yeah. Stillwagon does care what time of day it is.
MR. LEGAULT: He doesn't have a life, yeah.
MS. DAHL: So...
MR. LEGAULT: But that was just -- that's where that came from.
MS. DAHL: I've got you. Okay.
MR. LEGAULT: He just asked and I was just, like, six. I don't know.
MS. DAHL: Yeah. I've got you. I've got you. Okay. Well, I will let you know how the rest of the month goes. I'm going to try to turn out as many plea deals as possible

over the next 30 days.

MR. LEGAULT: I've got you.

MS. DAHL: And yeah, just it's going to be a lot of churn and burn as much as possible.

MR. LEGAULT: Yeah, just do what you can.

MS. DAHL: Yeah, yeah.

MR. LEGAULT: Because they'll get thrown on somebody else's lap.

MS. DAHL: Right, exactly, exactly. Cool. Well, I will be in touch, I'm sure. Are you guys on nights?

MR. LEGAULT: We're straight nights now, so we're 12:00 until 10:00.

MS. DAHL: Oh.

MR. LEGAULT: I switched our schedule. They wanted it to be straight nights, so I just went let's go straight nights.

MS. DAHL: Okay.

MR. LEGAULT: It works for us.

MS. DAHL: Okay.

MR. LEGAULT: So we're straight nights. If there's something where you need us in the morning, obviously, we all still get up, but [INAUDIBLE]

MS. DAHL: Right, right, right. Well, if I could be on a night shift, I would. Good.

MR. LEGAULT: Yeah, it helps. They love it. I could work either way. I don't give a shit if it's days or nights.

MS. DAHL: I'm not a morning bird. I'm just naturally a night owl.
MR. LEGAULT: I understand.
MS. DAHL: And it's kind of hell with -- with a 9:00 to 5:00 because it's, like, I can't talk to anyone before 10:00.
MR. LEGAULT: I'm the same, but I've got the luxury of just coming down here and I can shut that door and not have to talk to anybody if I don't want to.
MS. DAHL: Exactly, exactly. All right. Well, good deal. Yeah. I'll let you know how the rest of the month goes. I'll be in touch probably either at the end of this week or next week.
MR. LEGAULT: Yeah, don't worry about it. We'll be around.
MS. DAHL: Once I kind of get a handle on everything...
MR. LEGAULT: Yeah.
MS. DAHL: ...and all that jazz, so yeah.
MR. LEGAULT: [INAUDIBLE] but obviously the Jackson case is -- that's mine, so I think Megan knows -- or she had my number. I think she still does.
MS. DAHL: Yeah.
MR. LEGAULT: Just call if she needs anything.
MS. DAHL: Yeah. I'll make sure. I haven't touched base with Nikki in a while, so I'll have to reach out to her and, like...
MR. LEGAULT: Apparently he was -- he had to go to the

hospital or something for something, one of the jailers said, and he claimed he was going to have my job, and my badge, and a false arrest, and planting a gun on him. I said, sweet, he can have it.
MS. DAHL: Yeah. Here you go, good sir.
MR. LEGAULT: Yeah. You can have it.
MS. DAHL: Yeah. God.
MR. LEGAULT: I guess he's talking all kinds of shit down there.
MS. DAHL: Well, he's a shit talker.
MR. LEGAULT: I cannot wait -- I cannot wait for him to go away just -- I don't care if it's for three years, just go, just go away.
MS. DAHL: I know, I know. He's a shit talker. Were you there when we had that status conference and he starts going off about how, like -- because he blatantly said, like, oh, Your Honor, I don't understand how -- something to the effect of, like, I don't understand, they're saying that the firearm in my rap video was the one that they found in this encounter, and how is that legal. And I was, like, did you just admit to having the firearm in your rap video?
MR. LEGAULT: Can you use that?
MS. DAHL: We've got the transcript.
MR. LEGAULT: Good.

MS. DAHL: We're going to find -- like, I don't know [INAUDIBLE] you know, how much we can use it, but like, dumb ass. And then...

MR. LEGAULT: We never said that was the same firearm.

MS. DAHL: Well, it was the gold one that he was talking about.

MR. LEGAULT: Yeah, yeah, yeah. But...

MS. DAHL: But I was, like, oh, you just admitted that it's not a toy, it's a firearm.

MR. LEGAULT: Yeah.

MS. DAHL: Just...

MR. LEGAULT: Is it a bench trial or a jury trial? I thought it was going to be a bench trial.

MS. DAHL: So he wanted a bench trial. We haven't gotten to the point yet of figuring out, like, whether it's going to be a bench trial or a jury trial. I would love for it...

MR. LEGAULT: A bench trial would rock.

MS. DAHL: I know, I know. That will be -- yeah, that will be fun. But he had wanted one, and then, of course, like, he started rambling at that status conference and Greer goes, like, anything else? And he goes, yeah, you're looking good today, Your Honor. I was, like, this is a three ring circus. Can you imagine a bench trial? Because he would try to talk back to the judge.

MR. LEGAULT: Oh, yeah. That's why I was, like, I would love

to have a bench trial. I would love it.
MS. DAHL: So, so funny. It would be great. What a piece of work.
MR. LEGAULT: I still think -- I don't know if Nikki will try to talk him into a plea or not.
MS. DAHL: I think she's going to try her damndest, but, I mean, with that -- with him as her client...
MR. LEGAULT: He doesn't want it.
MS. DAHL: Yeah, like, there's -- even the most competent lawyer in the world could probably only get so far.
MR. LEGAULT: I assume she was appointed to him.
MS. DAHL: Yes. Yeah, because they appointed -- poor Nikki, they appointed her to this case, like, while she was out of town. And so, like, she had no idea what she was walking into.
MR. LEGAULT: Oh, no.
MS. DAHL: And just walked into this shit show. Yeah. I was, like, you got a rough one, sorry.
MR. LEGAULT: Yeah.
MS. DAHL: So...
MR. LEGAULT: Bless her heart.
MS. DAHL: Yeah, I know. Well, I'll let you know how it goes for sure. I'll be in touch either this week or next and figure it out. I appreciate it. Bye, puppy. Do you want this open?

MR. LEGAULT: Yeah.
MS. DAHL: Okay.

THIS CONCLUDES THE TRANSCRIPT OF

RECORDING 1110 - DAHL/LEGAULT

******

***RECORDING 1111 - DAHL/MATT GRYDER***

MS. DAHL: So I wanted to ask you a quick -- and why I wanted to close the door, do you know, by chance -- like, have you heard anything about the reason, like, why they decided not to renew my contract?

MR. GRYDER: So the only thing I know, and this is just what Kevin said, that they didn't think that you were doing enough, and Kevin insisted that you lied to the Chief when I guess it was last month or the month before...

MS. DAHL: What?

MR. GRYDER: ...he said you were going to indict, like, four or five people and you just indicted one. It was when Chism's trial was set.

MS. DAHL: Yeah, I know.

MR. GRYDER: That's -- Kevin was coming in here saying that. And Kevin will get something in his head and it could be complete total 100 percent bullshit, but you can't reason with him. And he came in here and told me that, and I said, Kevin, I said, she was going to be in trial. I said, normally when they're going to be in trial, they don't indict anybody. And he said, that's not what she said. She sat there and bold-faced lied to the Chief and I. I said...

MS. DAHL: I didn't lie. In fact...

MR. GRYDER: I said, Kevin, I said, that's not true. Yeah, it

is. Yeah, it is.
MS. DAHL: Uh-huh (Affirmative). Well, yeah. I let Legault know that, hey, you know, I got really caught up with, like, you know, trial prep and shit.
MR. GRYDER: Uh-huh (Affirmative).
MS. DAHL: And I'm only going to be able to indict one person. I didn't let Kevin know directly because he was, like, hey, communicate -- we had decided to communicate all of that stuff through Legault.
MR. GRYDER: Uh-huh (Affirmative).
MS. DAHL: And I thought that was enough.
MR. GRYDER: Well, he -- once he believes something, you can't tell him anything different, so...
MS. DAHL: Yeah. I did not lie. Did I get a little bit overly ambitious and underestimate how much time I would be spending on trial prep, yeah. Yeah, I did, because I had -- you know, that was my first one. I had no idea it was going to take as much time as it was.
MR. GRYDER: It takes a lot of time.
MS. DAHL: Yeah.
MR. GRYDER: And that's what I tried to tell him. I said, if she has a trial scheduled for when Grand Jury is, I said, she's going to be doing prep before that. I said, I'm kind of surprised that she indicted one person. Because, you know, it takes time to write the indictments...

MS. DAHL: Yeah.

MR. GRYDER: ...get all of that stuff going, but...

MS. DAHL: Yeah.

MR. GRYDER: When somebody has never done anything in their career, which his Kevin, he doesn't understand. And I'm not joking.

MS. DAHL: Yeah.

MR. GRYDER: All he's ever done since he's been here is ride other people's coat tails. And him and the Chief got hired together, and are like that, and that's why he's where he's at now. He's an idiot.

MS. DAHL: I've got you. Cool. Good, good to know. Yeah, because I was -- I was -- I sat down with Chief Turner to get an explanation, and everything that he told me just didn't match up because he was like, oh, well, you haven't communicated with officers. And I was, like, you brought this up in December. And I thought it was weird at the time because I went to SIS. I asked Will, and I asked Legault, and I asked Curt, hey, do you have a problem with how I communicate? They all said no. And so I told the Chief that, and I was like, well, I addressed that with them back in December when you randomly brought this up. And he was like, well, that's not what I was hearing. I was like, okay. So then I went to Legault and asked, you know, hey, you told me this back in December. The Chief

is telling me this now. Who is not being straight with me? And he was like, well, you know, we didn't have a problem with you. In fact, I thought it was weird because Turner called him that morning and was like, hey, how many times has Kat not answered you in a timely manner -- in a timely fashion? And he was like, I don't know, like maybe six times over the last two years, then she always answers in, like, a day or two. So he knew I was coming in for an explanation and called Legault that morning asking this stuff. This is after everything. I was like, okay, well that to me seems like a pretense. Am I wrong?

MR. GRYDER: All I know is what I -- nobody has told me directly. That's what I've overheard...

MS. DAHL: Yeah.

MR. GRYDER: ...that he just wasn't happy with your production.

MS. DAHL: Yeah. Never mind that my stats are on par with everybody else in the office for COVID or that, you know...

MR. GRYDER: And he hates...

MS. DAHL: Say what?

MR. GRYDER: ...people saying COVID, because our stats were down for this year, and I brought up, well, we've never had to deal with on every case where we have surveillance photos people are wearing a mask. And the response I got

was you can't use COVID as an excuse forever.
MS. DAHL: I'm sorry, we've just been through a global fucking pandemic, like a once in a lifetime, has not happened, like, since the '20s level.
MR. GRYDER: Yeah.
MS. DAHL: Okay, cool. That's fine. Yeah. I was just, like, none of it is adding up, yeah. Like, one of the other reasons he gave me was, like, I didn't answer an E-mail to Heather from, like, a year ago. And I was like, well, I talked to her on the phone. I didn't answer the E-mail, but like, I talked to her. And also, like, you're bringing up an E-mail from, like, June of...
MR. GRYDER: Yeah. That's like, hey, do you remember sending somebody an E-mail a year and a half ago?
MS. DAHL: Yeah.
MR. GRYDER: No, I don't.
MS. DAHL: Yeah, yeah. I was, like, how is this the reason, so I was just -- yeah. None of it was adding up when I asked for an explanation, so I was just wondering if you had heard something.
MR. GRYDER: That's all I've heard. They didn't ask me my opinion. They didn't ask me anything.
MS. DAHL: They didn't ask anybody anybody's opinion.
MR. GRYDER: I'm the black sheep back here anyway.
MS. DAHL: They didn't ask Wayne.

MR. GRYDER: Kevin, and David, and Don are all buddy-buddy, and I don't like Kevin, I don't like Don.
MS. DAHL: Yeah.
MR. GRYDER: So I'm -- I'm always the last to know anything back here.
MS. DAHL: I've got you. Well, I think it's -- and this is just a rumor that I've heard. I think it's interesting that Don Shepard's kid applied for the position.
MR. GRYDER: I don't think that's right.
MS. DAHL: You don't think so? Because that's what Tom said.
MR. GRYDER: I mean -- no, I mean I don't think it's right...
MS. DAHL: Oh.
MR. GRYDER: ...that he should apply because Kevin and Don will be in his line of supervision.
MS. DAHL: Right.
MR. GRYDER: That's not right. If he worked here, he wouldn't be able to work in criminal investigations as long as Don was here...
MS. DAHL: Yeah.
MR. GRYDER: ...because he would be in his line of supervision.
MS. DAHL: I know, I know. I mean...
MR. GRYDER: That's bullshit. I'm going to bring that up.
MS. DAHL: Because I heard that, like, there's a chance he could apply. And I was like -- and Tom said he did apply

the last time and I beat him, so okay. I swear.

MR. GRYDER: Do you have any leads on another job?

MS. DAHL: So I actually go in Monday for an interview with Judge Greer to be his clerk, so that's helpful.

MR. GRYDER: That would be a good job.

MS. DAHL: Yeah.

MR. GRYDER: Now, how do -- how do the district court clerks -- do they have a certain time frame?

MS. DAHL: So it would be for a year.

MR. GRYDER: Yeah, that's what I thought.

MS. DAHL: Yeah. And which, honestly, is probably -- because I kind of really want to get back to D.C. You know, that's something that I just -- I do. I miss it. I know it's trash and expensive.

MR. GRYDER: Yeah.

MS. DAHL: But -- but I miss it, weirdly enough. I don't know if that makes me a masochist or what. Okay. So I've got the report, I've got the criminal history

MR. GRYDER: Three, three, three, three -- do you have both reports?

MS. DAHL: Yes.

MR. GRYDER: Okay.

MS. DAHL: I've got the firearm. Let me pull up my notes. So I need any, like, dash cam or body cam that's potentially on this guy.

MR. GRYDER: There wouldn't be any body cam.
MS. DAHL: Okay.
MR. GRYDER: I'll look and see if there's any...
MS. DAHL: I'll also need his judgments if those are in your file.
MR. GRYDER: They're not.
MS. DAHL: Okay.

THIS CONCLUDES THE TRANSCRIPT OF

RECORDING 1111 - DAHL/GRYDER

******



Case 2:22-cv-00072-KAC-JEM Document 82-11 Filed 02/06/24 Page 175 of 178
PageID #: 2421

***RECORDING 1113 - DAHL/MATT GRYDER - PHONE CALL***

MS. DAHL: Hey, how are you?

MR. GRYDER: Okay. How are you?

MS. DAHL: Well, I've been better. So I got a call -- I would have to look at his name again. I don't think I've spoken to him before. One of the lieutenants in CID to, you know, give me an update on where they were with the Williams case.

MR. GRYDER: Yeah. Don?

MS. DAHL: Yes. Yeah. And he said that they went downtown last night and I guess tried to knock on his...

MR. GRYDER: Yeah. So -- so I'm not sure what the deal is with that. You know, Toma put the E-mail out if people saw him, hey, he has a warrant, like you asked.

MS. DAHL: Right.

MR. GRYDER: And apparently some patrol officers took it upon themselves to go to his apartment and beat on the door. And apparently they had a conversation with him through the door. And he said, I'm not answering the door until you tell me what this is about. And they said, well, you have a warrant. And he said, okay, I'll let my attorney handle it. I'm not opening the door. So for some reason, they just threw up their hands and left, which kind of boggles my mind.

MS. DAHL: Well, look, I'll be real with you. Come next

***CONFIDENTIAL***

Tuesday, it will have been a month since I indicted him. I have been begging...

MR. GRYDER: Uh-huh (Affirmative).

MS. DAHL: ...everybody from Toma, to Jeff, to everybody, you...

THIS CONCLUDES THE TRANSCRIPT OF

RECORDING 1113 - DAHL/GRYDER

***END OF RECORDINGS***

BY: Rebecca Overbey
Rebecca Overbey
Licensed Court Reporter

***CONFIDENTIAL***

C E R T I F I C A T E

I, Rebecca Overbey, Licensed Court Reporter in and for the State of Tennessee, do hereby certify that the foregoing is a true and complete

TRANSCRIPT OF DAHL RECORDINGS

the same transcribed to the best of my ability and understanding at the request of counsel from recordings given to me. I, Rebecca Overbey, was not present, nor did I have an agent present for these conversations.

WITNESS my hand and official seal at my office in Kingsport, (Sullivan County) Tennessee on this the 23rd day of January, 2023.

REBECCA L. OVERBEY COURT REPORTER STATE OF TENNESSEE

Rebecca Overbey

Rebecca Overbey
LICENSED COURT REPORTER
State of Tennessee
LCR #078

My License Expires:

June 30, 2024

***CERTIFIED ONLY IF AFFIXED SEAL IS GREEN***