IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE
AT GREENEVILLE

| | | |
|---|---|---|
| KATERI LYNNE DAHL, Plaintiff, | * | |
| VS. | * | CASE NO. 2:22-CV-00072-KAC-CRW |
| CHIEF KARL TURNER, in his individual capacity only; OFFICER JOHN DOES 1-3, in their individual capacities only; and CITY OF JOHNSON CITY, Defendants. | * | |

DEPOSITION OF

# KATERI LYNNE DAHL

(Taken June 20-21, 2023)

APPEARANCES:

COUNSEL FOR THE PLAINTIFF:

HUGH A. EASTWOOD
Attorney at Law
7911 Forsyth Blvd., Ste. 300
St. Louis, MO 63105-3825

ALEXIS I. TAHINCI
TAHINCI LAW FIRM
105 Ford Avenue, Ste. 3
Kingsport, TN 37663

***THIS STYLE PAGE CONTINUES***

| | |
|---|---|
| COUNSEL FOR THE DEFENDANTS: | K. ERICKSON HERRIN<br>HERRIN, MCPEAK & ASSOCIATES<br>515 E. Unaka Avenue<br>Johnson City, TN 37601 |
| | THOMAS J. GARLAND, JR.<br>MILLIGAN COLEMAN<br>230 W. Depot Street<br>Greeneville, TN 37743 |
| ALSO APPEARING: | LEAH W. MCCLANAHAN<br>ASSISTANT U.S. ATTORNEY<br>EASTERN DISTRICT OF TENNESSEE<br>800 Market Street, Ste. 211<br>Knoxville, TN 37902 |
| ALSO PRESENT: | JOY BAKER<br>INTERIM ASSISTANT CITY MANAGER<br>CITY OF JOHNSON CITY |
| | CATHY BALL<br>CITY MANAGER<br>CITY OF JOHNSON CITY |

the progression of those cases over the coming months.
Q. And the words he used in his E-mail, I think, was that let's put a status together, right?
A. Right.
Q. Okay. And you understood that Chief Turner was seeking a status on these cases, right?
A. Right.
Q. Was anyone else present with you when you had this discussion with Wayne Taylor on the 15th?
A. I don't believe so.
Q. And from this E-mail and the attached cases, you did note Jeff Legault's comment, there are cases here that we stopped sending that could be prosecuted?
A. Which...
Q. Look at your federal cases, the next page, right there. The bottom of this page, cases we stopped sending that could be prosecuted.
A. Without seeing the case files themselves, I can't really answer to that.
Q. I'm not asking you about them. I'm just saying you noted what was on these federal cases for which you were going to be preparing the status.
A. Correct.
Q. And it included current cases on which Kat Dahl has files, or at least according to Jeff Legault, and it includes

communication between the formal sit-down meetings. I believe I had communicated it in some way, but again, this was three years ago.
Q. I understand. Were you aware that SIS officers had stopped sending cases...
A. No.
Q. ...as indicated here at the bottom?
A. No.
Q. Did you talk to Legault about that?
A. Extensively.
Q. And what did Sergeant Legault tell you of why they had stopped sending you cases?
A. He didn't give me a reason other than, well, I know things are slower due to COVID. But I -- when I got this E-mail, I was alarmed, and I took steps to try and remediate -- to remedy the situation, which included going to SIS individually...
Q. Okay.
A. ...and asking them about their concerns.
Q. There's a reference in here, I just want to make sure I understand it, that Wayne Taylor, your supervisor, is suggesting to you that during the downtime of COVID that it was an excellent time to be preparing pros memos. Tell us what that means.
A. Pros memos were the internal documents that we prepared.

looking at, if you want to, Ms. Dahl, you can verify it, but this is the same thing as you looked at on Exhibit 1.
A. Okay.
Q. You'll see from the case numbers, those are Johnson City case numbers, correct?
A. Correct.
Q. Okay. And you will see that the first one, W20007121 gun case 6/28 [sic] -- 6/18/2020 is the first case on the December 15th list, as well as on the one we're looking at now from the May 19th, 2021 list, right?
A. Uh-huh (Affirmative).
MR. GARLAND: Yes?
A. Yes. I'm sorry, yes.
Q. And so that one is the first one on your May 19th, 2021 list...
A. Okay.
Q. ...that has a check mark.
A. Okay.
Q. And this first case is marked [redacted], right?
A. Yes.
Q. [redacted] was not indicted in June 2021, correct?
A. No, because I was supposed to be in trial.
Q. And that would have been the Chism case?
A. Correct.
Q. Is it your recollection that the Chism case pled out on

June the 3rd, 2021?
A. Yes, it pled out, I think, five days before we were supposed to go to trial.
Q. Is it your recollection though that the grand jury in June was June the 9th?
A. Correct.
Q. Okay. Considering the Wayne Taylor suggestion to you as made in the December 16th, 2020 E-mail about preparing status and also memorandums and draft indictments during the downtime of COVID, do you recall that in Wayne Taylor your supervisor's memorandum?
A. Yes.
Q. Prior to June 2021, had you prepared a prosecution memo on [redacted]?
A. I don't believe so, but I don't remember.
Q. If not, why not?
A. Probably because I was prioritizing other cases, and writing pros memos, and indicting other cases.
Q. Prior to June 2021, with respect to the [redacted] case that we're looking at on both lists, had you prepared a draft indictment?
A. I don't remember. I'm not sure.
Q. If not, why not?
A. Again, probably because I was prioritizing other cases.
Q. If you had done that, if you had prepared a draft memo, a

A. Yes.
Q. Do you recall that?
A. I do.
Q. Did you send Captain Peters an E-mail?
A. No, and that was my mistake, but I E-mailed Sergeant Legault instead. And I did that because of the instructions of Chief Turner and Captain Peters.
Q. Okay. We're going to come back to that, but you say you sent an E-mail about the...
A. It was either an E-mail or a text.
Q. Okay. About the June 9th, 2021 grand jury?
A. I did.
Q. But you did have a specific request from Captain Peters that you E-mail him. And so I think what you're telling me is that it was your mistake, or you forgot, or it didn't happen.
A. It was my mistake because it had been previously communicated to me that -- excuse me -- that Sergeant Legault should be my pri' -- like, my main point of contact when it came to cases, and so I followed up in that manner.
Q. Is it fairer to say that there was discussion of prioritizing cases after the June 9th, 2021 grand jury, but that here it was clear that you were to report to Captain Peters about these indictments, that's the reason

is which. I will mark this one...

Q. If you'll flip the page, one -- each one has got a yellow highlight. Kacei Pierce at the top. Is that...

COURT REPORTER: Kacei Pierce, yes.

Q. Okay. And then the next one is Nathan Tucker.

COURT REPORTER: Yes, Nathan Tucker will be number 13.

Q. Okay.

MS. TAHINCI: Thank you.

EXHIBIT #12: Kacei Pierce PACER documents.

EXHIBIT #13: Nathan Tucker PACER documents.

Q. Okay. Last, but not least on this section of questions. Take a look at that and see if you recognize that as a secret recording you had with Gryder.

A. Yes.

Q. Page 169. This is similar to your communication with Legault. Do you see what I'm looking at there in the middle of the page?

A. Yes.

Q. You're saying, Ms. Dahl, up at the top, well, yeah, I let Legault know that, hey, you know, I got really caught up with, like, you know, trial prep and shit. Mr. Gryder: Uh-huh. Ms. Dahl: And I'm only going to be able to indict one person. I didn't let Kevin know directly because he was, like, hey, communicate -- we had decided to communicate all of that stuff through Legault. Uh-huh.

asked her to describe...
Q. We're going to come back to [redacted].
A. Okay.
MR. GARLAND: Let her go ahead. Let her go ahead.
Q. Okay, okay. Go ahead.
A. Okay. I asked her to describe the two. She described them both as older white males. She described the first individual as quote/unquote "kind of creepy" and then described the -- and when I pulled up pictures of both Captain Peters and Chief Turner, she identified those individuals as having been up at Williams' apartment at one point. And before she identified Chief Turner via photo, she described him as someone that had a very distinct deep southern accent.
Q. You said she had said that there were other officers in Williams' apartment?
A. Correct.
Q. Who was identified as that? Who were the officers?
A. She didn't know. She was only able to identify Captain Peters and Chief Turner to me.
Q. Were these officers in uniform?
A. I don't remember if she said they were in uniform or not.
Q. When you -- where did you get pictures of Chief Turner and Captain Peters?
A. I just pulled up whatever was on Google at that point.

Q. They were in uniform, not in uniform?
A. I don't remember exactly. I think they were just some various publicly available photos of them.
Q. So when she said it was an older guy who was kind of creepy, did you show her any pictures other than Captain Peters?
A. I think I -- we were going through kind of the pictures of different police officers that were just on Google images.
Q. That's not my question exactly. When you -- when she said there was an older guy who was kind of creepy, you showed her Captain Peters' picture.
A. Yes, and then she said, yes, that's him.
Q. Can you tell me where you got that picture?
A. Google.
Q. All right. When did this take place, [redacted]?
A. This was in January of 2022, I believe.
Q. I've got a section on [redacted], so we're going to return to that...
A. Okay.
Q. ...as a separate situation. I had asked you if you had obtained or been provided information. I now want to know if you have been provided or obtained any evidence from anyone that Chief Turner was involved in corruption.
A. Nothing other than what [redacted]'s statements were.
Q. Okay. So your allegations of corruption are dependent

she said that Williams first approached her when she was a minor, when she was, like, 16.
Q. She did drugs with Williams?
A. I believe she did have a bit of a drug problem and had engaged in recreational use.
Q. Do you recall an E-mail -- a text message you had with [redacted] that she had seen, after your lawsuit was filed, that [redacted] -- [redacted] had posted on Facebook that she was a victim of Williams?
A. I vaguely remember that text message and, yes, she -- [redacted] had confided to me that Williams had abused and assaulted her.
Q. Had she also had consensual sexual relationships with him?
A. I don't know. I believe that might have been the case. I'm not sure how consensual it could be given the abusive nature of the relationship.
Q. This was January of 2022?
A. Yes.
Q. You had not yet moved to Alabama?
A. Correct.
Q. You and Tom McCauley were -- had gone to Numan's just as a social visit there?
A. Correct.
Q. Were you dating Tom McCauley?
A. No.

Jim Wood tell you evidence because he saw this, saw that, talked to this?

A. This was his assessment based on how he saw the case with Williams unfolding. He had knowledge of who Williams was, what Williams was accused of, and knew that there had several -- there had been several reports made about Williams and observed that there was no -- or at least from what he could see, there was no police action taken in this case. And so this was an assessment that he gave me based on his observations.

Q. Okay, okay. Next person, evidence of corruption.

A. There was -- I can't remember her name. She was another bartender that worked at Numan's and then was at Applebee's. Oh, gosh. It was Ashley Wright. And she relayed to me that she believed that there was some sort of corruption going on based on -- for similar reasons to James Wood, and what she observed with the Johnson City Police Department and how they handled this case. Specific...

Q. What did she observe?

A. Well, she attempted to call the Johnson City Police Department and alert them that she had heard Williams directly planning to rape and assault women there at Numan's. She was a bartender and she overheard Williams discussing his plans to roofie women within the bar. And

when she called -- according to her, when she called the Johnson City Police Department, she was told by whoever answered her call that there was nothing that they could do, that the only thing they could do was kick him out.

Q. Okay. When was the call made? Did you record the statement of this Ashley person?

A. I did not record her statement. I don't remember when she made that call. It would have been when she was working at Numan's, which was where Williams liked to frequent. So I don't know at what point this call was made. I think it was made probably, if I had to hazard a guess, you know, sometime in the two or three years before this all unfolded.

Q. Okay.

A. I don't know.

Q. That's fine. Okay. Next person.

A. So again, there was a Logan...

Q. Brown?

A. ...Brown. He was -- he indicated that he believed that there was something going on with the cops, you know, based on how they had handled the case.

Q. What cops? What cop?

A. Well, just as far as Johnson City Police Department in general.

Q. Name -- name of the cop.

You're not denying that, are you?
A. An assault occurred. Again, I think it is an inaccurate statement of his that I am -- I am solely responsible for any assault that occurred. Just because an officer contacted me doesn't mean that all of my other work and my other cases stopped.
Q. What can be -- we can agree on perhaps is that Jeff Legault's view of the situation, whether fair or not, was conveyed to Chief Turner.
A. It was.
Q. Let's make that the next exhibit, please.
COURT REPORTER: Number 26.
EXHIBIT #26: E-mail from Jeff Legault to Kevin Peters and Karl Turner, dated 5/1/21, Bates Stamp No. 0174.
Q. Let's go back to it after lunch. Let me get my head clear.
MR. GARLAND: Okay.
Q. Let's get a short one. Okay. Let's see if we can get through this and then we'll take a lunch break. We have discussed the recording of -- your recording, secret recording, of Chief Turner and Kevin Peters on December the 8th, 2020. I get that date out of your complaint. Am I correct that that was the date of that recording?
A. Yes.
Q. Prior to that meeting, you had received [redacted]'

investigative file from Toma Sparks on November the 12th...

A. 13th.

Q. ...or 13th. It's a little bit confusing for me. We will go if the 13th, if that's what you're saying.

A. It was.

Q. So you had [redacted]' file.

A. Yes.

Q. And you also had received from an SIS officer, or maybe others, other Williams information -- information.

A. Yes.

Q. Okay. Before Captain Peters arrives on our tape recording, shown on the tape recording, you tell Chief Turner -- this is Page 9 of the December 8th recording. You tell -- right there at the top, Line 4, Chief Turner for whatever the conversation is, we could be wrong there, but I don't know. And you say, right, right. Well, you know, I was kind of trying, you know, to push for them to get a search warrant on the computer because if he does have, you know, something, you know, of the nature of, like, child porn or whatever, you know, that would be a kind of ace in the hole type of situation, you know. At that point, I think, you know, we could go after him for a significant amount of time depending on what's on there. The other thing that I explored -- and then Chief Turner

Q. And what you were trying to do to bolster the probable cause evidence wise would be to get her toxicology report and if it showed that she had been drugged, that that might tip the 50/50 assessment of you and Wayne Taylor as to the existence of probable cause or having sufficient evidence of probable cause. Am I right?
A. Yes.
Q. Okay. You knew that the [redacted] investigation, girl out the window, was for a possible attempted homicide.
A. Yes.
Q. Do you know when the toxicology report came back on [redacted]?
A. I believe it came back in December or January of 2020/2021. I don't -- I didn't receive anything regarding that until I want to say it was April of 2021.
Q. Do you know if the toxicology report showed if [redacted] had been drugged?
A. The tox' -- the toxicology report, in my opinion, was inconclusive for my purposes. I think there was definitely the possibility that she could have been drugged. There was Eutylone, which is, I believe, a synthetic party drug, in her system. There was also Ketamine, which is a common rape drug, in her system. And the problem was that EMS actually administered her Ketamine, but they didn't measure her levels, so there was

Q. And did Wayne Taylor go through that analysis with you as well and agree with you?
A. Yes.
Q. Next exhibit, Bates Stamp 0009. Do you recognize this E-mail...
A. Yes.
Q. ...of Toma Sparks dated January 12, 2021, correct?
A. Yes.
Q. Okay. We would introduce that as the next exhibit.
COURT REPORTER: Number 29.
EXHIBIT #29: E-mail from Toma Sparks to Ms. Dahl, dated 1/12/21, Bates Stamp No. 0009.
Q. Okay. We'll sort of start at the bottom. It's an E-mail chain. Toma Sparks communicates to you on the 12th of January, 2021, started on the search warrant for the computer. I am having problems with some of the language for the probable cause. Are you available this week to give me a hand? I work Wednesday and Thursday night, blah, blah, blah. You respond, absolutely, that would be great. Could you send me a draft of the search warrant sometime tomorrow and I can start tweaking the language? If you can get me that, I can workshop it and then swing by JCPD. Is that your language...
A. Yes.
Q. ...on the 12th?

Toma Sparks.

MR. EASTWOOD: I'll object and say the transcript speaks for itself.

Q. Do you recall telling him -- did you tell Chief Turner on December 8th, I need more information from Toma Sparks?

A. I think it's clear through the conversation that was the case.

Q. Okay. But what is clear is that both you and Wayne Taylor did not believe there was sufficient evidence to support the search warrant at that time.

A. Correct. And I presented Chief Turner with what I thought were some viable options.

Q. Which was the toxicology report of [redacted].

A. And various other methods. One of the things I wanted to explore was trying to get evidence of other victims who had been drugged.

Q. Okay. On the December 8th though, you were aware that within hours of [redacted] falling out the window, that the Johnson City Police Department had interviewed Albert Watts, her friend who was up there, and that he had stated that [redacted] was not pushed and no one was within ten feet of her when she fell out the window. You saw his statement.

A. That was his statement.

Q. Okay. That's all I'm asking. That's all I'm asking,

I pressed the need to build a case.
Q. All right. 46, let's read it again. December 2020 through March 2021, Dahl repeatedly asked Chief Turner...
A. No.
Q. That's what it says.
A. Where?
Q. 46, read it yourself. 46, read it. Chief Turner to further investigate Voe.
A. Yes.
Q. When? Tell me when that you communicated during this time period with Chief Turner to further investigate Voe.
A. There was the December conversation.
Q. December, okay.
A. There was the January conversation.
Q. Okay. What was that conversation?
A. There were two -- from what I can remember, there were at least two different communications and I -- one was over the phone. I don't remember if the other one was in person. I don't think the other one was in person. But one -- there was one over the phone where we were discussing the search warrant and another victim that had come forward. I believe it was through the anonymous system. I asked -- I asked Chief Turner from December through March at least two documented times. I'm sure I made comments in person as well.

A. And I can go on. There was -- there was the canceled TBI meeting, which I found to be extremely odd and suspicious at the time. Then there was the fact that Chief Turner took issue with the TBI meeting. For what reason, I cannot fathom because I would imagine that getting more resources in on a case would be a good thing as opposed to a negative thing. Then there was the fact that Chief Turner's and Kevin Peters' complaint about my job performance coincided in time with the [redacted] interview. As it so happened, when I was trying to gather more evidence for the Williams file, I asked [redacted] to come in and give a more thorough statement. And I believe it was two or three hours after this interview occurred, I got a call from Wayne Taylor that Chief Turner was complaining about my job performance, and I found the timing on that to be extremely suspicious as well.
Q. You did see the E-mail from Legault to Chief Turner on December 11th, four days before your interview with [redacted], correct?
A. I believe so. I'm not sure which one you're referencing.
Q. I'm talking about your -- the E-mail that you got on the 16th from Wayne Taylor and the call or communication with him on the 15th, which as you say coincided with your [redacted] interview, correct?
A. I think they all coincided.

every name. There was -- I believe it was [redacted]. I believe it was [redacted]. There was -- who else? I believe Logan Brown was another one. There was an individual, and I don't remember her name, she was just a casual person that I had talked to on occasion at my yoga studio, and I wish I had gotten her name. So that's four right there. I think I talked to [redacted], but that wasn't until July, but there was [redacted]. There was...

Q. Let's stay with May, if you would.

A. Okay. And then there was a bartender at Watauga Brewery. I don't, unfortunately, remember her name, but I could describe her. Then there were a couple of other bartenders around that I had asked as well. I believe I asked the one in Yee-Haw Brewery, one in Tipton's. And so I believe [redacted] was -- and [redacted] were some of the ones that were actual victims.

Q. What is [redacted]s last name?

A. I don't remember because she was the one that reached out anonymously. She had -- she had texted me that she had gotten my number from someone in regards to this case and that she had knowledge. I don't remember if she was a victim off the top of -- because there were several different [redacted]. But she reached out and she said she had information. She didn't want to go completely on the record. And I think that was the one that reached out

other people stating that they had heard about girls getting DUIs after leaving Williams' apartment and after leaving his garage. So that seemed to be consistent in my opinion. Then it says [redacted] saw a lot more. I think this is going back to that [redacted]. I'm not sure if that's how you spell it or not. Then it says [redacted], that was her cousin. And then it says [redacted] needs to talk to me. I think this was a friend of [redacted]'s that she was trying to put me in touch with, but I don't remember. Then underneath it says, November 12th to November 13th, and that was when I was asking her again about -- because I had previously asked her about the time line of when she went to JCPD. I asked her again, are you sure you went down on November 12th, and she said yes. And then November the 13th was the day that Toma approached me with the case. So that's the end of 1474.
Q. Before we leave 1474, do we have a date when these conversations were taking place?
A. Right. I don't have a date on that. I know it would have been in the fall of 2021, but because some of these are out of order and, unfortunately, I might not have labeled it with a date at some points, I might have just opened and started scribbling...
Q. Okay.
A. ...but I know it would have been fall of 2021. So then

Q. Who is dating a new guy?
A. [redacted]. She was no longer -- because my concern had been that she and Williams had dated in the past. And she said, no, [redacted] is dating someone completely new, so that's what that is referencing.
Q. Okay.
A. And then it says, [redacted], question mark, [redacted]. These were two names that she was listing -- listing off as people that could have knowledge of Williams. And then it says underneath that, Knoxville, not [redacted]. And I think I was trying to distinguish between the numerous [redacted]. There was one [redacted] in Knoxville, there was one that was there local in Johnson City. There are too many [redacted]s floating around in this case. So then underneath that, I was asking her, [redacted], if she knew [redacted] and [redacted]. And she -- I think she indicated that she did kind of know them in passing, but she wasn't real good friends with them, so that's what that is referencing underneath where it says [redacted], [redacted], [redacted]. So then the -- one of the anecdotes that she had told me about how she had supposedly witnessed some sort of what she perceived to be a transaction of some sort between officers and Williams, I tried to press her on details with that. And it says, didn't see it, arrow, heard it. Cops would come, meaning cops would come to his

door. And so the first time she had told me that story, she said yes, I witnessed it. And then when I asked her, did you see it with your own eyes, she said, well, no, I was further back in the apartment, so I didn't see it, but I heard the conversation between Williams and supposedly these officers. And she said she had heard this conversation where these officers had come to Williams' door and said something to the effect of, quote/unquote, "hey, here you go," and then they would leave. And so it says, "hey, here you go" quote/end quotes, and cops would leave. And so she having come around Williams and been familiar with how he was involved with drugs and whatnot and some of the illicit activities, in her opinion there was something -- some sort of illicit activity going on with those interactions. Then it says, welded door shut up there multiple -- multiple something bust. I'm not sure what that was referencing. She was talking -- when it says welded door shut, she was talking about Williams apartment itself. And then underneath that it says, friendly at first and then he would -- then he would hide. And that was I believe she was talking about her relationship with Williams with those last notes. It says -- where she was saying, like, oh, he was -- he was friendly at first. I'm not sure what I was referencing when it says and then he would hide. Then it says, back

off, best friends, and then 94. I don't know what I was referencing with that, to be perfectly honest. It was probably just train of thought as I was talking to her. So that's the end of 1480. Okay...
MR. GARLAND: Excuse me just a second.
Q. Can we get one clarification, 1480.
A. Yes.
Q. Welded door shut.
A. Yes.
MR. GARLAND: There.
Q. There multiple times, but never came inside. Is that what that says?
A. Oh, yes. Okay. So she talked about how -- thank you. She talked about how he had welded his door shut, which is something that I was aware of, and then that is the next -- underneath that is a new thought. It's basically that the cops had come up there multiple times, but they never came inside. And that, she thought, was odd in that they were coming to the door, but just for unknown reasons, and never really coming inside the apartment.
Q. But she was inside the apartment?
A. Yes. Okay. So 1481, it's still the [redacted] conversation. I believe the top note is kind of completely unrelated, which is why there's a line there. I think that was some random notes that I had taken. Or maybe it wasn't. Maybe

A. Yes.
Q. Okay. I'm going to try to do one more to keep us moving. Jane Doe 7 is [redacted].
A. Yes.
Q. Okay. You first spoke to her sister, [redacted], in July of 2021...
A. Yes.
Q. ...according to your complaint, Paragraph 96, correct?
A. Yes.
Q. According to your complaint, Paragraph 95(d), the sister told you that a particular investigator from the Tennessee Alcohol and Beverage Commission, I think you called it the Bureau, had contacted Johnson City Police Department concerning [redacted]'s death...
A. Yes.
Q. ...the sister's death in a car crash that had occurred in Elizabethton. And according to the Alcohol and Beverage investigator, received no cooperation or follow-up...
A. Yes.
Q. ...with the Johnson City Police Department.
A. Yes.
Q. Okay. What is the name of this, I'm going to call him, ABC agent?
A. Misti Crain.
Q. I'm sorry?

A. Misti, M-I-S-T-I, Crain, C-R-A-I-N.
Q. And you claim, again, in your complaint, Paragraph 95(d), that you called this particular agent and she confirmed the sister's account. Is that right?
A. Yes.
Q. Did you record this conversation you had with the agent?
A. No, it was over the phone.
Q. Who did the sister of [redacted], which I think we've established as [redacted]...
A. Yes.
Q. ...speak with at the Johnson City Police Department?
A. She doesn't know. She spoke to a male officer or investigator. I asked her, I think, two or three times if she remembered anything or could recall a name, and she said no, she couldn't. She just went down there in person, and spoke to a male investigator down there, and told them that she was concerned that Sean Williams had something to do with her sister's death because he was the last one to see her alive. And this -- whoever this individual was supposedly told her that, well, Johnson City can't do anything because they don't have jurisdiction as the crash occurred in Elizabethton.
Q. And did she also go to Elizabethton and talk to the Elizabethton Police Department about the death?
A. Yes, she did. She went to Elizabethton to express her

concerns. At that point, I don't think she got anywhere because Elizabethton was processing it as a standard DUI, so from what I remember, they didn't have much interest in digging beyond that.

Q. Are you aware -- is there any information or have you been told that the Elizabethton Police Department or a member of that department contacted Johnson City?

A. I don't recall that, no.

Q. Why was the ABC agent calling Johnson City Police Department? What information was she -- did she need?

A. Well, she was extremely alarmed at the nature of the case. Her entire prerogative in getting involved with the [redacted] case was she was potentially going to prosecute the bar for over serving [redacted].

Q. Which bar?

A. This was Watauga Brewery.

Q. Watauga Brewery, okay.

A. Yes. And so when she began her investigation into Watauga Brewery, she very quickly found out that Laura had -- after she had left Watauga, she had gone up to Sean Williams' apartment and she said she very quickly found out what his reputation was, how he was known for drugging and raping women, and she was -- she was concerned because she couldn't prosecute the bar because of these details. There was no way that she could prove that [redacted] was over

Q. Do you have -- did you know -- I'm sorry, go ahead.

MR. EASTWOOD: No, I was going to say exactly -- I think -- I think to the extent she knows, right.

Q. Considering 27 pages of texts, do you understand what [redacted] meant when she told you that the ABC shut her down?

A. Yes, that [redacted] and her family were looking for any avenue of accountability with regards to [redacted]s case. And so she was not only interested in pursuing the lead against Williams, she was pursuing any lead that she had. When this whole first -- when this all first started and she was involved with the ABC investigation, the ABC, Misti Crain, came to her and basically said the same thing that she told me, that there's no way that I can prove that Watauga over served her based on how she was present in Williams' apartment, and what Williams' reputation was, and based on some of the testimony she heard from people that night because Misti interviewed several people that basically all said -- had the consistent narrative of, yes, [redacted] had been drinking, but she was not sloppy drunk. She was still coherent when she left the bar. And she was extremely different from the time that she left the bar to the time that she got behind the wheel, and we know that because of the voicemail recording that she has. And so [redacted] is referencing that, you know, ABC gave her

Williams himself admitted to with -- because I think in that time period, [redacted] actually called Williams, because she knew Alvie, and had a conversation with Williams and Alvie that she recorded. So a recording exists of Williams admitting that [redacted] was present in his apartment. Noah, who I talked to, relayed to me that his version of events is that he came back to the garage and he found it basically empty. The garage was shut, everyone was gone. [redacted] was gone. And he, at that point, didn't know what to do because he didn't have his phone on him. So he didn't know where [redacted] had gone, he didn't know where to look for her. He walked around downtown for, he said, about 30 minutes, 45 minutes looking for her, calling for her name, and then finally figured to himself, oh, well she must have just gotten in the Uber and gone home. So at that point he walked to a gas station and I think used the pay phone or someone's phone there to call a taxi and he went home. That's his version of events that that was the last time he saw [redacted] was outside of Williams' garage, you know, talking to them when he went to look for his cell phone. Williams' version of events is that, yes, [redacted] did come back to his apartment, but she was only there for about 15 minutes, and then she heard Noah calling for her, and she went down, and he could see through the window that they were

fighting or arguing. It looked like they were arguing at some point, and then the two of them walked off together. And that's Williams' version of events. I -- just based on who seems to be more credible given their background, I tend to think Noah is probably the more credible version of events when I was speaking to him, but we know that [redacted] was present in Williams' apartment for at least 15 minutes, possibly as long as 45 'ish to an hour. And before she went to his apartment, she was described by her friends as coherent and still in control of herself even though she had been drinking. After she got behind the wheel, she was completely incoherent. She -- there was no making any sense of what was happening to her in the moment.

Q. Did she call [redacted], her sister...

A. Yes.

Q. ...or [redacted] called her?

A. So she called [redacted] and [redacted] numerous times throughout that night. I think she got behind the wheel around -- probably around, like, 1:00 'ish. And if I remember correctly, so she -- there's an hour missing from about midnight to about 1:00. And about 1:00, based on phone records, she gets back to her car, starts calling both of her sisters. She -- and for whatever reason, and I don't know how this happened, I'm not really tech savy in this

me, [redacted] crashed on the -- I think it was November 10th, and it was November 11th when [redacted] began to figure out that she had been in Williams' apartment and kind of put these, you know, last steps together. And it was on the 12th that she went to JCPD. As far as I'm aware, some of the -- the autopsy and the testing and all of that was done almost pretty immediately after she died because [redacted] was actually the one -- [redacted], her older sister, is actually the mortician and she was the one to help take care of the remains after she passed.
Q. But you say there was an autopsy?
A. I believe there was. I don't know because I'm not as well versed in -- I know there's different levels to an autopsy. There's...
Q. Okay. That's all right. In your communications with [redacted]'s sister, [redacted], she was moving to Nashville.
A. Yes.
Q. Do you know why she was moving?
A. Yeah. She couldn't take it here anymore. This area reminds her too much of her sister, and she can never celebrate her birthday again either.
Q. Did you talk to her about her mental health, [redacted]?
A. Yeah, I'm sure it came up.
Q. Did you advise her to have counseling or what did you tell

A. No. She said -- there was one kind of story or anecdote that she gave where she said at one point an individual, who she believed to be Chief Turner, had gone into Sean Williams' apartment and told her, sweetie, you need to leave. And she took that to mean as she wasn't supposed to be in the room with -- with Chief Turner or whoever this individual was and Williams.
Q. Are we talking about one occasion or two occasions?
A. I believe it was at least one. I'm not sure if there were multiple, but it was at least one.
Q. Ms. Dahl, my recollection of your testimony yesterday was that you had been filmed by Ronan Farrow over a period of about three hours in Knoxville last week or within the last ten days, right?
A. Correct. It was -- I don't remember the exact date without a calendar in front of me, but...
Q. That's all right. Okay. So you were filmed, I think you told us, on the topics that were included in your complaint, but also the emotional impact that this situation had had on you. Is that right?
A. Correct.
Q. And this emotional impact that you've discussed on film with Ronan Farrow is the emotional impact for which you seek to hold Johnson City and Chief Turner liable in this lawsuit. Is that right?