UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
NORTHEASTERN DIVISION

KATERI LYNNE DAHL,               )
                                 )
        Plaintiff,               )
                                 )
v.                               )        No. 2:22−cv−00072−KAC−JEM
                                 )
CHIEF KARL TURNER, *et al.,*     )
                                 )
        Defendants.              )

### Declaration of Kateri Lynne Dahl

Kateri Lynne Dahl declares as follows:

1. My name is Kateri Lynne Dahl. I am over 18 years of age and I am competent to make this declaration. I am a citizen and resident of Madison County, Alabama. This declaration is based upon my personal knowledge. I reviewed records from discovery in this litigation in order to refresh my recollection.

2. At the time of the events in question, I was the Special Assistant U.S. Attorney for the U.S. Attorney's Office in Greeneville, TN. I have been practicing as an attorney since 2018, and I am barred in the District of Columbia in good standing.

3. As a "Special Assistant U.S. Attorney," the Memorandum of Understanding I signed with Johnson City Police, the Department of Justice ("DOJ"), and the Washington County District Attorney stated that I would work with the Johnson City Police Department to identify cases which are appropriate for federal prosecution, and would be actively involved in furthering the training of the Johnson City Police Department. This SAUSA position was a longstanding arrangement that renewed annually, and various lawyers

Doc ID: 235ba698510f716d1e1d0f411e0dd64b2a50c80c

have served in this position over many years. For example, my AUSA mentor Tom McCauley had previously been the Johnson City SAUSA.

4. In 2019, I applied for the SAUSA position after being encouraged to do so by Wayne Taylor, a Supervisory AUSA in the Greeneville U.S Attorney's Office. I had previously worked as a summer intern in 2014 and 2015 in the Greeneville office while I was in law school at the University of Tennessee. I maintained a relationship with Taylor and several other AUSAs in that office after I graduated from law school, and in late 2018 Taylor notified me that the position was becoming available. I applied in early 2019 and was asked to interview for the position in May 2019.

5. Taylor, Johnson City Police Chief Karl Turner, and District Attorney Ken Baldwin interviewed me. I was subsequently offered the position in June and started in September.

6. When I first started the job, I was told by Taylor that I would answer to both him and to Chief Turner, and to split my time between the U.S. Attorney's Office in Greeneville and the Johnson City Police Department. I was also to assist the Johnson City Police Department however I could with identifying investigations for federal prosecution. This included guiding them on best practices for federal indictments.

7. Taylor made it apparent that I would be juggling two bosses at the same time: one example of this was that while Taylor was my immediate supervisor, I always had to clear my time off with Chief Turner and arrange my schedule around JCPD's needs. Whenever I took vacation or sick leave, I cleared it with Chief Turner ahead of time. I had almost no interaction with the District Attorney's Office after my initial job interview. I was also expected to attend certain Johnson City hearings and meetings. I had to attend the City

Doc ID: 235ba698510f716d1e1d0f411e0dd64b2a50c80c

Commission meeting that approved funding for the SAUSA position, and I was expected to brief City Commissioners about my progress and accomplishments.

8. Chief Turner and Johnson City did not have any issues with my employment for the first year, and my contract was renewed by the MOU agency partners in June 2020 with no issue. At the time of that June 2020 renewal, I briefed the Johnson City Commission on my progress.

9. On the morning of November 13, 2020, I went to the Johnson City Police headquarters to check in with the investigators I worked with about some routine matters. As a manner of practice, I would normally go to the department at least once a week to touch base with officers and pick up any files that I would need for cases. When I arrived, I was approached by Investigator Toma Sparks, who asked me to take a look at a case for a felon in possession of ammunition. I hesitated, and explained to Inv. Sparks that per USAO policy that cases for ammunition were usually only prosecuted federally if there was a compelling reason. He responded that the suspect was a suspected serial rapist, and I was immediately intrigued.

10. I sat down with Inv. Sparks and Sgt. David Hilton, who began to lay out the whole story. They explained to me that the case began when a victim had fallen out a window, and proceeded to spend the next 15 minutes telling me about Sean Williams, the case with Jane Doe 1 and her fall from Williams' apartment, Williams' history of assault reports, and the disturbing findings in his apartment including the "Raped" list and the babydoll. Inv. Sparks and Sgt. Hilton also laid out the various rumors about Williams and his suspected criminal activity: they told me that his modus operandi was to lure women and girls through his garage where he stored his sports car, or that he would drug them while

Doc ID: 235ba698510f716d1e1d0f411e0dd64b2a50c80c

at a downtown bar. They stated that he was known for dealing drugs, especially cocaine, and was known for posting it to social media. They also claimed that there were rumors that he photographed the victims and blackmailed them into silence. They described the search warrant of Williams' apartment, and told me how the shotgun had disappeared and how Williams was able to wipe his phone. I questioned why they had not gotten a search warrant for the garage, but they claimed that they had no probable cause to obtain one. I asked if they had attempted to identify any of the women on the "Raped" list, but they said that they had not.

11. I was also perturbed by the fact that while they were telling me about the case, Sgt. Hilton had remarked about Jane Doe 1 that "You can see (Jane Doe 1) on the security footage, and she's dressed like a real… well I won't say it." I interpreted that as commentary from Sgt. Hilton about how Jane Doe 1 was dressed, and in my experience with sexual assault cases, I was immediately concerned that there would be gender bias present from the investigation officers that would hinder the case. I had previously been in a separate meeting with Inv. Sparks where I had overheard him state, "In my 20 years on the force, I've only encountered one real rape." I was worried that those biases would prevent a thorough and objective investigation, as well as discourage any victims who were interviewed in the process.

12. I listened to their description of the case, and then told them that I would absolutely take it. I was already alarmed at the facts being presented, and I told Inv. Sparks and Sgt. Hilton that while I would be open to indicting for ammunition as a last resort, I wanted to explore all possibilities for serious charges. I explained to them that the charge for

Doc ID: 235ba698510f716d1e1d0f411e0dd64b2a50c80c

ammunition did not carry a lengthy sentence, and that if what they were telling me was true, that this individual should be prosecuted for more serious crimes.

13. Inv. Sparks and Sgt. Hilton told me that they still had Williams' laptop and some camera SIM cards in custody. I told them that I didn't know if a search warrant was viable based on the amount of time that had passed and the facts of the case, but that I immediately wanted to begin exploring it as an opportunity. I asked Inv. Sparks to get me a draft search warrant as soon as possible, as well as any report they had on Williams as a suspect.

14. After I left, I immediately called Tom McCauley, my AUSA mentor and a former Johnson City SAUSA. I was immensely disturbed by the facts of the case, as well as the missteps that had already occurred in the investigation. I gave him a rundown of the case and told him that I was puzzled at some of the decisions made by Inv. Sparks, including how he did not even attempt to get a search warrant for Williams' garage.

15. After talking to McCauley, I placed a call to Taylor and briefed him on the case as well. I explained to Taylor that I was alarmed by the case and the fact that Williams was still living and working in downtown Johnson City. I told him that based on my experience, he appeared to be an ongoing threat to women and a danger to the community at large. Taylor agreed, and I told him about the investigation errors. He said he would set up a meeting for me with the TBI, as a case of this nature warranted additional resources. I followed up my phone call with an email to Taylor containing a photo of the list, which I sent to emphasize the serious and disturbing nature of the case.

16. I was excited and eager to take this case on, as I viewed it to be a top priority. From my previous knowledge and training about serial sexual offenders, I knew that Williams

Doc ID: 235ba698510f716d1e1d0f411e0dd64b2a50c80c

appeared to be the type to reoffend until circumstances changed and he was no longer in a position to do so. I was concerned about the number of alleged victims, because if that number was accurate, it meant that Williams was an extremely prolific offender and he would be a constant threat to the community. Given the number of alleged victims and the violent nature of the crimes, it was my opinion that this case should be a priority for both myself and JCPD. I had a number of cases without identifiable victims, such as drug trafficking cases, but I did not have any that had this extreme level of violence against the community.

17. I began researching Williams in any way possible. I had asked Inv. Sparks to send me the case reports for the other victims on November 13, but did not receive anything. I began reviewing Williams' Facebook page and any other internet records I could find about him or his business, Glass and Concrete Contracting, LLC. I also began examining his friend network on Facebook, in an attempt to identify leads about the women on the "Raped" list.

18. During this period, I made several trips to JCPD for other cases, and made a habit out of trying to prod Inv. Sparks, as well as the other investigators I worked with, to pursue more leads about the case.

19. On November 16, 2020, I asked JCPD Investigator Kirt Stillwagon if he knew anything about Williams or the women he associated with. Inv. Stillwagon said that he knew that a woman whose name was on the list was Williams' ex, and that she used to work at a restaurant that Inv. Stillwagon frequented. He said that this woman had used to complain that Williams was abusive. This confirmed in my mind that the woman who I had found

Doc ID: 235ba698510f716d1e1d0f411e0dd64b2a50c80c

on social media was most likely the same one on the list, given the unusual first name and the fact from Inv. Stillwagon that she had been romantically involved with Williams.

20. Over the next several weeks, I expressed my frustration about how Inv. Sparks had not gotten me a draft search warrant or the other victim reports to numerous people, including McCauley, Taylor, and JCPD investigators Stillwagon and Saulsbury. I was baffled about Inv. Sparks' apparent lack of interest or sense of urgency with this case, so I began discussing and asking for help from other officers.

21. On November 24, 2020, I got a call from Inv. Sparks, who told me that they had another rape victim of Williams. He told me that she was at the hospital undergoing a SANE[1] exam, and that they were planning on interviewing her once that was done. I told Inv. Sparks that I would meet him at the department, as I wanted to be present for the interview.

22. I was told by Inv. Sparks that Jane Doe 2, the new victim, was not sure that she wanted to do the interview that day and was coming to the department to pick up her phone. Jane Doe 2 arrived at the department with a victim advocate. I went out to greet her, because it had been my experience that victims often become more willing to cooperate and open up when they realize that a woman will be present for an interview. While Inv. Sparks spoke with the victim advocate, I introduced myself to Jane Doe 2 and explained my involvement in the case. I expressed my sympathy for her ordeal, and told her that it was fine if she wanted to interview on another day. At that point, Jane Doe 2 changed her mind and said she wanted to speak with me. I guided her into the department and into an interview room, and began asking some basic questions about the ordeal. Inv. Sparks joined and began to lead the interview. I asked questions that were especially pertinent to

---

[1] Sexual Assault Nurse Examiner

Doc ID: 235ba698510f716d1e1d0f411e0dd64b2a50c80c

any federal involvement, including Williams' drug distribution and his ownership of firearms.

23. After the interview had concluded, I asked Inv. Sparks to take a written statement from Jane Doe 2. She and Inv. Sparks left to complete the statement and retrieve her phone, at which point I was left alone with the victim advocate. I began to ask the advocate about her interactions with JCPD, as I was becoming increasingly concerned about their interactions with sexual assault victims and their apathy for prosecuting these cases. The advocate confided in me that the Johnson City Police Department was "the worst one to work with" in the Tri-Cities area.

24. The following day, I began to explore the possibility of pursuing an investigation or a search warrant through Williams' use of drugs to incapacitate victims, using a little known federal date rape provision under the Controlled Substances Act. I discussed that possibility with Taylor and called Inv. Sparks to tell him that I wanted to pursue it as an option. I also asked whether we could see if Jane Doe 2 could identify any of the victims, but his response was noncommittal.

25. I continued to research leads for the women on the "Raped" list, ahead of the December 8 scheduled meeting with the TBI. I also continued to research the possible investigative approaches we could utilize in the case, to justify further federal involvement.

26. Inv. Sparks and Investigator Saulsbury finally sent me the respective reports I had been asking for on November 30 and December 1.

27. On December 7, 2020, I received a text message from Chuck Kimbrell, the TBI agent I was supposed to meet with, that he would have to cancel our meeting due to a Covid exposure. I texted McCauley about the cancellation to express my disappointment.

Doc ID: 235ba698510f716d1e1d0f411e0dd64b2a50c80c

28. A little later that day, I received a call from Taylor. He told me that Chief Turner had learned about the TBI meeting and was angry that the meeting had been set up without his knowledge. Taylor told me that he assured Chief Turner that I was not responsible for the meeting, and that he had set it up, but cautioned me that Chief Turner seemed upset about the meeting. I told Taylor the meeting had been canceled earlier due to Covid.

29. The next morning, I received a call from Chief Turner. He told me that he wanted me to come into the department for a discussion that afternoon. I agreed and we set up a time for later that day.

30. The cancellation, Taylor's phone call, and Chief Turner's phone call in quick succession left me feeling disturbed. I began to suspect that the cancellation was not due to a Covid exposure, but due to Chief Turner's interference. I was apprehensive about meeting with Chief Turner given this turn of events, as I didn't want to be put in a position where I was either directed to ease up the pressure on the case, or defend what was said behind closed doors with no other witnesses. I knew Tennessee was a one-party recording state, so I made the decision to record the meeting in an effort to protect myself. I was feeling extremely apprehensive about the meeting, because the TBI cancellation and Chief Turner's anger about getting additional resources involved seemed bizarre. I was aware of competition between law enforcement agencies, but I had thought that JCPD would welcome the assistance, especially given Inv. Sparks' lack of motivation in how he was working the case. When the meeting was canceled in that fashion, I became fearful that if something was in fact awry, I would need proof before going to Taylor or anyone else at DOJ. I was aware that law enforcement agencies would sometimes become territorial over cases, but I was concerned that the bizarre series of mistakes and the disinterested

Doc ID: 235ba698510f716d1e1d0f411e0dd64b2a50c80c

attitude of the investigating officers combined with the sudden cancellation of the TBI meeting pointed towards something more than routine competition between agencies. I was particularly skeptical of the reason given for the meeting cancellation, that it was due to Covid, given that the cancellation was immediately followed by the news that Chief Turner was upset about the meeting and the phone call from Taylor. My suspicions proved correct as the meeting was not canceled due to Covid, but due to Chief Turner's and Cpt. Peters' interference.

31. On the afternoon of December 8, 2020, I went in to meet with Chief Turner. During the course of our meeting, we discussed the Williams case at length. I tried to present a number of my findings about Williams: the leads I had found regarding the identities of the women, the different concerns I had about him given my research, and several ideas about how to further the investigation. I was frustrated because Chief Turner didn't seem particularly interested in what I brought up, and I felt like my suggestions were essentially ignored. Captain Peters also joined the meeting after a while. I was especially disturbed when I tried to broach the topic of the list, and how I wanted to identify the women who were on it, when Turner cast doubt on its evidentiary value. I found it discouraging and baffling that such a simple investigative approach was dismissed before it was even tried. Cpt. Peters and Chief Turner seemed to favor installing pole cameras in front of Williams' garage, to which I half-heartedly agreed, but privately thought would be futile.

32. During the week of December 10, I called the June 2020 victim, Jane Doe 3, from the report that Inv. Sparks had given me. He had labeled her as "uncooperative," but she answered the phone when I called and was willing to come in to give a statement. I

Doc ID: 235ba698510f716d1e1d0f411e0dd64b2a50c80c

wanted a more detailed written statement for any future attempts to obtain a search warrant or use the federal date rape statute in some manner, as the description of her assault seemed to suggest she had been drugged as well. I asked McCauley to accompany me on this interview because I was still wary about how JCPD had been acting about this case.

33. I was also increasingly worried about the cavalier attitude that officers were displaying with the case, as well as their disdain for my insistence about it. In early December when I was at the department, Sgt. Gryder made the comment to me, "Well Kat if you're so invested in this case, go have a drink at Label and let Williams pick you up and take you back to his place. We'll come get you in an hour." I took this to mean that he was suggesting I would have better luck gathering evidence if I made myself a victim of Williams, rather than pressuring JCPD to investigate further.

34. On December 15, I called Inv. Sparks to make sure he could be present for the interview with Jane Doe 3, and met with McCauley at the Greeneville office and we told Taylor that we were headed to JCPD headquarters to interview this victim. Taylor approved.

35. Once at the department, I went outside to wait for Jane Doe 3 and accompany her inside. McCauley stayed in the back area, talking to Inv. Sparks and Cpt. Peters. Jane Doe 3 arrived and I guided her back to the conference room, as there were too many people present to utilize one of the interview rooms. Inv. Sparks led the interview, with McCauley and I mainly listening and asking for clarifications when necessary. I was interested in her recollection about the events leading up to the assault, and whether or not what she had experienced was the result of someone drugging her without her knowledge. After the interview, McCauley and I walked Jane Doe 3 out, and I explained

Doc ID: 235ba698510f716d1e1d0f411e0dd64b2a50c80c

to her that if she wanted to move her own case forward at all, that I did not have any control over that as a federal prosecutor. I assured her that while I did not have control over that, I would do whatever I could to support her if she did try to move forward with any sort of charges against Williams.

36. After Jane Doe 3 left, McCauley told me that he was disturbed by some comments that Cpt. Peters had made to him while I was waiting out front. He told me that Cpt. Peters had asked what he was doing there, and when McCauley responded that we were there to interview Jane Doe 3, Peters pulled up Jane Doe 3's Facebook profile and proceeded to make objectifying comments about her appearance.

37. Later that afternoon, I received a call from Taylor. He told me that Chief Turner was complaining about my job performance, mainly that I was not indicting cases fast enough and I was not communicating with officers. I told Taylor that I hadn't had anyone mention these criticisms to me personally, and I had met with Chief Turner the previous week. I also told Taylor that I was constantly in touch with Special Investigation Squad ("SIS") officers, but I would be sure to clarify with them if they felt that communication could be improved. Taylor agreed, and forwarded me the email he had received from Chief Turner about the cases that hadn't been indicted.

38. I called Investigator Stillwagon later that evening to ask about any alleged communication issues. I asked him whether he had a problem with how we communicated, and he said no. I told him that I wanted him to tell me the truth, and that I always welcomed healthy feedback. He reiterated that no, he did not have a problem with our communications.

Doc ID: 235ba698510f716d1e1d0f411e0dd64b2a50c80c

39. Over the next several days, I also approached Sgt. Legault, Inv. Saulsbury, and Inv. Barron. I asked them all whether or not they had a problem with how I communicated with them, and they all said no. Once again, I tried to emphasize that I wanted them to be honest with me if there was ever an issue, but all three officers denied it and insisted that there wasn't a problem. I also gave them all updates about the cases on the email list that Taylor had forwarded me from Chief Turner.

40. Sometime in late December 2020 or early January 2021, I went back to Taylor and orally reported that I had updated the officers about the cases, and had asked them if they had any issues with communication, but they all said no.

41. On December 30, in a separate meeting, I met with Taylor and told him about my concerns with JCPD. I told him how I was upset about the lack of respect from them, from how they talked to me and the comments they made, to the fact that they did not seem to listen to me when it came to my professional opinion as an attorney and how I wanted to proceed with the Williams case. I told him how they appeared to ignore me regarding the evidence that I had researched and found through social media, and attempted to bring to their attention. Taylor did not offer any meaningful assistance, and told me that if I had issues with the officers, I needed to communicate that myself. He did not offer to help, intervene, or support me in navigating these problems with JCPD. I took his reaction to mean that I was essentially on my own with these issues and that I would not receive any significant help from Taylor.

42. I continued to try and talk to officers about Williams through January 2021 and make different suggestions about the investigation, to no avail. I was deeply disappointed when

Doc ID: 235ba698510f716d1e1d0f411e0dd64b2a50c80c

there was no significant action taken by anyone to further the case or attempt to investigate the other allegations.

43. On January 12, after two months of reminding Inv. Sparks that I would like a draft search warrant for the computer and the SIM cards, he finally sent me a copy. I was dismayed when I reviewed it, because I was already concerned about the amount of time that had passed, and the affidavit he submitted was bare bones in my opinion. I told McCauley about it verbally and expressed my frustration that it had taken two months to get an affidavit that was unusable. I was extremely cautious about how to proceed, because I didn't want to jeopardize the case if a search warrant went forward and was subsequently thrown out on a motion to dismiss.

44. On January 25, I missed a call from Chief Turner at 3:47pm. I called him back at 4:00pm, but he did not pick up and the call went to voicemail. A short time later, I received an email from Taylor saying that Chief Turner called him and told him he was unable to reach me. At 5:30pm, Chief Turner called me and told me that they had received an anonymous tip about another victim of Williams, Jane Doe 4. He asked me where we were at in the search warrant process, and I explained to him that I was worried that at that point too much time had passed. But I also told him that I was continuing to research, just to be sure in my assessment. I did not tell Chief Turner that in addition to how much time had passed, the warrant Det. Sparks had sent for Williams' devices was completely deficient. I discussed the deficiencies with McCauley on several occasions, and was frustrated because of the subpar nature of Det. Sparks' efforts. Due to how much time had passed and the insufficient affidavit, a warrant for the devices was never obtained and JCPD officers never reviewed the content on those devices.

Doc ID: 235ba698510f716d1e1d0f411e0dd64b2a50c80c

45. On January 27, I was down at Johnson City Police Department when Inv. Stillwagon jokingly asked if I had been the one to who had graffitied Williams' garage. I told him I didn't know what he was talking about, and he pulled out his phone to show me a picture of Williams' garage with the word "Rapist" spray painted across it. After I left the department, I drove by Williams' garage in person to see the vandalism and took a picture of the spray painted message. I was disturbed by the fact that once again, these allegations seemed to be happening in plain sight. I texted McCauley and AUSA Greg Bowman about the graffiti, and told them I was concerned about how the rape allegations surrounding Williams were playing out in such a public manner.

46. In February, I made the decision to indict Williams for the ammunition at the next grand jury. I was fed up with waiting for new developments from JCPD and worried that the longer Williams was free, the greater chance for him to target women. I hoped that by indicting him on the ammunition, word would spread of his arrest, and subsequently victims would feel emboldened to come forward. I began working on preparing his pros memo and the case for indictment. As things were beginning to open up again in the beginning of February 2021, I began returning to more routine work tasks. There were some hiccups at the beginning of the year with administrative manners, as everyone had adjusted to the inconsistent nature during the majority of 2020 and it took some time to readjust. On February 8, Taylor sent me an email discussing a mistake I made with the Clerks' Office. I remember discussing this email with Taylor either over the phone or in person. I told him I would amend the mistake made with the Clerks' Office. However, I was frustrated by the criticism of not responding to Probation. I had experienced issues with their office numerous times, where I often had trouble getting in touch with the

Doc ID: 235ba698510f716d1e1d0f411e0dd64b2a50c80c

probation officer assigned to the case, or was waiting on a response from them until the last minute. There were several times that the probation officer would not send me their petition until the day of the detention hearing, sometimes as late as the hour before the hearing so I had very little time to review. I brought up this concern to McCauley, who had also experienced this problem. Kaycee Roberts, who worked for the Federal Defender's Office, had complained to me on numerous occasions that she too had issues with communicating with probation. I was frustrated because I felt like I could not bring up this issue to Taylor, as he had previously told me at the December 30 meeting that if I had a problem with the JCPD officers, I was responsible for handling it. Once again, I was given the impression that any problems with colleagues outside the USAO would be left to me to negotiate. I was discouraged because these issues felt like a one way street where others could raise questions with Taylor, but I could not ask for help or support when I needed it.

47. On February 16, 2021, Inv. Barron, who was not involved with the Williams case and claimed to know very little about Williams in his deposition, sent an email to Cpt. Peters, Sgt. Shepherd, Sgt. Hilton, Sgt. Gryder, and Sgt. Legault about a victim of a sexual assault and vaguely referenced the "Sean Williams situation." I was not told about this incident by any of the officers involved, despite my instructions to Sparks that I wanted to be kept in the loop on any new developments regarding Williams.

48. On February 26, 2021, I was driving past Williams' garage when I noticed that he had a poster in the garage window with his Snapchat username, presumably so passersby could add him on the social media app. I was upset and disturbed that a suspected serial rapist was openly advertising and inviting people to his social media, as I viewed it as one more

Doc ID: 235ba698510f716d1e1d0f411e0dd64b2a50c80c

way he was preying upon women and girls. I took a picture of the garage with the poster, and sent it to Inv. Sparks. Once again, he seemed uninterested in this development.

49. In the beginning of March, I began double checking that I had all the necessary documents to go forward with an indictment against Williams on March 8. When I revisited the felony judgment that Inv. Sparks had included in the file, I discovered it wasn't an actual certified felony judgment as I required for the grand jury. Rather, it was a criminal history from the Jackson County Court. On March 5, I texted Inv. Sparks about whether he had the actual certified judgment, but did not receive a response. I then called Inv. David Hilton about the judgment, and he stated that the document I had was the certified copy.

50. I called the Jackson County Courthouse and verified with them that the document in the file was not a certified judgment. However, I was told that since the felony conviction was rather old, it would have to be obtained from their archives which would take several weeks. I subsequently had to pull Williams from the March grand jury and placed him on the list for April.

51. At the beginning of March 2021, I began attending yoga classes at a studio in downtown Johnson City. In late March, I was having a conversation with an acquaintance at the class, and she mentioned that she lived downtown. I asked her how she liked it, and she said it was ok except for the parties and noise. She went on to talk about the "incident where the girl fell out of the window." I immediately recognized that she was referencing Jane Doe 1 and asked her what she knew. She said she didn't know much, just that a woman fell out of the apartment, and the person who owned that apartment was "sketchy." She also mentioned hearing rumors about the garage with the red sports car,

Doc ID: 235ba698510f716d1e1d0f411e0dd64b2a50c80c

and that it had an unsavory reputation as well. I was disturbed that knowledge about Williams was this common, and I asked her to contact me if she heard anything more about the garage or the apartment. I also warned her to stay away from both.

52. Throughout the month of March, I slowly got drawn into trial prep along with my other duties. One of my cases was set to go to trial on March 23, 2021, so I began to prepare in earnest for that possibility. On March 15, it was continued to later that spring. The other case I was preparing for trial was one where I was assigned to be second chair with AUSA Emily Swecker. At that point it appeared we were moving closer to that possibility, and had begun to do some prep. Towards the end of March, it appeared that AUSA Swecker's defendant was going to sign a plea agreement, but we weren't certain, so we continued to prepare.

53. I was also relieved that grand juries were starting to occur more regularly in spring of 2021. The Eastern District of Tennessee had had numerous grand juries canceled, or had one grand jury a month for the entire district. This was an ongoing pattern since the start of the pandemic in March 2020, but it appeared that things were slowly starting to open back up again. Not only did I want to begin to clear the Covid backlog of cases, but I was increasingly frustrated with JCPD's lack of understanding at how federal court was proceeding under Covid.

54. I was also exasperated at their lack of understanding when it came to presenting complaints. Our USAO was under instruction that complaints were only to be utilized in time sensitive cases, such as with an exceptionally dangerous defendant or another extenuating circumstance. They were not to be used in place of grand juries, as defendants arrested with a complaint still had to be formally indicted in a grand jury

Doc ID: 235ba698510f716d1e1d0f411e0dd64b2a50c80c

under the requirements of the Fifth Amendment. An abundance of defendants who needed to be indicted due to a complaint would cause further backlog. As the pandemic went on, it became increasingly apparent to me that JCPD officers were viewing a complaint as a substitute for grand juries. They also seemed unaware that complaints were subject to the schedule of the judge, which was itself subject to change as well.

55. On March 23, Legault emailed an updated version of his case list to Turner, again complaining that in his view, I was not indicting cases quickly enough. No one shared that list with me or the USAO at that time. Legault did not give any indication that he was unhappy with my performance at that time, either through text or phone conversations or when we were working in person. I met several times with Legault through the month of March, as we were working on a case that was possibly going to trial and Legault had been the arresting officer.

56. The next day, JCPD notified the June 2019 rape victim that a lab report indicating the presence of male DNA had come back position over nine months earlier dated July 15, 2020 – well before Jane Doe 1's fall. Despite actively working to prosecute Williams, I was not notified by Det. Sparks or any other officer about the positive rape kit results. This was even as I continued to press JCPD officers to further investigate Williams and had explicitly told Det. Sparks numerous times that I wanted any updates he had about the Williams case as I considered it a high priority.

57. On March 26, I went out for drinks with a friend of mine, Kaycee Roberts, who worked for the Federal Defender's office. We decided to go to the Watauga Brewery rooftop. Roberts told me about one of her friends who was connected to Williams on Facebook, but she wasn't sure about the nature of their relationship. I had previously disclosed to

Doc ID: 235ba698510f716d1e1d0f411e0dd64b2a50c80c

her that Williams was an alleged rapist, as I was concerned for her wellbeing when she went out in downtown Johnson City. I had also warned other female friends of mine to stay away from the garage and watch their drinks while they were downtown. Roberts went on to tell me that she did hear a rumor from a different friend about a man who would drug women in downtown Johnson City. It was becoming apparent to me that there was a well developed "whisper network" surrounding Williams and his reputation for sexually assaulting women.

58.  Towards the end of the night, I made the decision to try and question the bartender about whether she knew anything about Williams. I wanted to see if knowledge about his activities was limited to the girl in the yoga studio, or if it was more widespread. I waited until there was a moment where no one was around, and then I asked her if she knew anything about the garage with the red sports car. The bartender gave me an immediate alarmed look that told me she knew exactly what I was talking about. She said unprompted that the guy who owned the garage had a reputation of preying on women, and then asked why I wanted to know. I explained to her that I was a prosecutor and I was currently trying to track down potential victims. I asked if she knew any, and she responded that she did, but she didn't know if they would talk. I wrote down my name and phone number, and asked her to pass it along to any victims she knew or anyone that had information and she agreed.

59. Around April 1, Inv. Sparks let me know he had gotten the toxicology report for Jane Doe 1, after I had been asking for it for months.

60. On April 13, I indicted Sean Williams for being a felon in possession of ammunition. After grand jury, I asked Inv. Sparks if he was going to make the arrest, but he said to ask

Doc ID: 235ba698510f716d1e1d0f411e0dd64b2a50c80c

SIS to do it. I was frustrated since it was his case, but I didn't argue because I didn't care who arrested him as long as it got done. I asked SIS to make the arrest, but they said they were busy.

61. Over the next three weeks, I called, texted, and asked numerous officers in person to arrest Williams. I was either ignored or given excuses such as "they were busy" or "they didn't have the code to the building" or "they didn't see him." As the weeks dragged on, I became increasingly irate.

62. On April 21, I was approached by Inv. Barron to do a complaint on a defendant named Dalvin Robinson for felon in possession. I told him I would review the file and see if the judge had any availability. I was once again frustrated because it seemed JCPD was once again treating complaints as a substitute for indictments. I had just completed a complaint for Inv. Stillwagon a few weeks prior, and I was worried that they were getting too comfortable with a tool that was supposed to be used sparingly. I contacted the magistrate judge's chambers for availability, and was told that there was none for the rest of that day or the next. I relayed that to Inv. Barron, and told him that I would rather just indict this person at grand jury.

63. My consternation at Williams' delayed arrest was made worse when I met an acquaintance, Adam, for a drink on April 24. I met him downtown, and afterwards we decided to walk around and talk. As we were walking by Williams' apartment, Adam remarked that that was "the building that the girl fell out." I didn't respond, because at that point I was worried that there was still an active warrant and Williams hadn't been arrested. A little while later when we approached the garage, he once again unprompted remarked to "stay away from that place, that's where the creepy guy who assaults girls

Doc ID: 235ba698510f716d1e1d0f411e0dd64b2a50c80c

is." I was stunned by this comment and didn't respond again, but was furious that this appeared to be common knowledge in the community.

64. I became more and more vocal about my anger that an arrest had not been made, and voiced this complaint to every other AUSA within the Greeneville office, as well as Kaycee Roberts. I was very open with Taylor about my frustrations, but to my dismay, my concerns were not met with any offer of help. At one point I asked Taylor if I could just get the Marshals to arrest Williams, but he said that because Williams was not an active fugitive at that point, the arrest would have to come from the agency that brought the case.

65. On April 28, I was discussing these concerns with Megan Gomez, another AUSA within the Greeneville office. I expressed to her my frustration with how the case was progressing, and confided in her that I was becoming increasingly more suspicious about JCPD's conduct regarding Williams. AUSA Gomez agreed with my concerns, and told me that she worked frequently with one of the agents over at the Johnson City FBI field office. She offered to introduce me to this agent, Bianca Pearson, so I could relay my concerns about the case and seek additional assistance.

66. On April 30, I complained again to McCauley and AUSA Greg Bowman. Several of the SIS officers had promised me they would go look for and attempt to pick up Williams that evening, so I canceled my after work plans in order to remain on standby in the event of an arrest. After several hours, I asked the officers if they had made the arrest and they told me they had not. I told McCauley and Bowman how I was growing increasingly irate at the lack of action with arresting Williams.

Doc ID: 235ba698510f716d1e1d0f411e0dd64b2a50c80c

67. On May 4, after weeks of asking officers to execute the arrest warrant for Williams, I decided to drive to the Johnson City Police Department and confront Sgt. Legault and Inv. Sparks in person over the lack of an arrest and how they were avoiding me or giving me excuses. I was upset that when I had last spoken to Sgt. Legault about the case, he told me that Williams was "not a priority." When I arrived, I talked to Sgt. Legault first and he said that it was Inv. Sparks' case, so he should be the one to arrest him. I agreed, but told him that Inv. Sparks had said that SIS should be the one to make the arrest. After I spoke with Sgt. Legault, I went and spoke to Inv. Sparks. I told him that I wanted Williams to be a priority and that he should be arrested as soon as possible. Inv. Sparks told me that he would call Williams in to pick up his property and make the arrest at that point.

68. The night of the botched arrest attempt, I was not contacted or notified by anyone within JCPD, despite the fact that I had been vocal over my desire to make this case a priority.

69. On the morning of May 6, I had a missed call from Lt. Don Shepherd. I did not work with Lt. Shepherd, so I did not have his number saved and thus didn't immediately pick up. He left me a voicemail saying the arrest had gone wrong, but I had trouble making out the details and thought there must be a miscommunication. Then I received a call from Lt. Shepherd, who explained that an arrest attempt had been made and Williams had fled.

70. After I talked to Lt. Shepherd, I called Sgt. Legault and demanded an explanation. He told me that a few patrol officers had gone to Williams' apartment the night before, after Inv. Sparks put out a BOLO. He said that he did not know the details, but that Williams had refused to open the door for the officers, and so they subsequently left. I was baffled as to why Inv. Sparks had attempted to have Williams arrested in such a manner. When

we discussed it on May 4, we had talked about the possibility of Inv. Sparks calling Williams to come pick up his property, and arresting him once he came down to the police station. I did not have any other cases, especially cases under seal, where the arresting officer had put out a BOLO for the defendant and left the case vulnerable to the mistakes that had happened on May 5.

71. After I talked to Sgt. Legault, I immediately placed a call to the Marshals to let them know that an arrest attempt had been made, and that Williams had fled the area and was now a fugitive.

72. I then called Sgt. Matt Gryder to try and get more information. I was extremely upset that the arrest I had been begging them to execute was so grossly mishandled. I made my feelings known to Sgt. Gryder about the situation and that I was angry that a federal warrant under seal had been treated with such carelessness.

73. While I was placing these phone calls, I visited Williams' Facebook profile and saw that he had posted about one of his construction projects in Asheville, NC at approximately 9:30 a.m. that morning. I sent this information to the Marshals and was extremely frustrated that not only was the arrest warrant mishandled, but Williams was seemingly going about his life down in Asheville. I had previously told Sgt. Legault that I was afraid Williams would flee, but my concerns were dismissed.

74. On May 7, I got a call from Don Spurrell, who identified as one of Williams' attorneys, and said that while he had not been retained by Williams for the immediate criminal matter, he did have a generic retainer on file and had been in touch with him after the arrest attempt. Mr. Spurrell told me that he was working with Williams to turn himself in

Doc ID: 235ba698510f716d1e1d0f411e0dd64b2a50c80c

and that he would voluntarily turn himself in at the Greeneville courthouse the following Monday on May 10.

75. On May 10, Williams did not show up to the courthouse to voluntarily surrender. I called Mr. Spurrell, who told me that he was worried that his client was suicidal.

76. On May 11, I received an email from Inv. Sparks, who asked if we could release Williams' property that was in custody, with the exception of the ammunition. I responded and asked Inv. Sparks who was asking for it, as I was not inclined to release anything while the case was open and the defendant in question was a fugitive. Inv. Sparks responded that it was Don Spurrell who was asking for the property back, on behalf of his client. I told Inv. Sparks that I would not release the property.

77. That same day, I met with FBI Agent Bianca Pearson at the Johnson City FBI field office. I brought a copy of the Williams case file, and walked Agent Pearson through the evidence we had, what Williams was accused of doing, and the disconcerting actions by JCPD officers.

78. I told Agent Pearson that I was worried about the possibility of negligence or corruption, as it had been more than six months of witnessing inexplicable behavior from JCPD around this particular case. I emphasized to her that I did not have problems like this on any of my other cases with them, only on the Williams case. I was also concerned about the comments JCPD had made towards me indicating gender bias, such as when Sgt. Hilton remarked about Jane Doe 1's clothing. I told Agent Pearson that I feared that the victims in this case were not only being treated unfairly, but it was actively hindering any meaningful investigation. Agent Pearson did not seem phased by my assertions of gender bias. In fact, she made a remark indicating that she was familiar with that issue, saying

that JCPD was "bad about that, even with kids," or words to that effect. I took this to mean that she knew or had witnessed JCPD exhibit gender bias against sexual assault victims.

79. During this meeting, Agent Pearson and I were at her desk within the open-air office discussing the case where others could see or hear us.. After I went through the facts, Agent Pearson took the file and said she would look into the case.

80. I had been monitoring Williams' social media presence on Facebook since the botched arrest, and he deactivated his account on May 12.

81. On May 14, I stopped for a drink at the Windsor Speakeasy after some errands. I was by myself, so I made the decision to see if there were other bartenders who seemed to have this common knowledge about Williams and his reputation. After two drinks and when the bar started to empty, I quietly asked the bartender if she knew anything about the garage with the red sports car in downtown. Her face showed immediate fear, and her speech audibly faltered before she said she didn't know anything. Based on her reaction, the next time she came over, I pressed her again. She said she did know, but that she didn't want to talk about it. I wrote down my number and told her if she did want to talk about it, to give me a call. I was disturbed that the second time I had approached a bartender within the downtown area, there was an immediate reaction when the topic of Williams' garage was mentioned.

82. On May 17, Chief Turner called me and asked me to meet with him at the department. He said he had wanted to discuss the list of cases that was sent back in December 2020, and we set up a time to meet.

Doc ID: 235ba698510f716d1e1d0f411e0dd64b2a50c80c

83. Later that day, I told McCauley about the meeting and asked if he had ever had to brief Chief Turner on cases or even been asked to give updates while he was the SAUSA. He said he had not. I also called Corey Shipley, the Johnson City SAUSA before McCauley, and asked the same question. Shipley told me that JCPD had never asked him to do either of those tasks while he was SAUSA.

84. On May 19, I went to the Johnson City Police Department to meet with Chief Turner. I had made the decision to record the meeting as I had on December 8, in order to protect myself. During that conversation, we went over the list of cases and I gave them updates, as well as my tentative plans for indictments. In preparation for that meeting, I had asked all of my AUSA colleagues for their indictment numbers that year, in order to demonstrate that my numbers were comparable to the rest of the office. My conversations with my AUSA colleagues indicted that my indictment numbers were at or greater than my colleagues. I attempted to explain to Chief Turner and Cpt. Peters the difficulties that were being encountered with grand juries and indictments, as well as my other obligations. I gave them my plans, and thought I had explained enough to convey that those planned indictments were subject to changing circumstances, such as a canceled grand jury or if the case priorities shifted. Cpt. Peters told me that for cases going forward in the future, to communicate through Sgt. Legault and I agreed.

85. The conversation then turned to Williams, and I conveyed my fears to Chief Turner about how he might be suicidal, but my concerns were dismissed. I was also dismayed that Chief Turner and Cpt. Peters were laughing and joking about the case and the aftermath of his escape from the botched arrest, as it appeared that they did not grasp the gravity of the case.

Doc ID: 235ba698510f716d1e1d0f411e0dd64b2a50c80c

86. Later that day, I received a text message from Kaycee Roberts that contained a screenshot of an Instagram post she was sent by another friend. The post was by an anonymous account called "downtowntea" and it was a meme that depicted a photo of Williams' apartment, with text over the photo that said "If you know, you know. And you probably like blow. Just don't fall out the window." I was yet again disturbed by this public post which was displaying what appeared to be common knowledge about Williams, his apartment, his drug activity, and the events of Jane Doe 1 falling out of Williams' apartment. The post was dated April 23, 2021, 10 days after I had indicted Williams. I was shocked that not only did those who frequented downtown Johnson City seem to know about Williams' reputation, but it was so well known that public social media posts were being made about the topic.

87. On May 20, I found out that the case I was assigned to with AUSA Emily Swecker was going to trial. The plea negotiations fell through, and our trial was set for June 8, 2021. Swecker and I immediately began to focus almost exclusively on trial preparation.

88. Since our trial was set for a little over two weeks away, we became consumed with trying to prepare for it. This was set to be the USAO's first trial since the pandemic started in March 2020. Even though I was second chair, I was assigned opening statements, half the witness direct examinations and cross-examinations, and the closing argument rebuttal. I began prepping my opening and closing statements in all of my free time, as I had never given one before and this was going to be my first true test in front of the entire office. I was extremely nervous, and I spent almost every hour outside of other work obligations trying to perfect my opening and witness examinations.

Doc ID: 235ba698510f716d1e1d0f411e0dd64b2a50c80c

89. Towards the end of May, I was frustrated and concerned with the apparent activity in Williams' apartment. As his apartment was clearly viewable as the 5th floor of a condo building in the middle of downtown Johnson City, I would often make a point to observe it whenever I drove by. On numerous occasions, I noticed the lights were on, then turned off again, and then turned on. It appeared that someone was coming and going from the apartment, and I passed this information along to both JCPD and the Marshals, but no action was taken.

90. On June 2, the trial preparation with AUSA Swecker took an unexpected turn. We subsequently ended up scrapping our preparation and the defendant signed a plea agreement on June 3.

91. I went back to preparing for grand jury, but as I only had four days to prepare indictments as well as continue to attend to my other obligations, I could only prepare one instead of the five that I had previously discussed with Chief Turner and Cpt. Peters.

92. Sometime on June 3rd or 4th, I called Sgt. Legault to let him know that there would only be one case going forward for the June grand jury. I thought this would be sufficient communication, given that Cpt. Peters had directed me to communicate through Sgt. Legault. I also called Inv. Stillwagon to let him know, as he would be my witness for that grand jury.

93. On June 14, I received a text message from a woman, Jane Doe 5, who asked if I could speak to her about Williams. I spoke to Jane Doe 5 and she told me how she had been drugged and raped by Williams, and that she had been given my contact information by a friend at Watauga Brewery. Later that afternoon, I received another text from a woman who stated she had information about Sean. She told me she was a manager at Wild Wing

Doc ID: 235ba698510f716d1e1d0f411e0dd64b2a50c80c

Cafe and had witnessed girls come into the bar to use the phone in distress, and that she had also overheard conversations of women talking about being drugged or assaulted. I told McCauley and Taylor about the victim and the witness.

94. On June 25, I received a call from Chief Turner. He asked me what my home address was, and I gave it to him and then asked him if he needed to send me something. He responded that he needed to send me a letter notifying me that Johnson City would not be renewing my contract. I was shocked, but quickly figured out that Taylor had no idea about this, given that he was on vacation and I had not received any warning about the renewal being in jeopardy.

95. I asked Chief Turner if I could call him back, and immediately called Taylor. As I suspected, Taylor had no knowledge that Chief Turner was planning on terminating the contract. He told me to standby, and that he would attempt to talk to him.

96. As I waited, I called Greg Bowman, one of the AUSAs at Greeneville, and the acting supervisory AUSA while Taylor was on vacation. I explained what was going on and he was shocked as well. He told me to remain calm and wait for Taylor to call. I then called Agent Bianca Pearson, because I was alarmed that a termination had followed in an apparent pattern of retaliatory behavior. I told her that Chief Turner had just terminated my contract without any input from my supervisor at the courthouse, and that I wanted to schedule a followup meeting to discuss this with her as soon as possible. Finally I called Corey Shipley, because I had recently discussed JCPD's behavior with him, and I wanted his feedback given the prior conversation. He agreed that it seemed out of character from the treatment of the previous SAUSAs.

Doc ID: 235ba698510f716d1e1d0f411e0dd64b2a50c80c

97. Approximately an hour later, Taylor called me back. He told me that he had tried to change Chief Turner's mind, but that he was immovable. He said that the best he had been able to do was convince Chief Turner to grant me one month's extension, in order for the USAO to be able to transfer cases in an orderly fashion. At that point, I made up my mind that I had to do whatever was necessary to gather more facts about the Sean Williams case in the last month that I was employed at the Greeneville office. I was concerned that after I left, the case would die down, Williams would remain on the run given his significant financial assets, and the few witnesses who had been willing to speak up would either disappear or lose their resolve with the passage of time.

98. On June 26, I had a blind date that was set up. I did not feel like going given the events of the previous day, but I thought it might be another opportunity to poke around for downtown gossip and rumors regarding Williams. I met this person at a brewery downtown, and during the course of our conversation, I asked my usual opening line about the garage with the red sports car. He immediately knew who I was talking about, given his familiarity with the Johnson City bar scene. I asked him what his knowledge was of this person, and I got the same answers: that the person who owned the garage was a "creep", that there was a woman who fell, etc. But then he surprised me when he told me that he heard about a girl who had died after she left Williams' apartment: the rumor was that he had drugged her and she crashed while driving home. I pressured him to give me the girl's name, but he said he couldn't remember her full name, but gave me her first name.

Doc ID: 235ba698510f716d1e1d0f411e0dd64b2a50c80c

99. On June 28, I called Chief Turner and asked for an explanation as to why my contract was terminated. He asked me to come into the department, as I also had to sign for the one month extension. I agreed to meet him the following day.

100. On June 29, I met Chief Turner at the department. I was recording to protect myself once again, and because I was skeptical about the circumstances of my termination. I asked Chief Turner about the decision to terminate the contract, and the reasons he gave me appeared to be superficial. The first reason Chief Turner cited was the lack of communication. I pushed back against his statement, and told him that I had asked the officers whether they had a problem back in December 2020, but they told me they did not. Chief Turner responded that "They're telling me a different story." He mentioned other reasons, such as the lack of indictments, and how I had indicted only one case instead of the five that were discussed at the May 19 meeting. I explained to him the difficulties that I had encountered during Covid, how grand juries were shut down, and how I was scheduled to be in trial for the June grand jury until our witness recanted.

101. After our conversation, I signed the extension contract and headed to Sgt. Legault's office. I was confused as to why Chief Turner was continuing to bring up communication as an issue when the officers had told me otherwise back in December. I decided to confront him and record the conversation because of the apparent discrepancy from what I was being told versus what Chief Turner had said.

102. I found Sgt. Legault in his office and asked to speak with him. He agreed and I told him that my contract had been terminated. He replied that he had heard about the termination. I told him I wanted to talk to him because I was bothered by the apparent discrepancy between his previous reassurance that our communication was ok and Chief

Doc ID: 235ba698510f716d1e1d0f411e0dd64b2a50c80c

Turner's assertion that I was not communicating with officers. I told him that I believed someone was not being honest with me since I was getting different responses on the communication issue. Sgt. Legault responded and stated that Chief Turner had "put him on the spot" and called him earlier that day while he was in the middle of a search warrant. He told me that the Chief had asked him how many times he had spoken to me and not gotten a timely response. Legault stated, "And I was like timely, I mean that can be many things. That can be an hour, a day, two days or three days, you know. I don't know what you're asking in particular, so I said probably since you've worked here I said maybe six times where you may have went a day or two, and I hadn't heard from you."

103.    Sgt. Legault and I then discussed the indictments, where he acknowledged that Covid had slowed the process down. We also discussed how my trial with AUSA Swecker that was originally set in June had impacted the cases discussed at the May 19 meeting. I was frustrated because Sgt. Legault was still denying that there was a communication issue, which was in direct contradiction with what Chief Turner had stated to me.

104.    Later that week, I began working to identify the girl in the rumored car crash. I searched obituaries and news articles, until I found one that matched the details that I had been told. From the obituary, I was able to find family members through social media.

105.    On July 1, I contacted the sister of Jane Doe 7 to ask about the manner of death and whether or not there was any truth to the rumor. Jane Doe 7's sister confirmed the connection and stated that her sister had died on the way home from Williams' apartment. She proceeded to tell me the whole story, along with a detailed timeline. She told me that Jane Doe 7 had died in the early morning hours of November 10, 2020, and that she had visited the Johnson City Police Department on November 12 and spoken to a detective

Doc ID: 235ba698510f716d1e1d0f411e0dd64b2a50c80c

about her sister's death. She told me that the detective there had dismissed her request for help, as Jane Doe 7's car crash had occurred in Carter County. I was shocked that it appeared Johnson City Police knew about this case, but nothing was said to me the entire time I was working it. I was also disturbed that according Jane Doe 7's sister, she had placed a call to JCPD and asked for their help the day before Inv. Sparks approached me about the case.

106.     After I confirmed Jane Doe 7's connection to Williams, I went to meet with Agent Pearson at the FBI. This time we met in the front conference room and did not go back to her desk. I explained to her everything I had found since we last spoke, including the Jane Doe 7 car crash. I was also frank with her about my fear that my termination was connected to Williams in some manner, and that I suspected that JCPD's increasingly bizarre behavior surrounding the Williams case was due to a coverup for negligence in the case or due to corruption. Agent Pearson listened, but did not seem to be receptive to my concerns.

107.     Later that day, I received another call from another victim, Jane Doe 6, who had gotten my phone number through the bartender at Watauga Brewery. I learned that Jane Doe 6 had been assaulted by Williams recently that past winter. The assault details mirrored that of the other victims I had spoken to, in that Williams had drugged her before the attack.

108.     On July 12, I made contact with Misti Crain, who was an agent with the Tennessee Alcoholic Beverage Commission. I had gotten her contact information through Jane Doe 7's sister, as she was the one investigating the bar where Jane Doe 7 had been before encountering Williams in November 2020. Ms. Crain told me how when she was

Doc ID: 235ba698510f716d1e1d0f411e0dd64b2a50c80c

investigating the brewery, she realized that she could not build a case for overserving Jane Doe 7 given her encounter with Williams and his reputation for drugging women. Agent Crain told me she was alarmed at the whole situation so she contacted JCPD sometime in January of 2021 about Jane Doe 7, but they never called her back.

109. On July 15, I approached Taylor about everything I had researched on Williams. I shared my notes, told him about the new victims I had talked to, including the family of Jane Doe 7. I also told him about Agent Crain, and the inexplicable behavior I had observed JCPD exhibit with respect to the Williams case. I was frank about my concerns in how the case had been handled.

110. On July 20, I received an email from FBI Agent Bianca Pearson where she stated that the Williams case "had some suspicious activity, but the FBI was not able to look into it due to the current case loads." I was extremely disappointed that another person who I had asked for help was turning me down and ignoring my concerns. Agent Pearson recommended that I contact Jama Walker at TBI about the case, but I was frustrated because at that point, I had less than two weeks left in my contract. I was also skeptical about approaching TBI, as the previous attempt at meeting with them had been shut down.

111. On July 23, I went to the Johnson City Police Department to pick up some files. On my way out, I stopped by Sgt. Gryder's office, and decided on the spur of the moment to ask him about the circumstances of my termination. I was still concerned about the apparent discrepancies between Sgt. Legault's statements and Chief Turner's. I also made the decision at the last second to record the conversation in order to protect myself, as well as so I could have proof if there were even more inconsistencies. I asked Sgt. Gryder

Doc ID: 235ba698510f716d1e1d0f411e0dd64b2a50c80c

if he knew anything about my termination, and he told me that he didn't know anything

other than the fact that Cpt. Peters had told him that I had "lied" to Chief Turner about the

indictments. Sgt. Gryder had been involved in the Chism case and was there for some of

the trial prep, so he countered Cpt. Peters' statement by telling him that it wasn't true,

that I was supposed to be in trial. Sgt. Gryder told me that it didn't matter, because once

Cpt. Peters had made his mind up about something, there was no way to discuss that issue

with him. I was upset that Cpt. Peters would make such a statement, especially when he

was told by one of his own officers that his statements about my work were untrue.

112.    After I left the Greeneville office, I continued to keep an ear out for any news on

Williams. As the weeks passed, I grew more and more anxious that he would not be

found. By late October 2021, I decided to try and start investigating the case on my own

again, in an effort to find something useful that could lead to Williams' arrest or uncover

further information to develop the case.

113.    On November 8, I went downtown for a drink and started trying to uncover

information about the case again. I spoke to Logan Brown, the owner of Appalachian

Hookah Lounge. Mr. Brown's business was located next to Williams' apartment, and he

knew about Williams' reputation. I also spoke to James Wood, a bartender in downtown

Johnson City. He also had knowledge of Williams' predatory behavior and alleged he had

seen snapchats of "bricks of cocaine" in Williams' apartment.

114.    On November 19, I spoke to Neyland Davenport, who had alleged that Williams was

a rapist on a public Facebook post. Neyland relayed that he knew about Williams'

behavior through friends. He also said that a female friend of his had felt unsafe while at

Doc ID: 235ba698510f716d1e1d0f411e0dd64b2a50c80c

a party in Williams' apartment, but when he called the police to report that his friend was feeling unsafe at the party, he was ignored.

115.    On January 11, 2022, I went downtown to Numan's, a local bar in Johnson City with Tom McCauley. While I was there, I found and spoke to three women who I identified as victims of Williams. Two of the victims agreed to speak with me at a later point, but the third victim, Jane Doe 8, spoke to me at length about the nature of her friendship with Williams and how he had abused her. Jane Doe 8 stated that he raped her numerous times and he threatened to kill her on several occasions. She was very clearly distraught over the situation. Jane Doe 8 also stated that she had witnessed officers at Williams' downtown apartment. She stated that she suspected there was some sort of illicit activity going on between Williams and the officers who came to his apartment, as they would come to Williams' door, say something to the effect of "Hey, here you go," and then leave without an explanation. Jane Doe 8 was familiar with Williams and what his unlawful drug activity looked like, which led her to suspect that something questionable was happening between Williams and the officers.

116.    I attempted to get Jane Doe 8 to identify the officers she had seen at Williams' apartment, and pulled up some photos of various JCPD officers on Google. When I showed her pictures of Cpt. Peters and Chief Turner, she asserted that both men had been at Williams' apartment at one point. She stated that she heard Cpt. Peters say something to the effect of "we're all good Sean," and that Chief Turner told her "Sweetie you need to leave" (referring to Williams' apartment). Jane Doe 8 accurately described Chief Turner's voice when questioned, as he has a distinct deep voice with a heavy southern accent.

Doc ID: 235ba698510f716d1e1d0f411e0dd64b2a50c80c

117.  On January 20, I contacted and met with Jane Doe 1 and her mother to discuss the situation. Jane Doe 1 confided to me that she was stonewalled by the detective assigned to her case and frustrated because nothing had happened.

118.  On January 24, I met with Ashley Wright, a bartender who used to work at Numan's. I was given her information by Jane Doe 1, as she had also spoken to Ms. Wright. Ms. Wright told me that when she was working at Numan's, she overheard Williams discussing how he wanted to prey on women when she was working at Numan's, and that she and others who worked there had called the police due to his behavior several times. She stated that they were ignored and that the Johnson City Police told them to "just kick him out" of the bar.

119.  Since I filed this litigation, and based on my review of public court records, I have learned that three of the five cases that Chief Turner claims are reasons for not renewing my employment under the MOU were never indicted.  The fourth (Kacei Pierce) was already in state custody.  The fifth (Nathan Tucker) was not considered to be violent or dangerous to JCPD.


I declare (or certify, verify, or state) under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

_____          Dated: 02 / 05 / 2024
Kateri Lynne Dahl

Doc ID: 235ba698510f716d1e1d0f411e0dd64b2a50c80c


| | |
|---|---|
| **Title** | 2024.02.05 - Dahl v. Turner - Dahl Declaration.pdf |
| **File name** | 2024.02.05%20-%20...20Declaration.pdf |
| **Document ID** | 235ba698510f716d1e1d0f411e0dd64b2a50c80c |
| **Audit trail date format** | MM / DD / YYYY |
| **Status** | • Signed |

**This document was requested from app.clio.com**

## Document History

| | | |
|---|---|---|
| ⟲ SENT | **02 / 05 / 2024** 21:46:18 UTC-5 | Sent for signature to Kateri Lynne Dahl (kklynne@protonmail.com) from alexis@tahincilaw.com IP: 172.58.144.72 |
| 👁 VIEWED | **02 / 05 / 2024** 22:02:44 UTC-5 | Viewed by Kateri Lynne Dahl (kklynne@protonmail.com) IP: 45.30.104.59 |
| ✍ SIGNED | **02 / 05 / 2024** 22:04:34 UTC-5 | Signed by Kateri Lynne Dahl (kklynne@protonmail.com) IP: 45.30.104.59 |
| ⊘ COMPLETED | **02 / 05 / 2024** 22:04:34 UTC-5 | The document has been completed. |