IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE
AT GREENEVILLE


KATERI LYNNE DAHL,                    *
          Plaintiff,                  *
                                      *
VS.                                   *        CASE NO.
                                      *   2:22-CV-00072-KAC-CRW
CHIEF KARL TURNER, in his individual  *
capacity only; OFFICER JOHN DOES 1-3, *
in their individual capacities only;  *
and CITY OF JOHNSON CITY,             *
          Defendants.                 *


DEPOSITION OF

# MICHAEL BARRON

(Taken November 21, 2023)



APPEARANCES:

COUNSEL FOR THE PLAINTIFF:     ALEXIS I. TAHINCI
                               TAHINCI LAW FIRM
                               105 Ford Avenue, Ste. 3
                               Kingsport, TN  37663

COUNSEL FOR THE DEFENDANTS:    K. ERICKSON HERRIN
                               HERRIN, MCPEAK & ASSOCIATES
                               515 E. Unaka Avenue
                               Johnson City, TN  37601


***THIS STYLE PAGE CONTINUES***
_____

*COURT REPORTING AND VIDEO SERVICES*

P. O. Box 7481                    TELEPHONE:  (423) 230-8000
Kingsport, TN  37664             REBECCA@COURTREP.NET

ALSO PRESENT:                           JOY BAKER
                                         INTERIM ASSISTANT CITY MANAGER
                                         CITY OF JOHNSON CITY

BY PHONE:                               HUGH EASTWOOD
                                           KAT DAHL

| | | |
|---|---|---|
| 1 | A. | It could be, yes. |
| 2 | Q. | You have no recollection of receiving this tip? |
| 3 | A. | Like I said, if it came across on the text line, I'm sure |
| 4 | | at some point in time we did. |
| 5 | Q. | Do you know whether you followed up on this tip? |
| 6 | A. | I do not recall any kind of follow-up on this. |
| 7 | Q. | Do you have any recollection of CID treating this tip as a |
| 8 | | narcotics tip? |
| 9 | A. | I do not know. |
| 10 | Q. | Do you know anything about any investigation into |
| 11 | | narcotics trafficking by Sean Williams? |
| 12 | A. | Not as far as specifics, no. |
| 13 | Q. | Let's look at what has previously been entered as Exhibit |
| 14 | | 63. Do you recognize this E-mail? |
| 15 | A. | Yes. |
| 16 | Q. | I'm sorry, I think I referred to that as Exhibit 63. It's |
| 17 | | Exhibit 73, my apologies. Tell me about this medical |
| 18 | | investigation. |
| 19 | A. | So this is -- this is a victim from a previous case that |
| 20 | | we'd had several years ago, obviously involved in |
| 21 | | something else. And when that came in, I had tried to -- |
| 22 | | there was a firearm, I guess, that was in question that |
| 23 | | had been left behind and I had tried to make contact and |
| 24 | | stuff with her to, number one, find out some information |
| 25 | | on the phone to possibly return the firearm and then get |

MICHAEL BARRON                                    DIRECT - TAHINCI

20

| | |
|---|---|
| 1 | some information from her on the incident, and that was |
| 2 | unsuccessful. |
| 3 | Q. So you write in the first sentence of this E-mail on the |
| 4 | second line, quote, "Primarily given the Sean Williams |
| 5 | situation," end quote. Was Sean Williams a suspect in |
| 6 | this matter? |
| 7 | A. I think at that time anything that was coming in, I mean, |
| 8 | was kind of treated as possibly could be, so that was one |
| 9 | of the reasons I was trying to reach back out to her to |
| 10 | see if she could give some more specifics. |
| 11 | Q. What became of this report? |
| 12 | A. Like I said, after several attempts and stuff to try and |
| 13 | -- I think the last time I had talked to them, she had |
| 14 | indicated that she would make some arrangements or was |
| 15 | trying to make some arrangements and stuff to come back |
| 16 | and pick up the firearm and then never -- never had any |
| 17 | other contact after that. |
| 18 | Q. So it's a little unclear to me what exactly she was |
| 19 | reporting here. What crime allegedly occurred here? |
| 20 | A. I don't think really any particular crime. I can't |
| 21 | remember if -- I think basically it was a call that |
| 22 | generated at a hotel. You see down at the end, a Holiday |
| 23 | Inn. Or maybe that was something -- something separate. |
| 24 | My angle was because I was doing a lot with firearms and |
| 25 | stuff at the time, obviously trying to get some more |

MICHAEL BARRON                    DIRECT - TAHINCI

21

```
 1        information on it and get it back to her if it was

 2        something she lawfully owned and, again, just get some

 3        more specific information.

 4   Q.   Did she report this as a sexual assault?

 5   A.   No, I don't believe so.  I think it was just -- it may

 6        have been, like, an overdose investigation or something

 7        like that.

 8   Q.   There's reference in here to the victim feeling sick.  Did

 9        she think that she had been drugged?

10   A.   I mean, you could, I guess, look at it that way.  I don't

11        think from the best I remember our conversation that she

12        really got into a whole lot of specifics as far as that

13        goes.  That's kind of why I was trying to get her to come

14        back in and sit down and talk with us.  She was obviously

15        involved in something pretty serious, like I said, several

16        years ago, so I don't know if that was -- if that was part

17        of the reason and stuff for that or what.  But we just

18        ended up after that last conversation with no contact and

19        I couldn't get back with her.

20   Q.   You reference in the second paragraph here the subject and

21        his description as given by the victim.  Did that

22        description meet Sean Williams' description?  Did it match

23        Sean Williams' description?

24   A.   At that time, I'm not sure.  It could have.

25   Q.   Were you familiar with Sean Williams?
```

MICHAEL BARRON                                    DIRECT - TAHINCI

22

| 1 | A. | Not a lot, no. |
| 2 | Q. | When you refer to the Sean Williams situation, what did |
| 3 | | you mean by that? |
| 4 | A. | Just I'm assuming -- like I said, not knowing the exact |
| 5 | | time line, I'm assuming this was afterward, and so after |
| 6 | | the incident with the subject falling out the window and |
| 7 | | whatnot, I think this was maybe a good little bit after |
| 8 | | that. So if a complaint or something came in from down |
| 9 | | there, then it was, I guess, being looked at as maybe |
| 10 | | possibly related. |
| 11 | Q. | But you were not involved in the Sean Williams |
| 12 | | investigation? |
| 13 | A. | No. |
| 14 | Q. | Why did you send this E-mail to the particular people to |
| 15 | | whom you sent it? |
| 16 | A. | Just, like I said, for that very reason, you know, |
| 17 | | complaints were coming in and had had an incident and |
| 18 | | stuff there. Just, I mean, you see there at the beginning |
| 19 | | if we get similar information or something in the future, |
| 20 | | just keep this in mind. So I'm not sure if I sent this |
| 21 | | after -- after I exhausted all of the efforts and stuff |
| 22 | | and she wouldn't -- she wouldn't recontact me and stuff |
| 23 | | after that last time, so this was kind of my wrap up. |
| 24 | Q. | You write in the last paragraph, she advised that she |
| 25 | | still has or thinks her mother has a tablet that belongs |

MICHAEL BARRON                                    DIRECT - TAHINCI

Case 2:22-cv-00072-KAC-JEM   Document 82-34   Filed 02/06/24   Page 6 of 21   PageID #: 2632

```
 1        to the subject from Wonderland.  Do you know what happened
 2        to that tablet?
 3   A.   I do not.  Like I said, I could never get her to cooperate
 4        or come back in, so...
 5   Q.   And the subject from Wonderland that you're referring to
 6        there is somebody who you thought at the time may have
 7        been Sean Williams.  Is that accurate?
 8   A.   Not may have, but a possibility.  I mean, anything was
 9        possible, but a generic description, you know, again, we
10        were just kind of trying to get what we could, and get her
11        to come in and sit down with us, and that never happened.
12   Q.   Well, I'm a little confused here frankly because you
13        started out talking about this as a firearms
14        investigation, but when you read the narrative, there's
15        nothing about a reference to a firearm until the end, and
16        that's prefaced with the word coincidentally, correct?
17   A.   Right.
18   Q.   So the bulk of this E-mail is about -- it appears to me to
19        be about a report or complaint made by this woman victim
20        about a subject, correct?
21   A.   Yes.
22   Q.   And again, what was she -- what was she approaching the
23        police department about?  Was she...
24   A.   She -- I don't think she -- again, I think that she didn't
25        really approach us.  This was more or less, if I remember,
```

MICHAEL BARRON                              DIRECT - TAHINCI

24

```
 1        self-generated, seeing the name, being familiar with the
 2        name, knowing what she had been involved in and stuff
 3        several years ago, and then she popped back up, because I
 4        remember that investigation back when it happened.  And
 5        then, you know, if I remember correctly, it was either a
 6        medical investigation or something like that, so...
 7   Q.   So how does a medical investigation get started?
 8   A.   Overdose at a motel.  Someone comes into a hospital.  I
 9        mean, it could be one of several different ways, so...
10   Q.   So how does a coincidental report of a firearm being left
11        in a Holiday Inn room lead to this report about an
12        interaction with an unknown man at Wonderland?
13   A.   So I think we're looking at two different things.  The
14        beginning and stuff of it here, I guess, is coming off of
15        that medical investigation.  I mean, I would have to pull
16        the report up, that case number, to see what the specifics
17        were.  And then I'm not sure if I did a search afterward
18        to see if she had been involved in anything else or what,
19        and that's where the -- where the firearm report and stuff
20        was made or what, but I think we're looking at kind of two
21        different things, but...
22   Q.   At about the middle of this E-mail, you write, quote, "She
23        said that while she was feeling sick, at one point the
24        subject had his hand up her shirt and she told him no,"
25        end quote.  Was she -- was she suggesting that she had
```

MICHAEL BARRON                            DIRECT - TAHINCI

25

| | |
|---|---|
| 1 | been sexually assaulted? |
| 2 | A. I mean, that's -- what is there is, I'm assuming, is what |
| 3 | she said.  We didn't really get into any further |
| 4 | discussion about it. |
| 5 | Q. Was this matter investigated as a sexual assault? |
| 6 | A. To my knowledge, no.  Like I said, just because of no |
| 7 | further cooperation, no further contact from her after we |
| 8 | last spoke. |
| 9 | Q. Do you recall the name of this victim? |
| 10 | A. Not off the top of my head, no. |
| 11 | Q. Did you send this E-mail to Kat Dahl? |
| 12 | A. That is -- her name is not in the -- not in the to line up |
| 13 | there, no. |
| 14 | Q. Why not? |
| 15 | A. No particular reason. |
| 16 | Q. Okay.  You connected this situation with Sean Williams, |
| 17 | correct? |
| 18 | A. Not a connection.  Like I said, I'm just sending it up my |
| 19 | chain of command, I guess, like I said, just if we get |
| 20 | similar information in the future, keep this in mind. |
| 21 | Q. Similar information meaning what? |
| 22 | A. To what I have included in the E-mail as far as the |
| 23 | description and whatnot. |
| 24 | Q. Sean Williams at this point was being investigated for the |
| 25 | ████████████ fall out of the window incident, correct? |

MICHAEL BARRON                                    DIRECT - TAHINCI

26

| 1  | A. | I assume so, yes. |
| 2  | Q. | How does that connect to the facts that are set forth |
| 3  |    | here? |
| 4  | A. | I'm not sure I understand what you're asking. |
| 5  | Q. | What about the investigation into a woman falling out of a |
| 6  |    | window would trigger in your mind a connection to this set |
| 7  |    | of circumstances referenced in this E-mail? |
| 8  | A. | Well, off of -- if we're getting other complaints coming |
| 9  |    | in, like I said, this was the downtown area, you know, |
| 10 |    | possibly -- possibly the same suspect.  I mean, I don't |
| 11 |    | know, so I just felt like it was probably necessary that, |
| 12 |    | like I said, I at least put it out in an E-mail and make |
| 13 |    | them aware of it. |
| 14 | Q. | What would make you think this was possibly the same |
| 15 |    | suspect? |
| 16 | A. | I'm not saying that I did think that it was the same |
| 17 |    | suspect.  I'm just -- I mean, it's kind of general -- a |
| 18 |    | general description.  But there again, I just put it out, |
| 19 |    | hey, if you get any other information or you get any other |
| 20 |    | complaints, this is what she said. |
| 21 | Q. | Were you aware at this time that Toma Sparks was the |
| 22 |    | investigator assigned to investigate the |
| 23 |    | falling out the window incident? |
| 24 | A. | I'm not sure if I was or not. |
| 25 | Q. | You didn't send this E-mail to Toma Sparks, did you? |

MICHAEL BARRON                                    DIRECT - TAHINCI

27

| | |
|---|---|
| 1 | **A.** No. |
| 2 | **Q.** Did any charges at all come out of this situation? |
| 3 | **A.** Pertaining to this E-mail? |
| 4 | **Q.** Right. |
| 5 | **A.** No, not that I'm aware of. |
| 6 | **Q.** Let's look at Exhibit 162. |
| 7 | COURT REPORTER:  Is this a new one? |
| 8 | **Q.** Yes, I'm sorry, the new Exhibit 162. |
| 9 | COURT REPORTER:  It will be 163. |
| 10 | **Q.** Oh, I'm sorry, 163. |
| 11 | EXHIBIT #163:  E-mail from Matt Gryder to Michael Barron with |
| 12 | attached memorandum, dated 4/12/21. |
| 13 | **Q.** Have you seen this document before? |
| 14 | **A.** Yes. |
| 15 | **Q.** This appears to be an E-mail from Matt Gryder to you dated |
| 16 | April 12th, 2021 with an attachment called Sean Williams |
| 17 | ammunition nexus.doc.  Do you see that? |
| 18 | **A.** Yes. |
| 19 | **Q.** Why was Matt Gryder telling you where these ammunition |
| 20 | plants were located? |
| 21 | **A.** So a lot of times we would collaborate and stuff on these |
| 22 | sometimes.  He's done nexuses before, so he just -- he |
| 23 | sent me that information on this one to, I guess, kind of |
| 24 | save me -- save me the work on that.  I had never done a |
| 25 | nexus just solely on ammunition, so he sent me, like, a go |

MICHAEL BARRON                                    DIRECT - TAHINCI

28

| | | |
|---|---|---|
| 1 | Q. | Yes, with you personally. |
| 2 | A. | No. |
| 3 | Q. | Let's look at Exhibit 54.  Do you recognize this document? |
| 4 | A. | Yes. |
| 5 | Q. | What is this? |
| 6 | A. | It's just basically a daily activity E-mail sent at the |
| 7 | | end of one of our shifts. |
| 8 | Q. | And you drafted this E-mail, correct? |
| 9 | A. | Correct. |
| 10 | Q. | Did you normally draft these E-mails at the end of your |
| 11 | | shifts? |
| 12 | A. | Not normally.  If Sergeant Legault wasn't there, then one |
| 13 | | of the other of us that were there working that day would |
| 14 | | do a daily. |
| 15 | Q. | You wrote in here that you, Investigator Barron, wrote a |
| 16 | | complaint for prosecution -- for presentation in |
| 17 | | Greeneville with SAUSA Dahl on Thursday.  Do you see that? |
| 18 | A. | Uh-huh (Affirmative). |
| 19 | Q. | And this is referring to the Dalvin Stephens/Robinson case |
| 20 | | that you spoke about a few moments ago? |
| 21 | A. | Correct. |
| 22 | Q. | Do you have any idea how available the judges were in |
| 23 | | Greeneville in terms of making themselves available to |
| 24 | | review complaints and sign complaints? |
| 25 | A. | No. |

MICHAEL BARRON                                          DIRECT - TAHINCI

59

| | |
|---|---|
| 1 | Q. Did you ever ask Ms. Dahl about that? |
| 2 | A. No. |
| 3 | Q. Did you ever ask her what steps she took to locate a |
| 4 | judge? |
| 5 | A. In this particular case? |
| 6 | Q. Yes. |
| 7 | A. No. |
| 8 | Q. Or in any case. |
| 9 | A. No. |
| 10 | Q. Do you know which judges she may or may not have |
| 11 | approached about this complaint? |
| 12 | A. I don't know. |
| 13 | Q. Do you know how long it was until Mr. Stephens/Robinson |
| 14 | was eventually either complainted or indicted? |
| 15 | A. I think sometime maybe that next week, late that next |
| 16 | week. This was on a Wednesday. I was assuming, I guess, |
| 17 | we were going to do it on the Thursday, and that didn't |
| 18 | happen. |
| 19 | Q. In your experience in working with other SAUSAs, how long |
| 20 | did it typically take for a SAUSA to line up a judge to |
| 21 | sign a complaint? |
| 22 | MR. HERRIN: Object to the form of the question. |
| 23 | A. Can you ask me again? |
| 24 | Q. Sure. In your work with other SAUSAs, how long did it |
| 25 | typically take when you presented a complaint to the SAUSA |

MICHAEL BARRON                                    DIRECT - TAHINCI

60

| 1 | | -- how long did it typically take for the SAUSA to locate |
| 2 | | and schedule a judge to review that complaint? |
| 3 | A. | It seems like, like I said, you know, previously when we |
| 4 | | talked about this one we were doing, you know, with the -- |
| 5 | | I guess the concern being a timing thing, it normally |
| 6 | | worked out fairly quick, so... |
| 7 | Q. | And again, April 2021 was -- well, COVID protocols were |
| 8 | | still in place in the federal court, correct? |
| 9 | A. | I assume so. |
| 10 | Q. | Do you have any idea how often the magistrate judge was in |
| 11 | | court, physically in court? |
| 12 | A. | No idea. |
| 13 | Q. | Did you speak with Kat Dahl verbally about this complaint? |
| 14 | A. | I think we had just sent a couple of either texts or E- |
| 15 | | mails back just, you know, hey, where are we at or have |
| 16 | | you heard anything and, I mean, that was the extent of it. |
| 17 | Q. | Let's look at Exhibit 25.  Do you recognize this document? |
| 18 | A. | I've seen it, yes. |
| 19 | Q. | How did you come to see this document? |
| 20 | A. | During review for this. |
| 21 | Q. | Did you receive this document when it was sent? |
| 22 | A. | No, I'm not one of the recipients. |
| 23 | Q. | Could you have been blind copied on it? |
| 24 | A. | I don't think so. |
| 25 | Q. | Okay.  This E-mail also refers to the Dalvin |

**MICHAEL BARRON**                                                    **DIRECT - TAHINCI**

61

| 1 | | Stephens/Robinson case, correct? |
| 2 | A. | Yes. |
| 3 | Q. | It says in this E-mail written by Sergeant Legault that -- |
| 4 | | well, we'll just go line by line.  Yesterday, April 21st, |
| 5 | | 2021, a subject named Dalvin Stephens/Robinson was |
| 6 | | arrested by platoon two for felon in possession.  He was |
| 7 | | on video displaying and pointing a weapon at a vehicle. |
| 8 | | This subject is the one that ran over Deputy Daugherty |
| 9 | | several years ago in the county.  And then it reads, |
| 10 | | Investigator Barron spoke with SAUSA Kat Dahl about doing |
| 11 | | a complaint on him.  Did you verbally speak with her? |
| 12 | A. | I'm not sure if initially it was a phone call or if I |
| 13 | | texted her. |
| 14 | Q. | Okay. |
| 15 | A. | I want to think a phone call. |
| 16 | Q. | And then it says she stated that she would check to see if |
| 17 | | a judge was available.  Investigator Barron took it one |
| 18 | | step further and messaged SAUSA Dahl and stated that he |
| 19 | | would type the complaint to expedite and help Kat Dahl |
| 20 | | with the process.  Do you see that? |
| 21 | A. | Uh-huh (Affirmative). |
| 22 | Q. | Is it your testimony that you produced that text message |
| 23 | | to your counsel, to the City's counsel? |
| 24 | A. | I think we -- I think we have it, yes. |
| 25 | Q. | I will represent to you that that text message was not in |

**MICHAEL BARRON**                                              **DIRECT - TAHINCI**

62

| | | |
|---|---|---|
| 1 | | the subpoena response documents that I received. |
| 2 | A. | Okay. |
| 3 | Q. | Are you fairly certain that you do have that text message |
| 4 | | and did produce it? |
| 5 | A. | I thought so, but like I said, I'm not sure. |
| 6 | Q. | The next line says, she agreed that this would help and |
| 7 | | stated that she would get back to Investigator Barron |
| 8 | | about a judge.  Investigator Barron completed the |
| 9 | | complaint and messaged SAUSA Dahl stating it was finished, |
| 10 | | just waiting on her to tell him what judge would be |
| 11 | | available.  Do you see that? |
| 12 | A. | Yes. |
| 13 | Q. | Is it your testimony that you produced that text message |
| 14 | | as well? |
| 15 | A. | If I had it, then I think we would have it, so... |
| 16 | Q. | Do you have a recollection sitting here today of reviewing |
| 17 | | that text message with respect to your subpoena response? |
| 18 | A. | I've looked at so much, I'm not sure.  But like I said, if |
| 19 | | it's there and we have it, then I'm sure we've turned it |
| 20 | | over. |
| 21 | Q. | When he writes that you messaged SAUSA Dahl, does that |
| 22 | | indicate to you that it would have been a text message and |
| 23 | | not an E-mail? |
| 24 | A. | That's what it indicates to me, yes. |
| 25 | Q. | And then he writes, Kat Dahl never replied back. |

**MICHAEL BARRON**                                         **DIRECT - TAHINCI**

| 1 | | Investigator Barron reached out about 10:00 a.m. this date |
| 2 | | still inquiring about a judge and at this time of the E- |
| 3 | | mail still has not heard from SAUSA Dahl. This E-mail is |
| 4 | | dated Thursday, April 22nd, 2021 at 1:01 p.m., correct? |
| 5 | A. | Correct. |
| 6 | Q. | So if you reached out that morning at 10:00 a.m., that |
| 7 | | means that three hours had passed since you reached out |
| 8 | | and did not hear from her, correct? |
| 9 | A. | From the E-mail? |
| 10 | Q. | Right. |
| 11 | A. | Yes. |
| 12 | Q. | Do you have any idea what she was doing that morning? |
| 13 | A. | I do not, no. |
| 14 | Q. | Do you have any idea if she was in court? |
| 15 | A. | I don't. |
| 16 | Q. | Do you know whether she was in Greeneville versus |
| 17 | | Knoxville or some other place? |
| 18 | A. | I don't. |
| 19 | Q. | And looking back at the prior exhibit, the SIS daily |
| 20 | | activity report for April 21st where you first mentioned |
| 21 | | the Dalvin Stephens/Robinson case, that E-mail was written |
| 22 | | the night before this Exhibit 25 E-mail, correct? |
| 23 | A. | Say that again now, I'm sorry. |
| 24 | Q. | That's a long question to repeat. |
| 25 | A. | I'm sorry. |

MICHAEL BARRON                                    DIRECT - TAHINCI

64

1   Q.   Looking at the prior exhibit, which is the SIS daily

2        activity for April 21st, 2021...

3   A.   Okay.

4   Q.   ...that E-mail is dated Wednesday, April 21st at 9:57,

5        correct?

6   A.   Right.

7   Q.   9:57 p.m., correct?

8   A.   Right.

9   Q.   And then the next E-mail is the next morning -- well, the

10       next afternoon, April 22nd at 1:00 p.m., correct?

11  A.   Right.

12  Q.   So less than 24 hours has passed in between those two E-

13       mails, correct?

14  A.   Yes.

15  Q.   And then Jeff Legault writes close to the bottom of

16       Exhibit 25, we have went above and beyond on the last

17       several complaints by typing them ourselves, and it still

18       seems impossible to get much to happen.  Was it unusual

19       for investigators to type complaints themselves?

20  A.   Like we've already discussed it's, I mean, not necessarily

21       unusual, but it did happen.

22  Q.   So why would that indicate that SIS has gone above and

23       beyond in Jeff Legault's terminology?

24  A.   I mean, all I can say is an assumption as far as this

25       case, just trying to get it wrapped up and get the

MICHAEL BARRON                                    DIRECT - TAHINCI

65

```
 1         complaint as quick as we can on this particular subject.
 2    Q.   Do you know what time of day you talked to Kat Dahl
 3         initially about the complaint?
 4    A.   It probably would have been first thing when I came in.
 5    Q.   You sent your SIS daily report E-mail at 9:57 p.m.
 6    A.   Right.
 7    Q.   So when did your shift begin?
 8    A.   So probably we were working noon to 10:00, I would say
 9         back then.
10    Q.   So you think that you spoke to her about it sometime in
11         the afternoon of Wednesday, April 21st?
12    A.   That would be my guess.
13    Q.   Do you have any idea what hours she worked?
14    A.   No.
15    Q.   Do you have any idea what hours the judges worked?
16    A.   No.
17    Q.   What, in your view, is an acceptable response time from a
18         SAUSA in response to an E-mail or text message from you?
19   MR. HERRIN:   Object to the form of the question.
20    A.   Can you ask me that again, please?
21    Q.   How long do you think it should take for a SAUSA to
22         respond to an E-mail or text message from you?
23    A.   I think a lot of that is probably, like, situationally
24         dependent, so just my personal opinion.
25    Q.   Dependent on the situation including circumstances such as
```

**MICHAEL BARRON**                                          **DIRECT - TAHINCI**

66

| | |
|---|---|
| 1 | what the SAUSA is doing at the time? |
| 2 | A. I'm not... |
| 3 | Q. Well, you testified that you don't know what she was |
| 4 | doing, right? |
| 5 | A. Right. |
| 6 | Q. You don't know if she was in court, right? |
| 7 | A. Right. |
| 8 | Q. You don't know if she was working on other cases, right? |
| 9 | A. Right. |
| 10 | Q. You don't have any idea what her work load was, correct? |
| 11 | A. Correct. |
| 12 | Q. You have no idea how many other people were sending her |
| 13 | cases to review, correct? |
| 14 | A. Correct. |
| 15 | Q. Did you have a conversation with Jeff Legault in June of |
| 16 | 2021 regarding Kat Dahl? |
| 17 | A. As far as... |
| 18 | Q. Regarding her communication. |
| 19 | A. I have no idea. |
| 20 | Q. I'm going to show you what's been marked as Exhibit 80. |
| 21 | I'll represent to you that this is a text message that |
| 22 | Jeff Legault testified that he sent to Chief Turner. It |
| 23 | shows a date of June 29th, 2021. Do you see that? |
| 24 | A. Uh-huh (Affirmative). |
| 25 | Q. And he writes -- he mentions you at the bottom of this |

MICHAEL BARRON                          DIRECT - TAHINCI

67

1  text message, right?

2  A. Uh-huh (Affirmative).

3  Q. And the text of this message says, chief, I spoke with

4     Investigator Stillwagon and he also stated at least six

5     times she hasn't responded or responded much later, and

6     that's a lowball number, same as mine. Investigator

7     Saulsbury stated at least three times that he can think of

8     right now. Investigator Barron probably the same. Do you

9     see that?

10 A. Uh-huh (Affirmative).

11 Q. Did you have a conversation with Jeff Legault that would

12    have led him to write that?

13 A. I can't remember if he directly asked me that or I think

14    at some point we had talked about it, you know, as far as

15    -- as far as from my side, you know. My experience was

16    probably just mainly off of this particular case, so...

17 Q. So when he says at least three times that he can think of,

18    do you know what those three times would be?

19 A. I'm not sure.

20 Q. Okay. Are you aware that Kat Dahl's contract was already

21    nonrenewed as of June 29th, 2021?

22 A. No.

23 Q. When did you learn that Kat Dahl's contract would not have

24    been renewed?

25 A. I'm not even sure.


MICHAEL BARRON                                DIRECT - TAHINCI

                              68