```
              IN THE UNITED STATES DISTRICT COURT
             FOR THE EASTERN DISTRICT OF TENNESSEE
                          AT GREENEVILLE


KATERI LYNNE DAHL,                    *
          Plaintiff,                  *
                                      *
VS.                                   *      CASE NO.
                                      *   2:22-CV-00072-KAC-CRW
CHIEF KARL TURNER, in his individual  *
capacity only; OFFICER JOHN DOES 1-3, *
in their individual capacities only;  *
and CITY OF JOHNSON CITY,             *
          Defendants.                 *



                        DEPOSITION OF

                  JAMES "JIM" TALLMADGE

                 (Taken November 15, 2023)



APPEARANCES:

COUNSEL FOR THE PLAINTIFF:     ALEXIS I. TAHINCI
                               TAHINCI LAW FIRM
                               105 Ford Avenue, Ste. 3
                               Kingsport, TN  37663

COUNSEL FOR THE DEFENDANTS:    K. ERICKSON HERRIN
                               HERRIN, MCPEAK & ASSOCIATES
                               515 E. Unaka Avenue
                               Johnson City, TN  37601

                               EMILY C. TAYLOR
                               WATSON, ROACH, BATSON
                                 & LAUDERBACK
                               900 South Gay Street
                               Knoxville, TN  37902

              ***THIS STYLE PAGE CONTINUES***
```

---

**COURT REPORTING AND VIDEO SERVICES**

P. O. Box 7481                        TELEPHONE: (423) 230-8000
Kingsport, TN 37664                   REBECCA@COURTREP.NET

```
ALSO PRESENT:            DANIEL J. MURPHY
                         PENNSTUART
                         208 E. Main Street
                         Abingdon, VA  24210

                         JOY BAKER
                         INTERIM ASSISTANT CITY MANAGER
                         CITY OF JOHNSON CITY

BY PHONE:                HUGH EASTWOOD
                         KAT DAHL
```

```
 1   Q.   How would that come about?
 2   A.   The officer knowing about the warrant and knowing a likely
 3        location might take it upon himself or herself to go and
 4        do something like that.
 5   Q.   If an officer were going to do that, would you expect them
 6        to first reach out to the investigator who secured the
 7        warrant?
 8   A.   Not necessarily.
 9   Q.   Okay.  Why or why not?
10   A.   If there was very little known about it, then yes.  But if
11        the investigator had already presented some of that
12        information and told us about the existence of the
13        warrant, then no, not necessarily.
14   Q.   Okay.  Was it common for investigators to let patrol know
15        about the existence of a warrant through a BOLO?
16   A.   Yes, that is one way that they do it.
17   Q.   Is that a common practice?
18   A.   Yes.
19   Q.   What would you expect to see in the BOLO in that
20        situation?
21   A.   A picture of the subject of the warrant, their personal
22        information, name, date of birth, descriptors, height,
23        weight, things like that, any possible known locations
24        where they might be found, and the charge, of course,
25        itself.  And then possibly if there was any risk involved
```

1    in the warrant, any special information that might need to
2    be known about the warrant and/or the subject, I would
3    expect that to be in there.
4 Q. Hypothetically, if a BOLO was issued that did not indicate
5    the charge, but simply said the indictment is up in
6    records or something to that effect, would you expect an
7    officer to go to records and view the indictment prior to
8    attempting to serve the warrant?
9 A. Prior to attempting to serve it? Yes, I would expect that
10   person to at least gather some information on it in one
11   way or another.
12 Q. And why is that important?
13 A. Well, for the reasons I explained already, the safety
14   issue, any special knowledge that might be needed
15   regarding the person or the warrant itself.
16 Q. Is going to a wanted individual's residence, when the
17   individual presumably does not know that they are wanted,
18   a best practice for serving an arrest warrant?
19 MR. HERRIN: Object to the form of the question.
20 Q. And that's in your training and experience, would you --
21   hypothetically, if there is a wanted individual with a
22   sealed federal indictment, would the first step in finding
23   that person be going to their residence?
24 A. I don't know that there is a best practice because each
25   situation is different. I wouldn't -- I wouldn't say that

JAMES "JIM" TALLMADGE                           DIRECT - TAHINCI

15

```
 1        individual, Sean Williams, with the person who had the
 2        reinforced steel walls and door?
 3   A.   Yes.
 4   Q.   You understood that to be the same person?
 5   A.   Yes.
 6   Q.   In roll call on May 5th, would you have discussed this
 7        BOLO?
 8   A.   Yes.
 9   Q.   Would you have told the officers there at roll call about
10        the steel plates?
11   A.   I did not tell them.  I did not personally discuss the
12        BOLO.  It was discussed, pardon me.
13   Q.   Who would have discussed it?
14   A.   Investigator Sparks came to the roll call that night.
15   Q.   Okay.  Tell me about that.
16   A.   He came to roll call, which is standard practice for our
17        investigators when they're working evening shift, and he
18        passed on the information about the federal indictment at
19        that time, the charges, and he also mentioned that the
20        apartment had been fortified in that way.
21   Q.   Did he say anything else about Sean Williams?
22   A.   I don't recall.
23   Q.   Did he say anything about Sean Williams being suspected of
24        other crimes?
25   A.   I don't recall if he did or not.
```

JAMES "JIM" TALLMADGE                              DIRECT - TAHINCI

21

1    other side of the door saying while you were there.
2 A. I remember asking if the person behind the door -- if that
3    was Sean Williams. He said no, he was not, that he was
4    just a roommate. And he asked what was -- what was going
5    on, what the nature of our business was there. And I told
6    the person through the door that we would not discuss that
7    with anyone but Sean Williams.
8 Q. How long were you there at the apartment that night?
9 A. To the best of my memory, approximately 20 minutes, I
10   think.
11 Q. During that 20 minutes, was the conversation essentially
12   just what you relayed or were there other -- other
13   statements made?
14 A. By which -- which of us?
15 Q. Well, by either side.
16 A. Either side. My stance, our stance, remained the same,
17   that we wanted to speak to Sean Williams and that we would
18   not discuss our reason for being there with anyone other
19   than Sean Williams. We did indicate that the information
20   was of a personal nature. The person behind the door
21   continued to ask and did actually say -- go back and forth
22   a couple of times and say, well, I am Sean Williams, you
23   can go ahead. And I said, no, I'm still not going to have
24   this discussion through a closed door with no window that
25   I can see. I said, if you're willing to come out so we

JAMES "JIM" TALLMADGE                          DIRECT - TAHINCI

25