IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE
AT GREENEVILLE


KATERI LYNNE DAHL,                    *
        Plaintiff,                    *
                                      *
VS.                                   *          CASE NO.
                                      *   2:22-CV-00072-KAC-CRW
CHIEF KARL TURNER, in his individual  *
capacity only; OFFICER JOHN DOES 1-3, *
in their individual capacities only;  *
and CITY OF JOHNSON CITY,             *
        Defendants.                   *


DEPOSITION OF

# ERIC DAIGLE

(Taken December 28, 2023)



APPEARANCES:

COUNSEL FOR THE PLAINTIFF:      HUGH A. EASTWOOD
                                Attorney at Law
                                7911 Forsyth Blvd., Ste. 300
                                St. Louis, MO  63105-3825

                                ALEXIS I. TAHINCI
                                TAHINCI LAW FIRM
                                105 Ford Avenue, Ste. 3
                                Kingsport, TN  37663


***THIS STYLE PAGE CONTINUES***

---

*COURT REPORTING AND VIDEO SERVICES*

P. O. Box 7481                    TELEPHONE:  (423) 230-8000
Kingsport, TN  37664             REBECCA@COURTREP.NET

```
COUNSEL FOR THE DEFENDANTS:        K. ERICKSON HERRIN
                                   HERRIN, MCPEAK & ASSOCIATES
                                   515 E. Unaka Avenue
                                   Johnson City, TN  37601

                                   THOMAS J. GARLAND, JR.
                                   MILLIGAN COLEMAN
                                   230 W. Depot Street
                                   Greeneville, TN  37743

                                   EMILY C. TAYLOR
                                   WATSON, ROACH, BATSON
                                     & LAUDERBACK
                                   900 South Gay Street
                                   Knoxville, TN  37902

ALSO PRESENT:                      JOY BAKER
                                   INTERIM ASSISTANT CITY MANAGER
                                   CITY OF JOHNSON CITY

                                   CATHY BALL
                                   CITY MANAGER
                                   CITY OF JOHNSON CITY
```

2

| | |
|---|---|
| 1 | -- I would be talking about a USA or an AUSA on the |
| 2 | federal law side, but... |
| 3 | Q. Sure. Do you know if this sexual assault protocol that |
| 4 | Steve Finney promulgated applies to federal prosecutions? |
| 5 | A. I don't. I don't know if the federal USA in the area has |
| 6 | said we agree or not. I don't know. |
| 7 | Q. Okay. I'm going to get to Finding 2, which is the |
| 8 | material deficiencies with JCPD sexual assault |
| 9 | investigations. And your first sentence there says that |
| 10 | Johnson City's investigative practices were found to |
| 11 | compromise the effectiveness of the response to sexual |
| 12 | assault and led to under-enforcement of sexual assault |
| 13 | laws in Tennessee. Was there a certain -- what evidence |
| 14 | formed the basis of that conclusion? |
| 15 | A. Again, I'm reviewing all of the cases for failures, and |
| 16 | the failures are identified in the remainder of the |
| 17 | findings section. |
| 18 | Q. Okay. You -- you particularly make reference in this |
| 19 | paragraph to non-stranger sexual assault. Was that a |
| 20 | particularized issue with Johnson City investigations |
| 21 | based on your review? |
| 22 | A. As it says in the -- in the bottom there, that there were |
| 23 | -- as we identified failures in cases, we also identified |
| 24 | a pattern that these cases specifically fell into that |
| 25 | category. |

ERIC DAIGLE                                    DIRECT - EASTWOOD

```
 1   Q.   Okay.  And when you say a pattern, can you tell me sort of
 2        what underlying facts you notice that form the pattern?
 3   A.   Well, I would have to take a look at the majority, you
 4        know.  The spreadsheets are there looking at, you know,
 5        did -- was the victim interviewed, was evidence collected,
 6        was the suspect interviewed, or comments that were made in
 7        the investigation which show -- which show or can be
 8        interpreted as some form of bias in that those were the
 9        things that we found as consistent in the cases that were
10        prominently identified to be challenges.
11   Q.   When you say bias, what do you mean by that?
12   A.   Well, there's two types of biases in our world, and that
13        is, you know, implicit and explicit.  And explicit, as you
14        know, is, you know, sexism and racism as a type.  And then
15        implicit are biases that can be formed by many
16        applications.  As investigators, it is the goal of
17        supervisors and investigators to be -- to be trained and
18        supervised to ensure that no implicit biases can come into
19        application.  Some of the ones that I clarified here could
20        be, you know, the fact that there was a dating
21        relationship, and then there was an allegation of a sexual
22        assault, or that the female victim was a prostitute, or a
23        drug user, or had a long history of different types of
24        conduct.  And oftentimes the challenge is to ensure that
25        the investigators don't use their biases, their experience
```

ERIC DAIGLE                                    DIRECT - EASTWOOD

```
 1        and their history, to determine the credibility of a
 2        victim's complaint.
 3   Q.   And you noticed a pattern of bias by Johnson City in
 4        investigating sex crimes?
 5   A.   In the departments -- in the cases that were a failure.
 6        And I think it's again -- I'm going to say it again and
 7        again, which is not all of the cases were failures.  There
 8        was good work done by men and women at Johnson City Police
 9        Department.  But the ones that failed, you know, they
10        failed -- they failed.  And when we evaluated why they
11        were shown as a failure, these are the things that were
12        identified in the process.
13   Q.   What constitutes a failure in your view?
14   A.   As I said, we're going to go through the categories as the
15        assessment matrix, and then when we start to identify more
16        than one case has -- has not done the things that we would
17        expect them to do, we're going to start asking questions
18        as to why they didn't do it and start looking at trying to
19        identify what the challenges were.  And when we dig deeper
20        into the reports, a lot of times the biases will come out
21        in the reports based on statements such as, you know,
22        these individuals were in a dating relationship and then
23        the victim came and gave a sexual -- a complaint of sexual
24        assault.  And now the victim doesn't want to -- doesn't
25        want to continue the investigation, case closed.  And
```

ERIC DAIGLE                                    DIRECT - EASTWOOD

```
 1        we're like, well, wait a minute.  That's not -- that's not
 2        supposed to be the way that that works.  Or the victim has
 3        a long history as a prostitute or has a long history of
 4        drug addiction, you know.  And just because they have
 5        these things in their history, you know, doesn't
 6        automatically disqualify them from being a victim and the
 7        investigator needs to do more work to ensure that the
 8        disqualification, you know, the evidence is clarified.
 9   Q.   Thank you.  Turning to the next page, Page 15, you had
10        Finding 3 that JCPD's investigations were found to be
11        inconsistent, ineffective, and incomplete.  And I know we
12        talked about sort of some investigations being good and
13        some being failures.  Out of these 325 cases that you
14        reviewed, do you have an opinion on the number of good
15        cases versus failures?
16   A.   Not without looking at my spreadsheets, no.
17   Q.   Okay.  Would the spreadsheet indicate to you a number?
18   A.   No.  You know, it would.  If you sit there and do the
19        math, you're going to see...
20   Q.   Sure.
21   A.   ...here's -- let's just give an example.  Here's 25 cases,
22        and as you go down across the board, here's the cases that
23        didn't do something that they should have done.  And as we
24        look at those -- those quality of those cases, that
25        assessment tool, along with our assessment of the
```

ERIC DAIGLE                                    DIRECT - EASTWOOD

|     | is preservation of evidence, destruction of evidence. You |
| --- | --- |
| 1   | is preservation of evidence, destruction of evidence. You |
| 2   | could -- you know, as spending, you know, decades doing |
| 3   | this, you don't have to even go in and search. You can |
| 4   | just go in and hold, and get a warrant, and make sure |
| 5   | you're meeting the needs. But at least the key part is |
| 6   | when some officers -- one of the things that we saw, as I |
| 7   | identify in here, is that when you have information that |
| 8   | something like a sexual assault occurred in a certain |
| 9   | area, you know, for purposes of determining and the |
| 10  | protection of both the victim and the accused, you know, |
| 11  | you want to get that, you want to go in there and get that |
| 12  | evidence. And that has been -- that's a law enforcement |
| 13  | practice, you know. That's criminal procedure, criminal |
| 14  | investigation 101. |
| 15  | Q. Got it, okay. So, for example, if a woman is outside of a |
| 16  | residence, she's hysterical, she claims that she has just |
| 17  | been sexually assaulted, is there exigency for a |
| 18  | responding officer to at least try to hold the scene to |
| 19  | prevent destruction of evidence? |
| 20  | A. I think there is. |
| 21  | Q. Okay, thank you. And if an officer didn't hold the scene, |
| 22  | it could logically flow that a suspect could destroy or |
| 23  | tamper with evidence? |
| 24  | MR. HERRIN: Object to the form of the question. |
| 25  | A. It's possible. |

ERIC DAIGLE                                          DIRECT - EASTWOOD

101

```
1   Q.  For example, he could do laundry, wash the sheets, right?

2   A.  True.

3   Q.  Yeah, okay.  Thank you.  Recommendation -- turning back to

4       Page 17, there's recommendation 3a.  It says Johnson City

5       should develop a checklist for all sex related

6       investigations by responding officers and supervisors to

7       ensure consistency in collecting and documenting evidence.

8       I take it by the language you use here, the verb "should,"

9       that no such checklist existed at the time of your audit.

10  A.  We did not receive any type of checklist.

11  Q.  Is it industry standard to have such a checklist?

12  A.  I think well-functioning investigative units would want

13      that for at least the responding officers.  You're talking

14      about inexperienced officers who, you know, they're not

15      going to remember all of the steps that they should take.

16      And you don't want to -- you know, you don't want to --

17      the way that -- the way that myself and my team look at it

18      is that I'm not worried about your feelings here, I'm

19      worried about the fact that you got everything done.  And

20      so I think a checklist is val' -- we use checklists in

21      different types of investigations to just ensure that if

22      the individual who gets dispatched to this crime is a

23      brand new officer and has no experience that -- that, you

24      know, they are -- they have something to refer to make

25      sure that they're doing everything in their power.
```

ERIC DAIGLE                                    DIRECT - EASTWOOD

```
 1        didn't exist, I don't know.
 2    Q.  Okay, fair enough.  But in terms of this recommendation 3c
 3        when you talk about accountability for supervisors,
 4        officers, and investigators, what do you mean by that?
 5    A.  So if you go back to the beginning of the document, we had
 6        that image that we talked about, policy, training, and
 7        supervision, right?  The way that we build strong
 8        organizational operations is to make sure that supervisors
 9        and people who do the job are held accountable for doing
10        it the way they're supposed to.  And, you know, that
11        changes over the years.  A new officer is not going to
12        have the experience and the time to learn how to do it
13        correctly, so as a checks and balance to the system, we
14        would expect that his supervisor, or her supervisor or
15        command staff, or that we're checking to make sure that
16        these things are being held accountable.  And so on all
17        the things that we talked about to this point, you know,
18        not doing search warrants, not securing scenes, not taking
19        statements, whatever the failures that we identified or
20        the concerns that we identified, my biggest question is
21        going to be where was the supervisor or where was the
22        command staff to make sure that this got done, and why --
23        why -- why do we need an outside assessment to find things
24        that we should be finding ourselves along -- along the
25        process.
```

ERIC DAIGLE                                  DIRECT - EASTWOOD

```
1    Q.  Can you tell me more about some of the failures of
2        supervision in having case documentation and proper case
3        files?
4    A.  Well, I mean, I can only -- I can only utilize my
5        experience with departments, and that is that we are built
6        in a mechanism that there are all -- there's always a lot
7        of checks and balances to ensure effectiveness.  One of
8        the checks and balances is an on-scene supervisor or a
9        sergeant working that's going to go out and help the
10       officer on the scene make sure that they do it correctly.
11       That these same supervisors are going to be reviewing the
12       reports that the -- that the officers are submitting.  You
13       know, the purpose of that supervisor is to make sure that
14       they're following department policy and training.  And
15       then there's command staff above the supervisors.  And the
16       same thing even in the criminal investigations unit, which
17       is, you know, you have sergeants, and you have
18       lieutenants, you have captains, you have deputy chiefs and
19       chiefs.  The reason for these ranks are not just to hold
20       the position, but to be the checks and balances for -- for
21       the effectiveness of the agency to make sure that they are
22       one in protecting their people and that things are being
23       documented and done correctly, and, if not, that they're
24       taking action to address it.
25   Q.  And it is your opinion that there were failures here at
```

ERIC DAIGLE                                    DIRECT - EASTWOOD

122

|    |    |
|----|----|
| 1  | Johnson City as to sex crimes by these supervisors? |
| 2  | A.  Yes. |
| 3  | Q.  And particularly, there were failures by these supervisors |
| 4  | at Johnson City as to the Sean Williams cases that you |
| 5  | reviewed? |
| 6  | A.  I guess I say yes because, you know, especially the one we |
| 7  | used for an example, you know, why wasn't the scene |
| 8  | secured?  If there's supervisors on scene, maybe the |
| 9  | officer doesn't understand what's supposed to be done, but |
| 10 | I do expect the experienced supervisors to understand |
| 11 | what's supposed to be done. |
| 12 | Q.  And you have no explanation -- sorry, strike that.  You |
| 13 | have no good explanation for why these supervisory |
| 14 | failures occurred. |
| 15 | MR. HERRIN:  Object to the form of the question. |
| 16 | A.  I don't know why, correct. |
| 17 | Q.  Thank you.  Turning back to Page 19, line "d", the case |
| 18 | file records were deficient in the documentation of |
| 19 | witness interviews.  A threshold question, in the context |
| 20 | of sex crimes, who is a witness? |
| 21 | A.  It could be anybody who witnessed it, you know, other -- |
| 22 | other people in the room, other people at the party, other |
| 23 | people in the area, you know, medical staff that treated |
| 24 | the person, you know.  A witness is very broad, so again, |
| 25 | case by case.  Sometimes there are no witnesses, but if |

ERIC DAIGLE                                    DIRECT - EASTWOOD

123

```
1   Q.  And you are not involved in Johnson City implementing

2       these measures.

3   A.  I'm not, no.

4   Q.  Okay, great.  Thank you.  Turning to Page 24, you have

5       "g", JCPD's response to sexual assault was challenged

6       based on gender-based stereotypes and bias.  And then

7       there's specific statements by investigators and

8       department leadership that women reporting non-stranger

9       sexual assault are lying, and that such assaults are less

10      severe and traumatic to victims than other serious crimes.

11      Can you elaborate on that statement to me?  What were you

12      referring to?

13  A.  So, in speaking with different investigators, and I

14      believe the key one here was Investigator Dunn, there was

15      some directions that command staff in the investigative

16      application, and maybe in other areas of the department,

17      would make allegations or assumptions based on the

18      position or the situation that the female was in at the

19      time of the alleged assault, and therefore was lying as a

20      result of it.  And obviously, that is -- that is biased,

21      and it's biased as to the victims, and it needs to be --

22      it has no place in sexual assault investigations.

23  Q.  Did Investigator Dunn identify which supervisors held

24      those views?

25  A.  My recollection was that in the investigative application
```

ERIC DAIGLE                                    DIRECT - EASTWOOD

146

1    that she would hear the commander, Kevin Peters, make

2    comments about -- about the females who were victims and

3    the situations that they were faced in.  I don't have her

4    notes specifically in front of me, but that's what led to

5    us asking, you know, additional questions and follow-up.

6  Q.  Are her notes part of your file?

7  A.  They are.

8  Q.  Okay.  And other than Kevin Peters, what about Chief

9    Turner?  Was there any reference made to him in this issue

10    of gender-based stereotypes and bias?

11  A.  I don't recall.

12  Q.  Any lieutenants?

13  A.  I don't recall.  I only recall the commander at this

14    point, but it was -- it seemed to be -- you know, as we

15    started talking about earlier, you know, when things are

16    not going right, we want to know why, this is the way we

17    do it here, and our drill down into custom, which I think,

18    you know, got better with JCPD over the years.  I mean, we

19    found less challenges in the 2021 and 2022 investigations

20    than we did back in the '18, '19, '20 investigations.  So

21    the -- just as a totality, when we asked, well, why wasn't

22    this investigated more and why didn't the investigators

23    dig deeper, it was, well, you know, females -- if she was

24    -- if she was in a -- in a relationship, or if she was

25    formerly a prostitute, or she was a drug user, that those

| | |
|---|---|
| 1 | is this is what we knew, this is what the investigation |
| 2 | found, is it a fair and full and clear investigation, and |
| 3 | now if there's an issue with prosecution, then that is -- |
| 4 | that is the job of the prosecutor.  You know, it just -- |
| 5 | most people have gotten away, and I even think your own DA |
| 6 | has gotten away with the fact of you can't call a |
| 7 | prosecutor and just say, hey, I want to -- you know, the |
| 8 | victim doesn't want to -- doesn't return my calls.  Okay, |
| 9 | good, we're going to decline.  That just doesn't -- it |
| 10 | won't work in the last decade, so... |
| 11 | Q.  You say it's also a failure of supervisors.  Can you |
| 12 | elaborate on that?  What is the supervisory failing here |
| 13 | when a prosecutor declines to prosecute? |
| 14 | A.  Well, the supervisor has to approve the closure, so they |
| 15 | have to approve and agree with the officer that the report |
| 16 | is -- you know, that everything is good.  And if I was a |
| 17 | supervisor, I think the biggest area of concern is that |
| 18 | they're not looking out for their people because if I was |
| 19 | a sergeant, a lieutenant, and one of my investigators |
| 20 | brought to me a closed and said, hey, I talked to the |
| 21 | prosecutor and the prosecutor said that we're going to |
| 22 | close this case, and I was like -- I would be, like, where |
| 23 | is the evidence of that, where is the -- where is the |
| 24 | form, where is the -- where is the E-mail, where is that? |
| 25 | Just because they told that to you, I'd say, you know, if |

ERIC DAIGLE                                    DIRECT - EASTWOOD

154

1     this goes sideways, the prosecutor may selectively recall

2     that conversation a different way, and where's -- where's

3     the protection for your people?

4  Q. You mentioned Connecticut requiring an affidavit, for

5     example.  I know going on to Page 29 where you have a

6     discussion that prosecution declined, you recommend an

7     affidavit or a report.  Do you know if there have been any

8     changes, either at state or Johnson City level

9     requirements as to better documenting a prosecution

10    decline?

11 A. I do recall in our conversation with the district attorney

12    and his implementation of two new prosecutors that were

13    the center point of contact that they were very stringent

14    as to there were now very clear guidelines as -- which was

15    identified in the DA's protocol as to how a case would be

16    closed if it was closed.  And the fact that these

17    prosecutors were -- were, I guess, charged with a more

18    detailed specific way of doing that, and I'm kind of just

19    going off my memory here, that he also understood the

20    significance for his people of being a failure that a case

21    would come back and say prosecute -- prosecutor -- talked

22    to the prosecutor and they declined.  How do you know

23    that?  Maybe -- maybe the officer never talked to the

24    prosecutor.  We don't know that.

25 Q. You -- you say the exceptional clearance rate for JCPD is

ERIC DAIGLE                              DIRECT - EASTWOOD

155

1    A.   Yeah, I think that's, you know, in the business we call it
2         deliberately indifferent.  I think you owe -- you know, a
3         supervisor owes it to at least try to resolve this case to
4         the best interest of the victim.  And what's the harm,
5         what's the foul?  Unless -- unless you're telling me that
6         there's just none available, then find one.  But I
7         wouldn't do that, I would reassign it.
8    Q.   Do you know who the investigator was in this case?  Do the
9         case notes reflect that?
10   A.   That's one of the failure parts of this report writing
11        system was -- it says "I", but I don't know who "I" is, so
12        I'm trying to see if there's any -- it's not jumping out
13        at me.
14   Q.   Does it say who the sergeant was?
15   A.   It says that the investigator refers to himself,
16        obviously, as "I", and initially was the on-call
17        investigator for the weekend, and was called by Captain
18        Harrell.  He might be the duty supervisor for the weekend.
19        This is actually a very detailed report.  I mean, there's
20        a lot of information in this report.  Not -- there's still
21        a lot of questions in the report, but versus other
22        reports, it's pretty -- it does -- there is a reference to
23        Sergeant Hilton...
24   Q.   Okay.
25   A.   ...on 6/26/19, talking about it looks like the mother


ERIC DAIGLE                                    DIRECT - EASTWOOD

161

```
1    Q.  Recommendation 4 states, JCPD's command staff and
2        supervisors must provide oversight and be held accountable
3        for the manner in which cases are closed.  It sounds like
4        from this recommendation that you're putting the
5        accountability on the supervisors rather than the
6        reporting officers, or at least the officers writing the
7        reports.  Is that fair?
8    A.  Well, if the -- you know it's kind of fair.  I do believe
9        the reason why we have supervisors is to make sure the
10       officers do their job the way that they're supposed to do
11       it.  If the supervisors fail to address it, that only
12       magnifies the failures.  So, you know, if an officer might
13       not understand the basis of an exceptional clearance or
14       the officer may not understand what the policy says
15       specifically as to how something is supposed to be done,
16       but we hold the supervisors accountable for doing that.
17   Q.  Would you expect supervisors to be experienced and
18       familiar with what constitutes a proper investigation?
19   A.  If they are assigned to the CID unit, I would say yes.  A
20       road supervisor, you know, they can come from all
21       different -- they can come from all different levels of
22       experience.  That's why you have a lieutenant or a
23       commander.  There's other checks and balances.  You know,
24       not every -- not every supervisor is, you know, an expert
25       or properly qualified to do investigations, that's why
```

ERIC DAIGLE                          DIRECT - EASTWOOD

164

| | |
|---|---|
| 1 | they're not in investigations.  But -- but there should be |
| 2 | some checks and balances, which there are.  Like in this |
| 3 | situation, if it's a significant case, it's gets assigned |
| 4 | to CID.  That's done because CID has the resources and the |
| 5 | skill set to complete the job effectively. |
| 6 | Q.  In terms of this oversight, would you expect a lieutenant |
| 7 | over CID to have this oversight? |
| 8 | A.  I would expect the lieutenant to have knowledge of the |
| 9 | proper mechanisms to conduct criminal investigations, yes. |
| 10 | Q.  And sex investigations specifically? |
| 11 | A.  Any investigations, but specifically sex investigations, |
| 12 | yes. |
| 13 | Q.  The same -- the same question for a captain over CID. |
| 14 | A.  It matters, you know, what their -- what their involvement |
| 15 | is.  Remember, you know, a lieutenant -- a sergeant and a |
| 16 | lieutenant are daily -- are working and are involved in |
| 17 | the daily operations of the agency.  If the captain is |
| 18 | reviewing cases, if the captain is providing guidance, if |
| 19 | the captain -- a lot of times captains have |
| 20 | responsibilities for multiple areas.  I guess the answer |
| 21 | to that question depends on how involved in how the |
| 22 | department operates CID. |
| 23 | Q.  What about a chief? |
| 24 | A.  Well, the chief is the chief.  And what that means is that |
| 25 | he employees people below him or her to -- to ensure that |

ERIC DAIGLE                                    DIRECT - EASTWOOD

165

| | |
|---|---|
| 1 | things are operating effectively.  And unfortunately, the |
| 2 | reason we see failures across the country is sometimes |
| 3 | policy -- what we call customs or practices don't become |
| 4 | known to the chief until they blow up.  The question would |
| 5 | be, you know, what did he know and when did he know it. |
| 6 | And, you know, he's -- a chief is not -- a chief in a |
| 7 | normal agency is not involved in day-to-day operations.  A |
| 8 | chief has chief things to do.  But that's why he has men |
| 9 | and women below him who are responsible to ensure that |
| 10 | those things don't fail. |
| 11 | Q.  Thank you.  Turning on to the next finding about the |
| 12 | internal affairs process and the Finding 5 that all |
| 13 | complaints and misconduct against the department are |
| 14 | timely investigated.  Obviously, here -- well, strike |
| 15 | that.  Page 31, are you -- did you study any internal |
| 16 | affairs investigations in the course of conducting your |
| 17 | audit? |
| 18 | A.  I did not, no. |
| 19 | Q.  Okay.  Did you ask for any? |
| 20 | A.  I met with the internal affairs commander and asked the |
| 21 | internal affairs commander for any investigations or |
| 22 | complaints made during this time frame specifically |
| 23 | related to sexual assault investigations or sexual related |
| 24 | crimes, and I was told that there was none and there were |
| 25 | no investigations that fit that category.  Since that's my |

ERIC DAIGLE                                    DIRECT - EASTWOOD

166

| | |
|---|---|
| 1 | those have been assigned to someone with training in |
| 2 | sexual assault investigations? |
| 3 | A. Experience, yes. |
| 4 | Q. Okay. If an investigator testified that he did not have |
| 5 | particular training or experience in sexual assault cases, |
| 6 | but was assigned to the Sean Williams cases nevertheless, |
| 7 | would that be problematic in your view? |
| 8 | MR. HERRIN: Object to the form of the question. |
| 9 | A. That would be problematic, yes. |
| 10 | Q. And why would that be problematic? |
| 11 | A. Because it's like any type of investigation. I don't want |
| 12 | -- I don't want investigators who are not properly |
| 13 | qualified to do deadly force shooting cases doing deadly |
| 14 | force shooting cases. When we -- I don't want homicide |
| 15 | investigators -- I want them to be qualified and |
| 16 | experienced to do homicide investigations. You know, the |
| 17 | experience and the qualification based on your training is |
| 18 | important for -- I mean, I think it's the duty that we owe |
| 19 | to our citizens to give them the highest quality of |
| 20 | investigation that is allowed. |
| 21 | Q. Okay. And recommendation 8c on Page 36, it talks about |
| 22 | bias and also supervisory reviews bias. Is this |
| 23 | essentially what we discussed earlier about explicit and |
| 24 | implicit bias? |
| 25 | A. Yes, sir. |

ERIC DAIGLE                                              DIRECT - EASTWOOD

180

```
 1        Johnson City community and doing it correctly.

 2        Unfortunately, you know, there are a lot -- there are

 3        cases that actually getting streamed into certain

 4        individuals and certain job postings that found to be

 5        failures in this case.  And, unfortunately, the department

 6        is judged as a whole for the individuals that fail, but it

 7        doesn't mean that there are not other men and women that

 8        are doing the job the way that it's supposed to be done in

 9        Johnson City.

10   Q.   Do you have opinions on which individuals within the

11        department did fail?

12   A.   Well, I think that the -- the assessment clearly

13        identifies that if you are an investigator whose reports

14        continue to become the topics of my -- my findings and my

15        recommendations, that will -- that will give a funnel

16        effect as to where the failures did occur in the agency

17        that led to these challenges.

18   Q.   And that includes supervisors and command structure?

19   A.   Well, if they were responsible for overseeing them, then I

20        would -- I would say yes.

21   Q.   Okay.  The next sentence talks about discrimination and

22        law enforcement's handling of sexual assault reports

23        harming public trust in the criminal justice system

24        endangering victims and perpetuating negative stereotypes.

25        What discrimination are you referring there to?
```

ERIC DAIGLE                                    DIRECT - EASTWOOD

```
 1   Q.  But to put it another way, you didn't intentionally go out

 2       to review particular cases that Kat Dahl was working on or

 3       referred to her?

 4   A.  No.

 5   Q.  Okay.  Do you have an opinion if a forcible rape is a more

 6       serious crime than a felon in possession of a firearm?

 7   MR. HERRIN:  Object to the form of the question.

 8   A.  I mean, I think they're both pretty serious.  You know --

 9       you know, the difficulty for me is I would say one with a

10       victim and a victim that -- an identifiable victim where

11       the gun -- gun with a firearm -- a felon with a firearm is

12       -- doesn't have a victim.  Victim-related crimes, I think,

13       are the most significant crimes that law enforcement

14       should be investigating.

15   Q.  And is that particularly true when there were multiple

16       victims with -- with reports of similar sex criminality

17       against the same suspect?

18   MR. HERRIN:  Object to the form of the question.

19   A.  I can agree with that.

20   Q.  Sure.  I mean, in other words, a serial rapist is more

21       serious than a one-time rapist, although neither is good.

22   A.  I can agree with both of those things, yes.

23   Q.  Okay, thank you.  There were some recordings and

24       conversations involving Ms. Dahl and officers at Johnson

25       City Police Department.  Did you ever listen to those or
```

ERIC DAIGLE                                        DIRECT - EASTWOOD

211

| | |
|---|---|
| 1 | what is on the document versus common practice in the |
| 2 | industry.  So I am assuming for purposes that everything |
| 3 | the officers put in there are truthful and accurate, and I |
| 4 | found no information that showed me that they weren't |
| 5 | being truthful and accurate, which is why I documented it |
| 6 | in that way.  But I'm not doing an investigation to find |
| 7 | out whether they are being truthful and accurate, which |
| 8 | would require additional steps in an investigation.  I'm |
| 9 | only assuming that they are based on the quality of their |
| 10 | work and the information that applied.  And you're trying |
| 11 | -- you're asking me whether I know for a fact that they |
| 12 | are.  I hope they are, but I don't know for a fact that |
| 13 | they are. |
| 14 | Q.  Fair enough.  This record keeping system you identified as |
| 15 | the most significant failure that you came across, is that |
| 16 | an accurate statement on Page 12 of your report? |
| 17 | A.  Yes, sir. |
| 18 | Q.  And the defects in a record keeping system are not the |
| 19 | fault of individual investigating officers, is it? |
| 20 | A.  Well, they're not -- they're not -- yes, I think it's |
| 21 | across the board.  A system is only as good as the data |
| 22 | you put in it.  And unfortunately, the supervisors should |
| 23 | have been mandating that the officers put more data in the |
| 24 | system.  And so the challenge that's faced here is that |
| 25 | the system was archaic, antiquated, and difficult to use, |

ERIC DAIGLE                                          CROSS - HERRIN

224

1      but it is the system that you chose to use as a

2      department.  So, you know, there is a requirement for the

3      officers to use whatever system they're provided and to,

4      you know, protect themselves as we would expect in the

5      proper documentation.

6   Q.  As I understand your assessment of the record keeping

7      system, it was a lack of a centralized collection process

8      where you could go one location, find reports, video,

9      photos, witness statements, all of that in just one

10     available file.  Is that a fair look at it?

11  A.  That's fair, yes, sir.

12  Q.  It's already been mentioned that you found some paper

13     records that had been shredded once a case was closed, or

14     that there was a paper file somewhere that was hard to

15     retrieve paper -- a paper document.  Is that correct?

16  A.  That's what we were advised, yes.

17  Q.  But you did not find any evidence that investigators had

18     destroyed evidence in any active investigation, did you?

19  A.  I don't know the answer to that, sir.

20  Q.  Well, you would ask for and sometimes find a paper

21     document that had been placed in a paper -- in a file

22     somewhere.  They would retrieve that after some effort.

23  A.  That is accurate, yes, sir.

24  Q.  Okay.  So you did not find where there were documents

25     shredded, or not able to be found, or intentionally

ERIC DAIGLE                                    CROSS - HERRIN

225