UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
GREENEVILLE

| KATERI LYNNE DAHL, | ] |  |
|---|---|---|
| Plaintiff, | ] |  |
| v. | ] | No.: 2:22-cv-00072-KAC-JEM |
| CHIEF KARL TURNER, et al., | ] |  |
| Defendants. | ] |  |

### PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION IN LIMINE DIRECTED TO PLAINTIFF DAHL REGARDING HEARSAY TESTIMONY AT TRIAL [Doc. 98]

Plaintiff Kateri Lynne Dahl, by and through counsel, hereby submits this memorandum in opposition to the Motion in Limine filed by Defendants regarding hearsay testimony by Dahl.

Defendants list a number of statements they contend are inadmissible hearsay without undertaking any analysis of those statements, the reasons they might be offered, and the applicable hearsay exclusions and exceptions. Defendants apparently do not seek to exclude specific statements, but merely request "a directive from the Court to Plaintiff Dahl not to engage in hearsay commentary as she has demonstrated a willingness to do extensively in her submitted Declaration to the Court . . . ." Doc. 98 at 2. There is no basis in the Federal Rules of Evidence or the case law for treating Dahl differently than any other witness when it comes to hearsay statements, and certainly not because, as Defendants argue, Dahl happens to be a lawyer.

Defendants' motion does not even list the supposedly objectionable statements in full. Nevertheless, Dahl will attempt to address Defendants' concerns about each identified portion of her Declaration (Doc. 82-21).

1. "When I first started the job, I was told by Taylor that I would answer to both him and to Chief Turner, and to split my time between the U.S. Attorney's Office in Greeneville and the Johnson City Police Department. I was also to assist the Johnson City Police Department however I could with identifying investigations for federal prosecution. This included guiding them on best practices for federal indictments." Doc. 82-21 at ¶ 6. This statement was offered for its effect on Ms. Dahl. "A statement that is not offered to prove the truth of the matter asserted but to show its effect on the listener is not hearsay." *Biegas v. Quickway Carriers, Inc.*, 573 F.3d 365, 379 (6th Cir. 2009). Dahl can testify about what one of her superiors told her about her job structure and duties. This is also essentially innocuous background information.

2. "Taylor made it apparent that I would be juggling two bosses at the same time: one example of this was that while Taylor was my immediate supervisor, I always had to clear my time off with Chief Turner and arrange my schedule around JCPD's needs." Doc. 82-21 at ¶ 7. Again, Dahl can testify about what one of her superiors told her about her job structure and duties. This statement was offered for its effect on Ms. Dahl. This is also essentially innocuous background information. It is not even entirely clear that this statement is based solely on something Taylor said. To the extent Turner told Dahl something similar, that would be a statement of a party-opponent, which is excluded from the definition of hearsay. Fed. R. Evid. 801(d)(2).

3. "He said he would set up a meeting for me with the TBI, as a case of this nature warranted additional resources." Doc. 82-21 at ¶ 15. This is being offered for its effect on Dahl, the listener, rather than for its truth. It would also be admissible under

the residual exception, Fed. R. Evid. 807, because it is corroborated by Taylor's testimony and the fact that Taylor did indeed set up a meeting.

4. "Inv. Stillwagon said that he knew that a woman whose name was on the list was Williams's ex, and that she used to work at a restaurant that Inv. Stillwagon frequented. He said that this woman had used to complaint that Williams was abusive." Doc. 82-21 at ¶ 19. This statement was offered not for the truth of the matter asserted, but for its effect on Dahl, making it non-hearsay. This is apparent from the very next sentence: "This confirmed in my mind that the woman who I had found on social media was most likely the same one on the list, given the unusual first name and the fact from Inv. Stillwagon that she had been romantically involved with Williams." *Id.* Stillwagon was also an investigator with JCPD, making this an admissible statement by a party-opponent. Moreover, the statement is offered to show that JCPD had notice of Williams' behavior.

5. "The advocate confided in me that the Johnson City Police Department was 'the worst one to work with' in the Tri-Cities area." Doc. 82-21 at ¶ 23. Again, this is being offered for its effect on Dahl rather than for the truth of the matter. The advocate's identity is known to Defendants, the interview of Jane Doe 2 referenced in this paragraph was recorded, and Defendants produced the video to Dahl in discovery.

6. "[Taylor] told me that Chief Turner had learned about the TBI meeting and was angry that the meeting had been set up without his knowledge." Doc. 82-21 at ¶ 28. This statement is also being offered for its effect on Dahl rather than for its truth. But it would be admissible under the residual exception, Fed. R. Evid. 807, as well – it is

corroborated by other evidence in the record and is sufficiently trustworthy to warrant introduction.

7. "Sgt. Gryder made the comment to me, 'Well Kat if you're so invested in this case, go have a drink at Label and let Williams pick you up and take you back to his place. We'll come get you in an hour.'" Doc. 82-21 at ¶ 33. This statement is being offered not for its truth, but for its effect on Ms. Dahl, as the next sentence makes clear: "I took this to mean that he was suggesting I would have better luck gathering evidence if I made myself a victim of Williams, rather than pressuring JCPD to investigate further." *Id.* Sgt. Gryder was also a supervisor at JCPD commenting on an investigation (or lack thereof), so Dahl would argue that this statement is admissible under Rule 801(d)(2)(D).

8. "After Jane Doe 3 left, McCauley told me that he was disturbed by some comments that Cpt. Peters had made to him while I was waiting out front. He told me that Cpt. Peters had asked what he was doing there, and when McCauley responded that we were there to interview Jane Doe 3, Peters pulled up Jane Doe 3's Facebook profile and proceeded to make objectifying comments about her appearance." Doc. 82-21 at ¶ 36. The statements by Peters are admissible under Fed. R. Evid. 801(d)(2)(D), as Peters was a high-ranking employee of JCPD making comments about a victim of a crime that was under investigation by JCPD. Dahl anticipates that if he is allowed to testify, McCauley would corroborate what Dahl declares in this paragraph. Dahl sought to depose McCauley, but the U.S. Department of Justice denied Dahl's request pursuant to *Touhy*. Dahl has already issued a subpoena for McCauley's trial testimony

pursuant to *Touhy*, which DOJ has preliminarily indicated it will approve as to a limited scope of issues including the above.

9. "Later that afternoon, I received a call from Taylor. He told me that Chief Turner was complaining about my job performance, mainly that I was not indicting cases fast enough and I was not communicating with officers." Doc. 82-21 at ¶ 37. It is remarkable that Defendants take issue with this statement, as it summarizes *their own defense* in this case, which they have reiterated repeatedly in filings with the Court. The statement by Turner is admissible under Fed. R. Evid. 801(d)(2)(D). The statements by Taylor incorporating Turner's statements are not offered for the truth of the matter, but for their effect on Dahl. They are also admissible under the residual exception, because they are plainly corroborated by other evidence of record, including emails and testimony of Turner himself.

10. "[Stillwagon] reiterated that no, he did not have a problem with our communications." Doc. 82-21 at ¶ 38. This statement is offered for its effect on Dahl rather than for its truth. Dahl also submits that this is a statement of a party-opponent admissible under Fed. R. Evid. 801(d)(2)(D).

11. "[Legault, Saulsbury, and Barron] all said no." Doc. 82-21 at ¶ 39. This statement is offered for its effect on Dahl rather than for its truth. Dahl also submits that these are statements of a party-opponent admissible under Fed. R. Evid. 801(d)(2)(D). Moreover, as all these witnesses have testified, these statements may be admissible for impeachment purposes.

12. "Chief Turner called me and told me that they had received another anonymous tip about another victim of Williams, Jane Doe 4." Doc. 82-21 at ¶ 44. This statement is

corroborated by the anonymous tip itself and is therefore admissible under the residual exception, Fed. R. Evid. 807. It is also clearly a non-hearsay statement by a party-opponent that is admissible under Fed. R. Evid. 801(d)(2)(D).

13. "Kaycee Roberts, who worked for the Federal Defender's Office, had complained to me on numerous occasions that she too had issues with communicating with probation." Doc. 82-21 at ¶ 46. It is unlikely that Dahl will offer this statement at trial. Without waiving her right to call Kaycee Roberts, whom Plaintiff timely listed on her Rule 26 Disclosures and on her Pre-Trial List of Witnesses, Dahl therefore does not believe it would be productive to offer argument at this time about the admissibility of this statement.

14. An acquaintance at yoga class "mentioned that she lived downtown," "said it was ok except for the parties and noise," talked about "'the incident where the girl fell out of the window,'" said "the person who owned that apartment was 'sketchy,'" and "mentioned hearing rumors about the garage with the red sports car, and that it had an unsavory reputation as well." Doc. 82-21 at ¶ 52. These statements are offered for their effect on Dahl and to demonstrate that Sean Williams' unlawful behavior was a very well-known open secret, suggesting that Defendants would have known about it in 2020 and 2021 despite the sworn denials by Turner and others in JCPD leadership. As it is not offered for its truth, it is not hearsay.

15. "Roberts told me about one of her friends who was connected to Williams on Facebook, but she wasn't sure about the nature of their relationship." Roberts heard "a rumor from a different friend about a man who would drug women in downtown Johnson City." Doc. 82-21 at ¶ 57. These statements are offered for their effect on

Dahl and to and demonstrate that Sean Williams' unlawful behavior was a very well-known open secret, suggesting that Defendants would have known about it in 2020 and 2021 despite the sworn denials by Turner and others in JCPD leadership. In other words, the statements are offered not for their truth but to establish notice to the defendants, so they are not hearsay. This is clear from the last sentence of this paragraph: "It was becoming apparent to me that there was a well developed 'whisper network' surrounding Williams and his reputation for sexually assaulting women." *Id.*

16. A bartender at Watauga Brewing "said unprompted that the guy who owned the garage had a reputation of preying on women, and then asked why I wanted to know," and the bartender later indicated that she knew some of the man's potential victims, "but she didn't know if they would talk." *Id.* at ¶ 58. These statements are offered for their effect on Dahl (among other things, to demonstrate why Dahl reasonably suspected corruption or incompetence, the subjects of her protected activity). They are further offered to demonstrate that Sean Williams' unlawful behavior was a very well-known open secret, suggesting that Defendants would have known about it in 2020 and 2021 despite the sworn denials by Turner and others in JCPD leadership. In other words, the statements are offered not for their truth, but to establish notice to the defendants. Since they are not offered for their truth, then they do not meet the definition of hearsay.

17. Attorney Spurrell "said that while he had not been retained by Williams for the immediate criminal matter, he did have a generic retainer on file and had been in touch with him after the arrest attempt. Mr. Spurrell told me that he was working with Williams to turn himself in and that he would voluntarily turn himself in . . . .

Williams did not show up to the courthouse to voluntarily surrender. I called Mr. Spurrell, who told me that his client was suicidal." Doc. 82-21 at ¶¶ 74-75. These statements are not offered for their truth, but for the purpose of showing that JCPD officers' actions on May 5 did in fact have the effect of alerting Williams to the sealed indictment and allowing him to flee. Moreover, as an attorney, Dahl would normally rely on statements of opposing counsel.

18. FBI Agent Pearson "made a remark indicating that she was familiar with [gender bias at JCPD], saying that JCPD was 'bad about that, even with kids.'" "I took this to mean that she knew or had witnessed JCPD exhibit gender bias against sexual assault victims." Doc. 82-21 at ¶ 78. It is unlikely these statements would be offered at trial. They are, however, offered for their effect on Dahl rather than for their truth: they demonstrate why Dahl reasonably suspected incompetence or wrongdoing by JCPD with respect to investigating and seizing Williams. They are also offered to demonstrate widespread knowledge of systemic issues within JCPD, which suggests that Turner and top JCPD leadership would have been aware of these issues despite their sworn denials.

19. "Shipley told me that JCPD had never asked him to do either of those tasks while he was SAUSA." Doc. 82-21 at ¶ 83. This statement is offered for its effect on Dahl, to show that she had a reasonable basis to believe she was being treated differently than similarly situated SAUSAs who had not spoken out about Sean Williams. This statement provides another reason why Dahl reasonably suspected incompetence or wrongdoing by JCPD with respect to Williams. Dahl has listed Shipley as a witness, and he can testify to this statement directly, which would render it non-hearsay.

Shipley is no longer an employee of the U.S. Department of Justice, and would not be asked to testify as to any matters encompassed by *Touhy*.

20. A manager at Wild Wing told Dahl "she had witnessed girls come into the bar to use the phone in distress, and that she had also overheard conversations of women talking about being drugged or assaulted." Doc. 82-21 at ¶ 93. Dahl states that she reported this statement to McCauley and Taylor. *Id.* This statement is admissible because it is the kind of statement an investigator or prosecutor would normally rely upon in the course of an investigation or prosecution. It is further offered to demonstrate that Sean Williams' unlawful behavior was a very well-known open secret, suggesting that Defendants would have known about it in 2020 and 2021 despite the sworn denials by Turner and others in JCPD leadership. In other words, the statements are offered not for their truth but to establish notice to the defendants. Because they are not offered for their truth, they do not meet the definition of hearsay.

21. Acting supervisory AUSA Bowman told Dahl "to remain calm and wait for Taylor to call." Doc. 82-21 at ¶ 96. This is a completely innocuous statement that is offered for its effect on Dahl, not for its truth. Corey Shipley "agreed that [JCPD's treatment of Dahl] seemed out of character from the treatment of the previous SAUSAs." *Id.* This statement is offered for its effect on Dahl, to show that she had a reasonable basis to believe she was being treated differently than similarly situated SAUSAs who had not spoken out about Sean Williams. This statement provides another reason why Dahl reasonably suspected incompetence or wrongdoing by JCPD with respect to Williams. Dahl has listed Shipley as a witness, and he can testify to this statement

directly, which would render it non-hearsay. Shipley is no longer an employee of U.S. DOJ, and would not be asked about matters encompassed by *Touhy*.

22. A blind date "told me that he heard about a girl who had died after she left Williams' apartment: the rumor was that he had drugged her and she crashed while driving home. . . he said he couldn't remember her full name, but gave me her first name." Doc. 82-21 at ¶ 98. The content of this statement is independently corroborated, and it would therefore be admissible under the residual exception, Fed. R. Evid. 807. But the statement is offered to demonstrate that Sean Williams' unlawful behavior was a very well-known open secret, suggesting that Defendants would have known about it in 2020 and 2021 despite the sworn denials by Turner and others in JCPD leadership. In other words, the statement is offered not for its truth but to establish notice to the defendants. Because it is not offered for its truth, it does not meet the definition of hearsay. The statement is also offered to show that JCPD withheld information from Dahl that would have been critical to the prosecution of Williams, which supports her reasonable belief that JCPD was either incompetent or corrupt, the subject of her protected activity.

23. "Jane Doe 7's sister confirmed the connection and stated that her sister had died on the way home from Williams' apartment. . . . She told me that Jane Doe 7 had died in the early morning hours of November 10, 2020, and that she had visited the Johnson City Police Department on November 12 and spoken to a detective about her sister's death. She told me that the detective there had dismissed her request for help, as Jane Doe 7's car crash had occurred in Carter County. . . . [S]he had placed a call to JCPD and asked for their help the day before Inv. Sparks approached me about the case."

Doc. 82-21 at ¶ 105. The content of this statement is independently corroborated by other evidence, and it would therefore be admissible under the residual exception, Fed. R. Evid. 807. Dahl has also listed the declarant as a witness, so she can testify about this statement directly during the trial of this matter.

24. "Ms. Crain told me how when she was investigating the brewery, she realized that she could not build a case for overserving Jane Doe 7 given her encounter with Williams and his reputation for drugging women. Agent Crain told me she was alarmed by the whole situation so she contacted JCPD sometime in January of 2021 about Jane Doe 7, but they never called her back." Doc. 82-21 at ¶ 108. Dahl has listed Ms. Crain as a witness, and Ms. Crain can testify to these facts directly; if she does, it likely will not be necessary for Dahl to testify about Crain's out-of-court statements.

25. Sgt. Gryder "told me that he didn't know anything other than the fact that Cpt. Peters had told him I had 'lied' to Chief Turner about the indictments. . . . he countered Cpt. Peters' statement by telling him it wasn't true, that I was supposed to be in trial. Sgt. Gryder told me that it didn't matter, because once Cpt. Peters had made up his mind about something, there was no way to discuss that issue with him." Doc. 82-21 at ¶ 111. First, these are statements by a party-opponent admissible under Fed. R. Evid. 801(d)(2). Second, as Defendants note, the statements by Gryder were recorded by Dahl, so they have sufficient indicia of reliability to be admissible under Fed. R. Evid. 807. Dahl has no objection to playing the recording for the jury rather than testifying about these statements herself.

26. "Neyland relayed that he knew about Williams' behavior through friends. He also said that a female friend of his had felt unsafe while at a party in Williams' apartment,

but when he called the police to report that his friend was feeling unsafe at the party, he was ignored." Doc. 82-21 at ¶ 114. It is unlikely that Dahl will offer this statement at trial. Dahl therefore does not believe it would be productive to offer argument at this time about the admissibility of this statement.

27. "Jane Doe 8 stated that [Williams] had raped her numerous times and he threatened to kill her on several occasions. . . . Jane Doe 8 also stated that she had witnessed officers at Williams' downtown apartment. She stated that she suspected there was some sort of illicit activity going on between Williams and the officers who came to his apartment, as they would come to Williams' door, say something to the effect of 'Hey, here you go,' and then leave without an explanation." Doc. 82-21 at ¶ 115. Jane Doe 8's identity is known to Defendants, and Jane Doe 2 notified JCPD investigators of Jane Doe 8 in November 2020. Defendants apparently never interviewed Jane Doe 8 and chose not to depose her in this litigation. Dahl would not object if Defendants choose to call Jane Doe 8 at trial and ask her directly about these statements, at which point the statements would not be hearsay.

28. "Ms. Wright told me that when she was working at Numan's, she overheard Williams discussing how he wanted to prey on women . . ., and that she and others who worked there had called the police due to his behavior several times. She stated that they were ignored and that the Johnson City Police told them to 'just kick him out' of the bar." Doc. 82-21 at ¶ 118. This statement is offered to demonstrate that Sean Williams' unlawful behavior was a very well-known open secret, suggesting that Defendants would have known about it in 2020 and 2021 despite the sworn denials by Turner and others in JCPD leadership. It is also offered to show actual (rather than constructive)

notice to JCPD of Williams' illegal behavior. As it is not offered for its truth, it is not hearsay.

Defendants write, "[i]t is clear that Ms. Dahl is either uninformed as to the hearsay rules or deliberately ignores the restriction . . ." Doc. 99 at 4. Dahl respectfully suggests that perhaps it is Defendants who are uninformed about the hearsay rules, as they attempt no analysis whatsoever of the statements they reference. As demonstrated above, most of these statements are either excluded from the definition of hearsay by the Rules, are offered for a nonhearsay purpose, or fall clearly within well established hearsay exceptions. Ms. Dahl does not require any special pretrial admonition to "review Rule 802 and abide by it during her testimony." Doc. 99 at 4. Defendants, however, have waived and forfeited their opportunity to brief this Court on why Fed. R. Evid. 801, 803, 804, and 807 don't apply to the foregoing statements.

Dahl respectfully requests that Defendants' Motion *in Limine* Directed to Plaintiff Dahl regarding Hearsay Testimony at Trial [Doc. 98] be denied.

Dated: April 15, 2024

Respectfully submitted,

Counsel for Plaintiff Kateri Lynne Dahl

/s/ Hugh A. Eastwood
Hugh A. Eastwood, E.D. Mo. Bar No. 62058MO,
*admitted pro hac vice pursuant to L.R. 83.5(b)(1)*
Attorney at Law
7911 Forsyth Blvd., Ste. 300
St. Louis, Missouri 63105-3825
hugh@eastwoodlawstl.com
(314) 809 2343
(314) 228 0107 eFax

/s/ Alexis I. Tahinci
Alexis I. Tahinci, TN BPR No. 031808
Tahinci Law Firm PLLC
105 Ford Ave., Suite 3
Kingsport, TN 37663

(423) 840-1350  
(423) 815-1728 eFax  
alexis@tahincilaw.com

**Certificate of Service**

The undersigned certifies that on April 13, 2024 (s)he filed this document with the District Clerk to be served by operation of the Court's CM/ECF system upon all counsel of record.

*s/ Alexis I. Tahinci*  
Alexis I. Tahinci