1     that summary makes any sense, but it's a lot in one
2     package.
3  Q. Sure.  I mean, I saw Image 1 in your report had -- sort of
4     described constitutional policing as being the
5     intersection of policy, supervision, and training.  Is
6     that a fair, high-level summary of what you focus on?
7  A. Yes.  I would say the reason why we put that in the report
8     is that when we go into departments, we're only concerned
9     about their operational sanctity.  You know, we try to
10    avoid personnel and personalities, and we focus on the
11    things that departments should be doing to operate
12    effectively.  And that would be our key cornerstone of
13    anybody that investigates law enforcement, whether it's
14    Department of Justice or outside entities.  And I use the
15    word investigation, but I guess assessment is probably the
16    better way to do it, because it's an organizational study.
17    You -- you look at the cornerstones that make a department
18    operate effectively.  And as I identified there, we would
19    -- we would agree that constitutional policing falls under
20    effective policies, effective training on those policies,
21    and supervision to ensure that the officers are doing what
22    they're supposed to do.  And you can probably see that
23    through the analysis portion of the report and the
24    recommendations, that's where -- that's where our focus
25    was.

1      directly related to that for purposes of transparency and
2      clarity when conducting the assessment.
3  Q.  And we'll kind of get to the report in a second, but are
4      there particular documents or things that you thought were
5      necessary that you didn't get in preparing this report for
6      whatever reason?
7  A.  Well, the bigger challenge, as you saw in the report, was
8      that our frustration, which took a significant amount of
9      time, was that we want to give the department credit for
10     the work that they do do correctly, and we will then,
11     obviously, challenge them on work that they don't do equal
12     to continued standards.  One of the challenges that we
13     faced here was that the record keeping process and the
14     documents, the case files, we just expected more.  And we
15     spent a lot of time asking for more and working with the
16     department to find more solely because we don't -- we want
17     to make sure that we're getting an accurate assessment.
18     And obviously, when you're doing an assessment of
19     investigations, the quality of the investigation and the
20     documents that make up the investigation are a very
21     important part of determining the assessment.
22  Q.  I'm going to go to the next page, if we can.  There was a
23     section nine that talked about retention and destruction
24     of files.  I see that it was changed from two years to six
25     months.  Do you know why that change was made?

ERIC DAIGLE                                   DIRECT - EASTWOOD

23

Case 2:22-cv-00072-KAC-JEM   Document 124-1   Filed 04/13/24   Page 2 of 6   PageID #: 3888

1    what would be 325 'ish reports, we needed the case files
2    for those, and those were sent over to us.  And then once
3    we have those documents, we continue -- we begin our
4    assessment, which means we produce documents in order to
5    break down all of those files to something that we can
6    understand and start to work with.  And then those
7    documents then become transferred into a report.
8  Q. Who did you correspond with in writing from Johnson City
9    as you were going through this process?
10 A. Obviously, a majority of my conversations, or at least I
11    believe all of them by E-mail, would have Sunny Sandos in
12    them, our legal of the City.  Initially, we spent a lot of
13    time with the Sergeant John Hausman [sic].  I believe
14    that's how you say his name.  He was the guru of the
15    report entity, and so we needed -- we spent a lot of time
16    working with him in order to get the documents that we
17    needed to and question him on why certain things weren't
18    the way we expected them to be.
19 Q. You mentioned sort of record keeping a while ago.  Were
20    there people, employees or contractors, involved with
21    record keeping that you corresponded with?
22 A. There -- there may have been.  I think there was an
23    officer assigned to assist John.  I don't remember his
24    name.  So it was people associated with the records
25    division, but most of our correspondence would have gone

ERIC DAIGLE                                    DIRECT - EASTWOOD

26

```
 1        full-time job is because, you know, a good investigator is
 2        going to make contact with the victim, going to try to
 3        keep the victim involved in the process while the case is
 4        your case and ongoing.  And ways to do that would be just
 5        checking in on the victim, or attempting to get additional
 6        photographs of bruises or injuries, and follow up with
 7        them on a case by case basis, and we didn't see
 8        documentation of that.
 9   Q.   Thank you.  And then I see you have a -- you talk about
10        developing a more integrated approach with victim
11        advocates and experts who specialize in trauma.  In the
12        cases that you did review, was there an absence of victim
13        advocates or trauma experts?
14   A.   What we did see in cases where an outside entity would be
15        called in to assist, but very rarely did we see that or
16        was it documented.  It could have happened and just didn't
17        get any documentation.  Like a lot of times when you take
18        a victim to the hospital, the hospital has people on
19        staff, you know, social workers and therapists that will
20        be on staff and assist.  But, you know, whether -- what
21        they did or when they did it was not documented.
22   Q.   So I see here you have this recommendation on Page 23 and
23        24 of seven different steps.  Again, you have no idea if
24        JC, Johnson City, has implemented these recommendations?
25   A.   I do not.
```

1   Q.  And you are not involved in Johnson City implementing
2       these measures.
3   A.  I'm not, no.
4   Q.  Okay, great.  Thank you.  Turning to Page 24, you have
5       "g", JCPD's response to sexual assault was challenged
6       based on gender-based stereotypes and bias.  And then
7       there's specific statements by investigators and
8       department leadership that women reporting non-stranger
9       sexual assault are lying, and that such assaults are less
10      severe and traumatic to victims than other serious crimes.
11      Can you elaborate on that statement to me?  What were you
12      referring to?
13  A.  So, in speaking with different investigators, and I
14      believe the key one here was Investigator Dunn, there was
15      some directions that command staff in the investigative
16      application, and maybe in other areas of the department,
17      would make allegations or assumptions based on the
18      position or the situation that the female was in at the
19      time of the alleged assault, and therefore was lying as a
20      result of it.  And obviously, that is -- that is biased,
21      and it's biased as to the victims, and it needs to be --
22      it has no place in sexual assault investigations.
23  Q.  Did Investigator Dunn identify which supervisors held
24      those views?
25  A.  My recollection was that in the investigative application

ERIC DAIGLE                                    DIRECT - EASTWOOD

146

```
 1        review transcripts of those?
 2    A.  I did not.
 3    Q.  Did they -- okay, well, so I think you just answered my
 4        next question which is in no way did Ms. Dahl's
 5        performance as a federal prosecutor assigned to Johnson
 6        City affect the opinions in your report.
 7    A.  I don't have an opinion to that.
 8    Q.  Great.  I have nothing further at this time.  Thank you
 9        for your time today, Mr. Daigle.  I realize it's not the
10        best day of the year, perhaps, to do a depo.
11    A.  Thank you very much.  I appreciate it.
12                              ******
13    CROSS-EXAMINATION BY MR. K. ERICKSON HERRIN:
14    Q.  Mr. Daigle, my name is Erick Herrin.  I'm one of the
15        lawyers representing the City and Chief Turner.  What --
16        do you happen to be a marathon runner or what's your --
17        what's your circumstances of the rest of the day?
18    A.  I'm not going anywhere.  Whatever you need, sir.
19    Q.  So I take it that you're ready to keep answering some
20        questions?
21    A.  I'm good, yes, sir.
22    Q.  Okay.
23    A.  You all are a little far away though, so you might want to
24        move the microphone closer to you so you're -- I can hear
25        you clearly.
```

ERIC DAIGLE                                          CROSS - HERRIN