UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
NORTHEASTERN DIVISION
GREENEVILLE

| | |
|---|---|
| KATERI LYNNE DAHL, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 2:22-cv-00072-KAC-JEM |
| ) | |
| CHIEF KARL TURNER, ) | |
| *in his individual capacity only, et al.,* ) | |
| ) | |
| Defendants. ) | |

**Plaintiff's Motion to Stay Summary Judgment, to Re-open Discovery,
or, Alternatively, to Supplement the Summary Judgment Record**

I. **Introduction**

Since Dahl filed her response to each Defendant's Motion for Summary Judgment in this case on February 6, Dahl's undersigned counsel has obtained notice of additional discovery material to her claims. That discovery is publicly available in PACER filings in a parallel litigation with an overlapping common core of facts. *Does v. City of Johnson City, et al.,* No. 2:23-cv-71-TRM-CRW (E.D. Tenn.).[1] That discovery goes directly to a dispositive issue: that

---

[1] The underlying theories of each case—notwithstanding their overlapping common core of facts—is somewhat distinguishable. Dahl's theory is that she was fired for speaking out about Johnson City's failures to investigate and seize Sean Williams. By contrast, the Does class action Second Amended Complaint alleges claims including Criminal Conspiracy/ Corruption/ Obstruction; Aiding & Abetting; Witness Intimidation, Harassment, and Retaliation; Destruction and Concealment of Evidence relating to Williams' crimes; and, particularly, certain Johnson City officials taking cash and things of value from Williams and his associate Jane Doe 14 (known as Female 4 in the Does case). That said, both cases involve a pattern of unconstitutional and unlawful discrimination, particularly toward female victims of Sean Williams who reported sexual violence, and generally toward female sex crime reporters to Johnson City. And, both cases confirm that this discrimination was identified in a public report, or "audit," by police practices expert Eric P. Daigle, who was retained at the expense of Johnson City taxpayers.

Johnson City and Chief Turner had a retaliatory motive in firing Dahl for her whistleblowing on Sean Williams, and that their proffered explanations are pretextual. Please consider the following which the Doe plaintiffs recently identified in motion practice from *their* discovery from Johnson City and its officials, including *inter alia* former Chief Turner:

1. Dahl requested the case files for all Jane Doe victims of Sean Williams in discovery.[2] Yet Johnson City never produced any software "audit" records showing computer entries by individual officers as to each police report, including "views" and "edits." They were produced, however, in the parallel *Does* case according to discovery motions filed last week in that case.[3] *See* Ex. 6, Does Doc. 235 at 13. Those audit records go to Dahl's claims, and are responsive to her discovery requests. According to Johnson City's own police practice expert Eric P. Daigle, such audit records are an excellent source of evidence for investigating police misconduct. *Id.* at 13-14, citing Ex. 7, Does Doc. 235-24, Daigle Does Dep. at 247:19-25; 248:1-2. To quote from one of the Does motions filed June 28: "Audit trails are documents that police software systems generate that show which officers have viewed, printed, or edited a police report, as well as the date and time of each activity, among other information. Ex. 6, Does Doc. 235 at 13-14. They are useful in determining whether there has been misconduct on the part of an officer because

---

[2] Those include Defendant's Rule 26 disclosures as well as Dahl's First RFP Nos. 4 and 5 [Exhibit 2 hereto] and Dahl's Second RFP No. 5, the latter already filed with the Court [Docs. Doc. 59 p. 2; Doc. 59-1 p. 4]. There was also contested motion practice—sustained by the Court in Dahl's favor [Doc. 90]— as to certain Daigle-related files generally, insofar as they concerned Sean William cases and/or cases for which Dahl attempted to build prosecutions.

[3] In order to have a clean record, undersigned counsel has identified those documents with their CM/ECF document number from the Does case in this motion, and moves the Court to take judicial notice of this District Court's file from the *Does* case. Consistent with this Court's Order on redactions and sealing, undersigned counsel has redacted the names of Sean Williams sexual assault victims and will file a highlighted version of the redactions under seal. Where the redactions were made in the *Does* case, then undersigned counsel lacks the ability to file a highlighted version.

2

they can show an officer taking steps to cover up what happened, either by editing another officers' case notes, accessing reports for cases to which they are not assigned, or accessing reports after they have been removed from a case. *Id*. The JCPD audit trails for Williams' sexual assault investigations show that all the above happened here."

2. These audit records show that Captain Peters and Investigator Sparks viewed and at many times made myriad edits to case reports of Williams sex crime victims around critical dates in Dahl's attempts to build a case against Williams. Captain Peters, who was Chief Turner's right-hand man generally in interacting with Dahl, and particularly around her firing, testified in his deposition that his knowledge of these cases came from statements from a subordinate officer (or in one case, the victim's mother), omitting any mention of viewing, let alone editing, audits using computer software—at one point implying that he had not seen the case file or investigative notes. Ex. 3, Peters Dep. 22, 28-29 and 46. Investigator Sparks similarly testified that he would not have necessarily known of prior reports against Williams when Jane Doe 1 fell out the window, that he did not recall who did the initial investigations, and that he did not recall when he became aware of the reports. Ex. 4, Sparks Dep. 43, 108, 127, 152-53[4]. Yet the audit reports belie their testimony.

3. As to Williams' victim Jane Doe 3, whom Captain Peters testified to having no knowledge about and to which he was not directly assigned, Peters viewed her "incident case notes" four times the day that Jane Doe 3 reported her sexual assault by Williams on June 2,

---

[4] *See, e.g.,* Ex. 4, Sparks Dep. 127:16-20 (Q: Would these prior reports to JCPD have been known to you in the course of your investigation? A: Not necessarily. Q: Why not. A: They may have came up. I don't know when they came up.); *id.* at 108:8-14 (Q: Were you aware at the time of previous reports of rape against Sean Williams? A: I believe -- I don't recall if I was or not. Q: Did you interview Sean Williams? A: No, sir. Q: Why not? A: I don't know.); *id.* at 43:17-19 (Q: Okay. And do you know who did the initial investigations on those reports? A: I don't want to guess, so I don't recall who.).

3

2020, making several edits. *See* Ex. 6, Does Doc. 235 at 14; Ex. 8, Does Doc. 235-25. He then viewed the notes six more times on June 9, again on June 11, and again on June 16, 2020. *Id.* The JCPD reports for Jane Doe 3, however, do not show that Captain Peters had any role in the investigation of her sexual assault, noting only that Peters provided the correct phone number for Jane Doe 3. Ex. 9, Does Doc. 235-26. And Captain Peters testified in *this* case that a much more subordinate officer named Debbie Dunn investigated Jane Doe 3's case. Ex. 3, Peters Dep. 23-24. For a senior officer such as Peters, such a detailed review of the software audit files of one particular case *sua sponte* makes no sense and runs contrary to his deposition testimony, *id.* at 28 and 40[5], as well as that of Chief Turner[6]. It is further undermined by the fact that Peters took home Sean Williams files when he retired when "emptying his desk," *id.* at 8, and could not

---

[5] *See* Ex. 3, Peters Dep. 28: "Q: What about the [Jane Doe 3] case given your sort of knowledge of [Jane Doe 3]'s mom from high school? A: After I turned it over to Investigator Dunn, I didn't get any more knowledge about the case until she came to me and said that she did not want to prosecute. Q: When you say she, was that... A: Investigator Dunn. Q: Okay. Did you follow up with the mom or with the daughter? A: No, I did not. Q: Did you hear back from them? A: No, I did not. Q: Do you know if Investigator Dunn ever reviewed the evidence in that case, the [Jane Doe 3] case, with the state prosecutors? A: I have no knowledge of that. I don't know if she did or not.); *id.* at 40 (Q. You were in the room when Toma Sparks testified today, right? A. That's correct. Q. Okay. He investigated -- he testified -- strike that. He testified you were very familiar with all of your cases. Do you agree with that statement he made? A. That I was very familiar? Q. Yeah. A. With all of what cases? Q. Cases by officers in your chain of command… A. No, that's… MR. HERRIN: Object to the form of the question. A. That's incorrect. Q. Why is it incorrect? **A. Because during that time frame, we would have been 10 and 12 investigators, and they each carried between 20 and 30 cases. There's no way I could be familiar with all of them.**).

[6] Ex. 5, Turner Dep. 218 (Q: Did you know what happened to her before this litigation? A: No, sir.). This testimony is not credible in light of the audit reports because it is undisputed that Peters and Turner were good friends and worked closely together, and that Peters updated Turner on cases. For example, Peters and Turner together reviewed federal cases with Dahl repeatedly, including the Sean Williams cases; reviewed the Legault-prepared list of Dahl's cases that they complained of to Dahl's DOJ supervisor; Turner testified that Peters oversaw sexual assault investigations; and both men testified that they had a role in canceling the meeting that they believed Dahl had scheduled with TBI as to Williams. *Compare* Turner Dep. 216 with 137, 145-47, 154, 269-70, 272-73.

4

explain why he produced from his home JCPD emails involving Kat Dahl on which he was not originally copied while serving as Captain, *id.* at 127-30. And, Peters denied speaking with Jane Doe 14 but Jane Doe 14 testified that she spoke with Peters repeatedly. *Compare* Ex. 3, Peters Dep. 122[7] with Ex. 15, Female 4 Does Dep. 106-12, 157, 161-62, 178-83, ECF pp. 108-14, 159, 163-64, 180-85.[8]

4. At the same time that Peters repeatedly accessed Jane Doe 3's report in June 2020, the audit trails also show Peters viewed the records of Jane Doe 9's case file on June 9, 2020. Ex. 9 Does Doc. 235-26 at 17. This is significant because it shows that Peters was aware that another Williams' victim had reported her sexual assault just six months beforehand, and he was connecting the two incidents. Yet Peters took no action to further the investigation once Dahl was assigned the Williams case months later. Instead, Jane Doe 3's case was closed, and Johnson City expert Daigle testified in the Does case that JCPD's mishandling of her case was "egregious." Ex. 6, Does Doc. 235 at 15, citing to Ex. 7, Does Doc. 235-24, Daigle Does Dep. 217:17-25; 218:1-12.

5. According to the Does, other Sean Williams victims' case files were also viewed by Peters multiple times after Dahl was fired. For example, from July 2022 through March 2023, Peters viewed electronic case related to the investigation of another victim's report of rape. *Id.*

6. The Does further argue in a motion that the audit trails also show destruction and/or concealment of evidence. Ex. 6, Does Doc. 235 at 33, citing Ex. 9, Does Doc. 235-2. The Does allege, for instance, that the audit trail for [Jane Doe 9]'s case shows that Investigator Sparks

---

[7] Ex. 3, Peters Dep. 122 (Q: Do you know who, if anyone, at JCPD talked with [Jane Doe 14/ Female 4]? A. I don't know of anybody. I haven't.).
[8] Female 4 in the *Does* litigation appears to be Jane Doe 14 under the Second Amended Sealed Key dated January 9, 2024 and filed under seal contemporaneously with this motion with the Court as Exhibit 16.

edited the case notes for another officer involved in the investigation, JCPD Officer Bret Richardson, multiple times, ultimately removing Richardson's name from the case notes. *Id*. Dahl did not know this fact during discovery in this matter and thus did not depose Richardson.

7. Finally, as Dahl herself discovered in talking to Williams sex crime victims (which was monitored and surreptitiously reported to Peters in a memo by Sparks, *see* Dahl's Summary Judgment Opposition Exhibit in this case at Doc. 82-24), the Does allege that there are material differences between what the victims recount happened and what ended up in the final versions of their reports. Ex. 6, Does Doc. 235 at 16. Jane Doe 9 wanted her case to be investigated and prosecuted, which—as *Does* counsel argues—"is corroborated by her conduct immediately after her rape: she went straight from Williams' apartment to an urgent care and then a hospital where a rape kit was administered, and she submitted to a drug test which showed she had benzos in her system, a drug she never would have taken voluntarily." *Id.* Jane Doe 9 also provided a written statement that day and gave her clothes to the police so they could be tested for DNA. *Id.* Yet Sparks testified that Jane Doe 9 did not return his phone calls and failed to show up for a scheduled interview, and that Sparks immediately moved to close her case. *Id.*

8. The Does similarly allege that Sparks repeatedly edited and omitted material evidence from Jane Doe 15's case notes. Jane Doe 15 told JCPD that she saw images on Williams' cell phone which depicted Williams' penis in the mouths of children. *Id.* at 17. This would have provided JCPD with probable cause to search the Williams' phone, video and electronic devices seized by JCPD after the fall of Jane Doe 1 from Williams' penthouse window. *Id.* Yet JCPD did nothing with this information. This too was wholly elided from the deposition testimony in

6

this case by Captain Peters and Investigator Sparks, who denied probable cause for the search of Williams electronic devices under deposition questioning.[9]

9. The audit trails also show Investigator Sparks edited the files for Jane Doe 3, Jane Doe 9 and another Williams' victim, two months after he was removed from all Williams' investigations and instructed to stop working on Williams' cases in August 2023. *Id.* at 18. That was six months into discovery on this case, and over a year after Dahl filed suit, at which time Johnson City's own expert Mr. Daigle testified that an Internal Affairs investigation should have been opened. *See* Ex. 11, Does Doc. 237-6 at 7. To quote the Does' discovery motion, "[t]he audit trails strongly support intentional and knowing obstructive conduct on the part of Sparks and Peters." Ex. 6, Does Doc. 235 at 18.

10. Handwritten notes taken by City Manager Cathy Ball as to the City's police practices expert Eric Daigle belie her repeated public ballyhoo about the City's handling of sexual investigations[10], such that a reasonable juror could find that Johnson City's public statements were not credible. Ball's notes from Daigle meetings indicate as to its case files: "worst ever seen"; and as to victim interviews: "This is terrible. Case files are damaging – pulling together – Lost in turnover." *See* Ex. 11, Does Doc. 237-6, citing Ex. 12, Does Doc. 221-9 (Bates CITY-0139819). She also cited "laziness" as a reason that perpetrators such as Williams were not arrested. *Id.* (Bates CITY-0139820). She further noted as to why cases were not pursued

---

[9] *Compare* Ex. 3, Peters Dep. 134-36 with Ex. 4, Sparks Dep. 77-79.
[10] Oddly, despite City Manager Ball's history of press conferences boasting of transparency, her press release about the Daigle Report is now missing from the Johnson City website. *Compare* Murry Lee, *Johnson City city manager hopes webpage will improve access to lawsuit information,* WJHL.com (Apr. 11, 2024), available at https://www.wjhl.com/news/local/sean-williams-case/johnson-city-city-manager-hopes-webpage-will-improve-access-to-lawsuit-information/ (last accessed Jul. 3, 2024) with Johnson City's website deadlink, available at https://www.johnsoncitytn.org/government/legal_filings.php (last accessed Jul. 3, 2024).

"Leadership problem," and as to victims "Not participating – who are you to decide this – victim was treated terrible – cultural issues … structural problems. Good ole boys." *Id.* (Bates CITY-0139821). As to the failure to interview suspects such as Williams, Ball wrote "Always interview the suspect – Are you kidding me?" *Id.* (Bates CITY-0139822). As to organization, she wrote "Organizationally not operating at that level. Internal – alleged misconduct." *Id.* As to report writing, she wrote "Report writing phases: stuff that is bad is bad." *Id.* As to Captain Peters and Lt. Don Sheppard, both players in the Dahl story, she wrote "Kevin [Peters] and Don [Sheppard] hate each other, and "Don Sheppard – evil." *Id.* (Bates CITY-0139824). Further, there appears to be an attempt to shift the blame to the District Attorney noting "DA not innocent," *id.* (Bates CITY-0139839), since that office generally enjoys "absolute immunity" from suit, *id.* (Bates CITY-0139821).

   a. These notes were not produced in discovery in this case, despite Requests for Production and a Subpoena, and even after this Court granted Dahl's motion to compel as to the Daigle files from the City [Doc. 90]. It is noteworthy that the Ball notes are responsive to Plaintiff's Second RFP No. 5 and attempts to resolve objections thereto, in that they are "engagement communications and documents" as to the Daigle contract with Johnson City since they literally arise from a conversation between City Manager Ball and Mr. Daigle.

11. There are other contradictions in Chief Turner's testimony as to the Daigle report or audit. While Chief Turner testified that he was not interviewed by Mr. Daigle, nevertheless Mr.

Daigle testified credibly and repeatedly in the Does litigation that he did, giving details of those conversations.[11]

12. Before Dahl filed her lawsuit, City Manager Ball was under contract to purchase Sean Williams' penthouse in downtown Johnson City—the scene of his crimes, allegedly including the videotaped sexual assaults of 52 women and multiple children. *See* Ex. 13, Does Doc. 236. Further, this transaction was for $416,000 or roughly half of the condo's market value of $800,000. *Id.* at 8. Ball testified that she discussed this purchase, which was apparently not completed but likely involved at least earnest money to a convicted felon under investigation by the City, with defendant Chief Turner. *Id.*[12] In his deposition in the Dahl case, Chief Turner,

---

[11] *Compare* Ex. 5, Turner Dep. 312 (Q. Did Mr. Daigle interview you in connection with his work on the reviewing the cases? A. No, sir.) with Ex. 8, Does Doc. 235-25, Daigle Does Dep. 213, ECF p. 48 (Q. (BY MS. KRAMER) And when you say you didn't get it, you are referring to some documents, you don't know what they are, but you know they exist because of your conversation with Chief Turner; is that correct? MR. LAKEY: Object to form. A. That is correct. Let me put it more a little clearer, and that's this: In one of the Sean Williams case, the actions of the officers -I just don't understand. Like why? Why did the officer not secure the residence? Why did the officer not do this? I really wanted to know the answers to those questions, because there's no report that tells me why this didn't occur, and these are significant. And when that conversation came up, the answer was there may be more case reports that I don't have. And I said, "Okay. Well, if they're not part of this case file, then I don't -- I'm not going to take them. If they're part of a litigation, whatever that may be, it's not part of the case file."); *Id.* at 230-31, ECF pp. 65-66 (Q. What occasioned you to do an interview with Chief Karl Turner in December of 2022? A. Interesting way you asked that question, what occasioned me. Are you asking why I did the interview or- Q. Yes. A. Because, you know, he's the CEO of the organization. So if you're doing an assessment, you know, you want to- you want to involve the chief of police. It's his department, even though -- and ask him, you know, for some clarification on certain areas and to explain where my concerns were … Q. Did you tell Chief Turner that you believed that an internal investigation should have been initiated? A. I did.).

[12] Ball's deposition was sealed reluctantly by the Doe plaintiffs at the request of Johnson City deeming it "Confidential," but relevant portions were cited by the Does in their motion. *See* Ex. 13, Does Doc. 236 at 8, citing Ex. 14, Ball Dep. 132:13-20; 133:7-24. It is now also the subject of a pending motion for sanctions by the Doe plaintiffs since Ball then went onto host a press conference that the Does allege spun the very facts that she had just testified to but that she claimed were "confidential" under the Does Protective Order. *See generally* Ex. 13, Does Doc. 236.

9

when asked about his knowledge of Sean Williams' apartment, claimed he didn't even know the apartment number, and omitted mention of his knowledge that he had had conversations with City Manager Ball about the apartment. Ex. 5, Turner Dep. 212-213[13]. Yet City Manager Ball testified in the Does case that she asked Turner to run a criminal check in connection with her purchase offer on the Williams' apartment. Ex. 6, Does Doc. 235 at n. 8, citing Ex. 8, Does Doc. 235-25, Ball Does Dep. 132. She also testified that she knew about Jane Doe 1's fall from the window of the apartment. *Id.* at 134. Ball testified that Turner had specifically texted her about Williams' apartment that "fifth floor apartment was locked." *Id.* at 141. And there are other inconsistencies between Turner and Ball's deposition testimony as to the Williams apartment.[14]

II. **Legal Standard**

Rule 16(b)(4), Fed. R. Civ. P., provides that "a schedule may be modified only for good cause and with the judge's consent." Rule 56(d) provides that if a nonmovant can "show[] by

---

[13] Turner Dep. 222:9 – 223:3 ("Q: Okay. At this point, there had been two rape allegations against Sean Williams, one in November of '19 and one in June '20. Coupled with the generalized rumors about parties and drug taking at Mr. Williams' apartment, which was the scene of both [Jane Doe 9]'s and [Jane Doe 3]'s allegations, did that raise an issue for you in your mind that perhaps on their own, one allegation, a single allegation, but put together there was something suspicious going on with Sean Williams? **A: At the time, I'm not familiar with these investigations, so I couldn't say that anything brought suspicion to my mind if I didn't know about the investigations at the time.** Q: Would you agree that a reasonable officer, however, having learned not of one, but two separate rape allegations by an individual, as well as generalized rumors about drug taking and partying in the individual's apartment, should open an investigation into that individual? CITY ATTORNEY HERRIN: Object to the form of the question. A: I don't know if that's basis to open an investigation.") (emphasis added).

[14] *Compare* Ex. 5, Turner Dep. 61 (Q. Was Sean Williams one of those cases that you discussed with the city manager? A. I don't know if I discussed it with the city manager. I don't recall having discussions with the city manager.) with Ex. 14, Ball Does Dep. 135 (Q. When Karl Turner ran this report for you on April 6th, 2022, were there any specific discussions about Sean Williams? A. There were some -- I don't recall. Q. Do you recall generally if there were discussions about Sean Williams or the owner of the condominium? A. I recall saying that I was looking at a condominium in that building. I cannot recall the specifics of the conversation that I had with him around that.)

10

affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition [to a motion for summary judgment], the court may: (1) defer considering the motion or deny it; (2) allow time to obtain affidavits or declarations or to take discovery; or (3) issue any other appropriate order." Further, Rule 37(a)(1) provides that "[o]n notice to other parties and all affected persons, a party may move for an order compelling disclosure or discovery."

III. **Discussion**

Dahl is essentially confronted by additional responsive discovery in a parallel case with a common core of facts, of which she did not know either when reviewing Defendants' discovery production to her in this case, or when responding to Defendants' dispositive motions for summary judgment. This discovery, however, reveals thick new layers of circumstantial evidence in support of the gravamen of Dahl's retaliation claims. For Dahl's claims to survive summary judgment, she must present evidence of retaliatory motive for her firing. Such evidence, as already briefed to the Court, is often circumstantial. *See, e.g., Holzemer v. City of Memphis*, 621 F.3d 512, 525 (6th Cir. 2010); *Mulhall v. Ashcroft,* 287 F.3d 543, 551-54 (6th Cir. 2002). By not timely producing this written discovery, and by defense witnesses omitting the existence of this evidence from their deposition testimony, defendants have effectively thwarted Dahl's ability to present the full picture of additional evidence as to these elements—indeed, to permit Dahl to tie unusual and suspicious activity by senior Johnson City police officials close in time to actions by Dahl to build multiple sex crime cases against Williams. The evidence that has come to light in the *Does* case filings goes directly to the elements of the causes of action against each Defendant.

The Sixth Circuit has set forth a five-part standard in determining whether to allow additional discovery in response to a summary judgment motion: (1) when the appellants learned

11

of the issue that is the subject of the desired discovery; (2) whether the desired discovery would have changed the ruling below; (3) how long the discovery period had lasted; (4) whether the appellant was dilatory in its discovery efforts; and (5) whether the appellee was responsive to discovery requests. *Plott v. General Motors Corporation,* 71 F.3d 1170, 1196-97 (6th Cir. 1955). Here, each factor weighs in favor of Dahl re-opening discovery to respond to Defendants' summary judgment motions to supplement the record based on the discovery being actively adduced by the *Does* plaintiffs in their parallel case. (1) These motions were filed June 3 [Does Doc. 204], June 15 [Does Doc. 221], and June 28 [Does Docs. 225 and 226], after summary judgment briefing in this case. (2) This discovery could very well be outcome-determinative as to Defendants' summary judgment motion against Dahl. (3) This was a standard discovery period, but the parties engaged in vigorous and sometimes contested written discovery and depositions. As to (4) and (5), as the Court has already observed in granting Dahl's previous motion to compel as to the Daigle file [Doc. 90], Dahl was not dilatory in taking discovery, but Defendants dragged out resolving the Daigle issue over many months. And now, Dahl's undersigned counsel are bringing the Court's attention to newly-filed discovery in court filings in PACER in the parallel *Does* litigation.

In light of the contents of the foregoing, and in order to present additional facts essential to justify her opposition to summary judgment, Fed. R. Civ. P. 56(d), Dahl wants to take additional discovery—or, alternatively, supplement the record in this case—on: (i) the audit records and determine why they were not previously produced to her; (ii) depose Officer Bret Richardson as to why his work was edited out from case reports; (iii) re-depose Captain Peters and Investigator Sparks as to their view and edits audit records on the dates they did so (notwithstanding their previous testimony), and the temporal connection to Dahl's work on Sean

12

Williams cases, her pretextual disciplinary meetings with Captain Peters and Chief Turner as to a list of cases that Sparks helped create, and her firing; (iv) re-depose Chief Turner as to the audit records, and his interactions with Captain Peters and Cathy Ball; and, (v) to depose Cathy Ball as to her Daigle notes, her attempted purchase of Williams' apartment, of which Turner knew and apparently did his own investigation at her request, and her failure to open a meaningful Internal Affairs investigation into Dahl and Williams in light of the foregoing. These events—given their close relation in time to Dahl's efforts to urge Johnson City to investigate and seize Sean Williams—are highly probative that Johnson City senior officials were focused on spiking investigation into Williams despite Dahl's prosecutorial efforts to push them to build a case, and that this was a "substantial" or "motivating factor" in Chief Turner's decision to fire Dahl. *Brandenburg v. Hous. Auth. of Irvine,* 253 F.3d 891, 897 (6th Cir. 2001) (citing *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287 (1977). The omissions and contradictions exposed in at least four witnesses' testimony—Peters, Sparks, Turner, and Ball—as to this discovery suggest that a reasonable juror could seriously question the credibility and completeness of these witnesses' deposition testimony.

Where a party has misrepresented a material fact, a finder of fact—even at summary judgment—is entitled to reject the whole of their testimony. *See* Charles A. Wright, *et al.*, 10A Fed. Prac. & Proc. Civ. § 2726 (3d ed.) ("[I]f the credibility of the movant's witnesses is challenged by the opposing party and specific bases for possible impeachment are shown, summary judgment should be denied . . . ."); *The Santissima Trinidad,* 20 U.S. 283, 339 (1822) ("But where the party speaks to a fact in respect to which he cannot be presumed liable to mistake . . . it is extremely difficult to exempt him from the charge of deliberate falsehood; and Courts of justice, under such circumstances, are bound, upon principles of law, and morality and

13

justice, to apply the maxim *falsus in uno, falsus in omnibus*."). Several circuits have rejected summary judgment based on credibility problems with witnesses. *See, e.g., 3234 Washington,* 480 F.3d 841, 845 (8th Cir. 2007); *Quintana-Ruiz v. Hyundai Motor Corp.,* 303 F.3d 62, 76 (1st Cir. 2002) (citing, *inter alia, Chesapeake & Ohio Railway Co. v. Martin ("C & O"),* 283 U.S. 209 (1931), and *Sonnentheil v. Christian Moerlein Brewing Co.,* 172 U.S. 401 (1899)); *see also Donoghue v. Tannenbaum,* 2024 WL 3089369 (S.D.N.Y. June 20, 2024). A jury "may reject uncontradicted ... testimony when it is improbable, inherently contradictory, riddled with omissions, or delivered in a manner giving rise to doubts," but required the opponent for summary judgment to point to "some affirmative evidence in the record" on which the witness's credibility might be discredited. *Quintana-Ruiz,* 303 F.3d at 76.

Dahl deserves to inquire into the above discovery adduced in the *Does* case. She has met the standard for good cause shown. *See, e.g., Jodry v. Fire Door Sols.,* 3:20-cv-00243, at *1 (M.D. Tenn. Sep. 17, 2021) *(citing Morgan v. Gandalf, Ltd.,* 165 Fed. Appx. 425, 431 (6th Cir. 2006); *West American Insurance Co. v. Potts,* 908 F.2d 974 (6th Cir. 1990)). Or, at least, she should be able to obtain this discovery from the Does counsel and supplement her record in opposition to Defendants' summary judgment motions. That is because the evidence adduced by the Does discredits or contradicts the testimony of City officials Turner, Peters, Sparks and Ball—or shows material omissions in that testimony—either as to their involvement with Williams' victims cases that Dahl sought to prosecute, or their involvement with Williams generally (*e.g.,* Ball's explanation of her half-price contract to purchase the crime scene of Williams' sexual assaults). Dahl notes that she is not seeking a second bite at the apple. Rather, she simply wishes to show that certain proferred defense deposition testimony by four witnesses, including defendant Chief Turner, is "improbable, inherently contradictory, riddled with

14

omissions, and/or delivered in a manner giving rise to doubts" by supplementing some affirmative evidence adduced in the *Does* case.

IV. **Conclusion and Prayer**

Discovery in the parallel *Does* case shows that Defendants' discovery production in this case was incomplete or contained omissions, and that material evidence to essential elements of her claims was unavailable and unknown to Dahl's counsel when conducting discovery and when responding to Defendants' Motions for Summary Judgment. As shown above and in the attached Rule 56(d) Affidavit, that additional discovery shows material contradictions and material omissions in the existing Summary Judgment record.

WHEREFORE based on notice in PACER of this new evidence, Plaintiff Kateri Lynne Dahl prays this Court to GRANT her motion to Stay Summary Judgement, to Re-Open Discovery, or, Alternatively, to Supplement the Summary Judgment Record; to TAKE JUDICIAL NOTICE of this District Court's file in *Does v. City of Johnson City, et al.,* No. 2:23-cv-71-TRM-CRW (E.D. Tenn.); and to grant such other relief as may be just, meet and reasonable.

Dated: July 3, 2024                    Respectfully submitted,

*Counsel for Plaintiff Kateri Lynne Dahl*

/s/ Hugh A. Eastwood
Hugh A. Eastwood, *admitted pro hac vice pursuant to L.R. 83.5(b)(1),*
E.D. Mo. Bar No. 62058MO,
8112 Maryland Ave., Suite 400
St. Louis, Missouri 63105-3700
hugh@eastwoodlawstl.com
(314) 809 2343
(314) 228 0107 eFax

/s/ Alexis I. Tahinci
Alexis I. Tahinci, TN BPR No. 031808

15

Tahinci Law Firm PLLC
105 Ford Ave., Suite 3
Kingsport, TN 37663
(423) 406-1151
(423) 815-1728 Fax
alexis@tahincilaw.com

**Certificate of Service**

The undersigned certifies that on July 3, 2024 that (s)he filed this document with the District Clerk to be served by operation of the Court's CM/ECF system upon all counsel of record.

*/s/ Hugh A. Eastwood*