1    Q.   Okay. What was the date of your retirement from Johnson
2         City?
3    A.   February 28th, 2023.
4    Q.   We served a document subpoena on your lawyers, who kindly
5         accepted service, and they produced some documents to us
6         in advance of your deposition today. I believe it was at
7         least 168 pages of documents. Without going through them
8         page by page, it appears that many of those documents were
9         produced from files at Johnson City. Were you involved in
10        the production of those documents in response to our
11        subpoena?
12   A.   Yes.
13   Q.   Okay. Tell me about that, please.
14   A.   Just documents. When I retired and was cleaning out my
15        desk, I just threw a bunch of files in a big Rubbermaid
16        tub box. And then once Mr. Rader had wanted me to check
17        to see if I had anything pertaining to the case, I went
18        through the Rubbermaid tub and found those documents.
19   Q.   Were these things you took home once you retired?
20   A.   Yes.
21   Q.   Okay. Why -- how did you choose which documents to take
22        home with you when you retired?
23   A.   Like I said, I was just emptying my desk out, and files
24        that was in my desk, I was putting them in the tub.
25   Q.   Were there Johnson City rules around taking documents with

KEVIN PETERS                             DIRECT - EASTWOOD

1   A.   It would be their supervisors that -- you know, cases
2        would come in in the morning, they would be assigned out
3        to the investigator.  If something happened during the day
4        that required immediate response, then it could be two to
5        the whole squad or the whole unit going out to investigate
6        if it was a homicide or something like that.  Once on the
7        scene, a supervisor would make the determination on who
8        was going to be the lead investigator on it.
9   Q.   Before ▓▓▓▓▓▓▓▓▓ fell out the window, were you aware
10       of any investigations into Sean Williams?
11  A.   Yes, I was.
12  Q.   Okay.  Tell me more about that, please.
13  A.   I knew of the investigation into the ▓▓▓▓▓▓▓▓ --
14       ▓▓▓▓▓▓▓▓ incident.
15  Q.   How did you come to know of that?
16  A.   One night, I received a call from ▓▓▓▓▓▓▓▓ mother.
17  Q.   Was that just by happenstance?  You happened to answer the
18       phone when she was calling to talk to someone?  Tell me
19       about that.
20  A.   No, she called me.  I had went to high school with her,
21       and she called me.
22  Q.   Do you recall the approximate date that occurred?
23  A.   No, I do not.
24  Q.   Okay.  But you were captain at the time?
25  A.   No, I was not.

KEVIN PETERS                                          DIRECT - EASTWOOD

1  Q.  Okay. And what did ▮▮▮▮▮' mother relay to you?
2  A.  That her daughter had been sexually assaulted the night
3      before, and that she wanted to talk to someone about it,
4      and wanted it prosecuted. And she relayed to me the new
5      phone number for Ms. ▮▮▮▮ and I handed it off to the
6      investigator at the time that was working sexual assault
7      cases.
8  Q.  Who was that?
9  A.  Debbie Dunn.
10 Q.  Okay. And when ▮▮▮▮▮ mother said that she wanted
11     this investigated, did she mean the mom or ▮▮▮▮▮
12 A.  I'm assuming she meant her daughter, but she said she, so
13     I didn't...
14 Q.  And do you know what Debbie Dunn did after that to follow
15     up?
16 A.  Debbie Dunn made contact with Ms. ▮▮▮▮ and I was
17     advised that Ms. ▮▮▮▮ come in for an interview, at
18     which time her story had changed from the initial report.
19     And she advised me that Ms. ▮▮▮▮ had stated that she
20     didn't want to proceed with any prosecution into the
21     case.
22 Q.  Debbie Dunn said this?
23 A.  Yes.
24 Q.  Okay. And do you know if a sexual assault kit was
25     performed?

KEVIN PETERS                                    DIRECT - EASTWOOD

1  A. It was not.
2  Q. Do you know why that was?
3  A. Because the night of the incident, Ms. ███ did not
4     want to go to the hospital.
5  Q. Okay. Do you know if Mr. Williams had been interviewed?
6  A. In reference to the case or...
7  Q. Yes.
8  Q. No, he had not.
9  Q. Do you know why that was?
10 A. Because the victim did not wish to prosecute the case.
11 Q. At the time the victim did not wish to prosecute a
12    reported sexual assault, did Johnson City not investigate
13    further?
14 A. Not if the victim wished not to prosecute.
15 Q. And then this is a hypothetical. I'm not applying it to
16    Ms. ███ But even if there was other evidence of a
17    crime?
18 A. We have never gone against the wishes of a victim in a
19    case.
20 Q. When did you first learn that ███ fell out the
21    window?
22 A. I don't know the exact time frame as far as what time she
23    fell out of the window. It was either the day after or
24    the day of. I don't know exactly what time it was during
25    that period during the day.

KEVIN PETERS                                    DIRECT - EASTWOOD

| | | |
|---|---|---|
| 1 | Q. | What about the ▮▮▮▮▮▮▮ case given your sort of |
| 2 | | knowledge of ▮▮▮▮▮▮▮' mom from high school? |
| 3 | A. | After I turned it over to Investigator Dunn, I didn't get |
| 4 | | any more knowledge about the case until she came to me and |
| 5 | | said that she did not want to prosecute. |
| 6 | Q. | When you say she, was that... |
| 7 | A. | Investigator Dunn. |
| 8 | Q. | Okay. Did you follow up with the mom or with the |
| 9 | | daughter? |
| 10 | A. | No, I did not. |
| 11 | Q. | Did you hear back from them? |
| 12 | A. | No, I did not. |
| 13 | Q. | Do you know if Investigator Dunn ever reviewed the |
| 14 | | evidence in that case, the Katie Blevins case, with the |
| 15 | | state prosecutors? |
| 16 | A. | I have no knowledge of that. I don't know if she did or |
| 17 | | not. |
| 18 | Q. | Okay. Thank you for clarifying. There was a report of a |
| 19 | | sexual assault by ▮▮▮▮▮▮▮ I know you were here |
| 20 | | for some testimony about that earlier. |
| 21 | A. | Correct. |
| 22 | Q. | When did you first learn of ▮▮▮▮▮▮▮s complaint? |
| 23 | | Do you recall? |
| 24 | A. | No. Without seeing the case file and the investigative |
| 25 | | notes, I wouldn't be able to answer that because I don't |

| | |
|---|---|
| 1 | MR. HERRIN: Object to the form of the question. |
| 2 | A. Repeat the question. |
| 3 | Q. You were in the room when Toma Sparks testified today, |
| 4 | right? |
| 5 | A. That's correct. |
| 6 | Q. Okay. He investigated -- he testified -- strike that. He |
| 7 | testified you were very familiar with all of your cases. |
| 8 | Do you agree with that statement he made? |
| 9 | A. That I was very familiar? |
| 10 | Q. Yeah. |
| 11 | A. With all of what cases? |
| 12 | Q. Cases by officers in your chain of command... |
| 13 | A. No, that's... |
| 14 | MR. HERRIN: Object to the form of the question. |
| 15 | A. That's incorrect. |
| 16 | Q. Why is it incorrect? |
| 17 | A. Because during that time frame, we would have been 10 and |
| 18 | 12 investigators, and they each carried between 20 and 30 |
| 19 | cases. There's no way I could be familiar with all of |
| 20 | them. |
| 21 | Q. Was the ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ case a priority to you at |
| 22 | the time that Toma Sparks generated this memo? |
| 23 | A. To me personally? I think it was a priority to the police |
| 24 | department, but to me personally, no, because I didn't |
| 25 | oversee their day-to-day operations. |

KEVIN PETERS                                           DIRECT - EASTWOOD

40

```
 1  Q.  I want to turn back to this Exhibit 176, this memo you
 2      have in front of you there, sir.
 3  A.  Okay.
 4  Q.  Toma Sparks relays to you on November 24, '20, ▓▓▓▓▓
 5      ▓▓▓▓▓ went to the FBI stating -- office stating she had
 6      been raped.  Do you know why she went to the FBI?
 7  A.  I have no idea.
 8  Q.  And do you know who she spoke with at the FBI since Toma
 9      Sparks sent you this memo?
10  A.  I have no idea.
11  Q.  Did you ever follow up with Toma Sparks about this memo?
12  A.  As far as -- I think I looked at the case, but I never
13      talked to him about the memo itself, no.
14  Q.  Okay.  So you had this for informational purposes and you
15      didn't do anything further as a result?
16  A.  Not with the memo.
17  Q.  Well, I mean, once you received this memo, what were your
18      next steps?
19  A.  We went to a sergeant to find out details about the case
20      up to that point.
21  Q.  Which sergeant was this?
22  A.  That would be David Hilton.
23  Q.  Okay.  And then what did Sergeant Hilton tell you?
24  A.  Again, it's been a while.  Just told me basically what was
25      in the memo at that time because, like I say, this
```

KEVIN PETERS                                        DIRECT - EASTWOOD

46

Case 2:22-cv-00072-KAC-JEM   Document 128-3   Filed 07/03/24   Page 7 of 15   PageID #: 3934

| | | |
|---|---|---|
| 1 | A. | Well, I assume it was.  I don't know exactly when he left |
| 2 | | town. |
| 3 | Q. | Do you know who, if anyone, at JCPD talked with  |
| 4 | | |
| 5 | A. | I don't know of anybody.  I haven't. |
| 6 | Q. | Okay.  Do you know what her role was in maintaining |
| 7 | | electronic records for Glass & Concrete Contracting, LLC? |
| 8 | A. | I don't know what her position would be. |
| 9 | Q. | Do you know if an investigation was conducted by JCPD into |
| 10 | | that? |
| 11 | A. | Into her employment? |
| 12 | Q. | No, her role in maintaining electronics connected with the |
| 13 | | company. |
| 14 | A. | Nothing that I ever heard of. |
| 15 | Q. | I'm going to ask you about the BOLO that Toma Sparks |
| 16 | | issued on May 5th for Sean Williams.  Do you recall that |
| 17 | | generally? |
| 18 | A. | Generally, yes. |
| 19 | Q. | Would it have been appropriate in your view for him to |
| 20 | | issue a BOLO? |
| 21 | A. | Yes. |
| 22 | Q. | Okay.  And why would that be? |
| 23 | A. | Because prior, we'd had some interactions with some of the |
| 24 | | patrol supervisors.  They had voiced some concerns about |
| 25 | | CID not always sending out a BOLO for somebody that had |

KEVIN PETERS                                        DIRECT - EASTWOOD

1    you go, Danny.
2  MR. RADER:  Thank you.
3  Q. Okay.  This one is marked Peters documents 17 at the
4     bottom.
5  A. Okay.
6  Q. And so these documents came from your lawyers.  I take it
7     that these documents were not produced by the City to your
8     lawyers, so is it possible that these were documents that
9     you took home with you in that rubber -- Rubbermaid
10    container when you retired?
11 A. It's possible.  I don't know for sure sitting here today.
12    I gave what I had to my lawyer.  I don't remember what it
13    was.
14 Q. Which I deeply appreciate, sir, but that doesn't answer my
15    question as to why you had this document if you were never
16    copied on it in the first place.
17 A. I don't know.  I don't know why I had the document.  I
18    guess I must have, it's got my name at the top.
19 Q. Right.  So my question is, did you ever received E-mails
20    on which you were BCC'd?
21 A. I could have.  Like, as you know, I didn't even know what
22    BCC was, so...
23 Q. Okay.
24 A. ...I could have and not known.
25 Q. I don't want you to speculate.  Do you know why Toma would

KEVIN PETERS                                    DIRECT - EASTWOOD

127

```
 1      have -- assuming he BCC'd here, let's go with that
 2      assumption for the sake of this question.
 3  MR. HERRIN:  Object to the form of the question.
 4  Q.  I'm going to ask the question now.  Do you know why he
 5      would have blind copied you on an E-mail to Dahl other
 6      than Dahl not knowing about the fact that you were copied
 7      on it?
 8  MR. HERRIN:  Object to the form of the question.
 9  A.  I don't fully understand the question.
10  Q.  Okay.  If he BCC'd this E-mail to you, Dahl wouldn't know.
11  A.  Okay.  I'll take your word for it again.
12  Q.  Sure.  Because -- because your name is not on it, right?
13  A.  Correct.
14  Q.  Okay.  Do you know -- if he had done that, do you know why
15      he would have done that?
16  MR. HERRIN:  Object to the form of the question.
17  A.  No, I don't know why he would have done that.
18  Q.  Okay.  And I'm asking, I mean, did it have any connection
19      to the case list that you were copied on a month before
20      that came from Legault?
21  A.  No.
22  Q.  Let's mark this as an exhibit, please.
23  COURT REPORTER:  It will be 188.
24  EXHIBIT #188:  E-mail from Toma Sparks to Kat Dahl, dated
25      1/12/21, Peters documents 0017.
```

KEVIN PETERS                                          DIRECT - EASTWOOD

1   MR. GARLAND:  Let's go off the record just a second.  Do you
2       want me to clarify all of this or not?
3   Q.  On the record you can clarify it.  Let's do that just to
4       -- just...
5   MR. GARLAND:  Okay, that's fine.  I think we previously
6       disclosed an E-mail from Sparks to Peters dated January
7       26, 2021 that was forwarding the January 12, 2021 E-mail.
8   MS. TAHINCI:  That is not this.  There is no forward here.
9       This is January 12th and it's printed directly from
10      Peters' E-mail.  That E-mail is a separate E-mail.  We
11      know what you're talking about, but that's not this.
12  MR. GARLAND:  Okay.  I just wanted to make -- I just wanted to
13      make sure.  I disagree with you, but I just wanted to make
14      sure.
15  Q.  Okay.  Is this marked, ma'am?
16  COURT REPORTER:  188.
17  Q.  Yes.  And then, Ms. Overbey, have we already reviewed
18      Sparks 204?  And it's a Bates number 204.
19  COURT REPORTER:  Yes, it's Exhibit 179, I believe.  I'll check
20      and make sure.
21  MS. TAHINCI:  Why don't you put it in the record to verify
22      that that's what he's talking about.
23  Q.  And I'm just going to put back 179 into the record.  This
24      is an E-mail to you that's marked in the subject line Kat
25      Dahl, but has the Sparks affidavit draft attached to it.

KEVIN PETERS                                    DIRECT - EASTWOOD

129

```
 1   A.  Okay.
 2   Q.  Okay.  Do you know -- do you have a memory of that being
 3       sent?
 4   A.  It had to be sent, I'm sitting here looking at it.  I
 5       don't have a direct memory.  That was over two years ago,
 6       so...
 7   Q.  If it was a search warrant for Sean Williams, do you know
 8       why it said Kat Dahl in the subject line?
 9   A.  No, I have no idea.  It just says Kat Dahl E-mail.  I'm
10       assuming that it was in reference to him sending her an E-
11       mail.
12   Q.  Have you seen other investigations into criminal
13       defendants where you identify the case by the prosecutor
14       in the subject line?
15   MR. HERRIN:  Object to the form of the question.
16   A.  I don't recall of any, but I don't know.  I mean, I've
17       sent thousands upon thousands of E-mails.
18   Q.  Were you aware of the visit by Officers Lewis, McKinney,
19       and Sergeant Tallmadge to Williams' apartment on May the
20       5th?
21   A.  After the fact.
22   Q.  How soon?
23   A.  The next morning.
24   Q.  Okay.  How did you learn?
25   A.  So, Lieutenant Don Shepard.
```

KEVIN PETERS                                          DIRECT - EASTWOOD

130

```
 1  A.  Chief Turner.
 2  Q.  Okay.  And did you discuss at this meeting Sparks
 3      obtaining a search warrant?
 4  A.  She had brought up the issue about wanting to get the
 5      search warrant, yes.
 6  Q.  And after the execution of the initial search warrant at
 7      the end of September, do you know why there was no follow-
 8      up by Sparks until after this December meeting?
 9  MR. HERRIN:  Object to the form of the question.
10  A.  Follow-up -- there was follow-up on the case.  What kind
11      of follow-up are you asking about?
12  Q.  On searching the devices.
13  A.  We had received information back from Arlo that there had
14      been no video recorded.  From there, there was no nexus to
15      build from what happened on the night that the young lady
16      fell out of the window to getting into those devices.
17  Q.  Nexus to -- of what?
18  A.  Of probable cause to get into those -- those -- anything
19      on those devices had nothing to do with what happened on
20      that night.
21  Q.  Because Arlo said it didn't have footage?
22  A.  Yes.
23  Q.  Now, subsequent to that, Sparks got a second warrant for
24      the -- after he found drugs, right?
25  MR. HERRIN:  Object to the form of the question.
```

KEVIN PETERS                                         DIRECT - EASTWOOD

134

| | |
|---|---|
| 1 | A. There was a search warrant for the safe. |
| 2 | Q. All right. And he had found drugs already. |
| 3 | A. I don't remember anything about drugs. |
| 4 | Q. Do you remember him finding drugs in the apartment? |
| 5 | A. No, I don't. I don't remember anything about drugs. |
| 6 | Q. Okay. Do you remember him finding -- do you remember -- |
| 7 | were you there when the safe was opened? |
| 8 | A. No, I was not. |
| 9 | Q. Okay. Do you remember currency being found when the safe |
| 10 | was opened? |
| 11 | A. I was told there was currency in the safe. |
| 12 | Q. Okay. Could drugs and currency be a nexus to searching |
| 13 | the videotapes that the -- excuse me, strike that. Could |
| 14 | drugs and currency be a nexus to searching the devices? |
| 15 | A. I didn't think we had it at that time, no. |
| 16 | Q. Okay. Do you know why North Carolina police thought they |
| 17 | had it at the time when they found drugs and currency on |
| 18 | him and as well as other devices? |
| 19 | MR. HERRIN: Object to the form of the question. |
| 20 | A. Again, I had no knowledge of the drugs, so I couldn't have |
| 21 | made that connection. |
| 22 | Q. Let me ask you, sitting here today, do you think the |
| 23 | presence of drugs and currency would form a nexus of |
| 24 | probable cause to search the devices? |
| 25 | MR. HERRIN: Object to the form of the question. |

KEVIN PETERS                                          DIRECT - EASTWOOD

135

| | |
|---|---|
| 1 | A. You know, I would have to know everything that went |
| 2 | through the investigation and I don't know everything that |
| 3 | went on in the investigation. |
| 4 | Q. By December, there had been at least three complaints of |
| 5 | sexual assault in Williams' apartment to JCPD. Could that |
| 6 | be a nexus to searching the devices? |
| 7 | MR. HERRIN: Object to the form of the question. |
| 8 | A. Again, I would have to know that there was some reason |
| 9 | that somebody was suspected they were being recorded. |
| 10 | Q. Well, you know there were cameras in the apartment. You |
| 11 | had three girls who said they were sexually assaulted in |
| 12 | the apartment. |
| 13 | A. But we... |
| 14 | MR. HERRIN: Object to the form of the question. |
| 15 | Q. You can answer. |
| 16 | A. Okay. Say it again, I'm sorry. |
| 17 | Q. There were cameras in the apartment and at least three |
| 18 | young women who said they were sexually assaulted in the |
| 19 | apartment. Would that be a nexus to search the devices? |
| 20 | MR. HERRIN: Object to the form of the question. |
| 21 | A. I know there was cameras when the young lady fell out of |
| 22 | the window. Prior to that or after that, I don't know if |
| 23 | there was cameras in the apartment. |
| 24 | Q. Did Arlo tell you when the cameras were there? |
| 25 | A. No, they did not. All we had was a preservation letter |

KEVIN PETERS                                         DIRECT - EASTWOOD

136