|     |    |                                                              |
|-----|----|--------------------------------------------------------------|
| 1   |    | with drugs?                                                  |
| 2   | A. | Not at that time, no, sir.                                   |
| 3   | Q. | Okay.  What about rumors about Williams and young women?     |
| 4   | A. | No, sir.                                                     |
| 5   | Q. | Okay.  And you say not at that time.  When did you come to   |
| 6   |    | learn about those things?                                    |
| 7   | A. | Later on as we were investigating this case, I ran his       |
| 8   |    | name in our system, and it came up that he had two sexual    |
| 9   |    | assaults in there.                                           |
| 10  | Q. | Okay.  Do you recall...                                      |
| 11  | A. | Had him as a suspect.  I'm sorry.                            |
| 12  | Q. | I didn't mean to interrupt you.                              |
| 13  | A. | There was two cases that were reported of him as a suspect   |
| 14  |    | of sexual assault.                                           |
| 15  | Q. | Reported to Johnson City?                                    |
| 16  | A. | Yes, sir.                                                    |
| 17  | Q. | Okay.  And do you know who did the initial investigations    |
| 18  |    | on those reports?                                            |
| 19  | A. | I don't want to guess, so I don't recall who.                |
| 20  | Q. | Let's turn to Sparks 251.  So the first paragraph of the     |
| 21  |    | relevant facts and probable cause gets into the officers     |
| 22  |    | responding to the female that fell.  Do you see that?        |
| 23  | A. | Yes, sir.                                                    |
| 24  | Q. | Okay.  And when you swore this affidavit, did you talk to    |
| 25  |    | particular officers about the initial response?              |

**TOMA SPARKS**                                            **DIRECT - EASTWOOD**

43

1    case?
2  A. We was interviewing her, Jane Doe 2
3  Q. Okay.  Who else was present for the interview?
4  A. Ms. Dahl.
5  Q. And what did you do next?
6  A. I don't recall what -- what occurred next.  I don't
7     recall.
8  Q. Were you aware at the time of previous reports of rape
9     against Sean Williams?
10 A. I believe -- I don't recall if I was or not.
11 Q. Did you interview Sean Williams?
12 A. No, sir.
13 Q. Why not?
14 A. I don't know.
15 Q. Had you had -- would it be normal practice to interview
16    the suspect in a rape case?
17 A. I normally -- I don't know how many sexual assault cases
18    that I had.  I would assume, yeah, to interview the
19    suspect.  Then I knew he wasn't going to answer the door
20    if we went up there, so I didn't go up there.
21 Q. Why did you know he wouldn't answer the door?
22 A. Just from when we went up there to do the search warrant,
23    he wouldn't open up for us then, and that was the reason I
24    didn't go up there and talk to him or try to talk to him.
25 Q. Did you try to seize any evidence from Williams'

TOMA SPARKS                                    DIRECT - EASTWOOD

108

1    we've just gone through some reports, and it looks like
2    Jane Doe 9 and Jane Doe 3 were before October of 2020,
3    right?
4 A. Yes.
5 Q. Let me ask you about the record keeping system.  In the
6    course of your investigation, initial investigation of
7    Sean Williams, would those reports have been apparent to
8    you?
9 A. On which case?
10 Q. Jane Doe 1
11 A. I mean, I can look them up.  Jane Doe 1 case?
12 Q. Well, you're investigating Sean Williams, right?
13 A. With Jane Doe 1, yes, sir.
14 Q. Okay.  For attempted homicide, right?
15 A. Correct.
16 Q. Okay.  Would these prior reports to JCPD have been known
17    to you in the course of your investigation?
18 A. Not necessarily.
19 Q. Why not.
20 A. They may have came up.  I don't know when they came up.
21 Q. Was that because of defects in the City's record keeping
22    system?
23 A. No, sir.
24 Q. Was that because you didn't look for them?
25 A. I may not have looked for them at the first of it.

TOMA SPARKS                                    DIRECT - EASTWOOD

127

```
 1   A.   It could have.
 2   Q.   Did you follow up on the raped list?
 3   A.   I looked -- I looked up the repots that we had in our
 4        system and none of the names were -- we had none of the
 5        names in our system...
 6   Q.   When did you...
 7   A.   ...as being reported.
 8   Q.   Sorry.
 9   A.   That's okay.
10   Q.   When did you look that up?
11   A.   I don't recall.  It was not long after.  I don't recall
12        the exact date.
13   Q.   Did you make any further investigation into the raped
14        list?
15   A.   I did not.
16   Q.   Did you make an attempt to search the devices based on the
17        raped list?
18   A.   No, sir.
19   Q.   Why not?
20   A.   I was talking with a supervisor and we didn't have enough
21        to move forward with it.
22   Q.   And which supervisor was that?
23   A.   Sergeant Hilton.
24   Q.   Okay.  And then you said -- we're on Page 82 still,
25        paragraph number five it says, between June 2020 and
```

```
 1        November 2020, JCPD received at least three additional
 2        complaints of alleged sexual assaults.  In all three
 3        complaints, the female victims reported that while at the
 4        apartment of Sean Williams, they fell asleep and woke up
 5        with Williams vaginally penetrating with their -- his
 6        penis.  All of the female victims stated they did not
 7        consent for Williams to have intercourse with them during
 8        these specific events.  Did you use -- were you -- strike
 9        that.  When did you become aware of these three additional
10        complaints?
11   A.   I don't recall.
12   Q.   Okay.  Once you became aware of these three additional
13        complaints, did you attempt to obtain a search warrant for
14        the devices based on the informa' -- based on the
15        knowledge of the complaints?
16   A.   When were the reports -- this was June 2020?  I don't
17        recall.
18   Q.   Could the reports of the sexual assaults been a basis on
19        which to seek a search warrant for the devices?
20   A.   I guess it could have.
21   Q.   Did the report -- the devices, in your view, have a
22        greater nexus to the possessing or carrying of a weapon
23        than they did to these complaints of sex assault?
24   MR. HERRIN:  Object to the form of the question.
25   A.   I can't answer that.  These -- these cases here, we don't
```

TOMA SPARKS                                          DIRECT - EASTWOOD

153

```
 1          -- because what we were looking for is video on there, we
 2          didn't know if had any.  We wasn't aware of any type of
 3          video of any sexual assault.
 4     Q.   That wasn't my question.  My question is you wanted to see
 5          what was on these devices, right?
 6     A.   Correct.
 7     Q.   Okay.  Because they were from camera inside Williams'
 8          apartment.
 9     A.   Supposedly.  If it -- it could have been on there, could
10          not, because it was Arlo cameras.
11     Q.   Okay, fair enough.  And if those cameras could have
12          recorded  Jane Doe 1   falling out of a window, right?
13     A.   Uh-huh (Affirmative).
14     Q.   Those cameras could have recorded Sean Williams carrying
15          or possessing a weapon, right?
16     A.   Could have.
17     Q.   Couldn't they have also videotaped Williams performing a
18          sexual assault in his condo as reported by multiple women?
19     A.   Could have.
20     Q.   I'm going to turn to Page 85.  The third paragraph down
21          says, therefore, your affiant believes -- I believe this
22          is Mike Little, right?
23     A.   Correct.
24     Q.   Okay.  That probable cause exists, which draws a nexus
25          between Williams' proclivity for committing sexual based
```

TOMA SPARKS                                         DIRECT - EASTWOOD

```
 1        offenses and documenting these events by digital means.
 2        Do you agree with that statement?
 3   A.   Yes.
 4   Q.   Through this belief, it can be easily inferred that any
 5        device capable of recording and/or storing digital images,
 6        which belong to or has belonged to Williams, will likely
 7        contain stored evidence of these offenses.  Do you agree
 8        with that statement?
 9   A.   Yes, from the information we got from North Carolina.
10   Q.   Okay.  But back in November of 2020, you had multiple
11        complaints of women being sexually assaulted in Williams'
12        condo, correct?
13   MR. HERRIN:  Object to the form of the question.
14   A.   I wouldn't say multiple, no.
15   Q.   Okay.  Well, let's go back and look at that then.  Let's
16        go back to Sparks 81, all right?  Paragraph 3, do you see
17        that?  There's a number three at the top.  Do you see
18        that, sir?
19   A.   Number three, yes, sir.
20   Q.   Yeah, okay.  It says that on November 7th, a female
21        subject filed a complaint with the JCPD relating to an
22        alleged sexual assault which was reported to have occurred
23        in Johnson City, Tennessee on or about November 6, 2019.
24        Within the scope of this report, the female victim stated
25        she had gone to the apartment of a male acquaintance who
```

|  |  |  |
|---|---|---|
| 1 |  | she knew only as Sean.  That apartment was described by |
| 2 |  | the female victim as being on the fifth floor of a |
| 3 |  | building located at 200 Main Street in Johnson [sic] |
| 4 |  | Tennessee. Do you see that? |
| 5 | A. | I see it. |
| 6 | Q. | Do you believe that to be Sean Williams' apartment based |
| 7 |  | on the description there? |
| 8 | A. | Yes. |
| 9 | Q. | Okay.  And in fact, we -- we discussed this earlier in |
| 10 |  | your testimony, you later received, in March '21, DNA |
| 11 |  | evidence related to this complaint, right? |
| 12 | A. | Correct. |
| 13 | Q. | Okay.  And then you had [Jane Doe 1] in September 2020, |
| 14 |  | right? |
| 15 | A. | Yes. |
| 16 | Q. | And then if we turn to the next page, Page 82, we'll jump |
| 17 |  | down to Paragraph 5, it says between June 2nd, 2020 and |
| 18 |  | November 23rd, 2020, JCPD received at least additional -- |
| 19 |  | three additional complaints of alleged sexual assault.  In |
| 20 |  | all three complaints the female victims reported while at |
| 21 |  | the apartment of Sean Williams, they fell asleep and woke |
| 22 |  | up with Williams vaginally penetrating them with his |
| 23 |  | penis. |
| 24 | MR. HERRIN: | Object to the form of the question.  Having just |
| 25 |  | read the page before, it's inaccurate information. |

TOMA SPARKS                                               DIRECT - EASTWOOD

156

1  Q. No speaking objections. Okay. Let me ask you this. Did
2     probable cause exist to apply for a search warrant of
3     these devices before Williams was arrested earlier this
4     year?
5  MR. HERRIN: Object to the form of the question.
6  A. No.
7  Q. Why not?
8  A. I don't -- we didn't have enough information on it at the
9     time to get into the computers.
10 Q. Why not?
11 A. We didn't have probable cause. We didn't have enough
12    information on these incidents to be able to articulate to
13    get a search warrant for the computers.
14 Q. What is the bar for probable cause in your view?
15 A. Eyewitness information and testimony or evidence that this
16    occurred in their apartment -- his apartment to show that
17    this happened in his apartment to be able to get the
18    search warrant for them.
19 Q. But you had multiple complaints, right?
20 A. Yes, sir.
21 Q. Multiple women, the same perp, Sean Williams?
22 A. Listed as a perp, yes, sir.
23 Q. The same location, his condo, right?
24 A. Yes, sir.
25 Q. In some cases, you had DNA, right?

**TOMA SPARKS**                                  **DIRECT - EASTWOOD**

157

| | |
|---|---|
| 1 | A. At least one of them, I did. |
| 2 | Q. And a report from TBI as much? |
| 3 | A. On that one case, yes, sir. |
| 4 | Q. And that's not enough to apply for a search warrant for |
| 5 | videos? |
| 6 | A. I guess. |
| 7 | Q. But in January of '21, ▮Jane Doe 2▮ statement about |
| 8 | seeing guns is enough to apply for a search warrant for |
| 9 | the same videos, the same devices, for carrying or |
| 10 | possessing a firearm? |
| 11 | MR. HERRIN: Object to the form of the question. |
| 12 | A. That was with me and Ms. Dahl. We was going to the last |
| 13 | extreme to try to get it, and that was going to be pushing |
| 14 | it. There was a 50/50 shot that you even got a search |
| 15 | warrant on that it was so little. |
| 16 | Q. You're the -- you're the affiant, right? |
| 17 | A. Correct. |
| 18 | Q. Your name is signature, right? |
| 19 | A. Correct. |
| 20 | Q. Okay. This same document, Mike Little's affidavit, let's |
| 21 | turn to page Sparks 83. This is the North Carolina |
| 22 | seizure earlier this year. Do you see that, sir? |
| 23 | A. Yes, sir. |
| 24 | Q. Okay. I'm going to draw your attention to the second |
| 25 | paragraph of section seven. It says -- it begins, due to |

**TOMA SPARKS**                                                             **DIRECT - EASTWOOD**

```
 1      the large amount of currency and narcotics present.  Do
 2      you see that?
 3  A.  Uh-huh (Affirmative).
 4  Q.  Okay.  And it says, due to the large amount of currency
 5      and narcotics present, an investigation was conducted
 6      which focused on suspected drug trafficking by Williams.
 7      Do you agree with that, that the currency and the
 8      narcotics warrant an investigation into drug trafficking?
 9  A.  From North Carolina.
10  Q.  Okay.  And it says, during the drug trafficking
11      investigation, a search warrant was obtained for the
12      electronic and digital storage devices seized from
13      Williams' vehicle.  Do you see that?
14  A.  Yes, sir.
15  Q.  Do you think there was probable cause there for a search
16      warrant?
17  A.  For the amount of drugs that they found, yes.
18  Q.  Okay.  And do you know how much currency was found?
19  A.  I don't recall.
20  Q.  Okay.  And what's the nexus or the connection there
21      between the devices, and the currency, and the drugs?
22  A.  What's the nexus between the video and the...
23  Q.  I'm asking about these two sentences here.  They apply for
24      a search warrant for these devices based upon the currency
25      and the narcotics, right?
```

```
 1  MR. HERRIN:  Object to the form of the question.
 2  A.  Correct.  They were getting into these devices through the
 3      amount of drugs that he had and cash he had.
 4  Q.  Right.
 5  A.  That's how they got into them.
 6  Q.  And you agree there was probable cause for a search
 7      warrant there?
 8  MR. HERRIN:  Object to the form of the question.
 9  A.  Yes.
10  Q.  And after searching Williams' apartment and finding drugs
11      and currency in his safe, right?
12  A.  Yes, sir.
13  Q.  And having a report for   Jane Doe 2   right, about guns,
14      right?
15  A.  Yes, sir.
16  Q.  You were trying to get a search warrant, right?
17  A.  Correct.
18  Q.  Okay.  To search the devices, right?
19  A.  Correct.
20  Q.  And you didn't think you had enough to search them for a
21      sex crime.
22  A.  Correct.
23  Q.  Okay.  This is an E-mail from you to Gary Wills.  He's in
24      the DA's office.  Yeah, I'm sorry.  We'll put an exhibit
25      on the last one.
```

**TOMA SPARKS**                                    **DIRECT - EASTWOOD**