```
 1  Q.  What type of work things did you talk about typically?
 2  MR. HERRIN:  Object to the form of the question.
 3  A.  What type of work things?  It could be anything from a
 4      request for additional investigators in CID.  If he was
 5      shorthanded due to staffing problems, he might have those
 6      concerns.  It could be task force officer, you know, when
 7      are we going to be able to have our FBI task force officer
 8      going full-time, so it could be any number of things.
 9  Q.  Did you talk about individual cases typically?
10  A.  I could ask for updates on cases that were of interest or
11      I thought that might come up in conversation with my boss.
12  Q.  Your boss being the city manager?
13  A.  Yes.
14  Q.  What type of cases when you say were of interest come to
15      mind?
16  A.  Lots of times it would be serious cases like a homicide,
17      cases of that nature that the city manager might want to
18      know, you know, do we have a suspect or where are you all
19      at, are you close on making an arrest, that type of thing.
20  Q.  Was Sean Williams one of those cases that you discussed
21      with the city manager?
22  A.  I don't know if I discussed it with the city manager.  I
23      don't recall having discussions with the city manager.
24  Q.  What about Captain Peters?
25  A.  Yes, we discussed Mr. Williams.
```

KARL TURNER                                           DIRECT - EASTWOOD

61

1   A.  Well, because perhaps it could be taken care of at a
2       different level than Sergeant Legault.
3   Q.  Okay. Now, I see on this Exhibit 8, Bates 462, there are
4       check marks next to certain cases, ▓▓▓▓ Tucker,
5       Pierce, ▓▓▓▓ and ▓▓▓▓ I know our friend, Mr.
6       Herrin, went through those cases at some length with Ms.
7       Dahl yesterday. Do you know why Captain Peters put check
8       marks next to those cases? Well, let's -- before you
9       answer that question, I want to withdraw it. I assume, is
10      that Captain Peters who made the check marks next to those
11      cases?
12  A.  Captain Peters was taking notes, so I assume that, yes, he
13      made the check marks.
14  Q.  Okay. And do you know why he made those check marks?
15  A.  Can I see the copy of the secret recording from May?
16  Q.  Well, you can, but first I'm just asking you sitting here
17      today, do you know why or would you like to refresh from
18      the recording?
19  A.  Yeah, I would like to refresh.
20  Q.  Okay. You don't know offhand right now without
21      refreshing?
22  A.  As memory serves me, that was the cases that she agreed
23      she would take to the June grand jury, but I would like to
24      look at the...
25  Q.  Okay.

KARL TURNER                                    DIRECT - EASTWOOD

137

1          course of action and they get overruled by a supervisor,
2          right?
3     A.   I'm sure that happens.
4     Q.   Sure.  Do you know if all these cases were indicted
5          eventually?  Again, without -- you know, you don't need to
6          refresh for that because you wouldn't know from the
7          meeting anyway, right?  But do you know if those cases
8          were ultimately indicted?
9     MR. HERRIN:  Did he have the knowledge prior to the lawsuit
10         being filed, otherwise privileged information.
11    Q.   Before the lawsuit.
12    A.   My recollection is that Captain Peters came back and said
13         that the cases weren't indicted in the grand jury.
14    Q.   When?
15    A.   In June.
16    Q.   When in June?
17    A.   I don't recall the date that he came to me with that.
18    Q.   Was it before the decision not to renew the MOU?
19    A.   It was in early June, I think, but I don't remember the
20         date.
21    Q.   Did it have a role in the decision not to renew the MOU?
22    A.   It had a role in my recommendation.
23    Q.   Okay.  We'll get to that in a minute.  Did you have
24         further communications with Dahl about cases?  Do you know
25         how many of these cases were not indicted as of early

KARL TURNER                                    DIRECT - EASTWOOD

145

| | |
|---|---|
| 1 | June? |
| 2 | A. I don't know if any of the ones with the check marks were |
| 3 | indicted. |
| 4 | Q. Okay. So when Captain Peters came to you in early June, |
| 5 | you don't know which cases these are referring to? |
| 6 | A. He was referring to the ones that she agreed to indict |
| 7 | that they weren't indicted. |
| 8 | Q. Okay. All of them? |
| 9 | A. To my knowledge, yes. |
| 10 | Q. Okay. |
| 11 | A. That was the say I understood the communication. |
| 12 | Q. Did you have any further communications with Ms. Dahl |
| 13 | about those cases, why they were not indicted as of early |
| 14 | June? |
| 15 | A. No, sir. |
| 16 | Q. Did you, at the time, have any knowledge why they weren't |
| 17 | indicted other than the fact they weren't? |
| 18 | A. Just the fact that they weren't. |
| 19 | Q. We talked about this meeting in early June. I'm going to |
| 20 | refer you to, I believe, previously marked six, Bates 201. |
| 21 | This is an E-mail from Captain Peters to Kat Dahl on June |
| 22 | 8th. Do you remember that E-mail from earlier yesterday |
| 23 | or today when Mr. Herrin asked Ms. Dahl about it? |
| 24 | A. Yes, sir. |
| 25 | Q. Did you direct Captain Peters to send this E-mail? |

KARL TURNER                                      DIRECT - EASTWOOD

146

| | |
|---|---|
| 1 | A. I don't remember the origin of the E-mail. |
| 2 | Q. You talked about a meeting in early June with Captain |
| 3 | Peters. Did that meeting -- do you know if that meeting |
| 4 | occurred before or after this E-mail was sent? |
| 5 | A. I don't know if it was before or after. |
| 6 | Q. Do you know if Captain Peters received a response from Ms. |
| 7 | Dahl to this E-mail? |
| 8 | A. I don't know if he received a response. |
| 9 | Q. Do you know the basis of Captain Peters' knowledge that |
| 10 | allegedly none of the check marked cases had been indicted |
| 11 | as of early June? |
| 12 | A. No, sir. He just told me that they weren't indicted. |
| 13 | Q. Did he state whether he had talked to Ms. Dahl about it? |
| 14 | A. I don't recall. I don't recall how he had that knowledge. |
| 15 | Q. All right. Let's go next to an E-mail to you dated June |
| 16 | 23 from Joe Jaynes. Excuse me, it's not to you, it's |
| 17 | Captain Peters. Before this litigation, had you seen this |
| 18 | E-mail? |
| 19 | A. I don't know if I had seen it before the litigation, but I |
| 20 | know I've seen it as part of the litigation. |
| 21 | Q. This E-mail was dated June 23, correct? |
| 22 | A. Yes, sir. |
| 23 | Q. And your letter to Ms. Dahl not renewing her contract was |
| 24 | dated June 24th. Is that correct? |
| 25 | A. Yes, sir. |

KARL TURNER                                              DIRECT - EASTWOOD

147

Case 2:22-cv-00072-KAC-JEM   Document 128-5   Filed 07/03/24   Page 5 of 13   PageID #: 3959

1  Q. Okay. And then before that, there's no communication
2     until November 16, 2020 for one minute and 19 seconds,
3     right?
4  A. Yes, sir.
5  Q. And then, of course, November 16, 2020 is before the
6     December meeting that you had with Legault and Peters to
7     discuss concerns about Kat Dahl's communication and case
8     referrals, right?
9  A. Yes, sir.
10 Q. Okay. And then on November 12th, you get outgoing and
11    incoming calls in the afternoon between 1:08 and 2:21. Do
12    you see that?
13 A. Yes sir.
14 Q. And then November 11th, you get calls incoming and
15    outgoing in the span of about four and a half hours. Do
16    you see that?
17 A. Yes, sir, from 12:04 to 7:29.
18 Q. Yeah.
19 A. Well, I think that's 7:29 a.m., yes, sir, to 12:00 p.m.
20 Q. So do you see any evidence here in the phone records that
21    Officer Jaynes' calls to Ms. Dahl are going unanswered?
22 A. Not according to these phone records.
23 Q. Do you have any explanation for why Officer Jaynes might
24    make that allegation to Captain Peters?
25 A. Well, I don't know if the only way he communicated was

KARL TURNER                                    DIRECT - EASTWOOD

154

```
 1      continuing one, if I can.  You have not qualified Chief
 2      Turner as an expert in sexual assault investigations and
 3      cases and how to build a case.  You can try to do that if
 4      you want, but you're asking him cases.  They are more --
 5      I'm objecting because you're asking him questions that are
 6      more suited to an expert on these types of investigations.
 7      I'm going to have a continuing objection on that or -- if
 8      you're agreeable to a continuing objection.
 9  Q.  I am.
10  MR. HERRIN:  Okay.
11  Q.  During -- during the time you were chief, your department
12      investigated sexual assault crimes, right?
13  A.  Yes, sir.
14  Q.  And you were a policy maker for your department as to
15      training and supervision of officers who were making
16      sexual assault investigations.
17  MR. HERRIN:  Object to the form of the question.
18  A.  I didn't supervise officers that were making sexual
19      assault investigations.  Captain Peters did.
20  Q.  And you supervised Captain Peters.
21  A.  He falls under my chain of command, yes, sir.
22  Q.  Would you agree, all things being equal, that an officer
23      faced with a reluctant witness should try to build a case
24      through alternative means?
25  MR. HERRIN:  You've got my continuing objection, right?  Okay.
```

| | |
|---|---|
| 1 | Q. Yeah. |
| 2 | A. No, sir. |
| 3 | Q. Do you know what happened to her other -- before -- did |
| 4 | you know what happened to her before this litigation? |
| 5 | A. No, sir. |
| 6 | Q. Sitting here today, do you know what happened to her? |
| 7 | A. I know what is alleged to have happened. |
| 8 | Q. As the police chief, what would you have expected the |
| 9 | officers to have done with Ms. ▮▮▮▮▮ when they met up |
| 10 | with her outside of Mr. Williams' apartment? |
| 11 | A. To start an investigation about what she was claiming. |
| 12 | Q. So specifically, what would you have expected the officers |
| 13 | to do as to Ms. ▮▮▮▮▮ that evening? |
| 14 | A. As far as the investigation? |
| 15 | Q. Yes, sir. |
| 16 | A. I would expect them to take a statement from her, and if |
| 17 | she's claiming it was sexual assault to do the sexual |
| 18 | assault kit. |
| 19 | Q. Anything else? |
| 20 | A. As far as Ms. ▮▮▮▮▮ is concerned? |
| 21 | Q. Yes, ma'am [sic]. Yes, sir. |
| 22 | A. I would expect a victim advocate to maybe work with her. |
| 23 | Q. Do you know if the officers took Ms. ▮▮▮▮▮ to a medical |
| 24 | facility that evening? |
| 25 | MR. HERRIN: Prior to the lawsuit? Object to the form of the |

KARL TURNER                                              DIRECT - EASTWOOD

218

1  MR. HERRIN:  70, I think.
2  Q.  Is it 70 or 69?
3  MR. HERRIN:  70.
4  COURT REPORTER:  70.
5  Q.  Okay.  Thank you.  Someone's keeping track.
6  EXHIBIT #70:  Johnson City Police Department memorandum from
7      Toma Sparks to Kevin Peters, dated 12/3/20, Bates Stamp
8      No. 0425.
9  Q.  On Monday, your lawyers distributed an E-mail from Captain
10     Peters dated the next day, December 4th.  It is not Bated.
11     Before the litigation, had you seen this E-mail chain
12     before?
13 A.  No, sir, I don't remember seeing this E-mail.
14 Q.  Okay.  Were you aware on December 4th that a meeting had
15     been set up with TBI about Sean Williams?
16 A.  No.  I had talked to Wayne Taylor and he told me that Kat
17     had requested the TBI assist us in an investigation, so I
18     had a phone call with him.  But as far as a meeting being
19     set up, I didn't have that on my calendar that I'm aware
20     of.
21 Q.  Did you know who set up the meeting?
22 A.  No, sir.
23 Q.  Okay.  Did you have concerns about the meeting occurring?
24 A.  No, sir.
25 Q.  Did you call Wayne Taylor about the meeting or did he call

KARL TURNER                                      DIRECT - EASTWOOD

|  |  |  |
|---|---|---|
| 1 |  | you? |
| 2 | A. | I called Wayne Taylor. |
| 3 | Q. | Okay. And what was the purpose of your calling him? |
| 4 | A. | Captain Peters had told me that Ms. Dahl had contacted the |
| 5 |  | TBI about them assisting us in the investigation, and I |
| 6 |  | called Wayne with my concerns about that. |
| 7 | Q. | What were your concerns? |
| 8 | A. | The fact that she didn't tell us first so that we would be |
| 9 |  | able to coordinate investigative activities with the TBI. |
| 10 | Q. | Do you think that Ms. Dahl's conduct was improper in |
| 11 |  | contacting TBI? |
| 12 | A. | No. |
| 13 | Q. | Okay. Why not? |
| 14 | A. | She was just seeking someone else to help us, but we |
| 15 |  | should have had a heads up so that we could coordinate |
| 16 |  | with them. |
| 17 | Q. | And what would the benefit be of that coordination? |
| 18 | A. | So we didn't duplicate investigative efforts or something |
| 19 |  | that we might be doing would interfere with something that |
| 20 |  | they might be doing as far as an investigation. |
| 21 | Q. | To your knowledge, before this meeting occurred, had TBI |
| 22 |  | made any investigative efforts? |
| 23 | A. | Not to my knowledge. |
| 24 | Q. | Did Wayne Taylor tell you anything that distinguished the |
| 25 |  | circumstances under which there was communication between |

```
 1  A.   Probably Willhoit.
 2  Q.   Okay.  And who is he?
 3  A.   He's probably the -- my understanding is he's the agent in
 4       charge, supervising agent.
 5  Q.   Where?
 6  A.   TBI.
 7  Q.   Okay.  So a meeting was cancelled, but a meeting was going
 8       ahead with TBI anyway?
 9  A.   I guess that perhaps Captain Peters wanted to meet with
10       him first.
11  Q.   So, in other words, a meeting was going forward, but just
12       not with the U.S. Attorney's Office present.
13  A.   I don't know who would be attending the meeting.  I didn't
14       know about the meeting.
15  Q.   And then it says here, myself and Chief Turner had a
16       conversation with Wayne Taylor expressing our concerns
17       late yesterday.  Was this the phone call we were just
18       talking about?
19  A.   Yes, sir.
20  Q.   So Captain Peters was on the line as well?
21  A.   He was in my office.
22  Q.   Were you on speaker?
23  A.   No, I think I was on my cell phone.
24  Q.   Okay.  Do you know why Captain Peters says myself and
25       Chief Turner had a conversation with Wayne Taylor?
```

KARL TURNER                                          DIRECT - EASTWOOD

272

```
 1   A.  No, sir.
 2   Q.  Okay.  So he didn't -- Captain Peters didn't speak with
 3       Wayne Taylor to your knowledge?
 4   A.  I think it was on my cell phone.
 5   Q.  Okay.
 6   A.  I also had my office phone there which would have had a
 7       speaker phone on it, so...
 8   Q.  I want to move to mark this as 71.  I guess I'm not
 9       moving, I'm just marking.
10   EXHIBIT #71:  E-mail from Kevin Peters to Will Saulsbury,
11       dated 12/4/20.
12   Q.  Your office, pursuant to Tennessee law, makes annual
13       reports to TBI about crime statistics.  Is that the case?
14   A.  Yes, sir.
15   Q.  Okay.  Do you know who at your office compiles that data?
16   A.  It's through our records system, so John Hames would be
17       the sergeant that submits.
18   Q.  Was that done under your supervision and authority?
19   A.  He's the records manager, so he's the person responsible
20       for that.
21   Q.  Is he in your chain of command?
22   A.  Ultimately.
23   Q.  Who does he report to directly?
24   A.  The administrative major.
25   Q.  Who is that?
```

```
 1        could refer them to a tip line and we don't do a written
 2        report.  They may ask us questions as far as daily
 3        business where we don't report every contact we have with
 4        a citizen.
 5    Q.  And just yesterday we looked at that tip, right, from
 6        someone saying that she was assaulted by -- sexually by
 7        Sean Williams.
 8    A.  Yes, sir.
 9    Q.  There was no report there, right?
10    A.  I'm not aware of a report being made.
11    Q.  Did Mr. Daigle interview you in connection with his work
12        on the reviewing the cases?
13    A.  No, sir.
14    Q.  Do you have any bad feelings under the circumstances in
15        which you retired from Johnson City?
16    A.  No, sir.
17    Q.  Do you have any bad feelings towards the City of Johnson
18        City over the circumstances in which you retired from
19        Johnson City?
20    A.  I don't understand what you're asking.
21    Q.  Do you have any bad feelings towards the City?
22    A.  No, sir.
23    Q.  Okay.  Do you have any bad feelings towards Ms. Dahl?
24    A.  Yes.
25    Q.  Okay.  Tell me about those.
```