**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE
GREENEVILLE DIVISION**

**B.P., et al.,**

       **Plaintiffs,**

**v.**                          **No: 2:23-cv-00071-TRM-JEM**

**CITY OF JOHNSON CITY,
TENNESSEE, et al.,**

       **Defendants.**

_____/

## MOTION TO COMPEL PRODUCTION OF (1) DEFENDANTS' FINANCIAL RECORDS AND (2) THE REAL ESTATE CONTRACT BETWEEN CITY MANAGER CATHY BALL AND SEAN WILLIAMS

In January 2024, Plaintiffs requested tax records for the past ten years for Defendants Karl Turner, Kevin Peters, Toma Sparks, and Justin Jenkins. Plaintiffs also requested Defendants to identify all assets in their possession, custody, or control which could be used to satisfy a judgment. Defendants objected to both requests and produced nothing. On March 12, 2024, Plaintiffs sent a second set of requests to all individual Defendants, including Defendants Jeff Legault and Brady Higgins, specific to the time period January 1, 2018, to the present, which asked them to identify, among other things, all financial institutions where they have maintained accounts, identify any accounting firms they have used, identify all assets over $10,000 bought or sold and any titles for said assets, and produce all bank statements. On May 9, 2024, Plaintiffs further requested Jenkins produce receipts for Facebook Marketplace sales he made during the relevant time period, and mortgage records, among other items. To date, Defendants have failed to comply with these additional requests and/or have provided evasive or incomplete responses.

Additionally, during the deposition of City Manager Cathy Ball, Plaintiffs learned—for the first time—that Ball had entered into a real estate contract with Sean Williams in April 2022 for the off-market sale of his penthouse apartment for a price well below the market value. Ball made this deal while Williams was a fugitive from the Johnson City Police Department ("JCPD"), and Ball oversaw the police force in her role as City Manager. Ball testified that she had records of this transaction "in [her] office." Baehr-Jones Decl., Exh. 22, Ball Dep. 262:3. On June 12, 2024, Plaintiffs requested Defendant City produce these records no later than June 18, 2024, as the records were responsive to Plaintiffs' Request for Production No. 2 for all documents relating to Williams, which Plaintiffs had served on the City on December 21, 2023. Baehr-Jones Decl. ¶ 3. Defendant City did not respond. *Id.* On June 24, 2024, Plaintiffs provided another deadline of June 26, 2024. *Id.* Defendant City again did not comply and disputed that the records were responsive to Plaintiffs' requests. *Id.* Ball then held a press conference on June 26, in anticipation of Plaintiffs filing this motion, announcing the real estate deal with Williams herself, and claiming to do so for purposes of "transparency." Baehr-Jones Decl., Exh. 21.[1]

Plaintiffs therefore bring this motion to compel the above requests and seek attorneys' fees and costs, pursuant to Federal Rule of Civil Procedure 37(a)(5), as the deadlines for production have all passed and Defendants' objections are not substantially justified.

---

[1] At Defendants' insistence, Plaintiffs filed the redacted deposition transcript of Cathy Ball provisionally under seal on June 14, 2024, and additionally redacted any information concerning Ball's real estate deal with Williams from the public version of that filing. *See* ECF 221-1; Baehr-Jones Decl. ¶ 5. Plaintiffs made it clear in their notice to the Court that they did not believe anything in the redacted Ball transcript merited sealing but were requesting provisional sealing nonetheless in deference to defense counsel's demands. *Id.* It is indefensible and unethical for counsel for the City to insist on Plaintiffs filing this material under seal only for their representative to hold a press conference to spin her version of the events in anticipation of Plaintiffs filing this motion. Plaintiffs intend to bring a renewed motion to enjoin the extrajudicial conduct of Cathy Ball and a motion for sanctions against counsel for the City.

# RELEVANT FACTUAL BACKGROUND

## A. The Relevant Requests and Interrogatories

This motion seeks to compel complete responses to the following Plaintiffs' Requests for

Production and Interrogatories:

- Request for Production No. 7 ("RFP #7"), served on Defendants Turner, Peters, Sparks, and Jenkins on January 4 and 12, 2024, requesting, "All tax form W-2's, 1099's and tax returns filed by you or on your behalf, personally, as a member of a trust or other legal entity, or on behalf of any business you have or had an ownership interest in for the past 10 years to date." Decl. of Vanessa Baehr-Jones ("Baehr-Jones Decl."), Exhs. 1-4 (First Set of Interrogatories and Requests for Production of Documents to Defendants Turner, Peters, Sparks, and Jenkins), at 6.

- Interrogatory No. 9 ("Rog #9"), served on Defendants Turner, Peters, Sparks, and Jenkins on January 4 and 12, 2024, requesting Defendants, "List all assets in your possession, custody or control that may be used to satisfy a judgment." *Id.* at 4.

- Interrogatory No. 1 ("Rog #1"), served on <u>all</u> individual Defendants on March 14, 2024, requesting Defendants, "Identify all ASSETS valued over $10,000 bought or sold since January 1, 2018, including the date of the purchase or sale and the amount paid in consideration." Baehr-Jones Decl., Exhs. 5-10, at 3.

- Interrogatory No. 2 ("Rog #2"), served on <u>all</u> individual Defendants on March 14, 2024, requesting Defendants, "Identify all title(s) YOU hold to property valued over $10,000." *Id.*

- Interrogatory No. 4 ("Rog #4"), served on <u>all</u> individual Defendants on March 14, 2024, requesting Defendants, "Identify all accounting firms used to prepare YOUR tax returns since January 1, 2018, including the name and address of each firm." Baehr-Jones Decl., Exhs. 5-9, at 4 and Exh. 10, at 3.

- Interrogatory No. 5 ("Rog #5"), served on <u>all</u> individual Defendants on March 14, 2024, requesting Defendants, "Identify all financial institutions where YOU have maintained accounts since January 1, 2018, including the name and address of each institution." *Id.*

- Request for Production No. 10 ("RFP #10"), served on Kevin Peters and Toma Sparks on March 14, 2024, requesting, "All bank statements from January 1, 2018 to the present." Baehr-Jones Decl., Exhs. 6-7, at 5.

- Request for Production No. 11 ("RFP #11"), served on Justin Jenkins March 14, 2024, requesting, "All bank statements from January 1, 2018 to the present." Baehr-Jones Decl., Exh. 10, at 5.

3

- Request for Production No. 14 ("RFP #14"), served on Karl Turner on March 14, 2024, requesting, "All bank statements from January 1, 2018 to the present." Baehr-Jones Decl., Exh. 5 at 5.

- Request for Production No. 1 (RFP #1), served on Jenkins on May 15, 2024, requesting, "All receipts for purchases and/or sales over $1,000 YOU made on Facebook Marketplace for the relevant time period." Baehr-Jones Decl., Exh. 11 at 4.

- Request for Production No. 2 ("RFP #2"), served on Defendant City on December 21, 2023, requesting, "All DOCUMENTS REGARDING SEAN CHRISTOPHER WILLIAMS, including but not limited to, recordings, incident reports, statements, and inter- or intra- departmental COMMUNICATIONS." Baehr-Jones Decl., Exh. 12, at 3.

Defendants Turner, Peters, Sparks, and Jenkins refused to produce anything responsive to RFP #7 and Rog #9. Baehr-Jones Decl. ¶ 6. All Defendants objected to producing complete bank statements, and to date, Plaintiffs have received no financial records from any of the Defendants. Baehr-Jones Decl. ¶ 7. Defendants provided incomplete responses to Rog #1 and Rog #2. *See* Baehr-Jones Decl., Exhs. 13-16. Finally, Defendants Jenkins produced incomplete responses to RFP # 1, failing to produce any Facebook Marketplace receipts for sales of his assets. Baehr-Jones Decl. ¶ 8.

Plaintiffs have engaged in extensive meet and confers regarding Defendants' failure to produce complete financial records in response to the above requests and interrogatories. Additionally, Plaintiffs requested Defendant City produce the records of Ball's real estate deal with Williams in response to RFP #2. To date, Defendants have either refused to produce the relevant documents, produced incomplete responses, or offered only excerpted or time-limited records. Baehr-Jones Decl. ¶ 9.

As set forth below, the allegations and discovery obtained thus far in this case support the relevance of the above requests. The Court should therefore order Defendants to comply immediately and completely with the above requests and interrogatories.

4

## B. The Alleged Extortion Scheme Involved Payments to JCPD Officers

Plaintiffs have alleged that Defendant Toma Sparks and other JCPD officers engaged in an extortion scheme of Sean Williams and his company, Glass and Concrete Contracting LLC ("GCC"), through Female 4, taking cash from Female 4 in exchange for turning a blind eye to Williams' repeated sexual assaults of women and children in Johnson City. ECF 121, Second Amended Complaint ("SAC") ¶¶ 57-183, 311-66. The JCPD extortion scheme began around 2018 and continued until at least 2021. *See id.* ¶¶ 18-56. The allegations specifically state that Defendant Sparks received this money himself. *Id.* ¶ 63. With respect to the other Defendant JCPD officers, including Turner, Peters, Jenkins, Legault, and Higgins, the SAC alleges that they obstructed any investigation into Williams' sex trafficking venture <u>for the purpose of</u> covering up the extortion scheme. *Id.* ¶¶ 80, 87, 313-16.

Thus, the SAC alleges intentional and knowing misconduct on the part of <u>all</u> Defendant officers. The alleged motive for this obstructive conduct was to prevent the discovery of JCPD's corrupt extortion scheme to obtain cash from Williams. In other words—under this theory of the case—the officers were <u>all</u> motivated, either directly or indirectly, by money.[2]

## C. Bank Records and Deposition Testimony Corroborate the Extortion Scheme Allegations

As noted in a prior filing, *see* ECF 190, Plaintiffs obtained bank records for Williams' company, Glass and Concrete Contracting LLC ("GCC"), as well as for limited liability

---

[2] According to Higgins' deposition testimony, he was advised by Peters and others to take obstructive acts in the case of Female 8 and did not himself have knowledge of the larger scheme. (Baehr-Jones Decl., Exh. 17, Excerpts of Deposition Transcript for Brady Higgins ("Higgins Dep."), 114:19-25; 115:1-10; 102:17-25; 103:1-19.) While this tends to show Higgins had a minimal/unwitting role in the conspiracy, it further supports Peters was acting knowingly and intentionally to obstruct the investigations into Williams by personally directing Higgins to take these actions while withholding relevant information from him. Accordingly, Plaintiffs do <u>not</u> seek to compel Higgins to produce bank and tax records.

5

companies associated with Female 4.[3] Plaintiffs' ongoing review of these records has revealed that Williams moved money out of GCC through transfers to accounts associated with other limited liability companies, including those controlled by Female 4, and, over the course of the conspiracy, provided weekly payments directly to Female 4, all of which are listed as "commercial cash" transfers in the bank statements.

For instance, it appears that Williams moved $850 on a weekly basis via checks from an account ending in ███ to an account ending in ███ which Female 4 and Williams both controlled. (*See, e.g.*, ECF 192 (sealed filing) at RENASANT001200-001263; RENASANT000141.) The transfers were noted in the bank deposit slips as "for Female 4" (listing her true name) with a note stating "member draw" on several of the payments. (*See, e.g.*, *id.* at RENASANT001246.) The transfers were made as "commercial cash." This pattern of approximately $850/week payments continued over the course of the alleged conspiracy, with over $35,000 withdrawn by Female 4 in "commercial cash" between March and December 2020 alone. This evidence corroborates some of the facts alleged in the SAC concerning the nature and timing of the extortion scheme. *See* SAC ¶ 63. (Female 4 made "forged owner's draws" to access the cash to pay off Sparks and other JCPD officers on a weekly basis).

Notably, during her deposition, Female 4 could not provide any explanation for the work she performed for GCC during this time to justify the regular transfer of funds other than "holding the license." Baehr-Jones Decl., Exh. 19, Deposition of Female 4 ("Female 4 Dep."),

---

[3] Through discovery, Plaintiffs have also learned that Williams opened multiple bank accounts in his name, as well as in GCC's name, with different financial institutions, including one account that was shut down on suspicion of money laundering. (Baehr-Jones Decl., Exh. 18.) Plaintiffs have served additional subpoenas to obtain these bank records, as well as to track the money Female 4 moved out of Renasant bank accounts which she controlled. Plaintiffs are in the process of reviewing additional responses.

6

96:22-25; 97:1-9. She also provided inconsistent testimony regarding her level of involvement

with GCC's finances during the relevant time period, first stating she had no control over the

company's finances, and then admitting—when confronted with bank documents showing her

signature on company checks and transfers—to having access to the accounts.[4] *Compare id.* at

124:22-25; 125:1-3 ("I wasn't signing checks or anything"; ") *with id.* at 128:4-25; 129:1-25;

130:1-25; 131:1-16 ("Q: But you're the one authorizing that movement [of funds?] A: Yes."); *see*

*also id.* at 73:5-25; 74:1-25; 75:1-11.

In fact, the bank records show Female 4 maintained control of GCC bank accounts

throughout the time of the conspiracy and then took over the accounts after Williams absconded.

Records show, for example, that Female 4 opened a new account doing business as ("DBA")

GCC on April 26, 2022, which listed only her as the signatory. (ECF 192 at

RENASANT000010.)[5] She then moved funds out of GCC's old account into the new one which

only she controlled. Once funds were in the new account, she began withdrawing large amounts

in cash, appearing to structure withdrawals of $10,000 over several weeks in June 2022.

---

[4] The bank records also show additional large "commercial cash" transfers from the same account (███), with over $200,000 being withdrawn in 2020 alone. Many of these transfers move money to other limited liability companies ("LLCs"), a method of transferring funds that may have enabled illicit payments and money laundering. Additional records for Skyline Restoration and Manufacturing LLC, for example, show money transferred into Skyline from GCC, as well as large sums withdrawn in cash, or through personal checks, each month during the timeframe of the conspiracy. *See, e.g.*, Baehr-Jones Decl., Exh. 20 (filed under seal), at 11 ($5,000 withdrawn in cash on June 1, 2018), 20 ($3,606 withdrawn in cash on July 13, 2018), 43 ($1,300 in cash on September 28, 2018). Plaintiffs are continuing to subpoena additional bank records for LLCs associated with Williams and GCC to trace all the funds.

[5] Female 4 also offered inconsistent testimony on this point, first claiming that there was no "DBA" entity for GCC, and afterwards admitting the DBA entity existed, but only for purposes of the new bank account. *Compare* Female 4 Dep. at 112:11-12 ("There was no DBA set up.") *with id.* at 113:5-7 ("Q: And it's a DBA, correct? A: On banking documents, yes, but it wasn't like an actual company or anything.").

7

Female 4 also moved funds through a shell company which she opened on April 21, 2022, Southern Construction and Consulting LLC. Female 4 Dep. at 267:8-15. The bank account for this LLC had minimal activity until August 29, 2022, when $97,190 was deposited, only for the entire amount to be drained by September 13, 2022, leaving a balance of $46. The account shows no further activity until it was closed in March 2023. When asked during her deposition what work Southern Construction performed during this time to justify the $97,190 deposit, Female 4 could not describe what work she performed other than "consulting," and further testified there would be no invoices, receipts, or tax records for the company's work, despite over $97,000 moving through the company in a one-month period.[6] Female 4 Dep. at 71:17-24; 72:5-11; 147:21-25; 148:1-25; 149:1-25; 150:1-25; 151:1-10.

The timing of these transfers out of GCC into accounts controlled by Female 4 is significant. During her deposition, Female 4 testified that "Kevin Peters" called her on March 7, 2022, purportedly to alert her that Williams was a fugitive. Female Dep. at 106:13-25; 107:7-8. The timing of this call makes no sense, however, since Williams had already been on the lam for ten months by then. When pressed during the deposition, Female 4 could not provide any reasonable explanation for why Peters would have called her in March 2022 to tell her that Williams was a fugitive. *Id.* at 107:11-13. After the call with Peters, Female 4 began taking steps to liquidate Williams' assets, opening the new account in her name only and then transferring funds out of the old GCC account. There is also evidence that JCPD provided protection to Female 4 during this time when she grew concerned about Williams intervening. In June 2022,

---

[6] It appears Williams and Female 4 may have been using Skyline's accounts to move money to disguise payments to themselves or to make cash withdrawals. For example, in July 2022—the month before Female 4 transferred $49,345 to Skyline—Skyline issued a $25,000 check to Female 4. Exh. 20, at 478.

Female 4 then withdrew large amounts in cash from the new GCC accounts, taking out nearly $30,000 in cash in a two-week window.

Female 4 attempted to walk back her testimony concerning the phone call with Peters—another sign that this call was suspect and not for legitimate purposes. After a break in the deposition, Female 4 claimed she was no longer sure that it was Peters and—incorrectly—asserted that Plaintiffs' counsel had said his name first. In fact, Plaintiffs' counsel had never stated Peters' name. The change in her testimony is also suspicious given that Female 4 appeared to have a very clear memory of the phone call during her initial testimony. Female 4's repeated changes to her testimony tend to show that her initial answer was not only the truthful one, but that she realized how incriminating it might be for Peters that she had been contacted by him then. *See* Female 4 Dep. at 157:1-19;178:18-25; 179:1-22; 183:5-11.

In sum, bank records and deposition testimony tend to corroborate Plaintiffs' allegations regarding the movement of funds out of GCC to Female 4, in ways that do not appear to be explained by legitimate business activity. Additionally, further evidence suggests that Peters and possibly other JCPD officers may have benefited from Female 4's liquidation of GCC assets which began in April 2022 and continued through the summer of 2022.[7] All of this further supports that evidence of the corruption scheme is likely to be found in Defendants' financial records.

---

[7] Defendant City has produced Renasant Bank records for Williams and GCC for the years 2016-2022, which were inexplicably in the custody of JCPD in 2022. Counsel for the City has represented to Plaintiffs' counsel that the City cannot find the subpoena that would have resulted in JCPD receiving these records. Baehr-Jones Decl. ¶ 11. It remains unexplained why or how JCPD came to have six-years' worth of Williams' bank records in 2022.

9

### D. Corruption Scheme Broader Than Initially Known

As the above tends to show, the corruption scheme appears to be more extensive than what was initially alleged in the SAC. As Plaintiffs have obtained evidence in discovery, it appears that JCPD may have coordinated with Female 4 in liquidating Williams' assets in 2022. Additionally, Plaintiffs learned during the deposition of City Manager Cathy Ball that she also may have attempted to benefit financially from Williams around the same time. Specifically, Ball admitted that she was in contract to purchase Williams' penthouse apartment, 200 E. Main Street, Unit 5, in April 2022. (Baehr-Jones Decl., Exh. 22, Deposition of Cathy Ball ("Ball Dep."), 127:17-25.) She negotiated the off-market sale with a real estate agent—and a lawyer—for a purchase price of $416,000, an amount that was well below the market value for the apartment. *Id.* 132:21-25; 133:1-2 (According to Washington County tax records, when Unit 5 was listed in 2022, it was offered at $725,000, and ultimately sold for $800,000 in May 2022, meaning Ball was offered a nearly half-price offer in her off-market purchase in April 2022. (Baehr-Jones Decl, Exh. 23.)) Plaintiffs have requested the records for this contract to understand how Ball came to negotiate this off-market sale with Williams and the details of their contract.[8]

---

[8] Ball claimed during her deposition that she did not know who Williams was when she negotiated this off-market purchase, and only realized he was a fugitive during closing when Williams did not appear in person to finalize the sale. Ball Dep. at 128:5-10. This explanation defies common sense, however, and tends to conflict with her later testimony. Ball testified she lived in downtown Johnson City in a building across the street from Williams' apartment since at least December 2021. *Id.* 126:7-15. As City Manager, she also oversaw the police department. By April 2022, Williams had been the most wanted fugitive in the City for nearly a year; a City employee (Dahl) had been terminated for reasons connected with Williams; and nearly everyone in Johnson City knew about the woman who had fallen from Williams' penthouse apartment window. In fact, Ball admitted she also knew about this incident but had not connected it with anything else about Williams. *Id.* 132:7-20. Moreover, Ball requested Defendant Karl Turner run a criminal check on the neighborhood around Williams' apartment before she closed the deal. *Id.* Her testimony was then inconsistent concerning whether she and Turner discussed Sean Williams: "Q: When Karl Turner ran this report for you on April 6th, 2022, were there any

Based on what Plaintiffs are obtaining through discovery, it is even more urgent that Plaintiffs have access to Defendants' financial records. Not only has the evidence corroborated what Plaintiffs alleged in the SAC, but deposition testimony has revealed additional instances where Defendants—and even the City Manager—stood to benefit from financial dealings Williams and/or his companies.

### E. At Least Two Defendants' Responses to Interrogatories Tend to Show Asset Purchases that Exceed Legitimate Income Sources

As outlined in a previous filing, Defendant Jenkins' responses to Plaintiffs' interrogatories tend to show a series of large asset purchases during the relevant time period of the conspiracy. In 2021, he purchased several acres of land in a wealthy suburb of Johnson City and began construction on a brand-new home. Construction on the property was finished in July 2023. (Baehr-Jones Decl., Exh. 16, at 4.) Beginning in 2020, Jenkins also purchased three RVs and a speedboat, totaling over $73,500. *Id.* at 1-2. These purchases may have been an effort to launder cash obtained through the conspiracy. Jenkins states in his response to Plaintiffs' interrogatory that he took loans of approximately $27,000, $28,500, and $18,000 from Eastman Credit Union and Appalachian Community Federal Credit Union to make several of these purchases. *Id.* He then states that he sold one of the RVs and the speedboat on Facebook Marketplace but does not recall any details of the sales. *Id*. (Plaintiffs have requested receipts for these purchases, but thus far, have received no documents showing Facebook Marketplace sales. Baehr-Jones Decl. ¶ 10.) It is possible that Jenkins used the ill-gotten cash to repay the loans on the RVs, thereby making it appear that the cash came from selling the RVs on Facebook

---

specific discussions about Sean Williams? A: There were some -- I don't recall." *Id.* 133:7-10. Thus, it defies reason and common sense—and tends to conflict with her testimony concerning her conversations with Turner—that Ball had no idea who Williams was in April 2022.

Marketplace, when in fact, he was depositing the cash obtained from the conspiracy and keeping the assets.

For another sale, Jenkins states that he sold the RV he obtained with the $28,500 loan to Crowder RV Center. Documents for this sale obtained by Plaintiffs from Crowder RV, however, show that Jenkins sold the RV one year later for the pay-off amount of $6,914.23 plus $85.77, or $7,000 total, $21,500 less than the original loan amount. *See* ECF 205-4 (Redacted Copy of Crowder RV Records); Exh. 16 at 1-2. Thus, Jenkins could have repaid the full amount of the loan in part with ill-gotten cash, thereby laundering the cash through this transaction. Without Jenkins' bank records, and without any of the receipts for these purchases and sales, however, it is not possible to prove this.

Defendant Jeff Legault also lists purchases of

 (Baehr-Jones Decl., Exh. 32, at 1.)

(*Id.* at 2.)

In sum, responses from both Jenkins and Legault suggest that each Defendant made large asset purchases that may have exceeded what would have been available from legitimate sources of income. For Jenkins, his use of loans to purchase assets which were then sold, including at least one for significantly less value, may have been a method of laundering cash received from the conspiracy. Many questions remain about the nature and legitimacy of these transactions, which is precisely why Plaintiffs require Defendants' bank records.

The other Defendants have failed to respond to Plaintiffs' Interrogatories completely, so Plaintiffs cannot assess their total asset purchases over the relevant time period. Defendant Peters, for example, objected to Plaintiffs' Interrogatory seeking information for asset purchases over $10,000, providing limited information without including any monetary value for the listed

12

assets, so it remains unclear whether he has made large purchases during the alleged conspiracy. (Baehr-Jones Decl., Exh. 15, at 4-5.) Defendant Turner similarly did not list all monetary amounts for purchases—specifically, he failed to disclose the amount financed for his wife's car—and objected to the Interrogatory asking for all titles he holds for assets over $10,000, providing none. (Baehr-Jones Decl., Exh. 13, at 3.) Defendant Sparks also objected to both Interrogatories concerning assets over $10,000 and provided only those assets based on the "best of his recollection." (Baehr-Jones Decl., Exh. 14, at 2-3.) Thus, for these Defendants, it is impossible to know whether there are large assets purchases during the relevant time period without access to their bank records.

### F. Newly Discovered JCPD Audit Trails Show Intentional Concealment and Destruction of Evidence on the Part of Defendants

As noted above, Plaintiffs have obtained evidence in discovery that tends to corroborate the extortion scheme allegations. Plaintiffs have also obtained additional documents from Defendant City in discovery that tend to support knowing and intentional conduct on the part of Defendant Peters and Sparks in obstructing the investigations into Williams. This evidence further supports the instant motion because evidence of intentional obstructive conduct—i.e., criminal conduct—makes it more likely that Defendants had a motive to conceal the extortion scheme and their ill-gotten cash.

An excellent source of evidence for investigating police misconduct are audit trails. (Baehr-Jones Decl., Exh. 24, Deposition of Eric Daigle ("Daigle Dep."), at 247:19-25; 248:1-2.) Audit trails are documents that police reporting systems generate that show which officers have viewed, printed, or edited a police report, as well as the date and time of each activity, among other information. *Id.* They are useful in determining whether there has been misconduct on the part of an officer because they can show an officer taking steps to cover up what happened,

13

either by editing another officers' case notes, accessing reports for cases to which they are not assigned, or accessing reports after they have been removed from a case. *Id.* The JCPD audit trails for Williams' sexual assault investigations show that <u>all</u> the above happened here.

For instance, the audit trails show Defendant Peters actively monitored the case of one Williams' victim which he testified to having no knowledge about and to which he was not directly assigned. Peters viewed the "incident case notes" in the case of Female 2, who reported her sexual assault by Williams on June 2, 2020, four times the same day she reported her assault, making several edits. (Baehr-Jones Decl., Exh. 25.) He then viewed the notes six more times on June 9, again on June 11, and again on June 16, 2020. (*Id.*) The JCPD reports for Female 2, however, do not show that Defendant Peters had any role—or at least, no legitimate role—in the investigation of her sexual assault. (Baehr-Jones Decl., Exh. 26 (noting only that Peters provided the correct phone number for Female 2).) ██████████████████

██████████████████████████████████████████

████████ (Baehr-Jones Decl., Exh. 29, at 23.)

At the same time that Peters repeatedly accessed Female 2's report during June 2020, the audit trails for B.P.'s case file show Peters <u>also</u> viewed her records. (Baehr-Jones Decl., Exh. 27.) This is significant because it shows that Peters was not only monitoring Female 2's case, but he was also aware that another Williams' victim had reported her sexual assault just six months prior, and he was connecting the two incidents. Specifically, on June 9, 2020, Peters viewed the "main narrative case notes" and "B Richardson case notes" in B.P.'s case. (*Id.*) This is also notable because by this time—at least according to existing JCPD records—B.P.'s case had long been inactive: the case notes show the investigating officer requested to close her case on November 27, 2019, and no further investigatory work was done between then and June 2020.

14

Thus, there is nothing in B.P.'s file which suggests that Peters had any reason to know about her case, let alone be familiar with the file or have a reason to view it.

The audit trails for Female 2's case ███████████████████████████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████
█████████████████████ (Baehr-Jones Decl., Exh. 29) In fact, from the time Investigator Dunn began working the case on June 3, the audit trails show Peters reviewed Female 2's file <u>eight</u> times and B.P.'s file as well, all before Dunn requested to close the case on June 24, 2020. Thus, even though Peters was aware by then of two similar reports of sexual assault by the same perpetrator, Williams, within a six-month period, and was actively monitoring both cases, he took no action to further either of the investigations. Instead, Female 2's case was closed within a month of JCPD receiving her report. Notably, Daigle testified that his review of Female 2's case file showed JCPD's mishandling of her case was "<u>egregious</u>." Daigle Dep. 217:17-25; 218:1-12.

Similarly, during the investigation into Female 8's report of rape from July 2022 through March 2023, Defendant Peters viewed the reports of multiple other Williams' victims, including B.P. and Female 2, despite those cases having long been closed or inactive (Baehr-Jones Decl., Exhs. 25 and 27.) Ultimately, JCPD would also close Female 8's case on March 16, 2023, again with no charges having been brought. (Baehr-Jones Decl., Exh. 34.) And again, the audit trails show Peters was monitoring the case file, as well as viewing old Williams' reports, all throughout the time that Female 8's case was open. (Baehr-Jones Decl., Exh. 35.) Significantly, there is nothing to indicate that Peters—the number two commanding officer in the Department by this point—would have any reason to be actively monitoring these police reports, and regularly viewing and printing them, especially since the investigations went nowhere. These audit trails,

15

combined with Peters' inaccurate testimony, suggest he was closely monitoring Williams' reports for an ulterior reason.

The audit trails also show destruction and/or concealment of evidence. For instance, the audit trail for B.P.'s case shows that Defendant Sparks edited the case notes for <u>another</u> officer involved in the investigation, JCPD Officer Bret Richardson, multiple times.[9] This is significant because Richardson's name has been removed from the case notes. In the case file for B.P. produced by Defendant City, there is no record that Officer Richardson authored any of the case notes. Instead, the "Officer ID" line on the case notes is now blank. (*See* Baehr-Jones Decl., Exh. 28, at 1.) Thus, it may be that one of Sparks' edits to the case notes was to delete the original investigator's name from the case file. This would have effectively concealed from Plaintiffs— and anyone else—the identity of the original investigating officer on B.P.'s case. In fact, the only reason Plaintiffs now know his identity is because of the audit trails.

Critically, there are material differences between what the victims recount happened and what ended up in the final versions of their reports. For example, B.P. is adamant that she wanted her case to be investigated and prosecuted. This is corroborated by her actions on the day of her sexual assault: she went straight from Williams' apartment to an urgent care and then a hospital where a rape kit was administered, and she submitted to a drug test which showed she had benzos in her system, a drug she never would have taken voluntarily. She also provided a written statement that day and gave her clothes to the police so they could be tested for DNA. And yet, Officer Richardson's case notes—or at least, the version of these notes that currently exists—

---

[9] Defendant Higgins testified that it would trouble him if someone else had edited his case narrative notes because, "That's putting stuff in there that I did not do." Higgins Dep. 123:9-18. Higgins further testified that he would never edit someone else's case notes. *Id.* Yet the audit trails show Sparks editing Higgins' case narrative notes, as well as other officers' notes, multiple times.

state that she did not return his phone calls and failed to show up for a scheduled interview. (Baehr-Jones Decl., Exh. 28.) The notes then show that he almost immediately requested for the case to be closed, even though the results of the rape kit were still pending. *Id.* In other words, the case notes are inconsistent with B.P.'s actions following her rape; B.P.'s memory of the events; and what would be required in an active rape investigation with pending evidence submitted for DNA testing. This tends to suggest that one reason Sparks might have deleted Richardson's name from the case notes is because these notes are not actually his but are instead Sparks' later edits which he made to justify what happened in B.P.'s case.

Similarly, Defendant Higgins' case notes for Female 8—which the audit reports show Sparks edited repeatedly—also omit material evidence. Female 8 told Defendant Higgins that she saw images on Williams' phone which depicted Williams' penis in the mouths of children.[10] *Id.* ¶ 54. Yet, Higgins' case narrative notes state only that Female 8 told him that she "observed several photos of Williams and what appeared to be children," omitting the critical fact that Female 8 had told him Williams was sexually assaulting the children. (Baehr-Jones Decl., Exh. 33.) Female 8 also told Higgins about specific minors whom she suspected Williams may have been targeting. Inexplicably, none of this material information ended up in his report. *Id.* Had Higgins acted on Female 8's statements, he likely would have been able to establish new probable cause to search Williams' digital devices, which were still in the custody of JCPD, and which Plaintiffs allege contained child sexual abuse material. Instead, JCPD did nothing and closed Female 8's case. *Id.*

---

[10] There is no dispute that she did, in fact, report this to Defendant Higgins as there is a video recording of this interview. Baehr-Jones Decl. ¶ 54.

Finally, the audit trails also show Defendant Sparks edited the files for victims B.P., Female 8, and Female 12, two months <u>after</u> he was removed from all Williams' investigations and instructed to stop working on Williams' cases. (Baehr-Jones Decl., Exhs. 25, 27, 35.) In fact, by August 2023, JCPD had been removed from <u>any</u> Williams' investigation. *See* ECF 221 at 12. Yet Sparks continued to edit the files of Williams' victims.

Thus, the evidence suggests that the edits which Sparks (and others) made to the victims' files were material, either justifying the improper closure of investigations into Williams or concealing critical evidence against him. The audit trails strongly support intentional and knowing obstructive conduct on the part of Sparks and Peters, and further corroborate the TVPA allegations regarding extortion and corruption, making it more likely that evidence of financial gain will be found through discovery of Defendants' bank records.

## LEGAL STANDARD

This Court has previously explained that "[t]he scope of discovery under the Federal Rules of Civil Procedure is traditionally quite broad." ECF 128 at 14 (quoting *Meredith v. United Collection Bureau, Inc.*, 319 F.R.D. 240, 242 (N.D. Ohio 2017)). Federal Rule of Civil Procedure 26(b)(1) ("Rule 26(b)(1)") provides that a party is entitled to take discovery of any matter that is relevant to the claim or defense of any party, even if not admissible itself, if such discovery is reasonably calculated to lead to admissible evidence. *F.T.C. v. Trudeau*, 2012 WL 5463829, at *4 (N.D. Ohio Nov. 8, 2012); Fed. R. Civ. P. 26(b)(1).

## ARGUMENT

As set forth above, Plaintiffs' allegations regarding the extortion scheme have already been borne out in discovery with evidence that Female 4 was accessing cash through transfers to shell companies in a manner strikingly similar to what is alleged in the SAC. *Compare* ECF 192,

at RENASANT001246 ("member draw") *with* SAC ¶ 63 ("owner draws"). There is also testimony evidence from both Female 4 and City Manager Cathy Ball potentially inculpating Defendant Peters, Ball, and other JCPD officers in efforts to benefit financially from the liquidation and sale of Williams' assets in 2022, and the audit trails show efforts to conceal and destroy evidence on the part of Peters and Sparks. Thus, evidence obtained in discovery has tended to support the most serious allegations in Plaintiffs' complaint which allege police extortion and obstruction.

To date, however, Defendants have failed to produce financial records in response to Plaintiffs' requests for production and have provided inadequate and incomplete responses to interrogatories requesting information on large asset purchases.[11] Because Defendants' financial records are relevant to the claims alleged in the SAC—namely, the extortion scheme and the conspiracy to cover-up any investigation into Williams, as alleged in Counts I-IV, pursuant to 18 U.S.C. §§ 1595, 1591(a), and 1591(d)—the Court should grant Plaintiffs' motion to compel and order Defendants (1) to produce the requested tax and bank statements, (2) to provide complete responses to the interrogatories relating to asset purchases over $10,000, and (3) order Jenkins to produce complete receipts for his Facebook Marketplace sales. Moreover, because Plaintiffs have expended over 10 hours of attorney time in bringing this motion, Plaintiffs ask for an award of attorneys' fees. This sanction is appropriate and necessary in order to deter Defendants from continuing to obstruct Plaintiffs' ability to conduct discovery in this case.

//

//

---

[11] As set forth below, Plaintiffs have engaged in a lengthy meet and confer process in an effort to obtain these records before seeking Court intervention.

## A. Defendants' Financial Records Are Relevant to Proving the TVPA Claims

Relevant evidence is defined in Federal Rule of Evidence 401 as evidence having "any tendency to make a fact more or less probable than it would be without the evidence." Fed. R. Evid. 401. "Relevancy is an extremely broad concept. Both the Supreme Court and the Sixth Circuit have noted that the standard set forth in Rule 401 is a liberal one." *United States v. Maike*, 613 F. Supp. 3d 991, 997 (W.D. Ky. 2020) (quoting *Hinkle v. Ford Motor Co*., No. 3:11-24-DCR, 2012 WL 4049477, at *1-2 (E.D. Ky. Sept. 13, 2012)) (citing *Churchwell v. Bluegrass Marine, Inc*., 444 F.3d 898, 905 (6th Cir. 2006)).

Here, Plaintiffs' request for Defendants' financial records in the form of tax records and bank statements more than meets the relevance standard of Rule 26(b)(1). Plaintiffs allege claims against <u>all</u> Defendants that involve knowing and intentional conduct. Specifically, Plaintiffs allege that Defendants participated in a conspiracy to cover-up JCPD's extortion of Williams through Female 4, by obstructing any investigation into Williams' sex trafficking venture. SAC ¶¶ 80, 87, 313-16, 143-83. Whether Defendants received cash from the alleged extortion scheme is relevant to their motive and intent to participate in the obstruction conspiracy. *See Roche Diagnostics Corp. v. Shaya*, 679 F. Supp. 3d 588, 600 (E.D. Mich. 2023) (income tax evidence showing defendant's economic benefit from fraud scheme admissible at trial to show motive); *see also United States v. Sutton*, 732 F.2d 1483, 1493 (10th Cir. 1984) ("Evidence that defendant falsely certified crude oil logically tended to show defendant's motive and intent to obstruct justice."); *United States v. Carmichael*, 685 F.2d 903, 910 (4th Cir. 1982) ("evidence of the conspiracy and actual vote buying would have been admissible against each defendant in separate trials for obstruction of justice to prove motive").

20

As alleged, Defendants' actions not only put their careers on the line but opened them up to potential criminal liability as well. Indeed, Counts I-IV, including Count III, alleging obstruction under § 1591(d), are part of the federal <u>criminal</u> code, and if proved true, Plaintiffs' allegations amount to criminal conduct. Evidence that Defendants were benefiting from their participation in the obstruction conspiracy explains <u>why</u> they would risk so much to engage in such misconduct and would be admissible at trial to prove motive and intent.

Nor does any privacy interest Defendants may assert justify withholding these documents from Plaintiffs in discovery. "As the Sixth Circuit has consistently recognized, there is no privacy interest in the financial affairs of an individual." *State Farm Mut. Ins. Co. v. Policherla*, 2009 WL 2170183, at *3 (E.D. Mich. July 20, 2009) (citing *Jenkins v. Rock Hill Local Sch. Dist.*, 513 F.3d 580, 591 (6th Cir. 2008) and *Overstreet v. Lexington–Fayette Urban County Gov't*, 305 F.3d 566, 575 (6th Cir. 2002). Any concern for Defendants' privacy can be adequately addressed through redactions or confidentiality designations pursuant to the protective order in this case.

As set forth above, discovery in this case so far has corroborated what Plaintiffs have alleged with respect to intentional and knowing misconduct. Female 4 moved money out of GCC accounts and into shell businesses in strikingly similar methods to what is alleged in the SAC. Bank records from Renasant Bank show that large amounts of money were being transferred through different limited liability companies, including Skyline Restoration and Manufacturing LLC and Southern Construction and Consulting LLC, and then withdrawn in cash or cashed checks—including regular amounts withdrawn from Skyline during the timeframe of the conspiracy. *See, e.g.*, Exh. 20. Moreover, Ball's testimony concerning her own real estate contract with Williams in April 2022, and Female 4's testimony concerning Defendant Peters' phone call in March 2022, suggest additional instances of extortion and public corruption beyond

what Plaintiffs initially alleged. Thus, Plaintiffs' requests for financial records are reasonable in light of the allegations in the case, as well as recent discovery which has corroborated Plaintiffs' allegations in the SAC. Contrary to Defendants' objections, Plaintiffs' requests are not intended to harass, nor are they unduly burdensome, but are reasonably calculated to obtain material evidence proving that the Defendant officers had a financial incentive to carry out acts of obstruction.

### B. Plaintiffs Have Exhausted the Meet and Confer Process

Beginning on March 8, 2024, Plaintiffs engaged in an extensive meet and confer process on their requests for Defendants' tax returns and bank records. (Baehr-Jones Decl. ¶ 10.) After several months of back and forth, on May 15, 2024, counsel for Defendant Sparks offered to produce limited and incomplete records, showing only deposits for a limited time window and monthly summaries of total withdrawals and deposits. *Id.* Counsel for Jenkins, Legault, and Higgins also offered to produce bank statements for a limited time window. *Id.* All other Defendants have refused to provide any financial records, including tax and bank records. *Id.*

Plaintiffs cannot agree to limited or excerpted bank records due to the complexity of proving that Defendants had access to funds above what was available from legitimate sources. Although Plaintiffs' counsel attempted to provide compromise offers during the meet and confer process—at one point offering to accept bank statements for a limited time period—counsel's review of the Renasant Bank records has demonstrated how critical it is to be able to view the totality of bank transactions and activity in order to understand how illicit funds are being laundered. Given the nature of the allegations—police corruption amounting to a criminal conspiracy—it is likely that Defendant officers used complex means to conceal and launder any ill-gotten funds. For example, Defendants may have made small deposits over a long period of

time to conceal large amounts of cash. Or Defendants may have borrowed from their banks to make what appear to be legitimate purchases, like financing a house or purchasing an RV, and then repaid those purchases with the ill-gotten cash. Without complete records for the full time period of the alleged conspiracy, it will be difficult—if not impossible—to uncover such efforts to conceal funds.

### C. An Award of Attorneys' Fees Is Necessary Here to Deter Future Noncompliance

Plaintiffs' counsel expended significant time attempting to work with defense counsel to obtain the financial records for Defendants through civil discovery. That process has resulted in Plaintiffs receiving <u>no</u> records thus far. Counsel then spent over 10 hours preparing this brief and the accompanying exhibits in order to compel production of Defendants' financial records. As set forth in the attached Declaration of Vanessa Baehr-Jones, the total in fees and costs incurred in bringing this motion is $9,375. Baehr-Jones Decl. ¶¶ 52-53, Exh. 30; *see United States v. Singh*, No. CR 4:21-cr-00123-HSG (EDCA), ECF 88 at 6 ("[T]he Court also finds reasonable the $750 hourly rate for Victim's counsel, an attorney with extensive federal and state experience prosecuting child exploitation cases who specializes in sex abuse cases in private practice.").

Attorneys' fees and costs are justified here under Federal Rule of Civil Procedure 37(a)(5)(A). If a motion to compel disclosure is granted or disclosure is provided after a motion to compel disclosure is filed, Rule 37(a)(5)(A) authorizes the Court "to require the party whose conduct necessitated the motion, and/or the attorney advising that conduct, to pay the movant's reasonable expenses incurred in making the motion, including attorneys' fees, <u>unless</u> the movant did not attempt in good faith to obtain disclosure before filing the motion, the opposing party's failure to disclose was substantially justified, or other circumstances make an award of expenses unjust." *Acker v. Workhorse Sales Corp.*, No. 06-CV-14467, 2008 WL 1902034, at *3 (E.D.

23

Mich. Apr. 28, 2008) (emphasis added). Whether and to what extent discovery sanctions are warranted are for the Court to decide in its discretion. *National Hockey League v. Metropolitan Hockey Club, Inc*., 427 U.S. 639, 642, 96 S.Ct. 2778, 49 L.Ed.2d 747 (1976); *Harmon v. CSX Transportation, Inc*., 110 F.3d 364, 366 (6th Cir. 1997).

As set forth in the attached Baehr-Jones Declaration, Plaintiffs' counsel has made repeated efforts to obtain complete responses to Plaintiffs' requests and interrogatories regarding Defendants' financial records. Defendants' failure to respond was not substantially justified as these materials are plainly relevant to Defendants' motive and intent in participating in the alleged cover-up. Nor would an award of fees be unjust here. To the contrary, Plaintiffs are only requesting fees now—after there has already been extensive litigation regarding discovery in this case—because it has become clear that Defendants will be disincentivized to provide timely and fulsome responses to requests otherwise.

Unfortunately, Plaintiffs anticipate having to file additional motions to compel to obtain other outstanding discovery. This includes Defendant City's failure to search Defendant Turner's computer for responsive discovery (*see* Baehr-Jones Decl., Exh. 31); Defendant City's refusal to use an outside vendor, or in the alternative conduct an in-person, attorney-led search, to review Defendants' JCPD-issued cell phones for responsive materials (instead, the City used JCPD officer David Hilton, a potential co-defendant, to conduct extractions from Turner's and Peters' cellphones)[12] (*id.* ¶ 13); all Defendants' current refusal to produce their cellphone call logs, which Plaintiffs agreed to allow them to subpoena themselves (rather than Plaintiffs' counsel

---

[12] Hilton supervised Defendant Sparks on the Williams' cases. Given the allegations that JCPD officers engaged in a conspiracy to obstruct justice, including concealing and destroying records, it is grossly inadequate to task one of the officers potentially involved in the scheme with conducting the extraction of Turner and Peters' cellphones for responsive discovery.

issuing subpoenas to the cellphone providers directly) only for defense counsel to refuse to produce the call logs for the time periods requested by Plaintiffs (*id.* ¶ 14); and Defendants' failure to produce complete cell phone communications for Defendants Turner, Legault, and Higgins, all of which are <u>still</u> outstanding (*id.* ¶ 15).

Additionally, there is now evidence that Defendant City improperly withheld discovery in this case—including Plaintiffs' own case files—in coordination with District Attorney Steven Finney. *See* ECF 221 at 13-15. It was only once this Court denied the City's motion to quash the subpoena to Eric Daigle that the City began to produce records to Plaintiffs on March 19, 2024—ten months into the case and after repeated requests by Plaintiffs for their own police reports. *Id.* Plaintiffs have had to litigate to obtain even the most basic discovery in this case, yet this is the first time Plaintiffs' counsel has requested fees. Plaintiffs request this relief now in order to deter further noncompliance by Defendants and to ensure that this case can progress through discovery in a timely manner.

## CONCLUSION

For the foregoing reasons, Plaintiffs request the Court (1) order Defendants Turner, Peters, Sparks, Jenkins, and Legault to produce the records requested in Plaintiffs' Requests for Production and Interrogatories, *see supra* pages 3-4; (2) order Defendant City to produce the real estate contract between Cathy Ball and Sean Williams; and (3) award attorneys' fees and costs of $9,375.

Dated: June 27, 2024

Respectfully submitted,

Advocates for Survivors of Abuse PC

*/s/ Vanessa Baehr-Jones*
Vanessa Baehr-Jones CABN # 281715
*Pro Hac Vice*
Advocates for Survivors of Abuse PC
4200 Park Boulevard No. 413

Oakland, CA 94602
(510) 500-9634
vanessa@advocatesforsurvivors.com

/s/ Julie C. Erickson
Julie C. Erickson (California Bar # 293111)
Elizabeth A. Kramer (California Bar # 293129)
Kevin M. Osborne (California Bar #261367)
*Pro Hac Vice*
Erickson Kramer Osborne LLP
44 Tehama St.
San Francisco, CA 94105
415-635-0631
julie@eko.law
elizabeth@eko.law
kevin@eko.law

HMC Civil Rights Law, PLLC

/s/ Heather Moore Collins
Heather Moore Collins (# 026099)
Ashley Shoemaker Walter (#037651)
7000 Executive Center Dr., Suite 320
Brentwood, TN 37027
615-724-1996
615-691-7019 FAX
heather@hmccivilrights.com
ashley@hmccivilrights.com

Attorneys for Plaintiffs and Proposed Class

## CERTIFICATE OF SERVICE

I HEREBY certify that a copy of the foregoing has been filed and served via the court's

electronic filing system on June 27, 2024 to counsel of record:

| | |
|---|---|
| K. Erickson Herrin<br>HERRIN, McPEAK & ASSOCIATES<br>515 East Unaka Avenue<br>P. O. Box 629<br>Johnson City, TN 37605-0629<br>lisa@hbm-lawfirm.com<br>sandy@hbm-lawfirm.com<br><br>Emily C. Taylor<br>Maria Ashburn<br>WATSON, ROACH, BATSON &<br>LAUDERBACK, P.L.C.<br>P.O. Box 131<br>Knoxville, TN 37901-0131<br>etaylor@watsonroach.com<br>mashburn@watsonroach.com<br><br>*Attorneys to Defendants, Johnson City, Tennessee, Karl Turner, in his individual and official capacities, Captain Kevin Peters, in his official capacity, and Investigator Toma Sparks, in his official capacity*<br><br>Jonathan P. Lakey<br>Burch, Porter, & Johnson, PLLC<br>130 N. Court Ave.<br>Memphis, TN 38103<br>901-524-5000<br>jlakey@bpjlaw.com<br>mchrisman@bpjlaw.com<br><br>*Attorney to Defendant City of Johnson City, Tennessee* | Daniel H. Rader III<br>Daniel H. Rader IV<br>MOORE, RADER & YORK PC<br>46 N. Jefferson Avenue<br>P.O. Box 3347<br>Cookeville, TN 38502-3347<br>danrader@moorerader.com<br>danny@moorerader.com<br>andre@moorerader.com<br><br>*Counsel for Kevin Peters in his individual capacity*<br><br>Kristin Ellis Berexa<br>Ben C. Allen<br>FARRAR BATES BEREXA<br>12 Cadillac Drive, Suite 480<br>Brentwood, TN 37027-5366<br>kberexa@fbb.law<br>ballen@fbb.law<br>jdowd@fbb.law<br>msutton@fbb.law<br><br>*Counsel for Toma Sparks in his individual capacity*<br><br>Keith H. Grant<br>Laura Beth Rufolo<br>Robinson, Smith & Wells, PLLC<br>633 Chestnut Street, Suite 700<br>Chattanooga, TN 37450<br>kgrant@rswlaw.com<br>lrufolo@rswlaw.com<br>awells@rswlaw.com<br><br>*Counsel for Justin Jenkins in his individual capacity, Jeff Legault in his individual capacity and Brady Higgins in his individual capacity* |

*/s Julie C. Erickson*
Julie C. Erickson

27