IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE
GREENEVILLE DIVISION

**B.P., et al.,**

**Plaintiffs,**

**v.** **No: 2:23-cv-00071-TRM-JEM**

**CITY OF JOHNSON CITY, TENNESSEE, et al.,**

**Defendants.**
______________________________________/

**PLAINTIFFS' RESPONSE IN OPPOSITION TO STEVEN FINNEY'S MOTION TO QUASH SUBPOENAS AND FOR PROTECTIVE ORDER**

District Attorney General Steven Finney moves to quash subpoenas which seek highly relevant discovery. Because Finney waived any privileges that might otherwise apply when he sat for an interview with Defendant Johnson City's retained expert, Eric Daigle, answered questions pertaining to matters at the heart of this lawsuit, and Daigle's findings were then made public by Defendant City, the Court should deny the motion. The Court should also decline to allow Finney to further misuse the investigatory privilege to impede discovery in this case. Finally, Finney cannot now claim the protections of the "apex doctrine" having already sat for an interview with Defendant's expert; fundamental fairness precludes such an outcome.

## RELVANT FACTUAL BACKGROUND

### I. Finney Coordinates with Cathy Ball to Delay Any Inquiry into Corruption Allegations against JCPD

On June 23, 2022, former federal prosecutor Kateri Dahl filed her civil rights lawsuit against Defendant City of Johnson City and former Johson City Police Department ("JCPD") Chief Defendant Karl Turner. *See Dahl v. Turner Dahl v. Turner*, 2:22-cv-00072-KAC-JEM, ECF

15 (“the Dahl Complaint”). In her suit, Dahl alleged that Turner and other JCPD officers had conspired to terminate her employment after she pushed them to investigate sexual assault allegations against Sean Williams which numerous women had reported to JCPD. *Id.* ¶¶ 1-2. Instead of investigating these reports, however, JCPD officers inexplicably had taken no action despite several similar cases in which women recounted being drugged and raped by Williams in his downtown loft. *Id.* ¶¶ 31, 38-40. Turner had also dismissed a “Raped” list found during a search of Williams’ loft, claiming to Dahl—without any basis—that the sex may have been “consensual.” *Id.* ¶¶ 25, 35. When Dahl pushed for JCPD officers to follow up on the rape allegations, Turner corruptly manufactured a pretense to have her fired. *Id.* ¶¶ 44, 46, 80-88. These were serious claims of corruption. If proved true, it would mean that JCPD had actively protected a rapist while he terrorized the women of Johnson City.

Instead of immediately opening an internal affairs (“IA”) investigation into these allegations, however—which would have been industry standard practice responding to claims of corruption (*See* Decl. of Vanessa Baehr-Jones (“Baehr-Jones Decl.”), Exh. 1, Deposition of Eric Daigle (“Daigle Dep.”), 224:15-25; 225:1-5)—the City waited. (Baehr-Jones Decl., Exh. 2, Deposition of Cathy Ball (“Ball Dep.”) 84:11-25; 85:1-25.) Specifically, City Manager Cathy Ball waited two months to do anything to investigate these claims until the end of August 2022, when the City engaged in a letter exchange with the newly-elected District Attorney General (“DA”) for the First Judicial District, Steven Finney.[1] On August 24, 2022, Ball sent a letter to

[1] By August 2022, Ball had a personal motive to avoid any public corruption inquiry into Sean Williams. Just four months earlier, in April 2022, Ball had negotiated the off-market purchase of Williams’ penthouse loft, Unit 5, on 200 E. Market Street, Johnson City—the same apartment where Williams had raped over 52 women and sexually exploited multiple children. Ball was in contract to buy the apartment for $416,000, a price that appears well below its market value, at least according to public real estate websites and estimates. Ball Dep. 128:15-

Caasse 2:223-cv-000071-TRM-JEM Doocumeent 1238-161 Filed 06/23/24 Page 2 of 27 PageID #: 6346

the DA's office, requesting "either your office or the Tennessee Bureau of Investigation ("TBI") conduct a preliminary investigation to determine whether there is a basis to open a public corruption investigation based on the evidence in the possession of Attorney Dahl and her ability to identify Johnson City officers she is accusing of corruption." (Baehr-Jones Decl., Exh. 3.) Although she addressed this letter to the former DA, Kenneth Baldwin, it was received by Finney.[2] Thus, it appears to be no accident that on Finney's first day on the job as DA—September 1, 2022—he wrote back to Ball stating, "there is no mechanism for a preliminary investigation" and that he did not have "enough information to request a TBI investigation at this point." Baehr-Jones Decl., Exh. 4. Ball promptly forwarded his letter to the City Commissioners, informing them that "DA Finney . . . does not have enough information to move forward on an investigation." Baehr-Jones Decl., Exh. 5. She also informed the Commissioners that the local media would be reporting on Finney's letter that night. *Id.*

As Eric Daigle, an expert on police practices hired by the City, noted in his report, and reiterated during his deposition, Finney was incorrect in his letter that "there is no mechanism for a preliminary investigation." *See* ECF 96 (Daigle Report), at 32; Daigle Dep. 224:15-17. In fact, Ball should have initiated an IA investigation immediately upon learning of Dahl's allegations of police corruption. *Id.* Ball admitted in her deposition that, as City Manager, she has the power to

---

21; Baehr-Jones Decl., Exh. 6 (information from Realtor.com stating this unit sold on May 27, 2022, for $800,000); Exh. 7 (estimate on Zillow.com showing apartment valued at $708,200). (Plaintiffs are in the process of requesting official records from Washington Count regarding the final sale of the unit and have requested the records of Ball's contract with Williams from Defendant City.) Ultimately, Ball testified, the sale did not go through. Ball Dep. 129:10-13.

[2] Ball claimed she did not know whether counsel for the City, Erick Herrin, had been in contact with Finney regarding the letter exchange prior to September 1, 2022. Ball Dep. 93:13-20 ("Q: Okay. Do you know if Mr. Herrin talked to Mr. Finney about this letter? MS. TAYLOR: Object to the form of the question. That's ridiculous. That's attorney/client confidential information. Q (BY MS. COLLINS): Do you know? A: I do not.").

open IA investigation, but cited no example of where she had. *See* Ball Dep. 30:8-13. IA investigations are crucial for police accountability: as Daigle explained, "the big picture is that you have an obligation as a department to investigate misconduct and deal with the misconduct." Daigle Dep. 225:15-17. Yet, Ball—with Finney's letter of approval—continued to do nothing in response to the corruption allegations against JCPD.

## II. Daigle Interviews Finney as Part of his Audit of JCPD Practices and Policies Concerning the Handling of Crimes of Sexual Violence

On July 28, 2022, the City hired Daigle to conduct an independent audit of JCPD's handling of crimes of sexual violence. Baehr-Jones Decl., Exh. 8. The City provided Daigle with access to police files for cases of sexual violence between the years 2018 and 2022, and allowed Daigle to interview JCPD investigators and others to assist in conducting his review of JCPD's policies and practices. Daigle Report at 4-5. The resulting report was damning. Daigle found that JCPD's practices with respect to investigating crimes of sexual violence did not meet constitutional standards for policing, and specifically, that JCPD exhibited gender bias in failing to find reports of sexual assault "convince[ing]" enough to merit investigation. *Id.* at 21, 24, 33-35. Crime scenes were never searched; victims were discouraged from coming forward; perpetrators were never interviewed; and cases were improperly closed. *See generally id.*

Of particular importance to the instant motion to quash, Daigle found "[the] DA [was] not innocent." Baehr-Jones Decl., Exh. 9, at CITY-0139839; *see also* Daigle Dep. 263:15-17 ("Like this is not -- this may not just be a JCPD issue. It may actually be a D.A. issue, too.") Specifically, one of Daigle's findings concerned the improper closure of cases of sexual violence using the "exceptional circumstances" justification. Although there were specific requirements for closing a case using this justification, JCPD officers did not appear to have met those requirements, even though a high number, 161 out of 323 cases or 49.8%, were closed using this

means. Daigle Report at 26-28. Daigle found that JCPD officers had often discussed these closures verbally with attorneys in the DA's office but that there was little to no proper documentation to support the closures. *Id.* at 29 ("The challenge for JCPD is that there is no evidence, verbal or documentation, of what specifically was conveyed to the prosecutor."). Similarly, Daigle found that cases appeared to be closed based on a victims' purported reluctance to move forward with the case, even though there was typically no documentation in the case file supporting this, such as a signed form from the victim. *Id.* at 29-31; Daigle Dep. 112:25; 113:1-18. These closures were done in coordination with the DA's office, often in verbal exchanges with no subsequent documentation. Daigle Report at 29.

The closures based on purported victim reluctance were particularly concerning given another finding in Daigle's report that JCPD's practices had the effect of discouraging victim participation. *Id.* Thus, a victim could face bias and discrimination in reporting her assault, endure discouraging and retraumatizing police practices while being interviewed, and then have no input into a decision between JCPD and the DA's office to close her case based on her purported reluctance—all of which was happening without any documentation. *See id.* at 14-24.

Having reviewed JCPD case files and found the above concerning practices, Daigle requested to interview Finney as part of his audit. Daigle Dep. 122:5-6. Finney participated voluntarily and the two met in person on December 9, 2022. *Id.* 121:15-19. Daigle asked Finney questions about, among other things: (1) the DA's policies for closing cases of sexual violence; (2) TN state law concerning closure of cases of sexual violence—in particular, based on a victim's expressed noncooperation; (3) communications between the DA's office and JCPD about cases of sexual violence; and (4) the DA's protocol for sexual assault cases—all topics relevant to the claims in this lawsuit. *Id.* 104:20-25; 105; 106; 141:19-25; 142:1-14; 197:4-8.

### III. Daigle Recommends Johnson City Initiate an Investigation into Allegations of JCPD Corruption; City Declines

Daigle found one sexual assault case file during his audit to be particularly concerning. Daigle Dep. 217: 8-15. According to the police report, JCPD officers had responded to an exigent case where a woman had just fled her alleged assailant, yet the officers took none of the investigative steps that would be standard practice in such a circumstance. Daigle Report at 18. The officers failed to secure the crime scene; failed to search the crime scene; failed to collect any physical evidence, including from the victim; failed to identify, let alone interview, any witnesses; and failed to confront the suspect. Daigle Dep 217:22-25; 218:1-22. Daigle described these investigative steps as something "any brand new rookie out of the Academy" should know to do. *Id.* Daigle found the police failures in this case "egregious." *Id.* When he followed up about the case, he discovered that the alleged perpetrator was Sean Williams. *Id.* 213:13-18; 214:3-25; 215:3-18.

In December 2022, Daigle met with Defendant Turner who was still the Chief of JCPD to ask about this case, among other things, and express his concerns. *Id.* According to Daigle, Turner told him that Daigle was missing documents pertaining to Williams, which would explain what happened in the case, but then never provided Daigle with these documents or followed up to explain what might be incomplete in the case files.[3] *Id.* Daigle then offered to conduct his own investigation into the allegations concerning Williams, given that the Williams' case files were "incomplete," there were "a lot of unanswered questions," and the City had not initiated its own IA investigation. *Id.* 211:10-25; 212:1-21. The City declined this offer. *Id.* 212:22-25; 213:1-7.

[3] It appears from the facts detailed in Daigle's report that he is referencing the case of Female 2. *Compare* Daigle Report at 18 *with* SAC ¶¶ 104-108.

Despite Daigle's recommendation in his report—and his in-person statements to leadership—that an IA investigation should be opened, the City continued to do nothing in response to allegations of police corruption.

### IV. Finney Refuses to Provide Information to Victims' Counsel; Demands Williams' Rape Survivors Come into the DA's Office in Person for Charges to Be Brought

In July 2022, Plaintiffs' counsel began representing certain victims of Williams in any criminal investigations into Williams' sexual assaults or JCPD officers' misconduct in relation to Williams. Baehr-Jones Decl. ¶ 41. In this capacity, Plaintiffs' counsel communicated with U.S. Department of Justice prosecutors, who, in or around November 2022, opened an investigation into potential violations of 18 U.S.C. § 1591. *Id.* Plaintiffs were interviewed by the FBI as part of this investigation in 2022-2023. *Id.* To counsel's knowledge, this investigation is ongoing.

In April 2023, Williams was arrested on the campus of Western Carolina University. Baehr-Jones Decl., Exh. 10 (WJHL news article summarizing contents of search warrant affidavit). University police found files on his digital devices that appeared to be child sexual abuse material. *Id.* Subsequent searches of these devices by the FBI and other law enforcement revealed that Williams had documented his rapes of women and children, producing horrific images and videos of their sexual exploitation. *Id.* In some instances, he had labeled the folders containing the victim's files, "[name of victim] drugged," making it abundantly clear that he had intentionally drugged his victims before assaulting them. SAC at 3. Law enforcement identified at least 52 women depicted in these files. *Id.* ¶ 256.

At this point, it was beyond any doubt that Williams had drugged and raped dozens of women in Johnson City, including women who had reported their rapes to JCPD and about which JCPD had done nothing. *See id.* ¶¶ 113, 139, 256.

On July 26, 2023, Plaintiffs' counsel Vanessa Baehr-Jones met telephonically with Finney and Assistant DA Abby Wallace to discuss her clients' participation in the criminal prosecution(s) of Williams. Baehr-Jones Decl. ¶ 14. DOJ Trial Attorney Julie Pfluger and FBI Special Agent Paul Durant were also on the call. *Id.* During the call, Ms. Baehr-Jones represented that her clients desired criminal accountability for Williams and were willing to cooperate in any criminal investigation which would lead to his prosecution for their assaults. *Id.* Ms. Baehr-Jones asked for an update on the physical evidence submitted by her clients, and for any other updates the DA's office could provide on the status of the investigations, and specifically, whether there was a video of one of her clients' rapes. *Id.* Ms. Baehr-Jones also asked whether she could receive redacted versions of her clients' statements and police reports. *Id.*

Ms. Wallace stated that she would be unable—as a matter of law—to give any information about this evidence or to provide victim statements or police reports. *Id.* ¶ 15. She further refused to confirm whether any of Ms. Baehr-Jones' clients were listed on Williams' handwritten "Raped" list, stating again that she was prohibited by law from providing this information in an ongoing criminal investigation. *Id.* She also refused to confirm whether videos or images of Ms. Baehr-Jones' clients existed. *Id.* Inexplicably, however, Ms. Wallace then stated that if Ms. Baehr-Jones' clients were willing to come in and speak with her <u>in person</u>, she would then be able to provide them with updates about evidence in the case and share further information with them. *Id.* This seemed to conflict with what she had just stated regarding the legal prohibitions on providing any information during a pending criminal investigation.

Further concerning, Ms. Wallace indicated during the call that she would not be able to take any steps to protect the identities of the victims during a criminal prosecution. *Id.* ¶ 16. Ms. Wallace stated that she always filed indictments in rape cases publicly with the victim's full

name listed. *Id.* She further stated that there was no legal basis to ensure the confidentiality of a victim's identity, that she did not have a practice of obtaining protective orders, and she had never asked a court to seal any information pertaining to a rape victim's identity. *Id.*

During the call, Finney stressed that it was important that the victims come into the DA's office in person in order for them to be able to move forward with prosecutions. *Id.* ¶ 17. Ms. Baehr-Jones asked why any additional interviews of her clients were necessary given that they had been interviewed by Special Agent Durant already, and in some cases, had also provided prior statements to JCPD. *Id.* This requirement seemed particularly problematic given that one of JCPD's tactics for discouraging and intimidating these same victims had been requesting they come in for additional in-person interviews. (The Daigle Report also documented this practice, explaining how it discouraged women from pursing their reports of rape. Daigle Report at 21.)

Ms. Wallace provided an estimate that indictments in the cases of Williams' sexual assault victims would be filed by the end of the year (2023). *Id.* ¶ 18. Nearly a year later, however, none have been issued to date.

The following day, increasingly alarmed with the DA's office's response to her questions, Ms. Baehr-Jones contacted Special Agent Durant and Ms. Pfluger and requested that, for now, they not share the complete list of her clients' identities with the DA's office. *Id.* ¶ 19.

On August 2, 2023, Ms. Baehr-Jones learned during a telephone call with Ms. Pfluger and SA Durant that many of her clients were depicted in images and videos found on Williams' digital devices, including, but not limited to, B.P., H.A., Female 9, and Female 12. *Id.* ¶ 20.

## V. Finney Threatens Plaintiffs' Counsel After Counsel Inquires About Applying for Victim Compensation Funds

In the following months, Ms. Baehr-Jones spoke telephonically with DA Investigator Michael Little regarding her clients' participation in the DA's investigations into Williams, and

specifically, what protections the DA's office might be able to put in place to ensure the privacy of the victims. *Id.* ¶ 21. On October 27, 2023, Ms. Baehr-Jones emailed DA Little to inquire about obtaining investigative reports necessary to support her clients' applications for Tennessee victim compensation funds through the Tennessee Criminal Injuries Compensation Program. Baehr-Jones Decl, Exh. 11. These are funds available under state law for any victim of a crime who meets certain requirements, including reporting the crime and cooperating with law enforcement and efforts to prosecute. *See* Tenn. Code Ann. § 29-13-105 (West). Plaintiffs' counsel understood that her clients needed the reports to establish that they had, in fact, reported their rapes. Baehr-Jones Decl. ¶ 22. Little emailed back to state that he would look into the request. Exh. 11.

On November 13, 2023, Finney sent a letter to Ms. Baehr-Jones, informing her of his refusal to sign the affidavits necessary to support her clients' applications for victim compensation funds. Baehr-Jones Decl., Exh. 12, at 2. In the letter, Finney accused Ms. Baehr-Jones of impeding his investigators' ability to speak with victims represented in the class action lawsuit. *Id*. Finney went on to claim that it was "unclear at this point whether any of these represented victims wish to participate in the state prosecution of Williams or continue cooperating with the investigation." *Id.* He then indicated that he would refuse to sign the affidavits authorizing victim compensation funds to the victims in the civil class action lawsuit, unless and until they met with his investigators, even though a number of the victims had already reported their crimes multiple times, first to JCPD and then to the FBI. *Id.*

Finney then threatened Ms. Baehr-Jones professionally, claiming—incorrectly—that her representation of the victims in the ongoing state criminal investigation "could be improper," and further stating, "[a]s of this writing, it does not appear that you have the proper privileges

necessary to provide legal representation of clients in the State of Tennessee."[4] *Id.* Finney claimed to have "conferred with the Tennessee Board of Professional Responsibility in this matter." *Id.* Finally, he indicated that he was instructing state investigators to contact Ms. Baehr-Jones' clients directly, notwithstanding that they were represented parties. *Id.*

Disturbed by the bizarre and threatening nature of Finney's letter, Plaintiffs' counsel forwarded the letter to attorneys with the U.S. Department of Justice. Baehr-Jones Decl., Exh. 14. Ms. Baehr-Jones then responded to Finney, reiterating that her clients had always desired criminal accountability for Williams, and were willing to participate in any criminal prosecution of him, as she had consistently represented to Finney and other members of his office. Baehr-Jones Decl., Exh. 15. Ms. Baehr-Jones further questioned why it was necessary for her clients to sit for yet another round of interviews when there were now images and videos of their rapes:

> Forcing them to sit for yet another round of interviews – without their counsel present – would needlessly subject them to re-traumatization. Your insistence on this – and the manner in which you have corresponded with me – calls into question your motive in demanding this access to my clients.

*Id.* at 2. Ms. Baehr-Jones further requested that Finney provide any written guidance he had received from the Tennessee Board of Professional Responsibility justifying his threats that Ms. Baehr-Jones was improperly representing her clients. *Id.* Finney never responded. Plaintiffs' counsel has received no further correspondence or communications from his office.

---

[4] Not only was this inaccurate, both factually and legally, but Finney knew that Ms. Baehr-Jones was working with local counsel, HMC Civil Rights Law. Heather M. Collins had addressed a letter to Finney in August 2023, and been copied on email correspondence. *See, e.g.*, Baehr-Jones Decl., Exh. 13. It was also a matter of public record that Ms. Baehr-Jones was admitted *pro hac vice* in the federal civil rights case. ECF 9. Thus, Finney's statements were knowingly false and appeared to be made for the improper purpose of threatening Ms. Baehr-Jones professionally to discourage her from obtaining her clients' investigative reports and/or applying for victim compensation funds on their behalf.

To date, the DA's office has filed no indictments against Williams for any of his sexual assaults against the 52+ women depicted in the images and videos found on his digital devices at the time of his arrest—neither for victims represented by Plaintiffs' counsel, nor for any other unrepresented victims.

## VI. Finney Reopens All Criminal Investigations into Williams, Including the Case of Female 3; Justifies Withholding Evidence to Plaintiffs' Counsel in Civil Rights Case Based on Reopened Cases

On June 2, 2023, Finney met with City officials, including Ball, the new JCPD Chief Bill Church, among other JCPD and City personnel, to discuss the discovery of "new evidence" against Williams based on what was found in North Carolina. Baehr-Jones Decl., Exhs. 16, 17 at CITY-0073457, CITY-0073458-59. Then, on June 23, 2023, one day after the complaint was filed in this case, Finney sent a letter to Church, explaining that he had decided to have the DA's office and the TBI continue the investigations of Williams without the assistance of JCPD, because "if the Johnson City Police Department stayed involved and something went wrong, your department would get blamed and that my office [sic] was in collusion with the Johnson City Police Department." Exh. 17 at CITY-0073458. Finney did not state in his letter that there was a formal conflict, only that the new setup would avoid the potential for one "and/or any appearance of impropriety on any entity's part." *Id.* at CITY-0073459.[5]

On August 25, 2023, Plaintiffs' counsel sent a letter to Church, asking that he formally recuse JCPD from any criminal investigation of Williams going forward. Baehr-Jones Decl., Exh. 18 Mr. Herrin responded on September 1, 2023, confirming that JCPD would no longer be working on any William' investigation "to avoid any possible appearance of impropriety." Baehr-Jones Decl., Exh. 19.

[5] It is not clear whether Ball disclosed to Finney—or anyone else—the potential conflict she now had relating to Williams given her real estate contract with him in April 2022.

Despite this veneer of removal, however, Finney continued to coordinate with the City on matters involving Williams, and in particular, on the City's response to discovery requests in this civil rights case filed on behalf of Williams' victims.

Between June 2023 and February 2024, Finney's office reopened <u>all</u> JCPD investigations involving Sean Williams. This included the case of Female 3, who had fallen (or was pushed) out of the window of Williams' apartment in September 2020, and whose attempted homicide case had been inactive for years.[6] There did not appear—at least in discovery produced to Plaintiffs—to be any new basis on which to reopen the case of Female 3. Yet, Finney specifically cited this case specifically as a justification for withholding, "any documents or materials relevant to the ongoing investigation," and "any electronic communications sent or received by JCPD officers involving [her] case." Exh. 17 at CITY-0073301. The City also withheld from Plaintiffs evidence collected during the search of Williams' apartment on September 19, 2020, and documents relating to the search of Williams' safe. None of this discovery was produced to Plaintiffs until after March 19, 2024, even though it concerned specific allegations in the complaint and was responsive to Plaintiffs' requests.

In the meantime, letters sent via email between counsel for the City and the DA's office show Finney instructing the City not to produce <u>any</u> discovery in this case:

> As of today's date, all cases that originated in Johnson City are still being investigated and are active. Therefore, it is my opinion that the only documents that are subject to discovery are public records. Any other documents, recordings or

[6] A case note in her file, dated March 16, 2021, indicates, "The investigation into this case didn't reveal any criminal activity." Baehr-Jones Decl., Exh. 20. The case was requested to be placed on inactive status on May 25, 2021. *Id.* The only charge that resulted from this investigation was the felon-in-possession of ammunition charge, which was brought on April 13, 2021, and dismissed on September 25, 2023. *See United States v. Williams*, 2:21-cr-00027-DCLC-CRW, Doc Nos. 3, 54. Thus, by February 2024, it is unclear what basis the DA's office had to keep Female 3's case open other than to obstruct discovery in this civil rights lawsuit.

physical evidence are not discoverable as this could impede the status of active criminal cases.

Exh. 17, at CITY-0073263. The City complied with Finney's instructions and continued to withhold responsive discovery from Plaintiffs.

It was not until the Court's order denying the City's motion to quash Plaintiffs' subpoena to Daigle that the City finally began producing Plaintiffs' case files and other records. Baehr-Jones Decl, ¶ 41. By this time, Plaintiffs' counsel had been asking the City in one form or another for their clients' own police reports and written statements for nearly a year. Baehr-Jones Decl., Exh. 21. Even then, counsel for the City reached out to Finney on March 14, 2024, forwarding the Court's order and asking whether Finney planned to intervene in the case to file a motion. Exh. 17 at CITY-0073289. Ball also texted Finney on March 18, 2024—the day before the City was mandated to produce all documents—asking whether he "ha[d] time for a quick call." Finney responded, "Call me."[7] *Id.* at CITY-0073260. Finally, on March 19, 2024—for the first time—Plaintiffs' counsel received their clients' case files. Baehr-Jones Decl. ¶ 42.

Even now, counsel for the City is continuing to coordinate with the DA's office in refusing to de-designate Plaintiffs' and class members' JCPD reports to prevent redacted versions of these reports from being filed publicly in this case.[8] Baehr-Jones Decl., Exh. 22. These reports are incredibly damning for both the City and the DA's office. In the case of B.P., the police report shows that she reported her sexual assaults on November 7, 2019. Baehr-Jones Decl. ¶ 43. That

---

[7] During her deposition, Ball claimed she sent this text so she could give Finney a heads up about a memorandum of understanding concerning a new child advocacy center. Ball Dep. 240:11-14. Given the timing and the opaque nature of her text, the credibility of this explanation is highly suspect.

[8] Plaintiffs strongly disagree that there is a legal basis for continuing to seal redacted versions of police reports and victim statements at this juncture and have provided relevant caselaw to both counsel for the City and the DA's office in support of public disclosure. *See* Exh. 22. As of this filing, Plaintiffs have received no response. *Id.*

same day, she submitted to a drug test, a rape kit, and a witness provided a statement corroborating B.P.'s account. *Id.* The police report then shows that for the next three and a half years, between November 27, 2019, and May 11, 2023, the police took no investigative steps to follow up on her report. *Id.* In the case of Female 8, the police report shows that the DA's office declined prosecution and authorized closing her case in March 2023—just one month before images of her sexual assault were found on Willliams' digital devices. *Id.* ¶ 44. The DA authorized closing Female 8's case despite there being, by that time, numerous other reports by women alleging strikingly similar experiences of being drugged and raped by Williams. *Id.*

As justification for refusing to de-designate these reports, counsel for the City has cited the DA's "ongoing investigations." Exh. 22. Yet over a year after obtaining video and image evidence of Plaintiffs' rapes, the DA has still filed no indictments in their cases.

## VII. U.S. Department of Justice Opens Public Corruption Investigation into Potential Government Misconduct with Respect to Williams

In or around August-September 2023, the U.S. Department of Justice opened a public corruption investigation into allegations of police and government misconduct relating to the investigation(s) of Sean Williams. Baehr-Jones Decl. ¶ 45. Certain victims of Williams were interviewed in March 2024, as part of this investigation. *Id.* Plaintiffs' counsel Ms. Baehr-Jones, Ms. Collins, and Elizabeth Kramer were present for these interviews. *Id.* To counsel's knowledge, this investigation remains ongoing. *Id.*

## VIII. The City Finally Opens IA Investigation into Allegations of JCPD Misconduct, But Ball Holds Investigation "In Abeyance" Pending this Civil Rights Case

It appears from Ball's notes that the City first learned of the federal public corruption investigation on or about October 11, 2023, when Ball spoke to a TBI Special Agent assigned to this investigation. *See* Exh. 9, at 40; *see also* Ball Dep. 39:2-25; 40:1-23; 58:23-24 (explaining that she had spoken with someone about the public corruption "assessment" in Fall 2023).

Shortly thereafter, on November 1, 2023, the City finally opened its own IA investigation into the police misconduct allegations in Dahl's case, as well as this case. Baehr-Joned Decl., Exh. 23. The City still did nothing, however, to investigate the misconduct claims. According to Ball, she made the decision to hold the investigation "in abeyance" pending the outcome in this case. Ball Dep. 105:2-9. That meant that no officers were interviewed, and no further investigative steps were taken, other than sending out notification letters to the Defendants. *See* Exh. 23. On February 21, 2024, JCPD Captain Andy Hodges, who had been assigned to lead the IA investigation, wrote a memo to JCPD Chief Billy Church, requesting the investigation "be inactivated pending results or findings from the litigation." *Id.* at CITY-0141198.

**LEGAL STANDARD**

"The scope of discovery under a subpoena is the same as the scope of discovery under Rule 26," which is "traditionally quite broad." ECF 128 at 14 (quoting *Hendricks v. Total Quality Logistics, LLC*, 275 F.R.D. 251, 253 (S.D. Ohio 2011). Rule 26(b)(1) provides that a party is entitled to take discovery of any matter that is relevant to the claim or defense of any party, even if not admissible itself, if such discovery is reasonably calculated to lead to admissible evidence. *F.T.C. v. Trudeau*, 2012 WL 5463829, at *4 (N.D. Ohio Nov. 8, 2012); Fed. R. Civ. P. 26(b)(1).

**ARGUMENT**

Finney's motion to quash makes duplicative and doomed arguments as to Plaintiffs' efforts to obtain Finney's call records as well as to depose him: irrelevance, work product privilege, and investigative privilege. As shown from the extensive discussion above, Finney's call records and first-hand knowledge are probative, and any claim to a work product privilege or investigative privilege has been waived or seeks to abuse the privilege. Finney's attempt to

invoke the apex doctrine to avoid deposition also fails, as he has already demonstrated the significance of his first-hand knowledge of information related to the allegations in this case and his direct involvement in relevant events. And by having voluntarily submitted to an interview with Mr. Daigle as a part of the City-commissioned audit, Finney cannot now credibly claim he is too busy or important to sit for a deposition. The motion to quash and request for protective order should be denied.

## I. DA Finney's Cell Phone Records Should Be Produced

As the movant seeking a protective order, DA Finney bears the burden of establishing good cause, specifically that a "specific prejudice or harm will result from the absence of a protective order." *In re Ohio Execution Protocol Litig.*, 845 F.3d 231, 236 (6th Cir. 2016); Fed. R. Civ. P. 26(c)(1). He must also show that "(i) the discovery sought is unreasonably cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive; (ii) the party seeking discovery has had ample opportunity to obtain the information by discovery in the action; or (iii) the proposed discovery is outside the scope permitted by Rule 26(b)(1)." Fed. R. Civ. P. 26(b)(2)(C). Additionally, as the movant seeking to quash a properly issued subpoena, Finney bears the burden of proving that the documents are <u>not</u> relevant. The motion must be denied as Finney has failed to carry his burden of demonstrating these elements. To the contrary, the requested records are reasonably calculated to lead to the discovery of admissible evidence and are probative of witness credibility, namely that of Ball.

### A. <u>The Requested Cell Phone Records Are Probative</u>

Plaintiffs' allegations, history of events related to this litigation, and the discovery obstacles Plaintiffs have encountered to date, which are described above, are more than sufficient to entitle Plaintiffs to obtain, subject to the restrictions and protections provided by the parties'

protective order, Finney's cell phone records. These records will shed further light on the contours of the alleged obstruction of justice as well as potential additional allegations of wrongdoing concerning Finney's coordination with Ball and counsel for the City.

First, as set forth above, Ball testified that she texted Finney asking to talk on March 18, 2024, purportedly to discuss a child advocacy center. However, the timing is highly suspect considering the City's deadline to produce documents responsive to the Daigle subpoena was the following day. (Ball also testified that she only met or spoke to Finney "around 10 times." Ball Dep. 241:17-18.) The timeline of Finney's phone calls—both with Ball and counsel for the City—will shed light on the truthfulness of this testimony and may reveal further coordination. Evidence that goes to the credibility of a witness's sworn testimony is highly relevant and therefore discoverable. *See In re Complaint of Foss Mar. Co.*, No. 5:12-CV-21-TBR-LLK, 2015 WL 1249571, at *1 (W.D. Ky. Mar. 18, 2015) ("information related to the credibility of a witness serves as relevant evidence for the purposes of discovery"). This is especially true for Ball, given her admissions during her deposition about her own financial ties to Williams.

Second, should these records (or other discovery) substantiate that Finney had a hand in obstructing justice or engaged in public corruption, Plaintiffs will promptly seek to amend their complaint to include those allegations. In the meantime, however, Plaintiffs' allegations supporting Finney's involvement, SAC ¶¶ 220-27, combined with the evidentiary showing made above, *see* Secs. I, IV, V, and VI, *supra*, more than entitle Plaintiffs to the subject discovery. Given the facts already known, it is likely that Finney's phone records will result in probative evidence of the scope of Finney's involvement and motive to impede this lawsuit and/or other public corruption investigations into JCPD. Moreover, Finney's intervention in the discovery process in this litigation justify any intrusion into his privacy.

B. <u>Tennessee Rule of Criminal Procedure 16 Has No Application Here</u>

Finney's reliance on Rule 16 of the Tennessee Rules of Criminal Procedure is misplaced. Rule 16 governs the type of data that the State must disclose to a criminal defendant. *See* Tenn. R. Crim. P. 16. It simply has no application here. Finney's cases do not support his position. The court in *Tennessean v. Metro. Gov't of Nashville*, 485 S.W. 3d 857, 864 (Tenn. 2016), analyzed the scope and exemptions of Tennessee's Public Records Act ("PRA"), which is not at issue here. It did not hold that documents belonging to a district attorney are discoverable solely by the means provided by Rule 16. In fact, *Tennessean* actually demonstrates the inapplicability of Rule 16 here by clarifying that Rule 16 is for use in criminal cases. *See id.* at *863. Finney's only other case, *Sutton v. State*, 1999 WL 423005, at *6 (Crim. App. 1999), is a criminal case that has nothing to do with Rule 16. The cited page includes a summary of the factual background of the case, in which the court references an ancillary civil case, which involved a failed attempt to obtain documents under the PRA. *See id.* Finney's reliance on an opinion from the attorney general is of zero jurisprudential value.

C. <u>Finney Has Failed to Assert or Preserve the Law Enforcement Privilege</u>

Finney argues that the investigatory privilege applies to the extent that Plaintiffs seek discovery relating to Sean Williams cases from Finney's call history records, since those investigations remain "ongoing." ECF 203 at 5-6. This is the same baseless assertion Finney made in an effort to keep relevant discovery from Plaintiffs for months. Under this theory, Plaintiffs would be entitled to no discovery in this case so long as Finney delays bringing charges. This cannot be a basis to withhold otherwise relevant discovery.

"[P]rotected information under the investigative privilege includes information pertaining to law enforcement techniques and procedures, information that would undermine the

confidentiality of sources, information that would endanger witness and law enforcement personnel [or] the privacy of individuals involved in an investigation, and information that would otherwise ... interfere[ ] with an investigation." *United States v. Se. Eye Specialists*, *PLLC*, 586 F. Supp. 3d 787, 793 (M.D. Tenn. 2022) (quoting *In re The City of New York*, 607 F.3d 923, 943–46 (2d Cir. 2010)) (internal quotations omitted). "General routine information" about an investigation is "insufficient to justify indefinite secrecy." *Id.*

Here, Finney suggests (without actually arguing) that disclosing his cell phone records would interfere with either the Williams' investigations or some other unidentified investigations yet fails to explain how. To allow Finney to circumvent Plaintiffs' right to relevant discovery based on an empty assertion of "privilege" would be allowing him to abuse his position of public trust to avoid producing evidence that might inculpate him in serious wrongdoing. The facts set forth above demonstrate that Finney has already used his position to threaten Plaintiffs' counsel, to deny victims participating in the class action lawsuit access to victim compensation funds, and to coordinate with the City to withhold discovery from Plaintiffs under the guise of "privilege." The Court should not permit any further misuse of the DA's office to interfere with Plaintiffs' ability to obtain relevant discovery.

Further, should Plaintiffs seek to admit the records themselves into evidence, Defendants may make the appropriate objection or motion at that time. *Stratienko v. Chattanooga-Hamilton Cnty. Hosp. Auth.,* 2008 WL 2001990, at *4 (E.D. Tenn. May 7, 2008), *aff'd,* 402 F. App'x 990 (6th Cir. 2010) (denying motion for protective order premised on a claim of privilege).

D. Finney's Arguments Regarding Confidentiality and Scope Are Unavailing

Finney's other arguments also fail. As to Finney's citation of confidentiality and privacy, that documents are confidential "is not in itself grounds for quashing a subpoena." *Hackmann v.*

*Auto Owners Ins. Co.*, 2009 WL 330314, at *2 (S.D. Ohio Feb. 6, 2009). Moreover, Plaintiffs

seek only <u>records of calls</u>. The requested documents will not reveal, for example, the content of

text messages, emails, and obviously not the substance of any conversations held. They will only

indicate phone numbers, dates, and call durations. The disclosure of such information will not

result in a specific prejudice or harm against Finney. *See Whiting v. Trew*, 2020 WL 6468131, at

*9 (E.D. Tenn. Nov. 3, 2020) (denying motion for protective order where movant failed to

establish good cause where they did not demonstrate specific prejudice or harm). Finally, Finney

does not argue that his "disclosure of the requested documents could not be accomplished under

the terms of the current protective order." *Waite, Schneider, Bayless & Chesley Co. L.P.A. v.

Davis*, 2013 WL 146362, at *6 (S.D. Ohio Jan. 14, 2013). Indeed, the Protective Order in this

case will fully safeguard any personal information as well as personal and/or irrelevant call

records. ECF 94 (providing mechanism to designate materials Attorney's Eyes Only).

Finally, the temporal scope of the requests is reasonable in light of the timeline of events

described above. Finney claims the earliest date the requests can possibly reach back to is

September 1, 2022—the day he took office as DA. However, as shown above, the letter

exchange between Ball and Finney began before this. It appears that counsel for the City likely

coordinated with Finney <u>before</u> his first day in office, so that Finney could immediately send a

letter back to Ball which she then used as a basis to avoid any IA investigation. Plaintiffs'

subpoena is targeted to timeframes around which there are likely communications between

Finney and others based on significant events in this case.

In light of his improper and overbroad claims of privilege, Finney's motion does not

establish good reason for issuing a protective order or quashing Plaintiffs' subpoena, especially

considering the requested documents are highly relevant to Plaintiffs' case. *See F.T.C. v. Trudeau*,

2012 WL 5463829, at *4-5 (N.D. Ohio, Nov. 8, 2012) (denying motion to quash where movant failed to carry burden of demonstrating the discovery sought should not be permitted).

## II. Plaintiffs Should Be Allowed to Depose Finney

### A. Finney Has Highly Relevant Information

Finney has highly relevant testimony to offer concerning Plaintiffs' Equal Protection Claim. This is precisely why Daigle asked to speak with him in 2022. Finney can testify concerning (1) JCPD's improper closure of cases of sexual violence; (2) JCPD's failure to train and supervise officers investigating reports of sexual violence; (3) JCPD's policies and practices with respect to investigating cases of sexual violence; and (4) the documentation—or lack thereof—in JCPD case files and document management systems, among other topics that go to the heart of Plaintiffs' Equal Protection claim.

Finney also has testimony relevant to the TVPA claims. Specifically, it now appears that Ball may have benefited financially—or at least, attempted to benefit financially—from an off-market purchase of Williams' penthouse apartment at a price that was well below market value. This was while Ball was the City Manager, and therefore, effectively controlled the City's police department, and Williams was a fugitive wanted by that same department. On its face, this business transaction was corrupt. Just four months later, Finney engaged in a letter exchange with Ball that allowed her to avoid any public corruption inquiry or IA investigation into Williams and City officials for years—until this case prompted the U.S. Department of Justice to open its own criminal investigation. Only then did Ball open an IA investigation, though she has conveniently held it "in abeyance" until this lawsuit concludes.

There is also evidence that Finney misused his position of trust during this time to threaten Plaintiffs' counsel, improperly withhold victim compensation funds for victims

participating in this civil rights lawsuit, and impede discovery in this case. Finney's testimony concerning his motivations for taking these steps, his relationship to other key players in the conspiracy, and with whom he may have been coordinating these actions, is all highly relevant to understanding the scope of the obstruction scheme.

B. <u>All Claims of Privilege Fail or Have Been Waived</u>

Any work product privilege has been waived to the extent the content of Finney's conversations with Daigle were disclosed to the public through the Daigle Report. The privilege has also been waived because his communications with Defendant City have already been disclosed through discovery.

Nor does the deliberative process privilege apply here. As an initial matter, "the deliberative process privilege must be applied cautiously because it could become the exception that swallows up the rule favoring governmental openness and accountability." *Swift v. Campbell*, 159 S.W.3d 565, 578 (2004). Moreover, Finney provided information to Daigle about the topics outlined above and waived any deliberative privilege which might otherwise apply. And no deliberative process privilege could apply to any intentional obstructive acts Finney took.

Finally, as set forth above, the investigative privilege is being abused here. Finney has attempted to stymie Plaintiffs' discovery in this case by delaying indictments against Williams and reopening old investigations. This is a grave misuse of his position of public trust, and should not be the basis for him to avoid providing relevant testimony.

C. <u>Apex Doctrine</u>

Finney argues he enjoys the benefits of the "apex doctrine," which affords him a right to avoid deposition upon a showing of his rank unless Plaintiffs can establish "extraordinary circumstances" that would justify his deposition. "[T]he Sixth Circuit has resisted applying the

'apex doctrine' as a general analytical tool when considering a party's request to depose a high-level corporate officer. *Summer v. Detroit Pub. Sch. Cmty. Dist*., 2022 WL 22257187, at *2 (E.D. Mich. June 30, 2022). The doctrine "cannot be applied to grant a protective order based solely on an individual's corporate position without some showing that harm would result to the individual." *Amos v. Lampo Grp., LLC*, 2023 WL 375938, at *4 (M.D. Tenn. Jan. 24, 2023) (citing *Serrano v. Cintas Corp*., 699 F.3d 884, 901-02 (6th Cir. 2012)). The specific harms one must show are enumerated in Rule 26(c)(1). *Summer*, 2022 WL 22257187, at *2.

Finney has failed to make any of the requisite showing required to warrant application of the doctrine. Even if he had, Plaintiffs have established facts proving Finney has relevant information and his deposition is necessary. The applicable test is articulated in *In re Office of the Utah Attorney General*, 56 F.4th 1254, 1263 (10th Cir. 2022). First, the information sought must be unobtainable from another source. *Id*. at 1260. Second, there must be an indication that the witness has first-hand knowledge related to the claims. *Id.* at 1257. Based on the deposition testimony of Mr. Daigle, Finney is unique in possessing relevant information about the culture at JCPD and has relevant knowledge regarding how sexual assault cases were handled at the DA's office. Moreover, the City recognized Finney's unique knowledge by making him available to Daigle for his audit of JCPD's policies and practices. Finney has already been established as a witness with unique and relevant knowledge by virtue of his role in that audit.

Moreover, fairness dictates that Plaintiffs be given an equal opportunity to question Finney, who was apparently not of such high rank at the time Daigle interviewed him. Having already inserted himself into the investigative and discovery processes relating to both the Dahl case and this lawsuit, Finney cannot genuinely argue that he is too busy and important to be bothered by this case. Moreover, Plaintiffs' Complaint is of great importance to the community

Finney serves. The allegations affect the Johnson City community as a whole, and the City's ability to protect women from sexual violence. The discovery Plaintiffs seek is not designed to unnecessarily harass Finney, but rather serves a key function of his role as a public servant—accountability.

In support of his arguments, Finney cites *Serrano* for the position that the Court should grant a protective order to protect him from annoyance, embarrassment, oppression, or undue burden or expense. ECF 203 at 3. He also claims the apex doctrine places "a high burden on Plaintiffs to justify General Finney's deposition." *Id.* at 9 n.2. *Serrano* undermines Finney's position. As the court noted in *Amos*, "[c]ertainly, *Serrano* does not stand for the proposition asserted by Defendants here that a party seeking to depose an individual corporate officer who is also a party must demonstrate good cause to take the deposition." *Amos*, 2023 WL 375938, at *4. To the contrary, when one seeks the protection of the apex doctrine based on claims of relevance, as Finney does here, it is that he who must meet the burden. *Invesco Institutional (N.A.), Inc. v. Paas*, 244 F.R.D. 374, 380 (W.D. Ky. 2007) ("the party who is resisting production has the burden to establish that the material either does not come within the scope of relevance or is of such marginal relevance that the potential harm resulting from production outweighs the presumption in favor of broad disclosure"). Finney cannot make that showing here as he has is integrally involved in the claims of this case, and has already made himself available to Defendant City's expert.

**CONCLUSION**

For the foregoing reasons, the motion to quash should be denied.

Dated: June 14, 2024

Respectfully submitted,

Advocates for Survivors of Abuse PC

*/s/ Vanessa Baehr-Jones*
Vanessa Baehr-Jones CABN # 281715
*Pro Hac Vice*
Advocates for Survivors of Abuse PC
4200 Park Boulevard No. 413
Oakland, CA 94602
(510) 500-9634
vanessa@advocatesforsurvivors.com

*/s/ Elizabeth A. Kramer*
Julie C. Erickson (California Bar # 293111)
Elizabeth A. Kramer (California Bar # 293129)
Kevin M. Osborne (California Bar #261367)
*Pro Hac Vice*
Erickson Kramer Osborne LLP
44 Tehama St.
San Francisco, CA 94105
415-635-0631
julie@eko.law
elizabeth@eko.law
kevin@eko.law

HMC Civil Rights Law, PLLC

*/s/ Heather Moore Collins*
Heather Moore Collins (# 026099)
Ashley Shoemaker Walter (#037651)
7000 Executive Center Dr., Suite 320
Brentwood, TN 37027
615-724-1996
615-691-7019 FAX
heather@hmccivilrights.com
ashley@hmccivilrights.com

Attorneys for Plaintiffs and Proposed Class

## CERTIFICATE OF SERVICE

I HEREBY certify that a copy of the foregoing has been filed and served via the court's electronic filing system on June 14, 2024 to counsel of record:

| | |
|---|---|
| K. Erickson Herrin<br>HERRIN, McPEAK & ASSOCIATES<br>515 East Unaka Avenue<br>P. O. Box 629<br>Johnson City, TN 37605-0629<br>lisa@hbm-lawfirm.com<br>sandy@hbm-lawfirm.com<br><br>Emily C. Taylor<br>Maria Ashburn<br>WATSON, ROACH, BATSON &<br>LAUDERBACK, P.L.C.<br>P.O. Box 131<br>Knoxville, TN 37901-0131<br>etaylor@watsonroach.com<br>mashburn@watsonroach.com<br><br>*Attorneys to Defendants, Johnson City, Tennessee, Karl Turner, in his individual and official capacities, Captain Kevin Peters, in his official capacity, and Investigator Toma Sparks, in his official capacity*<br><br>Jonathan P. Lakey<br>Burch, Porter, & Johnson, PLLC<br>130 N. Court Ave.<br>Memphis, TN 38103<br>901-524-5000<br>jlakey@bpjlaw.com<br>mchrisman@bpjlaw.com<br><br>*Attorney to Defendant City of Johnson City, Tennessee* | Daniel H. Rader III<br>Daniel H. Rader IV<br>MOORE, RADER & YORK PC<br>46 N. Jefferson Avenue<br>P.O. Box 3347<br>Cookeville, TN 38502-3347<br>danrader@moorerader.com<br>danny@moorerader.com<br>andre@moorerader.com<br><br>*Counsel for Kevin Peters in his individual capacity*<br><br>Kristin Ellis Berexa<br>Ben C. Allen<br>FARRAR BATES BEREXA<br>12 Cadillac Drive, Suite 480<br>Brentwood, TN 37027-5366<br>kberexa@fbb.law<br>ballen@fbb.law<br>jdowd@fbb.law<br><br>*Counsel for Toma Sparks in his individual capacity*<br><br>Keith H. Grant<br>Laura Beth Rufolo<br>Robinson, Smith & Wells, PLLC<br>633 Chestnut Street, Suite 700<br>Chattanooga, TN 37450<br>kgrant@rswlaw.com<br>lrufolo@rswlaw.com<br>awells@rswlaw.com<br><br>*Counsel for Justin Jenkins in his individual capacity, Jeff Legault in his individual capacity and Brady Higgins in his individual capacity* |

/s/ *Elizabeth A. Kramer*
Elizabeth A. Kramer