```
1    lot of police departments around how to do this.

2    And so, yes, he talked a lot about how he went

3    across the country, provided training, and a lot of

4    it was around teaching police departments the

5    correct way to be able to understand people who have

6    been traumatized because of assault.  And there was

7    a lot of discussion around being able to work with

8    people to do that.

9         Q.     (BY MS. COLLINS) And, in fact, he

10   suggested that the officers needed to take training

11   on being trauma informed, right?

12              MS. TAYLOR:  Object to the form.

13        A.     Yes, ma'am.

14        Q.     (BY MS. COLLINS) Okay.  And as a

15   result of Mr. Daigle's report, the department did

16   that.  They changed, I guess, its way of doing

17   business, and some of the officers went through that

18   trauma informed training so that they could talk to

19   victims in a more compassionate way.

20              MS. TAYLOR:  Object to the form.

21        A.     So there is a thing called POST

22   certification that every police officer is required

23   to get.  Some of that includes trauma -- trauma

24   informed training, but we supplemented that.  So the

25   department had a budget for training.  That training
```

(615) 885-0073

```
 1    was supplemented by the Commission after this
 2    recommendation to the tune of another $100,000 to
 3    supplement that training.
 4          Q.       (BY MS. COLLINS) Okay.  If you
 5    could turn to the next page, 139827, and this was
 6    also from your discussion, I guess, on 2/15 with
 7    Mr. Daigle; is that correct?
 8          A.       Yes.
 9          Q.       Okay.  And these are some of the
10    recommendations that he made with respect to things
11    that needed to be fixed.
12                   Is that a fair summary?
13                   MS. TAYLOR:  Object to the form.
14          A.       Yes.
15          Q.       (BY MS. COLLINS) Now, if you could
16    turn to Page 139828, you wrote down at the bottom --
17    it looks like it says, "Chief walking out the door,
18    plans for next chief before we release the report."
19                   What is that -- what is that about?
20    What does that refer to?
21          A.       By this time, I knew that Chief
22    Turner had planned to retire, and he asked the
23    question of whether -- we were talking about the
24    timing of releasing the report, and he asked the
25    question about what the plans were for the next
```

```
1    chief and wanted to know whether or not we wanted to
2    release the report before the chief -- the new chief
3    was hired.
4            Q.      Okay.  Who made the decision when
5    the report was going to be released?
6            A.      Daigle.
7            Q.      Okay.  Did he make a
8    recommendation, or how did that come about?
9            A.      He recommended that -- and I'm
10   trying to recall.  There was a lot of conversation
11   around the release of the report.  A lot of the
12   meetings from this point forward were requesting
13   where he was on the report, what the timing was of
14   the report, and as we move forward, he talked about
15   different scenarios in which it could be released.
16           Q.      Okay.  Did you all have anyone with
17   like public relations within the City that also
18   worked on this?
19           A.      Yes.  The name that you saw before,
20   Keisha Shoun.
21           Q.      Okay.
22           A.      She is the Director of Public
23   Affairs, and she leads the department of
24   communications and marketing.
25           Q.      Okay.  Was she involved in that
```

```
 1    aspect as to when the report would be released to
 2    the community?
 3            A.        Yes, ma'am.
 4            Q.        Okay.  And now, on the next page,
 5    139829, you wrote in a box.  It says, "Challenging
 6    situation, stay with me."
 7                      What is -- what does that refer to?
 8            A.        I can't recall.
 9            Q.        What is IACP?  It looks like an I.
10            A.        It's an acronym that the police
11    officers will be able to tell you, but I cannot -- I
12    don't know what it stands for.
13            Q.        Okay.  And you wrote down the
14    words, "loyalty, transparent."
15                      What was that about?
16            A.        My recollection is that we were
17    talking about what we wanted in the next police
18    chief.  We were then moving to the discussion of
19    hiring the next police chief.
20            Q.        Okay.  Was the current police
21    chief, Chief Turner, not perceived as loyal and
22    transparent?
23                      MS. TAYLOR:  Objection to form.
24            A.        That is not what that meant.
25            Q.        (BY MS. COLLINS) Okay.  When you
```

(615) 595-0073

```
1    write, "Success/ " it looks like, "clients/did not
2    do what he was supposed to do," what does that refer
3    to?
4         A.        I don't -- I don't recall.
5         Q.        Okay.  Now, it looks like the next
6    meeting, based on your calendar entry, is March 8th,
7    2023; is that right?
8         A.        Yes, ma'am.
9         Q.        Okay.  The same people appear to be
10   involved, Sunny, Joy, Keisha, and you.
11                  And these are your handwritten
12   notes again?
13        A.        Yes, ma'am.
14        Q.        Okay.  It and looks like this
15   meeting was about the RMS system, correct?
16                  MS. TAYLOR:  Object to form.
17        Q.        (BY MS. COLLINS) Is that right?
18        A.        I don't know that the whole meeting
19   was, but this topic of conversation was about the
20   records management system.
21        Q.        Okay.  And you wrote down, "No
22   system Dropbox, paper files being destroyed."
23                  Where -- did Mr. Daigle discuss
24   that paper files were being destroyed?
25        A.        I'm sorry.  Your question was where
```

```
 1    did he describe?

 2            Q.        No.  No.

 3                      Did he discuss that paper files

 4    were being destroyed?

 5            A.        He discussed that in the meeting

 6    that we had on January 19th.

 7            Q.        Okay.  And he discussed it again on

 8    this date?

 9            A.        I don't know the context that --

10    whether it was revisiting that conversation, I don't

11    remember.

12            Q.        Okay.  Do you recall if he

13    discussed what evidence he had that paper files were

14    being destroyed, or had officers just told him that

15    that was their practice?

16                      MS. TAYLOR:  Object to the form.

17            A.        My recollection is that officers

18    had told him that.

19            Q.        (BY MS. COLLINS) If you could, turn

20    to the next page.

21            A.        So we're on 0139832?

22            Q.        139832, yes.

23                      If you could, go to the bottom of

24    the page.  You write, "In interviewing folks with

25    department," and then down below that you write,
```

```
 1      "lawsuit different than audit."
 2                      What did you mean by that?
 3                      MR. RADER:  Which page are you
 4          reading from?
 5                      MS. COLLINS:  139832.
 6                      MR. RADER:  Thank you.
 7          A.          Can you refer me back to which
 8      section you're talking about?
 9          Q.          (BY MS. COLLINS) Down at the bottom
10      of the page.
11                      Do you see where I've highlighted
12      it?
13          A.          Oh, I'm sorry.
14          Q.          Right there at the bottom of the
15      page.
16          A.          "In interviewing folks in
17      department, lawsuit different than audit."
18          Q.          What do you mean lawsuit different
19      than audit?
20          A.          I don't recall.
21          Q.          Okay.  And down below that it looks
22      like you wrote the word, "Damaging."
23                      Is that what that word is?
24          A.          It looks like that to me.
25          Q.          Okay.  You wrote, "Damaging, did
```

```
1    not/IA affairs, that the officers did not do what."
2               Is that what that says?
3         A.        It appears to read that way.
4         Q.        Okay.  So is it fair to say that
5    Mr. Daigle discussed that it was damaging that there
6    was not an internal affairs investigation into what
7    the officers did not do?
8               MS. TAYLOR:  Object to the form.
9         A.        I don't recall the context around
10   that sentence at all.
11        Q.        (BY MS. COLLINS) Okay.  But
12   Mr. Daigle did discuss with you and other people on
13   that phone call that something was damaging with
14   respect to an IA investigation.
15              MS. TAYLOR:  Object to the form.
16        A.        I do not recall that being the
17   case.
18        Q.        (BY MS. COLLINS) Okay.  What do you
19   recall about this then?
20        A.        I don't recall the -- if you read
21   me the question again.
22        Q.        Well, you can read what you wrote
23   in your own handwriting.
24        A.        Yeah.  I don't recall that he ever
25   said that there was a problem with internal affairs
```

```
 1    that had been completed.

 2              Q.        Okay?

 3              A.        I never recall any words about any

 4    internal affairs that had been completed and there

 5    being any problem with them.

 6              Q.        Okay.  What did you mean by what

 7    you wrote here, "Damaging, did not/IA affairs, that

 8    the officers did not," not do what?  What did you

 9    mean by that?

10                        MS. TAYLOR:  Object to the form.

11              A.        I don't recall.

12              Q.        (BY MS. COLLINS) Was there a

13    discussion on this phone call about internal

14    affairs?

15              A.        I would assume so, since I wrote

16    internal affairs.

17              Q.        Okay.  But you just don't know what

18    it was about.

19              A.        The only --

20                        MS. TAYLOR:  Object to the form.

21              A.        The only conversation we had about

22    internal affairs is that -- that's in the report,

23    that he felt like a lawsuit was a complaint and that

24    an internal affairs should be opened when there was

25    a lawsuit.  That is my only recollection of him
```

1    talking about internal affairs.

2        Q.        Okay.  If you could turn to the

3    next page, 139833, you wrote -- it appears that you

4    wrote, and you put a box around it at the top of the

5    page, "Should have done an IA," correct?

6        A.        Uh-huh.

7        Q.        So it's -- so Mr. Daigle stated

8    that you should have done an internal affairs

9    investigation.

10        A.        That it was his opinion that when a

11    lawsuit was filed, that that was the same as a

12    complaint, and that an internal affair -- and again,

13    I'm not going to know the terminology, should be

14    opened, and that is written in his report.

15        Q.        Okay.  And where you write down,

16    "Pattern and practice Monell," what does that refer

17    to?

18        A.        I don't recall.

19        Q.        Do you know what Monell refers to?

20        A.        No, I do not.

21        Q.        Do you know that that's a legal

22    standard for a plaintiff to demonstrate a claim

23    against a municipality for a constitutional

24    violation?

25                MS. TAYLOR:  Object to the form.

```
 1          A.      I did not know that at the time.

 2          Q.      (BY MS. COLLINS) Do you know it

 3  now?

 4          A.      You just said it.

 5          Q.      Okay.  So when he -- when you wrote

 6  down, "Pattern and practice/Monell," did you ask him

 7  what he meant by that?

 8          A.      I don't recall asking him what he

 9  meant by that.

10          Q.      Okay.  And down below that you

11  wrote -- it looks like you wrote, "Biggest challenge

12  not doing IA."

13                  Is that what that says?

14          A.      Yes, ma'am.

15          Q.      Okay.  Does that challenge still

16  exist?  You haven't done an IA with respect to the

17  claims in this litigation.

18                  MS. TAYLOR:  Object to the form.

19          A.      We've opened up investigations on

20  all of the officers named in the lawsuit pending the

21  outcome of the civil lawsuit.

22          Q.      (BY MS. COLLINS) Okay.  So you've

23  opened them.  And I think earlier the words you used

24  was you put them in abeyance.

25          A.      Yes, ma'am.
```

```
 1          Q.       Who made the decision to move
 2    Officer Hilton to internal affairs?
 3          A.       That was a joint decision by the
 4    command staff and myself.
 5                   Oh, excuse me.  What -- can you ask
 6    that question again?  I was thinking of a different
 7    person.
 8          Q.       Okay.  Who made the decision?
 9          A.       The person who was in that role was
10    put into an interim role of major of operations,
11    following the deputy chief's retirement.  So there
12    was a number of moves on the -- in the interim that
13    were made.  So the internal affairs was being done
14    by Scott Jenkins.  Scott Jenkins moved into Interim
15    Mayor, and then there was a recommendation on the
16    part of the command staff to move Officer Hilton
17    into IA, internal affairs.
18          Q.       Okay.  Who in command staff made
19    that decision?
20          A.       There were recommendations by all
21    of the members of the command staff, which include
22    the chief, the deputy chief, the two majors, and
23    myself.
24          Q.       When was that?
25          A.       On or around March, April 2023.
```

```
 1          Q.       Okay.  Was it after this phone call
 2   on March 8th?
 3          A.       I can't recall.
 4          Q.       And if you could turn to
 5   Page 139835, at the top of the page you wrote,
 6   "D.A.'s office is not at" -- does that say fault or
 7   fail?
 8          A.       I can't read it.
 9          Q.       Okay.  And you wrote, "Scorched
10   earth."
11                   What does that refer to?
12          A.       I can't remember.
13          Q.       Okay.  And it looks like you had a
14   meeting on April 25th, if you could turn to the next
15   page, 139836, with Eric Daigle on that day,
16   April 25th; is that correct?
17          A.       Yes.
18          Q.       Okay.  And on the next page -- or
19   the next couple pages you have meeting notes.  The
20   first you have 4/24/23 on them.  The next couple of
21   pages have 4/25.
22                   Are all of these notes from 4/25?
23          A.       I don't recall.
24          Q.       Okay.  If you could turn to
25   Page 139838, and you drew a diagram.
```

```
 1                    What is this from?

 2          A.        This is from a diagram that

 3   Mr. Daigle showed us and said would be contained in

 4   the report.

 5          Q.        Okay.  And down on that page, you

 6   have it starred, and it says, "Failed in all three."

 7                    Is that something that Mr. Daigle

 8   said that you failed -- that the Johnson City Police

 9   Department failed in all three?

10          A.        That's my recollection.

11          Q.        And that refers to policy,

12   training, and supervision.

13                    It was his opinion that the Johnson

14   City Police Department failed in those three areas?

15                    MS. TAYLOR:  Object to the form.

16          A.        That's what I recall.

17          Q.        (BY MS. COLLINS) Okay.  If you

18   could turn to 139839, these are your notes from the

19   meeting on 4/25/23.

20          A.        Yes, ma'am.

21          Q.        It looks like you wrote, "Record,"

22   out to the side under department policy.

23                    What does that refer to?

24          A.        I can't recall.

25          Q.        Is that record?
```

```
 1          A.       I can't recall.

 2          Q.       For operational it lists lack of

 3    something in record keeping.

 4                   Do you know what that says?

 5          A.       I don't.

 6          Q.       Okay.  And did he say that, again,

 7    the case files are a disaster, where you wrote that

 8    down?

 9                   MS. TAYLOR:  Object to the form.

10          A.       That's correct.

11          Q.       (BY MS. COLLINS) And down below it

12    says, "Attorney has more than we do, unless for

13    patrol, complicated, investigate."

14                   What does that mean?

15          A.       He was giving a situation that

16    could occur.  He was talking about, in some cases,

17    you may have attorneys that actually have more than

18    we do at that point in time.  He was giving a

19    hypothetical.

20          Q.       Okay.  Where there is a notation to

21    Watson, do you recall what that is?

22          A.       Watson is the name of the computer

23    system that we use -- we use now for everything,

24    because since -- since then we have converted all of

25    our -- all of our records to the same filing system,
```

(615) 595-0073

1    and the name of that filing system is Watson.

 2          Q.      Okay.  Now, down below that you

 3    also wrote, "All departments share information," and

 4    you write, quote, "Ted Bundy."

 5                  What is that about?

 6          A.      I don't recall.

 7          Q.      Okay.  And then down below that you

 8    starred, "Policies," and then you circled, "D.A. not

 9    innocent."

10                  What is that about?

11          A.      He was speaking to the fact that

12    the prior D.A., by not providing protocol, was not

13    innocent in all of this.

14          Q.      Okay.  And on the next page,

15    139840, you wrote, "Policy/criminal investigation,

16    rape crisis policy."

17                  What is that next word?  Sub

18    something.

19                  Supervisor, is that what that word

20    is?

21          A.      It looks like it to me.

22          Q.      "Supervisor cannot discipline

23    unless it is written down."

24                  Does that mean that there were not

25    written policies in some instances where there

```
 1   needed to be written policies?
 2                   MS. TAYLOR:  Object to the form.
 3        A.         I don't remember what he was
 4   speaking to.
 5        Q.         (BY MS. COLLINS) And you had
 6   training with a box around it, and it looks like you
 7   wrote, "Sexual assault for patrol."
 8                   Had it been a practice that the
 9   Johnson City Police Department did not train patrol
10   on sexual assault cases?
11                   MS. TAYLOR:  Object to the form.
12        A.         Can you ask the question again?
13        Q.         (BY MS. COLLINS) Sure.
14                   You noted that with respect to
15   training -- do you see that on the page?
16        A.         I do.
17        Q.         And you wrote, "Sexual assault for
18   patrol."
19                   Do you agree that that's what that
20   says?
21        A.         Yeah.
22        Q.         Okay.  What did you mean by that?
23        A.         He was educating me that the
24   training starts all the way from -- not just from
25   the investigative side, but that training needed to
```

(615) 595-0073

```
1    be done.  So a lot of the conversation was around

2    him being a teacher, and we were learning.  So he

3    was -- he was explaining training to me that when

4    you do this training, it needs to -- we need to make

5    sure that we include how the first contact is made

6    with the victim.  And so it begins with making sure

7    that we're also including, in the training that

8    we're doing, our patrol officers.

9            Q.      Okay.  Prior to Mr. Daigle

10   examining the policies and practices of the police

11   department, had patrol officers been trained in

12   sexual assault, how to handle sexual assault?

13           A.      I mentioned earlier there's POST

14   certification requirements of 40 hours, and that is

15   for all police officers.  And my understanding is

16   that includes sexual assault training.

17           Q.      Okay.  Do you know how much of the

18   POST certification includes sexual assault training?

19           A.      I don't.

20           Q.      Going down below that, it looks

21   like you wrote, "Bias in investigation."

22                   What does that refer to?

23           A.      Where?  I'm sorry.

24                   He was talking about best practices

25   and he -- I remember he was saying that the process
```

(615) 885-0073

```
 1    is that you go find the evidence.  So I specifically

 2    remember go find the evidence, that there's the

 3    requirement that the officer go find the evidence.

 4              Q.      And down at the bottom of the page,

 5    what does that say, those last two lines on the

 6    page?

 7              A.      "Investigator, control bias, go

 8    find evidence."

 9                      Is that what you're referring to?

10              Q.      Yeah.  I just can't tell what that

11    says.  It looks like it starts off saying

12    investigator, and I can't really read the rest.

13              A.      I can read words, but I can't put

14    them together in a sentence.

15              Q.      Okay.  What is the second word?  Is

16    that, "Control bias," or what?

17              A.      "Control/bias," or, "control bias."

18              Q.      Okay.  And then below that it says,

19    "Truth is" --

20              A.      I don't know what that word says.

21              Q.      And then beside that it says,

22    "Bias, something off page."

23                      Does that look right?

24              A.      The "bias" and "off page", I can

25    read that.  I can't read the word in between.
```

(615) 595-0073

```
 1          Q.       Okay.  And below that it looks like
 2   you have an acronym TPRM; is that right?
 3          A.       Yes, but I don't know if it's TPRN
 4   or TPRM, but I can't recall what that means.
 5          Q.       Okay.  And then it looks like he
 6   goes through the different points, starting on
 7   Page 139841, that are contained in his report, the
 8   bullet points.
 9                   The first one on the bottom of that
10   page is, "Limited investigation, always" -- it looks
11   like, "always," what, "of the victim"?
12          A.       Where are -- where are you?
13          Q.       139841 at the bottom of the page.
14          A.       I can't tell if the word says
15   credible or critical.  Credible of victim.
16          Q.       And then did you write out, "Crime
17   scene first, search warrant"?
18          A.       Yes.  That looks like crime scene.
19   And I can't read that word.  Crime -- I can't read
20   scene --
21          Q.       Okay.
22          A.       -- actually.
23          Q.       And if you turn to the next page,
24   does the first sentence say, "Underage, state blames
25   victim"?
```

```
 1        A.        No.

 2        Q.        What does it say?

 3        A.        Becomes.  He was educating me about

 4   what happens in different cases, and he said the

 5   state becomes the victim.

 6        Q.        Okay.  And the rest of this looks

 7   like what's contained in his report.

 8                  No. 2 is victim interviews, and it

 9   talks about the soft interview rooms; is that right?

10        A.        Yes.

11        Q.        Okay.  And turning to the last page

12   of the document it says, "Redo policy, statute of

13   limitations, federal."

14                  What is that referring to?

15        A.        Can you show me where you're at?

16        Q.        I'm on the last page of the

17   document.

18                  MS. TAYLOR:  Bate stamp

19        No. 0139844.

20        A.        What was your question?

21        Q.        (BY MS. COLLINS) What does that

22   refer to?

23        A.        "Redo policy, statute of

24   limitations, federal."  I don't recall.

25        Q.        Now, going back to the Daigle
```

```
 1    report, and this was Exhibit No. 56, are there any
 2    recommendations in here that Johnson City disagreed
 3    with or did not follow?
 4                   MS. TAYLOR:  Object to the form.
 5         A.        Yeah, I would have to break that
 6    down.  You've asked me two questions.  One is what
 7    we disagreed with; one is what we did not follow.
 8                   I don't think we ever sat down and
 9    said -- and had a conversation with our command
10    staff to be able to have a discussion back and forth
11    with Daigle.
12                   What we did is we set out to
13    improve the department, to be able to show them the
14    report and to show them how we would make
15    recommendations to improve the Johnson City Police
16    Department.
17         Q.        (BY MS. COLLINS) Okay.
18         A.        So when you say we disagree with, I
19    don't think we ever had the discussion about
20    disagreeing with him.  I think the one that we
21    said -- and again, I think I'm moving into a
22    situation where I had communications with
23    attorney/client privilege protected around handling
24    internal investigations.
25         Q.        Okay.  So he issued a finding on
```

1    Page 14 of his report that sexual assault

2    investigations conducted by the JCPD have material

3    deficiencies and can hinder the ability to collect

4    necessary evidence for a complete and accurate

5    investigation.

6                    MS. TAYLOR:  Is that a question?

7            Q.      (BY MS. COLLINS) Did you take steps

8    to address that?  Did the City take steps to address

9    that finding?

10           A.      We did not debate what he wrote and

11   found.  What we did is lay out a plan moving forward

12   of providing training that would address any of

13   these issues that any of the citizens would read.

14   But we did not go back and forth with him on

15   challenging anything that he put in writing.  What

16   we did was lay out a plan of things that we could do

17   to move forward to improve the department.

18                    MS. COLLINS:  Okay.  I'm going to

19           provide you another document we're going to

20           mark as Exhibit No. 58.

21                    All right.  Ready?

22                    (Exhibit 58 marked).

23                    MS. COLLINS:  Sorry.  I've tried to

24           warn you.

25                    MR. RADER:  You gave me sufficient

```
 1          warning.
 2          Q.       (BY MS. COLLINS) Here you go.
 3          A.       Oh, thank you.
 4                   MS. COLLINS:  All right.  And there
 5          were Bates numbers, I think, on this but I
 6          didn't print it correctly.  So sorry.
 7                   MR. RADER:  I don't know.
 8          Elizabeth made me redo it when I did that
 9          during the last deposition.
10                   MS. TAYLOR:  Do you want me to grab
11          my Bate stamped copy?  Well, I'm going to
12          grab my Bate stamped copy so we can at least
13          note the Bate stamps on the record.
14                   MS. COLLINS:  Yeah, let's go off
15          the record.
16                   VIDEOGRAPHER:  Off the record at
17          4:04.
18             (Off the record at 4:04 p.m.)
19              (On the record at 4:06 p.m.)
20                   VIDEOGRAPHER:  We're back on the
21          record at 4:06.
22    BY MS. COLLINS:
23          Q.       Okay.  Now, if you could turn to
24    Page 4 of the Exhibit No. 58.
25                   MR. LAKEY:  Can we just on the
```

Case 2:23-cv-00072-KAC-JEM   Document 238-22 Filed 05/28/24   Page 24 of 79   PageID #:
9395

(615) 595-0073

record not the -- not the -- not as you go through it, but just the whole range for the record.

MS. TAYLOR: So the document that the witness is looking at is Ball 1 through Ball 46.

Q. (BY MS. COLLINS) Okay. If you could turn to Page 4 of the document, this looks like a note from 6/2/22, and you write Scott Pratt and then you have three names below that.

What is this in reference to?

A. The first, Scott Pratt, I don't recall. So I don't know who Scott Pratt is right now. I can't recall that name. The other three, I was in a meeting with Chief Turner, and he was providing me with a list of the assessment of who would -- assessment of major of operations. And so he was providing me with a list of three names of people who tested for major of operations at that time period.

Q. Okay.

A. And the date, just to make sure we're correct, is June 2nd, 2022.

Q. Okay. And you have an arrow pointing under Kevin Peters' name.

```
 1                    And does that say bully?
 2          A.        It does.
 3          Q.        Okay.  What does that refer to?
 4          A.        In my conversations with Chief
 5     Turner, when we were looking at the three, that was
 6     the order that they scored in.  And so I had listed
 7     the order that they scored in.  So we were having a
 8     discussion about what those three candidates.  And
 9     under civil service guidelines, any of the top five
10     can be promoted.  So he and I were talking about
11     those three candidates, and I feel like I recall
12     saying, "I've heard people say that Kevin Peters can
13     be a bully."
14          Q.        Okay.  And on -- if you could turn
15     to Page 9 of your document, this looks like a note
16     from 7/26/22.
17                    This is a note about 42 U.S.C., and
18     you wrote, "1933, municipal liability," and you
19     wrote, "Monell liability policy, pattern, and
20     practice."
21                    Do you recall what that's about?
22          A.        I'm trying to think of the time
23     frame.  I don't know if, before this, I have the
24     meeting that I was in.
25                    Oh, I recall.  So when we were in
```

1   the process and I had recommended that we bring in
2   an outside independent party to be able to help with
3   continuous process improvement within the department
4   and to address the concerns that the public had at
5   that point in time, on this day we did a
6   meet-and-greet via Zoom or Meets with Daigle.  And
7   so he's telling us about his experience and things
8   that he's worked on and things that he's been
9   involved in.
10              So this is the first time that I
11  met him via Zoom.  And so I -- while I can't go
12  through here, I know the intent of this whole
13  meeting was for him to talk about the work that he
14  had done, what he had worked in, how long -- he was
15  really telling us his credentials in this meeting.
16        Q.      Okay.  And the rest of just
17  flipping through the next couple pages, all this is
18  your handwriting from meetings, correct?
19        A.      What are you asking me?
20        Q.      This -- this whole document is your
21  handwriting, correct?
22        A.      Yes, ma'am.
23        Q.      If you could turn to Page 30 --
24  well, it starts on Page 29.  This looks to be from
25  September -- or July 10th, 2023.

(615) 525-0073

```
 1                    And you wrote, "Bias, gender bias
 2     is not interviewing suspects, not gathering
 3     evidence, shredding evidence, record keeping,
 4     training."
 5                    And then on the next page it looks
 6     like you wrote, "Reasons for cases, Turner was
 7     Chief, corruption, Sparks, Jenkins."
 8                    What does that refer to?
 9          A.        I was reviewing the report that had
10     come in that day.  That was the day we received the
11     report from Daigle, and so I was looking through
12     that report and taking notes.
13          Q.        Did Daigle specifically mention
14     corruption and Sparks and Jenkins?
15                    MS. TAYLOR:  Object to the form.
16          A.        No.  That was from the lawsuit that
17     had been filed.
18          Q.        (BY MS. COLLINS) Okay.  So did you
19     talk with Daigle on September 10th, 2023 --
20     July 10th, 2023 about Sparks and Jenkins and
21     corruption?
22          A.        No, ma'am.
23          Q.        Okay.  Why did you write that down?
24          A.        I was making notes of information
25     that had come from both the lawsuit and from the
```

```
 1    report.
 2          Q.        Okay.
 3          A.        Sorry.
 4                    But I was -- I was just taking
 5    notes for my own purpose.
 6                    MS. COLLINS:  Okay.  I'm going to
 7          mark this next document as Exhibit 59.
 8                    (Exhibit 59 marked).
 9          Q.        (BY MS. COLLINS) Was the Daigle
10    audit report issued to the community?
11          A.        I'm sorry.  I just blanked a little
12    bit.  Was --
13          Q.        It's okay.
14                    Was the Daigle audit report issued
15    to the community?
16                    MS. TAYLOR:  Object to the form.
17          A.        I wouldn't say issued.  It was
18    provided.
19          Q.        (BY MS. COLLINS) Okay.  And who
20    drafted this?
21          A.        Communications, our Public Affairs
22    Director Keisha Shoun.
23          Q.        Okay.  And it listed the eight main
24    findings of the report, correct?
25          A.        Yes, ma'am.
```

```
 1          Q.        And it has a quote from you that
 2    you wanted, "to acknowledge that victims of sexual
 3    assault have not always received the best possible
 4    treatment and care from our police department.  The
 5    department's new leadership is dedicated to continue
 6    changes toward compassionate and effective service,
 7    so that all citizens know they are safe and
 8    protected."
 9                    Was that a statement that you made
10    at this point in time on July 18th, 2023?
11                    MS. TAYLOR:  Object to the form.
12          A.        Yeah.  Will you read the statement
13    again, ma'am?  And maybe if you could say the
14    question -- it sounded like you asked two different
15    questions to me.
16          Q.        (BY MS. COLLINS) In the third
17    paragraph, do you see it?
18          A.        Yes.
19          Q.        Okay.  It's got a quote that's
20    attributed to you.
21                    Did you make that statement?
22          A.        I reviewed the statement and made
23    it in conjunction with our staff.
24          Q.        Okay.  So you acknowledge that
25    victims of sexual assault have not always received
```

```
 1   the best possible treatment and care from the police
 2   department, right?
 3              A.      Yes.
 4                       MS. COLLINS:  Okay.  I'll mark the
 5              next document as Exhibit No. 60.
 6                       (Exhibit 60 marked).
 7                       MS. TAYLOR:  I don't think we got
 8              60.
 9                       Oh, he has it.  Okay.  Sorry.  I
10              didn't know that he had it.
11              Q.      (BY MS. COLLINS) Ms. Ball, it looks
12   like you sent an email saying that the press
13   coverage of Sean Williams' case has not been fair
14   and thorough with respect to its representation of
15   the police department.
16                       What was not fair or thorough about
17   it?
18                       MS. TAYLOR:  Do you have a copy of
19              the reference to the attached letter to
20              WJHL?
21                       MS. COLLINS:  I'll mark the next
22              document as Exhibit No. 61, and this is --
23              starts at CITY-73636.
24                       MR. RADER:  Thank you.
25                       What number?
```

```
 1                    MS. COLLINS:  Exhibit No. 61.

 2                    (Exhibit 61 marked).

 3           Q.       (BY MS. COLLINS) So do you see the

 4    letter?

 5           A.       Uh-huh.

 6           Q.       All right.  So what about what WJHL

 7    was reporting was not a fair and thorough

 8    representation of the police department?

 9           A.       They reported that the files, the

10    video files that had been found regarding -- in Sean

11    Williams' possession were in the City of Johnson

12    City's position following ████████████ fall from

13    the window, and that that was the documents that

14    were retrieved when, in fact, the documents and the

15    photos that were retrieved were from -- were

16    confiscated when he was arrested in western North

17    Carolina.

18                    And so I called them immediately to

19    tell them that that was inaccurate information and

20    had not been the case.  They redacted it

21    immediately, but they did not specifically say that

22    they redacted it because we called and told them to.

23           Q.       Okay.  You never reviewed the

24    digital evidence that was in the Johnson City's --

25    that they had in custody as a result of the ████████
```

```
1    █████████ fall, right?

2         A.       I have never seen that.

3         Q.       Okay.  And that was what we went

4    through with the search warrant that had remained

5    with Johnson City since her fall, and it had not

6    been reviewed.

7         A.       Correct.

8         Q.       Okay.  So sitting here today, you

9    have no basis upon which to state whether or not

10   some of those files were the same as what the FBI

11   recovered when they got the information in 2023 when

12   he was apprehended.

13                 MS. TAYLOR:  Object to the form.

14        Q.       (BY MS. COLLINS) I think I gave the

15   wrong year, but when he was apprehended in North

16   Carolina.

17                 MS. TAYLOR:  Object to the form.

18        A.       I would ask if I could take a

19   break.

20        Q.       (BY MS. COLLINS) You can't take a

21   break in the middle of a question.

22        A.       Okay.  Can you ask the question

23   again, because I'm confused about your question?

24        Q.       Okay.  When you issued this

25   statement to the press, you didn't know what was
```

1    actually on the files that had been in Johnson

2    City's custody since the ████████████ fall, did

3    you?

4           A.        No.

5           Q.        And some of that same digital

6    evidence could have been on the thumb drives that

7    was recovered -- or the evidence that was recovered

8    when he was apprehended in North Carolina, correct?

9                     MS. TAYLOR:  Objection to form.

10          A.        To my knowledge, there's been no

11   evidence of what was found in the Johnson City

12   when -- in the ████████████ -- when we confiscated

13   that information.

14          Q.        (BY MS. COLLINS) Right.  You don't

15   know what was on that because it was never looked

16   at, correct?

17          A.        I don't and, to my knowledge, WJHL

18   didn't either.

19          Q.        Then what was your basis for saying

20   it was false?

21                    MS. TAYLOR:  Object to the form.

22          A.        The information that was provided

23   stated that it was -- that was provided -- and all

24   of the information we had was that the information

25   was obtained through the D.A. was from the files

```
 1    that were confiscated when he was arrested in

 2    Western Carolina University -- at Western Carolina

 3    University.

 4                    MS. TAYLOR:  Let's take a break.

 5                    MS. COLLINS:  Okay.

 6                    VIDEOGRAPHER:  Going off the record

 7         at 4:22.

 8             (Off the record at 4:22 p.m.)

 9             (On the record at 4:39 p.m.)

10                    VIDEOGRAPHER:  Okay.  We're back on

11         the record at 4:39.

12    BY MS. COLLINS:

13         Q.       Ms. Ball, when did you first meet

14    Detective Sparks?

15         A.       The first time I recall meeting

16    Detective Sparks, to know him personally, was after

17    the lawsuit was filed.

18         Q.       After which lawsuit was filed?

19         A.       The Doe lawsuit.

20         Q.       Okay.  What do you mean by to know

21    him personally?

22         A.       I had met many officers.  We have

23    150 some, but I could not recall them by name.  But

24    I'd been in a lot of meetings with different folks,

25    but I did not individually or personally know
```

(615) 595-0073

```
 1   people, and I had not yet had that opportunity to be

 2   able to meet with him.

 3           Q.      Okay.  And you said that you met

 4   him and got to know him personally after this

 5   lawsuit was filed.

 6           A.      And I should say professionally.  I

 7   don't know that I've ever personally -- never had

 8   any dealings with him personally, but through his

 9   work.

10           Q.      All right.  After the lawsuit was

11   filed and you said you got to know him through his

12   work, did you talk with him?

13           A.      Yes, ma'am.

14           Q.      Okay.  About what?

15           A.      I met with him to inform him about

16   the lawsuit and provide him a copy of the lawsuit

17   and to be able to make him aware that we were going

18   to do an internal -- we were going to open an

19   internal investigation.

20           Q.      An internal affairs investigation?

21           A.      Yes, ma'am.

22           Q.      Okay.  And that's the one that's

23   still open?

24           A.      Yes, ma'am.

25           Q.      When you met with him, was anyone
```

(615) 425-0073

```
 1    else present?
 2          A.       Yes, ma'am.
 3          Q.       Who?
 4          A.       Chief of Police Billy Church,
 5    Deputy Chief Jenkins, ███████████, and Major
 6    Carrier.  I believe all four were present, and I
 7    think also our staff attorney, Blake Watson.  That's
 8    the best of my recollection.
 9          Q.       Okay.  Have you been in touch with
10    Detective Sparks since that initial meeting?
11                   MS. TAYLOR:  Object to the form.
12          A.       I have talked to him.  I've checked
13    on him.  I've met his wife.  I've brought bagels
14    into the department.  I went and worked with the
15    police department on a case that they did, a murder
16    case, and he was working on that case as well.  So
17    during the course of my job, I had interactions with
18    Investigator Sparks.
19          Q.       (BY MS. COLLINS) And when you say
20    you've checked on him, what do you mean by that?
21          A.       I've checked on his welfare, on his
22    well-being, to see how he's doing.
23          Q.       And what was the situation where
24    you met his wife?
25          A.       I was at our clinic.  We have a
```

(615) 525-0073

```
 1    City clinic.  I was walking out of it, and she was

 2    behind me, and she called my name and said that -- I

 3    didn't know who she was, but I talked to her there.

 4    And she was emotional and had -- I was able to talk

 5    to her, and she appreciated the level of support

 6    that had been provided.

 7              Q.      Okay.  Do you have occasion to text

 8    with him?

 9              A.      I have before.

10              Q.      About what?

11              A.      Checking on his well-being, making

12    sure he's okay.  He's lost a considerable amount of

13    weight, and I just wanted to make sure that he

14    wasn't in a situation where there was some state of

15    mental well-being on his behalf.

16                      MS. COLLINS:  Okay.  I'll mark the

17              next document as Exhibit No. --

18                      COURT REPORTER:  62.

19                      MS. COLLINS:  -- 62.  And this is

20              SPARKS 42.

21                      (Exhibit 62 marked).

22              Q.      (BY MS. COLLINS) Have you seen

23    these texts before?

24              A.      I don't know if you know the date

25    of the first one.
```

```
 1                    Do you have a date on that one?

 2         Q.        I do not.

 3         A.        I'm struggling with the first one,

 4    because I'm just not recalling it and the context.

 5    I'm not debating it.  I just don't know the date

 6    or -- and the part at the top, it doesn't make sense

 7    to me that I would send a text -- I would never text

 8    the whole department.  So I'm just having trouble

 9    understanding that text.

10         Q.        Okay.  All right.  So you don't

11    recall when the one on the first page was sent.

12         A.        I don't.

13         Q.        Okay.  If you could turn to the

14    second page, this one has a date of December 19th

15    and December 27th.  It looks like you sent the one

16    that says, "Checking on you to see how you're

17    doing."

18                    Does that sound right?

19         A.        Yeah.

20         Q.        Okay.  And he said, "Just stressed

21    out and hoping I did good."

22                    What does that refer to, "hoping I

23    did good"?  Do you know?

24         A.        I -- so why do you think that mine

25    is the first one?  Is that the way that you have it
```

```
 1    recorded?  Because I'm -- I just want to make sure

 2    if you're saying that --

 3            Q.      Well, if you look at the one on

 4    December 27th, it says, "Toma, please let me know if

 5    there's anything I can do."

 6                    MS. TAYLOR:  She's talking about

 7            this page.  See?

 8                    THE WITNESS:  I don't think she is.

 9            She's talking about the second page.

10            Q.      (BY MS. COLLINS) Page 43.

11            A.      Yeah.  I understand your logic now.

12            Q.      Okay.  So on December 19th, what

13    did he do good at?

14            A.      I'm not sure.  The only thing I can

15    think of is maybe that's when he did his deposition

16    for the Dahl case, but I'm guessing at that.

17            Q.      Okay.  And you asked for a minute

18    for a call.

19                    Do you recall if you talked to him?

20            A.      I don't recall.  I mean, it seems

21    like I logically would have if he said yes.

22            Q.      What exhibit number was that?

23            A.      62.

24                    MS. COLLINS:  All right.  I'm going

25            to mark the next document as Exhibit 63, and
```

(615) 255-0073

```
 1              this is SPARKS 4 through 5.

 2                     (Exhibit 63 marked).

 3         Q.        (BY MS. COLLINS) And at the top of

 4    the page on Page 5, which is the second page of the

 5    document, it looks to be a text conversation between

 6    you and Detective Sparks.

 7                     Does that look familiar at all?

 8         A.        It's in a different format.

 9                     Is that what you're asking me?

10    Does it look --

11         Q.        Does this text thread look familiar

12    to you?

13         A.        It doesn't look unfamiliar, but I

14    don't recall it specifically.

15         Q.        Okay.  What do you mean, "it

16    doesn't look unfamiliar"?

17         A.        I -- my leadership style is that I

18    will check on people that I have concerns about or

19    I'm concerned about their well-being.  And I have

20    reason to be very worried about Toma Sparks, and it

21    is not unreasonable for me to read this and think

22    that I would have sent it.

23         Q.        Okay.  All right.  This number

24    that's on here, is that your personal number or your

25    work number?
```

```
 1          A.       My work number.
 2          Q.       Okay.  And this is the one that you
 3   sent from your -- you have both of them on your
 4   phone.
 5          A.       Yes, ma'am.
 6          Q.       Okay.  Do you know what your Apple
 7   ID is?
 8                   MS. TAYLOR:  Object to the form.
 9          Q.       (BY MS. COLLINS) Okay.  What's your
10   Apple ID?
11          A.       It is Cathy, with a C, Ball --
12                   MR. LAKEY:  Can we go attorney's
13          eyes only on this, if we're going to do
14          this?
15                   MS. TAYLOR:  Sure.
16                   MR. RADER:  So can everyone leave
17          the room?
18                   MS. COLLINS:  Sure.  Let's go off
19          the record.  Off the record.
20                   VIDEOGRAPHER:  Going off the record
21          at 4:53.
22               (Off the record at 4:53 p.m.)
23               (On the record at 4:53 p.m.)
24                   VIDEOGRAPHER:  Okay.  We are back
25          on the record at 4:53.
```

```
 1    BY MS. COLLINS:
 2         Q.        What is your Apple ID?
 3         A.        ███████████████.  That's off
 4    the record.
 5              MS. TAYLOR:  Are you going to ask
 6         her any other like sensitive personal
 7         information?  I mean, if we need to go
 8         attorney's eyes only again, we can, but
 9         might as well do it while we --
10              MS. COLLINS:  Go back off the
11         record.
12              MR. LAKEY:  Well, we have a
13         question.
14              MS. TAYLOR:  Yeah, it's a question.
15              MS. COLLINS:  Okay.
16              MS. TAYLOR:  Well, she was looking
17         through --
18              MS. COLLINS:  We'll go back off the
19         record.
20              VIDEOGRAPHER:  Going off the record
21         at 4:54.
22         (Off the record at 4:54 p.m.)
23         (On the record at 4:59 p.m.)
24              VIDEOGRAPHER:  We're back on the
25         record at 4:59.
```

BY MS. COLLINS:

Q.    Okay.  Ms. Ball, at one of the
press conferences you mentioned you had a daughter,
but when I was asking you about family in the area
you didn't mention her.

Is she under the age of 18?

A.    Yes.

Q.    Okay.  How old is she?

A.    17.

Q.    Okay.  Does she live in the area?

A.    She lives in Asheville.

Q.    Okay.  Does she have any plans to
move back to the Greenville/Johnson City area?

MS. TAYLOR:  Object to the form.

A.    It depends on where she goes to
college.

Q.    (BY MS. COLLINS) Okay.  Is she
looking at ETSU?

A.    She's looking everywhere right now.

Q.    Okay.  Good for her.

MS. COLLINS:  All right.  Let's go
back off the record.

VIDEOGRAPHER:  Okay.  Going off the
record at 4:59.

(Off the record at 4:59 p.m.)

```
 1              (On the record at 5:01 p.m.)

 2                   VIDEOGRAPHER:  We're back on the

 3          record at 5:01.

 4                   MS. COLLINS:  I'm going to mark the

 5          next document as Exhibit No. 64.  It's

 6          CITY-73481.

 7                   (Exhibit 64 marked).

 8     BY MS. COLLINS:

 9          Q.      Okay.  Have you seen this email

10     before?

11          A.      Yes, ma'am.

12          Q.      All right.  It looks like you sent

13     an email to General Finney on December 11th.

14                   Do you recall what allegation you

15     were discussing?

16          A.      I was sending him our response to

17     the Second Amended Complaint from the Doe case

18     and -- or excuse me.  I don't recall if I was

19     sending him our Amended Complaint.  I was sending

20     him the Second Amended Complaint that was filed by

21     the Does.

22          Q.      Okay.

23          A.      And it mentioned his name.  And as

24     a professional courtesy, I was providing it to him.

25          Q.      Okay.  And when you reference in
```

```
 1    this email that -- Page 37.  You talked about on a
 2    phone call on Page 37.
 3                       Was that an allegation about both
 4    of you, or did that page contain allegations about
 5    both of you?
 6           A.       I would have to see, if I could,
 7    the Amended Complaint, because I don't -- I don't
 8    recall right now what Page 37 was.
 9           Q.       Okay.  Do you recall what you
10    talked about on the phone call?
11           A.       I was giving him a heads up that it
12    was included in the filing.
13           Q.       That what was included in the
14    filing?
15           A.       I would have to look at the filing
16    in order to recall my memory on that.  Excuse me.
17           Q.       Do you recall that it was about --
18    that there were allegations on Page 37 that had to
19    do with both of you?
20                    MS. TAYLOR:  Object to the form.
21           A.       I don't.
22           Q.       (BY MS. COLLINS) At this time, did
23    you talk to him about any discovery or production of
24    documents in the case?
25           A.       No.
```

```
 1                    MS. COLLINS:  I'll mark the next
 2          document is Exhibit 65.  This is CITY-73263.
 3                    COURT REPORTER:  Exhibit 65.
 4                    (Exhibit 65 marked).
 5          Q.       (BY MS. COLLINS) Okay.  With
 6   respect to this letter, was it your understanding
 7   that -- that all of the cases, the sexual assault
 8   cases, were still being investigated and were active
 9   at that time?
10          A.       Which sexual assault cases are you
11   referring to?
12          Q.       The ones alleged in the Doe
13   lawsuit.
14          A.       Yes.
15          Q.       Okay.  And the fact that they were
16   still active, did that have anything to do with
17   whether or not the City could provide that
18   information, considering they were active
19   investigations?
20                    MS. TAYLOR:  Object to the form of
21          the question.
22          A.       I would say the ability to provide
23   records is a legal question that I'm not able to
24   answer.
25          Q.       (BY MS. COLLINS) Did District
```

```
 1    Attorney Finney instruct the City not to produce any
 2    documents that had to do with the Jane Does in this
 3    lawsuit whose cases were being investigated?
 4                 MS. TAYLOR:  Object to the form.
 5         A.      Can you repeat the question?
 6         Q.      (BY MS. COLLINS) To your knowledge,
 7    did District Attorney General Finney instruct the
 8    City not to provide documents that had to do with
 9    the Jane Does in this case who had cases that were
10    actively being investigated?
11                 MS. TAYLOR:  Object to the form.
12         A.      To my knowledge, he -- we directed
13    any media or any inquiries to him because he was
14    investigating them.  But I'm not aware that he
15    directed us in any way not to release them.  We
16    would have known not to do that.
17         Q.      (BY MS. COLLINS) What about
18    providing them in discovery in this lawsuit to the
19    plaintiffs?
20                 MS. TAYLOR:  Object to the form.
21         Q.      (BY MS. COLLINS) Did he have any
22    say over that?
23         A.      Not to my knowledge.  I wasn't a
24    part of those conversations.
25                 MS. COLLINS:  I'm going to mark the
```

1            next document as Exhibit No. 66.  It's

2            CITY-73260.

3                 (Exhibit 66 marked).

4        Q.       (BY MS. COLLINS) Do you recall what

5  you discussed with Steve Finney about on March 18th?

6        A.       I do.

7        Q.       Okay.  What?

8        A.       I mentioned earlier that we were in

9  the process of helping fund a position for a

10  forensic -- for a forensic interviewer for the Child

11  Advocacy Center.  As part of that, the money had

12  been funded, but it required that a Memorandum of

13  Understanding be developed between the City and the

14  Child Advocacy Center.  There had been some

15  discussion in a meeting about how that money would

16  be allocated.  There was a disagreement, or at least

17  a conversation, from their Executive Director that

18  they would prefer that it go in a different

19  direction.

20            I was going to send him the

21  memorandum, the draft Memorandum of Understanding

22  for his review, and I wanted him to know that it was

23  coming his way, and that they had asked to get it

24  back so that it could be executed.

25        Q.       Okay.  Did you take any notes from

1    that meeting?

2           A.      I did not.

3           Q.      Do you know or do you have any sort

4    of -- do you have any regular meeting or discussions

5    with Inspector Finney?

6                   MS. TAYLOR:  Objection to form.

7                   MS. COLLINS:  Not Inspector.  I'm

8           sorry.  It's the end of the day.  I'm tired.

9           General.

10          Q.      (BY MS. COLLINS) Do you have any

11   sort of regular meeting with General Finney?

12          A.      No, ma'am.

13          Q.      Okay.  About how many times have

14   you spoken with him?  Is it a regular occurrence or

15   what?

16                  MS. TAYLOR:  Object to the form.

17          A.      I would say I've either met or

18   spoke to him around 10 times.  10, that's

19   ballpark-ish.

20          Q.      (BY MS. COLLINS) Okay.  Of those

21   discussions, have any of them been about this case?

22          A.      They've been about Sean Williams.

23          Q.      Okay.  Have we already discussed

24   the ones that -- where you met with him and

25   discussed Sean Williams?

(615) 595-0073

```
 1                    I know we went through the letter

 2   that he sent, and it pretty much encapsulated the

 3   discussion that you all had.

 4                    Anything else that we haven't

 5   already discussed that had to do with Sean Williams

 6   or the allegations in this case?

 7           A.      Not that I can recall.  If there's

 8   anything else, I would have minutes that have been

 9   produced and given to you, but not that I can recall

10   right now.

11           Q.      All right.  Ms. Ball, do you recall

12   giving a press conference about this case?

13           A.      Yes, ma'am.

14           Q.      Okay.  Why did you do that?

15           A.      The City was preparing and had

16   filed a response the day that the news -- the media

17   release was done.

18           Q.      Okay.  What media release are you

19   talking about?

20           A.      The one that you asked me about.

21   "Do you remember speaking to the media?"

22           Q.      Well, luckily I don't have to

23   answer questions today.

24                    The -- I'm talking about giving a

25   press conference after the Jane Does filed their
```

```
 1    lawsuit and the Second -- in the Second Amended

 2    Complaint.

 3                    No.  Strike that.

 4                    After the Jane Does filed their

 5    lawsuit, do you recall giving a press conference

 6    about the Jane Doe lawsuit?

 7         A.        Yes.

 8         Q.        Okay.

 9         A.        On August 25th, 2023.

10         Q.        And you stated that the Does were

11    to some degree at fault for their rapes because they

12    consumed and partook of illegal drugs during the

13    course of that time period and visit.

14                    What did you mean by that?

15         A.        Do you have a copy of that for me

16    to be able to look at?

17              MS. COLLINS:  Sure.  I have a

18         transcript of it.  We'll mark it as Exhibit

19         No. 67.

20                    (Exhibit 67 marked).

21         A.        And which page are you referring

22    to, ma'am?

23                    And I should be -- I should speak

24    louder.  I'm sorry.  I asked her which page she was

25    referring to.
```

```
1        Q.        (BY MS. COLLINS) And it's on
2    Page 6.
3        A.        And which -- can you tell me where
4    you're referring to in the document?
5        Q.        Line 4 through Line 9 and into Line
6    11.
7                  MS. TAYLOR:  Can you refer us to a
8        page?
9                  MS. COLLINS:  Sure.  6.
10                 MS. TAYLOR:  6.
11       A.        I say within the lawsuit, the Jane
12   Doe -- the Jane Doe lawsuit, as we refer to it,
13   there are allegations that are made by Jane Does.
14   And in that factual information that they provided,
15   it indicated that they consumed and partake --
16   partook of illegal drugs during the course of the
17   time period within that visit.  And that is
18   contained within the information they provided in
19   the lawsuit, meaning the Does.
20                 Is that what you're asking me?
21       Q.        (BY MS. COLLINS) Yes.
22                 Now, what did you base your
23   statement on that they were comparatively at fault?
24       A.        The attorneys filed a response to
25   the lawsuit, as well as I read the entire lawsuit.
```

(615) 595-0073

```
 1          Q.       Okay.  Why was it necessary to call
 2     a press conference about this?
 3          A.       As I mentioned, part of my ethical
 4     responsibility is to inform the public when
 5     information is provided.
 6                   I had the intentions of really
 7     making sure that there was a difference between a
 8     civil lawsuit and the allegations that -- or the
 9     response the City provided within the civil
10     litigation was very different than how our criminal
11     system handled them.
12                   My intent was to make sure that
13     victims of sexual assault felt comfortable and
14     understood that the difference between those two and
15     in two different cases -- two different times within
16     it, I repeated that in no case under criminal law is
17     it okay for a victim to be raped.
18          Q.       Okay.  So you're excusing it based
19     on the fact that it's a civil lawsuit, is that what
20     you're saying?
21                   MS. TAYLOR:  Object to the form of
22          the question.
23          A.       No.
24          Q.       (BY MS. COLLINS) Okay.  Then why
25     did you do it?
```

```
 1                      MS. TAYLOR:  Object to the form of

 2           the question.

 3           A.        Why did I do what?

 4           Q.        (BY MS. COLLINS) Say that they were

 5    comparatively at fault.

 6                      MS. TAYLOR:  Object to the form of

 7           the question.

 8           A.        I did not say that.  The response

 9    to the lawsuit said that.

10           Q.        (BY MS. COLLINS) Okay.  But you got

11    up and held a press conference about it, right?

12           A.        I did not hold a press conference

13    about that.

14           Q.        Well, that's what this transcript

15    is from.

16                      You did have a press conference to

17    explain that, right?

18                      MS. TAYLOR:  Object to the form of

19           the question.

20           Q.        (BY MS. TAYLOR) That that defense

21    was being asserted.

22                      MS. TAYLOR:  Object to the form of

23           the question.

24           Q.        (BY MS. COLLINS) Isn't that true?

25                      You stood up there and said that
```

```
 1    they were comparatively at fault.
 2                   MS. TAYLOR:  Object to the form of
 3         the question.
 4         A.        That was not the purpose of the
 5    lawsuit or the intent --
 6         Q.        (BY MS. COLLINS) Okay.
 7         A.        -- of the press conference.  Excuse
 8    me.
 9         Q.        And their civil lawsuit was a
10    lawsuit brought against the City because the
11    plaintiffs alleged that the City didn't take steps
12    to protect them, right?
13                   MS. TAYLOR:  Object to the form of
14         the question.
15         A.        My understanding is that that was
16    their -- that they -- what they alleged.
17         Q.        (BY MS. COLLINS) Okay.  And you
18    agree that people have a right to file a civil
19    lawsuit if they feel like their civil or
20    constitutional rights have been violated, correct?
21                   MS. TAYLOR:  Object to the form.
22                   MR. RADER:  Object to the form of
23         that one, especially.
24         A.        I don't know that I know enough
25    about the law, to be honest with you, as to when
```

```
 1    somebody has the right to do that and when they
 2    don't.
 3                     What I -- I was actually attempting
 4    to soften the blow of it coming out in the lawsuit,
 5    in the response to the lawsuit.
 6         Q.     (BY MS. COLLINS) You were softening
 7    the blow by getting up there and -- and saying that
 8    because they partook of illegal drugs that the City
 9    was using a defense of comparative fault?
10                MS. TAYLOR:  Object to the form of
11         the question.
12         A.          I was saying that was included
13    within our response.
14         Q.     (BY MS. COLLINS) How does that
15    encourage other victims to come forward if JCPD
16    mishandles their cases?
17                MS. TAYLOR:  Object to the form of
18         the question.
19         A.          The intent was to separate the
20    difference between a civil lawsuit versus a criminal
21    lawsuit.
22         Q.     (BY MS. COLLINS) Well, at this
23    point in time, you knew that JCPD had gotten
24    evidence from Sean Williams' apartment back in 2020,
25    correct?
```

```
 1              MS. TAYLOR:  Object to the form of
 2         the question.
 3         A.       I did.
 4         Q.       (BY MS. COLLINS) At this point in
 5    time, when you gave the press conference, you knew
 6    that multiple women had made allegations of rape
 7    against Sean Williams, correct?
 8              MS. TAYLOR:  Object to the form of
 9         the question.
10         A.       I knew -- I knew multiple women --
11    I'm sorry.  I knew that there was a lawsuit that
12    alleged --
13         Q.       (BY MS. COLLINS) When you gave the
14    press conference, you knew that multiple women --
15              MS. TAYLOR:  Let her answer.
16              MR. RADER:  Object --
17              MS. TAYLOR:  Let her answer.
18         Q.       (BY MS. COLLINS) You knew that
19    multiple women had alleged they had been raped by
20    Sean Williams.
21              MS. TAYLOR:  I'm going to direct
22         the witness to answer the last question.
23              Will you read back the last
24         question that she was interrupted in her
25         answer on?
```

```
 1              MS. COLLINS:  It's the same thing I
 2       just said.
 3              COURT REPORTER:  At this point in
 4       time, when you gave the press conference,
 5       you knew that multiple women had made
 6       allegations of rape against Sean Williams,
 7       correct?
 8       A.      We had three to four reports
 9  reported to the Johnson City Police Department.
10       Q.      (BY MS. COLLINS) Okay.  And none of
11  those three to four reports had been fully
12  investigated, had they?
13              MS. TAYLOR:  Object to the form
14       question.
15       A.      I don't have the answer to that
16  question.
17       Q.      (BY MS. COLLINS) Okay.  And at this
18  point in time, when you gave this press conference,
19  the City also had the Daigle report in its hands,
20  right?
21       A.      Yes, ma'am.
22       Q.      And the City also knew the extent
23  of the failures that it had, based on the Daigle
24  report, that claims of sexual assault had not been
25  properly investigated, right?
```

```
 1              MS. TAYLOR:  Object to the form of

 2         the question.

 3         A.       I knew there was opportunity for

 4    improvement in the way that the City handled sexual

 5    assault claims.

 6         Q.       (BY MS. COLLINS) And you also knew

 7    at this time, based on the Daigle report, that

 8    victims were not listened to and it was because of

 9    bias against them, right?

10              MS. TAYLOR:  Object to the form of

11         the question.

12         A.       I did not know that.

13         Q.       (BY MS. COLLINS) Okay.  All the

14    things that are listed in the Daigle report you had

15    in your possession, correct?

16         A.       Correct.

17              MS. TAYLOR:  Object to the form.

18         Q.       (BY MS. COLLINS) And he

19    specifically raised the issue with the City that it

20    had a problem with bias and the reason why sexual

21    assault investigations were not properly

22    investigated, right?

23              MS. TAYLOR:  Object to the form of

24         the question.

25         A.       That was his opinion.
```

```
 1          Q.      (BY MS. COLLINS) And he's the

 2    person that the City hired to get it on a better

 3    track with respect to sexual assault investigations,

 4    correct?

 5          A.      That's correct.

 6                  MS. TAYLOR:  Object to the form of

 7          the question.

 8          Q.      (BY MS. COLLINS) And despite

 9    knowing that Sean Williams had raped multiple women

10    in the City and that he had been arrested and found

11    with videos and pictures of those sexual assaults in

12    North Carolina, despite knowing that things sat in a

13    vault at the JCPD, despite knowing that there was a

14    raped list that the JCPD had been in possession of,

15    and despite having its own expert report saying that

16    they had not done a good job with respect to sexual

17    assault investigations, you still got up at a podium

18    and blamed the victims in this case because they

19    filed a lawsuit.

20                  MS. TAYLOR:  Object to the form of

21          the question.

22          A.      I did not blame the victims.

23          Q.      (BY MS. COLLINS) Isn't that what

24    you said, because they took partook of illegal drugs

25    and alcohol that the City was -- because the City
```

```
 1    was raising a comparative fault defense, that's
 2    blaming them.
 3                    MS. TAYLOR:  Object to the form of
 4         the question.
 5         A.       I did not blame the victims.
 6         Q.       (BY MS. COLLINS) If they feel
 7    differently, do you have any basis to contest that?
 8                    MS. TAYLOR:  Object to the form of
 9         the question.
10         A.       I am sorry if that hurt them.  I
11    would never do that, and that was not the intent,
12    and I never said that they were at fault for being
13    raped.
14         Q.       (BY MS. COLLINS) Do you think that
15    the people that -- the women that reported their
16    claims to the JCPD deserved to have their cases
17    investigated?
18                    MS. TAYLOR:  Object to the form of
19         the question.
20         A.       I believe they had their cases
21    investigated.
22         Q.       (BY MS. COLLINS) What about ████
23    rape kit?
24                    MS. TAYLOR:  Object to the form of
25         the question.
```

```
 1          A.          I don't think it is appropriate for

 2    me to respond to something I heard in deposition,

 3    and so I feel at this point in time, I am very

 4    reluctant to speak to what I believe that I heard in

 5    deposition about that rape kit.

 6          Q.          (BY MS. COLLINS) Well, you're the

 7    City Manager, right?

 8                      You have the authority to hire and

 9    fire people who aren't doing their job, right?

10                      MS. TAYLOR:  Object to the form of

11          the question.  This is argumentative, has

12          been for quite a while.

13          Q.          (BY MS. COLLINS) You have the

14    authority to hire and fire people who aren't doing

15    their job.

16          A.          Based on what I heard, the rape kit

17    was tested and her number had been changed, and they

18    tried to reach her.  That is what I thought I heard.

19    I very much want the facts of this case to come out.

20          Q.          Was it compared to Sean Williams?

21                      MS. TAYLOR:  Object to the form of

22          the question.

23          Q.          (BY MS. COLLINS) Her rape kit, when

24    her rape kit was done, was it compared with any DNA

25    evidence from Sean Williams?
```

```
 1          A.        I don't know the answer to that.

 2          Q.        If I told you that DNA evidence

 3   wasn't gotten from Sean Williams until 2023 when he

 4   was arrested in North Carolina, would that seem

 5   pretty egregious to you?

 6                    MS. TAYLOR:  Object to the form of

 7          the question.

 8          A.        If that were true, it would be.

 9          Q.        (BY MS. COLLINS) Do you know that

10   it's not true?

11                    MS. TAYLOR:  Object to form of the

12          question.

13          A.        I don't.

14          Q.        (BY MS. COLLINS) Do you agree that

15   the victims in this case have a right to pursue

16   accountability for letting a person with a raped

17   list continue to roam free for years?

18                    MS. TAYLOR:  Object to the form of

19          the question.

20          A.        Can you repeat the question,

21   please?

22                    MS. COLLINS:  Can you repeat the

23          question, please?

24                    COURT REPORTER:  Do you agree that

25          the victims in this case have a right to
```

```
 1              pursue accountability for letting a person

 2              with a raped list continue to roam free for

 3              years?

 4                      MS. TAYLOR:  Same objection.

 5         A.           I have no reference to answer that

 6    question.  I don't fully understand the question,

 7    and I don't understand how it relates to this

 8    lawsuit.  I feel like asking me to answer it means

 9    that there are facts out there that indicate that

10    there was some accountability on the part that I'm

11    not able to speak to.

12         Q.           (BY MS. COLLINS) Who told you to

13    have that press conference?

14         A.           No one.

15         Q.           That was your decision?

16         A.           Yes, ma'am.

17         Q.           Who told you to say that -- to

18    discuss that the plaintiffs were comparatively at

19    fault?

20                      MS. TAYLOR:  Objection to form.

21         A.           I was not saying that they were.  I

22    was saying that it was included in the response.

23         Q.           (BY MS. COLLINS) Why did you single

24    that out from the response?

25                      MS. TAYLOR:  Object to the form.
```

1        A.       My goal was to explain that because

2   that was filed in the report, in anticipation of it

3   being released to the media, I still wanted to

4   encourage women that in a criminal case, the Johnson

5   City Police Department as well as -- if they did not

6   feel comfortable coming to them that they would come

7   to somebody else, and that it would not hit the

8   media in a way that would discourage women from

9   coming forward when they were raped.

10       Q.       (BY MS. COLLINS) So by highlighting

11  this one issue that they were comparatively at

12  fault, you were trying to encourage other women to

13  come forward?  Is that what you're saying?

14              MS. TAYLOR:  Object to the form of

15        the question.

16       A.       I was anticipating the headlines to

17  read City Blames Women, and I was trying to provide

18  some context prior to that being a headline to a

19  story so that women would not feel like the City was

20  blaming them.  That was my goal.

21       Q.       (BY MS. COLLINS) Do you think you

22  achieved your goal?

23              MS. TAYLOR:  Objection to the form

24        of the question.

25       A.       Based on hearing from Jane Does, I

```
 1    don't.  And I'm very sorry for that.
 2            Q.      (BY MS. COLLINS) Now, if you could
 3    turn to Page 13 of the -- it looks like a
 4    question -- somebody posed a question that asked you
 5    to speak to when you found out what's allegedly on
 6    the thumb drives that North Carolina recovered with
 7    potentially 52 different women that have been
 8    victims, and they asked for your thoughts in
 9    discovering that.
10            Do you remember that question?
11            A.      Will you show me which sentence
12    you're referring to?
13            Q.      Sure.  It starts on -- Line 9 was
14    the question.
15            A.      Yes, ma'am.
16            Q.      And then your response is on 15
17    through 25.
18            Just let me know when you've had a
19    moment to review that.
20            A.      Yes, ma'am.
21            Q.      Okay.  And you acknowledge that
22    you've not done a good job of educating the public
23    on how you get probable cause.
24            Do you know how you get probable
25    cause?
```

```
1              MS. TAYLOR:  Object to the form of
2         the question.
3              A.        I could not speak to that, as I'm
4    not an expert in that area.
5              Q.        (BY MS. COLLINS) Okay.  What were
6    you talking about there when you say, "We've not
7    done a great job of educating the public about
8    probable cause"?
9              A.        I would say that the general public
10   does not understand, as well as myself, when there
11   is the ability to be able to -- and, for example,
12   when you have the right to seize property, when you
13   have the right to arrest someone, when you have the
14   right to search someone, that what may seem
15   reasonable to the general public may not legally be
16   allowed.  So I was referring to the fact that,
17   generally speaking, a lot of folks, unless
18   they're --
19             Q.        Go ahead.  I'm listening.
20             A.        Unless they're knowledgeable about
21   what rights people have, and unfortunately even
22   sometimes really bad people have, that there hasn't
23   been a lot of education around that.  So it was an
24   attempt to say that sometimes we don't fully
25   understand why information can't be taken or can't
```

```
 1   be used in a case.

 2          Q.       What information are you talking

 3   about?

 4          A.       If I recall correctly, there were a

 5   lot of -- there were questions about the computers

 6   that were taken from Sean Williams after ████████

 7   ██████ fell out the door -- or the window.  Excuse

 8   me.

 9          Q.       Okay.  And why those devices were

10   not searched at that time, correct?

11          A.       Yeah.

12          Q.       Okay.  And were you aware that at

13   that time they also recovered the raped list?

14                   MS. TAYLOR:  Object to the form of

15          the question.

16          A.       I generally recall that.

17          Q.       (BY MS. COLLINS) Okay.  So in

18   addition to being in possession of all of this

19   electronic evidence that wasn't looked at, the JCPD

20   was also in possession of a raped list --

21                   MS. TAYLOR:  Object to the form of

22          the question.

23          Q.       (BY MS. COLLINS) -- correct?

24          A.       A raped list, when you say that,

25   are you -- you're referring to --
```

```
 1          Q.      A list that has people's names on
 2   it.  The word raped at the top.
 3          A.      Yes ma'am.
 4          Q.      Okay.  So the JCPD was in
 5   possession of that at that same time.
 6                  MS. TAYLOR:  Object to the form of
 7          the question.
 8          A.      Yes, ma'am.
 9          Q.      (BY MS. COLLINS) Okay.  So there
10   really was no excuse for those devices not to have
11   been searched at that time, was there?
12                  MS. COLLINS:  Object to the form of
13          the question.
14          A.      I have no ability to answer that
15   question.  I was not here at the time, nor do I
16   understand the laws associated with it.
17          Q.      (BY MS. COLLINS) Who was your
18   realtor when you were looking to buy Sean Williams'
19   condominium?
20          A.      Shannon Castillo.
21          Q.      When did you begin negotiating that
22   contract?
23          A.      The beginning of April 2022.
24          Q.      Do you have any records of that
25   contract?
```

```
 1              A.        Yes, ma'am.

 2              Q.        Okay.  Where are they?

 3              A.        They're in my office.

 4              Q.        Why did you need a lawyer for that

 5    deal?

 6              A.        Why did I need a lawyer to buy real

 7    estate?  Is that your question?

 8              Q.        Yes.

 9              A.        I always use a lawyer to buy real

10    estate.

11              Q.        Do you own a lot of real estate?

12              A.        I own two homes.

13              Q.        What happened to the deposit, or

14    did you make a deposit?

15              A.        It was held in escrow by the

16    attorney and returned to me.

17              Q.        What basis did you have to pull out

18    of the contract?

19              A.        The fact that the seller was a

20    fugitive, and it was not questioned.

21              Q.        Okay.  Where is your other home?

22              A.        Asheville, North Carolina.

23              Q.        Who lives there?

24              A.        My husband and my daughter.

25              Q.        Okay.  What's your husband's name?
```

```
1        A.      ███████████████.

2        Q.      What's the address?

3        A.              ████████████████████

4  ████████████████████.

5                MS. COLLINS:  Okay.  Let's go off

6        the record.  I just need to review my notes.

7                VIDEOGRAPHER:  Going off the record

8        at 5:38.

9             (Off the record at 5:38 p.m.)

10            (On the record at 5:54 p.m.)

11               VIDEOGRAPHER:  We're back on the

12       record at 5:54.

13  BY MS. COLLINS:

14       Q.      Earlier I asked you if you dealt

15  with Tessier & Associates in your prior role as

16  Assistant City Manager in Asheville.

17               Who did you deal with at Tessier?

18       A.      Chuck Tessier.

19       Q.      Oh, it's Tessier?

20       A.      Tessier, yeah.

21       Q.      Okay.  Chuck.

22       A.      His wife owned a company, and also

23  she did some publishing and stuff and did some work

24  for the City.

25       Q.      Who was the lawyer that helped you
```

(615) 595-0073

1    with the sale of your home in Asheville?

2         A.        Oh, my goodness.  I would have to

3    find that information.  That's been a long time ago.

4         Q.        Okay.  Did Pete Peterson, your

5    predecessor, assist you with any sort of transition

6    when you took over the role as City Manager?

7         A.        He did.  I met with him several

8    times before I -- I accepted the position in late

9    October.  I think that's when the Commission voted

10   on it.  And so there was a couple of months that I

11   came over, met with different folks in the

12   organization.  So I had about a two-month kind of

13   opportunity to talk to him and to meet with staff

14   before I transitioned into the role.

15        Q.        Okay.  Were there any discussions

16   with Mr. Peterson about the Kat Dahl case?

17        A.        No.

18        Q.        Were there any discussions with

19   Mr. Peterson about the police department?

20        A.        No.

21        Q.        Did you take any notes from your

22   transition conversations with Mr. Peterson?

23        A.        I did.

24        Q.        Do you still have those notes?

25        A.        Yes.

```
 1          Q.      Have you given those notes to your
 2   attorney?
 3          A.      I can.  None of those notes pertain
 4   to anything related to Sean Williams or related to
 5   this case, but I'm happy to provide them.
 6          Q.      Okay.  Did you deal with anyone
 7   else at Tessier & Associates besides Chuck and his
 8   wife?
 9          A.      Not that I can recall.
10          Q.      What was his wife's name?
11          A.      Karen.
12          Q.      Also Tessier?
13          A.      Yes, ma'am.
14          Q.      What was the nature of the dealings
15   you had with Tessier & Associates?
16          A.      We had -- we had proposed and had a
17   study completed that showed the need for parking
18   downtown, and so we had located a piece of property
19   and were in the -- was in the process of
20   determining -- it was adjacent to the Grove Arcade
21   building that you mentioned before.  And so we did
22   design work with a consulting firm.  He was a
23   developer.  He worked to help acquire the property,
24   because he also worked in a -- as a -- in a real
25   estate kind of capacity, but worked on a
```

```
 1   redevelopment plan for that area.

 2           Q.        Which consulting firm are you

 3   talking about?

 4           A.        Kimley-Horn & Associates, I

 5   believe.  I'm not -- I'm not 100 percent sure, but

 6   it's a consulting firm that did parking garages.

 7           Q.        Do you know the address for the

 8   Grove -- for the property that they were working on,

 9   rather?

10           A.        It's on Haywood Road.

11           Q.        Okay.

12           A.        Across from the Harris Cherokee

13   Center -- Arena.

14                     Excuse me.  It's Haywood Street,

15   not Haywood Road.

16           Q.        How long have you known Chuck

17   Tessier?

18           A.        Probably since the early 2000's.

19   Middle 2000's.  I don't recall exactly.

20           Q.        Do you still have any contact with

21   him?

22           A.        No.

23           Q.        And did you meet him through the

24   course of your job duties?

25           A.        Yes, ma'am.
```

```
 1          Q.      Okay.  Any other projects that you
 2   can think of that involved --
 3          A.      He was a regular developer in town
 4   that would meet with me about different projects he
 5   was working on, but there was no -- there was never
 6   any that developed into the level of detail that
 7   that one did.
 8          Q.      And why was he meeting with you?
 9          A.      I was in a role of being the City
10   Engineer, and then I also was over our planning and
11   permitting process.  So any time there was a meeting
12   that would involve the planning department that was
13   a large scale, what we would consider a
14   transformational project, I would meet with -- I
15   would be a part of those meetings to discuss that.
16          Q.      Did you ever work with him or make
17   any money from him?
18          A.      No, ma'am.
19          MS. COLLINS:  Okay.  That's all we
20          have.
21                      EXAMINATION
22   BY MR. RADER:
23          Q.      I just want to ask you, Ms. Ball
24   briefly, on behalf of my client, when you were asked
25   today by Ms. Collins about these handwritten
```

1    notebooks that you prepare, it's my understanding --

2    and I want to be sure I'm clear.

3                    It's my understanding that you take

4    notes when people are talking as part of your effort

5    to focus and listen; is that correct?

6         A.        That's correct.

7         Q.        You're not trying to

8    stenographically record everything that happens,

9    like our court reporter here or some of us writing

10   notes down to keep that record.

11                  That's not your purpose; is that

12   right?

13        A.        Yes, sir.

14        Q.        And so when you write things down,

15   it might be comments that people have or words

16   they've made.

17                  It's not your conclusions; is that

18   correct?

19        A.        That's correct.

20        Q.        So there were a couple of comments

21   about my client, Mr. Peters.  You did not reach

22   those conclusions and record those in your notebook.

23                  Those are just words that somebody

24   might have said to you; is that correct?

25        A.        Correct.

```
 1          Q.      Okay.  Do you have any reason to
 2   believe that Mr. Peters was anything other than
 3   somebody who wanted to do a good job as a captain in
 4   the police department?
 5                  MS. COLLINS:  Objection to form.
 6          A.      I never personally experienced
 7   that.
 8          Q.      (BY MR. RADER) That he was anything
 9   other than wanting to do a good job?
10          A.      That's correct.
11                  MR. RADER:  All right.  Thank you,
12          ma'am.
13                  MS. COLLINS:  Anything else?
14                  All right.  You're done.
15                  THE WITNESS:  All right.
16                  VIDEOGRAPHER:  We're going off the
17          record at 6:02.
18                  FURTHER THIS DEPONENT SAITH NOT.
19              (Deposition ended at 6:02 p.m.)
20
21
22
23
24
25
```

```
1                    C E R T I F I C A T E

2     STATE OF TENNESSEE:

3     COUNTY OF KNOX:

4

5                    I, Jeffrey D. Rusk, Registered

6     Professional Reporter and Notary Public, do hereby

7     certify that I reported in machine shorthand the

8     foregoing proceedings; that the foregoing pages,

9     inclusive, were prepared by me using computer-aided

10    transcription and constitute a true and accurate

11    record of said proceedings.

12                    I further certify that I am not an

13    attorney or relative of any attorney or counsel

14    connected with the action, nor financially

15    interested in the action.

16                    Witness my hand and official seal

17    this the 3rd day of June, 2024.

18

19

20    _____

21    Jeffrey D. Rusk, RPR, CLVS
      Notary Public at Large
22    My Commission Expires:  4/29/2026
      TCRB License No. 212

23

24

25
```