IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE
AT GREENEVILLE

| | | |
|---|---|---|
| **Mikayla Evans**,<br>Plaintiff, | ) | |
| v. | ) | No. 2:24CV00106 |
| **Johnson City**, a governmental entity, | ) | |
| **Karl Turner**, individually and in his official capacity as Chief of Johnson City Police Department, | ) | |
| **Kevin Peters**, individually and in his official capacity as Investigator of the Johnson City Police Department, | ) | |
| **Toma Sparks**, individually and in his official capacity as Investigator of the Johnson City Police Department, | ) | |
| **Justin Jenkins**, individually and in his official capacity as Investigator of the Johnson City Police Department, | ) | |
| **Jeff Legault**, individually and in his official capacity as Investigator of the Johnson City Police Department, | ) | |
| **Brady Higgins**, individually and in his official capacity as Investigator of the Johnson City Police Department, and | ) | |
| **Does 8-20**, inclusive | ) | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

This section 1983 case is before the Court on motions to dismiss and/or for summary judgment: (1) alternative motion to dismiss and/or for summary on behalf the City of Johnson City and the following defendants in their official capacities only: Karl Turner, Kevin Peters, Toma Sparks, Justin Jenkins, Jeff Legault, and Brady Higgins, [Doc. 128, 130], Plaintiff's response in opposition, [Doc. 144], and Defendants' reply, [Doc. 145]; (2) alternative motion to dismiss and/or for summary judgment on behalf of Karl Turner, in his individual capacity, [Doc. 125, 127], Plaintiff's memorandum in opposition, [Doc. 134], and Turner's reply, [Doc. 147]; (3) motion to dismiss plaintiff's Third Amended Complaint ("TAC") by Defendant Kevin Peters pursuant to Fed. R. Civ. P. 12(b)(6), and in the alternative for summary judgment pursuant to Fed. R. Civ. P. 56, [Doc. 120, 121], Plaintiff's Memorandum in Opposition, [Doc.135], and Peters' reply, [Doc. 149]; (4) motion to dismiss Plaintiff's Third Amended Complaint on behalf of Toma Sparks, in his individual capacity, and in the alternative for summary judgment, [Doc.131, 132], Plaintiff's Memorandum in Opposition, [Doc. 136], and Sparks' reply, [Doc.150]; and (5) motion to dismiss and/or motion for summary judgment by Justin Jenkins, Brady Higgins, and Jeff Legault, in their individual capacities, [Doc. 122, 124], Plaintiff's Memorandum in opposition, [Doc. 141], and defendants' reply, [Doc. 148].

This order will address the pending motions to dismiss and will defer ruling on the motions for summary judgment as set forth below. For the reasons stated below, the motion of the City of Johnson City and the official capacity defendants to dismiss, [Doc. 128], will be GRANTED IN PART and DENIED IN PART. The motion to dismiss by Karl Turner, [Doc. 134], will be GRANTED IN PART and DENIED IN PART. The motion to dismiss by Kevin Peters, [Doc. 120],

will be GRANTED IN PART and DENIED IN PART. The motion to dismiss by Toma Sparks, [Doc. 131], will be GRANTED IN PART and DENIED IN PART. The motion to dismiss by Justin Jenkins and Jeff Legault, [Doc. 122], will be GRANTED IN PART and DENIED IN PART. The motion to dismiss by Brady Higgins will be GRANTED IN FULL. The Court will defer ruling on the motions for summary judgment by all defendants for a period of 21 days as set forth below.

**I. The Complaint's Allegations.**

The Third Amended complaint, [Doc. 119], (hereinafter "TAC"), which is the operative complaint in the case, alleges as follows against the defendants, Johnson City, Karl Turner ("Turner"), Kevin Peters ("Peters"), Toma Sparks ("Sparks"), Justin Jenkins ("Jenkins"), Brady Higgins ("Higgins"), Jeff Legault ("Legault"), and Does 8-20:

At all relevant times, Turner was the Chief of Police in Johnson City, Tennessee. Peters was a captain at the Johnson City Police Department ("JCPD"), and Sparks, Jenkins, Legault and Higgins were JCPD Investigators. Does 8-20 were JCPD officers. (TAC, ¶¶ 3-9).

Beginning in 2018 and continuing through his incarceration "Sean Williams ("Williams"), with the aid of defendants, conspired with Alvaro Fernando Diaz-Vargas ("Diaz-Vargas") and others to drug, assault, and sexually exploit women and minors in his downtown Johnson City apartment." Defendants "allowed Williams to 'get away' with his crimes [and] actively helped him conceal and destroy evidence, preventing his arrest." [*Id.* at ¶16).

Williams, a Johnson City businessman and his accomplice Diaz-Vargas used Williams' business to buy and sell narcotics and funnel money to the individual defendants in exchange for protection from investigation. [*Id.* at ¶17]. During the relevant time, "Williams developed a modus operandi" to attract, drug, and rape women. Williams met women with the help of young male associates and

offered them alcohol and/or drugs to entice them to come to his apartment and/or garage. Williams laced the alcohol and/or drugs with common date rape drugs with the intent to incapacitate them. The women passed out, and after they regained consciousness discovered they had been sexually assaulted. [ *Id*. at ¶¶ 18-20].

Williams continued his criminal behavior by bribing JCPD officer defendants to prevent investigations and/or cover up evidence of his crimes. Officer defendants accepted a weekly bribe of at least $2000 from Williams or his accomplices. Defendants ignored reports, intimidated and belittled the victims, and discouraged pursuit of legal remedies against Williams. [*Id*. at ¶¶ 23, 25].

On November 7, 2019, Jane Doe 3 was in Williams' apartment and began to feel mentally and physically incapacitated. Doe 3 woke up in Williams' bed with Williams on top of her. She escaped Williams' apartment and was taken by a friend to an urgent care clinic for a rape kit. While at the urgent care, she reported the event to JCPD officers. She heard nothing from JCPD for over a year and a half. Sparks then called her with the results of the rape kit showing she had been drugged and raped. Sparks tried to dissuade her from pursuing charges, describing Williams as "untouchable," lied to her about JCPD's ability to obtain DNA from Williams, and told her JCPD probably could not protect her if she reported the rape. Doe 3 nevertheless decided to pursue charges, and called Sparks to notify him of her decision, but never heard back from him. [ *Id*. at ¶¶ 26-30].

On June 1, 2023, over four years after the rape of Doe 3 and after Kateri Dahl ("Dahl") filed suit against Johnson City, Sparks wrote a search warrant for Williams' DNA. Sparks communicated this to Doe 3 but, on June 23, 2023, JCPD stopped all further work on Doe 3's case. No charges were ever filed against Williams for the rape of Doe 3. In June 2020, Jane Doe 4 reported Williams had raped her. No charges were ever filed in Doe 4's case either. [*Id*. at ¶¶ 31-33.][1]

[1] On June 21, 2023, suit was filed in this Court on behalf of Jane Doe plaintiffs 1-9, all making similar allegations. *See Does 1-9 v. Johnson City, et al*., No. 2:23cv71. That case has been settled.

On November 13, 2020, Sparks approached Dahl, then serving as a Special Assistant United States Attorney, about indicting Williams on a felon in possession of ammunition charge. Sparks told Dahl Williams was also a suspected serial rapist. [ *Id.* at ⁋ 34.]. Sparks also explained that Williams had a history of assault reports and that JCPD had found disturbing items in Williams' house, including a "Raped List" and a baby doll with a hole cut into its private parts. Sparks told Dahl that Williams was known to lure women from his garage to his apartment and drug them, to blackmail them to silence them, and how he was allowed to wipe his phone clean of potentially relevant evidence. Dahl asked Sparks to send her the Williams case file and to draft a search warrant. Sparks did neither until months later, and then the draft warrant was wholly insufficient, [*Id.* at ⁋⁋ 34-36].

On November 21, 2020, Jane Doe 1 reported an assault by Williams on November 20, the previous day, to the FBI, instead of JCPD. The assigned FBI agent called Sparks to come to the FBI offices with Doe 1. Sparks took Doe 1 to the hospital for a rape kit and took her to JCPD offices and interviewed her. Sparks told Doe 1 she was the first woman to want to pursue charges against Williams and the others were too scared. Doe 1 never received the results of the rape kit. In August 2023, video of Williams' assault of Doe 1 was uncovered. No charges were ever brought against Williams for the sexual assault of Doe 1. [ *Id.* at ⁋⁋ 32-40].

In October 2020, Jane Doe 2 was at a party at Williams' apartment. Williams offered her a drink; she lost consciousness and woke up partially naked with Williams lying on the couch next to her. The assault was reported to Sparks who advised Doe 2 not to file a police report until rape kit results were received. As with other cases, no rape kit results were ever provided to Doe 2 and no charges were ever brought. JCPD never arrested Williams and never charged him with a single assault. [*Id.*

at ⁋⁋ 41-45].

In December 2019, Dahl discovered the existence of Jane Doe 4 and her allegations against Williams. JCPD had concealed this report from her. December 2019 was also the first time Dahl was shown Doe 4's rape kit results, which showed the presence of male DNA. Sparks had been in possession of the report since July 2019. JCPD reports said Doe 4 was uncooperative; however, when contacted by Dahl she agreed to come to JCPD offices and meet with Dahl. Dahl, Sparks, and SAUSA Thomas McCauley were present for the interview. Peters showed McCauley pictures of Doe 4 from her Facebook page and made derogatory comments about her. McCauley expressed concern to Dahl that Peters' behavior was a symptom of discriminatory bias against female victims of sexual assault. [ *Id.* at ⁋⁋ 46-48].

On September 19, 2020, Plaintiff was out in downtown Johnson City and had consumed a couple of beers. She found herself at Williams' apartment after spending about twenty minutes at a party at Williams's garage and beginning to feel the effects of a drug. She has no memory of entering the apartment, although surveillance footage shows her entering the apartment, along with Williams and a third person. At about 2:34 a.m., Williams attempted to sexually assault Plaintiff, and she was pushed out of his five-story apartment window. JCPD arrived on the scene and Plaintiff was admitted to the hospital with serious injuries requiring multiple surgeries. [ *Id.* at ⁋⁋ 40-61].

While at the hospital, despite Plaintiff's insistence that she was drugged and assaulted, JCPD did not allow her to be tested for date rape drugs. Plaintiff's blood was sent to the crime lab, but Plaintiff did not receive the results until almost a year later and the blood sample had already been destroyed. [ *Id.* at ⁋⁋ 63-64]. Sparks and Peters, however, had the results on or around January 19, 2021. Sparks emailed the report to the plaintiff on or around January 20, 2022. The blood sample had been destroyed on September 1, 2021. [*Id.* at ⁋⁋ 65-66].

Although JCPD did some investigation of Plaintiff's interaction with Williams, what followed was a series of alleged intentional conduct on the part of defendants to compromise and/or sabotage the investigation. Sparks withheld the toxicology report until after the blood sample had been destroyed to prevent further testing for the presence of a date-rape drug. Sparks also intentionally assured plaintiff that the investigation was on-going, allowing statutes of limitation to expire against Williams. [*Id*. at ¶ 67]. During a thirty-minute interview with Williams, Sparks and Jenkins allowed Williams to keep his cellphone which had access to video surveillance cameras in Williams' apartment. After the interview, Sparks and Jenkins left Williams alone with his cellphone, knowing that the phone likely contained video evidence of Plaintiff's fall, and that Williams would likely delete the evidence if given an opportunity to do so. Sparks seized the cellphone only after Williams had done just that. [ *Id*. at ¶¶ 68-70].

Pursuant to a search warrant, JCPD officers seized four phones, four computers and three memory cards from Williams' apartment. These devices, in the custody of JCPD for two years, were never searched. [*Id*. at ¶¶ 70-71]. Likewise, defendants attempted to sabotage Dahl's investigation. On March 16, 2021, Legault and Peters learned of another alleged victim of Williams and intentionally did not disclose that information to Dahl and concealed information about a victim who died on November 20, 2020, while driving from Williams' home. [*Id*. at ¶¶ 75-76].

A meeting with Turner, Peters and the TBI with Dahl was arranged by Wayne Taylor, Supervising AUSA in the Greeneville office of the United States Attorney. Taylor informed Dahl that Turner was upset about the meeting. Turner and Peters then canceled the meeting on December 7, 2020. [*Id*. at ¶¶ 75-76]. After the cancellation, Turner asked Dahl to meet with him to discuss Williams. Dahl met with Turner and Peters, who cast doubt on the evidence Dahl had collected and minimized the importance of the "Raped" list found in Williams' apartment. Dahl recorded the

meeting. Following an interview with Doe 4, Turner called SAUSA McCauley to complain about Dahl. [*Id*. at ¶¶ 78-79].

The TAC alleges that the conspirators took affirmative steps to cover up Williams' attempted homicide of Plaintiff. Turner discouraged Dahl from obtaining a warrant to inspect Williams' SIM cards and Sparks delayed sending Dahl a draft search warrant affidavit. When he did, the draft was insufficient to establish probable cause for a warrant. These acts, according to Plaintiff, were intentional with the goal of protecting Williams and to enrich themselves by taking "hundreds of thousands of dollars in cash from Williams . . ." The TAC alleges a conspiracy continuing "at least until 2023" "to further Williams' criminal acts, destroy evidence against Williams and obstruct the investigation into Williams for years. . ." Sparks and Jenkins accepted payments from Williams as a *quid pro quo,* either explicit or implied, to shield Williams from prosecution and permit him to continue to abuse vulnerable female victims. [*Id*. at ¶¶ 80-91].

Sparks and Jenkins were the first JCPD officers to arrive at the scene on September 19, 2020, taking control of the scene at Williams' apartment. They ignored JCPD policies for securing and searching a crime scene. Evidence [2] obtained in the Doe case shows that Sparks and Jenkins had already been making deposits in cash and laundering payments through multiple bank and loan accounts which exceeded their known sources of income. Sparks and Jenkins never tested Williams' bloody hands at the scene of the fall and, at the direction of Turner and Peters, intentionally suppressed and destroyed evidence on Williams' digital devices. At the direction of Sparks and Jenkins, JCPD officers left Williams' apartment unsecured and did not seize video camera evidence from the apartment. Williams' associate and co-conspirator, Dias-Vargas, was left in the unsecured apartment, enabling Diaz-Vargas to conceal and/or destroy evidence. Surveillance video shows

[2] Plaintiff does not say what that "evidence" is, which becomes a major issue for her when the Court considers defendant's motions for summary judgment, as discussed below.

Jenkins was the last officer to interact with Diaz-Vargas and that Jenkins saw Diaz-Vargas re-enter the unsecured apartment. [*Id*. at ¶¶ 92-103].

Williams was taken to JCPD headquarters to be interviewed by Jenkins, but Williams was allowed to maintain control of his cellphone. By the end of the interview, Williams had erased all relevant data from his cellphone. Only then did Jenkins seize the cellphone. Sparks and Jenkins failed to seize a handwritten note from the interview room which said, “Call Arlo!!!,” apparently referring to the Arlo video camera system in the apartment. When Jenkins and Sparks returned to Williams’ apartment with a search warrant, Diaz-Vargas had removed the video cameras and hidden them in a closet. Although Sparks and Jenkins spent nine hours in the apartment executing the search warrant, they failed to seize and inventory relevant evidence, including a rifle in plain sight, despite knowing Williams was a convicted felon. They failed to seize a handwritten note from Williams’ nightstand with the word “Raped” and a list of twenty-three female names, including some of children and babies. [ *Id*. at ¶¶ 101-115]. They did, however, seize Williams’ safe containing hundreds of thousands of dollars and a gold Cartier necklace. The safe had no apparent relevance to the investigation of Plaintiff’s fall. Williams has accused JCPD of stealing money from the safe. [ *Id.* at ¶¶ 112,117]. As noted above, digital devices were seized but not examined for over two years. [ *Id*. at ¶¶ 118, 121]. Later, when Williams was a fugitive from justice hiding in North Carolina, Sparks attempted to turn the SIM cards and cameras over to Williams’ attorney. Dahl stepped in and prevented the transfer.

In and around August-September 2023, Williams began posting messages to Facebook through a female co-conspirator. According to the posts, they were written from jail using a contraband phone. On or about September 2, 2023, Williams wrote a message describing an extortion scheme involving JCPD officers. According to Williams’ posts, beginning on an unknown

date and continuing until at least September 2020, JCPD officers, including Sparks, extorted cash from Williams through a co-conspirator, Female 4, at the rate of $2000 per week. Williams used false IRS 1099 forms to pay the money out of his business. [ *Id.* at ¶¶ 123-125].

Sparks applied for and obtained a second search warrant for Williams' safe, purportedly for evidence of the attempted homicide of Plaintiff. Several bags of cash were found in the safe, but the cash was not inventoried. Although Diaz-Vargas and/or Williams had time to destroy and/or conceal other evidence, they left hundreds of thousands of dollars in the safe. According to Williams, he kept a large amount of cash in the safe and half was taken by the officers. Officers also took the Cartier gold necklace from the safe and did not return it to Williams. [ *Id.* at ¶¶ 120-135].

In August 2023, the Department of Justice ("DOJ") and the FBI opened a federal corruption investigation into potential JCPD officer misconduct related to Williams. Former federal prosecutor Dahl filed a civil complaint against Johnson City on June 23, 2022, including allegations of JCPD's systemic and pervasive practice of facilitating and ignoring acts of sexual violence and drug activity by Williams. *See* [Doc. 128-3]. A meeting of DA Elect Steve Finney, Turner and Peters was held on August 23, 2022, to strategize an organized response to Dahl's allegations. On the next day, Johnson City manager, Cathy Ball ("Ball") and Turner sent a letter to the outgoing DA Kenneth Baldwin asking his office or the Tennessee Bureau of Investigation ("TBI") to conduct a preliminary investigation to determine whether a basis existed to open a public corruption investigation into the allegations made in Dahl's complaint. On Finney's first day in office, September 1, 2022, Finney responded to Ball's and Turner's letter that there was no such thing as a "preliminary investigation. . ." Ball forwarded Finney's letter to the Johnson City Commissioners. On August 30, 2023, Finney did officially request that TBI open a "theft" investigation into events relating to the opening of Williams' safe. By September 2023, the "theft" investigation had become

a joint state-federal investigation. [ *Id*. at ⁋⁋ 143-149].

In the fall of 2023, a TBI investigator interviewed Female 4. On November 16, 2023, Sparks was interviewed by TBI and FBI agents as a potential target of the public corruption investigation. In January 2024, discovery in the *Doe* case "tie[d] Sparks to a $14,000 payment to Female 4," Williams' associate and co-conspirator, who provided cash to Sparks and other JCPD officers. Plaintiff characterizes the payment as a "bribe," to buy Female 4's silence in the ongoing investigation. [ *Id.* at ⁋⁋ 150-152]. On December 20, 2023, and January 3, 2024, two deposits from unknown sources of $12, 098.10 each cleared Sparks' checking account at Truist Bank. On January 22, 2024, a consignment shop in Nashville wired $14,000 to Female 4's bank account after an unknown purchaser bought a gold Cartier necklace she had consigned. On January 11, 2024, a check was written on Sparks' Truist checking account in the amount of $20,000, purportedly for a construction company that had done work for Sparks. The next day, January 12, 2024, $20,000 was transferred from Sparks' savings account to his checking account. On January 17, 2024, the $20,000 check from Sparks' checking account was deposited or cashed at another Truist Bank branch and on January 18, the Nashville consignment shop deposited $21,000 in cash into its bank account. On January 24, 2024, another check for $1,200 from Sparks' checking account was cashed or deposited. In sum, bank records show a total of $21,200 in outgoing checks from Sparks' account within seven days of the $21,000 deposit into the consignment shop's account from the purported purchaser of the Cartier necklace and the $14,000 payment to Female 4. No records, receipts or invoices for the sale of the necklace exist. [ *Id.* at ⁋⁋ 158-168].

Between 2018 and 2022, Jenkins used cash he received from Williams and Female 4 to pay off a series of auto, construction, and home loans totaling over $400,000. Bank records show that Jenkins repaid approximately $391,132.67 worth of loans in that time frame, many of which

involved auto loans. Within days of the search of Williams' apartment, Jenkins paid off one loan in the amount of $34,308.39 and opened a new loan for $45,236.22.[3] On June 1, 2022, Female 4 withdrew $11,800 in cash from Williams' company account. On June 2, 2022, Jenkins opened a new car loan for $11,000, with a total amount financed of $11,855.79. Jenkins paid off the new loan within two months. Sparks also used elaborate means to conceal funds he received from Williams, moving money through multiple savings, checking and loan accounts at four different financial institutions. Sparks also had approximately $68,000 of unexplained deposits of smaller sums of cash. [ *Id*. at ¶¶ 183-192].

Turner and Peters dismissed Williams' victims account, claiming the victims were not credible despite overwhelming evidence to the contrary. Peters ridiculed and made jokes about a victim's appearance prior to the victim providing a statement about her sexual assault by Williams and on other occasions made jokes about victims' clothing and appearance. Williams continued trafficking drugs, drugging and raping victims, and sexually exploiting children for years because JCPD refused to fully investigate and arrest Williams. [ *Id*. at ¶¶ 194-198].

In December 2022, the defendants obtained information that one of Williams' victims, Female 9, was meeting with a civil rights attorney. On December 8, 2022, Female 9 met with an FBI Special Agent to provide a statement about her sexual assault by Williams. On April 18 or 19, 2023, Female 9 was standing outside Tipton's Street Pub in downtown Johnson City with a male companion waiting for her ride when at least two JCPD patrol cars drove up and stopped. Officers handcuffed the male and Female 9 took out her phone to video record the interaction. An officer took hold of her arm and took her to the ground where she was pinned down by officers, resulting in bruises all over her body. The police report indicates that officers came to the scene after a call

[3] Plaintiff alleges such a pattern of payments is indicative of money laundering to conceal and disguise the actual source of the funds, *i.e.* Williams.

from a security guard at Tipton's that the male had refused to leave, and he and Female 9 were arguing. [4] Female 9 was arrested for "disorderly conduct and resisting arrest." The report said Female 9 was in possession of a small baggie of cocaine, which Female 9 claims was not hers and was planted on her by the officers. Female 9 received an eviction notice from the Johnson City Housing Authority later that same day because of her arrest. Without permanent housing, she lost custody of her children. Defendant Legault was the supervisory officer who approved the unlawful detention of Female 9. [*Id*. at ¶¶ 200-211].

In August 2022, responding to community response following the Dahl complaint, Johnson City announced it had initiated an independent third-party review by the Daigle Law Group ("DLG") of JCPD's handling of sexual assault investigations. The DLG report was released by Johnson City on July 18, 2023, and concluded that JCPD's overall handling of women's reports of sexual assault and rape was severely deficient and rife with discriminatory conduct based on hostility and bias towards women. The report also found that JCPD supervisors allowed investigators to close sexual assault cases improperly, based on the reluctance of the victims, even when prosecution would otherwise have been possible. DLG opined that JCPD's "pattern and practice" or "custom" regarding sexual assault cases did not meet constitutional standards of policing. DLG found that JCPD's practices discouraged female victims of sexual assault from working with law enforcement to pursue charges. The report revealed no legitimate law enforcement purpose justified these inadequacies; instead, JCPD's practice of discouraging women from pursuing sexual assault charges stemmed from misconceptions and stereotypes about women and victims of sexual assault. JCPD had failed to train officers to ensure effective and unbiased responses to allegations of sexual assault. [*Id*. at ¶¶ 215-223].

---

[4] Plaintiff claims this incident was harassment to prevent Female 9 from reporting Williams' crimes and that the officers lacked probable cause for an arrest.

The report identified JCPD practices which made reporting sexual assaults "unnecessarily burdensome," including practices motivated by gender bias and animus against women. DLG found discrimination based on gender-based stereotypes and bias responsible in part for deficiencies in JCPD responses to sexual assault complaints. [ *Id*. at ⁋⁋ 233, 243]. As set forth in the *Dahl* complaint, Turner, Peters, Sparks and other investigators made statements to her that evidenced their discriminatory animus toward female victims of sexual assaults. Turner cast doubt on the credibility of Williams' victims even though their names appeared on the "Raped" list, dismissing their cases as possible consensual sex. Peters made jokes about Williams' victims' clothing and appearance. Sparks, commenting on the allegations against Williams said: "In my 20 years on the force, I've only encountered one real rape." A male investigator said to Dahl, "Well, Kat, if you are so invested in developing this case, go have a drink at Label and let [Williams] pick you up and take you back to his place. We'll come get you in an hour." [ *Id*. at ⁋ 254].

**II. The Complaint's Causes of Action**

The complaint alleges six potential causes of action: 1) a negligence claim against all defendants under the Tennessee Governmental Tort Liability Act ("TGTLA"), Tenn. Code Ann. § 29-20-205 (Count I); 2) a civil conspiracy against all defendants pursuant to 42 U.S.C. § 1983 (Count II); 3) a state law claim for fraudulent concealment against all defendants (Count III); 4) a violation of equal protection based on sexual bias against all defendants pursuant to 42 U.S.C. § 1983 (Count IV); 5) a substantive due process claim against all defendants pursuant to 42 U.S.C. § 1983 (Count V); and 6) a state law claim of intentional infliction of emotional distress against all defendants (Count VI).

**III. Standard of Review**

In deciding whether to dismiss Plaintiff's claim under Rule 12, the Court "construe[s] the complaint in the light most favorable to the plaintiff." *Directv v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007). To avoid dismissal, the complaint's allegations "must be enough to raise a right to relief above the speculative level." *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007). Where the defendant attacks the plaintiff's complaint on its face, the court will consider the well-pled factual allegations as true. *O'Bryan v. Holy See*, 549 F.3d 431, 443 (6th Cir. 2008), withdrawn from bound volume, opinion amended and superseded, 556 F.3d 361 (6th Cir. 2009). However, "conclusory allegations masquerading as factual conclusions will not suffice" to defeat a motion to dismiss. *Id.* A court may dismiss a complaint when "the allegations of a complaint are totally implausible, attenuated, unsubstantial, frivolous, devoid of merit, or no longer open to discussion." *Apple v. Glenn*, 183 F.3d 477, 479 (6th Cir. 1999).

## IV. Discussion and Analysis

### A. Official Capacity Claims

Turner, Peters, Sparks, Jenkins, Legault and Higgins are sued individually and in their official capacities. These defendants argue the official capacity claims should be dismissed because they are redundant of the claims against Johnson City. They are correct, and Plaintiff doesn't really argue otherwise. Official capacity claims are claims against the municipality, which is already a defendant here. *Kraemer v. Luttrell*, 189 F. A'ppx 361, 366 (6th Cir. 2006). A § 1983 action against a municipal employee as agent for acts undertaken in an official capacity is tantamount to a claim against the municipality that the employee or agent represents. *Kentucky v. Graham*, 473 U.S. 159, 165-66, 105 S.Ct. 3099, 87 L.Ed. 2d 114 (1985). As such, the official capacity claims will be

DISMISSED.[5]

### B. Statute of Limitations

All defendants argue the applicable statute of limitations has expired on Plaintiff's claims. There is no federal statute of limitations for a §1983 case; instead, § 1983 adopts the most analogous state statute of limitations. It is by reference to federal standards, however, that courts look to determine the accrual date in a § 1983 claim. *Reguli v. Russ*, 109 F.4th 874, 879 (6th Cir. 2024). Although the Supreme Court follows what has been called an "occurrence" rule, the Sixth Circuit has largely followed a "discovery" rule for § 1983 claims. *Id.* The Sixth Circuit has not clearly defined the difference between the "occurrence" rule and the "discovery" rule. "The occurrence rule starts the limitations period on the first day that a plaintiff has a complete cause of action; the discovery rule delays this start date until the plaintiff discovers basic facts about the claim." *Id.*

Even so, the Sixth Circuit has been less than clear about what a plaintiff must discover to trigger the limitations period. Some cases suggest the period starts when "a plaintiff knows or has reason to know of the *injury* which is the basis of his action." *Id*. at 882 (quoting *Sevier v. Turner,* 742 F. 2d 262, 273(6th Cir. 1984). In another case, the Sixth Circuit suggested that the limitations period does not begin until a plaintiff knows or should know of "both his *injury* and the *cause* of that injury." *Id*. (quoting *Bishop v. Child's Ctr. for Developmental Enrichment*, 618 F. 3d 533, 536 (6th Cir. 2010)).

Not only has the Sixth Circuit not clarified this issue, but the Circuit has also not given a great deal of clarity with which to apply the discovery rule in a practical sense. The Sixth Circuit

---

[5] The Court notes that the same would be true of the claims against the John Doe defendants. It is not clear from the complaint whether the John Doe defendants are sued individually or in their official capacities. The Sixth Circuit requires plaintiffs to set out clearly whether they are suing municipal employees in their individual capacity; otherwise, it is presumed that the employee is sued in an official, not individual capacity. *Wells v. Brown*, 891 F.2d 591-92(6th Cir. 1989)

has held that "[a] plaintiff has reason to know of h[er] injury when [s]he should have discovered it through the exercise of reasonable diligence." *Scott v. Ambani*, 577 F.3d 642-646 (6th Cir. 2009). "Stated differently, '[i]n determining when the cause of action accrues in § 1983 cases, we look to the event which should have alerted the typical lay person to protect his or her rights.'" *Cooey v. Strickland,* 479 F. 3d 412, 416 (6th Cir. 2007) (quoting *Trzebuckowski v. City of Cleveland*, 319 F. 3d 853, 856 (6th Cir. 2003)).

**1. Does the "occurrence" rule or the "discovery" rule apply in this case?**

Most of the defendants argue that there is no discovery rule in this case, while some argue it as if the discovery rule applies. By the reckoning of some of the defendants, the calculation is a simple one. Plaintiff's fall occurred on September 19, 2020, triggering the limitations period, making the complaint filed over four years later clearly time barred. In other words, the date of the "occurrence" was September 19, 2020, and the complaint had to be filed within one year of that date to be timely. (*See* Doc 132 at 9). Johnson City and Turner, on the other hand, appear to acknowledge that the discovery rule applies. (*See* Doc. 130 at 10-21; Doc. 122 at 25). Either way, no matter the differing approaches, all defendants argue the statute of limitations has clearly run and Plaintiff's complaint is time barred. Plaintiff, of course, argues for application of the discovery rule and argues that she did not discover her cause of action until a time within one year of the filing of the complaint. As noted above, the United States Supreme Court and the Sixth Circuit have taken seemingly different approaches to when a § 1983 claim accrues to trigger the running of the statute of limitations.

> The Supreme Court has explained that the "standard" accrual "rule" starts a limitations period when "the plaintiff has 'a complete and present cause of action.'" *Bay Area Laundry & Dry Cleaning Pension Tr. Fund v. Ferbar Corp. of Cal., Inc.*, 522 U.S. 192, 201, 118 S. Ct. 542, 139 L. Ed. 2d 553(1997) (quoting *Rawlings v. Ray*, 312 U.S. 96, 98, 61 S. Ct. 473, 85 L. Ed. 605(1941)); *see Rotkiske v. Klemm*, 589 U.S. 8, 13, 140 S. Ct. 355, 205 L. Ed. 2d 291(2019). Put differently, this "injury-

occurrence" or "occurrence" rule triggers the limitations period on the first day that every element of a claim has occurred such that the plaintiff may sue in court over the claim. *See Wallace [v. Kato],* 549 U.S. [384] at 388, 127 S. Ct. 1091[,166 L. Ed. 2d 973(2007)]. The Supreme Court has recited this rule in three § 1983 cases. *See Reed v. Goertz*, 588 U.S. 230, 235-36, 143 S. Ct. 955, 215 L.Ed. 2d 218 (2023). *McDonough v. Smith*, 588 U.S. 109, 114-15, 139 S. Ct. 2149, 204 L. Ed. 2d 506(2019); *Wallace*, 549 U.S. at 388, 127 S. Ct. 1091.

> But our § 1983 cases have taken a different approach. We have suggested that the statute adopts a "discovery rule," not an "occurrence" rule. See *Dibrell [v. City of Knoxville,]* 984 F. 3d 1156, 1162 (2021)]; *Sharpe v. Cureton*, 319 F. 3d 259,266 (6th Cir. 2003). This rule postpones the limitations period to the date plaintiff discovered, or reasonably should have discovered, basic facts about the claim. *See Johnson v. Memphis Light Gas & Water Div*., 777 F.3d 838, 843(6th Cir. 2015); *Dixon v. Anderson*, 928 F.2d 212, 215 (6th Cir. 1991); *Sevier v. Turner*, 742 F.2d 262, 273 (6th Cir. 1984).

*Reguli*, 109 F.4th at 879-80.[6]

Those defendants who rely on the "occurrence" rule do so without any real analysis and simply assume, again without analysis, that its application means the limitations period began to run on the date of Plaintiff's fall from Williams' apartment. They make no effort to explain why September 19, 2020, is the "first day that every element of [her] claim ha[d] occurred." The argument is so deficient and perfunctorily addressed as to possibly amount to a waiver. This Court, sitting in the Sixth Circuit, will, as that court has done, apply the "discovery" rule to this case.[7]

**2. Analysis**

In support of their motion for summary judgment, Johnson City has offered 83 pages of text messages between Plaintiff and Dahl between December 21, 2021 and December 20, 2023, which

---

[6] The parties approach the statute of limitation issue as if application of one rule rather than the other automatically results in a different accrual date to trigger the running of the limitations period. In the Court's view, that is not necessarily so.

'7 Although the parties have discussed the statute of limitations issue as either an occurrence rule or a discovery rule, there may be other possibilities which no party has addressed. For one, the fraudulent concealment doctrine might toll the statute of limitations, although the plaintiff must plead that response in her complaint. *Dabish v. McMahon*, 818 F. App'x 423, 428 (6th Cir. June 19, 2020) (citing *Lutz v. Chesapeake Appalachian, LLC*, 717 F. 3d 459, 474 (6th Cir. 2013). Another is that the statute of limitations for a civil conspiracy claim might begin to run at the time of the last overt act in furtherance of the conspiracy. *See Anderson v. Knox County*, 2018 WL 7500205 (E.D. Ky. October 3, 2018).

were produced as part of the now-settled *Doe* case [ Doc. 128-1 at 3-85], a transcript of an interview of Plaintiff by WJHL-TV posted on June 3, 2022 [ *Id.* at 86-87], and the declaration of Plaintiff filed in the *Doe* case on September 30, 2022. The defendants who rely exclusively on the "occurrence" rule argue that Plaintiff's case accrued on September 19, 2020, the date of her fall. Those who discuss the discovery rule argue Plaintiff knew or should known of her cause of action no later than February 9, 2022, or, alternatively, by June 23, 2022, the date of the filing of Dahl's complaint against Johnson City and Turner, and that the statute of limitations had long since expired when plaintiff filed this lawsuit on June 20, 2024. [Doc. 130 at 9, 13-14]. Those documents, while relevant to deciding the motions for summary judgment, are not relevant to the motion to dismiss which address the adequacy of the factual allegations in the complaint.

The Plaintiff's complaint alleges that she could not have learned of JCPD's intentional failure to investigate Williams until the First Amended Class Complaint was filed on September 6, 2023. [ Doc. 119 at ⁋ 255]. While acknowledging that she was aware that JCPD failed to bring charges against Williams related to her fall and that JCPD "did not suspect foul play" as early as September 21, 2020, she had no knowledge at the time "that JCPD intentionally failed to investigate Williams to protect both in exchange for bribes and themselves from being discovered for accepting these bribes." [ *Id.* at ⁋ 256]. Said differently, Plaintiff appears to say that she was unaware the failure to investigate Williams over her fall was simply one act in a much larger conspiracy to violate the civil rights of Williams' female victims until the second amended complaint was filed in the Doe case.[8]

---

[8] This issue might possibly be decided differently on summary judgment, especially considering the fact Plaintiff has completely failed to even attempt to meet her burden in response to the summary judgment motions. She has offered no evidence, not even her own declaration, to support her claim made in paragraph 255 of her complaint, for instance. As discussed more fully below, plaintiff risks her whole case by refusing to even try to meet her burden and simply asking for discovery before the motions are decided. In the feeble response she has made, she relies on unverified allegations from her complaint, something she cannot do in response to a motion for summary judgment.

Johnson City/Turner first point to Evans' sworn testimony in the *Does* lawsuit to contradict Evans' claim that up until September 6, 2023, she believed JCPD continued to investigate her incident. In her declaration, she stated that she was informed by Sparks that JCPD had closed its investigation into her fall on September 19, 2020.[9] For the sake of its argument, Johnson City/Turner (hereinafter "Johnson City") assume arguendo that Evans has a legal right to sue for an alleged improper investigation of a third party. [Doc. 130 at 12].

Johnson City points to one of the text messages from Evans to Dahl in support of its argument that the cause of action accrued no later than February 9, 2022. On that date, Evans told Dahl she had been told to sue JCPD, making the statement that "they tanked the crap out of my case so he could get away with another crime." [ *Id.* at 13]. And, citing *Reguli*, Johnson City argues that Evans "had pinpointed [JCPD] as the culprit" at least by February 9, 2022. [ *Id.* (quoting *Reguli*, 109 F. 4th at 884)]. Likewise, they claim defendants' subjective reasons for injuring the plaintiff are irrelevant.

Alternatively, defendants claim the action accrued no later than June 23, 2022, the date of the filing of Dahl's original complaint. The *Does* complaint was filed on June 21, 2023, within one year of the filing of the Dahl lawsuit. The *Does* complaint sought to avoid the bar of the statute of limitations by pleading that, with the filing of the *Dahl* complaint, they became aware of JCPD's institutional policy of ignoring complaints of criminal activity and bodily harm, including rape and drug activity by Williams and his accomplices, made by multiple women.[10] The *Does* complaint

---

[9] If this were a mere failure to investigate claim, one likely not cognizable as a constitutional violation for §1983 purposes as discussed below, this might be probative on when the statute of limitations began to run. But given the actual nature of the claim, the *Does* declaration is largely irrelevant on the accrual issue. It may call into question the Plaintiff's credibility, but it does little more.

[10] This is indeed the date on which Judge McDonough found the *Doe* action had accrued for statute of limitations purposes. See [ Order, No. 2:23cv71, Doc. 301, filed August 21, 2024, at 19]. ("While, according to Plaintiffs' allegations, those officers were not always responsive and at times dismissive, it is not reasonable to expect plaintiffs to suspect this behavior was symptomatic of an intricate sex-trafficking conspiracy between public officials and a serial rapist.")].

alleged a sex-based bias against female crime victims by JCPD. [ *Id*. at 14]. The *Does* complaint, according to Johnson City, would have "alerted a typical lay person to protect his or her rights." [ *Id.* at 15 (quoting *Johnson*, 777 F. 3d at 843)]. Johnson City also argues, based on the whole of the text messages between Evans and Dahl, [ *Id*. at 15-20], that Evans was in a position of far superior knowledge when compared to the Doe plaintiffs because she had been in close contact with Dahl prior to the filing of the *Dahl* lawsuit. Johnson City also points to the transcript of the WJHL interview of Evans on June 30, 2022, one week after Dahl filed her complaint, in which she states that she feels like "[JCPD] railroaded [her investigation]. [ *Id.* at 20].

Peters makes an additional argument based on the Sixth Circuit's prior holdings that all that is necessary for the statute of limitations to begin to run is that a plaintiff have a complete cause of action. He characterizes the Plaintiff's claim as being that "she did not know the Defendant's subjective motivations (*i.e.* Plaintiff's truly offensive and specious allegations of bribery as to these civil servants)" and argues it does not matter. Citing *Reguli*, Peters argues that "[t]he Sixth Circuit has rejected any requirement that Plaintiff have discovered [the defendants'] wrongful motivation to start the running of the statute of limitations." [ Doc. 121 at 7].

Plaintiff, of course, takes a contrary view. The text messages, she claims "reflect mere suspicion of mishandling in Plaintiff's individual case by February 2022, not knowledge of the broader municipal policy of bribery and bias that caused her harm." [Doc. 144 at 7]. Evans' declaration asserts that she did not learn of the systemic issues until the Jane Does' lawsuit in June 2023 revealed the full pattern. [ Doc. 128-2, Evans declaration at ⁋ 6]. Plaintiff relies heavily on *Snyder-Hill v. Ohio State University,* 48 F. 4th 686, 698 (6th Cir. 2022) to support her position. [Doc. 144 at 10].

In *Snyder-Hill*, a group of male student athletes sued Ohio State under § 1983 for alleged

decades-long sexual abuse by a team physician. The central issue in the case was when the plaintiffs' claims accrued for statute of limitations purposes. The Sixth Circuit held that the claims accrued no later than 2018, even though there had been indications of the abuse for years, because, citing an independent study commissioned by the university, the abuse took place in the context of a medical examination and "in general, patients may have 'confusion as to whether sexual abuse, in fact, occurred.'" *Snyder-Hill*, 48 F. 4th at 694.

Citing various individual text messages, Plaintiff argues they indicate that at least three attorneys told her she did not have a complete cause of action, that she was searching for facts which would confirm her suspicions, and that she did not have the requisite knowledge to pursue a cause of action. [ Doc. 144 at 11]. Plaintiff appears to acknowledge, as defendants argue, that a single failure to investigate does not, standing alone, give rise to a constitutional violation but claims that, like in *Snyder-Hill*, it was only after the filing of the Does' lawsuit on June 21, 2023 that she became aware of the fact that she was actually a victim of a years' long conspiracy giving rise to her cause of action. [ *Id*. at 12].

As noted above, the critical question appears to be, "when did plaintiff know or have reason to know of her legal injury through the exercise of reasonable diligence?" Analysis of this question requires the Court to determine when the "cause of action" accrued. As already mentioned, the Supreme Court has explained that, generally speaking, a cause of action accrues, and thus the statute of limitations begins to run, when the plaintiff has "a complete and present cause of action." *Bay Area Laundry*, 522 U.S. 192 at 201. That, in turn, requires the Court to determine what the cause of action is and when it was complete. See also *Snyder-Hill*, 48 F. 4th at 686. ("The discovery rule involves a two-prong test, and the plaintiff must show that she (1) knows or reasonably should have known that her injury was (2) caused by the defendant in order to trigger the statute of limitations.").

The parties themselves are of little help in answering these questions. The defendants largely characterize Evans' claims as based on a failure of defendants to properly investigate her fall on September 19, 2020, and a failure to investigate Williams prior to the fall. [*See*, for example, Turner memo, Doc. 127 at 3-4 ("Evans' claims can be divided into two categories: (1) claims based on an alleged failure to investigate Sean Williams. . .prior to her fall that somehow caused her fall, and (2) claims based upon an alleged improper investigation into her fall.")]. Plaintiff, of course, characterizes her cause of action differently. For Plaintiff, "[t]his case arises from . . . a years'-long conspiracy with Sean Williams . . . and . . . JCPD officers to accept bribes in exchange for suppressing investigations into Williams' assaults on women. . ." and for constitutional violations (equal protection, state-created danger) arising from [Johnson City's] deliberate inaction, bribery and cover-up, which increased the risk to Plaintiff and caused her injuries. [Doc. 136 at 2]. Plaintiff has essentially disavowed that this is a straight-forward single failure to investigate claim. The Court accepts, at this preliminary stage, her characterization as Plaintiff is the master of her own complaint.

Statute of limitations issues are often straight-forward but this case presents a somewhat unique and complex question. Not only is the nature of the claim and when the claim accrued somewhat vague, the factual questions are numerous. Plaintiff alleges that she "learned of defendants' intentional mishandling of her investigation no earlier than the first amended complaint [in the *Does* case] on September 6, 2023." [TAC, Doc. 119 at ⁋ 255]. Resolution of the factual issues raised by the text messages, transcript and the declaration of Plaintiff in the *Does* case is near impossible for the Court when viewed against the unverified allegations of the TAC. Plaintiff's failure to properly respond to the motion for summary judgment compounds the problem.

The motions to dismiss the TAC as barred by the statute of limitations are DENIED, as the

TAC makes sufficient plausible factual allegations to preclude dismissal. As far as the motion for summary judgment, the Court will defer ruling pending a proper response by Plaintiff, as set forth below.

**C. Failure to state a claim upon which relief can be granted (Rules 12(b)(1) & (b)(6))**

Defendants assert that all claims, both federal and state, should be dismissed under Federal Rule of Civil Procedure 12(b)(1) (lack of subject matter jurisdiction/lack of standing) or Federal Rule of Civil Procedure 12(b)(6) (failure to state a claim upon which relief can be granted) "because Evans cannot sue for an alleged wrongful investigation of a third party," *i.e.* that Plaintiff lacks standing. [ Doc. 130 at 3], It appears that all defendants adopt, at least in part, the arguments of Johnson City and Turner.

With respect to the § 1983 claims, Johnson City and Turner assert there are "no factual allegations that would support a civil conspiracy claim or a fraudulent concealment claim under 42 U.S. § 1983 or state law." [Doc. 130 at 3]. Johnson City and Turner characterize Plaintiff's claims as two: (1) failure to investigate a third party, Sean Williams, and (2) improper investigation of Plaintiff's fall. [ Doc. 127 at 3-4]. They likewise characterize Plaintiff's complaint as alleging that the failure to investigate was because individual defendants (1) were accepting bribes, and (2) not properly investigating claims of female victims. [ *Id*. at 8].

Johnson City relies heavily on a Fifth Circuit case, *Lefebure v. D'Aquilla*, 15 F. 4th 650 (5th Cir. 2021), which in turn relies heavily on *Linda R.S. v. Richard D*., 410 U.S. 614 (1973). In *Lefebur*e, the plaintiff alleged that she had been repeatedly raped by her cousin's husband, Boeker, on the grounds of a Louisiana state prison where the husband was an assistant warden. He was arrested but never indicted. *Id.* at 651-52. The plaintiff filed suit alleging that the District Attorney, Boeker, and the Sheriff conspired to protect Boeker from investigation and prosecution. *Id*. at 652.

Plaintiff's § 1983 complaint included claims under the Equal Protection Clause, the Due Process Clause, and for civil conspiracy. *Id.* at 653. The Fifth Circuit held that Lefebure had no standing to sue for failure to investigate or prosecute another person. *Id*. at 655. The Fifth Circuit also rejected an argument that a discriminatory policy related to prosecutions would change the analysis. *Id.* at 656.

Plaintiff responds that reliance on *Lefebure* or *Linda R.S.* is misplaced and accuses defendants of mischaracterizing the nature of her claim. Plaintiff argues that she does not pursue a stand-alone claim for failure to investigate and/or prosecute a crime but rather for "constitutional violations (equal protection discrimination, state-created danger) arising from. . . deliberate inaction, bribery and cover up which increased risk to plaintiff and caused her injuries." [Doc 134 at 5]. The Plaintiff urges the Court to reject defendants' characterization of her claims, and argues she has successfully pleaded "a corrupt conspiracy to obstruct any investigation into Sean Williams being intentional, extreme and outrageous, shocking to the conscience. . ." Any failure to investigate is simply part of a larger unconstitutional scheme. Plaintiff, she argues, has alleged a pattern of unconstitutional behavior both prior to and after Plaintiff's fall. [Doc. 134 at 4-7].

In reply, defendants reply that Plaintiff's argument concerning *Linda R.S.* is precluded by *United States v. Texas,* 599 U.S. 670 (2023) and asserts that Plaintiff is attempting to make an argument made by Justice Barrett in her concurring opinion, but not by the majority. With respect to Plaintiff's argument that she can prove *Monell* liability based on a "custom" or "practice" with multiple instances of similar conduct, Johnson City /Turner characterizes Plaintiff's argument as "confused." [ Doc. 146 3-5]. More specifically, Johnson City argues that, for *Monell* liability, Plaintiff must still establish standing for underlying constitutional violations. [*Id*. at 6].

**1. Standing**

Standing has three elements: (1) injury in fact, (2) causal connection between the injury and the conduct complained of; and (3) the injury will be "redressed" by a favorable decision. As noted above, Defendants argue, largely based on *Lefebure,*[11] that Plaintiff lacks standing. It is a longstanding, fundamental rule of American jurisprudence that a person generally lacks a judicially cognizable interest in the prosecution or non-prosecution of another. *Linda R.S.*, 410 U.S. at 619. *See* also *Mitchell v. McNeil*, 487 F. 3d 374, 378 (6th Cir. 2007) (" There is no statutory or common law right, much less a constitutional right, to an investigation."). And, if that were the claim here, *i.e.,* a failure to investigate and/or prosecute Sean Williams because of Plaintiff's fall, the case would necessarily end here. Plaintiff seems to acknowledge that such a claim is not cognizable.

Plaintiff, however, claims that she asserts much more than that, that is, a corrupt conspiracy of which failure to investigate and/or prosecute Williams, was one of the overt acts in furtherance of the conspiracy, to deny Plaintiff protected equal protection and substantive due process rights guaranteed by the Constitution by accepting bribes and/or showing sexual bias against female victims. Although Plaintiff's TAC is anything but a model of clarity, the Court will not disturb Plaintiff's statement of her own claim at this early stage of these proceedings.

Defendants argue that Plaintiff's complaint has claims which fall into two specific time periods--before September 19, 2020, and <u>after</u> September 19, 2020, and it is true that can be said temporally. But it does not appear to the Court that a fair reading of the TAC means that plaintiff, in essence, alleges two separate conspiracies. Rather, it confirms to the Court that Plaintiff is in fact alleging a long-running conspiracy beginning with the date of the first Jane Doe report of her sexual assault by Williams to JCPD and running to the last overt act of the alleged conspiracy.

The Court is also not unaware of the Supreme Court's holding in *United States v. Texas*, 599

[11] The Court also notes that *Lefebure* is a Fifth Circuit opinion, not necessarily binding on this district court sitting in the Sixth Circuit.

U.S. 670 (2023). Mostly for reasons set forth above, the case is not on point. And finally, defendants' argument about *Monell* is misplaced for the same reason, as more fully explained below. From the Court's perspective, and given a fair reading of the TAC, Plaintiff does not seek to hold Johnson City liable for a simple pattern of inadequate investigation. It appears to the Court that she argues not that Johnson City is liable simply for a custom or policy alone without an underlying constitutional violation but that she meets both prongs of municipal liability—that she alleges a constitutional violation and a policy or practice leading to the alleged violation.

**2. Section 1983**

Although not exactly presented this way by the parties, it seems clear to the Court that any §1983 case must be premised on at least one of the constitutional violations alleged. To prevail on a § 1983 claim, plaintiff is required to prove two elements: (1) she "was deprived of a right secured by the Constitution or laws of the United States, and (2) that [she] was subjected or caused to be subjected to, this deprivation by a person acting under color of state law." *Gregory v. Shelby County, Tenn.*, 220 F. 3d 433, 441 (6th Cir. 2000). It is undisputed in this case that defendants acted under color of state law so the Court will focus its attention on the first element.

A municipality is considered a "person" under § 1983 and may be held liable for actions that deprive a plaintiff of federal rights—commonly referred to as *Monell* liability. See *Monell v. Dept of Social Ser.*, 436 U.S. 658, 98 S.Ct. 2018, 56 L. Ed. 611 (1978). Likewise, a police officer is a "person" acting under color of state law. A municipality is not liable under § 1983 simply because it employs the alleged unlawful actor. Liability only attaches where a custom, policy, or practice is the moving force behind the violation. Thus, under § 1983 local governments are responsible only for their own illegal acts and will not be held vicariously liable under the doctrine of *respondent superior* for the actions of their employees. To state a claim against a municipality under §1983, the

plaintiff must adequately plead (1) a violation of a federal right, (2) the defendant acted under color of state law, and (3) the municipality's policy or custom caused the deprivation of rights. *Soltesz v. Rushmore Plaza Civic Center*, 847 F. 3d 941 (8th Cir, 2017); *Wright v. City of Euclid,* 962 F. 3d 852 (6th. Cir. 2020). Again, there is no dispute that the actions alleged were taken under color of state law. On the question of municipality liability then, the Court's focus will be on elements one and three.

**a. Failure to investigate**

The parties agree that there is no statutory or constitutional right to an investigation and a single failure to investigate and/or prosecute a third party does not amount to the violation of a federal right. *Mitchell*, 487 F. 3d at 374. Plaintiff, however, cites several cases which she argues stand for the proposition that while a single failure to investigate may not be sufficient to give rise to a constitutional claim, such a claim does arise where there is "a clear and persistent pattern of violations." [Doc. 134 at 9 (quoting *David v. Bellevue*, 706 F. App'x 847-853(6th Cir.2017))].

All the cases cited by Plaintiff, however, appear to arise in the context of § 1983 deliberate indifference claims that ultimately hinge on whether local governing bodies are liable based on a governmental "custom" or "policy." It is unclear whether that line of cases has application in this case, although their logic might apply equally here. That precise question does not appear to have been raised by the parties, and it is unnecessary for the Court to address it further at this point in the litigation.

**b. Equal Protection**

Plaintiff appears to assert both a conspiracy and a stand-alone equal protection claim to establish the first element of a § 1983 claim. Count IV, the stand-alone claim, characterizes the conduct as an "unconstitutional pattern and practice as to women reporters" of sexual assault. [Doc.

119 at 53]. Among other factual allegations, Count IV alleges that Turner and Peters dismissed female victims' claims of sexual assault, despite overwhelming evidence, claiming these reports were not credible. [*Id*. at 340]. Peters "ridiculed and made jokes about a victim's appearance prior to the victim providing a statement about Williams' sexual assault to JCPD and Dahl. [*Id*. at 341]. On another occasion, Peters made jokes about Williams' victims' clothing and appearance. [*Id* at 342]. Following Plaintiff's fall, she was discouraged from pursuing an investigation of Williams, she was questioned about her mother and her alleged sexual promiscuity, and JCPD investigators engaged in behavior indicative of victim blaming. [*Id*. at 343]. Peters and Higgins failed and/or refused to investigate numerous reports of rape and drugging by numerous women because of a bias against female sexual assault victims. [*Id*. at 344].

Turner, Peters, Sparks, Jenkins, Legault and Higgins accepted weekly bribes of $2000 or more from Williams' shell companies and did not investigate for years because of the bribes. [*Id*. at 339].[12] Evidence obtained through discovery in the *Does* case ties Sparks to a $14,000 payment made to Female 4 in January 2024. The payment "was intended to buy Female 4's silence in a public corruption investigation and ensure she would not inculpate Defendant Sparks or other JCPD officers . . ." [*Id.* at 150]. Female 4 was identified in a Williams Facebook post "as the conspirator who provided cash to defendant Sparks and other JCPD officers . . ." [*Id*. at 151]. On December 20, 2023, and January 3, 2024, two deposits of $12, 098.10 from unknown sources were deposited in Sparks' bank account at Truist Bank. [*Id*. at 158]. On January 11, 2024, a check was written from Sparks' account at Truist Bank to an individual purported to be with a construction company that had done work on Sparks' deck. The next day, January 12, 2024, $20,000 was transferred from Sparks's savings account to his checking account. Also on January 12, 2024, Female 4 received a

[12] The Court addresses this conclusory allegation further below.

phone call from a consignment shop in Nashville, Tennessee where she had consigned a Cartier gold necklace like the one taken from Williams' safe. On January 17, 2024, the $20,000 check from Sparks' checking account was deposited or cashed at another Truist Bank branch. [*Id*. at 158-163].

On January 18, 2024, the consignment shop in Nashville deposited $21,000 in cash into its bank account. The shops records indicate that an unknown buyer purchased the necklace through an intermediary at a trade show in Miami. No records, receipts or invoices exist for the transaction. On January 22, 2024, the consignment shop wired $14,000 to Female 4's bank account. On January 24, 2024, another check for $1,200 from Sparks's account was cashed or deposited. [*Id*. at 164-167]. Thus, Sparks' bank records show a total of $21,200 in outgoing checks within seven days of when the consignment shop deposited $21,000 in cash from a purported buyer and then wired $14,000 to Female 4. [*Id*. at 168].

Between 2018 and 2022, Jenkins "laundered" cash received from Williams and Female 4 by paying off a series of auto, construction and home loans totaling over $400,000. [*Id*. at 183]. Jenkins bank records showed he repaid approximately $391,132.67 worth of loans between January 2020 and August 2023 and engaged in a pattern of auto loan repayments "indicative of money laundering." [*Id*. at 184]. Within days of the search of Williams' apartment on September 20, 2020, for instance, Jenkins paid off one loan in the amount of $34, 388.89 and took a new loan for $45,236.22. [*Id*. at 185]. Plaintiff alleges these loan payments were to launder cash taken from Williams' safe. [*Id*.]. The safe contained hundreds of thousands of dollars when seized. Williams has alleged that he kept large amounts of cash in the safe, and half was taken by the officers. [*Id*. at 132-33]. Officers also took a gold Cartier necklace from the safe but never inventoried the currency or the necklace. [*Id*. at 132, 134].

In August 2022, Johnson City initiated an independent third-party review of JCPD's

handling of sexual assault allegations by Daigle Law Group (DLG). The report was released on July 18, 2023. [*Id.* at 215-16]. The report concluded that JCPD's overall handling of sexual assault and rape cases "was severely rife with discriminatory conduct based on hostility and bias toward women." [*Id*. at 216]. According to the Report, this conduct was unlawful and discouraged female victims from reporting their assaults, allowing JCPD Investigators to close sexual assault cases improperly based on the purported reluctance of the victims to cooperate. [Id. at 217].

Johnson City's entire argument on Plaintiff's equal protection claim consists of two, short paragraphs, the first of which contains three sentences. Johnson City states: "Evans does not have standing or cannot state a claim for an alleged wrongful investigation of a third party. In the alternative, there are no municipal allegations. Finally, if this Court finds no underlying constitutional violation, then Johnson City cannot be liable." [Doc. 130 at 4]. These same arguments are repeated with some citations in the second paragraph. [*Id*. at 7]. Turner's brief in response makes a marginally better attempt to set out his arguments. His analysis, however, is equally sparse. First, he argues that Evans has no constitutional right to the investigation of a third party but largely ignores the true nature of Plaintiff's failure to investigate claim. Second, he argues "the theory [. . .] that Turner and others were accepting bribes in return for protecting Williams would not support an Equal Protection Clause claim", and Evans has failed to otherwise allege a cognizable Equal Protection Clause claim against Turner based [on] vague and conclusory allegations. . . and 'group pleadings' are insufficient to support a claim against him." Third, Evans cannot prove any conduct of Turner was either a "cause in fact" or "proximate cause" of her injuries. [Doc. 127 at 11-12]. All other defendants address the equal protection claim, but only in ways specific to the defenses of individual defendants.

Plaintiff responds that defendants continue to mischaracterize her claim as one of failure to

investigate a third party. [Doc. 134 at 8]. The Court, as set forth above, agrees. And their dogged, single-minded determination to see Plaintiff's claims as anything else undermines most of their arguments for dismissal and deprive the Court of adequate briefing on these motions. Plaintiff further argues that she has properly pled a claim for violation of her equal protection rights and her complaint gives defendants fair notice of her claim. Third, Plaintiff argues that, to the extent the Court finds that her claims arise in whole on a single failure to investigate, her complaint nevertheless is not subject to dismissal because (1) Plaintiff has a right to protection against arbitrary and capricious government action that shocks the conscience and violates the decencies of civilized conduct (citing *City of Sacramento v. Lewis*, 523 U.S. 833, 846-47 (1998) and (2) defendants' failure to investigate is part of a larger unconstitutional scheme based on a policy or custom of Johnson City, that is, multiple prior inadequate investigations in sexual assault cases (citing a multitude of Sixth Circuit cases). [Doc. 134 at 8-10].

**i. Has Plaintiff properly pled an Equal Protection claim?**

The Equal Protection Clause of the Fourteenth Amendment commands that "no state shall . . . deny to any person within its jurisdiction the equal protection of the law." U.S. const. amend XIV, § 1. To state an equal protection claim, a plaintiff must adequately plead that the government treated the plaintiff "disparately as compared to similarly situated persons and that such disparate treatment either burdens a fundamental right, targets a suspect class, or has no rational basis." *Center for Bio. Ethical Reform, Inc. v. Napolitano*, 648 F. 3d 365, 379 (6th Cir. 2011) (quoting *Club Italica Soccer & Sports Org. v. Charter Twp. Of Shelby, Michigan,* 470 F. 3d 286, 299 (6th Cir. 2006)). Disparate treatment, therefore, becomes the "threshold of an equal protection claim." *Id*. (quoting *Scarbrough v. Morgan Cty. Bd. Of Educ.,* 470 F.3d 250, 260 (6th Cir. 2006)).

The complaint here makes plausible factual allegations of disparate treatment. Although the

complaint makes no specific comparison to similarly situated individuals, its allegations are not simply conclusory. There are innumerable plausible references throughout the complaint to "female victims" and bias toward female victims of sexual assault and the like. Perhaps clearest of all is the finding from the Johnson City commissioned independent investigation of JCPD's handling of sexual assault claims by female victims by DLG.

As Plaintiff points out, the DLG report and its findings set out in the complaint is likely sufficient by itself to provide plausible factual allegations to support disparate treatment of female sexual assault victims. The report "found that JCPD's overall handling of <u>women's</u> reports of sexual assaults and rape was severely deficient and rife with <u>discriminatory conduct</u> based on bias toward women. [Doc. 119 at ⁋ 216 (emphasis added)]. The report concluded that "JCPD's practices discouraged <u>female</u> victims of sexual assault from working with law enforcement to pursue charges." [*Id*. at ⁋ 221 (emphasis added); *see also* ⁋⁋ 222-250].

**ii. Does Plaintiff allege a substantive due process claim by alleging government action that "shocks the conscience and violates the decencies of civilized conduct?"**

Plaintiff claims also that her complaint alleges another theory of unconstitutional conduct. Relying on *Sacramento v. Lewis,* Plaintiff asserts a right to protection against arbitrary and capricious government action that "shocks the conscience and violates the decencies of civilized conduct." [Doc. 134 at 9] (quoting *Sacramento*, 523 U.S. at 846-47).

In the *Sacramento* case, (*abrogated on other grounds by Saucier v. Katz*, 533 U.S. 194, 121 S.Ct. 2151, 150 L. Ed. 2d 272), the Supreme Court held that to establish a substantive due process violation, a plaintiff must demonstrate that defendants' conduct was "so egregious, so outrageous, that it may be fairly said to shock the contemporary conscience." *Id.,* 523 U.S. at 847, n.8. "Conduct intended to injure in some way is the sort of official action most likely to rise to the conscience-

shocking level." *Id.* at 849. "Protection against governmental arbitrariness is the core of due process, including substantive due process," *Hurtado v. California*, 110 U.S. 516, 527, 4 S.Ct. 111, 116-17, 28 L.Ed. 232(1884); *Daniels v. Williams*, 474 U.S. 327, 331, 106 S.Ct. 662-665, 88 L. Ed. 2d 662(1986), but only the most egregious executive action can be said to be "arbitrary" in the constitutional sense. *Collins v. Harker Heights*, 503 U.S. 115, 129, 112 S.Ct. 1061-1071, 117 L.Ed. 2d 261(1992). The cognizable level of executive abuse is that which shocks the conscience. *Collins*, 503 U.S. at 128; *Rochin v. California*, 342 U.S. 165, 172-173, 72 S.Ct. 205, 209-210, 96 L.Ed. 183(1952).

Conduct shocks the conscience, and thus violates substantive due process rights, if it violates the decencies of civilized conduct and includes conduct so brutal and offensive that they do not comport with traditional ideas of fair play and decency. *Range v. Douglas*, 763 F.3d 573, 589(6th Cir. 2014). The bribery, bias, and obstruction allegations, if true even in part, are disturbing, even reprehensible, and likely criminal.[13] That does not mean that the conduct automatically meets the shocks the conscience standard. No party has directed the Court to similar behavior in the caselaw, and the Court's research has yielded none either. Let the Court be clear, however, that acceptance of a bribe by a police officer from the very criminal he has sworn to protect the public from is the very kind of conduct that strikes at the heart of the criminal justice system, undermines public respect for the law, results in arbitrariness, and fails to comport with traditional notions of fair play and decency.

As Judge McDonough has already observed in the *Doe* case: "If any conduct clears the high

[13] The defendants, of course, deny the factual allegations of the TAC related to these issues. They do not explicitly deny their record of faulty police work done over two-thirds of a decade. The Court has searched for a reason to explain their actions (or inaction) if there was no bribery, bias, or obstruction. If plain systemic incompetence is the explanation, then it exists on a scale unlike anything this Court has ever seen. Incompetence, however, is likely not a violation of the Constitution.

bar of 'conscience-shocking' behavior, it is this. It is difficult to conceive of the possibility that public servants were cashing in on the sexual exploitation of the very citizens they are charged to protect; such alleged conduct so brazenly transgresses all standards of care we impose on those servants." [*See* Doc. 301 at 20 in *Doe v. Johnson City, Tennessee*, No. 2:23cv71, filed August 21, 2024.] See also *McCarty v. City of Southfield*, 644 F. App'x 411 (6th Cir. 2016) (police officer's ramming of driver's car with much larger vehicle was so outrageous as to shock the conscience); *Braley v. City of Pontiac*, 906 F.2d 220 (6th Cir. 1990) (police officer's misuse of his badge did not "shock the conscience"); *Larson v. City of Algood*, 390 F. Supp. 3d 874(2019) (sending and receiving sexually explicit text messages on city-provided phone and sexual intercourse in the workplace while on duty did not shock the conscience.).

Plaintiff here has plead sufficient facts to state a claim for violation of substantive due process by alleging conduct which shocks the conscience.

**iii. Civil conspiracy to violate § 1983**

As the Court has already indicated and although Plaintiff separates her § 1983 claims into counts (and not with the greatest clarity), the gist of her complaint in Counts II, IV, and V is a claim for conspiracy to violate her civil rights to equal protection and substantive due process pursuant to 42 U.S.C. § 1983 and substantive claims for violation of her rights to equal protection and substantive due process.

A claim of civil conspiracy is a cognizable claim under § 1983. To state a claim for civil conspiracy under § 1983, a plaintiff must allege facts, when accepted as true, would allow a jury to find that (1) a single plan existed, (2) conspirators shared a conspiratorial object to deprive plaintiff of her constitutional rights, and (3) an overt act was committed in furtherance of the conspiracy that caused injury. *Marvaso v. Sanchez*, 971 F.3d 599, 606 (6th Cir. 2020). A civil conspiracy under §

1983 is "an agreement between two or more persons to injure another by unlawful actions." *Id.* (quoting *Revis v. Meldrum*, 489 F.3d 273, 290 (6th Cir. 2007)). Express agreement among all conspirators is not necessary. Each conspirator need not know all the details of the illegal plan, nor all the participants involved. It must be shown, however, that each alleged conspirator shared in the general conspiratorial objective. *Hooks v. Hooks*, 771 F.2d 935, 943-44 (6th Cir. 1985).

Defendants do not engage in any discussion of these elements and largely ignore Plaintiff's own characterization of her claim as one of civil conspiracy under § 1983. They generally offer the conclusory argument that Plaintiff has provided no plausible factual allegations to support such a claim. The Court disagrees, except as to Higgins as mentioned below. The factual pleadings are adequate to overcome a motion to dismiss the conspiracy claim.

**iv. Section 1983 claims against individual defendants**

Although the Court has found that the TAC contains plausible allegations to defeat Johnson City's motion to dismiss the § 1983 claims, Plaintiff also sues the individual defendants for the same § 1983 claims—conspiracy to violate § 1983 (Count II) and substantive claims of violation of equal protection (Count IV) and substantive due process (Count V). Although their arguments vary in some ways, the individual defendants, in one way or another, challenge whether the TAC contains plausible factual allegations, not couched as conclusions, against the individual defendants. In deciding these motions, the Court must look to the allegations against them individually, not collectively, to determine whether the TAC alleges sufficient facts to support a claim against them individually. Therefore, a brief review of the complaint's allegations against them individually is necessary:[14]

**Turner.** Turner was the chief of police in Johnson City during the relevant time period of

[14] Plaintiff uses improper group pleading throughout her complaint. As much as possible, the Court looks only to the paragraphs where factual allegations are made by name or context against each of them individually.


Case 2:24-cv-00076-KAC-CRW Document 153 Filed 04/13/26 Page 36 of 55 PageID #: 5842

the events described in the TAC. Dahl was a Special Assistant United States Attorney, whose position was funded by Johnson City. At some point, Dahl began actively investigating the complaints of the victims of sexual assault by Sean Williams. At the request of Supervisory AUSA Wayne Taylor, Turner scheduled a meeting to discuss the case. Turner intentionally canceled the meeting because he was upset with Dahl. Turner then requested a meeting with Dahl to discuss the Williams case. Dahl recorded the meeting. During the meeting, Turner cast doubt on the evidence already collected and indicated that he thought the "raped" list found in Williams' apartment might be a list of women with whom Williams had had consensual sex. After the meeting, Turner called AUSA Tom McCauley, who previously held the same position as Dahl, to complain about Dahl.

Turner discouraged Dahl from obtaining a search warrant to inspect SIM cards from Williams' phone and affirmatively refused to investigate the crimes against Williams' victims. He refused to refer charges for prosecution, and when he did, he did so in a piecemeal and incomplete manner to undermine any potential prosecution. Turner intentionally interfered with Dahl's efforts to investigate Williams' sex trafficking venture by conspiring to terminate the funding of her contract with Johnson City. At the direction of Turner and Peters, in their supervisory capacity, Sparks and Jenkins intentionally suppressed and destroyed evidence on Williams' digital devices. As payment from Williams, Turner and all other defendants took hundreds of thousands of dollars in cash from Williams, including cash and a gold Cartier necklace from Williams' safe.

Turner met with DA-elect Steve Finney on August 23, 2022, "to strategize an organized response to Dahl's complaint." As part of Turner's strategy, he sent a letter to the outgoing DA about a year after the filing of the Dahl complaint, asking his office or the TBI to perform a preliminary investigation to determine whether any basis existed for a public corruption investigation into allegations made by Dahl. On Finney's first day in office, September 1, 2022, he responded to the

letter that there was no such thing as a "preliminary investigation", and he did not have sufficient information to move forward. Turner intentionally delayed the request because he knew Finney would not approve any investigation. Cathy Ball, former mayor and a co-signer of the Turner letter, forwarded the letter to the Johnson City Commissioners.

On September 19, 2020, the day of Plaintiff's fall, CID Supervisor Hilton sent an email to the leadership of JCPD, including Turner, setting forth the details of Plaintiff's fall and the investigative steps already taken by JCPD. Hilton explained that JCPD would need to obtain additional search warrants for Williams' digital devices and the safe seized from his apartment. Against the advice of Hilton, Turner and Peters, head of CID, made the decision not to obtain the warrant. Turner continued to discourage the obtaining of a search warrant over the next four months. Turner dismissed the victims' assault claims, stating the victims were not credible.

In August 2022, Johnson City initiated an investigation by DLG of JCPD's handling of sexual assault reports from January 2018 through December 2022,[15] which included the date of Plaintiff's assault by Williams. The results of the report were damning, finding that JCPD's handling of women's reports of sexual assaults and rape was severely deficient and rife with discriminatory conduct based on hostility and bias toward women. DLG concluded that JCPD's pattern and practice with respect to sexual assault reports and investigation of those reports did not meet constitutional standards of policing and also fell short of industry standards. DLG noted JCPD practices which made reporting of sexual assaults "unnecessarily burdensome" to female victims, including practices motivated by gender bias and discriminatory animus toward women. DLG found that JCPD's interactions with women reporting sexual assaults reflect gender-based stereotypes and bias, including overtly discriminatory statements made by JCPD officers,

[15] These dates coincide with Turner's tenure as Police Chief in Johnson City.

investigators and leadership. As a result, only 11.27% of the reported rape cases between 2018-2022 ended in the arrest of a suspect.

These facts, taken as a whole, are sufficient to state an individual claim against Turner for conspiracy to violate § 1983 and the substantive claims of violations of equal protection and substantive due process.

**Peters**. Peters was a captain in the JCPD who appears to have reported directly to Turner, and who was head of CID. In June 2019, Dahl reached out to Jane Doe 4 who, although reported as "uncooperative" by JCPD, agreed to an interview with Dahl. Sparks and McCauley were present for the interview, which was led by Sparks. Following the interview, Peters showed McCauley pictures of Jane Doe 4 on Facebook and made derogatory comments about her appearance. On March 16, 2020, Peters learned of another alleged victim of Williams but intentionally did not disclose that information to Dahl. Dahl was also not informed of another alleged victim, who died on November 20, 2020, while on her way home from Williams' apartment.

Supervisory AUSA Wayne Taylor arranged a meeting with Turner, Peters, and Dahl which Turner and Peters intentionally cancelled. The details of that meeting are set forth above in the section about factual allegations related to Turner. After that meeting, Peters suggested the installation of pole cameras which were unlikely to capture video of a crime.

Peters was involved with intentionally interfering with a search of Williams' digital devices, which likely contained evidence of Plaintiff's fall. Sparks and Jenkins intentionally suppressed and destroyed evidence on Williams' digital devices at the direction of Turner and Peters. On September 19, 2020, call logs show that the CID supervisor on the scene, David Hilton, called Peters three times between 4:37 a.m. and 5:40 a.m., for six, four, and fourteen minutes respectively, and Peters continued to receive updates from Hilton throughout the day, including during the execution of the

search warrant at the Williams apartment. Hilton and Peters spoke for four minutes at 11:28 a.m. and for fourteen minutes at 3:05 p.m.

Peters, along with the other defendants, took payments from Williams in the hundreds of thousands of dollars. Peters and others involved affirmatively refused to investigate Williams' crimes against female victims, including the Plaintiff; affirmatively refused to refer charges for prosecution; referred charges in a piecemeal and incomplete manner to undermine potential prosecution; knowingly conspired to destroy and conceal evidence; and knowingly intimidated and dissuaded women from pursuing criminal charges. Peters and others also intentionally interfered with Dahl's efforts to investigate and potentially prosecute Williams' sex crimes.

Peters' August 23, 2020, meeting with Turner and Dahl is outlined above. The only other allegation of the TAC not noted there is that over the next four months, Peters received updates about Williams' digital devices, but they remained in JCPD custody unsearched.

During the investigation of Williams, Peters ridiculed and made jokes about a female victim's appearance prior to the victim providing a statement about her sexual assault by Williams. On another occasion, Peters made jokes about Williams' victims' clothing and appearance, and claimed the victims were not credible. Peters allegedly dismissed Williams' victims because he had a financial incentive in the form of illegal bribes.

As with Turner, these allegations, taken together are sufficient to plausibly plead claims of conspiracy to violate § 1983 and individual claims for violation of equal protection and substantive due process.

**Sparks.** Sparks was an investigator employed by JCPD and heavily involved in the Williams investigation. In June 2019, Dahl reached out to the victim identified as Jane Doe 4 even though JCPD records indicated she was uncooperative. She agreed to meet with Dahl and was

interviewed by Sparks, Dahl and former Johnson City SAUSA Tom McCauley.

Plaintiff was bedridden and unable to care for herself from the date of the fall through the summer 2022. During her hospitalization, Plaintiff insisted she was drugged and assaulted but JCPD did not allow Plaintiff to be tested for date rape drugs and her rape kit was not properly administered. Plaintiff's blood was sent to the crime lab and Sparks and Peters received the toxicology report on or around January 19, 2021. Sparks did not send the report to Plaintiff until January 20, 2022, after her blood sample had been destroyed in September 2021. Sparks' actions with respect to the toxicology report prevented Plaintiff from requesting further testing that would have revealed the presence of date-rape drugs.

Sparks and Jenkins interviewed Williams at JCPD headquarters. During the thirty-minute interview, Williams was allowed to keep his cellphone which had access to the video surveillance cameras in his apartment. After the interview, Sparks and Jenkins left Williams alone with his cellphone, knowing he would try to delete evidence from the phone. Williams deleted data from his cellphone and made phone calls from the phone before it was ultimately seized. Sparks then applied for a search warrant for Williams' apartment to search for evidence of attempted criminal homicide.

While investigating Plaintiff's fall, JCPD officers left the Williams apartment unsecured and left the apartment without securing the Arlo video cameras which pointed to the window at the center of the room where Plaintiff fell. Sparks and Jenkins also failed to seize a handwritten note next to Williams' phone which said, "Call Arlo!!" They seized the phone but not the note. Sparks and Jenkins intentionally left Diaz-Vargas in the unsecured apartment alone while they interviewed Williams at JCPD headquarters enabling him to destroy evidence. Jenkins saw Diaz- Vargas re-enter the Williams apartment before he left the scene to interview Williams. Sparks applied for a search warrant for the apartment at 8:52 a.m.

Beginning at 10:08 a.m. on September 19, 2020, Sparks and Jenkins executed the search warrant, remaining at the apartment for the next nine hours. The search was not thorough nor conducted according to JCPD protocol. Sparks and Jenkins failed to secure, seize and inventory key pieces of evidence. Instead, they seized Williams' safe, which had no apparent relevance to the attempted homicide investigation, because a drug dog alerted on it. The safe contained hundreds of thousands of dollars in cash and a gold Cartier necklace. They failed to seize a rifle in plain view inside Williams' front door, despite knowledge that Williams was a convicted felon prohibited from possessing a firearm. They also did not seize a handwritten note from Williams' nightstand with the word "raped' atop a list of the names of twenty-three females, including what appeared to be names of children and infants. Sparks also seized several digital devices which remained in JCPD custody unexamined for over two years. Sparks never obtained a search warrant for the devices, but did obtain a search warrant for the search of the safe. Sparks found bags of cash in the safe, most of which were gone when the safe was returned.

Williams operated Glass and Concrete, LLC, along with Diaz-Vargas, which had millions of dollars in annual revenue. Williams used his business to forward payments to Sparks, Jenkins and others in exchange for protection from investigation and possible prosecution. During the investigations, Sparks, Jenkins and other defendants took hundreds of thousands of dollars in cash from Williams, including a gold Cartier necklace and cash from the safe seized from his apartment. Sparks had already been making deposits in cash and laundering payments through multiple bank and loan accounts which far exceeded his known income for years. Williams, on or about September 2, wrote a Facebook post claiming that JCPD officers, including Sparks, extorted cash from Williams through his co-conspirator Female 4, at the rate of at least $2,000 per week. Williams' company used false Internal Revenue 1099 Forms to pay the money out of the business. The


Case 2:24-cv-00076-KAC-CRW Document 153 Filed 04/13/26 Page 42 of 55
PageID #: 5838

payments were paused in September 2020 after Plaintiff fell from Williams' fifth story apartment.

On December 20, 2023, and January 3, 2024, two deposits from unknown sources of $12,098.10 each cleared Sparks' checking account at Truist Bank. On January 11, 2024, counsel for the Doe plaintiffs spoke to Female 4 about telling the truth about what happened with Williams. On the same day, a check was written from Sparks' checking account to an individual purported to be with a construction company that had done work on Sparks' deck in October-November 2023. On the next day, $20,000 was transferred from Sparks' savings account to his checking account. The same day, January 12, 2024, Female 4 received a phone call from a consignment store in Nashville, Tennessee, where she had consigned a gold Cartier necklace. On January 17, 2024, the $20,000 check from Sparks' checking account was cashed or deposited.

On January 18, 2024, the consignment shop in Nashville deposited $21,000 in cash into its bank account. According to the consignment shops records, an unknown buyer at a tradeshow in Miami, Florida had purchased the gold Cartier necklace. No records, receipts or invoices for the transaction exist. On January 22, 2024, the consignment shop wired $14,000 to Female 4's bank account. Sparks' bank records show a total of $21,200 in outgoing checks within seven days of when the consignment shop deposited $21,000 in cash from the purported buyer, about whom no records apparently exist, and then wired $14,000 to Female 4. Sparks moved money through multiple savings, checking and loan accounts which he held or controlled at least four different financial institutions. Sparks deposited smaller sums of cash directly into his checking account with unexplained deposits totaling approximately $68,000 during the alleged conspiracy.

These factual allegations, taken as a whole, are sufficient to plausibly plead Counts II and V, but not Count IV, against Sparks individually. Sparks' motion as to these counts will be GRANTED IN PART AND DENIED IN PART.

**Jenkins**: Jenkins was also an investigator with JCPD and heavily involved with Sparks in the investigation. He took payments from Williams as set forth elsewhere in this memo and was involved jointly with most of the investigative actions of Sparks outlined above.

Between 2018-2022, Jenkins engaged in a scheme to launder ill-gotten cash received from Williams and/or Female 4 by paying off a series of auto, construction and home loans totaling more than $400,000. The Doe plaintiffs subpoenaed certain bank records of Jenkins. The records show Jenkins repaid approximately $391,132.67 worth of loans between January 2020 and August 2022. Within days of the search of Williams' apartment and the seizure of Williams' safe, Jenkins paid off one loan of $34,308.89 and opened a new loan for $45,236.22. On June 1, 2022, Female 4 withdrew $11,800 in cash from a Williams' business account. The next day, Jenkins opened a new car loan for $11,000 with a total amount financed of $11,855.79. Jenkins paid off the $11,000 loan within two months. Jenkins took out nine auto loans within four years. Jenkins also deposited smaller sums of cash during this time frame from cash payments received from Williams through Female 4.

As with Sparks, these factual allegations are sufficient to plausibly plead a conspiracy to violate § 1983 and violation of substantive due process but not for violation of equal protection. The motion to dismiss Count IV is GRANTED and DENIED as to Counts II and V.

**Legault**: Legault was an investigator employed by JCPD. The TAC contains fewer specific factual allegations against Legault. The TAC makes the same allegations that Legault received payments from Williams and/or Female 4 in exchange for protecting Williams from investigation and prosecution.

On March 16, 2021, Legault and Peters received information about another alleged victim of Williams. They intentionally withheld that information and information about other victims from Dahl, including information about a victim who died on November 20, 2020, while driving home

from Williams' apartment. The TAC also details an event on April 18 or 19, 2023, involving Female 9, another of Williams' victims. Female 9 was standing outside Tipton's Street Pub with a male companion, waiting for a ride, when at least two JCPD patrol cars drove up. The male companion was handcuffed and Female 9 pulled out her cellphone to video the events. One of the officers took hold of her arm and when she pulled back, he physically assaulted her, and her head hit the ground. Officers pinned her down and continued to assault her, leaving her with bruises all over her body.

The JCPD report of the incident stated that a security guard for Tipton's reported that the male refused to leave Tipton's and that the male and female were arguing in the parking lot. The report contains no other facts to establish probable cause for the arrest of Female 9 or her male companion. The report justified the arrest of Female 9 based on her disorderly conduct and resisting arrest. It further states a search of her backpack incident to the arrest found a small baggie containing a white substance which field tested positive for cocaine. Female 9 claims the officers planted the cocaine.

Legault was the supervising officer who signed off on the police report which documented Female 9's arrest. This arrest occurred about four months after Female 9 had reported her sexual assault by Williams to an FBI Special Agent as a witness in the FBI's sex trafficking investigation of Williams. The incident was part of an effort by JCPD, including Legault, to retaliate against and intimidate Female 9. The TAC also alleges that Legault failed to interview witnesses, including Williams' victims, send victim information to Dahl, and failed to execute search warrants despite being directed to do so.

Once again, the TAC contains sufficient allegations against Legault to plausibly plead a claim for conspiracy to violate § 1983 and for violation of substantive due process, but not equal protection. Legault's motion is GRANTED as to Count IV and DENIED as to Counts II and V.

**Higgins**: Higgins is likewise an investigator employed by JCPD. Of all defendants, the TAC's allegations against Higgins are the sparsest. It makes the same allegations of bribery and extortion as it does for other defendants.[16] It does allege, in a conclusory fashion, that Higgins "acted in concert" with other defendants to destroy evidence and conceal information from other agencies in exchange for bribes. The TAC also alleges, again in conclusory fashion, that Higgins failed to investigate Williams even though directed to do so and acted as a conduit of communications between co-conspirators. The TAC does **<u>not</u>** make any specific plausible factual allegations of any overt acts committed by Higgins.

Based upon these sparse allegations against Higgins, the TAC does not sufficiently allege plausible facts to plead the causes of action set out in Counts II, IV and V. Higgins' motion as to these counts is GRANTED in full.

**D. Qualified Immunity**

A two-pronged analysis is used to determine whether qualified immunity applies in a given case: (1) whether the facts, viewed in the light most favorable to the plaintiff, show that the officers' conduct violated a constitutional right; and (2) whether that right was clearly established at the time of the challenged conduct. *Nelson v. City of Battle Creek*, 802 F. App'x 983, 986 (6th Cir. 2020) (citing *Saucier v. Katz*, 533 U.S. 194, 201, 121 S. Ct. 2151, 150 L. Ed 2d 272(200)). Once a defendant raises a qualified immunity defense, plaintiff bears the burden of showing that the officer is not entitled to qualified immunity. *Burgess v. Fischer*, 735 F.3d 462, 472 (6th Cir. 2013).

"Clearly established" means that, at the time of the officer's conduct, the law was sufficiently clear that "every reasonable official would understand that what he is doing was unlawful." *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S. Ct. 3034, 97 L. Ed. 2d 523 (1987).

---

[16] The Court considers the allegations of bribery and extortion to be especially serious, if true. If not, the allegations are malicious, libelous, and constitute sanctionable conduct on the part of Plaintiff and her attorneys.


Case 2:24-cv-00072-KAC-JEM Document 153 Filed 04/13/26 Page 46 of 55 PageID #: 2856

"Existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd,* 563 U.S. 731, 741, 131 S. Ct. 2074, 179 L. Ed. 2d 1149 (2011). In determining a particular right is clearly established, the Court should not define it at a high level of generality but assess whether the particular conduct is unconstitutional. *Mullenix v. Luna*, 577 U.S. 7, 12, 126 S. Ct. 305, 193 L. Ed. 2d 255 (2015). "[A]n officer might lose qualified immunity even if there is no reported case 'directly on point.'" *Ziglar v. Abbasi*, 582 U.S. 120, 151, 137 S. Ct. 1843, 198 L. Ed. 2d 290 (2017). That is, "[t]here need not be a case with the exact fact pattern or even 'fundamentally similar' facts," as long as the defendants had "fair warning" that their conduct violated the plaintiff's rights. *Goodwin v. City of Painesville*, 781 F. 3d 314, 325 (6th Cir. 2015).

The burden is on the plaintiff to show a defendant is not entitled to qualified immunity, but that burden is modest at the motion-to-dismiss stage. *Courtright v. City of Battle Creek,* 839 F. 3d 513, 518 (6th Cir. 2016). This issue is usually resolved at the summary judgment stage to allow for "development of the factual record," which is "frequently necessary to decide whether the official's actions violated clearly established law. *MacIntosh v. Clous*, 69 F. 4th 309, 315 (6th Cir. 2023).

As set forth above, Plaintiff has pled sufficient plausible facts to establish that her rights to equal protection and substantive due process were violated. And, in this Court's view, those rights were clearly established at the time of the defendants' conduct. This Court again agrees with Judge McDonough that: "[h]ere, Plaintiff[] alleges that Defendants knowingly obstructed or attempted to obstruct criminal investigations to cover up police participation in an extortion scheme to rake in cash from a sex-trafficking venture. . . If true, there is no colorable argument Defendants were ignorant to the patent unconstitutionality of their actions; it is at least 'plausible' that Defendants' action violated a clearly established constitutional right." *Jane Doe, et. al. v. Johnson City, et. al.*, No. 2:23cv71, Doc. 301 at 26-27. Plaintiff has met her burden at this stage of this litigation.

### E. State Law Claims

#### 1. Tennessee Governmental Tort Liability Act

Johnson City's liability for torts committed by its employees and agents is governed the Tennessee Governmental Liability Act ("TGTLA"). Tenn. Code Ann. §§ 29-20-201 through 29-20-407. The TGTLA codifies the Tennessee common law rule of sovereign immunity for counties, municipalities, and other governmental entities. Tenn. Code Ann. § 29-20-201; *Limbaugh v. Coffee Medical Ctr*., 59 S.W. 3d,73, 79 (Tenn. 2001). The TGTLA affirms that municipalities in Tennessee are immune from suit with certain exceptions or waivers set forth in the TGTLA. *Doyle v. Frost*, 49 S.W. 3d 853, 657 (Tenn. 2001).

Under the TGTLA, Johnson City will then be generally subject to suit for claims sounding in negligence with certain enumerated exceptions. *Limbaugh*, 59 S.W. 3d at 79. Tennessee Code Annotated § 29-20-205 provides in pertinent part that immunity from suit of all governmental entities is removed "for injury proximately caused by a negligent act or omission of any employee within the scope of his employment, except if the injury arises out of . . . (2). . . civil rights." "Civil rights" has usually been interpreted to mean claims arising under federal civil rights laws, such a 42 U.S.C. § 1983. When a plaintiff's negligence claims arise out of the same facts and circumstances as his civil rights claims under 42 U.S.C. § 1983, they fall within the civil rights exception of the TGTLA and must be dismissed. *Tinkle v. Dyer County*, 2018 WL 6840155, at *2 (W.D. Tenn. Dec. 31, 2018). Employees, on the other hand, are immune pursuant to Tennessee Code Annotated § 29-20-310(b) (providing that "[n]o claim may be brought against an employee or judgment entered against an employee for damages for which the immunity of a governmental entity is removed by this chapter . . .").

In Count One of her complaint, Plaintiff brings a negligence claim against all defendants

under the TGTLA. As is clear from the above, she cannot maintain those claims against the individual defendants for the simple reason that negligence claims are among the class of claims for which immunity has been removed for Johnson City. Likewise, Plaintiff's attempt to characterize or disguise what are clearly negligence claims as intentional torts is unavailing. The individual negligence claims of Count One must, therefore, be DISMISSED. The Court has scratched its head more than once while trying to piece together a coherent Plaintiff's response to Johnson City's argument on the TGTLA claims. In any event, whether characterized as negligence or intentional torts, the factual allegations in Count One are the very same allegations made with respect to the § 1983 claims. They clearly arise out of the same facts and circumstances. The essence of Plaintiff's complaint is for a civil rights violation. Count One will be DISMISSED against all defendants.

**2. Fraudulent Concealment**

The gist of Plaintiff's claim for fraudulent concealment under Tennessee state law is that all defendants concealed the cause of action, failed to disclose material facts, and failed to disclose information when there was a duty to do so, preventing Plaintiff from discovering the cause of action despite exercising reasonable care and diligence.

The elements for a cause of action for fraudulent concealment under Tennessee state law are: "(1) the defendant had a duty to disclose a known fact or condition; (2) the defendant failed to disclose it; (3) the plaintiff reasonably relied upon the resulting misrepresentation; and (4) the plaintiff consequently suffered injury." *Briggs & Stratton Power Prods. Grp., LLC v. Osram Sylvania, Inc.,* 2017 WL 5992361 (Tenn. Ct. App. 2017).

Plaintiff states her Count III claim in four short paragraphs. The essence of her claim is that "Defendants" took affirmative action to conceal the cause of action preventing Plaintiff from

discovering the cause of action. More specifically, "Defendants" had knowledge of material facts and concealed them from Plaintiff, knowing there was a duty to do so. [Doc. 119 at ¶¶ 328-331].

It appears that defendants rely on two primary arguments: 1) that Plaintiff has not pled sufficient plausible facts to establish the duty to disclose, and 2) that plaintiff has not met the heightened pleading requirement of Rule 9(b) for fraud claims. Plaintiff seems to suggest there was duty on the part of Sparks, in particular, to send her the results of her toxicology report. Plaintiff also suggests this state law claim is established by her allegation that Sparks concealed Williams' wrongdoing and claimed falsely that an investigation was ongoing, when in fact it was not. Yet in another response, she says "fraudulent concealment tolls the statute [of limitations] under Tennessee law, citing Tenn. Code Ann. § 29-3-110. [compare Doc. 136 at 7 with Doc. 41 at 10].[17]

This claim, however, fails for a very simple reason. Fraudulent concealment requires a "duty to disclose" a material fact by the defendant. See *Briggs & Stratton*, 2017 WL 5992361 at *11. Plaintiff's only allegations as to a duty to disclose are conclusory, i.e., that defendants "remained silent and failed to disclose material facts despite a duty to disclose," [Doc. 119 at ¶ 329], and "by failing to disclose information when he or she had a duty to do so." [ *Id*. at ¶ 331]. Plaintiff does not plead plausible facts to show that such a duty existed—no case law, no constitutional provision, no statute, ordinance or policy from which the duty could arise, except for a vague reference to "JCPD" policies. This failure is fatal to Plaintiff's claim for fraudulent concealment. Count III is DISMISSED as to all defendants.

**3. Intentional Infliction of Emotional Distress**

Count VI of the TAC is a state law claim against all defendants for the state law tort of intentional infliction of emotional distress. As an initial matter, Johnson City retains sovereign

[17] Plaintiff seems to conflate the argument that fraudulent concealment might toll the applicable statute of limitations with her effort to plead a stand-alone tort claim for fraudulent concealment.


Case 2:24-cv-00076-KAG-CRW Document 153 Filed 04/13/26 Page 50 of 55
PageID #: 5850

immunity for the claim, and the claim for intentional infliction of emotional distress is DISMISSED against Johnson City for that reason.

In Tennessee, as this Court has previously explained, the elements of the tort of intentional infliction of emotional distress are that the conduct of the defendant was "(1) intentional or reckless, (2) so outrageous that it is not tolerated by civilized society, and (3) resulted in serious mental injury to the plaintiff." *Rimmel v. Burke*, 2023 WL 10475992, at *4 (E.D. Tenn. 2023)(quoting *Rogers v. Louisville Land Co.*, 367 S.W. 3d 196, 205, (Tenn. 2012)). "Liability has been found only in the rare occasions where the conduct is so outrageous as to go beyond all possible bounds of decency and to be regarded as atrocious and utterly intolerable in a civilized community." *Odom v. Claiborne Co.*, 498 S.W. 3d 882, 887 (Tenn. 2016).

The Court notes first that Plaintiff makes no specific allegations against any individual defendant, and this makes it virtually impossible to find that she states a claim against any individual defendant. Even in Plaintiff's responses, she continues to refer to the collective "Defendants". She does, however, make specific reference to the alleged conduct of Sparks regarding his individual acts. [Doc. 119 at ⁋ 358] and Jenkins [ *Id.* at ⁋ 359] but only by reference through her incorporation of all other paragraphs of the TAC. [ See *id.* at ⁋⁋ 110-115, 117]. The facts alleged by Plaintiff state a claim for much the same reason as the Court has found the alleged behavior to be "conscience-shocking," but only as to Sparks and Jenkins. The claim for intentional infliction of emotional distress will be DISMISSED as to Turner, Peters, Higgins and Legault.

**V. The Motions for Summary Judgment**

Alternatively, each defendant has moved for summary judgment on all counts. Each of the individual defendants has attached his own declaration which, among other things, denies ever taking a bribe or knowing of others who had, entering into any agreement with Sean Williams

or each other to protect Williams from prosecution, allowing anyone to destroy evidence or obstruct the investigation of Sean Williams in any way, taking anything of value from Williams' apartment, or having any discriminatory animus toward any female victims. [See Docs. 122-1, 122-2, 122-3, 131-1, 120-1, 125-1]. Johnson City has attached the declaration of Thomas J. Garland, Jr., various text messages and transcripts, and the *Dahl* and *Doe* complaints. [Docs. 128-1 thru 128-4].

Summary judgment is appropriate only if the court is satisfied "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(C). The burden of showing the absence of any such genuine issue rests with the moving party. A party seeking summary judgment always bears this initial burden, informing the court of the basis for its motion, and identifying any portion of the "pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). The Court will view the motion in the light most favorable to the party opposing the motion. *Matsushita Elec. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L.Ed. 2d 538 (1986).

Plaintiff has not responded to the merits of defendants' motions for summary judgment but rather argues that summary judgment is premature without adequate discovery, particularly in civil rights cases, citing *Tarleton v. Meharry Med. Col.*, 717 F. 2d 1523, 1535(6th Cir. 1983) and *White's Landing Fisheries, Inc. v. Buchholzer*, 29 F. 3d 229, 231-32 (6th Cir. 1994). Plaintiff has attached the declaration of Plaintiff's counsel [Doc. 142-1] in support of her request to invoke Rule 56(d). In the declaration, counsel states that no discovery had been conducted in this case and is needed to fairly respond to the motions for summary

judgment. This is a case, given its complexities and the clear public interest in the litigation, where the Court would be inclined to grant the request to allow discovery before deciding summary judgment motions, especially where the Court has already decided motions to dismiss. But this case has a wrinkle not present in most cases, as discussed below.

The defendants oppose the request for discovery and argue that the declaration of Plaintiff's counsel is deficient and does not meet the technical requirements of Rule 56(d). Johnson City points out that its motion for summary judgment is limited to the statute of limitations issue and the declaration of Plaintiff's counsel does not say how discovery would aid in the resolution of that issue. Johnson City is correct and the Court is somewhat baffled that Plaintiff made no attempt to respond to the Johnson City motion, not even with the declaration of Plaintiff herself, explaining the text messages and the TV interview transcript, or any basis for her assertion made in paragraph 255 of the TAC that she learned of the mishandling of her investigation "no earlier than the filing of the first amended complaint on September 6. 2023." In short, there is no reason apparent to the Court as to why the declaration of Evans, at a minimum, could not have been filed in response.

Second, Plaintiffs second amended complaint, like the original, made certain allegations "upon information and belief." It was only after Plaintiff represented to the Court that she now had evidence which supported these claims "after discovering additional evidence produced in the *Dahl v. Johnson City, et. al* case" that she was permitted to amend her complaint, and those claims proved important in some ways in the Court's resolution of the motions to dismiss. It seems somewhat disingenuous for Plaintiff to now argue that discovery is necessary to allow her to respond to the motions for summary judgment considering her previous representation to the Court, at least as far as those paragraphs go to a material fact.

This case is one of significant public interest involving the fundamental fairness and integrity of the criminal justice system. More specifically, the allegations call into question the fairness, honesty and integrity of the Johnson City Police Department and its leadership. Indeed, the Court has already found the alleged behavior, if true, to be outrageous and shocking to the conscience of the community, and it is loath to dismiss Plaintiff's complaint at this early stage without discovery after finding it alleges sufficient plausible facts to at least in part survive motions to dismiss. On the other hand, the court will not allow Plaintiff to take advantage of the Court or these defendants by potentially making false statements to the Court. That also raises a significant issue of public interest involving the integrity of the Courts and potentially subjects Plaintiff and Plaintiff's counsel to sanctions.

For these reasons, Plaintiff shall have twenty-one days from the date of the entry of this order to supplement her responses to the motions for summary judgment. At a minimum, she must respond fully to Johnson City's motion for summary judgment on the ground that her complaint is barred by the statute of limitations and respond more fully to the other pending motions by producing the evidence in her possession which she represented to the Court justified allowing her to amend her complaint yet again to remove the "upon information and belief" qualifier. Furthermore, since, as noted above, the allegations of bribery are so serious and potentially libelous if untrue, Plaintiff must produce in affidavits, declarations or other appropriate form the evidence she has to convince the Court the allegations of bribery against individual defendants are made in good faith. Only then will the Court consider her request for discovery. Plaintiff is forewarned that failure to comply with the Court's directive may result in the dismissal of her third amended complaint.[18]

[18] Plaintiff is also forewarned that the Court is likely to look skeptically on any request to extend the twenty-one day

## VI. Conclusion

For reasons set forth herein, it is ORDERED:

1. The motion to dismiss by Johnson City and Turner, Peters, Sparks, Jenkins, Legault and Higgins, in their official capacities, [D0c. 128], is **GRANTED** with respect to the official capacity claims but **GRANTED IN PART** and **DENIED IN PART** as set forth herein;

2. The motion of Turner to dismiss, [Doc. 125], is **GRANTED** in part and **DENIED** in part as set forth herein;

3. The motion of Peters to dismiss, [Doc. 120], is **GRANTED IN PART** and **DENIED IN PART** as set forth herein;

4. The motion of Sparks to dismiss, [Doc. 131], is **GRANTED IN PART** and **DENIED** IN PART as set forth herein;

5. The motions of Jenkins and Legault to dismiss, [Doc. 122], is **GRANTED IN PART** and **DENIED IN PART** as set forth herein;

6. The motion of Higgins to dismiss, [Doc. 122], is **GRANTED IN FULL**; and

7. The Court will defer ruling on the motions for summary judgment and the request for discovery for a period of twenty-one days from the date of the entry of this order, allowing Plaintiff that period to respond to the directives of the Court as set forth above.

SO ORDERED.

ENTER:

s/ J. RONNIE GREER
UNITED STATES DISTRICT JUDGE

deadline set in this order.