UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT GREENEVILLE

| | | |
|---|---|---|
| KATERI LYNNE DAHL,<br><br>Plaintiff,<br><br>v.<br><br>KARL TURNER, et al.,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | 2:22-CV-72-KAC-JEM |

**MEMORANDUM OPINION AND ORDER**

Before the Court are (1) Defendant Karl Turner's "Motion for Partial Judgment on the Pleadings and for Summary Judgment" [Doc. 61], (2) Defendant City of Johnson City, Tennessee's "Motion for Summary Judgment" [Doc. 66], (3) Plaintiff Kateri Lynne Dahl's Motion to Stay Summary Judgment, to Re-open Discovery, or, Alternatively, to Supplement the Summary Judgment Record [Doc. 128] and (4) a Supplement to that Motion [Doc. 150], (5) Defendants' Supplemental Response to Plaintiff's Supplement to Motion to Stay Discovery or Reopen Discovery or Supplement the Record [Doc. 151], (6) Plaintiff's Motion to Exclude "Defendants' Supplemental Response to Plaintiff's Supplement to Motion to Stay or Reopen Discovery or Supplement The Record [Doc. 150]" [Doc. 152], (7) Plaintiff's Motion to Take Judicial Notice in support of Plaintiff's Motion to Re-Open Discovery [Doc. 154], (8) Plaintiff's Notice of New Authorities [Doc. 158] with (9) a Supplement [Doc. 159], and (10) Defendants' Response to Plaintiff's Notice of New Authorities [Doc. 160]. As described below, the Court (1) declines to reopen discovery and (2) dismisses the remaining claims against Defendants Turner and Johnson City.

## I. **<u>Background</u>**[1]

Plaintiff began "practicing as an attorney" in 2018 [*See* Doc. 82-213 at 1 (Declaration of Kateri Dahl ("Decl. K. Dahl"))]. In July 2019, she was detailed from the District Attorney's Office, where she was working as an "Assistant District Attorney," to the "the United States Attorney's Office for the Eastern District of Tennessee" to act as a Special Assistant United States Attorney ("SAUSA") [*See* Doc. 40-2 at 1, 4 (2019 MOU)]. Plaintiff entered a Memorandum of Understanding ("MOU") with the United States Attorney's Office, the District Attorney General, the Mayor of the City of Johnson City, the Manager of the City of Johnson City, and the Mayor of Washington County [*See id.*]. The purpose of the "detail[]" was "to assist the city of Johnson City in its continuing efforts" and "goals of eliminating" "the violent criminals" and "drug traffickers who are contributing to violent crime and other crimes in the area" [*Id.* at 1]. To achieve this goal, Plaintiff was to "work with the Johnson City Police Department" ("JCPD"), "the First Judicial District Attorney's Office, and the First Judicial Drug Task Force under the guidance of the United States Attorney's Office in identifying investigations best prosecuted in federal district court" [*Id.*].

At all relevant times, Defendant Turner "was the Police Chief for the JCPD" [*See* Doc. 61-1 at 1 (Declaration of Karl Turner ("Decl. K. Turner"))]. Captain Kevin Peters "was the head of the JCPD's Criminal Investigation Division ('CID')" [*See* Doc. 62 at 3]. And Sergeant Jeff LeGault led the Special Investigation Squad ("SIS") "within CID" [*Id.*].

Under the MOU, Plaintiff "c[ould] prosecute any type of criminal case," but her "primary focus" was prosecuting violations of 18 U.S.C. §§ 922, 924(c), 2118(a), 1951, and 2113, and "all

[1] Because Defendants moved for summary judgment, the Court describes the factual allegations in the light most favorable to Plaintiff and draws all reasonable inferences in her favor. *See Raimey v. City of Niles Ohio*, 77 F.4th 441, 448 (6th Cir. 2023) (citing *Hicks v. Scott*, 958 F.3d 421, 430 (6th Cir. 2020)).

violations of Title 21, involving illegal trafficking of controlled substances" [*See* Doc. 40-2 at 2 (2019 MOU)]. The SAUSA program was "funded," at least in part, "by the Department of Justice" [*Id.* at 1, 3; *see also* Doc. 61-1 at 2 (Decl. K. Turner)]. The MOU provided for a one-year "term" [*See* Doc. 40-2 at 3 (2019 MOU)]. The text of the MOU did not allow the parties to extend the MOU for a term of "less then twelve months" [*See* Docs. 40-2 at 3 (2019 MOU), 40-3 at 3 (2020 MOU)].

Plaintiff's first term began on "July 1, 2019 and end[ed] [on] June 30, 2020" [*Id.* at 3]. At the conclusion of the first term, there were no reported complaints regarding Plaintiff's performance [*See* Docs. 61-1 at 2 (Decl. K. Turner at 2), 82-21 at 3 (Decl. K. Dahl)]. "With the concurrence of all the parties," Plaintiff's MOU was "extended" on "July 1, 2020" for an "additional" twelve-month term to expire on "June 30, 2021" [*See* Doc. 40-3 at 3 (2020 MOU)].

"On the morning of November 13, 2020," Investigator Sparks of the JCPD approached Plaintiff about a potential prosecution "for a felon in possession of ammunition" [*See* Doc. 82-21 at 3 (Decl. K. Dahl)]. Plaintiff explained to Investigator Sparks that "cases for ammunition were usually only prosecuted federally if there was a compelling reason" [*Id.*]. And Investigator Sparks advised Plaintiff that "the suspect," later identified as Sean Williams, "was a suspected serial rapist" [*Id.*]. After hearing Investigator Sparks's "description" of the allegations against Williams, Plaintiff informed him that she "would absolutely take" the case [*Id.* at 4]. Plaintiff explained that "while I [Plaintiff] would be open to indicting [Williams] for ammunition as a last resort, I [Plaintiff] wanted to explore all possibilities for serious charges" [*Id.*]. And Plaintiff advised that she "didn't know if a search warrant was viable based on the amount of time that had passed and the facts of the case" [*Id.* at 5]. Nonetheless, Plaintiff asked Investigator Sparks "to get me [Plaintiff] a draft search warrant as soon as possible" [*Id.*].

Plaintiff then called her DOJ supervisor, Assistant United States Attorney ("AUSA") Taylor "and briefed him on the case" [*Id.*]. AUSA Taylor offered to "set up a meeting for" Plaintiff with the Tennessee Bureau of Investigation ("TBI") to discuss the Williams case, specifically increasing resources for the case [*Id.*]. AUSA Taylor scheduled that meeting with TBI Agent Kimbrell for December 8, 2020 [*See* Doc. 82-25 at 1 (Saulsbury 12/4/2020 Email)]. Based on Plaintiff's training and experience as a state prosecutor, she believed that prosecuting Williams "should be a priority" and she was continually frustrated by JCPD's apparent lack of "urgency" surrounding the Willaims investigation [*See* Doc. 82-21 at 6-7 (Decl. K. Dahl)].

On December 4, 2020, the JCPD learned of the scheduled meeting with the TBI [*See* Doc. 82-25 at 1 (Saulsbury 12/4/2020 Email)]. Captain Peters "cancelled" the meeting and rescheduled it for the following Monday [*Id.*]. TBI Agent Kimbrell sent Plaintiff a text message indicating that "he would have to cancel our meeting due to a Covid exposure" [*See* Doc. 82-21 at 8 (Decl. K. Dahl)]. But Plaintiff received a call from AUSA Taylor informing her that Defendant "Turner had learned about the TBI meeting and was angry that the meeting had been set up without his knowledge" [*Id.* at 9].

On December 8, 2020, Defendant Turner called Plaintiff and asked her "to come into the department for a discussion that afternoon" [*Id.*]. Plaintiff met with Defendant Turner and Captain Peters, and she secretly recorded the conversation [*Id.*; *see generally* Doc. 61-9 (12/8/2020 Dahl Secret Recording)]. They primarily discussed the Williams case and potential issues surrounding a federal prosecution [*See generally* Doc. 61-9 (12/8/2020 Dahl Secret Recording)]. Plaintiff wanted the JCPD to "get a search warrant" on Williams's computer [*See id.* at 9]. But Defendant Turner asserted that the JCPD "ran into some issues" with "probable cause on the search warrant" [*Id.*]. Plaintiff admitted that she was "kind of 50/50 at this point" on whether the JCPD

would have probable cause for a search warrant—an assessment that AUSA Taylor ostensibly agreed with [*Id.* at 11]. Plaintiff also expressed hesitancy to charge Williams only with unlawful possession of ammunition as a convicted felon [*Id.* at 5]. Plaintiff was concerned that "if I [Plaintiff] charge him [Williams] with the ammo, he's going to get out" "on bond" because of his "[in]significant criminal history," "money," and the current "COVID" policies [*Id*. at 44]. Plaintiff wanted to "explore[] more fully" "rape charges" and even suggested perusing charges against Williams under "th[e] Federal date rape statute" [*Id.* at 5, 39-40]. But Plaintiff acknowledged that the date rape statute may not be "the strongest statute as far as prosecuting or charging," and that if it came down to it, she would likely not "be comfortable" "actually charging him [Williams] with this statute" [*Id.* at 40-41]. Captain Peters, for his part, suggested "working th[e] case" as a "drug" case because Williams was known to possess, and possibly sell, illicit drugs [*Id.* at 34, 44, 48]. Ultimately, Plaintiff, Defendant Turner, and Captain Peters decided to (1) "try[] to get a search warrant" for Williams's "computer and the SIM cards" and (2) install a "poll cam[era]" near the vicinity of Williams's garage "to see what we can get" [*Id.* at 33, 42, 45-46, 48-51, 56].

"Sometime in the latter part of 2020," Defendant Turner and Captain Peters "began receiving complaints" from Seargeant LeGault about Plaintiff's "lack of communication and/or lack of progress on the cases she was presented for prosecution" [*See* Doc. 61-1 at 3 (Decl. K. Turner)]. On December 11, 2020, Seargeant LeGault emailed them "a list of the cases that SIS has either given to Kat [Plaintiff] and she has all the materials for or sent her reports of cases we [SIS] wanted prosecuted" [*Id.* at 15]. The "list"—titled "Federal Cases for 2019-2020"—divided cases into three groups: (1) cases that Sergeant LeGault "believed" Plaintiff "was evaluating or planning to prosecute," (2) cases that "had been sent to" Plaintiff "by email for consideration of prosecution," and (3) "cases that had not been sent" because of Plaintiff's "lack of progress on the

cases in the first two categories" [*Id.* at 4, 16]. In preparing the list, Sergeant LeGault spoke to his subordinate SIS officers, who also reported experiencing communication issues with Plaintiff [*See* Doc. 82-28 at 6 (Deposition of Jeff LeGault ("J. LeGault Dep")].

On December 15, 2020, Defendant Turner forwarded Sergeant LeGault's email and list to AUSA Taylor [*See* Doc. 61-1 at 18 (Decl. K. Turner)]. In the email, Defendant Turner explained: "These are cases we would like information on regarding prosecution. I understand the complications with the federal grand jury and COVID-19. If Kat [Plaintiff] could send an update I will pass the information along to SIS" [*Id.*]. Later that day, AUSA Taylor informed Plaintiff that Defendant "Turner was complaining about my [Plaintiff's] job performance, mainly that I [Plaintiff] was not indicting cases fast enough and I [Plaintiff] was not communicating with the officers" [*See* Doc. 82-21 at 12 (Decl. K. Dahl)].

Plaintiff also expressed frustration about her relationship with the JCPD to AUSA Taylor. On December 30, 2020, Plaintiff told AUSA Taylor that the JCPD officers "did not seem to listen to me [Plaintiff] when it came to my professional opinion as an attorney and how I wanted to proceed with the Williams case" and "attempted to ignore me [Plaintiff] regarding the evidence that I had researched and found through social media" [*See* Doc. 82-21 at 13 (Decl. K. Dahl)]. According to Plaintiff, AUSA Taylor "told me [Plaintiff] that if I [Plaintiff] had issues with the officers, I [Plaintiff] needed to communicate that [her]self" [*Id.*].[2]

[2] For his part, on February 8, 2021, AUSA Taylor emailed Plaintiff about performance issues related to problems with her court submissions (relayed by the Clerk's office), responsiveness to the Probation Office, completion of required trainings, and tardiness in giving work to AUSA Taylor for his review [*See* Docs. 82-21 at 15 (Decl. K. Dahl); 61-5 at 9 (2/18/2021 Taylor Email)].

In February 2021, Plaintiff decided to indict Williams for possessing ammunition as a felon [*Id.* at 15]. She had planned to indict Williams at the March grand jury but did not have a copy of his certified judgment [*Id.* at 17]. Accordingly, she pushed the indictment to April [*Id.*].

On March 23, 2021, Sergeant LeGault sent an updated case list to Defendant Turner and Sergeant Peters [*See* Doc. 61-1 at 21 (Decl. K. Turner)]. This time, Sergeant LeGault explained that the list contained "cases that Kat has access to as well as cases we have stopped trying to prosecute due to her not prosecuting the current case we have sent her" [*Id.*]. This list was not sent directly to the United States Attorney's Office or Plaintiff [*See* Doc. 82-21 at 19 (Decl. K. Dahl)]. But sometime "during the late winter or early spring 2021," Defendant Turner "advised the City Manager that I [Defendant Turner] had received complaints and had concerns regarding" Plaintiff's "work performance" [*See* Doc. 61-1 at 5 (Decl. K. Turner)].

On April 13, 2021, Plaintiff indicted Williams for illegally possessing ammunition as a convicted felon [*See* Doc. 82-21 at 20 (Decl. K. Dahl)].

On April 21, 2021, Plaintiff was approached by Investigator Barron "to do a complaint on a defendant named Dalvin Robinson for felon in possession" [*Id.* at 21]. Robinson had previously hit a Sherriff's Deputy with his car and was considered a priority for federal prosecution by the JCPD [*See* Doc. 61-1 at 24-25 (Decl. K. Turner)]. Then, on April 22, 2021, Sergeant LeGault emailed Defendant Turner and Captain Peters, explaining that "Inv. Barron spoke with SAUSA Kat Dahl [Plaintiff] about doing a complaint on" Robinson and offered to "type the complaint to expedite and help Kat Dahl [Plaintiff] with the process" [*See id.* at 24]. The email stated that Plaintiff "agreed this would help" and that she "would get back to Inv. Barron about a judge" [*Id.*]. So, Inv. Barron "completed the complaint," "messaged SAUSA Dahl stating it was finished," and Plaintiff "never replied back" "to tell him what judge would be available" [*Id.*]. Sergeant LeGault

said to Defendant Turner and Captain Peters that despite going "above and beyond on the last several complaints by typing them ourselves," "it still seems impossible to get much to happen" [*Id.*]. Sergeant LeGault acknowledged that he was not "in" Plaintiff's "shoes" and did not "know what [wa]s happening in Greeneville" but expressed that SIS "at least need[ed]" a "respon[se] back on cases that are of priority" [*Id.*]. Plaintiff "disputes the account of Barron and Legault," but she does not dispute that Sergeant LeGault sent this email to Defendant Turner [*See* Doc. 82 at 17].

On or around May 1, 2021, Robinson was released from state custody on bail [*Id.* at 25]. And Sergeant LeGault sent another email to Defendant Turner and Captain Peters stating that SIS "typed the complaint for Kat [Plaintiff] and as you can see she never followed through with getting a judge or filing the complaint from a few weeks ago when he was in custody. This one is on Kat Dahl" [*Id.* at 25]. Plaintiff "disputes the account of Barron and Legault," but she does not dispute that Sergeant LeGault sent this email to Defendant Turner [*See* Doc. 82 at 17-18].

On April 28, 2021, Plaintiff met with AUSA Gomez to discuss her frustration with the JCPD's investigation of Williams [*See* Doc. 82-21 at 22 (Decl. K. Dahl)]. AUSA Gomez suggested that Plaintiff voice her concerns about the "JCPD's conduct regarding Williams" to Federal Bureau of Investigations ("FBI") Agent Bianca Peterson [*Id.*]. And several days later, on April 30, 2021, Plaintiff complained to AUSAs McCauley and Bowman about her frustration with the JCPD's handling of the Williams case [*Id.*].

On Tuesday, May 11, 2021, Plaintiff met with FBI Agent Peterson at the Johnson City FBI field office. Plaintiff "brought a copy of the Williams case file, and walked Agent Peterson through the evidence [sh]e had, what Williams was accused of doing, and the disconcerting actions by JCPD officers" [*Id.* at 25]. Plaintiff "told Agent Peterson that I [Plaintiff] was worried about the

possibility of negligence or corruption" [*Id.*]. Plaintiff also expressed "concern[s] about comments JCPD had made towards me [Plaintiff] indicating gender bias" and explained that Plaintiff "believed the victims in this case" were "being treated unfairly" [*Id.*]. The meeting occurred in an "open air office" at the FBI field office where "others" at the FBI field office "could" potentially "see or hear" the conversation [*Id.* at 26].

In May 2021, JCPD Officer Jaynes was the "liaison officer" with the FBI [*See* Doc. 86-1 at 1 (Declaration of Joe Jaynes ("Decl. J. Jaynes")]. During May 2021, he "work[ed] one day per week in the FBI" field office, typically a Monday or Friday [*See id.*; Doc. 86-3 at 2-3 (Deposition of Joe Jaynes ("J. Janes Dep.")]. Officer Jaynes has sworn "under penalty of perjury" that:

> 3. I had no knowledge of Kateri Dahl ("Ms. Dahl") making any complaint to the FBI about the JCPD and/or Chief Turner while she was a Special Assistant United States Attorney ("SAUSA").
>
> 4. More specifically, I have been asked to assume, on information and belief, that Ms. Dahl came to the FBI Office on May 11, 2021 and met with FBI Special Agent Bianca Person to make a complaint about JCPD and/or Chief Turner. I have no knowledge of any such meeting occurring. I never learned of any such meeting while Ms. Dahl was a SAUSA.
>
> 5. This first time I learned that Ms. Dahl had allegedly made a complaint to the FBI about the JCPD and/or Chief Turner was after Ms. Dahl filed this lawsuit.
>
> 6. . . . I did not communicate with anyone, including Chief Turner, that Ms. Dahl had complained to the FBI about the JCPD and/or Chief Turner.

[*See* Doc. 86-1 at 1-2 (Decl. J. Jaynes)].

On May 17, 2021, Defendant Turner asked for another meeting with Plaintiff to "discuss the list of cases that was sent back in December 2020" [*See* Doc. 82-21 at 26-27 (Decl. K. Dahl)]. On May 19, 2021, Plaintiff met with Defendant Turner and Captain Peters, and she secretly recorded the meeting [*See* Docs. 66-5 at 15-16 (Deposition of Kateri Lynne Dahl); 61-11 at 1 (5/19/2021 Dahl Secret Recording)]. Generally, they discussed prioritization of cases and ways to

improve communication between Plaintiff and the JCPD [*See id.* at 18-20, 26-28, 31, 33]. Captain Peters asked Plaintiff: "Can you just send me an E-mail on who got indicted [at the June Grand Jury] and then that way I can get in with the Chief [Defendant Turner] and we know where we stand on these cases and everything? . . . Because evidently the information is not flowing to us" [*Id.* at 19]. Plaintiff agreed [*Id.*]. Defendant Turner also suggested that JCPD internally "prioritize" their cases and assign "one person [to] communicat[e] with her [Plaintiff] on cases that we [JCPD] need done" [*Id.* at 26]. Defendant Turner told Plaintiff that going forward, Sergeant LeGault would handle prioritization and communicate those priorities to Plaintiff [*Id.*].

On or about June 3, 2021, Plaintiff called Sergeant LeGault to inform him that only one case would go forward to the June Grand Jury [*See* Doc. 82-21 at 29 (Decl. K. Dahl)]. On June 8, 2021, Captain Peters emailed Plaintiff to "see what Johnson City cases have been or will be presented to the Federal Grand Jury" and alternatively to ask for "a date when" the cases "will be presented" if "none have [yet] been presented" [*See* Doc. 61-1 at 27 (Decl. K. Turner)]. Plaintiff did not respond to the email [*See* Doc 61-6 at 3 (Deposition of Kevin Peters ("K. Peters Dep.")]. On June 9, 2021, Plaintiff presented one Johnson City case at the Federal Grand Jury [*See* Doc. 61-1 at 30 (Decl. K. Turner)]. That case "was originally given to [AUSA] Tom McCauley" and "passed" to Plaintiff [*Id.*]. "No cases on" Sergeant LeGault's case list "were taken through" to the Grand Jury [*Id.*]. Sergeant LeGault relayed this information via email to Captain Peters, who responded: "Still haven't heard anything from her [Plaintiff]. Don't expect that I will" [*Id.*]. And Captain Peters informed Defendant Turner that Plaintiff "did not report" to Peters "directly on the outcome of the Grand Jury" as "she had agreed" [*Id.* at 9-10].

As the MOU was coming to an end, Defendant Turner "asked City Attorney Sandos whether it would be possible for the City to renew" the MOU "for another year" "but then

terminate it a few months later if" Plaintiff's "work performance did not improve" [*See id.* at 10]. "Attorney Sandos advised" him "that the better course of action would be to not renew" the MOU [*Id.*; *see also* Doc. 61-2 at 2 (Declaration of Sunny Sandos ("Decl. S. Sandos")]. In accordance with the City Attorney's advice, Defendant Turner "recommended to the City Manager" Pete Peterson that the MOU "not be renewed," and he "agreed" [*Id.*]. "Chief Turner had the power to recommend that" the MOU "not be renewed," but "the power to decide whether to seek the renewal from the City Commission resided with [then] City Manager Pete Peterson" [*See* Doc. 61-2 at 2 (Decl. S. Sandos)]. Defendant Turner has sworn "under penalty of perjury" that:

> 36. At the time I recommended to the City Manager that Ms. Dahl's contract not be renewed, I had absolutely no knowledge that Ms. Dahl had made any complaints to the FBI or any third party alleging "Johnson City Policy Department's failures to investigate and seize Williams, and the substantial likelihood that Johnson City Policy Department was either corrupt or plainly incompetent." Likewise, during that same time frame I had no knowledge that Ms. Dahl was allegedly investigating me or Johnson City.
>
> 37. Similarly, at no time prior to the non-renewal of Ms. Dahl's contract did I have any knowledge that Ms. Dahl was refusing to participate in or remain silent about "illegal activities." Consistent therewith, I had no knowledge of Ms. Dahl reporting any alleged illegal activities to any person, entity or government agency at any time prior to the City's decision to not renew her contract.

[Doc. 61-1 at 11, 14 (Decl. K. Turner)].

At some point in either May or June of 2021, Defendant Turner asked Captain Peters to "check" with other officers to "see if they had any incidents where communication wasn't flowing" from Plaintiff [*See* Doc. 82-45 at 7 (K. Peters Dep.)]. In response to that request, Officer Jaynes sent an email to Captain Peters on June 23, 2021 noting that "[c]ommunication (or lack thereof) is a major issue with" Plaintiff, and Officer Jaynes "h[ad] a handful of very strong federal gun cases that I [Officer Jaynes] cannot get indicted in Federal Court because I cannot get Kat [Plaintiff] to

contact me" [*See* Doc. 82-51 at 1 (6/23/2021 Jaynes Email)]. But according to Captain Peters, by the time he reviewed the email, the "determination [not to renew the MOU] had already been made" [*See* Doc. 82-45 at 10 (K. Peters Dep.)].

On June 24, 2021, Defendant Turner notified Plaintiff that "Johnson City would not" renew the MOU [*See* Doc. 82-21 at 20 (Decl. K. Dahl)]. Later that day, AUSA Taylor called Defendant Turner to ask him to change his mind [*Id*. at 31]. Defendant Turner agreed to enter into a separate one-month contract so Plaintiff could transfer her files to an AUSA [*Id.*; *see also* Doc. 61-2 at 3, 12-14 (Decl. S. Sandos)]. On June 29, 2021, Defendant Turner explained the reasons for nonrenewal to Plaintiff; he specifically mentioned a "lack of communication" and "indictments" [*See* Doc. 82-21 at 32 (Decl. K. Dahl)]. To Plaintiff, the reasons "appeared to be superficial" [*Id.*].

On June 23, 2022, Plaintiff filed suit [*See* Doc. 1]. Also, on June 23, 2022, Plaintiff filed a complaint with the DOJ Office of the Inspector General ("OIG") alleging retaliation for whistleblowing related to Williams [*See* Doc. 76 at 2-24 (OIG Complaint)]. On June 30, 2022, the OIG reviewed Plaintiff's concerns and determined that the "matters you [Plaintiff] raised are outside our investigative jurisdiction, therefore no action can be taken by our Office" [*Id.* at 1].

Plaintiff's operative "First Amended Complaint" raised five (5) claims. Against Defendant Turner, the Amended Complaint raises claims for (1) "First Amendment Retaliation" (Count One), (2) "Procedural Due Process Violation" (Count Two), and (3) "Substantive Due Process Violation" (Count Three) [Doc. 56 at 46-52]. Against Defendant Johnson City, the Amended Complaint raises claims for (4) "Retaliatory Discharge" under the Tennessee Public Protection Act ("TPPA") (Count Four) and (5) violations of the National Defense Authorization Act ("NDAA") (Count Five) [*Id.* at 52-54].

Defendant Turner filed a "Motion for Partial Judgment on the Pleadings and for Summary Judgment" [Doc. 61]. Specifically, he sought dismissal of Count Three under Federal Rule of Civil Procedure 12(c), and dismissal of Counts One and Two under Rule 56 [*See* Doc. 61]. Defendant Johnson City filed a "Motion for Summary Judgment" [Doc. 66], seeking dismissal of Counts Four and Five under Rule 56. Plaintiff filed a "Omnibus Opposition Brief to Each Defendant's Motion for Summary Judgment" [Doc. 82]. Plaintiff "concede[d]" and "withdr[ew]" her Substantive Due Process claim (Count Three) [*See* Doc. 82 at 43]. But she defended the remaining claims [*See generally* Doc. 82]. Defendants each filed a reply in support of their respective motion [*See* Docs. 86, 87].

While this case was ongoing, criminal and civil litigation related to Williams and his victims was also proceeding separately [*See, e.g.*, *United States v. Williams*, 2:21-cr-27 (E.D. Tenn.); *United States v. Williams*, 2:23-cr-111 (E.D. Tenn.); *United States v. Williams*, 1:23-cr-61 (W.D.N.C.); *Jane Does 1-9 v. City of Johnson City, Tenn.*, 2:23-cv-71 (E.D. Tenn.); *Evans v. City of Johnson City*, 2:24-cv-106 (E.D. Tenn.)]. Plaintiff's counsel was following that separate litigation. As a result, Plaintiff filed a Motion to Stay Summary Judgment, to Re-open Discovery, or, Alternatively, to Supplement the Summary Judgment Record [Doc. 128], requesting "additional discovery" putatively under Rule 56(d), based on purported "omissions" in Defendants' discovery productions [*See* Doc. 128 at 15]. Because it was unclear whether the Parties had "fully complied with their obligations under Rule 26(e)," the Court ordered the Parties to "supplement all applicable discovery" [Doc. 149 at 1-2]. And because Plaintiff's Motion failed to identify "what material facts" she "hope[d] to uncover" as Rule 56(d) requires, the Court ordered Plaintiff to file a supplement "specifically identifying (1) which precise additional discovery she seeks after all Rule 26(e) supplementation is complete" and (2) "how each of those precise items

'sheds further light' on an issue that is in dispute in either or both of the pending motions for summary judgment" [*Id.* at 2].

Thereafter, Plaintiff filed a Supplement [Doc. 150] indicating that "[t]he [P]arties timely made their Rule 26(e) supplementation as ordered" and identifying eight (8) items of additional discovery Plaintiff sought [Doc. 150 at 1-7 ]. Defendants responded [Doc. 151]. Plaintiff moved to exclude Defendants' response [Doc. 152]. Then, Plaintiff filed a Notice of New Authorities [Doc. 158] with Supplement [Doc. 159]. And Defendants filed a Response to Plaintiff's Notice of New Authorities [Doc. 160].

## II. Analysis

### A. Defendants' Are Entitled To Summary Judgment On The Remaining Claims Against Them.

Under Federal Rule of Civil Procedure 56, the Court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court views the facts in the light most favorable to the nonmoving party and makes all reasonable inferences that can be drawn from those facts in her favor. *See Raimey*, 77 F.4th at 448. A moving party bears the burden of demonstrating that no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party meets this burden, the nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir. 2009) (citation omitted); *see also* Fed. R. Civ. P. 56(c)(1). A dispute over a material fact is a "genuine issue" if a reasonable jury could find for the nonmoving party on that issue. *Cockrel v. Shelby Cnty. Sch. Dist.*, 270 F.3d 1036, 1048 (6th Cir. 2001) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "[C]onclusory and unsupported allegations,

rooted in speculation, do not meet [the summary judgment] burden." *Bell v. Ohio State Univ.*, 351 F.3d 240, 253 (6th Cir. 2003) (citation omitted).

**i. Defendant Turner Is Entitled To Summary Judgment On Count One.**

Count One, a First Amendment retaliation claim, is cognizable under 42 U.S.C. § 1983. To prevail on a Section 1983 First Amendment retaliation claim, a plaintiff must show that (1) she engaged in constitutionally protected speech; (2) a defendant took adverse action against her that would cause her to suffer an injury that would likely chill a person of ordinary firmness from continuing in that speech; and (3) the adverse action was motivated at least in part by the plaintiff's constitutionally-protected speech. *See McElhaney v. Williams*, 81 F.4th 550, 556 (6th Cir. 2023); *see also Myers v. City of Centerville, Ohio*, 41 F.4th 746, 759 (6th Cir. 2022); *Dye v. Office of the Racing Comm'n*, 702 F.3d 286, 294 (6th Cir. 2012). For purpose of summary judgment, Defendant Turner only challenges the third element of the prima facie case [*See* Doc. 62 at 9-10].[3]

The operative Amended Complaint, which binds Plaintiff, identifies her protected speech as "making allegations to multiple third parties, including the FBI, about Johnson City Police Department's failures to investigate and seize Williams, and the substantial likelihood that Johnson City Police Department was either corrupt or plainly incompetent" [*See* Doc. 56 at 47]. And the Amended Complaint alleges that "Defendant Turner's termination of Dahl's employment" was the relevant "adverse action against her" [*Id.*]. Defendant Turner does not dispute that this speech constitutes protected speech [*See* Doc. 62 at 9]. Instead, he argues that because he was not aware that Plaintiff "engaged in" this protected speech before he decided not to recommend renewal of

[3] He alternatively argues that he would have taken the same action in the absence of the protected speech [*Id.*].

the MOU, Plaintiff cannot show that the alleged adverse action—nonrenewal of the MOU—was motivated by Plaintiff's constitutionally protected speech [*Id.* at 9-10]. On this record, he is right.

Against Defendant Turner's sworn statements that at the relevant time he "had absolutely no knowledge that Ms. Dahl had made any complaints to the FBI or any third party alleging 'Johnson City Policy Department's failures to investigate and seize Williams, and the substantial likelihood that Johnson City Policy Department was either corrupt or plainly incompetent,'" [*see* Doc. 61-1 at 11 (Decl. K. Turner)], Plaintiff identifies "circumstantial evidence" that she believes is enough to proceed to a jury based on the theory that Defendant Turner perjured himself [*See* Doc. 82 at 33, 35-36]. It is legally possible to state a prima facie case in this way, but the circumstantial evidence here falls short. *See Holzemer v. City of Memphis*, 621 F.3d 512, 526 (6th Cir. 2010).

***First***, Plaintiff contends that because (1) JCPD officers learned of the December 2020 TBI meeting and (2) there is "circumstantial evidence" that some JCPD officers knew information and "would have" "informed his chain of command," a jury could infer that Defendant Turner knew of Plaintiff's protected speech [*See* Doc. 82 at 33, 35]. But that argument reaches too far based on the record before the Court and would ask the jury to speculate. *See Bell*, 351 F.3d at 253. Further, she argues that there is "circumstantial evidence" showing that Officer Jaynes knew of the May 11, 2021 complaint to the FBI, but she fails to address Officer Jaynes's sworn statement to the contrary, discussed below.

***Second***, she argues that the December 11, 2020 LeGault case list constitutes "Retaliation" [*See* Doc. 82 at 35]. But that is not consistent with the theory of this claim before the Court. Under Plaintiff's theory of the case, and upon review of the record, the earliest that Plaintiff "ma[de] allegations to . . . third parties, including the FBI, about Johnson City Police

Department's failures to investigate and seize Williams, and the substantial likelihood that Johnson City Police Department was either corrupt or plainly incompetent," [*see* Doc. 56 at 47], was April 28, 2021, when Plaintiff confided in AUSA Gomez, [*see* Doc. 82-21 at 22 (Decl. K. Dahl)]. The December 11, 2020 case list therefore cannot be "[r]etaliation" as a matter of law because it occurred before the alleged protected speech.

***Third***, in multiple logical leaps, Plaintiff argues that circumstantial evidence would allow the jury to determine that (1) Officer Jaynes overheard Plaintiff's May 11, 2021 FBI complaint and (2) he reported that complaint to someone higher up in his chain of command, or maybe directly to Officer Turner, and (3) Officer Turner learned of the complaint and was motivated not to renew the MOU on that basis [*See* Doc. 82 at 21, 35-36]. But the evidence identified would not allow a jury to reach that conclusion.

The sworn evidence in the record is that Officer Jaynes had "no knowledge" of any May 11, 2021 meeting and "did not communicate with anyone, including Chief Turner, that Ms. Dahl had complained to the FBI about the JCPD and/or Chief Turner" [*See* Doc. 86-1 at 1-2 (Decl. J. Jaynes)]. And the circumstantial evidence supports, not undermines, that sworn testimony. In May 2021, Officer Jaynes was typically in the FBI field office one day a week, on a Monday or Friday [*See id.*, Doc. 86-3 at 2-3 (J. Janes Dep.)]. May 11, 2021 was a Tuesday. Officer Turner, too, swore that during the relevant time he "had absolutely no knowledge that Ms. Dahl had made any complaints to the FBI or any third party alleging 'Johnson City Policy Department's failures to investigate and seize Williams, and the substantial likelihood that Johnson City Policy Department was either corrupt or plainly incompetent.'" [Doc. 61-1 at 11, 14 (Decl. K. Turner)]. Against this evidence, "there can be no genuine issue as to any material fact when the nonmoving party has failed to make a showing sufficient to establish the existence of an element essential to

that party's case, and on which that party will bear the burden of proof at trial." *See Barr v. Lafon*, 538 F.3d 554, 561 (6th Cir. 2008) (cleaned up); *see also Harbin-Bey v. Rutter*, 420 F.3d 571, 580 (6th Cir. 2005).

***Finally***, Plaintiff generally contends that deviation from standard operating procedure by JCPD Officers combined with the temporal proximity of the May 11 FBI meeting to Defendant Turner's recommendation not to renew the MOU constitute circumstantial evidence of retaliation [*See* Doc. 82 at 35-36]. When "analyzing the facts in temporal proximity cases," the Court "look[s] at the totality of the circumstances to determine whether an inference of retaliatory motive could be drawn." *See Holzemer*, 621 F.3d at 526. Here, these facts, even taken together with the other circumstantial evidence Plaintiff identifies, are insufficient to bridge the logical gap. Defendant Turner's alleged retaliatory action occurred the month after Plaintiff's latest protected speech, the May 11, 2021 complaint [*See* Doc. 61-2 at 2 (Decl. S. Sandos)]. *See Hill v. Lappin*, 630 F.3d 468, 476 (6th Cir. 2010). Viewing the facts in the light most favorable to Plaintiff, Defendant Turner made the allegedly retaliatory decision on June 9 at the earliest, the day Plaintiff failed to contact Captain Peters regarding the Grand Jury as promised [*See* Docs. 61-1 at 9-10 (Decl. K. Turner); 61-2 at 2 (Decl. S. Sandos)]. At that time, Defendant Turner would have preferred to "renew" Plaintiff's MOU "for another year" and "terminate it a few months later if" Plaintiff's "work performance did not improve" [*See* Doc. 61-1 at 10 (Decl. K. Turner)]. But the City Attorney advised against that course of action [*Id.*; *see also* Doc. 61-2 at 2 (Decl. S. Sandos)]. Taken together, the evidence fails to permit an inference of a retaliatory motive by Defendant Turner. *See Holzemer*, 621 F.3d at 526. Accordingly, Plaintiff has not shown

that Defendant Turner's decision not to recommend renewal of the MOU was motivated at least in part by her constitutionally-protected speech. *See McElhaney*, 81 F.4th at 556.

**ii. Defendant Turner Is Entitled To Summary Judgment On Count Two.**

"To establish a procedural due process violation, Plaintiff[] must show (1) that [she] ha[s] been deprived of a cognizable [property] interest, and (2) that such deprivation occurred without adequate procedural protections." *Golf Village North, LLC v. City of Powell, Ohio*, 14 F.4th 611, 623 (6th Cir. 2021) (quoting *Schulkhers v. Kammer*, 955 F.3d 520, 545 (6th Cir. 2020)). Whether a cognizable property interest exists "depends largely on state law." *Bailey v. Floyd Cnty. Bd. of Edu., By & Through Towler*, 106 F.3d 135, 141 (6th Cir. 1997) (citations omitted). "'[T]o establish a protected interest' in a government position, an employee 'must be able to point to some statutory or contractual right conferred by the state which supports a legitimate claim to continued employment.'" *Crawford v. Benzie-Leelanau Dist. Health Dept. Bd. of Health*, 636 F. App'x 261, 267 (6th Cir. 2016) (quoting *Bailey*, 106 F.3d at 141).

The operative Amended Complaint, which binds Plaintiff, identifies only the TPPA as a source of state law that "provides Dahl [Plaintiff] with a limited but cognizable Constitutional property interest in continued employment free from retaliation for whistleblowing" [*See* Doc. 56 at 48].[4] Tennessee is an at-will employment state. *Franklin v. Swift Transp. Co.*, 210 S.W.3d 521, 527 (Tenn. Ct. App. 2006). But the TPPA provides a limited carveout—"[n]o employee shall be discharged or terminated ***solely for*** refusing to participate in, or for refusing to remain silent about, illegal activities." Tenn. Code Ann. § 50-1-304(b) (emphasis added). To have a right under the

[4] Plaintiff concedes that the "'due process' that Chief Turner owed Dahl [Plaintiff] was modest, and afforded him wide latitude" and that MOU "itself had no written or other objective standard or review process for annual extension" [*See* Doc. 56 at 49]. Accordingly, as pleaded, the procedural due process claim is limited to a property interest, if any, the TPPA provides.

TPPA, a plaintiff must establish (1) her status as an employee of the defendant employer; (2) her refusal to participate in or remain silent about "illegal activities"; (3) that she was terminated or discharged; and (4) an "exclusive causal relationship between [that termination and her] refusal to participate in or remain silent about illegal activities." *See Franklin*, 210 S.W.3d at 528. A plaintiff has "a formidable burden in establishing" a right under the TPPA. *See Darnall v. A+ Homecare, Inc.,* No. 01-A-01-9807-CV-00347, 1999 WL 346225, at *5 (Tenn. Ct. App. June 2, 1999).

Taking the third element first, the Tennessee Supreme Court has defined "termination" to mean "[t]he complete severance of an employer-employee relationship" and "discharge" to mean "[t]he firing of an employee." *See Harman v. Univ. of Tennessee*, 353 S.W.3d 734, 738 (Tenn. 2011). Termination "requires an act on the part of the employer to end the employment relationship." *Id.*; *see also Thomas v. Metro. Gov't of Nashville & Davidson Cnty.*, No. M2025-00288-COA-R3-CV, 2026 WL 1469431, at *3 (Tenn. Ct. App. May 26, 2026). Tennessee Courts have determined that the decision not to renew an expiring contract for employment does not constitute an "act on the part of the employer" sufficient to violate the TPPA. *See Howard v. Life Care Centers of Am., Inc.*, No. E2004-00212-COA-R3CV, 2004 WL 1870067, at *5 (Tenn. Ct. App. Aug. 20, 2004) ("There is no authority in Tennessee which gives an individual the right to sue for failure to renew a contract and we do not deem it appropriate to create such a cause"); *Freeman v. Lewisburg Hous. Auth.*, No. M200601898COAR3CV, 2008 WL 360607, at *4 (Tenn. Ct. App. Feb. 8, 2008) (noting that plaintiff's "claim must fail because his employment ended with the expiration of his contract rather than by his termination within the meaning of the" TPPA).

Accordingly, Plaintiff had no property interest in the renewal of the MOU under the TPPA, and her procedural due process claim, therefore, fails.

Further, to have a right under the TPPA, a plaintiff must "show an ***exclusive*** causal relationship between their protected activity and the adverse employment action." *Levan v. Sears, Roebuck & Co.*, 984 F. Supp. 2d 855, 872 (E.D. Tenn. 2013) (emphasis added). The alleged protected activity must be the "sole reason" for her termination. S*ee Hugo v. Millennium Lab'ys, Inc.*, 590 F. App'x 541, 544 (6th Cir. 2014) (citing *Guy v. Mut. of Omaha Ins. Co.*, 79 S.W.3d 528, 537 (Tenn. 2002) (emphasis omitted)). Here, again, the record falls flat. Against Defendants' evidence that Defendant Turner (and the City Attorney and City Manager Peterson) were not aware of Plaintiff's complaints about identified illegal activity, Plaintiff relies on the circumstantial evidence she identified to attempt to support her retaliation claim based on Defendant Turner's awareness of her complaints [*See* Doc. 82 at 48-49 (arguing only that the circumstantial evidence showed Defendant "Turner's knowledge")]. But just as this circumstantial evidence failed to show Defendant Turner's awareness for the retaliation claim, and thus causation, it also fails to show Defendant Turner's awareness, and thus causation, to establish a right under the TPPA. And to the extent Plaintiff argues that "Dahl has knowledge imputed to Johnson City generally," she fails to identify any unique specific knowledge that could be imputed to "Johnson City" that is not in the chain arising from Defendant Turner—the person who recommended to the City Manager that the MOU not be renewed [*See* Doc. 82 at 49]. Accordingly, Plaintiff has not shown a protected right under the TPPA. And on her theory of the case, the procedural due process claim fails.

**iii. Defendant City Of Johnson City Is Entitled To Summary Judgment On Count Four.**

The Count Four TPPA claim against Defendant Johnson City is based on the same facts and theory as Plaintiff's purported property right in Count Two [*See* Doc. 56 at 52]. As such, the above analysis for Count Two applies equally to Count Four. And because Plaintiff does not have a right under the TPPA as a matter of law, she also does not have a claim against Defendant Johnson City under the TPPA. Accordingly, Defendant Johnson City is entitled to summary judgment on Count Four.

**iv. Defendant City Of Johnson City Is Entitled To Summary Judgment On Count Five.**

Under the NDAA:

> An employee of a contractor, subcontractor, grantee, subgrantee, or personal services contractor may not be discharged, demoted, or otherwise discriminated against as a reprisal for disclosing to a person or body described in paragraph (2) information that the employee reasonably believes is evidence of gross mismanagement of a Federal contract or grant, a gross waste of Federal funds, an abuse of authority relating to a Federal contract or grant, a substantial and specific danger to public health or safety, or a violation of law, rule, or regulation related to a Federal contract (including the competition for or negotiation of a contract) or grant.

41 U.S.C. § 4712(a)(1). To "prevail on h[er] NDAA retaliation claim," a plaintiff "must show (1) [s]he made a protected disclosure to a person specified in the statute, (2) [s]he suffered an adverse employment action, and (3) the protected disclosure was a contributing factor in the adverse employment action." *See Beltran v. Lockheed Martin Corp.*, No. 25-10808, 2026 WL 788905, *2 (5th Cir. Mar. 20, 2026) (cleaned up) (quoting *DuPage Reg'l Off. of Educ. v. United States Dep't of Educ.*, 58 F.4th 326, 350 (7th Cir. 2023)). The NDAA specifies the "person or body" to which a protected disclosure must be made to qualify under the Act. *Id.* § 4712(a)(2).

The operative Amended Complaint, which binds Plaintiff, identifies "Johnson City" as her employer and the relevant "federal government contractor and/or grantee under the meaning of 41 U.S.C. § 4712" [Doc. 56 at 53]. And she identified her "SAUSA position" and a "pole camera" that "Johnson City used . . . to surveil Sean Williams that was directly funded by a federal grant" as the relevant grants [*Id.*]. She "complained to people outside of her chain of command, including to the FBI and to DOJ colleagues" about purportedly qualifying information [*See id.*]. And Plaintiff's "complaints" were allegedly a "contributing factor in Chief Turner's decision" not to renew the MOU "on behalf of" Defendant Johnson City [*Id.*]. Plaintiff also "complained as a lawful whistleblower" to the DOJ OIG "in June 2022" [*Id.*].

The Amended Complaint only expressly identified Plaintiff's "FBI and DOJ colleagues" and the DOJ OIG as the "persons and bodies" to whom she allegedly made a protected disclosure [*See* Doc. 56 at 53-54]. But in her Opposition, Plaintiff indicated that she also complained to "supervisors within JCPD," which could arguably fall within the Amended Complaint's assertion that Plaintiff "complained to people outside of her chain of command" [*See* Docs. 82 at 51, 56 at 54]. So, the Court analyzes each of these disclosures.

Start with DOJ OIG. Plaintiff made her June 2022 OIG complaint well after the June 2021 nonrenewal of the MOU, which she identifies as her adverse employment action under the NDAA [*See* Docs. 56 at 53; 76 at 2-24 (OIG Complaint)]. This later-June 2022 disclosure could not have been "a contributing factor in" the earlier-June 2021 nonrenewal of the MOU. *See Beltran*, 2026 WL 788905 at *2. So that theory fails.

That leaves only Plaintiff's complaints to FBI Agent Peterson; AUSAs Taylor, Gomez, McCauley and Bowman; and unnamed JCPD "supervisors." But the record does not show that any of these individuals is a "person or body" to which a protected disclosure may be made under

the NDAA. Plaintiff does not identify a particular statutory definition that she believes applies [Doc. 82 at 51-53]. This Court identified only three that could arguably apply: (1) "[a] Federal employee responsible for contract or grant oversight at the relevant agency," (2) "[a]n authorized official of the Department of Justice or other law enforcement agency" under the NDAA, or (3) "[a] management official or other employee of the contractor" who "has the responsibility to investigate, discover, or address misconduct." *See* 41 U.S.C. § 4712 (a)(2)(D), (E), (G). Simply put, nothing in the record shows that any one of the actually-identified individuals qualifies. *See Beltran*, 2026 WL 788905, *2 (quoting *DuPage*, 58 F.4th at 350); 41 U.S.C. § 4712 (a)(2)(D), (E). And a "supervisor within JCPD" could conceptually qualify as "[a] management official or other employee of the contractor" "who has the responsibility to investigate, discover or address misconduct." *See* 41 U.S.C. § 4712 (a)(2)(G). But Plaintiff has not identified (1) any specific supervisor within the JCPD to whom she complained, (2) that individual's "responsibility to investigate, discover, or address misconduct," or (3) when the complaint was made. So, there is no "genuine issue" for trial on this claim. *See Cockrel*, 270 F.3d at 1048.[5]

**B. It Is Not Appropriate To Reopen Discovery As Plaintiff Requests.**

But what of Plaintiff's requests to reopen discovery? They are unjustified. Rule 56(d) provides an avenue for relief if a party requires additional discovery to oppose a motion for summary judgment. *See* Fed. R. Civ. P. 56(d). But the party seeking additional discovery must "indicate" to the Court the "need for discovery, what material facts [she] hopes to uncover, and why [she] has not previously discovered the information." *Doe v. City of Memphis*, 928 F.3d 481,

---

[5] This claim would also likely fail because the record fails to show that any Johnson City decisionmaker related to the MOU was aware of Plaintiff's alleged complaints, precluding a finding that any complaint was a "contributing factor." *See Beltran*, 2026 WL 788905, *2. But the Court need not reach that issue here.

490 (6th Cir. 2019) (quoting *Ball v. Union Carbide Corp.*, 385 F.3d 713, 720 (6th Cir. 2004)). The party must "***clearly explain***" how the additional discovery will "shed further light on the issue[s]" relevant to summary judgment, "demonstrat[ing] that for specified reasons, [she] cannot present facts essential to justify [her] opposition." *See Hayes v. Gordon Food Serv., Inc.*, 783 F. Supp. 3d 1016, 1034 (W.D. Ky. Jan. 27, 2025) (cleaned up) (quoting *Moore v. Shelby Cnty.*, 718 F. App'x 315, 319 (6th Cir. 2017)).

Here, the Motion, even as supplemented,[6] failed to meet that standard. ***First***, Plaintiff seeks now-"City Manager Cathy Ball's texts and other written communication with defendant Police Chief Turner and Ball's real estate agent Shannon Castillo," arguing that the discovery "is necessary to shed further light on Chief Turner's purported denial of knowledge of Williams's illegal activities and of Dahl's whistleblowing" [*See* Doc. 150 at 2]. But Plaintiff failed to connect this discovery to any issue that remains at summary judgment. Factually, Defendant Turner has not denied "knowledge of Williams's illegal activities" [*See id.*]. Plaintiff's remaining theory appears to be that this discovery would help her show that Defendant Turner has lied about something at some point, and therefore he lied under penalty of perjury when he swore that he was not aware of the complaints that underly the claims. But Plaintiff does not "clearly explain" what supports that theory and why she believes this discovery would yield the evidence of untruthfulness she seeks. And an explanation does not reveal itself upon the Court's review of the

[6] The Court **GRANTS** Plaintiff's Motion to Take Judicial Notice in support of Plaintiff's Motion to Re-Open Discovery [Doc. 154] to the extent that she asks the Court to take judicial notice of the fact that *Does v. City of Johnson City, et al.*, 2:23-cv-71 (E.D. Tenn.) has concluded via settlement [*See* 2:23-cv-71 (E.D. Tenn.), Doc. 565]. *See* Fed. R. Evid. 201. But Plaintiff did not supply the Court "with the necessary information" to take judicial notice of the purported amount of the settlement or the "new evidence" purportedly relayed in a New Yorker article [*See* Doc. 154]. *See* Fed. R. Civ. P. 201(c). And even if it were appropriate to take judicial notice of each of these facts, they would not change the outcome of the Court's analysis here.

record. Rule 56(d) is not a license to go on a fishing expedition if a party is dissatisfied with the record that exists at summary judgment. So, Plaintiff has not met her burden. *See Hayes*, 783 F. Supp. 3d at 1034.

***Second***, Plaintiff seeks "2022 financial records for Sean Williams business associate Jane Doe 14 as to each of Johnson City Police Officer Justin Jenkins and Officer Toma Sparks, and records as to Williams currency seized but not inventoried" [*See* Doc. 150 at 3]. This request is even further adrift from the issues that remain in this case. Generally speaking, Plaintiff believes that this evidence "shows motive by each Defendant to fire Dahl [Plaintiff], and drains [witness] credibility" [*Id.* at 3-4]. But, again, the Motion fails to connect this discovery to her main hurdle at summary judgment—the record evidence that Defendant Turner was not aware of the complaints that underly her claims. So, this argument fails too.

***Third***, Plaintiff seeks the "Mike Little affidavits showing what was on devices seized from Williams' penthouse condo and stored by Johnson City" [*See* Doc. 150 at 4]. ***Fourth***, Plaintiff seeks "[r]ecorded audio and/or video footage of Jane Does other than Jane Doe 2 and Jane Doe 15, particularly Jane Doe 3 and Jane Doe 9" [*Id.* at 4-5]. ***Fifth***, Plaintiff seeks "Police records involving Jane Doe 14" [*Id.* at 5]. ***Sixth***, Plaintiff seeks "Sean Williams's jailhouse diary," "log calls with reporters," and "all government exhibits accepted into evidence at his escape trial where the jury convicted Williams" [*Id.* at 6]. She asserts that each "goes to" Defendants' alleged "motive to fire" Plaintiff [*Id*. at 4-6]. The record reveals that each Defendant had a reason or "motive" not to renew the MOU. But, again, the Motion fails to show how this discovery would connect to an issue that remains live.

***Seventh***, Plaintiff seeks "[u]nredacted JCPD officer phone bills and call logs" [*See* Doc. 150 at 6]. And ***Eighth***, Plaintiff seeks "[d]epositions of defendant Chief Turner, Captain Kevin

Peters, Officer Justin Jenkins, Officer Toma Sparks, Jane Doe 14—each limited to new information obtained well after discovery closed in this case" [*Id.* at 6-7]. She believes that the discovery will demonstrate "motive" and "credibility for Defendants' proffered reason for firing" Plaintiff [*See* Doc. 150 at 6]. Again, the Motion does not argue that the discovery will show that Defendant Turner was aware of the relevant complaints. This request asks the Court to make too many inferential leaps, unmoored from any legal theory or factual evidence. So, this argument fails too. *See Hayes*, 783 F. Supp. 3d at 1034. Accordingly, the Court **DENIES** Plaintiff's Motion to Stay Summary Judgment, to Re-open Discovery, or, Alternatively, to Supplement the Summary Judgment Record, as supplemented [Docs. 128, 150].[7]

## III. Conclusion

For the reasons set forth above, the Court (1) declines to reopen discovery and (2) dismisses the remaining claims against Defendants Turner and Johnson City. No claims remain in this action. An appropriate judgment shall enter.

SO ORDERED.

KATHERINE A. CRYTZER
United States District Judge

[7] Because Defendants did not seek permission to file their Supplemental Response [Doc. 151] and the Supplemental Response does not impact the Court's analysis, the Court **GRANTS** Plaintiff's Motion to Exclude "Defendants' Supplemental Response to Plaintiff's Supplement to Motion to Stay or Reopen Discovery or Supplement The Record [Doc. 150]" [Doc. 152]. *See* E.D. Tenn. L.R. 7.1(d).